JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFF(S)

HARTFORD FIRE INSURANCE COMPANY and HARTFORD CASUALTY INSURANCE COMPANY

### DEFENDANT(S)

INTERDIGITAL COMMUNICATIONS CORPORATION and INTERDIGITAL TECHNOLOGY CORPORATION

(b) County of Residence of First Listed Plaintiff    **Hartford, CT**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    **N/A**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorneys (Firm Name, Address, and Telephone Number)

White and Williams LLP
One Liberty Place, Suite 1800, 1650 Market Street
Philadelphia, PA 19103, (215) 864-7000

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

X 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PLF | DEF |  | PLF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | X |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | X | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| X 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS – Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities – Employment | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities – Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

X 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (do not cite jurisdictional statutes unless diversity): 28 USC § 1332(a)  28 USC § 2201 et seq

Brief description of cause:    DECLARATORY JUDGMENT ACTION Regarding Insurance Coverage

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    X YES    ☐ NO

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE _____    DOCKET NUMBER _____

DATE _____    SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

DOCS_PH 1840047v.1

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA - DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff:   Hartford Fire Insurance Company, Hartford Plaza, Hartford, CT 06115
Hartford Casualty Insurance Company, 4040 Vincennes Circle, Suite 100, Indianapolis, IN 46268

Address of Defendant:   Interdigital Communications Corporation, 781 Third Avenue, King of Prussia, PA 19406
Interdigital Technology Corporation, 300 Delaware Avenue, Suite 527, Wilmington, DE 19801

Place of Accident, Incident or Transaction:   N/A
*(Use Reverse Side for Additional Space)*

---

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))   Yes ☒   No ☐

Does this case involve multidistrict litigation possibilities?   Yes ☐   No ☒

*RELATED CASE IF ANY*
Case Number:                     Judge:                              Date Terminated:

Civil cases are deemed related when yes is answered to any of the following questions:

1.  Is this case related to property included in earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☐   No ☒

2.  Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes ☐   No ☒

3.  Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?   Yes ☐   No ☒

---

**CIVIL:**   (Place ☒ in ONE CATEGORY ONLY)

A.   *Federal Question Cases:*
1.  ☐  Indemnity Contract, Marine Contract, and All Other Contracts
2.  ☐  FELA
3.  ☐  Jones Act – Personal Injury
4.  ☐  Antitrust
5.  ☐  Patent
6.  ☐  Labor-Management Relations
7.  ☐  Civil Rights
8.  ☐  Habeas Corpus
9.  ☐  Security Act(s) Cases
10.  ☐  Social Security Review Cases
11.  ☐  All other Federal Question Cases (please specify)

B.   *Diversity Jurisdiction Cases:*
1.  ☒  Insurance Contract and Other Contracts
2.  ☐  Airplane Personal Injury
3.  ☐  Assault, Defamation
4.  ☐  Marine Personal Injury
5.  ☐  Motor Vehicle Personal Injury
6.  ☐  Other Personal Injury (Please specify)
7.  ☐  Products Liability
8.  ☐  Products Liability - Asbestos
9.  ☐  All Other Diversity Cases (Please specify)

## ARBITRATION CERTIFICATION
*(Check appropriate category)*

I,                     counsel of record do hereby certify:

☐  Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☒  Relief other than monetary damages is sought.

DATE:   January 12, 2006          Gale White                     46485
                                  Attorney-at-Law                Attorney I.D. #

**NOTE:**  A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

---

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE:   January 12, 2006          Gale White                     46485
                                  Attorney-at-Law                Attorney I.D. #

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| HARTFORD FIRE INSURANCE | : | CIVIL ACTION |
| COMPANY and HARTFORD CASUALTY | : | |
| INSURANCE COMPANY | : | |
| v. | : | |
| INTERDIGITAL COMMUNICATIONS | : | |
| CORPORATION and INTERDIGITAL | : | NO. |
| TECHNOLOGY CORPORATION | | |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants.  (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a)    Habeas Corpus -- Cases brought under 28 U.S.C. §2241        ( )
through §2255.

(b)    Social Security -- Cases requesting review of a decision of        ( )
the Secretary of Health and Human Services denying
plaintiff Social Security Benefits.

(c)    Arbitration -- Cases required to be designated for        ( )
arbitration under Local Civil Rule 53.2.

(d)    Asbestos -- Cases involving claims for personal injury or        ( )
property damage from exposure to asbestos.

(e)    Special Management -- Cases that do not fall into tracks (a)        (X)
through (d) that are commonly referred to as complex and
that need special or intense management by the court.  (See
reverse side of this form for a detailed explanation of
special management cases.)

(f)    Standard Management -- Cases that do not fall into any one        ( )
of the other tracks.

| | | |
|---|---|---|
| January 12, 2006 | *Gale White* (signature) | Gale White |
| **Date** | **Attorney-at-law** | **Attorney for Plaintiffs** |
| 215-864-6234 | 215-789-7534 | whiteg@whiteandwilliams.com |
| **Telephone** | **Fax Number** | **E-mail Address** |

DOCS_PH 1840078v.1

## Civil Justice Expense and Delay Reduction Plan
### Section 1:03 - Assignment to a Management Track

(a)    The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)    In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management.  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

Case 1:06-cv-00422-JJF    Document 20    Filed 07/12/2006    Page 4 of 66

(c)    The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)    Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)    Nothing in this Plan is intended to supersede Local Civil Rules 3 or 7, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

### SPECIAL MANAGEMENT CASE ASSIGNMENTS
#### (See § 1.02(e) Management Track Definitions of the Civil Justice Expense and Delay Reduction Plan)

Special management cases will usually include that class of cases commonly referred to as "complex litigation" as that term has been used in the Manuals for Complex Litigation.  The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985.  This term is intended to include cases that present unusual problems and require extraordinary treatment.  See §0.1 of the first manual.  Cases may require special or intense management by the court due to one or more of the following factors: (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition.  It may include two or more related cases.  Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues.  See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **HARTFORD FIRE INSURANCE COMPANY** <br> Hartford Plaza <br> Hartford, CT 06115 <br><br> and <br><br> **HARTFORD CASUALTY INSURANCE COMPANY** <br> 4040 Vincennes Circle, Suite 100 <br> Indianapolis, IN 46268 <br><br>        Plaintiffs, <br><br>      vs. <br><br> **INTERDIGITAL COMMUNICATIONS CORPORATION** <br> 781 Third Avenue <br> King of Prussia, PA 19406 <br><br> and <br><br> **INTERDIGITAL TECHNOLOGY CORPORATION** <br> 300 Delaware Avenue <br> Suite 527 <br> Wilmington, DE 19801 <br><br>      Defendants. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |

JURY TRIAL DEMANDED

Case 2:06-cv-00165-JG     Document 1-1     Filed 01/12/2006     Page 5 of 66

**COMPLAINT**

CIVIL ACTION NO.

### COMPLAINT FOR DECLARATORY JUDGMENT

By way of this Complaint, Hartford Fire Insurance Company and Hartford Casualty

Insurance Company (referred to herein collectively as "Hartford") allege as follows:

1.    In this action, Hartford seeks a declaration that it has no duty to defend

InterDigital Communications Corporation ("ICC") and/or InterDigital Technology Corporation

("ITC") (collectively referred to herein as "InterDigital") in connection with the underlying

action styled *Nokia Corporation and Nokia, Inc. v. InterDigital Communications Corporation and InterDigital Technology Corporation* (referred to herein as either the "*Nokia* action" or "*Nokia* complaint").

2.    In this action, Hartford also seeks a judicial declaration that it owes no indemnity to ICC and/or ITC in connection with the *Nokia* action.

Case 2:06-cv-00166-JG    Document 1-1    Filed 01/12/2006    Page 6 of 66

3.    Alternatively, Hartford seeks a declaration of the parties' respective rights, duties and obligations, if any, under certain policies of insurance issued by Hartford to InterDigital Communications Corporation.

## THE PARTIES

4.    Plaintiff Hartford Fire Insurance Company ("Hartford Fire") is a citizen of the State of Connecticut, being a corporation that is organized under the laws of the State of Connecticut and which maintains its principal place of business in Hartford, Connecticut.

5.    Plaintiff Hartford Casualty Insurance Company ("Hartford Casualty") is a citizen of the State of Indiana, being a corporation that is organized under the laws of the State of Indiana and which maintains its principal place of business in Indianapolis, Indiana.

6.    On information and belief, Defendant ICC is a citizen of the Commonwealth of Pennsylvania, being a corporation that is organized under the laws of the Commonwealth of Pennsylvania and which maintains its principal place of business in King of Prussia, Pennsylvania.  On information and belief, at all times relevant to this action, ICC was authorized to conduct business in the Commonwealth of Pennsylvania, including within the Eastern District.

-2-

7.    On information and belief, Defendant ITC is a citizen of the state of Delaware, being a corporation that is organized under the laws of Delaware and which maintains its principal place of business in Wilmington, Delaware. On information and belief, at all times relevant to this action, ITC was authorized to conduct business in the Commonwealth of Pennsylvania, including within the Eastern District.

## JURISDICTION AND VENUE

8.    This Court has original jurisdiction over this declaratory judgment action based upon 28 U.S.C. § 1332(a) and 28 U.S.C. § 2201 *et seq*. The amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000.00.

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

10.    Pursuant to 28 U.S.C. § 1391(a), venue is proper in the Eastern District of Pennsylvania if either "a substantial part of the events or omissions giving rise to the claim occurred" and/or "any defendant is subject to personal jurisdiction at the time the action is commenced" in the Eastern District of Pennsylvania.

11.    A substantial part of the events or omissions giving rise to this action took place in the Eastern District of Pennsylvania.

12.    On information and belief, the Hartford Policies were delivered to ICC in the Commonwealth of Pennsylvania at its location in King of Prussia, Pennsylvania.

-3-

13.     Upon information and belief, ICC, a resident of the Commonwealth of

Pennsylvania, is located in and regularly conducts business from King of Prussia, Pennsylvania

and, therefore, is subject to personal jurisdiction within the Eastern District of Pennsylvania.

### THE UNDERLYING *NOKIA* COMPLAINT

14.     On or about January 12, 2005, Nokia Corp. and Nokia, Inc. (collectively "Nokia")

Case 2:06-cv-00183-JCJ    Document 1    Filed 01/12/2006    Page 8 of 66

filed the *Nokia* complaint against ICC and ITC in the United States District Court for the District

of Delaware.

15.     The *Nokia* complaint sets forth 21 causes of action - 20 of which seek declarations

of non-infringement and/or invalidity as to various patents purportedly held by InterDigital

relating to mobile phone technology and one of which sets forth a claim for alleged violations of

the Lanham Act.  *See Nokia* complaint, attached hereto as Exhibit A.

16.     The *Nokia* complaint sets forth Nokia's claims that:

(a)     InterDigital is the owner of many patents.  InterDigital has been claiming
        since the early 1990's that these patents cover much of the technology
        necessary to operate mobile phone systems. *See Nokia* complaint, ¶ 8.

(b)     InterDigital has been involved in litigation with two other companies,
        Motorola, Inc. and Ericcson, involving whether these companies' products
        infringe InterDigital's patents, but courts have rejected most of
        InterDigital's patent infringement claims. *See Nokia* complaint, ¶¶ 9, 10.

(c)     InterDigital has "more recently" been claiming that its patents cover the
        technology being used in new mobile phone systems, the so-called "3G"
        technology.  *See Nokia* complaint, ¶ 11.

(d)     Nokia and InterDigital are parties to three licensing agreements which
        license to Nokia the right to manufacture and sell products that fall within
        the older (2G) and the new (3G) technology and patents owned by
        InterDigital. *See Nokia* complaint, ¶ 12.

(e)     The parties are engaged in an arbitration relating to royalties owed by
        Nokia under the licensing agreements.  *See Nokia* complaint, ¶ 14.  On

-4-

information and belief, the arbitration has been resolved in favor of InterDigital. *See* InterDigital Wins Ruling in Nokia Royalty Dispute, WALL STREET JOURNAL, December 29, 2005, attached as Exhibit B.

    (f)    The licensing agreements are in place only to the end of 2006 and Nokia contends that it believes (based in part on InterDigital's purported litigiousness) that InterDigital will sue Nokia for patent infringement at that time. *Nokia* complaint, ¶¶ 15, 16.

17.    Nokia's claim of violation of the Lanham Act (Count XXI of the *Nokia* complaint) alleges that InterDigital has made false or misleading representations about InterDigital patents and Nokia's products and the application of InterDigital's patents to Nokia's products. Nokia asserts that these statements have damaged Nokia's business and reputation in the wireless market. *See Nokia* complaint, ¶ 142.

18.    The *Nokia* complaint alleges that InterDigital made these false statements in "bad faith" and with "knowledge of their falsity." *See Nokia* complaint, ¶ 146.

19.    Upon information and belief, the *Nokia* complaint remains pending against InterDigital; however, by Memorandum Opinion dated December 21, 2005, the United States District Court for the District of Delaware dismissed Nokia's declaratory judgment claims relating to non-infringement and patent invalidity for lack of jurisdiction. *Nokia Corp. v. InterDigital Communications,* Slip Copy, 2005 WL 3525696 (D. Del. Dec. 21, 2005).

## THE HARTFORD POLICIES

The General Liability Policies

20.    Hartford Fire issued the following two commercial general liability policies to ICC as the named insured:

    (a)    Policy No. 39 UUN TS 0845 DB for the December 22, 2003 to December 22, 2004 policy period; and,

-5-

      (b)    Policy No. 39 UUN TS 0845 K1 for the December 22, 2004 to December 22, 2005 policy period.

21.    The Hartford Fire general liability policies provide coverage subject to, among other things, a $1 million per occurrence limit, a $1 million personal and advertising injury limit, and a $2 million general aggregate limit.

22.    Hartford Fire's general liability policies provide that Hartford will pay certain sums that the insured becomes legally obligated to pay as damages because of "bodily injury," "property damage," and/or "personal and advertising injury" to which the insurance applies.

23.    The "bodily injury" or "property damage" must be caused by an "occurrence" that takes place in a "coverage territory" during the policy period.

24.    The Hartford Fire general liability policies define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

25.    The Hartford Fire general liability policies define "bodily injury" as "bodily injury, sickness or disease sustained by a person, including mental anguish or death resulting from any of these at any time."

26.    The Hartford Fire general liability policies define "property damage" as "physical injury to tangible property, including all resulting loss of use of that property . . . ." and as "[l]oss of use of tangible property that is not physically injured. . . ."

27.    On information and belief, InterDigital does not contend that the *Nokia* complaint implicates "bodily injury" or "property damage" coverage.  If InterDigital contends that covered "bodily injury" and/or "property damage" are alleged in the *Nokia* complaint, Hartford will, at

-6-

that time, amend this complaint to include the applicable exclusions with regard to "bodily injury" and/or "property damage."

28.    The Hartford Fire general liability policies also provide a duty to defend and/or indemnify "those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies" provided that the offense arises out of the insured's business and was committed in the "coverage territory" during the policy period.

Case 1:06-cv-00165-JJF     Document 1     Filed 03/14/2006     Page 11 of 66

29.    The Hartford Fire general liability policies define "personal and advertising injury" as "injury, including consequential 'bodily injury,' arising out of one or more of the following offenses:

a.    False arrest, detention or imprisonment;

b.    Malicious prosecution;

c.    The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d.    Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e.    Oral, written or electronic publication of material that violates a person's right of privacy;

f.    Copying, in your "advertisement" or on "your web site", a person's or organization's "advertising idea" or style of "advertisement";

g.    Infringement of copyright, slogan, or title of any literary or artistic work, in your "advertisement" or on "your web site"; or

      h.     Discrimination or humiliation that results in injury to the feelings or reputation of a natural person."

(Parts g. and i. of the definition of "personal and advertising injury" are added/amended to the policy by the Cyberflex endorsement, amending Coverage B).

     30.    Hartford is not obligated, however, to defend or indemnify a "suit" that does not seek covered damages.

     31.    The Hartford Fire general liability policies bar coverage for "personal and advertising injury" to the extent precluded by the various policy exclusions, including but not limited to those set forth below:

      a.     Knowing Violation of Rights of Another

          "Personal and advertising injury" caused by an offense committed by, at the direction or with the consent or acquiescence of the insured with the expectation of inflicting "personal and advertising injury."

      b.     Material Published with Knowledge of Falsity

          "Personal and advertising injury" arising out of oral, written or electronic publication of material, if done by or at the direction of the insured with knowledge of its falsity.

      c.     Material Published Prior to Policy Period

          "Personal and advertising injury" arising out of oral, written or electronic publication of material whose first publication took place before the beginning of the policy period.

               * * *

      g.     Quality or Performance of Goods - - Failure to Conform to Statements

          "Personal and advertising injury" arising out of the failure of goods, products, or services to conform with any statement of quality or performance made in your "advertisement" or on "your web site";

               * * *

DOCS_PH 1829139v.1

i.    Infringement of Intellectual Property Rights

"Personal and advertising injury" arising out [of] any
violation of any intellectual property rights such as
copyright, patent, trademark, trade name, trade secret,
service mark or other designation of origin or authenticity.

* * *

(Exclusions g. and i. are added/amended to the policy by the Cyberflex endorsement, amending Case 2:06-cv-00165-JS     Document 1-1     Filed 01/12/2006     Page 13 of 66
Coverage B).

The Umbrella Policies

32.    Hartford Casualty issued the following two umbrella policies to ICC as the named

insured:

(a)    Policy No. 39 RHU TS 0953 for the December 22, 2003 to December 22,
2004 policy period; and,

(b)    Policy No. 39 RHU TS 0953 for the December 22, 2004 to December 22,
2005 policy period.

33.    The Hartford Casualty umbrella policies each provide coverage subject to a

$10,000 self-insured retention, a $15 million per occurrence limit, and a $15 million general

aggregate limit.

34.    The Hartford Casualty umbrella policies provide that Hartford Casualty "will pay

those sums that the 'insured' becomes legally obligated to pay as 'damages' in excess of the

'underlying insurance,' . . . because of 'bodily injury,' 'property damage,' or 'personal and

advertising injury' to which this insurance applies because of an 'occurrence.'"

35.    The Hartford Casualty umbrella policies define "occurrence" as:

1.    With respect to any "bodily injury" or "property damage":
an accident, including continuous or repeated exposure to
substantially the same general harmful conditions, and

-9-

     2.     With respect to "personal and advertising injury": an offense described in one of the numbered subdivisions of that definition in the "underlying insurance".

36.     The terms "bodily injury," "property damage" and "personal and advertising injury," since not otherwise defined within the Hartford Casualty umbrella policies, "shall follow the definitions of the applicable 'underlying insurance' policy" – that is, the Hartford Fire

general liability policy definitions as set forth above.

37.     The Hartford Casualty umbrella policies will not provide either a defense or indemnity for "personal and advertising injury" in accordance with the following exclusion:

     4.     Personal and Advertising Injury

     This policy does not apply to "personal and advertising injury."

     EXCEPTION

     This exclusion does not apply if "underlying insurance" is applicable to "personal and advertising injury" and to claims arising out of that "personal and advertising injury."

38.     The Hartford Casualty umbrella policies provide a duty to defend "bodily injury," "property damage," and/or "personal and advertising injury" to which the insurance applies and for which either there is no "underlying insurance" or the "underlying insurance" has been exhausted by payments of "damages" for "occurrences" within the "policy period."

39.     The Hartford Fire general liability policies and the Hartford Casualty umbrella policies are collectively referred to herein as the "Hartford Policies."

## COVERAGE DISPUTE

40.    InterDigital has tendered the *Nokia* complaint to Hartford seeking a defense and indemnity for said action.

41.    In response to the tender of the *Nokia* complaint, by letter dated April 5, 2005, Hartford denied any obligation to defend and/or indemnify InterDigital and advised, *inter alia,* that the *Nokia* complaint did not seek damages for any "bodily injury," "property damage," or "personal and advertising injury" as defined in the Hartford Policies.

42.    In the April 5, 2005 letter, Hartford requested further information concerning ITC given that ITC was not expressly listed as a Named Insured or Additional Insured to the Hartford Policies.

43.    Thereafter, InterDigital challenged Hartford's declination of coverage and argued that the Lanham Act allegations within the *Nokia* complaint constitute a "personal and advertising injury."

44.    By letter dated June 6, 2005, Hartford reaffirmed its declination of coverage.

45.    By letter dated October 12, 2005, InterDigital again challenged Hartford's declination of coverage.

46.    Under the express terms, conditions, definitions, endorsements and exclusions of the Hartford Policies, there is no duty to defend any of the allegations contained within the *Nokia* complaint.

47.    Under the express terms, conditions, definitions, endorsements and exclusions of the Hartford Policies, Hartford has no obligation to indemnify InterDigital for any of the claims contained within the *Nokia* complaint.

48.    Pursuant to 28 U.S.C. § 2201 *et seq.*, Hartford is entitled to a judicial determination concerning the scope and Case 1:06-cv-00422-JJF    Document 1    Filed 07/10/2006    Page 16 of 66 of its rights and obligations, if any, under the Hartford Policies with respect to the *Nokia* complaint.

49.    For the reasons set forth herein, an actual, justiciable controversy exists between the parties concerning their respective rights and obligations, if any, under the Hartford Policies with respect to the *Nokia* complaint.

## COUNT ONE

*For A Declaratory Judgment That Hartford Has No Duty to Defend InterDigital in the Nokia Action*

50.    Hartford restates the allegations set forth in paragraphs 1 through 49 of this complaint and incorporates them by reference herein.

51.    Under the terms, conditions, definitions, exclusions and endorsements of the Hartford Policies, Hartford has no duty to defend InterDigital in connection with the *Nokia* complaint.

52.    The *Nokia* complaint does not allege any "bodily injury" caused by an "occurrence" as defined by the Hartford Policies.

53.    The *Nokia* complaint does not allege any "property damage" caused by an "occurrence" as defined by the Hartford Policies.

54.    The *Nokia* complaint does not allege any "personal and advertising injury" as defined by the Hartford Policies.

55.    The Hartford Fire general liability policies exclude "'personal and advertising injury' arising out of oral, written or electronic publication of material, if done by or at the direction of the insured with knowledge of its falsity." This exclusion applies to the *Nokia* complaint because, *inter alia*:

Case 1:06-cv-00422-JJF    Document 1    Filed 01/12/2006    Page 17 of 66

(a)    The *Nokia* complaint alleges that InterDigital has made false statements regarding the scope and applicability of its patents in "bad faith" and with "knowledge of their falsity." *See Nokia* complaint, ¶ 146.

(b)    The United States District Court for the District of Delaware held in its December 21, 2005 Memorandum Opinion that in order to state a claim under section 43(a) of the Lanham Act, Nokia must demonstrate that InterDigital (the patent holder) acted in bad faith. *See Nokia Corp. v. InterDigital Communications,* Slip Copy, 2005 WL 3525696, *5 (D. Del. Dec. 21, 2005).

56.    The Hartford Fire general liability policies exclude "'personal and advertising injury' caused by an offense committed by, at the direction or with the consent or acquiescence of the insured with the expectation of inflicting 'personal and advertising injury'." This exclusion applies to the *Nokia* complaint because, *inter alia:*

(a)    The *Nokia* complaint alleges that InterDigital has used false or misleading descriptions and has made false public statements regarding the scope of its patent portfolio and the applicability of its patents. *See Nokia* complaint, ¶¶ 142-143.

(b)    The *Nokia* complaint asserts that these statements were made in "bad faith" and with "knowledge of their falsity." *See Nokia* complaint, ¶ 146.

57.    The Hartford Fire general liability policies exclude "'personal and advertising injury' arising out of the oral, written or electronic publication of material whose first publication

DOCS_PH 1829139v.1

took place before the beginning of the policy period." This exclusion applies to the *Nokia*

complaint because, *inter alia*:

    (a)    The earliest Hartford general liability policy issued to ICC bears an inception date of December 22, 2003;

    (b)    There is no duty to defend available under the Hartford Fire general liability policies for any "personal and advertising injury" arising out of material "first published" prior to December 22, 2003.

    (c)    The *Nokia* complaint alleges that InterDigital began making allegations in the "early 1990's" concerning its patents for 2G technology (*see Nokia* complaint, ¶ 8); and,

    (d)    The *Nokia* complaint alleges that "more recently" InterDigital's allegations include that it also has patents which cover 3G technology. *See Nokia* complaint, ¶ 11.

58.    The Hartford Fire general liability policies exclude "'personal and advertising injury' arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your 'advertisement' or on 'your web site'." This exclusion applies to the *Nokia* complaint because, *inter alia*:

    (a)    The Nokia complaint alleges that InterDigital claims in public statements that InterDigital's patent portfolio covers the practice of 3G wireless phone systems. *See Nokia* complaint, ¶ 143.

    (b)    Nokia alleges that these statements are false and that the InterDigital patents are not necessary to practice 3G wireless phone standards. *See Nokia* complaint, ¶ 143

59.    The Hartford Fire general liability policies exclude "'personal and advertising injury' arising out of any violation of any intellectual property rights such as copyright, patent, trademark, trade name, trade secret, service mark or other designation of origin or authenticity." This exclusion applies to the *Nokia* complaint because, *inter alia*:

    (a)    The claims in the *Nokia* complaint arise out of a dispute concerning intellectual property rights.

-14-

(b)    The Lanham Act violations alleged in Count XXI arise out of statements allegedly made by InterDigital regarding the scope of its patent portfolio and Nokia's possible violation of such patents. *See Nokia* complaint, ¶¶ 143, 145.

60.    The Hartford Policies cover only those "personal and advertising injury" offenses that were committed during the policy period.  Certain, if not all, of the statements made by InterDigital took place outside the Hartford policy period:

Case 1:06-cv-00422-JJF    Document 1-1    Filed 01/12/2006    Page 19 of 66

(a)    Nokia alleges that InterDigital began making statements concerning the scope of InterDigital's patents in the "early 1990's." *See Nokia* complaint, ¶ 8.

(b)    Nokia further alleges that "more recently" InterDigital has made statements concerning the scope of InterDigital's 3G technology patents. *See Nokia* complaint, ¶ 11.

61.    Because the *Nokia* complaint does not allege any "personal and advertising injury" within the Hartford Fire general liability policies, there is no duty to defend implicated pursuant to the Hartford Casualty umbrella policies which specifically exclude "personal and advertising injury" unless "'underlying insurance' is applicable."

62.    Since there is no duty to defend under the Hartford Fire general liability policies for the reasons set forth herein, there is also no duty to defend under the umbrella policies issued by Hartford Casualty.

63.    To the extent that some or all of InterDigital's expense, loss or obligation was voluntarily incurred, without the consent of Hartford, such expense, loss or other obligations are excluded from the Hartford Policies.

64.    To the extent that InterDigital failed to mitigate and/or avoid any legal fees and costs incurred in connection with the underlying claims, such legal fees, costs or other obligations are excluded from the Hartford Policies.

65.    Any obligations otherwise determined to be afforded under the Hartford Policies (which Hartford denies) are limited, and perhaps rendered excess, by the existence of any other insurance and the terms and conditions of any "other insurance" provisions in the Hartford Policies.

Case 1:06-cv-00422-JJF    Document 1    Filed 07/10/2006    Page 20 of 66

**WHEREFORE,** Plaintiffs Hartford Fire and Hartford Casualty respectfully request that the Court:

(a)    Declare that Hartford has no duty to defend InterDigital in connection with the *Nokia* complaint;

(b)    Alternatively, should the Court determine that there is a duty to defend, the Court should also:

(1)    declare the respective rights and obligations of the parties under the Hartford Policies, and declare the limits of any obligation of Hartford to defend InterDigital with respect to the *Nokia* complaint;

(2)    determine the respective rights and obligations (if any) of Hartford in seeking and obtaining reimbursement from InterDigital of any fees, costs or settlements not related to the defense or settlement of a potentially covered claim;

(c)    Grant Hartford such other and further relief as may be necessary and appropriate under the circumstances.

## COUNT TWO

*For A Declaratory Judgment that Hartford Owes No Indemnity to InterDigital*
*in the Nokia Action*

66.    Hartford restates the allegations set forth in paragraphs 1 through 65 of this complaint and incorporates them by reference herein.

67.     Under the terms, conditions, definitions, exclusions and endorsements of the Hartford Policies, there is no indemnity available to InterDigital in connection with the *Nokia* complaint.

68.     Since Hartford has no duty to defend the *Nokia* complaint for all of the reasons set forth above, Hartford has no duty to indemnify InterDigital for the claims set forth in the *Nokia* complaint.

69.     Even if Hartford were to have an obligation to defend the *Nokia* complaint (which Hartford denies), Hartford may not ultimately owe any indemnity to InterDigital because the duty to indemnify is not based on the allegations of the complaint.

70.     The duty to indemnify is based on the true facts which have not yet been determined.

**WHEREFORE,** Plaintiffs Hartford Fire and Hartford Casualty respectfully request that the Court:

(a)     Declare that Hartford has no obligation to indemnify InterDigital in connection with the *Nokia* complaint;

(b)     Alternatively, should the Court determine that there an obligation to indemnify InterDigital, the Court should also:

(1)     declare the respective rights and obligations of the parties under the Hartford Policies, and declare the limits of any obligation of Hartford to indemnify InterDigital with respect to the *Nokia* complaint;

    (2)    determine the respective rights and obligations (if any) of Hartford in seeking and obtaining reimbursement from InterDigital of any fees, costs or settlements not related to the defense or settlement of a potentially covered claim;

   (c)    Grant Hartford such other and further relief as may be necessary and appropriate under the circumstances.

## <u>COUNT THREE</u>

*For A Declaratory Judgment Concerning Whether ITC Is An Insured Under The Hartford Policies And Entitled to Either A Defense or Indemnity Thereunder*

71.    Hartford restates the allegations set forth in Paragraphs 1 through 70 of this complaint and incorporates them by reference herein.

72.    By letter dated March 28, 2005, Hartford acknowledged receipt of the *Nokia* complaint, advised that "InterDigital Technology Corporation" is not listed on the policy, and asked for information about the relationship of this entity to InterDigital Communications Corporations, Inc.

73.    InterDigital responded by letter dated April 21, 2005 and advised that "InterDigital Technology Corporation is (i) a direct, wholly owned, subsidiary of InterDigital Communications Corporation and (ii) not an insured under another policy." *See* InterDigital Letter dated April 21, 2005, attached hereto as Exhibit C.

74.    InterDigital requested that Hartford confirm that ITC is an "insured under Section II of the Commercial General Liability coverage Form . . . and the umbrella policy referenced above."

-18-

75.    ITC is not expressly named as either a Named Insured or an Additional Insured under the Hartford Policies.

76.    ITC is not a Named Insured to the Hartford Policies unless it qualifies as such pursuant to a Named Insured endorsement attached to one of the Hartford Policies.

77.    Furthermore, unless ITC qualifies as an insured pursuant to the "Who Is An Insured" provisions to any of the Hartford Policies, ITC is not an insured under such policies.

78.    No duty to defend or indemnify is extended to ITC under the Hartford Policies to the extent that ITC does not constitute a named insured or an additional insured under the policies.

**WHEREFORE,** Plaintiffs Hartford Fire and Hartford Casualty respectfully request that the Court:

(a)    Declare that Hartford has no duty to defend or indemnify ITC in connection with the *Nokia* complaint;

(b)    Alternative, should the Court determine that there is a duty to defend and/or indemnify ITC, the Court should also:

    (1)    declare the respective rights and obligations of the parties under the Hartford Policies, and declare the limits of any obligation of Hartford to defend and/or indemnify ITC with respect to the *Nokia* complaint;

    (2)    determine the respective rights and obligations (if any) of Hartford in seeking and obtaining reimbursement from ITC of any fees, costs or settlements not related to the defense or settlement of a potentially covered claim;

(c)     Grant Hartford such other and further relief as may be necessary and appropriate under the circumstances.

**WHITE AND WILLIAMS**

Attorneys for Plaintiffs, Hartford Fire
Insurance Company and Hartford Casualty
Insurance Company

By: _____
Gale White, Esquire
Anthony L. Miscioscia, Esquire
Pa. I.D. Nos: 46485/69215
1800 One Liberty Place
Philadelphia, PA  19103-7395
Tel. No. (215) 864-6234/6356

-20-

**A**



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NOKIA CORPORATION and NOKIA, INC.

    Plaintiffs,

       v.

INTERDIGITAL COMMUNICATIONS CORPORATION and INTERDIGITAL TECHNOLOGY CORPORATION

    Defendants.

**COPY**

Civil Action No.    0 5 - 1 6

**DEMAND FOR JURY TRIAL**

## COMPLAINT FOR DECLARATORY JUDGMENTS OF PATENT INVALIDITY AND NONINFRINGEMENT AND VIOLATIONS OF THE LANHAM ACT RELATING TO 3G MOBILE PHONE TECHNOLOGY

Plaintiffs Nokia Corporation and Nokia, Inc. (collectively referred to as "Nokia") file this Complaint for Declaratory Judgments Of Patent Invalidity And Noninfringement And Violations Of The Lanham Act Relating To 3G Mobile Phone Technology against Defendants InterDigital Communications Corporation and InterDigital Technology Corporation (collectively "InterDigital") and in support of their Complaint allege:

### Nature And Basis Of Action

1.    This is an action arising under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the United States Patent Laws, 35 U.S.C. § 1 *et seq.* and the Lanham Act, 15 U.S.C. §1051 *et seq.*. Nokia requests declarations that: (i) the claims of various patents owned by InterDigital are invalid; and (ii) Nokia does not infringe any claim of the patents. Nokia seeks damages and injunctive relief for InterDigital's violations of the Lanham Act.

## The Parties

2.      Nokia Corporation is a global leader in the design, manufacture and supply of mobile handset and infrastructure products. Nokia Corporation is incorporated under the laws of Finland and has its principal place of business at Keilalahdentie 4, Espoo, Finland. Nokia, Inc. is incorporated under the laws of the state of Delaware and has a principal place of business at 6000 Connection Dr., Irving, Texas.

3.      InterDigital Communications Corporation is incorporated under the laws of the State of Pennsylvania and has its principal place of business at 781 Third Avenue, King of Prussia, Pennsylvania. InterDigital Technology Corporation is incorporated under the laws of the State of Delaware and has its principal place of business at 300 Delaware Avenue, Suite 527, Wilmington, Delaware. Upon information and belief, InterDigital Technology Corporation is a wholly-owned subsidiary of InterDigital Communications Corporation.

## Jurisdiction And Venue

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 based on federal question jurisdiction.

5.      This Court has personal jurisdiction over InterDigital Communications Corporation and InterDigital Technology Corporation pursuant to the laws of the State of Delaware, including the Delaware long-arm statute, 10 Del. Code § 3104.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

### Facts Giving Rise To This Action

7.    InterDigital has continued to represent for more than a decade both publicly and to the wireless handset industry that it has hundreds of patents that cover the principal wireless handset standards in the United States.

*InterDigital's 2G Allegations*

8.    InterDigital began making allegations in the early 1990's that it had hundreds of patents that cover the principle "2G" mobile phone systems that implement the IS-54/136 and GSM mobile phone standards.  The IS-54/136 and GSM standards are implemented through so-called 2G mobile phone systems using Time Division Multiple Access ("TDMA") technology.  The IS-54/136 standard, or US-TDMA, is a standard developed in the United States and includes an early version of the standard, IS-54, and a later revision, IS-136.  The GSM standard is a similar standard originally developed in Europe.  Both IS-54/136 and GSM standards use TDMA as a means by which multiple mobile callers can use the same radio frequency concurrently.

9.    InterDigital has in the past asserted certain of its 2G patents in court against Motorola, Inc. and Ericsson.  The courts in the *Motorola* and *Ericsson* cases determined that most, if not all, of the asserted patents in those cases were either invalid or not infringed by mobile handset and infrastructure products used in the United States.

10.    Most of the 2G patents asserted against Motorola and Ericsson by InterDigital were found to be invalid or not infringed for at least the following reasons:

- Many of the broad claims of the patents are limited to an obsolete speech compression method different from the method used in 2G systems in the United States;

- Many of the claims of the InterDigital 2G Patents are limited to a system with a single base station controlling a single cell.  This single base station

limitation was used by InterDigital in the United States Patent Office in an effort to distinguish InterDigital's patents from prior art. No industry standard applicable to mobile handsets or their associated infrastructure contemplates such a system; instead, all current mobile systems in use in the United States use multiple base stations to control multiple cells.

- In an effort to distinguish prior art, many of the claims of the 2G patents were limited – during prosecution of the respective applications in the United States Patent Office and in subsequent litigation – to systems in which the call path is hard-wired, rather than controlled by software. Likewise, no industry standard applicable to mobile handsets or their associated infrastructure requires hard-wired call paths; instead, mobile systems in use in the United States during any relevant period are controlled dynamically by software.

Case 2:05-cv-00016-??? Document ??? Filed 03/12/2006    Page 29 of 66

Comparison of the claim limitations of InterDigital 2G patents and their prosecution histories to either the 2G industry standards or any systems in use in the United States shows that none of the hundreds of claims can be infringed by any of those 2G systems, including those utilized by companies such as Motorola, Ericsson and Nokia.

### InterDigital's 3G Allegations

11.    More recently, InterDigital has made allegations that it has patents that cover "3G" mobile systems that are currently being rolled out and further developed in the United States, referred to as the WCDMA and CDMA 2000 products. The WCDMA and CDMA 2000 standards are implemented through 3G mobile systems using Code Division Multiple Access ("CDMA") technology. The patents that InterDigital contends cover 3G mobile systems (hereafter collectively defined as "InterDigital's 3G Patents"), copies of which are attached as Exhibits A-R, include:

U.S. Patent No. 5,574,747, issued November 12, 1996 (the "'747 patent");

U.S. Patent No. 6,181,949, issued January 30, 2001 (the "'949 patent");

U.S. Patent No. 5,841,768, issued November 24, 1998 (the "'768 patent);

U.S. Patent No. 6,215,778, issued April 10, 2001 (the "'778 patent");

U.S. Patent No. 5,179,572, issued January 12, 1993 (the "'572 patent);

U.S. Patent No. 6,075,792, issued June 13, 2000 (the "'792 patent");

U.S. Patent No. 5,799,010, issued August 25, 1998 (the "'010 patent");

U.S. Patent No. 5,614,914, issued March 25, 1997 (the "'914 patent");

U.S. Patent No. 5,663,990, issued September 2, 1997 (the "'990 patent");

U.S. Patent No. 5,859,879, issued January 12, 1999 (the "'879 patent");

U.S. Patent No. 5,363,403, issued November 8, 1994 (the "'403 patent");

U.S. Patent No. 5,553,062, issued September 3, 1996 (the "'062 patent");

U.S. Patent No. 5,719,852, issued February 17, 1998 (the "'852 patent");

U.S. Patent No. 6,014,373, issued January 11, 2000 (the "'373 patent");

U.S. Patent No. 6,259,688, issued July 10, 2001 (the "'688 patent");

U.S. Patent No. 6,289,004, issued September 11, 2001 (the "'004 patent");

U.S. Patent No. 5,081,643, issued January 14, 1992 (the "'643 patent");

and

U.S. Patent No. 5,673,286, issued September 30, 1997 (the "'286 patent").

Although InterDigital contends that 3G mobile products made in the United States infringe its 3G Patents, all of InterDigital's 3G Patents are either invalid or not infringed by mobile handset and infrastructure products being rolled out on the United States. In particular, no Nokia product either sold in the United States or in development for sale in the United States infringes any valid claim of InterDigital's 3G Patents.

*The License Agreement Between Nokia and InterDigital*

12.    Nokia and InterDigital are parties to three expressly interrelated agreements ("the Agreements"), the primary subject matter of which is a license to Nokia of the patents owned by InterDigital that InterDigital alleges are required to make and sell products that are compliant with the 2G and 3G telephone standards.

13.    There is a dispute between Nokia and InterDigital as to the validity and scope of the patents that form the basis of the Agreements between them.

14.    With respect to 2G products, despite the invalidity and/or narrowness of InterDigital's 2G patents as determined by the courts in the *Motorola* and *Ericsson* cases, InterDigital has publicly announced its intention to seek hundreds of millions of dollars in royalties from Nokia under the Agreements. Nokia has refused to pay the fees InterDigital is demanding. The parties are currently engaged in an International Chamber of Commerce Arbitration with respect to 2G products, entitled *Nokia Corporation v. InterDigital Communications Corporation and InterDigital Technology Corporation,* ICC Case Number 12 829/JNK.

15.    With respect to 3G products, InterDigital continues to contend that its patents broadly cover 3G technology. Under the Agreements, Nokia is licensed to InterDigital's 3G patents only through the end of 2006. Nokia is currently designing, rolling out and further developing 3G products in the United States that will be manufactured and sold by Nokia after 2006.

16.    Nokia has a reasonable apprehension that InterDigital will sue Nokia for patent infringement with respect to InterDigital's 3G patents.

17.    InterDigital has a history of litigiousness. InterDigital's tactics are so well known, in fact, that *Forbes Magazine* published an article on InterDigital's litigation tactics, a copy of which is attached as Exhibit S. The article describes InterDigital as a company that uses litigation to "extract[] money from companies" that make handheld mobile phones. The article goes on to explain that InterDigital

has earned enmity for its hardball enforcement of intellectual property rights. Virtually all of its $33 million profit from the first nine months [of 2003] has come from dragging customers like Ericsson and NEC Corp. through legal disputes over patents.

18.    In an August 13, 2003, investor conference call, InterDigital's Chief Executive Officer, Howard Goldberg, acknowledged that InterDigital uses litigation as leverage in disputes with companies such as Nokia, included bringing injunctions to prevent the shipping of handsets. A copy of the transcript of the conference call is attached as Exhibit T (see page 14).

19.    Such articles and statements by InterDigital executives support Nokia's reasonable apprehension that it has regarding InterDigital's willingness and intent to pursue patent infringement litigation against it.

20.    Nokia has filed this suit because of InterDigital's efforts to enhance the value of its patents and Nokia's current need to design and develop 3G products that it will put into wide scale production after 2006.

21.    Nokia seeks declarations that the claims of InterDigital's 3G Patents are either invalid or that Nokia's 3G products do not infringe any valid claim of those patents.

22.    Although Nokia and InterDigital are currently arbitrating their 2G dispute, that dispute does not involve 3G products. Further, when Nokia attempted to raise the validity and scope of relevant InterDigital Patents in the arbitration by requesting that the

Arbitral Tribunal issue declarations on the validity and scope of InterDigital's 2G patents, InterDigital denied that declarations the invalidity and scope of its patents were arbitrable disputes under the Agreements.

## COUNT I.
### Declaration Of NonInfringement Of U.S. Patent No. 5,574,747

23.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 22, as if set forth in full.

24.    The '747 patent relates to a system and method for adaptive power control of a spread spectrum transmitter of a mobile unit operating in a cellular-communications network having a plurality of mobile units in communication with a base station. Claims 1-3, 6-10 and 13-24 of the '747 patent are directed to a circuit in the mobile unit which changes the transmitted power of the handset so that the power level detected by the base station is at a "threshold level." This change is made using a step-size algorithm located in the mobile unit. The '747 patent requires that an accumulator in a handset store a series of prior power level values and uses this series in the power control algorithm used by the handset.

25.    The WCDMA and CDMA 2000 3G standards require a command to raise or lower transmitted power within a WCDMA or CDMA 2000 mobile handset based on a power control algorithm. The standards specify that this adjustment be made by infrastructure, not by an algorithm contained in the handset. Accordingly, Nokia does not infringe claims 1-3, 6-10 and 13-24 of the '747 patent either literally or under the doctrine of equivalents, nor does it contribute to the infringement by others or actively induce others to infringe these claims of the '747 patent.

- 8 -

26.    Accordingly, Nokia is entitled to a declaratory judgment of non-infringement of the '747 patent.

## COUNT II.
### Declaration Of Invalidity Of U.S. Patent No. 5,574,747

27.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 26, as if set forth in full.

28.    Upon information and belief, at least claims 4-5 and 11-12 of the '747 patent are invalid. The '747 patent relates to a system and method for adaptive power control of a spread spectrum transmitter of a mobile unit operating in a cellular-communications network having a plurality of mobile units in communication with a base station. Claims 4-5 and 11-12 of the '747 patent are invalid in view of a 1993 IEEE publication, Viterbi & Viterbi, *Performance of Power-Controlled Wideband Terrestrial Digital Communication,* IEEE Transactions on Communications, vol. 41, no. 4, April 1993, pp. 559-569, because the limitations of these claims of the '747 patent are either contained in the Viterbi reference or are inherent in wireless systems, including IS-95 systems.

29.    Accordingly, Nokia is entitled to a declaratory judgment of invalidity of claims 4-5 and 11-12 of the '747 patent.

## COUNT III.
### Declaration Of Noninfringement Of U.S. Patent No. 6,181,949

30.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 29, as if set forth in full.

31.    The '949 patent relates to a method of controlling initial power ramp-up in CDMA systems by using short codes. Specifically, the patent relates to a system and

method of controlling transmission power during the establishment of a channel in a CDMA communication system utilizing the transmission of a short code from a subscriber unit to a base station during initial power ramp-up. According to the '949 patent, the short code is a sequence for detection by the base station which has a much shorter period than a conventional spreading code. The ramp-up starts from a power level

that is guaranteed to be lower than the required power level for detection by the base station. The subscriber unit quickly increases transmission power while repeatedly transmitting the short code until the signal is detected by the base station. Once the base station detects the short code, it sends an indication to the subscriber unit to cease increasing transmission power. Various claims of the '949 patent require a second ramp-up rate after the initial power ramp-up.

    32.    Nokia does not infringe Claims 3-5, and 8-10 of the '949 patent. Each of those claims requires a second ramp-up period after the first ramp-up period. WCDMA and CDMA 2000 standards compliant handsets, including those of Nokia, do not have a second ramp-up period. Rather they have a single step increase in the power level after the initial ramp-up. Therefore, Nokia does not infringe Claims 3-5 or 8-10 of the '949 patent either literally or under the doctrine of equivalents, nor does it contribute to the infringement by others or actively induce others to infringe these claims of the '949 patent.

    33.    Accordingly, Nokia is entitled to a declaratory judgment of non-infringement of the '949 patent.

## COUNT IV.
### Declaration Of Invalidity Of U.S. Patent No. 6,181,949

34.     Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 33, as if set forth in full.

35.     Upon information and belief, claims 1-2 and 6-7 of the '949 patent are invalid.  As alleged in paragraph 31 above,  the '949 patent relates to a method of controlling initial power ramp-up in CDMA systems.

36.     Claims 1-2, and 6-7 of the '949 patent are either anticipated or obvious in view of the IS-95A standard.  The IS-95A standard, published by the Telecommunications Industry Association, May 1995, discloses each limitation of these claims of the '949 patent.

37.     Claims 1-2, and 6-7 of the '949 patent are also either anticipated or obvious in view of  Viterbi & Viterbi, *Erlang Capacity of a Power Controlled CDMA System*, IEEE Journal on Selected Areas in communications, vol. 11, no. 6, August 1993, pp. 892-900.  With respect to the ramp-up limitation contained in the claims of the '949 patent, Viterbi states "[i]f this initial power level is not sufficient for detection, and hence acknowledgement is not received, the user increases his power in constant decibel steps every frame until his request is acknowledged." Id. at p. 898.

38.     Accordingly, Nokia is entitled to a declaratory judgment that Claims 1-2 and 6-7 of the '949 patent are invalid.

## COUNT V.
### Declaration Of Noninfringement Of U.S. Patent No. 5,841,768

39.     Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 38, as if set forth in full.

40.    The '768 patent relates to a method of controlling initial power ramp-up in a CDMA system.  Specifically, the patent relates to a system and method of controlling transmission power during the establishment of a channel in a CDMA communication system utilizing the transmission of a code from a subscriber unit to a base station during initial power ramp-up.  The code is a sequence for detection by the base station which has a shorter period than a conventional spreading code.  The ramp-up starts from a power level that is guaranteed to be lower than the required power level for detection by the base station.  The subscriber unit quickly increases transmission power while repeatedly transmitting the code until the signal is detected by the base station.  Once the base station detects the code, it sends an indication to the subscriber unit to cease increasing transmission power.  The claims of the '768 patent also require transmission of a second periodic signal at a second ramp-up rate with the second ramp-up rate being less than said first ramp-up rate.

41.    Nokia's products do not implement a second ramp-up rate function as claimed in the '768 patent nor does the WCDMA or CDMA 2000 standards require such a second ramp-up rate function.  Therefore, Nokia does not infringe any claim of the '768 patent either literally or under the doctrine of equivalents, nor does it contribute to the infringement by others or actively induce others to infringe any claim of the '768 patent.

42.    Accordingly, Nokia is entitled to a declaratory judgment of non-infringement of the '768 patent.

## COUNT VI.
### Declaration Of Noninfringement of U.S. Patent No. 6,215,778

43.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 42, as if set forth in full.

- 12 -

44.    The '778 patent relates to a bearer channel modification system for a code division multiple access (CDMA) communication system.

45.    According to the '778 patent, the multiple access, spread-spectrum communication system disclosed in the patent processes a plurality of information signals received by a Radio Carrier Station (RCS) over telecommunication lines for simultaneous

transmission over a radio frequency (RF) channel as a code-division-multiplexed (CDM) signal to a group of Subscriber Units (SUs).  The RCS receives a call request signal that corresponds to a telecommunication line information signal, and a user identification signal that identifies a user to receive the call. The RCS includes a plurality of Code Division Multiple Access (CDMA) modems, one of which provides a global pilot code signal.  The modems provide message code signals synchronized to the global pilot signal.  Each modem combines an information signal with a message code signal to provide a CDM processed signal. The RCS includes a system channel controller coupled to receive a remote call.  An RF transmitter is connected to all of the modems to combine the CDM processed signals with the global pilot code signal to generate a CDM signal. The RF transmitter also modulates a carrier signal with the CDM signal and transmits the modulated carrier signal through an RF communication channel to the SUs.  Each SU includes a CDMA modem which is also synchronized to the global pilot signal. The CDMA modem despreads the CDM signal and provides a despread information signal to the user. The system includes a closed loop power control system for maintaining a minimum system transmit power level for the RCS and the SUs, and system capacity management for maintaining a maximum number of active SUs for improved system performance.

- 13 -

46.    Accordingly, the claims of the '778 patent are directed to having a subscriber unit change from one spread spectrum channel to another spread spectrum channel having a different data rate.

47.    WCDMA standards compliant infrastructure manages the bandwidth assigned to a base station by changing the bandwidth of an assigned channel, rather than

dynamically adding or removing channels. Nokia's WCDMA products do not infringe the '778 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '778 patent.

48.    In CDMA 2000 standards compliant systems, infrastructure manages the bandwidth assigned to a base station by determining the order, type, and number of channels assigned to handsets. Claims 4 of the '778 patent requires assigning multiple channels to a subscriber station at a time. CDMA 2000 infrastructure can manage the bandwidth of a handset solely by changing the type of channel currently assigned to the handset. Nokia's CDMA 2000 handsets do not infringe Claim 4 of the '778 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '778 patent.

49.    Nokia is entitled to a declaratory judgment of non-infringement of the '778 patent.

- 14 -

## COUNT VII.
### Declaration Of Invalidity of U.S. Patent No. 6,215,778

50.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 49, as if set forth in full.

51.    As alleged in paragraph 44 above, the '778 patent relates to a bearer channel modification system for a code division multiple access (CDMA) communication system.

52.    Upon information and belief, the claims of the '778 patent are invalid.

53.    The claims of the '778 patent are directed to having a subscriber unit change from one spread spectrum channel to another spread spectrum channel having a different data rate.

54.    The claims of the '778 patent are either anticipated or obvious in view of the IS-95a standard of May 1995, as modified by *Telecommunications Systems Bulletin, Support for 14.4 kbps Data Rate and PCS Interaction for Wideband Spread Spectrum Cellular Systems*, dated May 11, 1995. Each limitation of the claims of the '778 patent is disclosed or obvious in view of the IS-95a Telecommunications Systems Bulletin and/or the IS-95a standard.

55.    The claims of the '778 patent are either anticipated or obvious in view of the A. Baier et al, *Design Study for a CDMA-Based Third-Generation Mobile Radio System*, IEEE Journal on Selected Areas in Communications, vol. 12, no. 4, May 1994. Each limitation of the claims of the '778 patent is disclosed in the Baier reference and/or the IS-95 standard.

56.    Nokia is entitled to a declaratory judgment that the claims of the '778 patent are invalid.

- 15 -

## COUNT VIII.
### Declaration Of Noninfringement of U.S. Patent No. 5,179,572

57.     Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 56, as if set forth in full.

58.     The '572 patent relates to a spread spectrum conference calling system and method. Specifically, the patent relates to a spread-spectrum-conference-calling receiver for use over multiple communications channels.  The patent specifies that at each of a plurality of spread-spectrum transmitters, a transmitter-generic-chip-code generator generates a generic-chip-code signal and a transmitter-message-chip-code generator generates a message-chip-code signal. An EXCLUSIVE-OR gate spread-spectrum processes message data with the message-chip-code signal to generate a spread-spectrum signal.  The combiner combines the generic-chip-code signal and the spread-spectrum-processed signal.  A plurality of receiver-generic-chip-code generators generate a plurality of replicas of the generic-chip-code signal.  Each receiver-generic mixer recovers a carrier signal from one of the plurality of received spread-spectrum-communications signals.  A plurality of receiver-message-chip-code generators generate a plurality of replica of the message-chip-code signals. A plurality of receiver-message mixers despread one of the plurality of received spread-spectrum-communications signal as a modulated-data signal.  Tracking and acquisition circuits use the recovered carrier signal for synchronizing the replicas of the generic-chip-code signals to the recovered carrier signals, respectively. An envelope detector demodulates the modulated-data signal as a demodulated signal.

59.     The claims of the '572 patent, therefore, are directed to a system and method for synchronously demodulating a plurality of modulated data signals on a

plurality of spread spectrum channels in a conference call. The conference call is sent on multiple channels and the subscriber unit demodulates all of the calls in order to listen to them.

60.     Nokia's CDMA 2000 and WCDMA products do not provide for conference calling such that the calls are combined from separate spread spectrum

channels at the mobile handset. Therefore, Nokia's CDMA 2000 handsets do not infringe the '572 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '572 patent.

61.     Nokia is entitled to a declaratory judgment of noninfringement of the '572 patent.

## COUNT IX.
### Declaration Of Invalidity of U.S. Patent No. 5,179,572

62.     Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 61, as if set forth in full.

63.     As alleged in paragraph 58 above, the '572 patent relates to a spread spectrum conference calling system and method. Specifically, the claims of the '572 patent are directed to a system and method for synchronously demodulating a plurality of modulated data signals on a plurality of spread spectrum channels in a conference call. The conference call is sent on multiple channels and the subscriber unit demodulates all of the calls in order to listen to them.

64.     Upon information and belief, if the claims of the '572 patent are not limited to conference calling, the '572 patent is invalid as anticipated or obvious.

## COUNT X.
### Declaration Of Noninfringement of U.S. Patent No. 6,075,792

65.     Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 64, as if set forth in full.

66.     The '792 patent relates to a CDMA communication system which

selectively allocates bandwidth upon demand.  The '792 patent discusses a CDMA wireless digital communication system which supports all types of voice and data communications while utilizing a minimum amount of bandwidth for the particular application.     According to the '792 patent, the system efficiently allocates ISDN bandwidth on demand by a subscriber.  Upon initialization of the subscriber unit, the system establishes a channel and generates the necessary spreading codes to support the highest capacity channel desired by the subscriber unit.  Portions of the communication spectrum bandwidth are not reserved until actually required by the subscriber unit.  The '792 patent states that since the call setup is performed at the beginning of a call from that subscriber unit, including the assignment of spreading codes, a subscriber unit can quickly gain access to the portion of the spectrum that is required to support the particular application.

67.     The '792 patent, therefore, is directed to bandwidth allocation of the spread spectrum by utilizing different channels that may be added or removed, and selectively used to increase bandwidth.  The claims of the '792 patent are directed to subscriber units and base stations that have the capability to use, establish and tear down such channels.

- 18 -

68.    The WCDMA standard does not dynamically add or tear down channels to establish different data rates.  Nokia's products comply with the WCDMA standard and therefore do not implement the bandwidth allocation process claimed in the '792 patent.

69.    Nokia's products also do not establish or use a wireless ISDN channel. Accordingly, Nokia's products do not infringe the '792 patent, including at least claims 1

3-6, 10-12, and 17-18, because those claims require the use of an ISDN channel.

70.    Nokia's handsets also do not assign or allocate wireless channels.  Such decisions are done by infrastructure.    Therefore, Nokia's products do not infringe the claims of the '792 patent, including at least claim 9, either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '792 patent.

71.    Upon information and belief, Nokia's CDMA 2000 handsets do not directly infringe any claim of the '792 patent, because those claims require claim elements that are not present in Nokia's handsets. Nokia's CDMA 2000 handsets also do not contributorily infringe any claim of the '792 patent because only CDMA 2000 infrastructure, as opposed to handsets, could meet various claim limitations.  Upon information and belief, for each such claim limitation not present in Nokia's CDMA 2000 handsets, there exist substantial uses and infrastructure implementations that do not infringe any claim of the '792 patent.  Therefore, Nokia's products do not infringe any claim of the '792 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '792 patent.

72.    Nokia is entitled to a declaratory judgment of noninfringement of the '792 patent.

## COUNT XI.
### Declaration Of Invalidity of U.S. Patent No. 6,075,792

73.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 72, as if set forth in full.

74.    As alleged in paragraph 66 above, the '792 patent relates to a CDMA communication system which selectively allocates bandwidth on demand.

75.    Upon information and belief, at least claims 2, 7, 8, and 13-15 of the '792 patent are invalid in view of at least *IS-95 Enhancements for Multi-Media Services* by Chih-Lin I et al. Each of the elements of these claims of the '792 patent are disclosed or obvious in light of the *IS-95 Enhancements for Multi-Media Services* which was published at least as early as Autumn of 1996.

76.    Upon information and belief, at least claims 2, 7, 8, and 13-15 of the '792 patent are invalid in view of at least U.S. Patent No. 6,072,787 ("the '787 patent") assigned to Nokia. Each of the elements of these claims of the '792 patent is disclosed or obvious in light of the '787 patent, which was filed on July 5, 1996.

77.    Nokia is entitled to a declaratory judgment of invalidity with respect to at least claims 2, 7, 8, and 13-15 of the '792 patent.

## COUNT XII.
### Declaration Of Noninfringement of U.S. Patent No. 5,799,010

78.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 77, as if set forth in full.

79.    The '010 patent relates to a code division multiple access (CDMA) communication system.  The '010 patent discusses a multiple access, spread-spectrum communication system that processes a plurality of information signals received by a Radio Carrier Station (RCS) over telecommunication lines for simultaneous transmission over a radio frequency (RF) channel as a code-division-multiplexed (CDM) signal to a group of Subscriber Units (SUs).  The RCS receives a call request signal that corresponds to a telecommunication line information signal, and a user identification signal that identifies a user to receive the call. The RCS includes a plurality of Code Division Multiple Access (CDMA) modems, one of which provides a global pilot code signal. The modems provide message code signals synchronized to the global pilot signal. Each modem combines an information signal with a message code signal to provide a CDM processed signal. The RCS includes a system channel controller coupled to receive a remote call. An RF transmitter is connected to all of the modems to combine the CDM processed signals with the global pilot code signal to generate a CDM signal. The RF transmitter also modulates a carrier signal with the CDM signal and transmits the modulated carrier signal through an RF communication channel to the SUs. Each SU includes a CDMA modem which is also synchronized to the global pilot signal.  The CDMA modem despreads the CDM signal and provides a despread information signal to the user.

80.    The claims of the '010 patent are therefore directed to a CDMA system that uses a "global pilot code signal" for synchronizing modems.  The global pilot code is defined as "a channel with a spreading code but no data modulation."

81.    The WCDMA standard does not require that message signals be synchronized to a global pilot code signal as claimed in the '010 patent. In Nokia's WCDMA systems, message channels are not synchronized to a global pilot code signal and therefore do not infringe the '010 patent.

82.    Nokia's CDMA 2000 handsets do not directly infringe claims 1-4 and 9 of
the '010 patent because those claims require "means for receiving a call request signal" and "modem processing means." These claim limitations, as properly construed, are not present in Nokia's CDMA 2000 handsets. Nokia's CDMA 2000 handsets likewise do not contributorily infringe claim 1-4 and 9 of the '010 patent because only CDMA 2000 infrastructure, as opposed to handsets, could contain "means for receiving a call request signal." There likewise exist substantial uses and infrastructure implementations that do not meet the "means for receiving a call request signal," as properly construed, required in claims 1-4 and 9 of the '010 patent. Therefore, Nokia's CDMA 2000 products do not infringe claims 1-4 and 9 of the '010 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe claims 1-4 and 9 of the '010 patent.

83.    Nokia's CDMA 2000 handsets likewise do not infringe claims 5-8 of the '010 patent. Nokia's CDMA 2000 handsets do not calculate the acquisition signal as required by those claims. Therefore, Nokia's CDMA 2000 products do not infringe claims 5-8 of the '010 patent either literally or under the doctrine of equivalents, nor contribute to the infringement by others or actively induces others to infringe claims 5-8 of the '010 patent.

84.    Nokia's CDMA 2000 handsets also do not infringe any claim of the '010 patent because Nokia's CDMA 2000 handsets are not synchronized to a pilot code as required by the claims of the '010 patent.  Therefore, Nokia's CDMA 2000 products do not infringe any claim of the '010 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '010 patent.

85.    Nokia is entitled to a declaratory judgment of noninfringement of the '010 patent.

## COUNT XIII.
### Declaration Of Invalidity of U.S. Patent No. 5,799,010

86.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 85, as if set forth in full.

87.    Upon information and belief, the claims of the '010 patent are invalid.  As alleged in paragraph 79 above, the '010 patent relates to a code division multiple access (CDMA) communication system that uses a "global pilot code signal" for synchronizing modems.

88.    Each of the claims of the '010 is anticipated by or obvious in light of  the IS-95a standard or the TR45 draft to the IS-95a standard entitled *Mobile Station – Base Station Compatibility Standard for dual-Mode Wideband Spread Spectrum Cellular System*, PN-3144, dated December 9, 1992, both of which were published before the filing date of the '010 patent.

89.    Each of the claims of the '010 patent is anticipated or obvious in light of Gaudenzi, et al., *Chip Timing Synchronization in an All-Digital Band-Limited DS/SS Modem*, IEEE Conference on Communications (ICC), 1991, pp. 1688-1692.

- 23 -

90.     The claims of the '010 patent are therefore either anticipated or rendered obvious by the IS-95a standard, the TR45 draft to the IS-95a standard, and/or Gaudenzi, et al.

91.     Nokia is entitled to a declaratory judgment of invalidity of the claims of the '010 patent.

## COUNT XIV.
### Declaration Of Noninfringement of U.S. Patent No. 5,614,914

92.     Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 91, as if set forth in full.

93.     The '914 patent relates to a wireless telephone distribution system with time and space diversity transmission for determining receiver location. The '914 patent discloses a wireless communication system that combines time and space diversity to reduce fading. In particular, the '914 patent discloses a data packet which carries digital telephone traffic that is transmitted at three different times from three different antennas. The mobile subscriber receiver receives the same data packet at three different times from the three different antennas, and uses the best data packet or combination of the data packets to reduce the effects of fading. A transfer station receives a time division multiplex multiple access (TDMA) signal from a base station carrying telephone data packet traffic to form three data packet repeats at spatially diverse antennas locations. The transfer station further modulates a code division multiple access (CDMA) system using a TDMA signal which links the mobile subscriber receiver to the transfer station. Each data packet received at the transfer station is retransmitted at three different times to the mobile subscriber station on a CDMA link. The time division and code division multiplex signals transmitted from space diversity antennas provide the ability to

determine subscriber location using the same communication signals which are used for the primary telephone data communication. Specifically, the subscriber station receiver uses the absolute and relative time of arrival of the three repeated data packets to determine the respective distances of the mobile subscriber station to the three transmitting antennas. Because the transmitting antennas are at known fixed locations,

receiver location is determined.

94.    The '914 patent, therefore, claims a system and method relating to determining the location of a mobile subscriber station using an observed time difference of arrival (OTDOA) of wireless signals from at least three transmitting stations.

95.    Nokia does not implement OTDOA in its WCDMA or CDMA 2000 wireless products and therefore does not infringe the '914 patent.

96.    Nokia is entitled to a declaratory judgment of noninfringement of the '914 patent.

## COUNT XV.
### Declaration Of Noninfringement of U.S. Patent No. 5,663,990

97.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 96, as if set forth in full.

98.    Nokia does not infringe any claim of the '990 patent. The '990 patent relates to a wireless telephone distribution system with time and space diversity transmission and has a similar disclosure as that of the '914 patent alleged in paragraph 93 above.

99.    The claims of the '990 patent focus on a time switched transmission technique wherein the same data is broadcast twice in two different time slots to achieve time switched transmit diversity.

- 25 -

100.    Two open loop transmit diversity schemes are included in the WCDMA standard.  These two schemes include Time Switched Transmit Diversity (TSTD) and Space Time Transmit Diversity (STTD).  TSTD involves periodically switching the transmit antenna for separate time divided slots and retransmitting the same information. STTD involves coding the signal for separate antennas and transmitting on those antennas simultaneously.

101.    All but two of the independent claims (9 and 23) of the '990 patent include a limitation to a communication system or method where the transmitted signal is encoded using a pseudorandom number to achieve spread spectrum modulation.  Claims 9 and 23, which do not contain the pseudorandom number encoding limitation, contain a limitation to a system or method where a transfer station is utilized between the base station and the user equipment.

102.    None of Nokia's WCDMA or CDMA 2000 products infringe claim 9 or 23 of the '990 patent, or their dependent claims.  No implementation of either standard includes a transfer station as required by those claims.  Nokia's handsets when used with such systems, therefore, do not infringe claim 9 or 23 of the '990 patent, or the claims which depend from them.

103.    Nokia's CDMA 2000 handsets do not infringe any claim of the '990 patent because no CDMA 2000 system has been implemented with either TSTD or STTD. Nokia's handsets when used with such systems, therefore, do not infringe any claim of the '990 patent.

104.    The WCDMA standard specifies that the only channel that employs a TSTD scheme is the synchronization channel.    In the WCDMA standard, the

- 26 -

synchronization channel is not spread as required by all of the independent claims of the '990 patent (except claims 9 and 23).

105.    When the WCDMA standard employs STTD, the "same data packet" is not transmitted as required by the claims of the '990 patent.  Additionally, when the WCDMA standard employs STTD, data packets are not discarded as required by the claims of the '990 patent.

106.    Nokia's WCDMA systems comply with the WCDMA standard.  Nokia's systems therefore do not infringe the claims of the '990 patent.

107.    Nokia is entitled to a declaratory judgment of noninfringement of the '990 patent.

## COUNT XVI.
### Declaration Of Noninfringement of U.S. Patent No. 5,859,879

108.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 107, as if set forth in full.

109.    The '879 patent relates to a wireless telephone distribution system with time and space diversity transmission and has a similar disclosure as that of the '914 and '990 patents alleged in paragraphs 93 and 100-101 above.

110.    The claims of the '879 patent focus on a time divided transmission technique wherein the same data is broadcast twice in two different time slots to achieve time transmit diversity.

111.    The claims of the '879 patent include a limitation to a communication system or method where the transmitted signal is encoded using a pseudorandom number to achieve spread spectrum modulation.

112.    As explained in paragraph 104 above, the only channel in WCDMA that employs TSTD is the standard synchronization channel and that channel is not spread as required by all of the claims of the '879 patent.

113.    As explained in paragraph 105 above, when the WCDMA standard employs STTD, the "same data packet" is not transmitted as required by the claims of the '879 patent..

114.    When the WCDMA standard employs STTD it uses the same spreading code instead of different spreading codes as required by the claims of the '879 patent.

115.    Nokia's WCDMA systems comply with the WCDMA standard.  Nokia's systems therefore do not infringe the claims of the '879 patent.

116.    Upon information and belief, Nokia's CDMA 2000 handsets do not infringe any claim of the '879 patent because no CDMA 2000 systems have been implemented with either TSTD or STTD.  Nokia's handsets when used with such systems, therefore, do not infringe any claim of the '879 patent.

117.    Nokia is entitled to a declaratory judgment of noninfringement of the '879 patent.

## COUNT XVII.
### Declaration Of Noninfringement of U.S. Patent Nos. 5,363,403; 5,553,062; 5,719,852; 6,014,373; and 6,259,688

118.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 117, as if set forth in full.

119.    Nokia does not infringe any claim of the '403 patent, the '062 patent, the '852 patent, the '373 patent, or the '688 patent.

- 28 -

120.    The '403 patent relates to a spread spectrum CDMA subtractive interference canceler and method.  The patent discloses a spread-spectrum code division multiple access interference canceler for reducing interference in a direct sequence CDMA receiver having N chip-code channels.  The interference canceler includes a plurality of correlators or matched filters, a plurality of spread-spectrum-processing circuits, subtracting circuits, and channel correlators or channel-matched filters.  Using a plurality of chip-code signals, the plurality of correlators despreads the spread-spectrum CDMA signal as a plurality of despread signals, respectively.  The plurality of spread-spectrum-processing circuits use a timed version of the plurality of chip-code signals, for spread-spectrum processing the plurality of despread signals, respectively, with a chip-code-signal corresponding to a respective despread signal.  For recovering a code channel using an i.sup.th chip-code-signal, the subtracting circuits subtract from the spread-spectrum CDMA signal, each of the N-1 spread-spectrum-processed-despread signals thereby generating a subtracted signal. The N-1 spread-spectrum-processed-despread signals do not include the spread-spectrum-processed-despread signal of the i.sup.th channel of the spread-spectrum CDMA signal. The channel correlator or channel-matched filter despreads the subtracted signal.

121.    The '062 patent is a continuation-in-part of the '403 patent.  The '852 patent, the '373 patent and the '688 patent are all continuations of the '403 patent.

122.    The '403 patent, the '062 patent, the '852 patent, the '373 patent and the '688 patent (the "Subtractive Interference Cancellation patents") all disclose and claim a method and system for subtractive interference cancellation in a multi-channel, spread spectrum CDMA system.

- 29 -

123.    In a multiple channel spread spectrum system, interference is created by the multiple channels. When one channel is decoded or despread, interference from the other channels will appear as noise. The system and method in the Subtractive Interference Cancellation patents claim a series of components to remove this noise by subtracting the signals corresponding to other channels from the input signal prior to processing the channel of interest.

124.    Nokia's WCDMA digital wireless systems do not implement subtractive interference cancellation techniques and therefore do not infringe any claim of the Subtractive Interference Cancellation patents.

125.    Nokia's CDMA 2000 handsets do not implement subtractive interference cancellation techniques as required by InterDigital's patents and therefore do not infringe any claim of the Subtractive Interference Cancellation patents.

126.    Nokia is entitled to a declaratory judgment of noninfringement of the Subtractive Interference Cancellation patents.

## COUNT XVIII.
### Declaration Of Noninfringement of U.S. Patent No. 6,289,004

127.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 126, as if set forth in full.

128.    The '004 patent relates to adaptive cancellation of fixed interferers and discloses a base station which cancels the effects of known fixed interference sources by producing a signal substantially free from the interference sources to thereby increase channel capacity. The adaptive interference canceler system includes a main antenna for receiving signals from other communication stations and at least one directional antenna

- 30 -

directed toward an interference source. The main and directional antennas are coupled to the adaptive canceler, which weights signals received by the directional antennas and sums the weighted signals to produce a cancellation signal. The adaptive canceler subtracts the cancellation signal from the signals received by the main antenna to provide an output signal substantially free from the interference generated by the one or more known interference sources.

129.    The claims of the '004 patent all require that the system include a directional antenna with four coplanar feeds mounted near the main base station antenna.

130.    Neither the WCDMA standard, nor the CDMA 2000 standard, require the use of directional antennas.

131.    Nokia's WCDMA and CDMA 2000 products comply with the WCDMA and CDMA 2000 standards, and do not employ directional antennas. Nokia's systems therefore do not infringe any claim of the '004 patent.

132.    Nokia is entitled to a declaratory judgment of noninfringement of the '004 patent.

## COUNT XIX.
### Declaration Of Noninfringement of
### U.S. Patent No. 5,081,643

133.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 132, as if set forth in full.

134.    The '643 patent relates to a spread spectrum multipath receiver apparatus and method. In particular, the '643 patent discloses an apparatus for adapting to receive a particular path, having the greatest amplitude, of a spread-spectrum signal with multipath. According to the patent, the spread-spectrum signal is modulated by a chip-code. A chip-

- 31 -

code generator generates a chip-code signal having the same chip-code as the spread-spectrum signal. A plurality of shift registers shift the chip-code signal by a plurality of time delays. First and second ring counters generate first and second sequencing signals for controlling first and second switching devices. The first switching device successively switches between a plurality of taps of the shift registers in a direction of increasing or

decreasing delays for generating the chip-code signal with the first time delay. The second switching device successively switches between the plurality of taps of the shift registers in a direction of increasing or decreasing delays for generating the chip-code signal with a second time delay. A first correlator correlates the spread-spectrum signal received at the input with the chip-code signal with the first time delay. A second correlator correlates the spread-spectrum signal received at the input with the chip-code signal with the second time delay. A comparator generates first and second comparator signals by comparing the outputs of the first correlator and the second correlator.

135.    Nokia's WCDMA and CDMA 2000 products do not include "delay means" or "shift registers" as claimed in the '643 patent. The WCDMA and CDMA 2000 standards likewise to not require such "delay means" or "shift registers." Instead of delaying a code after it is generated by the code generator, as required by the '643 patent, Nokia's WCDMA products modify the speed of the code generator by internal clocking. Instead of delaying a code after it is generated by the code generator with shift registers, as required by the '643 patent, Nokia's CDMA 2000 products choose from multiple samples of the input signal or reprogram the code generator. Nokia's products therefore do not infringe any claim of the '643 patent either literally or under the doctrine of

equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '643 patent.

136.    Nokia's WCDMA products also do not include delay codes by one or more chip intervals, as required by claims 1 and 2 of the '643 patent because Nokia's WCDMA products shift the speed of the internal code generator by 1/2 chip. Nokia's

WCDMA products do not infringe claims 1 and 2 of the '643 patent either literally or under the doctrine of equivalents, nor contribute to the infringement by others or actively induce others to infringe claims 1 and 2 of the '643 patent.

137.    Nokia's WCDMA products also do not include a difference amplifier as required by the claims of the in the '643 patent. Therefore, Nokia's WCDMA products do not infringe the claims of the '643 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe the claims of the '643 patent.

## COUNT XX.
### Declaration Of Noninfringement of
### U.S. Patent No. 5,673,286

138.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 137, as if set forth in full.

139.    The '286 patent relates to a spread spectrum multipath processor system and method.    In particular, the '286 patent discloses a spread-spectrum system and method for providing high capacity communications through multipath compensation. The multipath processor system includes a first plurality of correlators, a second plurality of correlators, a first adder, a second adder, and a selector device or a combiner device is provided for tracking a spread-spectrum signal arriving in a plurality of groups. The first

plurality of correlators despreads a first group of spread-spectrum signals as a first group of despread signals which are added by the first adder to generate a first combined-despread signal. The second plurality of correlators despreads a second group of spread-spectrum signals as a second group of despread signals which are added by the second adder to generate a second combined-despread signal. The selector device selects either the first or the second combined-despread signal and outputs the selected signal. According to the patent, the combiner device alternatively combines the first and the second combined-despread signals and outputs the combined signal.

Case 2:06-cv-00165-JG    Document 11    Filed 08/06/2006    Page 59 of 66

140.  Nokia's WCDMA and CDMA 2000 products do not include "combining" or "selecting" signals twice as required by the claims of the '286 patent.  Nokia's products therefore do not infringe any claim of the '286 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '286 patent.

### COUNT XXI.
### Violation Of § 43(a) Of The Lanham Act

141.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 140, as if set forth in full.

142.    InterDigital has used false or misleading descriptions or representations in connection with its patent portfolio, the WCDMA Standard, the CDMA 2000 standard, Nokia's products, the applicability of InterDigital's patents to Nokia's products, and the applicability of InterDigital's patents to 3G wireless standards within the meaning of 15 U.S.C. §1125(a) (§43(a) of the Lanham Act).  This misconduct of InterDigital has inhibited the development of 3G technology, damaged Nokia's business and its reputation in the wireless market.

- 34 -

143.   Upon information and belief, InterDigital has repeatedly made public statements that its patent portfolio covers the practice of 3G wireless phone systems and the sale of 3G compliant products.   These statements are false because InterDigital's patents are not necessary to practice 3G wireless phone standards.

144.   These false statements are material and, upon information and belief, have caused actual deception or have a tendency to deceive a substantial portion of the intended audience.

145.   InterDigital's misrepresentations about the scope and validity of its patents and how these patents apply to Nokia's products have injured Nokia in its business and have damaged Nokia's reputation.

146.   Upon information and belief, InterDigital has made these false statements in bad faith and with knowledge of their falsity.

### JURY DEMAND

Nokia demands a trial by jury.

### PRAYER FOR RELIEF

WHEREFORE, Nokia respectfully requests that the Court enter judgment:

(a)     That Nokia does not infringe the '747 patent, the '949 patent, the '768 patent, the '778 patent, the '572 patent, the '792 patent, the '010 patent, the '914 patent, the '990 patent, the '879 patent, the '403 patent, the '062 patent, the '852 patent, the '373 patent, the '688 patent, the '004 patent, the '643 patent, or the '286 patent;

(b)     That the '747 patent, the '949 patent, the '778 patent, the '792 patent, the '572 patent and the '010 patent are invalid;

(c)     That InterDigital's statements concerning the scope and validity of its 3G

patents are false and misleading, in violation of § 43(a) of the Lanham Act;

(d)     Awarding Nokia damages in an amount to be determined at trial for

Nokia's loss;

(e)     Granting Nokia its attorneys' fees and costs; and

(f)     Granting such other and further relief as the Court deems just and proper.


                                        MORRIS, NICHOLS, ARSHT & TUNNELL

                                        Jack B. Blumenfeld (#1014)
                                        Julia Heaney (#3052)
                                        1201 N. Market Street
                                        Wilmington, DE 19801
                                        (302) 658-9200
                                        Attorneys for NOKIA CORPORATION and
                                        NOKIA, INC.

Of Counsel:

ALSTON & BIRD LLP

Peter Kontio
Patrick J. Flinn
Gardner S. Culpepper
Keith E. Broyles
1201 West Peachtree Street
Atlanta, GA  30309-3424
404-881-7000

January 12, 2005

- 36 -

**B**

---

**InterDigital Wins Ruling In Nokia Royalty Dispute**

By CHAD BRAY
DOW JONES NEWSWIRES
December 29, 2005 4:17 a.m.

NEW YORK — A federal judge confirmed an arbitration award of about $250 million for InterDigital Communications Corp., which is in a dispute with cellphone maker Nokia Corp. over royalties.

In an order filed Wednesday in the Southern District of New York, Judge William H. Pauley III upheld the award granted by an arbitration panel in June and denied Nokia's motion to vacate it.

"While this court does not necessarily agree with every finding of the panel, there is nothing so aberrant about the award to require vacatur," Judge Pauley said in his order. "This court confirms the award in its entirety."

The dispute revolves around royalties agreed to as part of licensing agreements entered into by InterDigital Communications and Nokia in January 1999.

A Nokia spokesman didn't immediately have a comment when reached Wednesday afternoon.

Under the agreements, Nokia paid InterDigital $31.5 million in royalties for all handset sales using InterDigital technology prior to January 2002, according to the judge's order.

Nokia's royalty obligations for sales between January 2002 and December 2006 would then be contingent on InterDigital entering into licensing agreements with one of Nokia's three "major competitors" — Lucent Technologies Inc., Telefon AB L.M. Ericsson or Motorola Inc., according to the order.

In March 2003, InterDigital entered into two patent licensing agreements with Ericsson and Sony Ericsson Mobile Communications — a joint venture between Sony Corp. and Ericsson. In creating the joint venture, Ericsson sold its handset business to Sony Ericsson for cash consideration, according to the judge's order.

After entering into the Ericsson agreements, InterDigital requested about $500 million in royalty payments from Nokia, which disputed the obligations and invoked its right to arbitration.

In a filing with the Securities and Exchange Commission on Tuesday, InterDigital said it has taken action to utilize the dispute resolution process under its licensing agreement with Nokia in order to compel Nokia to abide by the arbitration panel's ruling.

The dispute resolution process would establish a timetable for discussions, senior representative meetings and any future initiation of arbitration, if necessary, according to the filing.

C



Smart Technologies™

<u>CONFIDENTIAL</u>

April 21, 2005

<b>Via Fedex and Certified Mail</b>

Ms. Patricia M. Palmer, CCLA
The Hartford
100 Enterprise Drive
P.O. Box 2000
Rockaway, NJ 07866

KEY OFFICE 344

Re:    InterDigital Communications Corporation
       <u>Your File No. YCH KLP 42471</u>

Dear Ms. Palmer:

In accordance with your telephone conversation of April 13, 2005 with Bruce Pailet of this office, the undersigned, on behalf of InterDigital Communications Corporation, hereby respectfully requests reconsideration of the declination of coverage decision set forth in your letter to me of April 5, 2005 for the reasons stated below.

The justification for the declination of coverage is erroneously predicated upon the belief that the claims alleged by Nokia Corporation under Section 43(a) of the Lanham Act are excluded from coverage because they do not come within subsections (f) or (g) of the definition of "personal and advertising injury" as contained in Commercial General Liability Coverage Form (HG 00 01 10 01), nor do the claims allege any patent infringement. On the contrary, we believe that the claims asserted by Nokia that InterDigital has "used false or misleading descriptions or representations in connection with its patent portfolio, the WCDMA Standard, the CDMA 2000 standard, Nokia's products, the applicability of InterDigital's patents to Nokia's products, and the applicability of InterDigital's patents to 3G wireless standards..." which "have damaged Nokia's business and its reputation in the wireless market" come squarely within the coverage provided by subsection (d) of the definition of "personal and advertising injury". It is critical to note here that the claims alleged by Nokia are *not claims for patent infringement*, but rather are for *statements or writings alleging patent infringement* that were made and which have had the effect of damaging Nokia's business and reputation.

Subsection (d) affords coverage for "publication of material that slanders or libels a person or organization *or disparages a person's or organization's goods, products and*

**InterDigital®**

Smart Technologies™

*services*"; precisely (indeed, almost verbatim) the claims alleged by Nokia under the Lanham Act.   As the Lanham Act makes clear, claims brought under Section 43(a) are predicated on the statements themselves and not the act of any underlying patent infringement (those claims are addressed elsewhere in the complaint). Thus any attempt to deny coverage based on narrowly applying the alleged disparagement claims to the patent infringement "exclusion" from the definition of personal and advertising injury is in error.

In respect of the analysis and declination of coverage under Policy No. 39RHU TS 0953 (umbrella liability coverage) it is stated that the "policy does not apply to 'personal and advertising injury [unless] underlying insurance' is applicable...." Therefore, in accordance with the conclusions reached above, coverage should be available under this policy also.  Again, your letter incorrectly predicates its analysis on the act of patent infringement, when the Lanham Act claims are grounded in slander, libel and disparagement. Patent infringement arises only in the context of simply being one of the topics referenced in the alleged slander, libel or disparagement. It is *not* the basis for the claims themselves.

Lastly, your letter also requests information with respect to the relationship of InterDigital Technology Corporation to InterDigital Communications Corporation. InterDigital Technology Corporation is (i) a direct, wholly-owned subsidiary of InterDigital Communications Corporation and (ii) not an insured under another policy. Therefore, we ask that you confirm that it is also an "insured" under Section II of the Commercial General Liability Coverage Form (CG 00 01 10 01) and the umbrella policy referenced above.

For the reasons set forth above, InterDigital believes that one or more of the claims alleged by Nokia are covered under one or more of InterDigital's policies and request is hereby made that the declination of coverage decision contained in your letter of April 5, 2005 be reconsidered and that InterDigital be provided with a defense and indemnity to Nokia's lawsuit.

If you need any further information please contact me.

Sincerely,

Lawrence F. Shay
General Counsel

cc: The Addis Group

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**HARTFORD FIRE INSURANCE**
**COMPANY**
and

**HARTFORD CASUALTY INSURANCE**
**COMPANY**     Case 2:06-cv-00165-JG     Document 1-2     Filed 01/12/2006     Page 1 of 1

Plaintiffs,

vs.

**INTERDIGITAL COMMUNICATIONS**
**CORP.**

and

**INTERDIGITAL TECHNOLOGY CORP.**

Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION NO.

---

### DEMAND FOR TRIAL BY JURY

Plaintiffs Hartford Fire Insurance Company and Hartford Casualty Insurance Company

hereby demand a trial by jury of issues so triable.

**WHITE AND WILLIAMS**

Attorneys for Plaintiffs, Hartford Fire
Insurance Company and Hartford Casualty
Insurance Company

By: _____

Gale White, Esquire
Anthony L. Miscioscia, Esquire
WHITE AND WILLIAMS LLP
One Liberty Place, Suite 1800
1650 Market Street
Philadelphia, PA  19103
(215) 864-6234-6356

-21-

DOCS_PH 1829139v.1