## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **HARTFORD FIRE INSURANCE COMPANY and HARTFORD CASUALTY INSURANCE COMPANY** | : : : : : | JURY TRIAL DEMANDED |
| Plaintiffs, | : : | **COMPLAINT** |
| v. | : : | CIVIL ACTION NO.  06-422-JJF |
| **INTERDIGITAL COMMUNICATIONS CORPORATION and INTERDIGITAL TECHNOLOGY CORPORATION** | : : : : : | |
| Defendants. | : : | |

### FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

By way of this First Amended Complaint, Hartford Fire Insurance Company and Hartford Casualty Insurance Company (referred to herein collectively as "Hartford") allege as follows:

1.    In this action, Hartford seeks a declaration that it has no duty to defend InterDigital Communications Corporation ("ICC") and/or InterDigital Technology Corporation ("ITC") (collectively referred to herein as "InterDigital") in connection with the underlying action styled *Nokia Corporation and Nokia, Inc. v. InterDigital Communications Corporation and InterDigital Technology Corporation*, U.S. Dist. Ct., D. Del., C.A. No. 05-16-JJF (referred to herein as either the "*Nokia* action").

2.    In this action, Hartford also sought a judicial declaration that it owes no indemnity to ICC and/or ITC in connection with the *Nokia* action.  However, by Order dated December 14, 2006, this Court dismissed Count II of Hartford's initial Complaint (seeking a declaration of no

duty to indemnify InterDigital), without prejudice to refile such Count following the conclusion of the *Nokia* action. In light of this Court's prior ruling, Hartford does not assert below a cause of action seeking a declaration of no indemnity, but Hartford reserves all rights to assert such a claim at a later date.

3.     Since this Court's ruling, Nokia has filed an Amended Complaint in the *Nokia* action <u>and</u> Hartford has received information evidencing that Nokia's claims involve communications made outside the Hartford coverage territory and outside the Hartford policy periods.

4.     For the reasons set forth below, Hartford is entitled to a declaration that it has no duty to defend InterDigital for the claims asserted in the *Nokia* action.

5.     Alternatively, Hartford seeks a declaration of the parties' respective rights, duties and obligations, if any, under certain policies of insurance issued by Hartford to InterDigital Communications Corporation.

## **THE PARTIES**

6.     Plaintiff Hartford Fire Insurance Company ("Hartford Fire") is a citizen of the State of Connecticut, being a corporation that is organized under the laws of the State of Connecticut and which maintains its principal place of business in Hartford, Connecticut.

7.     Plaintiff Hartford Casualty Insurance Company ("Hartford Casualty") is a citizen of the State of Indiana, being a corporation that is organized under the laws of the State of Indiana and which maintains its principal place of business in Indianapolis, Indiana.

PHLDMS1 3101164v.3

8.    On information and belief, Defendant ICC is a citizen of the Commonwealth of Pennsylvania, being a corporation that is organized under the laws of the Commonwealth of Pennsylvania and which maintains its principal place of business in King of Prussia, Pennsylvania. On information and belief, at all times relevant to this action, ICC was authorized to conduct business in the Commonwealth of Pennsylvania, including within the Eastern District.

9.    On information and belief, Defendant ITC is a citizen of the state of Delaware, being a corporation that is organized under the laws of Delaware and which maintains its principal place of business in Wilmington, Delaware. On information and belief, at all times relevant to this action, ITC was authorized to conduct business in the Commonwealth of Pennsylvania, including within the Eastern District.

## JURISDICTION AND VENUE

10.    This Court has original jurisdiction over this declaratory judgment action based upon 28 U.S.C. § 1332(a) and 28 U.S.C. § 2201 *et seq.* The amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000.00.

11.    Pursuant to 28 U.S.C. § 1391(a), venue was and is proper in the Eastern District of Pennsylvania because "a substantial part of the events or omissions giving rise to the claim occurred" and/or "any defendant is subject to personal jurisdiction at the time the action is commenced" in the Eastern District of Pennsylvania.

12.    A substantial part of the events or omissions giving rise to this action took place in the Eastern District of Pennsylvania.

PHLDMS1 3101164v.3

13.    On information and belief, the Hartford Policies were delivered to ICC in the Commonwealth of Pennsylvania at its location in King of Prussia, Pennsylvania.

14.    Upon information and belief, ICC, a resident of the Commonwealth of Pennsylvania, is located in and regularly conducts business from King of Prussia, Pennsylvania and, therefore, is subject to personal jurisdiction within the Eastern District of Pennsylvania.

15.    However, by Order dated May 30, 2006, Defendants' Motion to Transfer Venue was granted and this action was transferred to the United States District Court for the District of Delaware.

## THE UNDERLYING *NOKIA* ACTION

### Nokia's Initial Complaint

16.    On or about January 12, 2005, Nokia Corp. and Nokia, Inc. (collectively "Nokia") filed the initial *Nokia* complaint against ICC and ITC in the United States District Court for the District of Delaware.

17.    The initial *Nokia* complaint sets forth 21 causes of action - 20 of which seek declarations of non-infringement and/or invalidity as to various patents purportedly held by InterDigital relating to mobile phone technology and one of which sets forth a claim for alleged violations of the Lanham Act. *See Nokia* complaint, attached hereto as Exhibit A.

18.    The initial *Nokia* complaint sets forth Nokia's claims that:

    (a)    InterDigital is the owner of many patents. InterDigital has been claiming since the early 1990's that these patents cover much of the technology necessary to operate mobile phone systems. *See Nokia* complaint, ¶ 8.

    (b)    InterDigital has been involved in litigation with two other companies, Motorola, Inc. and Ericcson, involving whether these companies' products

infringe InterDigital's patents, but courts have rejected most of InterDigital's patent infringement claims. *See Nokia* complaint, ¶¶ 9, 10.

(c)    InterDigital has "more recently" been claiming that its patents cover the technology being used in new mobile phone systems, the so-called "3G" technology. *See Nokia* complaint, ¶ 11.

(d)    Nokia and InterDigital are parties to three licensing agreements which license to Nokia the right to manufacture and sell products that fall within the older (2G) and the new (3G) technology and patents owned by InterDigital. *See Nokia* complaint, ¶ 12.

(e)    The parties are engaged in an arbitration relating to royalties owed by Nokia under the licensing agreements. *See Nokia* complaint, ¶ 14. On information and belief, the arbitration has been resolved in favor of InterDigital. *See* InterDigital Wins Ruling in Nokia Royalty Dispute, WALL STREET JOURNAL, December 29, 2005, attached as Exhibit B.

(f)    The licensing agreements are in place only to the end of 2006 and Nokia contends that it believes (based in part on InterDigital's purported litigiousness) that InterDigital will sue Nokia for patent infringement at that time. *Nokia* complaint, ¶¶ 15, 16.

19.    Nokia's claim of violation of the Lanham Act (Count XXI of the *Nokia* complaint) alleges that InterDigital has made false or misleading representations about InterDigital patents and Nokia's products and the application of InterDigital's patents to Nokia's products. Nokia asserts that these statements have damaged Nokia's business and reputation in the wireless market. *See Nokia* complaint, ¶ 142.

20.    The initial *Nokia* complaint alleges that InterDigital made these false statements in "bad faith" and with "knowledge of their falsity." *See Nokia* complaint, ¶ 146.

21.    By Memorandum Opinion dated December 21, 2005, the United States District Court for the District of Delaware dismissed Nokia's declaratory judgment claims relating to non-infringement and patent invalidity for lack of jurisdiction. *Nokia Corp. v. InterDigital Communications,* Slip Copy, 2005 WL 3525696 (D. Del. Dec. 21, 2005).

PHLDMS1 3101164v.3

22.     Only the Lanham Act count (Count XXI of the *Nokia* complaint) remained from the initial *Nokia* complaint.

### Nokia's Amended Complaint

23.     On or about February 6, 2007, the *Nokia* court granted Nokia leave to file an amended complaint. Pursuant to that Order, Nokia's Amended Complaint was deemed filed as of that date.

24.     Nokia's Amended Complaint sets forth fourteen (14) causes of actions against InterDigital. *See Nokia* Amended Complaint (Public Version), attached hereto at Exhibit B.

25.     Nokia's Amended Complaint differs from Nokia's initial complaint in at least three respects:  (1) Nokia does not repeat the numerous patent invalidity/non-infringement counts raised in the initial complaint (which counts Hartford understands have since been dismissed), (2) Nokia alleges two separate Lanham Act claims, and (3) Nokia adds a number of state law claims. *See id.*

26.     In Count I of the amended complaint, Nokia alleges its first Lanham Act claim – namely that InterDigital used "false or misleading descriptions or representations in connection with its patent portfolio, the 3G standards (including the UMTS standard, the CDMA 2000 standard, and the TD-SCDMA standard), Nokia's products, the applicability of InterDigital's patents to Nokia's products, and the applicability of InterDigital's patents to 3G wireless standards within the meaning of 15 U.S.C. § 1125(a) (§ 43 of the Lanham Act)." *See Nokia's Amended Complaint* at ¶ 48.

27.     In Count II of the amended complaint, Nokia alleges its second Lanham Act claim – namely that "InterDigital declared to ETSI as essential at least 100 US patents and 85 US

patent applications that have issued as patents since they were declared InterDigital to [the European Telecommunications Standards Institute ("ETSI")]." *See id.* at ¶ 60.

28.    Like the initial complaint, however, Nokia alleges throughout the Amended Complaint that InterDigital's actions were "willful and in bad faith", and that InterDigital made false and misleading statements "in bad faith and with knowledge of their falsity." *See, e.g., id.* at ¶¶ 57, 65.

### Statements Identified by Nokia as Supporting its Claims Against InterDigital

29.    Upon information and belief, in the course of discovery in the *Nokia* action, Nokia has identified various statements allegedly supportive of its claims against InterDigital.

30.    Upon information and belief, certain of the statements identified by Nokia were made outside of Hartford's coverage territory and others have been made outside the Hartford policy periods.

31.    For example, upon information and belief, on or about June 30, 2006, Nokia filed its Statement Pursuant to First Discovery Order in which Nokia identified twenty-one (21) statements in support of its allegations that "InterDigital has repeatedly made public statements that its patent portfolio covers the practice of 3G wireless phone systems and the sale of 3G complaint products." *See* Statement Pursuant to First Discovery Order, attached hereto as Exhibit C.

32.    Those 21 statement were organized into four general categories:

    (1)    statements made in InterDigital's filings with the United States
           Securities and Exchange Commission (seven statements);

    (2)    statements on the InterDigital website (five statements);

-7-

     (3)     statements made through various news outlets (seven statements); and

     (4)     declarations to the European Telecommunications Standards Institute ("ETSI") (two statements).

33.     Upon further information and belief, on or about August 15, 2006, Nokia served its First Supplemental Objections and Responses to InterDigital's Interrogatories. *See* First Supplemental Objections and Responses to InterDigital's Interrogatories, attached hereto as Exhibit D.

34.     Therein, Nokia identified four categories of statements at issue, including:

     (1)     InterDigital's essentiality declarations to the European Telecommunications Standards Institute ("ETSI"). The first of these declarations was made on April 10, 2001.

     (2)     InterDigital's 3G licensing presentations to Nokia in January 2002 and June 2003, wherein InterDigital allegedly contended that certain patents were essential to certain 3G standards. The presentations reportedly were memorialized in two PowerPoint presentations.

     (3)     InterDigital's public statements, to the media and other persons or entities, regarding the essentiality of its patents, including but not limited to statements dating back to at least 1999; and

     (4)     Statements in InterDigital's SEC filings, including those dating back to at least 2000.

35.     Upon information and belief, InterDigital has summarized the statements it believes are at issue in Nokia's initial complaint – by identifying such statements in the redacted exhibits to InterDigital's proposed December 2006 Summary Judgment brief. *See* Exhibit E.

36.     In those redacted exhibits, InterDigital similarly identifies statements made outside of Hartford's coverage territory and/or made prior to the Hartford policy periods. *See id.*

PHLDMS1 3101164v.3

37.    In all, Nokia and InterDigital appear to have identified twenty-four (24) alleged statements of InterDigital. *See* Exhibit F, attaching Hartford's March 27, 2007 letter from Michael Hebert to Stephen Mathes and chart appended thereto summarizing those statements.

38.    Most of those statements were made outside the Hartford "coverage territory" and/or outside the Hartford policy periods. *See id.*

39.    Hartford has requested that InterDigital advise Hartford of any other statements at issue in the *Nokia* action of which InterDigital is aware. *See id.*

40.    To date, Inter Digital has not advised Hartford of any other such statements.

### THE HARTFORD POLICIES

#### The General Liability Policies

41.    Hartford Fire issued the following two commercial general liability policies to ICC as the named insured:

> (a)    Policy No. 39 UUN TS 0845 DB for the December 22, 2003 to December 22, 2004 policy period; and,
>
> (b)    Policy No. 39 UUN TS 0845 K1 for the December 22, 2004 to December 22, 2005 policy period.

42.    The Hartford Fire general liability policies provide coverage subject to, among other things, a $1 million per occurrence limit, a $1 million personal and advertising injury limit, and a $2 million general aggregate limit.

43.    Hartford Fire's general liability policies provide that Hartford will pay certain sums that the insured becomes legally obligated to pay as damages because of "bodily injury," "property damage," and/or "personal and advertising injury" to which the insurance applies.

44.    The "bodily injury" or "property damage" must be caused by an "occurrence" that takes place in a "coverage territory" during the policy period.

45.    The Hartford Fire general liability policies define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

46.    The Hartford Fire general liability policies define "bodily injury" as "bodily injury, sickness or disease sustained by a person, including mental anguish or death resulting from any of these at any time."

47.    The Hartford Fire general liability policies define "property damage" as "physical injury to tangible property, including all resulting loss of use of that property . . . ." and as "[l]oss of use of tangible property that is not physically injured. . . ."

48.    On information and belief, InterDigital does not contend that the *Nokia* action implicates "bodily injury" or "property damage" coverage.  If InterDigital contends that covered "bodily injury" and/or "property damage" are alleged in the *Nokia* action, Hartford will, at that time, amend this complaint to include the applicable exclusions with regard to "bodily injury" and/or "property damage."

49.    The Hartford Fire general liability policies also provide a duty to defend and/or indemnify "those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies" provided that the offense arises out of the insured's business and was committed in the "coverage territory" during the policy period.

50.    The Hartford CGL policies define "coverage territory" as:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in a. above; or

c. All other parts of the world if the injury or damage arises out of:

> (1) Goods or products made or sold by you in the territory descried in a. above;
>
> (2) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; or
>
> (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic communication

provided the insured's responsibility to pay damages is determined in the United States of America (including its territories and possessions), Puerto Rico and Canada, in a "suit" on the merits according to the substantive law in such territory or in a settlement we agree to. (emphasis added).

51.    The Hartford Fire general liability policies define "personal and advertising injury" as "injury, including consequential 'bodily injury,' arising out of one or more of the following offenses:

a.    False arrest, detention or imprisonment;

b.    Malicious prosecution;

c.    The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d.    Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e.    Oral, written or electronic publication of material that violates a person's right of privacy;

-11-

      f.     Copying, in your "advertisement" or on "your web site", a person's or organization's "advertising idea" or style of "advertisement";

      g.     Infringement of copyright, slogan, or title of any literary or artistic work, in your "advertisement" or on "your web site"; or

      h.     Discrimination or humiliation that results in injury to the feelings or reputation of a natural person."

(Parts g. and i. of the definition of "personal and advertising injury" are added/amended to the policy by the Cyberflex endorsement, amending Coverage B).

52.     Hartford is not obligated to defend or indemnify a "suit" that does not seek covered damages.

53.     The Hartford Fire general liability policies bar coverage for "personal and advertising injury" to the extent precluded by the various policy exclusions, including but not limited to those set forth below:

      a.     Knowing Violation of Rights of Another

           "Personal and advertising injury" caused by an offense committed by, at the direction or with the consent or acquiescence of the insured with the expectation of inflicting "personal and advertising injury."

      b.     Material Published with Knowledge of Falsity

           "Personal and advertising injury" arising out of oral, written or electronic publication of material, if done by or at the direction of the insured with knowledge of its falsity.

      c.     Material Published Prior to Policy Period

           "Personal and advertising injury" arising out of oral, written or electronic publication of material whose first publication took place before the beginning of the policy period.

* * *

-12-

g.   Quality or Performance of Goods - - Failure to Conform to Statements

"Personal and advertising injury" arising out of the failure of goods, products, or services to conform with any statement of quality or performance made in your "advertisement" or on "your web site";

\* \* \*

i.   Infringement of Intellectual Property Rights

"Personal and advertising injury" arising out [of] any violation of any intellectual property rights such as copyright, patent, trademark, trade name, trade secret, service mark or other designation of origin or authenticity.

\* \* \*

(Exclusions g. and i. are added/amended to the policy by the Cyberflex endorsement, amending Coverage B).

### The Umbrella Policies

54.   Hartford Casualty issued the following two umbrella policies to ICC as the named insured:

(a)   Policy No. 39 RHU TS 0953 for the December 22, 2003 to December 22, 2004 policy period; and,

(b)   Policy No. 39 RHU TS 0953 for the December 22, 2004 to December 22, 2005 policy period.

55.   The Hartford Casualty umbrella policies each provide coverage subject to a $10,000 self-insured retention, a $15 million per occurrence limit, and a $15 million general aggregate limit.

56.   The Hartford Casualty umbrella policies provide that Hartford Casualty "will pay those sums that the 'insured' becomes legally obligated to pay as 'damages' in excess of the

-13-

'underlying insurance,' . . . because of 'bodily injury,' 'property damage,' or 'personal and advertising injury' to which this insurance applies because of an 'occurrence.'"

57.    The Hartford Casualty umbrella policies define "occurrence" as:

1.    With respect to any "bodily injury" or "property damage": an accident, including continuous or repeated exposure to substantially the same general harmful conditions, and

2.    With respect to "personal and advertising injury": an offense described in one of the numbered subdivisions of that definition in the "underlying insurance".

58.    The terms "bodily injury," "property damage" and "personal and advertising injury," since not otherwise defined within the Hartford Casualty umbrella policies, "shall follow the definitions of the applicable 'underlying insurance' policy" – that is, the Hartford Fire general liability policy definitions as set forth above.

59.    The Hartford Casualty umbrella policies will not provide either a defense or indemnity for "personal and advertising injury" in accordance with the following exclusion:

4.    Personal and Advertising Injury

This policy does not apply to "personal and advertising injury."

EXCEPTION

This exclusion does not apply if "underlying insurance" is applicable to "personal and advertising injury" and to claims arising out of that "personal and advertising injury."

60.    Additionally, the Hartford Casualty umbrella policies contain an endorsement entitled Amendment of Insuring Agreement -- Known Injury or Damage, which provides *inter alia*:

-14-

(2) This insurance applies to "bodily injury", "property damage"
or "personal and advertising injury" only if:

(a) The "bodily injury", "property damage" or "personal
and advertising injury" occurs during the "policy period";

61.    The Hartford Casualty umbrella policies provide a duty to defend "bodily injury,"

"property damage," and/or "personal and advertising injury" to which the insurance applies and

for which either there is no "underlying insurance" or the "underlying insurance" has been

exhausted by payments of "damages" for "occurrences" within the "policy period."

62.    The Hartford Fire general liability policies and the Hartford Casualty umbrella

policies are collectively referred to herein as the "Hartford Policies."

## COVERAGE DISPUTE

63.    InterDigital tendered the *Nokia* complaint and later the *Nokia* Amended

Complaint to Hartford seeking a defense and indemnity for said action.

64.    In response to the tender of the *Nokia* complaint, by letter dated April 5, 2005,

Hartford denied any obligation to defend and/or indemnify InterDigital and advised, *inter alia,*

that the *Nokia* complaint did not seek damages for any "bodily injury," "property damage," or

"personal and advertising injury" as defined in the Hartford Policies.

65.    In the April 5, 2005 letter, Hartford requested further information concerning ITC

given that ITC was not expressly listed as a Named Insured or Additional Insured to the Hartford

Policies.

66.    Thereafter, InterDigital challenged Hartford's declination of coverage and argued

that the Lanham Act allegations within the *Nokia* complaint constitute a "personal and

advertising injury."

-15-

67.     By letter dated June 6, 2005, Hartford reaffirmed its declination of coverage.

68.     By letter dated October 12, 2005, InterDigital again challenged Hartford's declination of coverage.

69.     Thereafter, InterDigital requested that Hartford provide a defense and indemnity with respect to Nokia's Amended Complaint.

70.     In response to the tender of the *Nokia* Amended Complaint, by letter dated March 27, 2007, Hartford denied any obligation to defend and/or indemnify InterDigital and advised, *inter alia,* that the *Nokia* Amended Complaint does not allege "bodily injury", "property damage" or "personal and advertising injury" covered by the Hartford policies and that one or more of the Hartford policy exclusions barred coverage. *See* Exhibit F.

71.     Pursuant to 28 U.S.C. § 2201 *et seq.*, Hartford is entitled to a judicial determination concerning the scope and nature of its rights and obligations, if any, under the Hartford Policies with respect to the *Nokia* complaint and Amended Complaint.

72.     For the reasons set forth herein, an actual, justiciable controversy exists between the parties concerning their respective rights and obligations, if any, under the Hartford Policies with respect to the *Nokia* action.

## COUNT ONE

*For A Declaratory Judgment That Hartford Has No Duty to Defend InterDigital in the Nokia Action*

73.     Hartford restates the allegations set forth in paragraphs 1 through 72 of this First Amended Complaint and incorporates them by reference herein.

-16-

74.    Under the terms, conditions, definitions, exclusions and endorsements of the Hartford Policies, Hartford has no duty to defend InterDigital in connection with the *Nokia* action.

75.    Neither the *Nokia* complaint nor the Amended Complaint alleges any "bodily injury" caused by an "occurrence" as defined by the Hartford Policies.

76.    Neither the *Nokia* complaint nor the Amended Complaint alleges any "property damage" caused by an "occurrence" as defined by the Hartford Policies.

77.    Neither the *Nokia* complaint nor the Amended Complaint alleges any "personal and advertising injury" as defined by the Hartford Policies.

78.    Upon information and belief, Nokia's claims are based upon statements made outside the Hartford "coverage territory" and/or outside the Hartford policy periods.

79.    Hartford has no obligation to provide coverage for such claims. Further, the costs associated with defending any such claims may be the responsibility of some other insurance company.

80.    Upon information and belief, a number of the statements upon which Nokia's claims are based were made outside of the Hartford policies' coverage territory -- such as the statements to the ETSI.

81.    Additionally, depending upon where InterDigital's licensing statements/presentations were made, those statements also may fall outside Hartford's "coverage territory."

-17-

82.     Hartford has denied coverage for any claims based upon statements made outside the Hartford coverage territory and has asked InterDigital to identify each and every offense (and all related statements) at issue which InterDigital contends was committed in the Hartford "coverage territory" and provide Hartford with copies of all such statements and information as to where such statement was made. *See* Exhibit F.

83.     Additionally, both the *Nokia* complaint and the *Nokia* Amended Complaint repeatedly and expressly allege that (a) InterDigital has used false or misleading descriptions and has made false public statements regarding the scope of its patent portfolio and the applicability of its patents, and (b) that these statements were made in "bad faith" and with "knowledge of their falsity." *See, e.g., Nokia* complaint, ¶¶ 142-143, 146; Amended Complaint, ¶¶ 40, 57, 65.

84.     The foregoing allegations are incorporated into and made a part of each of Nokia's claims in the Amended Complaint.

85.     The Knowing Violation of Rights of Another Exclusion and the Material Published with Knowledge of Falsity Exclusion bar coverage, respectively, for "personal and advertising injury" if it arose out of oral, written or electronic publication of material done by or at the direction of the insured with knowledge of its falsity, or if the "personal and advertising injury" was caused by the insured with the expectation of inflicting "personal and advertising injury.

86.     Further, as determined in the *Nokia* action, Nokia is required to prove bad faith in order to be successful on its claims against InterDigital. *See Nokia Corp. v. InterDigital Communications*, 2005 WL 3525696, *5 (D. Del. Dec. 21, 2005).

-18-

87.     Nokia cannot prevail on its Lanham Act claims or its state law claims contained in the Amended Complaint without proving that InterDigital acted in bad faith, and thus implicating either the Knowing Violation of Rights of Another Exclusion and/or the Material Published with Knowledge of Falsity Exclusion contained in the Hartford policies. As such, Hartford has no duty to defend InterDigital.

88.     Nokia's allegations that InterDigital had knowledge of the false and misleading statements at issue in the Underlying Action place these claims squarely within the Material Published with Knowledge of Falsity Exclusion.

89.     The Hartford Fire general liability policies exclude "'personal and advertising injury' arising out of oral, written or electronic publication of material, if done by or at the direction of the insured with knowledge of its falsity." This exclusion bars any duty to defend the *Nokia* action because, *inter alia*:

     (a)     The *Nokia* complaint and Amended Complaint allege that InterDigital has made false statements regarding the scope and applicability of its patents in "bad faith" and with "knowledge of their falsity." *See, e.g., Nokia* complaint, ¶ 146; *Nokia* Amended Complaint, ¶¶ 40, 57, 65.

     (b)     The United States District Court for the District of Delaware held in its December 21, 2005 Memorandum Opinion that in order to state a claim under section 43(a) of the Lanham Act, Nokia must demonstrate that InterDigital (the patent holder) acted in bad faith. *See Nokia Corp. v. InterDigital Communications,* Slip Copy, 2005 WL 3525696, *5 (D. Del. Dec. 21, 2005).

90.     The Hartford Fire general liability policies exclude "'personal and advertising injury' caused by an offense committed by, at the direction or with the consent or acquiescence of the insured with the expectation of inflicting 'personal and advertising injury'." This exclusion bars any duty to defend the *Nokia* action because, *inter alia:*

PHLDMS1 3101164v.3

(a)   Nokia alleges that InterDigital has used false or misleading descriptions and has made false public statements regarding the scope of its patent portfolio and the applicability of its patents. *See, e.g., Nokia* complaint, ¶¶ 142-143; *Nokia* Amended Complaint, ¶¶ 36-37.

(b)   Nokia asserts that these statements were made in "bad faith" and with "knowledge of their falsity." *See, e.g., Nokia* complaint, ¶ 146; *Nokia* Amended Complaint, ¶¶ 40, 57, 65.

91.   The Hartford Fire general liability policies exclude "'personal and advertising injury' arising out of the oral, written or electronic publication of material whose first publication took place before the beginning of the policy period." This exclusion applies to the *Nokia* complaint and Amended Complaint because, *inter alia*:

(a)   The earliest Hartford general liability policy issued to ICC bears an inception date of December 22, 2003;

(b)   There is no duty to defend available under the Hartford Fire general liability policies for any "personal and advertising injury" arising out of material "first published" prior to December 22, 2003.

(c)   Nokia alleges that InterDigital began making allegations in the "early 1990's" concerning its patents for 2G technology (*see Nokia* complaint, ¶ 8; *Nokia* Amended Complaint, ¶ 22);

(d)   Nokia alleges that "more recently" InterDigital's allegations include that it also has patents which cover 3G technology. *See Nokia* complaint, ¶ 11; *Nokia* Amended Complaint, ¶ 27; and

(e)   The statements identified by both Nokia and InterDigital as being at in the *Nokia* action evidence that the prior publication exclusion applies since Nokia's claims are based upon InterDigital's statements whose first published took place before the Hartford policy periods. *See, e.g.,* Exhibit F (and chart attached thereto).

92.   The Hartford Fire general liability policies exclude "'personal and advertising injury' arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your 'advertisement' or on 'your web site'." This exclusion applies to the *Nokia* complaint and Amended Complaint because, *inter alia*:

-20-

    (a)    Nokia alleges that InterDigital claims in public statements that InterDigital's patent portfolio covers the practice of 3G wireless phone systems. *See, e.g., Nokia* complaint, ¶ 143; *Nokia* Amended Complaint, ¶¶ 35-36.

    (b)    Nokia alleges that these statements are false and that the InterDigital patents are not necessary to practice 3G wireless phone standards. *See Nokia* complaint, ¶ 143; *Nokia* Amended Complaint, ¶¶ 50-52.

93.    The Hartford Fire general liability policies exclude "'personal and advertising injury' arising out of any violation of any intellectual property rights such as copyright, patent, trademark, trade name, trade secret, service mark or other designation of origin or authenticity." This exclusion applies to the *Nokia* complaint and Amended Complaint because, *inter alia*:

    (a)    The claims in the *Nokia* action arise out of a dispute concerning intellectual property rights.

    (b)    The Lanham Act violations arise out of statements allegedly made by InterDigital regarding the scope of its patent portfolio and Nokia's possible violation of such patents. *See, e.g., Nokia* complaint, ¶¶ 143, 145; *Nokia* Amended Complaint, ¶¶ 50-52.

94.    The Hartford Policies cover only those "personal and advertising injury" offenses that were committed during the policy period. Certain, if not all, of the statements made by InterDigital took place outside the Hartford policy period:

    (a)    Nokia alleges that InterDigital began making statements concerning the scope of InterDigital's patents in the "early 1990's." *See, e.g., Nokia* complaint, ¶ 8; *Nokia* Amended Complaint, ¶ 22.

    (b)    Nokia further alleges that "more recently" InterDigital has made statements concerning the scope of InterDigital's 3G technology patents. *See, e.g., Nokia* complaint, ¶ 11; *Nokia* Amended Complaint, ¶ 27.

    (c)    Additionally, both Nokia and InterDigital have identified as among the statements at issue in the *Nokia* action numerous statements made outside the Hartford policy periods. *See, e.g.,* Exhibit F (and chart attached thereto).

95.    Because the *Nokia* action does not allege any "personal and advertising injury" within the Hartford Fire general liability policies, there is no duty to defend implicated pursuant to the Hartford Casualty umbrella policies which specifically exclude "personal and advertising injury" unless "'underlying insurance' is applicable."

96.    Since there is no duty to defend under the Hartford Fire general liability policies for the reasons set forth herein, there is also no duty to defend under the umbrella policies issued by Hartford Casualty.

97.    To the extent that some or all of InterDigital's expense, loss or obligation was voluntarily incurred, without the consent of Hartford, such expense, loss or other obligations are excluded from the Hartford Policies.

98.    To the extent that InterDigital failed to mitigate and/or avoid any legal fees and costs incurred in connection with the underlying claims, such legal fees, costs or other obligations are excluded from the Hartford Policies.

99.    Any obligations otherwise determined to be afforded under the Hartford Policies (which Hartford denies) are limited, and perhaps rendered excess, by the existence of any other insurance and the terms and conditions of any "other insurance" provisions in the Hartford Policies. As such, one or more other insurance carriers may be obligated to pay and/or share in any defense due from Hartford.

100.    Hartford has requested that InterDigital advise Hartford of any other insurers and that, to the extent that InterDigital continues to believe that it is entitled to coverage from Hartford, InterDigital immediately place all other insurers of notice of this claim – including any

-22-

insurers who provided coverage prior to the inception of the Hartford policies and any insurers

providing coverage for international offenses – due to the fact that certain of the statements at

issue are alleged to have been made outside the Hartford coverage territory and/or Hartford

policy periods. *See* March 27, 2007 letter. To date, Hartford has not received any response from

InterDigital to this request.

**WHEREFORE,** Plaintiffs Hartford Fire and Hartford Casualty respectfully request that

the Court:

     (a)    Declare that Hartford has no duty to defend InterDigital in connection with the *Nokia* action, including both the claims asserted in the *Nokia* complaint and in the Amended Complaint;

     (b)    Alternatively, should the Court determine that there is a duty to defend, the Court should also:

          (1)    declare the respective rights and obligations of the parties under the Hartford Policies, and declare the limits of any obligation of Hartford to defend InterDigital with respect to the *Nokia* complaint and Amended Complaint;

          (2)    determine the respective rights and obligations (if any) of Hartford in seeking and obtaining reimbursement from InterDigital of any fees, costs or settlements not related to the defense or settlement of a potentially covered claim;

     (c)    Grant Hartford such other and further relief as may be necessary and appropriate under the circumstances.

## COUNT TWO

*For A Declaratory Judgment Concerning Whether ITC Is An Insured Under The Hartford Policies And Entitled to Either A Defense or Indemnity Thereunder*

101.    Hartford restates the allegations set forth in Paragraphs 1 through 100 of this First

Amended Complaint and incorporates them by reference herein.

102.    By letter dated March 28, 2005, Hartford acknowledged receipt of the *Nokia*

complaint, advised that "InterDigital Technology Corporation" is not listed on the policy, and

-23-

asked for information about the relationship of this entity to InterDigital Communications Corporations, Inc.

103.    InterDigital responded by letter dated April 21, 2005 and advised that "InterDigital Technology Corporation is (i) a direct, wholly owned, subsidiary of InterDigital Communications Corporation and (ii) not an insured under another policy." *See* InterDigital Letter dated April 21, 2005.

104.    InterDigital requested that Hartford confirm that ITC is an "insured under Section II of the Commercial General Liability coverage Form . . . and the umbrella policy referenced above."

105.    ITC is not expressly named as either a Named Insured or an Additional Insured under the Hartford Policies.

106.    ITC is not a Named Insured to the Hartford Policies unless it qualifies as such pursuant to a Named Insured endorsement attached to one of the Hartford Policies.

107.    Furthermore, unless ITC qualifies as an insured pursuant to the "Who Is An Insured" provisions to any of the Hartford Policies, ITC is not an insured under such policies.

108.    No duty to defend or indemnify is extended to ITC under the Hartford Policies to the extent that ITC does not constitute a named insured or an additional insured under the policies.

**WHEREFORE,** Plaintiffs Hartford Fire and Hartford Casualty respectfully request that the Court:

-24-

(a)    Declare that Hartford has no duty to defend or indemnify ITC in connection with the *Nokia* action;

(b)    Alternative, should the Court determine that there is a duty to defend and/or indemnify ITC, the Court should also:

    (1)    declare the respective rights and obligations of the parties under the Hartford Policies, and declare the limits of any obligation of Hartford to defend and/or indemnify ITC with respect to the *Nokia* action;

    (2)    determine the respective rights and obligations (if any) of Hartford in seeking and obtaining reimbursement from ITC of any fees, costs or settlements not related to the defense or settlement of a potentially covered claim;

(c)    Grant Hartford such other and further relief as may be necessary and appropriate under the circumstances.

**WHITE AND WILLIAMS**

Attorneys for Plaintiffs, Hartford Fire Insurance Company and Hartford Casualty Insurance Company

By: _____

James S. Yoder, Esquire
White and Williams LLP
824 N. Market Street - Suite 902
Wilmington, DE 19899-0709
(302) 654-0424

and

Gale White, Esquire
Anthony L. Miscioscia, Esquire
White and Williams LLP
1800 One Liberty Place
Philadelphia, PA 19103-7395
Tel. No. (215) 864-6234/6356

PHLDMS1 3101164v.3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **HARTFORD FIRE INSURANCE COMPANY and HARTFORD CASUALTY INSURANCE COMPANY** | : | JURY TRIAL DEMANDED |
| | : | |
| Plaintiffs, | : | **COMPLAINT** |
| | : | |
| v. | : | CIVIL ACTION NO. 06-422-JJF |
| | : | |
| **INTERDIGITAL COMMUNICATIONS CORPORATION and INTERDIGITAL TECHNOLOGY CORPORATION** | : | |
| | : | |
| Defendants. | : | |

## DEMAND FOR TRIAL BY JURY

Plaintiffs Hartford Fire Insurance Company and Hartford Casualty Insurance Company

hereby demand a trial by jury of issues so triable.

WHITE AND WILLIAMS

Attorneys for Plaintiffs, Hartford Fire
Insurance Company and Hartford Casualty
Insurance Company

By: _____
James S. Yoder, Esquire
White and Williams LLP
824 N. Market Street - Suite 902
Wilmington, DE 19899-0709
(302) 654-0424

and

Gale White, Esquire
Anthony L. Miscioscia, Esquire
WHITE AND WILLIAMS LLP
One Liberty Place, Suite 1800
Philadelphia, PA 19103
(215) 864-6234-6356

PHLDMS1 3101164v.3

## CERTIFICATE OF SERVICE

I, James S. Yoder, Esquire, hereby certify that I have caused a true and correct copy of Hartford Fire Insurance Company and Hartford Casualty Insurance Company's First Amended Complaint to be served, via regular mail, postage prepaid, on this date, upon the following:

Arleigh P. Helfer, III, Esquire
Steven Mathes, Esquire
Hoyle, Fickler, Herschel & Mathes LLP
Suite 1500
One South Broad Street
Philadelphia, PA 19107-3418
*Counsel for InterDigital
Communications Corporation and
InterDigital Technology Corporation*

Richard L. Horwitz, Esquire
Jennifer C. Wasson, Esquire
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE 19801
*Counsel for InterDigital Communications
Corporation and InterDigital Technology
Corporation*

WHITE AND WILLIAMS LLP

James S. Yoder

Date: April 20, 2007

-27-

# EXHIBIT  A

PHLDMS1 1956948v.1

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NOKIA CORPORATION and NOKIA, INC.

      Plaintiffs,

         v.

INTERDIGITAL COMMUNICATIONS CORPORATION and INTERDIGITAL TECHNOLOGY CORPORATION

      Defendants.

COPY

Civil Action No. ___0 5 - 1 6___

DEMAND FOR JURY TRIAL

**COMPLAINT FOR DECLARATORY JUDGMENTS
OF PATENT INVALIDITY AND NONINFRINGEMENT AND VIOLATIONS OF
THE LANHAM ACT RELATING TO 3G MOBILE PHONE TECHNOLOGY**

Plaintiffs Nokia Corporation and Nokia, Inc. (collectively referred to as "Nokia") file this Complaint for Declaratory Judgments Of Patent Invalidity And Noninfringement And Violations Of The Lanham Act Relating To 3G Mobile Phone Technology against Defendants InterDigital Communications Corporation and InterDigital Technology Corporation (collectively "InterDigital") and in support of their Complaint allege:

### Nature And Basis Of Action

1.    This is an action arising under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the United States Patent Laws, 35 U.S.C. § 1 *et seq.* and the Lanham Act, 15 U.S.C. §1051 *et seq.*. Nokia requests declarations that: (i) the claims of various patents owned by InterDigital are invalid; and (ii) Nokia does not infringe any claim of the patents. Nokia seeks damages and injunctive relief for InterDigital's violations of the Lanham Act.

### The Parties

2.    Nokia Corporation is a global leader in the design, manufacture and supply of mobile handset and infrastructure products. Nokia Corporation is incorporated under the laws of Finland and has its principal place of business at Keilalahdentie 4, Espoo, Finland. Nokia, Inc. is incorporated under the laws of the state of Delaware and has a principal place of business at 6000 Connection Dr., Irving, Texas.

3.    InterDigital Communications Corporation is incorporated under the laws of the State of Pennsylvania and has its principal place of business at 781 Third Avenue, King of Prussia, Pennsylvania. InterDigital Technology Corporation is incorporated under the laws of the State of Delaware and has its principal place of business at 300 Delaware Avenue, Suite 527, Wilmington, Delaware. Upon information and belief, InterDigital Technology Corporation is a wholly-owned subsidiary of InterDigital Communications Corporation.

### Jurisdiction And Venue

4.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 based on federal question jurisdiction.

5.    This Court has personal jurisdiction over InterDigital Communications Corporation and InterDigital Technology Corporation pursuant to the laws of the State of Delaware, including the Delaware long-arm statute, 10 Del. Code § 3104.

6.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## Facts Giving Rise To This Action

7.      InterDigital has continued to represent for more than a decade both publicly and to the wireless handset industry that it has hundreds of patents that cover the principal wireless handset standards in the United States.

*InterDigital's 2G Allegations*

8.      InterDigital began making allegations in the early 1990's that it had hundreds of patents that cover the principle "2G" mobile phone systems that implement the IS-54/136 and GSM mobile phone standards. The IS-54/136 and GSM standards are implemented through so-called 2G mobile phone systems using Time Division Multiple Access ("TDMA") technology. The IS-54/136 standard, or US-TDMA, is a standard developed in the United States and includes an early version of the standard, IS-54, and a later revision, IS-136. The GSM standard is a similar standard originally developed in Europe. Both IS-54/136 and GSM standards use TDMA as a means by which multiple mobile callers can use the same radio frequency concurrently.

9.      InterDigital has in the past asserted certain of its 2G patents in court against Motorola, Inc. and Ericsson. The courts in the *Motorola* and *Ericsson* cases determined that most, if not all, of the asserted patents in those cases were either invalid or not infringed by mobile handset and infrastructure products used in the United States.

10.     Most of the 2G patents asserted against Motorola and Ericsson by InterDigital were found to be invalid or not infringed for at least the following reasons:

- Many of the broad claims of the patents are limited to an obsolete speech compression method different from the method used in 2G systems in the United States;

- Many of the claims of the InterDigital 2G Patents are limited to a system with a single base station controlling a single cell. This single base station

- 3 -

limitation was used by InterDigital in the United States Patent Office in an effort to distinguish InterDigital's patents from prior art. No industry standard applicable to mobile handsets or their associated infrastructure contemplates such a system; instead, all current mobile systems in use in the United States use multiple base stations to control multiple cells.

- In an effort to distinguish prior art, many of the claims of the 2G patents were limited – during prosecution of the respective applications in the United States Patent Office and in subsequent litigation – to systems in which the call path is hard-wired, rather than controlled by software. Likewise, no industry standard applicable to mobile handsets or their associated infrastructure requires hard-wired call paths; instead, mobile systems in use in the United States during any relevant period are controlled dynamically by software.

Comparison of the claim limitations of InterDigital 2G patents and their prosecution histories to either the 2G industry standards or any systems in use in the United States shows that none of the hundreds of claims can be infringed by any of those 2G systems, including those utilized by companies such as Motorola, Ericsson and Nokia.

*InterDigital's 3G Allegations*

11.     More recently, InterDigital has made allegations that it has patents that cover "3G" mobile systems that are currently being rolled out and further developed in the United States, referred to as the WCDMA and CDMA 2000 products. The WCDMA and CDMA 2000 standards are implemented through 3G mobile systems using Code Division Multiple Access ("CDMA") technology. The patents that InterDigital contends cover 3G mobile systems (hereafter collectively defined as "InterDigital's 3G Patents"), copies of which are attached as Exhibits A-R, include:

U.S. Patent No. 5,574,747, issued November 12, 1996 (the "'747 patent");

U.S. Patent No. 6,181,949, issued January 30, 2001 (the "'949 patent");

U.S. Patent No. 5,841,768, issued November 24, 1998 (the "'768 patent);

- 4 -

U.S. Patent No. 6,215,778, issued April 10, 2001 (the "'778 patent");

U.S. Patent No. 5,179,572, issued January 12, 1993 (the "'572 patent);

U.S. Patent No. 6,075,792, issued June 13, 2000 (the "'792 patent");

U.S. Patent No. 5,799,010, issued August 25, 1998 (the "'010 patent");

U.S. Patent No. 5,614,914, issued March 25, 1997 (the "'914 patent");

U.S. Patent No. 5,663,990, issued September 2, 1997 (the "'990 patent");

U.S. Patent No. 5,859,879, issued January 12, 1999 (the "'879 patent");

U.S. Patent No. 5,363,403, issued November 8, 1994 (the "'403 patent");

U.S. Patent No. 5,553,062, issued September 3, 1996 (the "'062 patent");

U.S. Patent No. 5,719,852, issued February 17, 1998 (the "'852 patent");

U.S. Patent No. 6,014,373, issued January 11, 2000 (the "'373 patent");

U.S. Patent No. 6,259,688, issued July 10, 2001 (the "'688 patent");

U.S. Patent No. 6,289,004, issued September 11, 2001 (the "'004 patent");

U.S. Patent No. 5,081,643, issued January 14, 1992 (the "'643 patent");
and

U.S. Patent No. 5,673,286, issued September 30, 1997 (the "'286 patent").

Although InterDigital contends that 3G mobile products made in the United States infringe its 3G Patents, all of InterDigital's 3G Patents are either invalid or not infringed by mobile handset and infrastructure products being rolled out on the United States.  In particular, no Nokia product either sold in the United States or in development for sale in the United States infringes any valid claim of InterDigital's 3G Patents.

*The License Agreement Between Nokia and InterDigital*

12.    Nokia and InterDigital are parties to three expressly interrelated agreements ("the Agreements"), the primary subject matter of which is a license to Nokia of the patents owned by InterDigital that InterDigital alleges are required to make and sell products that are compliant with the 2G and 3G telephone standards.

13.    There is a dispute between Nokia and InterDigital as to the validity and scope of the patents that form the basis of the Agreements between them.

14.    With respect to 2G products, despite the invalidity and/or narrowness of InterDigital's 2G patents as determined by the courts in the *Motorola* and *Ericsson* cases, InterDigital has publicly announced its intention to seek hundreds of millions of dollars in royalties from Nokia under the Agreements.   Nokia has refused to pay the fees InterDigital is demanding. The parties are currently engaged in an International Chamber of Commerce Arbitration with respect to 2G products, entitled *Nokia Corporation v. InterDigital Communications Corporation and InterDigital Technology Corporation,* ICC Case Number 12 829/JNK.

15.    With respect to 3G products, InterDigital continues to contend that its patents broadly cover 3G technology.   Under the Agreements, Nokia is licensed to InterDigital's 3G patents only through the end of 2006.  Nokia is currently designing, rolling out and further developing 3G products in the United States that will be manufactured and sold by Nokia after 2006.

16.    Nokia has a reasonable apprehension that InterDigital will sue Nokia for patent infringement with respect to InterDigital's 3G patents.

- 6 -

17.　　InterDigital has a history of litigiousness. InterDigital's tactics are so well known, in fact, that *Forbes Magazine* published an article on InterDigital's litigation tactics, a copy of which is attached as Exhibit S. The article describes InterDigital as a company that uses litigation to "extract[] money from companies" that make handheld mobile phones. The article goes on to explain that InterDigital

> has earned enmity for its hardball enforcement of intellectual property rights. Virtually all of its $33 million profit from the first nine months [of 2003] has come from dragging customers like Ericsson and NEC Corp. through legal disputes over patents.

18.　　In an August 13, 2003, investor conference call, InterDigital's Chief Executive Officer, Howard Goldberg, acknowledged that InterDigital uses litigation as leverage in disputes with companies such as Nokia, included bringing injunctions to prevent the shipping of handsets. A copy of the transcript of the conference call is attached as Exhibit T (see page 14).

19.　　Such articles and statements by InterDigital executives support Nokia's reasonable apprehension that it has regarding InterDigital's willingness and intent to pursue patent infringement litigation against it.

20.　　Nokia has filed this suit because of InterDigital's efforts to enhance the value of its patents and Nokia's current need to design and develop 3G products that it will put into wide scale production after 2006.

21.　　Nokia seeks declarations that the claims of InterDigital's 3G Patents are either invalid or that Nokia's 3G products do not infringe any valid claim of those patents.

22.　　Although Nokia and InterDigital are currently arbitrating their 2G dispute, that dispute does not involve 3G products. Further, when Nokia attempted to raise the validity and scope of relevant InterDigital Patents in the arbitration by requesting that the

Arbitral Tribunal issue declarations on the validity and scope of InterDigital's 2G patents, InterDigital denied that declarations the invalidity and scope of its patents were arbitrable disputes under the Agreements.

## COUNT I.
### Declaration Of NonInfringement Of U.S. Patent No. 5,574,747

23.     Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 22, as if set forth in full.

24.     The '747 patent relates to a system and method for adaptive power control of a spread spectrum transmitter of a mobile unit operating in a cellular-communications network having a plurality of mobile units in communication with a base station. Claims 1-3, 6-10 and 13-24 of the '747 patent are directed to a circuit in the mobile unit which changes the transmitted power of the handset so that the power level detected by the base station is at a "threshold level." This change is made using a step-size algorithm located in the mobile unit. The '747 patent requires that an accumulator in a handset store a series of prior power level values and uses this series in the power control algorithm used by the handset.

25.     The WCDMA and CDMA 2000 3G standards require a command to raise or lower transmitted power within a WCDMA or CDMA 2000 mobile handset based on a power control algorithm. The standards specify that this adjustment be made by infrastructure, not by an algorithm contained in the handset. Accordingly, Nokia does not infringe claims 1-3, 6-10 and 13-24 of the '747 patent either literally or under the doctrine of equivalents, nor does it contribute to the infringement by others or actively induce others to infringe these claims of the '747 patent.

26.     Accordingly, Nokia is entitled to a declaratory judgment of non-infringement of the '747 patent.

## COUNT II.
### Declaration Of Invalidity Of U.S. Patent No. 5,574,747

27.     Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 26, as if set forth in full.

28.     Upon information and belief, at least claims 4-5 and 11-12 of the '747 patent are invalid. The '747 patent relates to a system and method for adaptive power control of a spread spectrum transmitter of a mobile unit operating in a cellular-communications network having a plurality of mobile units in communication with a base station. Claims 4-5 and 11-12 of the '747 patent are invalid in view of a 1993 IEEE publication, Viterbi & Viterbi, *Performance of Power-Controlled Wideband Terrestrial Digital Communication*, IEEE Transactions on Communications, vol. 41, no. 4, April 1993, pp. 559-569, because the limitations of these claims of the '747 patent are either contained in the Viterbi reference or are inherent in wireless systems, including IS-95 systems.

29.     Accordingly, Nokia is entitled to a declaratory judgment of invalidity of claims 4-5 and 11-12 of the '747 patent.

## COUNT III.
### Declaration Of Noninfringement Of U.S. Patent No. 6,181,949

30.     Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 29, as if set forth in full.

31.     The '949 patent relates to a method of controlling initial power ramp-up in CDMA systems by using short codes. Specifically, the patent relates to a system and

method of controlling transmission power during the establishment of a channel in a CDMA communication system utilizing the transmission of a short code from a subscriber unit to a base station during initial power ramp-up. According to the '949 patent, the short code is a sequence for detection by the base station which has a much shorter period than a conventional spreading code. The ramp-up starts from a power level that is guaranteed to be lower than the required power level for detection by the base station. The subscriber unit quickly increases transmission power while repeatedly transmitting the short code until the signal is detected by the base station. Once the base station detects the short code, it sends an indication to the subscriber unit to cease increasing transmission power. Various claims of the '949 patent require a second ramp-up rate after the initial power ramp-up.

32.     Nokia does not infringe Claims 3-5, and 8-10 of the '949 patent. Each of those claims requires a second ramp-up period after the first ramp-up period. WCDMA and CDMA 2000 standards compliant handsets, including those of Nokia, do not have a second ramp-up period. Rather they have a single step increase in the power level after the initial ramp-up. Therefore, Nokia does not infringe Claims 3-5 or 8-10 of the '949 patent either literally or under the doctrine of equivalents, nor does it contribute to the infringement by others or actively induce others to infringe these claims of the '949 patent.

33.     Accordingly, Nokia is entitled to a declaratory judgment of non-infringement of the '949 patent.

- 10 -

## COUNT IV.
### Declaration Of Invalidity Of U.S. Patent No. 6,181,949

34.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 33, as if set forth in full.

35.    Upon information and belief, claims 1-2 and 6-7 of the '949 patent are invalid.    As alleged in paragraph 31 above, the '949 patent relates to a method of controlling initial power ramp-up in CDMA systems.

36.    Claims 1-2, and 6-7 of the '949 patent are either anticipated or obvious in view of the IS-95A standard.    The IS-95A standard, published by the Telecommunications Industry Association, May 1995, discloses each limitation of these claims of the '949 patent.

37.    Claims 1-2, and 6-7 of the '949 patent are also either anticipated or obvious in view of Viterbi & Viterbi, *Erlang Capacity of a Power Controlled CDMA System*, IEEE Journal on Selected Areas in communications, vol. 11, no. 6, August 1993, pp. 892-900.  With respect to the ramp-up limitation contained in the claims of the '949 patent, Viterbi states "[i]f this initial power level is not sufficient for detection, and hence acknowledgement is not received, the user increases his power in constant decibel steps every frame until his request is acknowledged." Id. at p. 898.

38.    Accordingly, Nokia is entitled to a declaratory judgment that Claims 1-2 and 6-7 of the '949 patent are invalid.

## COUNT V.
### Declaration Of Noninfringement Of U.S. Patent No. 5,841,768

39.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 38, as if set forth in full.

40.     The '768 patent relates to a method of controlling initial power ramp-up in a CDMA system.  Specifically, the patent relates to a system and method of controlling transmission power during the establishment of a channel in a CDMA communication system utilizing the transmission of a code from a subscriber unit to a base station during initial power ramp-up.  The code is a sequence for detection by the base station which has a shorter period than a conventional spreading code.  The ramp-up starts from a power level that is guaranteed to be lower than the required power level for detection by the base station. The subscriber unit quickly increases transmission power while repeatedly transmitting the code until the signal is detected by the base station.  Once the base station detects the code, it sends an indication to the subscriber unit to cease increasing transmission power.  The claims of the '768 patent also require transmission of a second periodic signal at a second ramp-up rate with the second ramp-up rate being less than said first ramp-up rate.

41.     Nokia's products do not implement a second ramp-up rate function as claimed in the '768 patent nor does the WCDMA or CDMA 2000 standards require such a second ramp-up rate function.  Therefore, Nokia does not infringe any claim of the '768 patent either literally or under the doctrine of equivalents, nor does it contribute to the infringement by others or actively induce others to infringe any claim of the '768 patent.

42.     Accordingly, Nokia is entitled to a declaratory judgment of non-infringement of the '768 patent.

## COUNT VI.
### Declaration Of Noninfringement of U.S. Patent No. 6,215,778

43.     Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 42, as if set forth in full.

- 12 -

44.    The '778 patent relates to a bearer channel modification system for a code division multiple access (CDMA) communication system.

45.    According to the '778 patent, the multiple access, spread-spectrum communication system disclosed in the patent processes a plurality of information signals received by a Radio Carrier Station (RCS) over telecommunication lines for simultaneous transmission over a radio frequency (RF) channel as a code-division-multiplexed (CDM) signal to a group of Subscriber Units (SUs). The RCS receives a call request signal that corresponds to a telecommunication line information signal, and a user identification signal that identifies a user to receive the call. The RCS includes a plurality of Code Division Multiple Access (CDMA) modems, one of which provides a global pilot code signal. The modems provide message code signals synchronized to the global pilot signal. Each modem combines an information signal with a message code signal to provide a CDM processed signal. The RCS includes a system channel controller coupled to receive a remote call. An RF transmitter is connected to all of the modems to combine the CDM processed signals with the global pilot code signal to generate a CDM signal. The RF transmitter also modulates a carrier signal with the CDM signal and transmits the modulated carrier signal through an RF communication channel to the SUs. Each SU includes a CDMA modem which is also synchronized to the global pilot signal. The CDMA modem despreads the CDM signal and provides a despread information signal to the user. The system includes a closed loop power control system for maintaining a minimum system transmit power level for the RCS and the SUs, and system capacity management for maintaining a maximum number of active SUs for improved system performance.

46.    Accordingly, the claims of the '778 patent are directed to having a subscriber unit change from one spread spectrum channel to another spread spectrum channel having a different data rate.

47.    WCDMA standards compliant infrastructure manages the bandwidth assigned to a base station by changing the bandwidth of an assigned channel, rather than dynamically adding or removing channels. Nokia's WCDMA products do not infringe the '778 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '778 patent.

48.    In CDMA 2000 standards compliant systems, infrastructure manages the bandwidth assigned to a base station by determining the order, type, and number of channels assigned to handsets. Claims 4 of the '778 patent requires assigning multiple channels to a subscriber station at a time. CDMA 2000 infrastructure can manage the bandwidth of a handset solely by changing the type of channel currently assigned to the handset. Nokia's CDMA 2000 handsets do not infringe Claim 4 of the '778 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '778 patent.

49.    Nokia is entitled to a declaratory judgment of non-infringement of the '778 patent.

- 14 -

## COUNT VII.
### Declaration Of Invalidity of U.S. Patent No. 6,215,778

50. Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 49, as if set forth in full.

51. As alleged in paragraph 44 above, the '778 patent relates to a bearer channel modification system for a code division multiple access (CDMA) communication system.

52. Upon information and belief, the claims of the '778 patent are invalid.

53. The claims of the '778 patent are directed to having a subscriber unit change from one spread spectrum channel to another spread spectrum channel having a different data rate.

54. The claims of the '778 patent are either anticipated or obvious in view of the IS-95a standard of May 1995, as modified by *Telecommunications Systems Bulletin, Support for 14.4 kbps Data Rate and PCS Interaction for Wideband Spread Spectrum Cellular Systems*, dated May 11, 1995. Each limitation of the claims of the '778 patent is disclosed or obvious in view of the IS-95a Telecommunications Systems Bulletin and/or the IS-95a standard.

55. The claims of the '778 patent are either anticipated or obvious in view of the A. Baier et al, *Design Study for a CDMA-Based Third-Generation Mobile Radio System*, IEEE Journal on Selected Areas in Communications, vol. 12, no. 4, May 1994. Each limitation of the claims of the '778 patent is disclosed in the Baier reference and/or the IS-95 standard.

56. Nokia is entitled to a declaratory judgment that the claims of the '778 patent are invalid.

## COUNT VIII.
### Declaration Of Noninfringement of U.S. Patent No. 5,179,572

57.     Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 56, as if set forth in full.

58.     The '572 patent relates to a spread spectrum conference calling system and method. Specifically, the patent relates to a spread-spectrum-conference-calling receiver for use over multiple communications channels. The patent specifies that at each of a plurality of spread-spectrum transmitters, a transmitter-generic-chip-code generator generates a generic-chip-code signal and a transmitter-message-chip-code generator generates a message-chip-code signal. An EXCLUSIVE-OR gate spread-spectrum processes message data with the message-chip-code signal to generate a spread-spectrum signal. The combiner combines the generic-chip-code signal and the spread-spectrum-processed signal. A plurality of receiver-generic-chip-code generators generate a plurality of replicas of the generic-chip-code signal. Each receiver-generic mixer recovers a carrier signal from one of the plurality of received spread-spectrum-communications signals. A plurality of receiver-message-chip-code generators generate a plurality of replica of the message-chip-code signals. A plurality of receiver-message mixers despread one of the plurality of received spread-spectrum-communications signal as a modulated-data signal. Tracking and acquisition circuits use the recovered carrier signal for synchronizing the replicas of the generic-chip-code signals to the recovered carrier signals, respectively. An envelope detector demodulates the modulated-data signal as a demodulated signal.

59.     The claims of the '572 patent, therefore, are directed to a system and method for synchronously demodulating a plurality of modulated data signals on a

- 16 -

plurality of spread spectrum channels in a conference call. The conference call is sent on multiple channels and the subscriber unit demodulates all of the calls in order to listen to them.

60.    Nokia's CDMA 2000 and WCDMA products do not provide for conference calling such that the calls are combined from separate spread spectrum channels at the mobile handset. Therefore, Nokia's CDMA 2000 handsets do not infringe the '572 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '572 patent.

61.    Nokia is entitled to a declaratory judgment of noninfringement of the '572 patent.

## COUNT IX.
## Declaration Of Invalidity of U.S. Patent No. 5,179,572

62.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 61, as if set forth in full.

63.    As alleged in paragraph 58 above, the '572 patent relates to a spread spectrum conference calling system and method. Specifically, the claims of the '572 patent are directed to a system and method for synchronously demodulating a plurality of modulated data signals on a plurality of spread spectrum channels in a conference call. The conference call is sent on multiple channels and the subscriber unit demodulates all of the calls in order to listen to them.

64.    Upon information and belief, if the claims of the '572 patent are not limited to conference calling, the '572 patent is invalid as anticipated or obvious.

- 17 -

## COUNT X.
### Declaration Of Noninfringement of U.S. Patent No. 6,075,792

65.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 64, as if set forth in full.

66.    The '792 patent relates to a CDMA communication system which selectively allocates bandwidth upon demand.    The '792 patent discusses a CDMA wireless digital communication system which supports all types of voice and data communications while utilizing a minimum amount of bandwidth for the particular application.    According to the '792 patent, the system efficiently allocates ISDN bandwidth on demand by a subscriber.    Upon initialization of the subscriber unit, the system establishes a channel and generates the necessary spreading codes to support the highest capacity channel desired by the subscriber unit.    Portions of the communication spectrum bandwidth are not reserved until actually required by the subscriber unit.    The '792 patent states that since the call setup is performed at the beginning of a call from that subscriber unit, including the assignment of spreading codes, a subscriber unit can quickly gain access to the portion of the spectrum that is required to support the particular application.

67.    The '792 patent, therefore, is directed to bandwidth allocation of the spread spectrum by utilizing different channels that may be added or removed, and selectively used to increase bandwidth.    The claims of the '792 patent are directed to subscriber units and base stations that have the capability to use, establish and tear down such channels.

68.    The WCDMA standard does not dynamically add or tear down channels to establish different data rates.  Nokia's products comply with the WCDMA standard and therefore do not implement the bandwidth allocation process claimed in the '792 patent.

69.    Nokia's products also do not establish or use a wireless ISDN channel. Accordingly, Nokia's products do not infringe the '792 patent, including at least claims 1, 3-6, 10-12, and 17-18, because those claims require the use of an ISDN channel.

70.    Nokia's handsets also do not assign or allocate wireless channels.  Such decisions are done by infrastructure.   Therefore, Nokia's products do not infringe the claims of the '792 patent, including at least claim 9, either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '792 patent.

71.    Upon information and belief, Nokia's CDMA 2000 handsets do not directly infringe any claim of the '792 patent, because those claims require claim elements that are not present in Nokia's handsets.  Nokia's CDMA 2000 handsets also do not contributorily infringe any claim of the '792 patent because only CDMA 2000 infrastructure, as opposed to handsets, could meet various claim limitations.  Upon information and belief, for each such claim limitation not present in Nokia's CDMA 2000 handsets, there exist substantial uses and infrastructure implementations that do not infringe any claim of the '792 patent.  Therefore, Nokia's products do not infringe any claim of the '792 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '792 patent.

72.   Nokia is entitled to a declaratory judgment of noninfringement of the '792 patent.

## COUNT XI.
### Declaration Of Invalidity of U.S. Patent No. 6,075,792

73.   Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 72, as if set forth in full.

74.   As alleged in paragraph 66 above, the '792 patent relates to a CDMA communication system which selectively allocates bandwidth on demand.

75.   Upon information and belief, at least claims 2, 7, 8, and 13-15 of the '792 patent are invalid in view of at least *IS-95 Enhancements for Multi-Media Services* by Chih-Lin I et al. Each of the elements of these claims of the '792 patent are disclosed or obvious in light of the *IS-95 Enhancements for Multi-Media Services* which was published at least as early as Autumn of 1996.

76.   Upon information and belief, at least claims 2, 7, 8, and 13-15 of the '792 patent are invalid in view of at least U.S. Patent No. 6,072,787 ("the '787 patent") assigned to Nokia. Each of the elements of these claims of the '792 patent is disclosed or obvious in light of the '787 patent, which was filed on July 5, 1996.

77.   Nokia is entitled to a declaratory judgment of invalidity with respect to at least claims 2, 7, 8, and 13-15 of the '792 patent.

## COUNT XII.
### Declaration Of Noninfringement of U.S. Patent No. 5,799,010

78.   Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 77, as if set forth in full.

79.    The '010 patent relates to a code division multiple access (CDMA) communication system. The '010 patent discusses a multiple access, spread-spectrum communication system that processes a plurality of information signals received by a Radio Carrier Station (RCS) over telecommunication lines for simultaneous transmission over a radio frequency (RF) channel as a code-division-multiplexed (CDM) signal to a group of Subscriber Units (SUs). The RCS receives a call request signal that corresponds to a telecommunication line information signal, and a user identification signal that identifies a user to receive the call. The RCS includes a plurality of Code Division Multiple Access (CDMA) modems, one of which provides a global pilot code signal. The modems provide message code signals synchronized to the global pilot signal. Each modem combines an information signal with a message code signal to provide a CDM processed signal. The RCS includes a system channel controller coupled to receive a remote call. An RF transmitter is connected to all of the modems to combine the CDM processed signals with the global pilot code signal to generate a CDM signal. The RF transmitter also modulates a carrier signal with the CDM signal and transmits the modulated carrier signal through an RF communication channel to the SUs. Each SU includes a CDMA modem which is also synchronized to the global pilot signal. The CDMA modem despreads the CDM signal and provides a despread information signal to the user.

80.    The claims of the '010 patent are therefore directed to a CDMA system that uses a "global pilot code signal" for synchronizing modems. The global pilot code is defined as "a channel with a spreading code but no data modulation."

- 21 -

81.     The WCDMA standard does not require that message signals be synchronized to a global pilot code signal as claimed in the '010 patent. In Nokia's WCDMA systems, message channels are not synchronized to a global pilot code signal and therefore do not infringe the '010 patent.

82.     Nokia's CDMA 2000 handsets do not directly infringe claims 1-4 and 9 of the '010 patent because those claims require "means for receiving a call request signal" and "modem processing means." These claim limitations, as properly construed, are not present in Nokia's CDMA 2000 handsets. Nokia's CDMA 2000 handsets likewise do not contributorily infringe claim 1-4 and 9 of the '010 patent because only CDMA 2000 infrastructure, as opposed to handsets, could contain "means for receiving a call request signal." There likewise exist substantial uses and infrastructure implementations that do not meet the "means for receiving a call request signal," as properly construed, required in claims 1-4 and 9 of the '010 patent. Therefore, Nokia's CDMA 2000 products do not infringe claims 1-4 and 9 of the '010 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe claims 1-4 and 9 of the '010 patent.

83.     Nokia's CDMA 2000 handsets likewise do not infringe claims 5-8 of the '010 patent. Nokia's CDMA 2000 handsets do not calculate the acquisition signal as required by those claims. Therefore, Nokia's CDMA 2000 products do not infringe claims 5-8 of the '010 patent either literally or under the doctrine of equivalents, nor contribute to the infringement by others or actively induces others to infringe claims 5-8 of the '010 patent.

84.    Nokia's CDMA 2000 handsets also do not infringe any claim of the '010 patent because Nokia's CDMA 2000 handsets are not synchronized to a pilot code as required by the claims of the '010 patent. Therefore, Nokia's CDMA 2000 products do not infringe any claim of the '010 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '010 patent.

85.    Nokia is entitled to a declaratory judgment of noninfringement of the '010 patent.

### COUNT XIII.
### Declaration Of Invalidity of U.S. Patent No. 5,799,010

86.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 85, as if set forth in full.

87.    Upon information and belief, the claims of the '010 patent are invalid. As alleged in paragraph 79 above, the '010 patent relates to a code division multiple access (CDMA) communication system that uses a "global pilot code signal" for synchronizing modems.

88.    Each of the claims of the '010 is anticipated by or obvious in light of the IS-95a standard or the TR45 draft to the IS-95a standard entitled *Mobile Station – Base Station Compatibility Standard for dual-Mode Wideband Spread Spectrum Cellular System*, PN-3144, dated December 9, 1992, both of which were published before the filing date of the '010 patent.

89.    Each of the claims of the '010 patent is anticipated or obvious in light of Gaudenzi, et al., *Chip Timing Synchronization in an All-Digital Band-Limited DS/SS Modem*, IEEE Conference on Communications (ICC), 1991, pp. 1688-1692.

90.    The claims of the '010 patent are therefore either anticipated or rendered obvious by the IS-95a standard, the TR45 draft to the IS-95a standard, and/or Gaudenzi, et al.

91.    Nokia is entitled to a declaratory judgment of invalidity of the claims of the '010 patent.

## COUNT XIV.
## Declaration Of Noninfringement of U.S. Patent No. 5,614,914

92.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 91, as if set forth in full.

93.    The '914 patent relates to a wireless telephone distribution system with time and space diversity transmission for determining receiver location. The '914 patent discloses a wireless communication system that combines time and space diversity to reduce fading. In particular, the '914 patent discloses a data packet which carries digital telephone traffic that is transmitted at three different times from three different antennas. The mobile subscriber receiver receives the same data packet at three different times from the three different antennas, and uses the best data packet or combination of the data packets to reduce the effects of fading. A transfer station receives a time division multiplex multiple access (TDMA) signal from a base station carrying telephone data packet traffic to form three data packet repeats at spatially diverse antennas locations. The transfer station further modulates a code division multiple access (CDMA) system using a TDMA signal which links the mobile subscriber receiver to the transfer station. Each data packet received at the transfer station is retransmitted at three different times to the mobile subscriber station on a CDMA link. The time division and code division multiplex signals transmitted from space diversity antennas provide the ability to

determine subscriber location using the same communication signals which are used for the primary telephone data communication. Specifically, the subscriber station receiver uses the absolute and relative time of arrival of the three repeated data packets to determine the respective distances of the mobile subscriber station to the three transmitting antennas. Because the transmitting antennas are at known fixed locations, receiver location is determined.

94.    The '914 patent, therefore, claims a system and method relating to determining the location of a mobile subscriber station using an observed time difference of arrival (OTDOA) of wireless signals from at least three transmitting stations.

95.    Nokia does not implement OTDOA in its WCDMA or CDMA 2000 wireless products and therefore does not infringe the '914 patent.

96.    Nokia is entitled to a declaratory judgment of noninfringement of the '914 patent.

### COUNT XV.
### Declaration Of Noninfringement of U.S. Patent No. 5,663,990

97.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 96, as if set forth in full.

98.    Nokia does not infringe any claim of the '990 patent. The '990 patent relates to a wireless telephone distribution system with time and space diversity transmission and has a similar disclosure as that of the '914 patent alleged in paragraph 93 above.

99.    The claims of the '990 patent focus on a time switched transmission technique wherein the same data is broadcast twice in two different time slots to achieve time switched transmit diversity.

100.    Two open loop transmit diversity schemes are included in the WCDMA standard. These two schemes include Time Switched Transmit Diversity (TSTD) and Space Time Transmit Diversity (STTD).  TSTD involves periodically switching the transmit antenna for separate time divided slots and retransmitting the same information. STTD involves coding the signal for separate antennas and transmitting on those antennas simultaneously.

101.    All but two of the independent claims (9 and 23) of the '990 patent include a limitation to a communication system or method where the transmitted signal is encoded using a pseudorandom number to achieve spread spectrum modulation. Claims 9 and 23, which do not contain the pseudorandom number encoding limitation, contain a limitation to a system or method where a transfer station is utilized between the base station and the user equipment.

102.    None of Nokia's WCDMA or CDMA 2000 products infringe claim 9 or 23 of the '990 patent, or their dependent claims.  No implementation of either standard includes a transfer station as required by those claims. Nokia's handsets when used with such systems, therefore, do not infringe claim 9 or 23 of the '990 patent, or the claims which depend from them.

103.    Nokia's CDMA 2000 handsets do not infringe any claim of the '990 patent because no CDMA 2000 system has been implemented with either TSTD or STTD. Nokia's handsets when used with such systems, therefore, do not infringe any claim of the '990 patent.

104.    The WCDMA standard specifies that the only channel that employs a TSTD scheme is the synchronization channel.   In the WCDMA standard, the

- 26 -

synchronization channel is not spread as required by all of the independent claims of the '990 patent (except claims 9 and 23).

105.    When the WCDMA standard employs STTD, the "same data packet" is not transmitted as required by the claims of the '990 patent. Additionally, when the WCDMA standard employs STTD, data packets are not discarded as required by the claims of the '990 patent.

106.    Nokia's WCDMA systems comply with the WCDMA standard. Nokia's systems therefore do not infringe the claims of the '990 patent.

107.    Nokia is entitled to a declaratory judgment of noninfringement of the '990 patent.

## COUNT XVI.
## Declaration Of Noninfringement of U.S. Patent No. 5,859,879

108.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 107, as if set forth in full.

109.    The '879 patent relates to a wireless telephone distribution system with time and space diversity transmission and has a similar disclosure as that of the '914 and '990 patents alleged in paragraphs 93 and 100-101 above.

110.    The claims of the '879 patent focus on a time divided transmission technique wherein the same data is broadcast twice in two different time slots to achieve time transmit diversity.

111.    The claims of the '879 patent include a limitation to a communication system or method where the transmitted signal is encoded using a pseudorandom number to achieve spread spectrum modulation.

- 27 -

112.    As explained in paragraph 104 above, the only channel in WCDMA that employs TSTD is the standard synchronization channel and that channel is not spread as required by all of the claims of the '879 patent.

113.    As explained in paragraph 105 above, when the WCDMA standard employs STTD, the "same data packet" is not transmitted as required by the claims of the '879 patent.

114.    When the WCDMA standard employs STTD it uses the same spreading code instead of different spreading codes as required by the claims of the '879 patent.

115.    Nokia's WCDMA systems comply with the WCDMA standard. Nokia's systems therefore do not infringe the claims of the '879 patent.

116.    Upon information and belief, Nokia's CDMA 2000 handsets do not infringe any claim of the '879 patent because no CDMA 2000 systems have been implemented with either TSTD or STTD. Nokia's handsets when used with such systems, therefore, do not infringe any claim of the '879 patent.

117.    Nokia is entitled to a declaratory judgment of noninfringement of the '879 patent.

## COUNT XVII.
### Declaration Of Noninfringement of U.S. Patent Nos. 5,363,403; 5,553,062; 5,719,852; 6,014,373; and 6,259,688

118.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 117, as if set forth in full.

119.    Nokia does not infringe any claim of the '403 patent, the '062 patent, the '852 patent, the '373 patent, or the '688 patent.

120.    The '403 patent relates to a spread spectrum CDMA subtractive interference canceler and method. The patent discloses a spread-spectrum code division multiple access interference canceler for reducing interference in a direct sequence CDMA receiver having N chip-code channels. The interference canceler includes a plurality of correlators or matched filters, a plurality of spread-spectrum-processing circuits, subtracting circuits, and channel correlators or channel-matched filters. Using a plurality of chip-code signals, the plurality of correlators despreads the spread-spectrum CDMA signal as a plurality of despread signals, respectively. The plurality of spread-spectrum-processing circuits use a timed version of the plurality of chip-code signals, for spread-spectrum processing the plurality of despread signals, respectively, with a chip-code-signal corresponding to a respective despread signal. For recovering a code channel using an i.sup.th chip-code-signal, the subtracting circuits subtract from the spread-spectrum CDMA signal, each of the N-1 spread-spectrum-processed-despread signals thereby generating a subtracted signal. The N-1 spread-spectrum-processed-despread signals do not include the spread-spectrum-processed-despread signal of the i.sup.th channel of the spread-spectrum CDMA signal. The channel correlator or channel-matched filter despreads the subtracted signal.

121.    The '062 patent is a continuation-in-part of the '403 patent. The '852 patent, the '373 patent and the '688 patent are all continuations of the '403 patent.

122.    The '403 patent, the '062 patent, the '852 patent, the '373 patent and the '688 patent (the "Subtractive Interference Cancellation patents") all disclose and claim a method and system for subtractive interference cancellation in a multi-channel, spread spectrum CDMA system.

- 29 -

123.    In a multiple channel spread spectrum system, interference is created by the multiple channels. When one channel is decoded or despread, interference from the other channels will appear as noise. The system and method in the Subtractive Interference Cancellation patents claim a series of components to remove this noise by subtracting the signals corresponding to other channels from the input signal prior to processing the channel of interest.

124.    Nokia's WCDMA digital wireless systems do not implement subtractive interference cancellation techniques and therefore do not infringe any claim of the Subtractive Interference Cancellation patents.

125.    Nokia's CDMA 2000 handsets do not implement subtractive interference cancellation techniques as required by InterDigital's patents and therefore do not infringe any claim of the Subtractive Interference Cancellation patents.

126.    Nokia is entitled to a declaratory judgment of noninfringement of the Subtractive Interference Cancellation patents.

## COUNT XVIII.
### Declaration Of Noninfringement of U.S. Patent No. 6,289,004

127.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 126, as if set forth in full.

128.    The '004 patent relates to adaptive cancellation of fixed interferers and discloses a base station which cancels the effects of known fixed interference sources by producing a signal substantially free from the interference sources to thereby increase channel capacity. The adaptive interference canceler system includes a main antenna for receiving signals from other communication stations and at least one directional antenna

- 30 -

directed toward an interference source. The main and directional antennas are coupled to the adaptive canceler, which weights signals received by the directional antennas and sums the weighted signals to produce a cancellation signal. The adaptive canceler subtracts the cancellation signal from the signals received by the main antenna to provide an output signal substantially free from the interference generated by the one or more known interference sources.

129.    The claims of the '004 patent all require that the system include a directional antenna with four coplanar feeds mounted near the main base station antenna.

130.    Neither the WCDMA standard, nor the CDMA 2000 standard, require the use of directional antennas.

131.    Nokia's WCDMA and CDMA 2000 products comply with the WCDMA and CDMA 2000 standards, and do not employ directional antennas. Nokia's systems therefore do not infringe any claim of the '004 patent.

132.    Nokia is entitled to a declaratory judgment of noninfringement of the '004 patent.

## COUNT XIX.
### Declaration Of Noninfringement of
### U.S. Patent No. 5,081,643

133.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 132, as if set forth in full.

134.    The '643 patent relates to a spread-spectrum multipath receiver apparatus and method. In particular, the '643 patent discloses an apparatus for adapting to receive a particular path, having the greatest amplitude, of a spread-spectrum signal with multipath. According to the patent, the spread-spectrum signal is modulated by a chip-code. A chip-

code generator generates a chip-code signal having the same chip-code as the spread-spectrum signal. A plurality of shift registers shift the chip-code signal by a plurality of time delays. First and second ring counters generate first and second sequencing signals for controlling first and second switching devices. The first switching device successively switches between a plurality of taps of the shift registers in a direction of increasing or decreasing delays for generating the chip-code signal with the first time delay. The second switching device successively switches between the plurality of taps of the shift registers in a direction of increasing or decreasing delays for generating the chip-code signal with a second time delay. A first correlator correlates the spread-spectrum signal received at the input with the chip-code signal with the first time delay. A second correlator correlates the spread-spectrum signal received at the input with the chip-code signal with the second time delay. A comparator generates first and second comparator signals by comparing the outputs of the first correlator and the second correlator.

135.    Nokia's WCDMA and CDMA 2000 products do not include "delay means" or "shift registers" as claimed in the '643 patent. The WCDMA and CDMA 2000 standards likewise to not require such "delay means" or "shift registers." Instead of delaying a code after it is generated by the code generator, as required by the '643 patent, Nokia's WCDMA products modify the speed of the code generator by internal clocking. Instead of delaying a code after it is generated by the code generator with shift registers, as required by the '643 patent, Nokia's CDMA 2000 products choose from multiple samples of the input signal or reprogram the code generator. Nokia's products therefore do not infringe any claim of the '643 patent either literally or under the doctrine of

equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '643 patent.

136.    Nokia's WCDMA products also do not include delay codes by one or more chip intervals, as required by claims 1 and 2 of the '643 patent because Nokia's WCDMA products shift the speed of the internal code generator by 1/2 chip. Nokia's WCDMA products do not infringe claims 1 and 2 of the '643 patent either literally or under the doctrine of equivalents, nor contribute to the infringement by others or actively induce others to infringe claims 1 and 2 of the '643 patent.

137.    Nokia's WCDMA products also do not include a difference amplifier as required by the claims of the in the '643 patent. Therefore, Nokia's WCDMA products do not infringe the claims of the '643 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe the claims of the '643 patent.

## COUNT XX.
### Declaration Of Noninfringement of
### U.S. Patent No. 5,673,286

138.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 137, as if set forth in full.

139.    The '286 patent relates to a spread spectrum multipath processor system and method. In particular, the '286 patent discloses a spread-spectrum system and method for providing high capacity communications through multipath compensation. The multipath processor system includes a first plurality of correlators, a second plurality of correlators, a first adder, a second adder, and a selector device or a combiner device is provided for tracking a spread-spectrum signal arriving in a plurality of groups. The first

- 33 -

plurality of correlators despreads a first group of spread-spectrum signals as a first group of despread signals which are added by the first adder to generate a first combined-despread signal. The second plurality of correlators despreads a second group of spread-spectrum signals as a second group of despread signals which are added by the second adder to generate a second combined-despread signal. The selector device selects either the first or the second combined-despread signal and outputs the selected signal. According to the patent, the combiner device alternatively combines the first and the second combined-despread signals and outputs the combined signal.

140. Nokia's WCDMA and CDMA 2000 products do not include "combining" or "selecting" signals twice as required by the claims of the '286 patent. Nokia's products therefore do not infringe any claim of the '286 patent either literally or under the doctrine of equivalents, nor does Nokia contribute to the infringement by others or actively induce others to infringe any claim of the '286 patent.

**COUNT XXI.**
**Violation Of § 43(a) Of The Lanham Act**

141. Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 140, as if set forth in full.

142. InterDigital has used false or misleading descriptions or representations in connection with its patent portfolio, the WCDMA Standard, the CDMA 2000 standard, Nokia's products, the applicability of InterDigital's patents to Nokia's products, and the applicability of InterDigital's patents to 3G wireless standards within the meaning of 15 U.S.C. §1125(a) (§43(a) of the Lanham Act). This misconduct of InterDigital has inhibited the development of 3G technology, damaged Nokia's business and its reputation in the wireless market.

- 34 -

143.    Upon information and belief, InterDigital has repeatedly made public statements that its patent portfolio covers the practice of 3G wireless phone systems and the sale of 3G compliant products.  These statements are false because InterDigital's patents are not necessary to practice 3G wireless phone standards.

144.    These false statements are material and, upon information and belief, have caused actual deception or have a tendency to deceive a substantial portion of the intended audience.

145.    InterDigital's misrepresentations about the scope and validity of its patents and how these patents apply to Nokia's products have injured Nokia in its business and have damaged Nokia's reputation.

146.    Upon information and belief, InterDigital has made these false statements in bad faith and with knowledge of their falsity.

**JURY DEMAND**

Nokia demands a trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Nokia respectfully requests that the Court enter judgment:

(a)    That Nokia does not infringe the '747 patent, the '949 patent, the '768 patent, the '778 patent, the '572 patent, the '792 patent, the '010 patent, the '914 patent, the '990 patent, the '879 patent, the '403 patent, the '062 patent, the '852 patent, the '373 patent, the '688 patent, the '004 patent, the '643 patent, or the '286 patent;

(b)    That the '747 patent, the '949 patent, the '778 patent, the '792 patent, the '572 patent and the '010 patent are invalid;

- 35 -

(c)    That InterDigital's statements concerning the scope and validity of its 3G patents are false and misleading, in violation of § 43(a) of the Lanham Act;

(d)    Awarding Nokia damages in an amount to be determined at trial for Nokia's loss;

(e)    Granting Nokia its attorneys' fees and costs; and

(f)    Granting such other and further relief as the Court deems just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL

Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200
Attorneys for NOKIA CORPORATION and
NOKIA, INC.

Of Counsel:

ALSTON & BIRD LLP

Peter Kontio
Patrick J. Flinn
Gardner S. Culpepper
Keith E. Broyles
1201 West Peachtree Street
Atlanta, GA  30309-3424
404-881-7000

January 12, 2005

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NOKIA CORPORATION and NOKIA INC., | |
| Plaintiffs, | |
| | Civil Action No. 05-16-JJF |
| v. | |
| INTERDIGITAL COMMUNICATIONS CORPORATION and INTERDIGITAL TECHNOLOGY CORPORATION, | **DEMAND FOR JURY TRIAL** **PUBLIC VERSION** |
| Defendants. | |

## FIRST AMENDED COMPLAINT

Plaintiffs Nokia Corporation and Nokia Inc. (collectively "Nokia") file this First Amended Complaint ("Complaint") against Defendants InterDigital Communications Corporation and InterDigital Technology Corporation (collectively "InterDigital") and in support of this Complaint allege:

### Nature and Basis of Action

1.     This is an action for violations of the Lanham Act (15 U.S.C. §1051 et seq.), common law unfair competition, intentional interference with business relationships or opportunities, injurious falsehood, and commercial or business disparagement, and for violations of the laws of the States of Delaware, Pennsylvania, and Texas. Nokia seeks damages, declaratory and injunctive relief, and disgorgement of unjust enrichment for InterDigital's unlawful conduct.

### The Parties

2.     Nokia Corporation is a global leader in the design, manufacture, and supply of wireless (or "mobile") telephone equipment, including handset and infrastructure products.

3.     Nokia is also a global leader in the design and development of interoperability standards that are central to the functioning of mobile telephony equipment and the economic success of the wireless industry.

4.     Nokia Corporation is incorporated under the laws of Finland and has its principal place of business at Keilalahdentie 4, Espoo, Finland.

5.     Nokia Inc. is incorporated under the laws of the state of Delaware and has a principal place of business at 6000 Connection Dr., Irving, Texas.

6.     InterDigital Communications Corporation is incorporated under the laws of the State of Pennsylvania and has its principal place of business at 781 Third Avenue, King of Prussia, Pennsylvania.

7.     InterDigital Technology Corporation is incorporated under the laws of the State of Delaware and has its principal place of business at 300 Delaware Avenue, Suite 527, Wilmington, Delaware.

8.     Upon information and belief, InterDigital Technology Corporation is a wholly owned subsidiary of InterDigital Communications Corporation.

**Jurisdiction and Venue**

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338 based on federal question jurisdiction, and has supplemental jurisdiction over all other claims based on 28 U.S.C. § 1367.

10.     This Court has personal jurisdiction over InterDigital Communications Corporation and InterDigital Technology Corporation pursuant to the laws of the State of Delaware, including the Delaware long-arm statute, 10 Del. Code § 3104.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

### Facts Giving Rise to this Action

12.    Wireless telephone handset and infrastructure equipment complies with industry standards that ensure that products produced by different companies can interoperate. The so-called first generation of wireless telephony used analog radio signals to convey messages between wireless handsets and base stations connected to the public switched telephone network. These base stations received and transmitted radio signals to handsets in small areas called "cells," and as a mobile user left one cell and entered another, the call would be transferred to next cell.

13.    The capacity of the first generation system was soon limited, however, because only one user could use a frequency channel at a time in any given cell. A second generation of mobile telephone technology was developed to address this problem. More users could share the same frequency – thereby increasing the capacity of each cell – if the voice communications were digitized. This Second Generation (or "2G") technology used two basic methods to allow multiple users to share the same frequency. The first used time division (called "Time Division Multiple Access," or "TDMA") as the method of sharing the frequency. The 2G standard developed in Europe, of which Nokia is a pioneer, is called GSM. The second method was to spread the digitized signals across a wider bandwidth, giving each user a unique "spreading code" that allowed each separate call to be distinguished by the receiving station. This method is called Code Division Multiple Access (CDMA), and was specified in the United States by a standard called IS-95.

14.    GSM and IS-95 remain the two principal competing 2G standards implemented worldwide. Both have continued to evolve to allow the transmission of data as well as voice communications, and the more efficient transmission of data in "packets." These improvements

and other aspects of the two technologies make them different in other ways besides the method of sharing radio frequencies. The networks between the transmission towers and the public switched telephone network are incompatible between GSM and IS-95.

15.    A third generation ("3G") of wireless telephony has been defined to succeed both IS-95 and GSM. This third generation will use more bandwidth to transmit data, and is intended to transmit information at substantially higher rates than 2G technology, such as video and internet content. The 3G successor to IS-95 is called CDMA 2000, and the 3G successor to GSM is called UMTS (Universal Mobile Telephone Service).

16.    The transition from GSM to UMTS will allow much of the existing GSM network infrastructure to be compatible with UMTS. The method of sharing frequencies is different in UMTS than GSM, however, as UMTS has adopted code division as the method of multiple access. CDMA 2000 also uses code division, and will be backward compatible with IS-95, but the remainder of its network will remain incompatible with GMS and UMTS.

17.    These technologies are made possible by the cooperation of the manufacturers of the equipment used for wireless telephony and the carriers who sell the service to customers. Only if the parties agree on, and specify, the standards for implementing the technology can multiple manufacturers compete to make the telephone handsets and network equipment for carriers.

18.    In the process of specifying standards, the participants may have intellectual property rights ("IPRs") – including patents and published patent applications – where as a technical matter the standard cannot be implemented without infringing the patent (or the patent that would issue if an application were granted). Standards bodies have developed policies

requiring parties to timely identify such IPRs, and with respect to the licensing of identified patents, as a condition of allowing participation in the standards-setting process.

19.     As mentioned above, Nokia was a pioneer in the development of GSM and likewise was a key inventor in much of what has been defined to be the 3G UMTS standard. Nokia holds many patents covering this technology – as do other manufacturers – and has followed the policies specified regarding identifying and licensing patents called for by the applicable standards bodies.

20.     InterDigital's only real business is coercing patent license payments from the wireless telephone industry.   Nonetheless, it has become a member of wireless telephony standards organizations.  It does so in order to claim that it, too, has patents essential to the practice of the standards and it has been particularly active in claiming that it has patents essential to the practice of the UMTS standard.  By claiming that it has essential patents, it insists that all manufacturers of systems that comply with the standards must pay it patent license fees.

21.     InterDigital makes no tangible products, however, and it has in fact invented nothing of value that would merit the license fees it has been demanding from Nokia and others in the industry.  Accordingly, it has had to develop, implement and maintain a scheme to mislead manufacturers and others in the industry into believing, falsely, that its patent portfolio is essential, valuable, and validly covers standards such as UMTS.

*InterDigital's False Statements Regarding Second Generation Technology*

22.     InterDigital began alleging in the early 1990s that it had numerous patents essential to 2G mobile phone standards.  InterDigital has in the past asserted certain of its 2G patents in court against OKI America, Inc., Qualcomm, Inc., Motorola, Inc., and Ericsson, Inc.

23.     The court in the Motorola case determined that all of the asserted patents in those cases were either invalid or not infringed by mobile handset and infrastructure products used in the United States.

24.     In none of these disputes did a court rule that any of InterDigital's patents were valid and infringed. Indeed, comparison of the claim limitations of InterDigital 2G patents and their prosecution histories to either the 2G mobile phone standards or any systems in use in the United States shows that none of the claims can be infringed by any of those 2G systems, including those utilized by companies such as Motorola, Ericsson, and Nokia.

25.     InterDigital's purpose in declaring patents to be essential to the 2G standard, and in publicizing its contentions regarding essentiality, was to convey, and did in fact convey, the claim that all manufacturers of 2G compliant systems were required to pay InterDigital patent royalties.

26.     These claims were false, in that InterDigital did not have valid patents that were essential to the practice of the applicable 2G standards. Accordingly, companies were not legally obligated to pay InterDigital money simply because their products were compliant with the 2G standards.

*InterDigital's False Statements Regarding Third Generation Technology*

27.     More recently, InterDigital has alleged that its patents are essential to 3G mobile telephone standards, including UMTS, CDMA 2000, and a standard called TD-SCDMA.

28.     For example, InterDigital has filed declarations claiming at least 195 patents were essential to the practice of the UMTS standard with the European Telecommunications Standards Institute ("ETSI"). InterDigital made these declarations through two filings with ETSI. The first filing was made in April 2001. The second filing was made in April 2004.

29.     ETSI is one of the preeminent Standards Setting Organizations ("SSOs") – establishing the wireless standards for one of the largest markets in the world. Most of the major industry players are accordingly members of ETSI. ETSI has taken a leadership role amongst SSOs by requiring its members to declare IPRs that are "essential" to UMTS. ETSI makes these declarations publicly available through a searchable database on its website.

30.     At the time InterDigital made the declarations to ETSI (and currently), the term "ESSENTIAL" with respect to IPRs was a defined term as follows:

> "ESSENTIAL" as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

31.     At the time InterDigital made these declarations, it knew that many, if not all, of the IPRs it was declaring to ETSI did not meet this definition of "essential." Indeed, InterDigital made the deliberate decision to include IPRs that it knew were not technically necessary. InterDigital has never publicly identified which of the IPRs it declared to ETSI actually meet the ETSI definition of "essential" and which do not. As a result, ETSI members have been left with the impression that all of InterDigital's declared IPRs are technically essential.

32.     The UMTS Standard has more than four hundred separately numbered provisions, as listed in the "table of contents" in section 5 of ETSI TS 121.101. For each patent or application that it declared to ETSI, however, InterDigital did not list the particular provision or provisions for which InterDigital contended the declared patent or application was essential.

33.     InterDigital's declarations to ETSI are publicly available through a searchable database on ETSI's website.

34.     In addition, InterDigital has engaged in a campaign of publicity regarding its claim of essentiality in the press and in other ways intended to be disseminated in the communications industry. InterDigital claims in public statements that it has patents essential to the practice of the UMTS standard, and that it expects to obtain substantial license revenue from all companies who make standards compliant products. For example, in a press release issued on November 10, 2006, InterDigital claims that it "has built an intellectual property portfolio of more than 7,500 issued patents and patents pending around the world," and boasts of its "active participation in global standards bodies that shape the evolution of the technology and the future of the industry." InterDigital further claims that its participation in the standards process allowed it to create "a strong portfolio of patented technologies which it licenses to manufacturers of 2G, 2.5G, 3G and 802 products worldwide."

35.     That is, InterDigital does more than just claim that it has essential patents with respect to 3G technologies. InterDigital claims that its portfolio of patents is sufficiently broad that all manufacturers of 3G products must pay InterDigital substantial fees for the privilege of making standards-compliant products.

36.     These statements, particularly when considered in their totality, are false and misleading in number of respects, including but not necessarily limited to the following:

    a.     Participants in the industry, including manufacturers and users of 3G compliant equipment, do not have to pay InterDigital any money, notwithstanding the IPRs claimed in InterDigital's portfolio. Alternatively, the weakness of the portfolio is such that InterDigital is not entitled to the sums of money it has demanded from the industry for patent license rights it has provided to its portfolio.

b.    The vast majority, if not all, of the IPRs declared by InterDigital to ETSI to be essential to the current implementation of UMTS are not, in fact essential. A list of such patents is attached hereto as Exhibit A. In addition, Nokia incorporates by this reference Plaintiffs' Statement Pursuant to Second Discovery Order, served on Defendants December 14, 2006, for a detailed explanation of the falsity of these declarations.

c.    Indeed, InterDigital routinely and knowingly declares patents to be essential to ETSI even though it is well aware that its patents do not meet the definition of "essential" contained in the ETSI IPR policy.

d.    To the extent there are, in fact, any patents in the InterDigital portfolio which meet the definition of "essential," members of the industry do not need to pay InterDigital any money for them. This is for one or more of the following reasons: (i) the patents are already licensed to most if not all of those in the industry, including Nokia, as part of a package of license rights previously granted for the practice of the IS-95 standard; (ii) the patents are applicable to a specific implementation of the UMTS standard known as Time-Division Duplexing (TDD) ("TDD Patents"), which has not been implemented commercially anywhere in the world with respect to wireless mobile telephones; and/or (iii) the patents cannot be valid and cover the standard at the same time.

e.    Likewise, to the extent there are, in fact, any patents in the InterDigital portfolio which meet the definition of "essential," Nokia does not need to pay InterDigital any money for them for the reasons stated above and for the additional reason that

Nokia has an agreed-upon, fully-paid, irrevocable license to InterDigital's TDD Patents.

      f.    In addition, there are no other patents in the InterDigital portfolio that are valid and that are infringed by any Nokia 3G product.

    37.    Accordingly, it is false and misleading for InterDigital to say or suggest that the industry as a general matter owes it money, or should pay it money, for the practice of 3G standards, and it is false and misleading for InterDigital to say or suggest that Nokia owes it money, or should pay it money, for the practice of 3G standards.

*InterDigital's Abuse of the Standards Process*

    38.    As noted above, InterDigital touts its participation in telecommunications standards bodies as a basis for contending that it has a portfolio of essential patents for which industry manufacturers must pay license fees. InterDigital has, in fact, grossly abused its membership in standards bodies in order to further its scheme of misleading the industry into paying money for patents for which no money is actually owed.

    39.    For example, as alleged above, InterDigital is a member of ETSI, the premier standards body that promulgates the UMTS standard. That body has promulgated a Policy for declaring IPRs,. That Policy, a true and correct copy of which is attached as Exhibit B and incorporated herein by reference, requires, among other things, good faith implementation by ETSI members. It further requires the timely disclosure of "essential" patents (as that term is defined in the Policy), and the specification of the particular portion of the standard to which the patent in question is essential.

    40.    InterDigital has abused this Policy, deliberately, and in bad faith, in at least the following respects:

a.   *Over-Declaration* – InterDigital has declared IPRs to be essential that are not essential, and which InterDigital knows are not essential, in order to inflate artificially and falsely the perceived value of its portfolio.

b.   *Late Declaration* – InterDigital, aware of the requirement of timely declaration of IPRs, nonetheless withheld IPRs from declaration until 2001, and then between 2001 and 2004, in order to create a "patent ambush" on those in the industry making standards-compliant equipment.

c.   *No Declaration* – InterDigital, again notwithstanding the requirement of timely declaration of IPRs, has, on information and belief, withheld from declaration IPRs since 2004 even though it has evaluated its portfolio since that time and determined that non-declared IPRs meet the criteria it applied for declaring IPRs in 2001 and 2004. InterDigital is reserving these IPRs, on information and belief, for further use in "ambush" or surprise litigation tactics.

d.   *Deliberately Vague Declaration* – Notwithstanding the requirement, effective before InterDigital's 2004 declarations, that a member specify the portion of the standard to which a declared IPR is essential, InterDigital engaged in a sham intended to limit the ability of the public to evaluate the truth of its essentiality claims. The declaration form IPR holders were to use when InterDigital made its 2004 declarations contained a column – entitled "Standard No." – for the particular provision of the standard for which a declared IPR is essential. In its declarations, InterDigital cited only to the Table of Contents for the entire standard, intentionally and deliberately, in order to obfuscate and conceal the lack of actual essentiality of the patents listed.

e.    *Secret Repeal* – InterDigital now claims that it has withdrawn from declaration IPRs that were declared in its 2001 filing with ETSI, but not listed in its 2004 filing. This, too, is a sham intended to avoid the consequences of its bad faith declaration in 2001. There is no evidence that InterDigital ever communicated to the public or interested parties that it had withdrawn any of the IPRs declared in 2001, and those declarations appear in the ETSI database in the same form as the 2004 declarations. InterDigital did not withdraw or update its 2001 declarations. The 2004 declarations did not inform ETSI members that they superseded the 2001 declarations in their entirety. ETSI's policies do not state, moreover, that subsequent declarations supersede previous ones. In fact, on October 30, 2006, InterDigital recently rejected its own endorsement of secret repeal by *explicitly* requesting that ETSI remove its essentiality declarations regarding a small number of IPRs.

41.    This bad faith behavior is a part of the broader scheme InterDigital has implemented to mislead the industry into believing (a) that it has a portfolio of essential patents, (b) that the portfolio's scope and value justify the royalties it has been demanding, and (c) that manufacturers should pay it money in order to manufacture standards-compliant technology.

*Injury to Nokia*

42.    The bad faith conduct, false and misleading behavior, and other wrongful acts set forth herein have injured Nokia. First, the conduct is likely to cause confusion in the marketplace. To the extent there are false statements in the ETSI declarations – whether made in good faith or not – they should be corrected in order to remove the likely confusion in the marketplace. Because InterDigital has refused to withdraw or modify the false declarations (and

indeed has declared in proceedings in this Court that all 195 patents are, in fact, essential), an injunction of this Court requiring InterDigital to withdraw all false declarations and engage in corrective advertising is required.

43.    In addition, InterDigital had in fact acted in bad faith in implementing and maintaining this deceptive scheme.  It has obtained unjust profits from this scheme, and should be ordered to disgorge all profits it has obtained from the illicit plan.

44.    Next, this misconduct has caused a direct financial injury to Nokia.

45.    Notwithstanding the ultimate truth or falsity of InterDigital's essentiality declarations, InterDigital is not relieved from its legal and equitable obligations arising from having made these declarations in the first instance.

46.    Nokia accordingly is entitled to the injunctive and declaratory relief requested herein, as well as money damages and the disgorgement of InterDigital's unjust enrichment.

**COUNT I.**
**Violation of § 43(a) of the Lanham Act**
**(Essentiality Claims)**

47.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 46, as if set forth in full.

48.    InterDigital has used false or misleading descriptions or representations in connection with its patent portfolio, the 3G standards (including the UMTS standard, the CDMA 2000 standard, and the TD-SCDMA standard), Nokia's products, the applicability of InterDigital's patents to Nokia's products, and the applicability of InterDigital's patents to 3G wireless standards within the meaning of 15 U.S.C. § 1125(a) (§43(a) of the Lanham Act). These statements are made in connection with goods or services and are used in interstate commerce within the meaning of 15 U.S.C. § 1125(a).

49.    This misconduct of InterDigital has inhibited the development of 3G technology, damaged Nokia's business, and its reputation in the wireless market.

50.    InterDigital has repeatedly stated that its patents are essential to 3G wireless telecommunications standards and are infringed by current manufacture, use, or sale of 3G-compliant products. InterDigital has further claimed that manufacturers of 3G technology must pay money to InterDigital as a result of the allegedly essential patents.

51.    These statements are false or misleading for the reasons stated above, and because no valid claim of any InterDigital's patent is necessary for manufacturers to make, sell, or import wireless phone standards currently being implemented compliant with the applicable 3G standards.

52.    InterDigital has repeatedly stated that its patents are essential to 3G wireless telecommunications standards and are infringed by Nokia's manufacture, use, or sale of 3G-compliant products. InterDigital has further claimed that Nokia must pay money to InterDigital as a result of the allegedly essential patents.

53.    These statements are false or misleading for the reasons stated above, and because no valid claim of any InterDigital's patent is necessary for Nokia to make, sell, offer to sell or import wireless phone standards currently being implemented compliant with the applicable 3G standards.

54.    Nokia will prove that no valid claim of any of the patents in the InterDigital portfolio reads on any Nokia product made, used, sold, offered for sale, or imported into the United States, and thus that Nokia owes no money to InterDigital as a result of its purported 3G patent portfolio. Even if InterDigital has some patents that may have valid claims that are essential to 3G standards, InterDigital's general claims that its patent portfolio contains essential

patents -- which were made after InterDigital declared hundreds of U.S. patents and patent applications essential to ETSI -- are false or misleading because Nokia will prove that a substantial number, if not all, of those declarations are false.

55.    These false statements are material and, upon information and belief, have caused actual deception and are likely to deceive a substantial portion of the intended audience.

56.    InterDigital's misrepresentations about the scope and validity of its patents and how these patents apply to Nokia's products have caused actual injuries to Nokia in its business and have damaged Nokia's reputation as alleged herein.

57.    InterDigital has made these false statements in bad faith and with knowledge of their falsity.

58.    Nokia is accordingly entitled to the relief requested herein.

**COUNT II.**
**Violation of § 43(a) of the Lanham Act**
**(ETSI Declarations)**

59.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 58, as if set forth in full.

60.    InterDigital declared to ETSI as essential at least 110 US patents and 85 US patent applications that have issued as patents since they were declared by InterDigital to ETSI.

61.    Through these declarations, InterDigital claimed that each of these 195 patents is infringed by UMTS-compliant 3G products. Whether the patents are, in fact, essential is an objectively verifiable proposition and not a statement of mere opinion or "puffing."

62.    InterDigital's false and misleading declarations are material and, upon information and belief, have caused actual deception or have a tendency to deceive a substantial portion of the intended audience.

63.    InterDigital's misrepresentations through its ETSI declarations about the scope and validity of its patents and how these patents apply to Nokia's products have caused actual injuries to Nokia in its business and have damaged Nokia's reputation.

64.    Nokia will prove that no valid claim of any of the patents in the InterDigital portfolio reads on any Nokia product made, used, sold, offered for sale, or imported into the United States, and thus that Nokia owes no money to InterDigital as a result of its purported 3G patent portfolio.  Even if InterDigital has some patents that may have valid claims that are essential to 3G standards, InterDigital's general claims that its patent portfolio contains essential patents – which were made after InterDigital declared hundreds of U.S. patents and patent applications essential to ETSI – are false or misleading because Nokia will prove that a substantial number, if not all, of those declarations are false.

65.    InterDigital has made these false and misleading statements in bad faith and with knowledge of their falsity.  These statements are made in connection with goods or services and are used in interstate commerce within the meaning of 15 U.S.C. § 1125(a).

66.    Nokia is accordingly entitled to the relief requested herein.

### COUNT III.
### Violation of Delaware Deceptive Trade Practices Act
### (6 Del. Code § 2532)

67.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 66, as if set forth in full.

68.    InterDigital cast a cloud over Nokia's 3G products by creating the false and misleading impression those products contained technology that infringed InterDigital's patents.

69.    InterDigital declared its patents as essential to 3G standards, when they were not.

70.    InterDigital represented that its patents were essential to 3G standards, even though it knew they were not.

71.    InterDigital sowed confusion in the market by leading consumers to believe that Nokia's and other 3G standards-compliant manufacturers' products infringed its patents.

72.    InterDigital created confusion in the industry, in general, and among ETSI members, in particular, by (a) declaring patents to be essential to 3G standards, when it knew that they were not, (b) not withdrawing the 2001 declarations or indicating that the 2004 declarations replaced the 2001 declarations, (c) not providing sufficient information in the declarations to verify essentiality, and (d) indicating that manufacturers should pay money when no money needs to be paid.

73.    InterDigital's actions were willful and in bad faith.

74.    InterDigital's above-described deceptive trade practices have caused and threaten to continue to cause actual injuries to Nokia.

75.    InterDigital's above-described deceptive trade practices were willful and Nokia is entitled to treble damages pursuant to 6 Del. Code § 2533(c).

76.    Nokia is further entitled to the relief requested herein.

**COUNT IV.**
**Common Law Unfair Competition**
**(Delaware)**

77.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 76, as if set forth in full.

78.    Nokia reasonably anticipated obtaining revenue with respect to 3G technology.

79.    InterDigital's actions were willful and in bad faith.

80.    InterDigital's above-described unfair competition has caused and threatens to continue to cause actual injuries to Nokia.

81.    Nokia is further entitled to the relief requested herein.

### COUNT V.
### Common Law Unfair Competition
### (Pennsylvania)

82.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 81, as if set forth in full.

83.    Nokia reasonably anticipated commercial benefits with respect to 3G products.

84.    Additionally, InterDigital's bad faith and affirmative misrepresentations regarding its patent portfolio constitute unfair methods of competition.

85.    InterDigital's above-described acts of unfair competition has caused and threatens to continue to cause actual injuries to Nokia.

86.    Nokia is further entitled to the relief requested herein.

### COUNT VI.
### Intentional Interference with Prospective Business Opportunities
### (Delaware)

87.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 86, as if set forth in full.

88.    Nokia possessed a reasonable probability of a business opportunity with respect to 3G products.

89.    InterDigital's interference was willful and in bad faith.

90.    InterDigital's interference was the cause of Nokia's loss of business opportunity as, absent InterDigital's interference, more 3G Nokia products would have been sold and licensees would have paid additional royalties to Nokia.

91.    InterDigital's interference has caused and threatens to continue to cause actual injuries to Nokia.

92.    InterDigital's interference was knowing and willful in that InterDigital represented that all 3G manufacturers must pay money for license rights to its patents even though it knew the money was not, in fact, owed. Nokia is therefore entitled to punitive damages from InterDigital.

93.    Nokia is further entitled to the relief requested herein.

### COUNT VII.
### Intentional Interference with Prospective Business Relations
### (Pennsylvania)

94.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 93, as if set forth in full.

95.    Nokia possessed a reasonable probability of revenues from business relations with respect to 3G technology.

96.    InterDigital intentionally interfered with Nokia's reasonable probability of business relations with the purpose or intent of harming Nokia by preventing the relations from occurring, as InterDigital knew or should have known that its declarations would affect the marketability of Nokia's products and the licensing royalties that Nokia would receive.

97.    There was no privilege or justification for InterDigital's interference as InterDigital used an unfair method of competition.

98.    InterDigital's interference was willful and in bad faith.

99.    InterDigital's interference was the cause of Nokia's loss of business opportunity as, absent InterDigital's interference, more 3G Nokia products would have been sold and Nokia would have received additional royalties.

100.     InterDigital's interference has caused and threatens to continue to cause actual injuries to Nokia.

101.     InterDigital's interference was knowing and willful in that InterDigital represented that all 3G manufacturers must pay license fees for its patents even though it knew that such fees were not required.   Nokia is therefore entitled to punitive damages from InterDigital.

102.     Nokia is further entitled to the relief requested herein.

### COUNT VIII.
### Intentional Interference with Prospective Business Relations
### (Texas)

103.     Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 102, as if set forth in full.

104.     Nokia possessed a reasonable probability of revenues from business relations from 3G technology.

105.     InterDigital intentionally and in bad faith interfered with Nokia's reasonable probability of business relations with the a conscious desire to prevent the relations from occurring, or with knowledge that the interference was certain or substantially certain to prevent the relations from occurring, as InterDigital knew or should have known that its declarations would affect the marketability of Nokia's products and the licensing royalties that Nokia would receive.

106.     InterDigital intentionally interfered with Nokia through an independently tortious or unlawful act by the defendant, including through all of the counts set forth herein.

107.     There was no privilege or justification for InterDigital's interference as InterDigital used an unfair method of competition.

108.    InterDigital's interference was the cause of Nokia's loss of business opportunity as, absent InterDigital's interference, more 3G Nokia products would have been sold and Nokia would have received additional royalties.

109.    InterDigital's interference has caused and threatens to continue to cause actual injuries to Nokia.

110.    InterDigital's interference was knowing and willful in that InterDigital represented that all 3G manufacturers must pay license fees for its patents even though it knew that such fees were not required.    Nokia is therefore entitled to punitive damages from InterDigital.

111.    Nokia is further entitled to the relief requested herein.

### COUNT IX.
### Injurious Falsehood
### (Delaware)

112.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 111, as if set forth in full.

113.    InterDigital published false statements through its declarations to ETSI.

114.    InterDigital declared that its patents were essential to 3G standards even though it knew they were not, or acted in reckless disregard of the declarations' truth or falsity.

115.    InterDigital further intimated that manufacturers such as Nokia needed to pay licensee fees for these patents, even though current 3G technology does not infringe them.

116.    InterDigital's declarations were willful and in bad faith.

117.    InterDigital intended its declarations to result in pecuniary harm to Nokia, or recognized or should have recognized harm would result, as InterDigital knew its statements would negatively impact marketability of Nokia's products.

118.    InterDigital's interference has caused and threatens to continue to cause actual injuries to Nokia.

119.    Nokia is further entitled to the relief requested herein.

## COUNT X.
### Commercial Disparagement
### (Pennsylvania)

120.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 119, as if set forth in full.

121.    InterDigital published false statements through its declarations to ETSI.

122.    InterDigital declared that its patents were essential to 3G standards even though it knew they were not, or acted in reckless disregard of the declarations' truth or falsity.

123.    InterDigital further intimated that manufacturers such as Nokia needed to pay license fees for these patents, even though current 3G technology does not infringe them.

124.    InterDigital's declarations were willful and in bad faith.

125.    InterDigital intended its declarations to result in pecuniary harm to Nokia, or recognized or should have recognized harm would result, as InterDigital knew its statements would negatively impact marketability of Nokia products.

126.    InterDigital's interference has caused and threatens to continue to cause actual injuries to Nokia.

127.    Nokia is further entitled to the relief requested herein.

## COUNT XI.
### Business Disparagement
### (Texas)

128.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 127, as if set forth in full.

129.    InterDigital published false statements through its declarations to ETSI.

130.    InterDigital declared that its patents were essential to 3G standards even though it knew they were not, or acted in reckless disregard of the declarations' truth or falsity.

131.    InterDigital further intimated that manufacturers such as Nokia needed to pay license fees for these patents, even though current 3G technology does not infringe them.

132.    InterDigital's declarations were willful and in bad faith.

133.    InterDigital intended its declarations to result in pecuniary harm to Nokia, or recognized or should have recognized harm would result, as InterDigital knew its statements would negatively impact marketability of Nokia's products.

134.    Upon information and belief, Nokia has suffered lost business expected from persons who are aware of InterDigital's statements.

135.    InterDigital's declarations have caused and threaten to continue to case actual injuries to Nokia.

136.    Nokia is further entitled to the relief requested herein.

## COUNT XII.
### Unjust Enrichment
### (Delaware)

137.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 136, as if set forth in full.

138.    InterDigital received an unjust enrichment of licensing revenues as a result of its false and misleading declarations to ETSI and other conduct described herein.

139.    Nokia has lost money due to InterDigital's wrongful conduct.

140.    InterDigital's false and misleading declarations to ETSI and other conduct described herein were purposeful and in bad faith, and caused both InterDigital's unjust enrichment and Nokia's loss.

141.    There was no privilege or justification for the false and misleading declarations to ETSI and other conduct described herein as InterDigital used an unfair method of competition.

142.    Nokia suffers the absence of an adequate remedy at law as InterDigital has improperly obtained licensing revenue and the adequate remedy is restitution of this improperly obtained revenue.

143.    InterDigital's declarations have caused and threaten to continue to cause actual injuries to Nokia.

144.    Nokia is further entitled to the relief requested herein.

## COUNT XII.
### Unjust Enrichment
### (Pennsylvania)

145.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 144, as if set forth in full.

146.    InterDigital received an unjust benefit of licensing revenues as a result of its false and misleading declarations to ETSI and other conduct described herein.

147.    InterDigital appreciated its unjust benefit as the false and misleading declarations to ETSI and other conduct described herein were purposeful and in bad faith.

148.    InterDigital accepted and retained its unjust benefit at the expense of Nokia and others and therefore it would be inequitable not to return its benefit.

149.    There was no privilege or justification for the false and misleading declarations to ETSI and other conduct described herein as InterDigital used an unfair method of competition.

150.    Nokia suffers the absence of an adequate remedy at law as InterDigital has improperly obtained licensing revenue and the adequate remedy is restitution of this improperly obtained revenue.

151.    InterDigital's declarations have caused and threaten to continue to cause actual injuries to Nokia.

152.    Nokia is further entitled to the relief requested herein.

## COUNT XIV.
### Unjust Enrichment
### (Texas)

153.    Nokia incorporates and re-alleges the averments contained in paragraphs 1 through 152, as if set forth in full.

154.    InterDigital received an unjust enrichment of licensing revenues as a result of its false and misleading declarations to ETSI and other conduct described herein.

155.    InterDigital's false and misleading declarations to ETSI and other conduct described herein were purposeful and in bad faith.

156.    InterDigital accepted and retained its unjust benefit at the expense of Nokia and others and therefore it would be inequitable not to return its benefit.

157.    There was no privilege or justification for the false and misleading declarations to ETSI and other conduct described herein as InterDigital used an unfair method of competition.

158.    Nokia suffers the absence of an adequate remedy at law as InterDigital has improperly obtained licensing revenue and the adequate remedy is restitution of this improperly obtained revenue.

159.    InterDigital's declarations have caused and threaten to continue to cause actual injuries to Nokia.

160.    Nokia is further entitled to the relief requested herein.

## JURY DEMAND

Nokia demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Nokia respectfully requests that the Court enter judgment:

(a)    Declaring the extent to which any of the patents set forth in Attachment A actually meet the definition of "essential" under the ETSI IPR policy;

(b)    Declaring the extent to which any of the patents in Attachment A are necessarily infringed by compliance of a product with a 3G standard actually commercially implemented anywhere in the world;

(c)    Declaring the extent to which any of the patents in Attachment A have valid, enforceable claims which necessarily read on any product compliant with the any 3G standard, including but not necessarily limited to Nokia products made, used, sold, offered for sale or imported in the United States;

(d)    Declaring that no Nokia 3G compliant product infringes any valid, enforceable claim of any of the patents in Attachment A (or any such other United States patent as InterDigital may refuse to concede is not infringed by Nokia);

(e)    That InterDigital's statements concerning the scope and validity of its 3G patents are false or misleading;

(f)    Enjoining InterDigital from continued dissemination of these false and misleading statements;

(g)    Requiring InterDigital to take all necessary steps to have its false and misleading statements withdrawn from ETSI's website;

(h)    Awarding Nokia damages in an amount to be determined at trial for Nokia's losses;

(i)    Awarding Nokia treble damages pursuant to 6 Del. Code § 2533(c);

(j)    Awarding Nokia punitive damages;

(k)    Requiring InterDigital's disgorgement of its unjust enrichment;

(l)    Granting Nokia its attorneys' fees and costs pursuant to 6 Del. Code § 2533(b) and all

other applicable bases for awarding fees and costs; and

(m)    Granting such other and further relief as the Court deems just and proper.


MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Julia Heaney*

JACK B. BLUMENFELD (#1014)
JULIA HEANEY (#3052)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200
Attorneys for NOKIA CORPORATION and
NOKIA, INC.

OF COUNSEL:

ALSTON & BIRD LLP
Patrick Flinn
Randall Allen
Lance Lawson
1201 West Peachtree Street
Atlanta, GA 30309
(404)881-7000

Original Filing Date: January 9, 2007
Public Filing Date: February 9, 2007
550110

CERTIFICATE OF SERVICE

I, Julia Heaney, hereby certify that on February 9, 2007 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Richard L. Horwitz
Potter Anderson & Corroon LLP

I also certify that copies were caused to be served on February 9, 2007 upon the following in the manner indicated:

BY HAND AND E-MAIL

Richard L. Horwitz
Potter Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE 19801
rhorwitz@potteranderson.com

BY E-MAIL

Dan D. Davison
Fulbright & Jaworski LLP
2200 Ross Avenue
Suite 2800
Dallas, TX 75201-2784
ddavidson@fulbright.com

/s/ Julia Heaney
_____
Julia Heaney (#3052)

# EXHIBIT  C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NOKIA CORPORATION and NOKIA
INC.,

    Plaintiffs,

      v.

INTERDIGITAL COMMUNICATIONS
CORPORATION and INTERDIGITAL
TECHNOLOGY CORPORATION,

    Defendants.

C.A. No. 05-16-JJF

**ATTACHMENTS C & D ARE
CONFIDENTIAL**

---

### PLAINTIFFS' STATEMENT PURSUANT TO FIRST DISCOVERY ORDER

Pursuant to the First Discovery Order, issued by Special Master Seitz on June 12, 2006, Plaintiffs Nokia Corp. and Nokia Inc. ("Nokia") hereby serve on Defendants InterDigital Communications Corp. and InterDigital Technology Corp. ("InterDigital") Plaintiffs' Statement Pursuant to First Discovery Order.

### I.    INTERDIGITAL'S FALSE PUBLIC STATEMENTS

Nokia's allegation that "InterDigital has repeatedly made public statements that its patent portfolio covers the practice of 3G wireless phone systems and the sale of 3G compliant products" is supported by numerous statements regarding InterDigital's portfolio and specific statements regarding particular InterDigital patents.

Nokia's allegations are supported by statements in InterDigital's filings with the U.S. Securities and Exchange Commission, including the following:

- "We have indicated to the appropriate [standards bodies] that we hold patents and patent applications that are essential for implementation of the present 3G standards in products, and have, in conjunction with such indication, declared that

our patented inventions will be available for license under the general principles of fairness, reasonableness and/or non-discrimination." InterDigital Communications Corp. Form 10-K, Mar. 31, 2005.

- "As a result of our participation in the Standards, we have filed declarations that make our essential inventions available for use and we will license on fair, reasonable and non-discriminatory or similar terms consistent with the requirements of the individual Standards organizations." InterDigital Communications Corp. Form 10-K, Mar. 31, 2005.

- "We have indicated to the appropriate standards bodies that we hold patents and patent applications that are essential for implementation of the present 3G standards specifications in products, and have, in conjunction with such indication, declared that our patented inventions will be available for license under the general principles of fairness, reasonableness and/or non-discrimination for each standards body." InterDigital Communications Corp. Form 10-K, Mar. 15, 2004.

- "We have indicated to the appropriate standards bodies that we hold patents and patent applications that are essential for implementation of the present 3G standards specifications in products, and have, in conjunction with such indication, declared that our patented inventions will be available for license under the general principles for each standards body." InterDigital Communications Corp. Form 10-K, Mar. 31, 2003.

- "We have indicated to the appropriate standards setting bodies that we hold patents and patent applications that are either essential or commercially important for implementation of the present 3G standards specifications in products, and have, in conjunction with such indication, declared that our patented inventions will be available for license under the general principles for each standards body." InterDigital Communications Corp. Form 10-K405, Mar. 29, 2002

- "We have indicated to the appropriate standards setting bodies that we hold patents and patent applications that are either essential or commercially important for implementation of the present 3G standards specifications into products." InterDigital Communications Corp. Form 10-K405, Apr. 2, 2001.

- "We believe that our patent portfolio is applicable to all of the air interface protocols described in the [3G] standard, and we have indicated to the standard setting bodies that we hold patents and patent applications that are either essential or commercially important for 3G products built to present standards specifications." InterDigital Communications Corp. Form 10-K, Mar. 29, 2000.

InterDigital has also claimed on its website to have essential patents, stating:

- "InterDigital believes that, in many instances, licenses for certain of our patents are required for third parties to manufacture and sell digital cellular products in compliance with TDMA and CDMA-based standards currently in use worldwide." www.InterDigital.com/tech_products_licensing.shtml.

2

- "Today, [InterDigital's] inventions and technology are embedded in every 2G, 2.5G and 3G device." www.InterDigital.com/tech_products_introduction.shtml.

- "InterDigital has a strong portfolio of patented technologies covering 2G, 2.5G and 3G standards, which it licenses worldwide." http://www.interdigital.com/press_room_news_archive_detail.jsp?releaseId=5474 34&cb=1151594870650

- "InterDigital supports the evolution of 3G technology through active participation in the standards bodies, invention of essential patented technologies, and development of advanced 3G product solutions." http://phx.corporate-ir.net/phoenix.zhtml?c=116582&p=irol-newsArticle&ID=813104 (dated Feb. 6, 2006).

- InterDigital's 3G license with High Tech Computer, "affirms InterDigital's position as a recognized developer and contributor of essential wireless technologies." http://phx.corporate-ir.net/phoenix.zhtml?c=116582&p=irol-newsArticle&ID=547419 (dated Dec. 17, 2003).

InterDigital has also claimed through various news outlets that its patents are essential to 3G standards:

- "[W]e have essential patents . . . and anybody that produces a 3G terminal U.S. device, needs to be licensed under all these essential patents. So from our perspective, every manufacturer who produces devices to that standards [sic] needs to license with us." William Merritt, Speech at Bear Stearns Annual Technology Conference (June 12, 2006).

- "Panasonic's acknowledgement that they used our technology was tantamount to a . . . statement that our patents are essential. So it's not that they were making some - doing some particular implementation that lead them into our patents. It was an acknowledgement by them that, yes InterDigital does hold essential patents." Id.

- "InterDigital holds essential [intellectual property rights] in variations of 3G, including FDD, TDD and CDMA." www.tdscdma-forum.org/EN/zl/yjx.asp (attributing quote to Donald Boles, Senior Vice President and Chief Patent Strategist of InterDigital from Interview, dated July 25, 2005).

- "[InterDigital's] broad portfolio of essential patents, along with InterDigital's 3G products and technology, will serve to fuel [InterDigital's] revenue growth as the 3G market emerges." www.3Gnewsroom.com/3g_news/jan_02/news_1743.shtml (attributing quote to Howard E. Goldberg, President and Chief Executive Officer of InterDigital; dated Jan 16, 2002).

- InterDigital's 3G licenses with Matsushita, Sharp and Japan Radio Company "reflect the industry's recognition of the importance of [InterDigital's] 3G essential patent portfolio." www.3Gnewsroom.com/3g_news/jan_02

/news_1732.shtml (attributing quote to Howard E. Goldberg, President and Chief Executive Officer of InterDigital; dated Jan. 15, 2002).

- InterDigital is "a recognized developer and contributor of essential technology" for 3G. www.3Gnewsroom.com/3g_news/dec_02/news_2867.shtml (attributing quote to William Merritt, President of InterDigital Technology Corp.; dated Dec. 18, 2002).

- "We have said in a prior press release that we believe that our patents are essential to each of the five specifications under the third generation technology. Therefore anyone practicing that technology is going to have to deal with us." Video Interview by Bill Griffeth with Howard Goldberg, President, InterDigital Communications Corp. (Jan. 10, 2000), 2000 WLNR 2850752(statement by Goldberg).

- "InterDigital began saying on Nov. 17[, 1999] that it holds 'patents that are essential to the new IMT-2000 standard,' executive vice president Rip Tilden said yesterday." Henry J. Holcomb, *InterDigital Soars After U.N. Report a New Wireless-Technology Standard Was Adopted*, Philadelphia Inquirer (Dec. 31, 1999).

Nokia's allegation is also supported by InterDigital's declarations to the European Telecommunications Standards Institute ("ETSI") that certain foreign and domestic patents are essential to the 3G standard UMTS. In particular, on April 10, 2001, InterDigital declared 80 patents and applications to be essential to UMTS (on behalf of InterDigital or its subsidiaries). These declarations were submitted to ETSI by InterDigital's then CEO, Howard Goldberg, and a copy of these declarations is included as Attachment A to this Statement. On April 8, 2004, InterDigital declared 1,192 patents and applications to be essential to UMTS (on behalf of InterDigital or its subsidiaries). These declarations were submitted to ETSI by Donald Boles, InterDigital's Chief Patent Officer, and a copy of these declarations is included as Attachment B to this Statement.

Essentiality declarations to ETSI are publicly available in a searchable online database, available at http://webapp.etsi.org/IPR/home.asp. The ETSI website instructs manufacturers wishing to produce standards-compliant products to use the database to identify patents that have

been declared to be essential to the relevant standard. *See, e.g.,* http://www.etsi.org/legal/IPR_database/FAQ_IPR-Policy.htm.

# REDACTED

InterDigital made these statements to Nokia for the express purposes of convincing Nokia to enter into a license agreement with InterDigital. These presentations are important marketing materials developed and utilized by InterDigital for the purpose of selling patent licenses, InterDigital's only source of revenue.

## II.   INTERDIGITAL'S STATEMENTS ARE FALSE

A review of InterDigital's patents establishes the falsity of the statements regarding the essentiality of those patents. Although the enormous number of patents InterDigital has declared to ETSI has prevented Nokia from reviewing every patent that InterDigital claims is essential, the patents Nokia has reviewed are believed not to be essential to UMTS or CDMA2000. (*See, e.g.,* Attachment E.) InterDigital can not reasonably contest this fact because it previously publicly embraced it. In December 2003, Forbes Magazine reported that Howard Goldberg, who was at that time the Chief Executive Officer of InterDigital Communications Corp., said, "Any company can design around our patents . . . ." Elizabeth MacDonald, *Pay Up Or Else,* Forbes Magazine, Dec. 22, 2003, at 122-24 (included as Attachment F). InterDigital made this statement less than four months before declaring to ETSI that 1,192 patents and applications were essential to UMTS.

5

The patents InterDigital has declared to ETSI do not substantiate InterDigital's claims regarding the essentiality of its portfolio. At least two third-party experts studying the industry have reviewed the essentiality of InterDigital's ETSI patents and determined that the vast majority of these patents are in fact not essential to UMTS. Dr. David Goodman and Dr. Robert A. Myers have concluded that approximately 64% of InterDigital's publicly declared inventions are not essential to UMTS (see Attachment G, at 4-5). Although this study did not find affirmatively all of InterDigital's patents to be non-essential, the study does not support InterDigital's claims that its patent portfolio is essential to UMTS. The study did not consider the file history of the patents in interpreting the claims (which may require a substantially narrower interpretation of the patent claims), nor did it examine the validity of any of InterDigital's patents.

Because the study did not disclose the patents that were not affirmatively judged essential, Nokia cannot augment this analysis with proper claim construction or with invalidity considerations at this time. Moreover, because InterDigital has declared over 1,272 patents to ETSI, it is practically impossible, at least at this stage, for Nokia to have reviewed all of InterDigital's patents for essentiality. Instead, Nokia has analyzed in detail a sample of InterDigital's self-proclaimed stronger patents. Nokia included this analysis in its responses to InterDigital's First Set of Interrogatories and includes it with this statement as Attachment E. This analysis strongly supports Nokia's view that none of these patents are essential to UMTS or CDMA2000.

Moreover, InterDigital's statements that particular patents and applications are essential to UMTS are themselves violations of the Lanham Act. The Goodman and Myers Report agrees that the vast majority of these 1,272 statements are false.

6

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Julia Heaney
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200
  Attorneys for NOKIA CORPORATION and
  NOKIA INC.

OF COUNSEL:

ALSTON & BIRD LLP
Peter Kontio
Randall L. Allen
Lance A. Lawson
William R. Hubbard
1201 West Peachtree Street
Atlanta, GA 30309
404-881-7000

June 30, 2006

7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NOKIA CORPORATION and NOKIA
INC.,

      Plaintiffs,

      v.

INTERDIGITAL COMMUNICATIONS
CORPORATION and INTERDIGITAL
TECHNOLOGY CORPORATION,

      Defendants.

C.A. No. 05-16-JJF

## VERIFICATION

I, Henry Muir, state as follows:

      I am a Director of IPR Licensing for Nokia Corporation. I have read Plaintiffs'

Statement Pursuant to First Discovery Order ("Plaintiffs' Statement"), and I know the

contents thereof. I verify under penalty of perjury under the laws of the United States of

America that the facts in Plaintiffs' Statement are true and correct to the best of my

knowledge.

Executed this 30th day of June, 2005.

_____

Henry Muir
Director of IPR, Licensing
Nokia Corporation
Nokia House
Summit Avenue
Farnborough, Hampshire GU14 0NG
United Kingdom

ATL01/12259222v2

# EXHIBIT  D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NOKIA CORPORATION and NOKIA INC.,

Plaintiffs,

v.

INTERDIGITAL COMMUNICATIONS
CORPORATION and INTERDIGITAL
TECHNOLOGY CORPORATION,

Defendants.

C.A. No. 05-16-JJF

## PLAINTIFFS' FIRST SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES TO PLAINTIFFS

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiffs Nokia Corp. and Nokia Inc. ("Nokia") hereby serve on Defendants InterDigital Communications Corp. and InterDigital Technology Corp. ("Defendants" or "InterDigital") Plaintiffs' First Supplemental Objections and Responses to Defendants' First Set of Interrogatories to Plaintiffs.

### I.    RESERVATIONS OF RIGHTS

In responding to Defendants' First Set of Interrogatories to Plaintiffs, Nokia states that it has conducted a diligent search, reasonable in scope, of those files and records in its possession, custody, or control believed to be the most likely to contain information responsive to the interrogatories herein and has solicited information from those individuals employed by or otherwise affiliated with Nokia who are believed to be the most likely to have knowledge of such matters. Nokia has not, however, undertaken to search or review all of the files and records in its possession or control, nor has it

solicited information from every individual employed by or otherwise affiliated with it, because to do so would be unduly burdensome and prohibitively expensive. In the event, therefore, that information or documents containing information responsive to Defendants' First Set of Interrogatories to Plaintiff are later identified or brought to Nokia's attention, Nokia reserves the right to amend, revise, supplement, modify, or clarify the following objections and responses. Nokia further reserves the right to complete its investigation and discovery of the facts, and to rely at trial or in other proceedings upon documents and information in addition to the information provided herein, regardless of whether such information is newly discovered or newly in existence.

Nokia has responded to these interrogatories as it interprets and understands them. If InterDigital subsequently asserts an interpretation of any response that differs from Nokia's understanding, Nokia reserves the right to supplement or amend its objections or responses.

Nokia's responses to Defendants' First Set of Interrogatories to Plaintiffs shall not constitute an admission by Nokia that any of the interrogatories or the responses thereto, or the documents produced in connection therewith, are admissible as evidence in any trial or other proceeding. Nokia specifically reserves the right to object on any grounds, at any time, to the admission of any interrogatory or any response or document produced in connection therewith in any such trial or other proceeding. Nokia's responses to these interrogatories is not a concession that any of the individuals identified by Nokia will be called as a witness or that he or she possesses discoverable information, or that the subject matter of the particular interrogatory is relevant to this action.

Any responsive documents or thing not privileged will be produced as business records in the manner in which they are maintained, or, unless otherwise noted below, categorized by Interrogatory Number to the extent feasible, and made available for inspection by InterDigital at a mutually convenient time and place, using procedures permitted by Rules 33(d) and 34 of the Federal Rules of Civil Procedure.

## II.     GENERAL OBJECTIONS

1.     Nokia objects to Defendants' First Set of Interrogatories to Plaintiffs to the extent they call for the disclosure of information and documents that are subject to the attorney-client privilege, other privilege, or the work-product immunity, or call for a response that would require disclosure of the mental impressions, conclusions, or legal theories of its attorneys or other representatives. Nokia further objects to identifying such information and documents on the grounds that such identification would itself intrude on the attorney-client privilege and work-product immunity.

2.     Nokia objects to any directions, definitions, or instructions contained in Defendants' First Set of Interrogatories to Plaintiffs to the extent that those instructions and definitions alter the generally understood definitions under the Federal Rules of Civil Procedure and Evidence or seek to impose on Nokia obligations -- including but not limited to disclosure and supplementation requirements -- beyond those required by the Federal Rules of Civil Procedure. For example, the Federal Rules of Civil Procedure do not obligate Nokia to comply with InterDigital's Instruction 1, which purports to require Nokia to "identify that portion of [an] interrogatory that is allegedly overly broad." This objection also includes but is not limited to Definitions 7, 8, 9, and 15, and Instructions 1, 2, and 3.

3

3.    Nokia further objects to the definitions contained in Defendants' First Set of Interrogatories to Plaintiffs to the extent that InterDigital intends for those definitions to apply outside of Defendants' First Set of Interrogatories to Plaintiffs.

4.    Nokia further objects to Defendants' First Set of Interrogatories to Plaintiffs to the extent that InterDigital prematurely seeks discovery of Nokia's contentions at an early point in this litigation, before Nokia has had an opportunity to obtain meaningful discovery from InterDigital or non-parties. Nokia has endeavored to answer the interrogatories as completely as reasonably possible at this time. Because discovery has only recently begun and much of the information Nokia needs to respond to these interrogatories is in the possession, custody, or control of InterDigital or third parties, Nokia's responses are therefore unavoidably incomplete. Nokia will supplement its responses insofar as merited by further discovery.

Insofar as any of Defendants' First Set of Interrogatories to Plaintiffs seek information to which the foregoing General Objections apply, failure to note these General Objections shall not be a waiver of those or other general objections with respect to any interrogatory.

## III.    RESPONSES TO FIRST SET OF INTERROGATORIES

### INTERROGATORY NO. 1:

Identify each statement or assertion made by InterDigital which forms the basis of Nokia's Lanham Act claim, including the declarant, recipient, date each statement was allegedly made, and the statement or assertion made, together with any documents, materials or individuals with knowledge that relate to such statement(s) or assertion(s). *See* Nokia's Complaint at Count XXI.

### ANSWER:

In addition to the foregoing Reservations of Rights and General Objections, all of which are incorporated herein by reference, Nokia specifically objects to Interrogatory

4

No. 1 to the extent that it seeks information or documents protected by the Attorney/Client privilege or Work Product immunity. Nokia further objects to this interrogatory because it is overly broad and unduly burdensome. For example, given (1) the capacious definition of "relate" in the definitions, (2) the size of Nokia's workforce, which includes tens of thousands of employees, and (3) the public nature of some of InterDigital's essentiality claims, many Nokia employees may have knowledge and may have created documents or materials that "relate" to InterDigital's essentiality claims. Nokia further objects to this interrogatory to the extent it seeks information that is publicly available or in the possession, custody, or control of InterDigital. Indeed, Nokia may not be aware of all statements that will form the basis of its Lanham Act claim, as Nokia may be unaware of all of the false claims of essentiality that InterDigital has presented to a substantial portion of the relevant audience.

Nokia further objects to this interrogatory because it is premature as, among other things, InterDigital has neither identified each of the patents it has in the past declared to be essential, nor identified all of the statements it has made regarding the essentiality of its patents. Nokia has endeavored to answer the aspects of this interrogatory involving opinions or contentions as completely as reasonably possible at this time. However, because discovery has only recently begun and much of the information Nokia needs to respond to this interrogatory is in InterDigital's possession, custody, or control, Nokia's response is unavoidably incomplete. Nokia will supplement this response insofar as further discovery supports a more complete response.

Subject to and without waiving the General Objections and the specific objections, Nokia is presently aware of certain statements by InterDigital demonstrating

5

that InterDigital has violated the Lanham Act and answers as follows. Nokia's Lanham

Act claim is based on InterDigital's false and misleading claims that InterDigital owns

patents that are essential to WCDMA and CDMA2000, including but not limited to all

statements identified in Plaintiffs' Statement Pursuant to First Discovery Order and in

Defendants' Statement Pursuant to Special Master's First Discovery Order. For example,

the statements forming the basis of Nokia's Lanham Act claim include:

(1)    InterDigital's essentiality declarations to the European Telecommunications Standards Institute ("ETSI"). With respect to its U.S. patents, InterDigital has contended that approximately 182 U.S. patents are essential to a 3G standard. These declarations were made on April 10, 2001, and April 8, 2004, and are available from ETSI's website at http://webapp.etsi.org/IPR/home.asp.

(2)    InterDigital's 3G licensing presentations. In licensing presentations to Nokia dated January 2002 and June 2003, InterDigital contended that certain patents were essential to certain 3G standards. The presentations were memorialized in two PowerPoint presentations. Nokia will produce copies of these presentations.

(3)    InterDigital's public statements, to the media and other persons or entities, regarding the essentiality of its patents, including but not limited to Elizabeth MacDonald, *Pay Up Or Else*, FORBES, Dec. 22, 2003, at 122-24; and

(4)    Statements in InterDigital's SEC filings, including for example the Form 10-K that InterDigital filed with the SEC on March 14, 2006.

Individuals with knowledge of InterDigital's false statements include individuals

present at InterDigital's licensing presentations to Nokia in January 2002 and June 2003:

- Ilkka Rahnasto, Nokia Corporation

- Kalle Moilanen, Nokia Corporation

- Kari Lång, Nokia Corporation

- William J. Merritt, InterDigital Communications Corp., 781 Third Avenue, King of Prussia, PA 19406

6

- Joseph King, InterDigital Communications Corp.

- Fatih Ozloturk, InterDigital Communications Corp., 2 Huntington Quadrangle, Melville, NY 11747

**INTERROGATORY NO. 2:**

Identify any and all evidence that InterDigital made the statements or assertions identified in Nokia's Answer to Interrogatory No. 1 in bad faith and/or with knowledge of their falsity, including all facts, documents, materials, and the person(s) with knowledge that support or refute that such statements were made in bad faith and with knowledge of their falsity. *See* Nokia's Complaint at Count XXI.

**ANSWER:**

In addition to the foregoing Reservations of Rights and General Objections, all of which are incorporated herein by reference, Nokia specifically objects to Interrogatory No. 2 to the extent that it seeks information or documents protected by the Attorney/Client privilege or Work Product immunity. Nokia further objects to this interrogatory because it is overly broad and unduly burdensome. For example, some of the information targeted by this interrogatory – regarding InterDigital's bad faith – is publicly available. In Elizabeth MacDonald, *Pay Up Or Else*, FORBES, Dec. 22, 2003, at 122-24, InterDigital's former CEO, Howard Goldberg is quoted as saying "Any company can design around our patents . . . ." That same article indicates that InterDigital has pursued a licensing strategy based on "dragging its customers . . . through legal disputes over patents."

Nokia also objects to this interrogatory to the extent it seeks information that is in the possession, custody, or control of InterDigital. Indeed, InterDigital possesses far better access to evidence of its bad faith than Nokia at this time because Nokia has not yet received complete discovery responses nor any documents from InterDigital.

7

Nokia further objects to this interrogatory because it is premature as, among other things, InterDigital has neither identified each of the patents it has in the past declared to be essential, nor identified all of the statements it has made regarding the essentiality of its patents. Nokia has endeavored to answer the aspects of this interrogatory involving opinions or contentions as completely as reasonably possible at this time. However, because discovery has only recently begun and much of the information Nokia needs to respond to this interrogatory is in InterDigital's possession, custody, or control, Nokia's response is unavoidably incomplete. For example, Nokia understands that similar issues have arisen in other cases involving InterDigital. Nokia believes that it will be able to more fully respond to this interrogatory after InterDigital has adequately responded to Nokia's first round of discovery requests, and will supplement this response insofar as further discovery supports a more complete response.

Subject to and without waiving the General Objections and the specific objections, Nokia answers as follows. First, a review of many of the statements listed in response to Interrogatory 1 shows those statements to be false, and Nokia therefore reasonably believes that InterDigital knew or should have known of the falsity of these statements. Second, InterDigital has not updated its ETSI declarations to reflect its current essentiality contentions. In its 2001 and 2004 declarations to ETSI, InterDigital identified as essential 110 U.S. patents and 72 applications that have issued as US patents. In InterDigital's response to Nokia's request that InterDigital "[i]dentify every patent that InterDigital currently contends to be essential" InterDigital identified (by reference) only 10 of those 182 U.S. patents. InterDigital has made no effort to notify ETSI, the industry, or the public that it no longer contends that 172 U.S. patents are

8

essential to UMTS. Third, the process InterDigital employs to identify essential patents –
as described in InterDigital's interrogatory responses – is not sufficiently rigorous,
reflecting a bad-faith indifference to the truth or falsity of InterDigital's essentiality
declarations.

## INTERROGATORY NO. 3:

Identify all facts, documents, materials and the person(s) with knowledge related
to, that support and/or that refute your contention that "all of InterDigital's 3G patents are
either invalid or not infringed by mobile handset and infrastructure products being rolled
out in the United States. In particular, no Nokia product either sold in the United States
or in development for sale to the United States infringes any claim of InterDigital 3G
patent." *See* Nokia's Compliant at p. 5, ¶11 . Your answer should include what analyses
Nokia conducted to make such determination, the result of such analyses for each and
every InterDigital patent analyzed, when such analyses took place and the individual(s)
with knowledge of such analyses.

### ANSWER:

In addition to the foregoing Reservations of Rights and General Objections, all of
which are incorporated herein by reference, Nokia specifically objects to Interrogatory
No. 3 to the extent that it misrepresents the contents of Nokia's Complaint. Nokia also
objects to this interrogatory – which focuses on invalidity and non-infringement analyses
– to the extent that it seeks the production of information or documents protected by the
Attorney/Client privilege or Work Product immunity. Nokia further objects to this
interrogatory because it is overly broad, unduly burdensome, and not reasonably
calculated to lead to the discovery of admissible evidence. For example, the contentions
in Paragraph 11 of Nokia's Complaint that are quoted in this interrogatory have been
dismissed. In addition, this interrogatory targets "every InterDigital patent analyzed"
regardless of whether Nokia's Lanham Act claim involves that patent. To the extent that
the issues addressed by this interrogatory are still a part of this action, Nokia will address
those issues in its response to Interrogatory 4. Nokia further objects to this interrogatory

9

to the extent it seeks information that is in the possession, custody, or control of InterDigital, such as the file histories of the relevant patents.

Nokia further objects to this interrogatory because it is premature as, among other things, InterDigital has neither identified each of the patents it has in the past declared to be essential, nor identified all of the statements it has made regarding the essentiality of its patents. Nokia has endeavored to answer the aspects of this interrogatory involving opinions or contentions as completely as reasonably possible at this time. However, because discovery has only recently begun and much of the information Nokia needs to respond to this interrogatory is in InterDigital's possession, custody, or control, Nokia's response is unavoidably incomplete. Nokia will supplement this response insofar as further discovery supports a more complete response.

Subject to and without waiving the General Objections and the specific objections, Nokia answers as follows. Pursuant to Federal Rule of Procedure 33(d), Nokia will produce documents from which the information targeted by Interrogatory 3 may be derived or ascertained. Nokia further contends that the following persons may have evidence responsive to this interrogatory:

- David J. Goodman, Department of Electrical and Computer Engineering, Polytechnic University, Brooklyn, New York, dgoodman@poly.edu.

- Robert A. Myers, Fairfield Resources International, Stamford, Connecticut, myers@frlicense.com.

**INTERROGATORY NO. 4:**

Identify all analyses performed by or for Nokia related to its contention that any or all patents in InterDigital's Patent Portfolio are non-essential, invalid, and/or not infringed, including, without limitation, all facts, documents, materials, conclusions and the person(s) with knowledge related to each analysis.

10

**ANSWER:**

In addition to the foregoing Reservations of Rights and General Objections, all of which are incorporated herein by reference, Nokia specifically objects to Interrogatory No. 4 -- which focuses on invalidity and essentiality analyses -- to the extent that it seeks the production of information or documents protected by the Attorney/Client privilege or Work Product immunity. Nokia further objects to this interrogatory to the extent it seeks information that is in the possession, custody, or control of InterDigital, such as the file histories of the relevant patents.

Nokia further objects to this interrogatory because it is premature as, among other things, InterDigital has neither identified each of the patents it has in the past declared to be essential, nor identified all of the statements it has made regarding the essentiality of its patents. Nokia has endeavored to answer the aspects of this interrogatory involving opinions or contentions as completely as reasonably possible at this time. However, because discovery has only recently begun and much of the information Nokia needs to respond to this interrogatory is in InterDigital's possession, custody, or control, Nokia's response is unavoidably incomplete. Nokia will supplement this response insofar as further discovery supports a more complete response.

Subject to and without waiving the General Objections and the specific objections, Nokia answers as follows. Pursuant to Federal Rule of Procedure 33(d), Nokia will produce documents from which the information targeted by Interrogatory 4 may be derived or ascertained. Nokia further contends that the following persons may have evidence responsive to this interrogatory:

- David J. Goodman, Department of Electrical and Computer Engineering, Polytechnic University, Brooklyn, New York, dgoodman@poly.edu.

11

- Robert A. Myers, Fairfield Resources International, Stamford, Connecticut, myers@frlicense.com.

Subject to and without waiving the General Objections and the specific objections, Nokia further responds that the following patents owned by InterDigital are not essential to any 3G standard for the following reasons and based on the following facts:

# PORTIONS

# REDACTED

# PORTIONS REDACTED

# PORTIONS

# REDACTED

14

# PORTIONS REDACTED

# PORTIONS REDACTED

# PORTIONS
# REDACTED

# PORTIONS REDACTED

### INTERROGATORY NO. 5:

Identify all facts, documents, materials and the person(s) with knowledge related to, that support and/or that refute your contention that "InterDigital has used false or misleading descriptions or representations in connection with its patent portfolio, the WCDMA standard, the cdma2000 standard, Nokia's products, the applicability of InterDigital's patents to Nokia's products, and the applicability of InterDigital's patents to 3G standards within the meaning of 15 U.S.C. § 1125(a) (§ 43(a) of the Lanham Act)." *See* Nokia's Complaint at ¶ 142, p. 34.

**ANSWER:**

In addition to the foregoing Reservations of Rights and General Objections, all of which are incorporated herein by reference, Nokia specifically objects to Interrogatory No. 5 to the extent that it misrepresents the contents of Nokia's Complaint. Nokia also objects to this interrogatory – which focuses on invalidity and non-essentiality analyses – to the extent that it seeks the production of information or documents protected by the Attorney/Client privilege or Work Product immunity. Nokia further objects to this interrogatory because it is overly broad and unduly burdensome. For example, given (1) the capacious definition of "relate" in the definitions, (2) the size of Nokia's workforce, which includes tens of thousands of employees, and (3) the public nature of InterDigital's essentiality claims, many Nokia employees may have knowledge and may have created documents or materials that "relate" to InterDigital's essentiality claims. Nokia also objects to this interrogatory to the extent it seeks information that is in the possession, custody, or control of InterDigital, including InterDigital's essentiality declarations. Nokia also objects to this interrogatory because it is duplicative of Interrogatories 1 and 4.

Nokia further objects to this interrogatory because it is premature as, among other things, InterDigital has neither identified each of the patents it has in the past declared to be essential, nor identified all of the statements it has made regarding the essentiality of its patents. Nokia has endeavored to answer the aspects of this interrogatory involving opinions or contentions as completely as reasonably possible at this time. However, because discovery has only recently begun and much of the information Nokia needs to respond to this interrogatory is in InterDigital's possession, custody, or control, Nokia's

response is unavoidably incomplete. Nokia will supplement this response insofar as further discovery supports a more complete response.

Subject to and without waiving the General Objections and the specific objections, Nokia answers as follows. The statements identified in response to Interrogatory 1 are false for the reasons listed in Plaintiffs' Statement Pursuant to First Discovery Order. Furthermore, pursuant to Federal Rule of Procedure 33(d), Nokia will produce documents from which the information targeted by Interrogatory 5 may be derived or ascertained. Nokia further contends that the following persons may have evidence responsive to this interrogatory:

- Ilkka Rahnasto, Nokia Corporation

- Kalle Moilanen, Nokia Corporation

- Kari Lång, Nokia Corporation

- William J. Merritt, InterDigital Communications Corp., 781 Third Avenue, King of Prussia, PA 19406;

- Joseph King, InterDigital Communications Corp.

- Fatih Ozloturk, InterDigital Communications Corp., 2 Huntington Quadrangle, Melville, NY 11747

- D. Ridgely Bolgiano, InterDigital Communications Corp., 781 Third Avenue, King of Prussia, PA 19406;

- Brian G. Kiernan, InterDigital Communications Corp., 781 Third Avenue, King of Prussia, PA 19406;

- Richard G. Saunders, 19 Big Look Trail, Medford, New Jersey 08055;

- Howard Goldberg;

- Donald M. Boles, InterDigital Communications Corp.,

20

- David J. Goodman, Department of Electrical and Computer Engineering, Polytechnic University, Brooklyn, New York, dgoodman@poly.edu; and

- Robert A. Myers, Fairfield Resources International, Stamford, Connecticut, myers@frlicense.com.

**INTERROGATORY NO. 6:**

Identify all facts, documents, materials and the person(s) with knowledge related to, that support and/or that refute your contention that statements by InterDigital ". . . influenced purchasing decisions by raising costs for all market participants . . . increased production costs for Nokia and raised the cost of Nokia developing and marketing standards compliant technology and deterred Nokia's customers from purchasing Nokia's standards complaint products." *See* Plaintiffs' Answering Brief in Opposition to Defendants' Motion to Dismiss Pursuant to FEDERAL RULES OF CIVIL PROCEDURE 12(B)(1), 12(B)(6) and 12(H)(3) ("Nokia's Answering Brief"), at p. 30.

**ANSWER:**

In addition to the foregoing Reservations of Rights and General Objections, all of which are incorporated herein by reference, Nokia specifically objects to Interrogatory No. 6 to the extent that it misrepresents the contents of Nokia's Answering Brief. Nokia also objects to this interrogatory to the extent that it seeks the production of information or documents protected by the Attorney/Client privilege or Work Product immunity. Nokia further objects to this interrogatory because it is overly broad and unduly burdensome. For example, some of the information targeted by this interrogatory — regarding the harm caused to the wireless industry by false essentiality claims — is publicly available. Nokia also objects to this interrogatory to the extent it seeks information that is in the possession, custody, or control of InterDigital. For example, in the Form 10-K that InterDigital filed with the SEC on March 14, 2006, InterDigital stated on page 12 that:

[N]umerous companies . . . claim that they hold essential . . . 3G patents. To the extent that multiple parties all seek royalties on the same product,

the manufacturers may have difficulty in meeting the financial requirements of each patent holder.

Nokia further objects to this interrogatory because it is premature as, among other things, InterDigital has neither identified each of the patents it has in the past declared to be essential, nor identified all of the statements it has made regarding the essentiality of its patents. Nokia has endeavored to answer the aspects of this interrogatory involving opinions or contentions as completely as reasonably possible at this time. However, because discovery has only recently begun and much of the information Nokia needs to respond to this interrogatory is in InterDigital's possession, custody, or control, Nokia's response is unavoidably incomplete. Nokia will supplement this response insofar as further discovery supports a more complete response.

To the extent that Interrogatory No. 6 seeks information regarding a narrative description of the harm to Nokia stemming from InterDigital's false statements, Nokia objects to Interrogatory No. 6 as duplicative of Interrogatory No. 8.

Subject to and without waiving the General Objections and the specific objections, Nokia answers as follows. Pursuant to Federal Rule of Procedure 33(d), Nokia will produce documents from which the information targeted by Interrogatory No. 6 may be derived or ascertained. Nokia further contends that the following persons may have evidence responsive to this interrogatory:

- Henry Joseph Colquhoun Muir, Director of IPR Licensing, Nokia Corporation, Nokia House, Summit Avenue, Farnborough, GU14 ONG, United Kingdom.

In addition, the following companies also are likely to possess information relating to Nokia's contention that false essentiality claims by InterDigital have raised costs for all market participants.

- BenQ Corp., Taiwan
- Compal Electronics, Taiwan
- Compal Communications, Inc., Taiwan
- Curitel Communications, Inc., Korea
- DBTel, Taiwan
- Haier, China
- LiteOn, Taiwan
- Option NV, Netherlands
- Palm, Inc., United States
- Pantech, Korea
- Sierra Wireless, United States
- TCL, China

In addition, the following publicly available documents relate to Nokia's contention that false essentiality claims by InterDigital have raised costs for all market participants.

- Drew Cullen, *Gang of Four set W-CDMA royalty cap*, The Register, Nov. 6, 2002, *available at*
  http://www.theregister.co.uk/2002/11/06/gang_of_four_set_wcdma/.

23

- *InterDigital will not limit standard royalty*, 3GNewsroom.com, Nov. 21, 2002, *available at* http://www.3gnewsroom.com/3g_news/nov_02/news_2761.shtml.

- Vodafone, *Examining the IPR Regime*, Aug. 29, 2005, *available at* http://portal.etsi.org/docbox/workshop/gsc/gsc10archive/gsc10_ipr/gsc10_ ipr_15a1%20Evaluation%20of%20IPR%20challenges%20in%20Standard s%20making.ppt

- Vodafone Group plc, *Evaluation of IPR Challenges in Standards Making*, Aug. 24, 2005, *available at* http://portal.etsi.org/docbox/workshop/gsc/gsc10archive/gsc10_ipr/gsc10_ ipr_15%20Evaluation%20of%20IPR%20challenges%20in%20Standards %20making.doc

- *Vodafone evaluation of IPR challenges in ETSI, available at* http://sos-interop.org//files/vodafone_evaluation_of_ipr_challenges_in_etsi_555.doc

- Ericsson, Motorola, Nokia, *Proposal for IPR Policy Reform*, Feb. 20, 2006, available from http://portal.etsi.org/Portal_Common/home.asp

- IPR Working Group, GSM Association, *IPR Problem Statement*, July 20, 2005, *available at* http://sos-interop.org//files/ipr_working_group_problem_statement_ver_2_246.doc

- Tobias Buck, *Groups push for action on intellectual property*, FT.com, Nov. 21, 2005, *available at* http://www.ft.com/cms/s/9609cb48-5ab1-11da-8628-0000779e2340,dwp_uuid=d4f2ab60-c98e-11d7-81c6-0820abe49a01.html.

- John Oates, *Telcos united on anti-patent laws*, The Register, *available at* http://www.theregister.co.uk/2005/11/22/telcos_unite_on_ip/

- ComputerWire, *Patent fees weigh down 3G uptake*, The Register, Sept. 13, 2002, *available at* http://www.theregister.co.uk/2002/09/13/patent_fees_weigh_down_3g/

- *3G market could be stifled by high IPR costs*, 3Gnewsroom.com, May 2, 2005, *available at* http://www.3gnewsroom.com/3g_news/may_05/news_5817.shtml

- Brett Simpson & Richard Kramer, *3G IPR: A Great Mobile Mystery*, Arete, Jan. 25, 2005, *available at* https://www.arete.net/REPORTS/3GIPR250105.pdf

- Kim Tae-gyu, *Cell Phone Makers Face Higher Royalties*, Korea Times, Oct. 17, 2005, *available at* http://times.hankooki.com/lpage/tech/200510/kt2005101718201511800.htm

- Rudi Bekker's & Joel West, *The Effect of Strategic Patenting on Cumulative Innovation in UMTS Standardization*, Mar. 2006, *available at* http://www.dime-eu.org/files/active/1/IPR-WORKING-PAPER-9_BekkersWest.pdf

## INTERROGATORY NO. 7:

Identify all facts, documents, materials and the person(s) with knowledge related to, that support and/or that refute your contention that InterDigital made false statements representing the characteristics of Nokia's products which have harmed Nokia's goodwill and reputation.

**ANSWER:**

In addition to the foregoing Reservations of Rights and General Objections, all of which are incorporated herein by reference, Nokia specifically objects to Interrogatory No. 7 to the extent that it seeks the production of information or documents protected by the Attorney/Client privilege or Work Product immunity. Nokia also objects to this interrogatory to the extent it seeks information that is in the possession, custody, or control of InterDigital. For example, in the Form 10-K that InterDigital filed with the SEC on March 14, 2006, InterDigital stated on page 12 that:

> [N]umerous companies . . . claim that they hold essential . . . 3G patents. To the extent that multiple parties all seek royalties on the same product, the manufacturers may have difficulty in meeting the financial requirements of each patent holder.

Nokia further objects to this interrogatory because it is premature as, among other things, InterDigital has neither identified each of the patents it has in the past declared to be essential, nor identified all of the statements it has made regarding the essentiality of its patents. Nokia has endeavored to answer the aspects of this interrogatory involving opinions or contentions as completely as reasonably possible at this time. However, because discovery has only recently begun and much of the information Nokia needs to respond to this interrogatory is in InterDigital's possession, custody, or control, Nokia's response is unavoidably incomplete. Nokia will supplement this response insofar as further discovery supports a more complete response.

Nokia objects to Interrogatory No. 7 to the extent to which it seeks information duplicative of the information sought through Interrogatories No. 6, 9, and 10. To the extent that Interrogatory No. 7 seeks information regarding a narrative description of the

harm to Nokia stemming from InterDigital's false statements, Nokia objects to Interrogatory No. 7 as duplicative of Interrogatory No. 8.

Subject to and without waiving the General Objections and the specific objections, Nokia answers as follows. Pursuant to Federal Rule of Procedure 33(d), Nokia will produce documents from which the information targeted by Interrogatory 7 may be derived or ascertained. Nokia further contends that the following persons may have evidence responsive to this interrogatory:

- Henry Joseph Colquhoun Muir, Director of IPR Licensing, Nokia Corporation, Nokia House, Summit Avenue, Farnborough, GU14 ONG, United Kingdom.

In addition, the following publicly available documents relate to Nokia's contention that InterDigital's claims that its patents are essential — and that Nokia must therefore enter a license with InterDigital — have harmed Nokia's reputation and goodwill.

- *Nokia and InterDigital Settle; Future Battle Looms*, Mobile Europe, May 5, 2006, *available at*

  http://www.mobileeurope.co.uk/news/news_story.ehtml?o=2136

### INTERROGATORY NO. 8:

Identify how each statement or assertion identified in Interrogatory No. 1 has caused Nokia to be damaged and the dollar amount, if any, of such damage, including the amount of damages claimed for Nokia's goodwill and reputation. *See* Nokia's Answering Brief at pp. 30-31.

#### ANSWER:

In addition to the foregoing Reservations of Rights and General Objections, all of which are incorporated herein by reference, Nokia specifically objects to Interrogatory

27

No. 8 to the extent that it seeks the production of information or documents protected by the Attorney/Client privilege or Work Product immunity. Nokia also objects to this interrogatory to the extent it seeks information that is in the possession, custody, or control of InterDigital.

Nokia further objects to this interrogatory because it is premature and unduly burdensome as, among other things, InterDigital has neither identified each of the patents it has in the past declared to be essential, nor identified all of the statements it has made regarding the essentiality of its patents. Nokia has endeavored to answer the aspects of this interrogatory involving opinions or contentions as completely as reasonably possible at this time. However, because discovery has only recently begun and much of the information Nokia needs to respond to this interrogatory is in InterDigital's possession, custody, or control, Nokia's response is unavoidably incomplete. Nokia will supplement this response insofar as further discovery supports a more complete response.

Subject to and without waiving the General Objections and the specific objections, Nokia answers as follows. Nokia has been damaged by InterDigital's actions as provided in the Complaint and any additional damages, under any damages theory, necessary to fully compensate Nokia for InterDigital's violations of the Lanham Act. Nokia expects the extent of these damages to become clear through discovery and Nokia has not yet computed those damages. Nokia expects to provide its damages calculations in an expert report in accordance with the Court's Rule 16 Scheduling Order entered in this matter. Moreover, Nokia need not demonstrate any particular amount of damages in order to obtain the injunctive relief that it has requested.

Without excluding any other form of damages, Nokia contends that it has been damaged in at least four respects. First, InterDigital's false declarations have contributed to the delay in the "roll out" of WCDMA, i.e., InterDigital's statements have slowed the transition from 2G technology to WCDMA technology. InterDigital's false declarations have caused uncertainty regarding the royalties that must be paid for WCDMA products, raising concerns that WCDMA products will be too expensive to provide adequate profits. Wireless operators have consequently been more reluctant to implement WCDMA technology on a wide scale. The confusion in the marketplace has contributed to Nokia selling WCDMA products at a slower rate than it otherwise would have to wireless operators and end consumers.

Second, InterDigital's false essentiality declarations have inhibited Nokia from licensing its WCDMA portfolio. InterDigital's false declarations effectively accuse the WCDMA products manufactured by third parties of infringement. Those manufacturers are also aware of the essentiality claims of companies like Nokia. As a practical matter, because of the large number of patents declared essential to WCDMA, manufacturers have difficulty distinguishing between the false and true essentiality declarations. To avoid licensing non-essential patents, some manufacturers are more reluctant to enter any WCDMA licenses. The position of manufacturers is exacerbated by the possibility that, if a manufacturer accepted the licensing claims of all the owners of patents declared essential, the cumulative royalties might prevent the manufacturer from being able to profit on the sale of its WCDMA products. InterDigital has recognized that the licensing demands of one company may affect the licensing success of another company.

29

Interdigital stated in the Form 10-K that InterDigital filed with the SEC on March 14, 2006:

> [N]umerous companies . . . claim that they hold essential . . . 3G patents. To the extent that multiple parties all seek royalties on the same product, the manufacturers may have difficulty in meeting the financial requirements of each patent holder.

Manufacturers are thus concerned that the cumulative royalties will "stack" high enough to eliminate the manufacturer's profits. InterDigital's threats thus create a cloud of uncertainty that inhibits manufacturers from licensing Nokia's patents. The sporadic timing of InterDigital's declarations further contributes to this confusion.

Third, InterDigital's false essentiality declarations have made it more difficult for Nokia to obtain favorable terms in its WCDMA licenses. Even when Nokia is successful in licensing its patents, licensees are unwilling to agree to certain terms out of concern for the amount of cumulative royalties that the licensee must pay. As a practical matter, for WCDMA products to be profitable, royalties cannot exceed a certain threshold. If a manufacturer agrees to pay – or fears it must pay – inflated royalties to InterDigital based on the large number of patent declarations InterDigital has made, the manufacturer will be willing to pay Nokia less than it would if InterDigital had not made the false declarations.

Fourth, InterDigital's false statements have harmed Nokia's goodwill. InterDigital's false essentiality claims are equivalent to claims that Nokia must enter a license with InterDigital or face enormous infringement liability. Such infringement claims further harm Nokia's goodwill. Furthermore, InterDigital's false declarations of essentiality exaggerate InterDigital's role – and thereby diminish Nokia's role – in standard setting.

**INTERROGATORY NO. 9:**

Identify all facts, documents, materials and the person(s) with knowledge related to, that support and/or that refute your contention that "InterDigital's statements have chilled consumer demand after the expiration of the 1999 license because consumers are reluctant to buy allegedly infringing products."

**ANSWER:**

In addition to the foregoing Reservations of Rights and General Objections, all of which are incorporated herein by reference, Nokia specifically objects to Interrogatory No. 9 to the extent that it misrepresents the Nokia's statements. Nokia also objects to this interrogatory to the extent that it seeks the production of information or documents protected by the Attorney/Client privilege or Work Product immunity. Nokia further objects to this interrogatory because it is overly broad and unduly burdensome. For example, the interrogatory seeks publicly available information regarding the impact on the wireless industry of false essentiality declarations. Nokia also objects to this interrogatory to the extent it seeks information that is in the possession, custody, or control of InterDigital. For example, in the Form 10-K that InterDigital filed with the SEC on March 14, 2006, InterDigital stated on page 12 that:

> [N]umerous companies . . . claim that they hold essential . . . 3G patents. To the extent that multiple parties all seek royalties on the same product, the manufacturers may have difficulty in meeting the financial requirements of each patent holder.

Nokia further objects to this interrogatory because it is premature as, among other things, InterDigital has neither identified each of the patents it has in the past declared to be essential, nor identified all of the statements it has made regarding the essentiality of its patents. Nokia has endeavored to answer the aspects of this interrogatory involving opinions or contentions as completely as reasonably possible at this time. However, because discovery has only recently begun and much of the information Nokia needs to

31

respond to this interrogatory is in InterDigital's possession, custody, or control, Nokia's response is unavoidably incomplete. Nokia will supplement this response insofar as further discovery supports a more complete response.

To the extent that Interrogatory No. 9 seeks information regarding a narrative description of the harm to Nokia stemming from InterDigital's false statements, Nokia objects to Interrogatory No. 9 as duplicative of Interrogatory No. 8.

Subject to and without waiving the General Objections and the specific objections and pursuant to Federal Rule of Procedure 33(d), Nokia will produce documents from which information targeted by Interrogatory 9 may be derived or ascertained. Nokia further contends that the following persons may have evidence responsive to this interrogatory:

- Henry Joseph Colquhoun Muir, Director of IPR Licensing, Nokia Corporation, Nokia House, Summit Avenue, Farnborough, GU14 0NG, United Kingdom.

The following publicly available documents also relate to Nokia's contention that consumer demand for 3G products has been chilled by InterDigital's false declarations of essentiality.

- Drew Cullen, *Gang of Four set W-CDMA royalty cap*, The Register, Nov. 6, 2002, *available at*

  http://www.theregister.co.uk/2002/11/06/gang_of_four_set_wcdma/.

- *InterDigital will not limit standard royalty*, 3GNewsroom.com, Nov. 21, 2002, *available at*

  http://www.3gnewsroom.com/3g_news/nov_02/news_2761.shtml.

32

- Vodafone, *Examining the IPR Regime*, Aug. 29, 2005, *available at* http://portal.etsi.org/docbox/workshop/gsc/gsc10archive/gsc10_ipr/gsc10_ipr_15a1%20Evaluation%20of%20IPR%20challenges%20in%20Standards%20making.ppt

- Vodafone Group plc, *Evaluation of IPR Challenges in Standards Making*, Aug. 24, 2005, *available at* http://portal.etsi.org/docbox/workshop/gsc/gsc10archive/gsc10_ipr/gsc10_ipr_15%20Evaluation%20of%20IPR%20challenges%20in%20Standards%20making.doc

- *Vodafone evaluation of IPR challenges in ETSI, available at* http://sos-interop.org//files/vodafone_evaluation_of_ipr_challenges_in_etsi_555.doc

- Ericsson, Motorola, Nokia, *Proposal for IPR Policy Reform*, Feb. 20, 2006, available from http://portal.etsi.org/Portal_Common/home.asp

- IPR Working Group, GSM Association, *IPR Problem Statement*, July 20, 2005, *available at* http://sos-interop.org//files/ipr_working_group_problem_statement_ver_2_246.doc

- Tobias Buck, *Groups push for action on intellectual property*, FT.com, Nov. 21, 2005, *available at* http://www.ft.com/cms/s/9609cb48-5ab1-11da-8628-0000779e2340,dwp_uuid=d4f2ab60-c98e-11d7-81c6-0820abe49a01.html.

- John Oates, *Telcos united on anti-patent laws*, The Register, available at http://www.theregister.co.uk/2005/11/22/telcos_unite_on_ip/

33

- ComputerWire, *Patent fees weigh down 3G uptake*, The Register, Sept.

  13, 2002, *available at*

  http://www.theregister.co.uk/2002/09/13/patent_fees_weigh_down_3g/

- *3G market could be stifled by high IPR costs*, 3Gnewsroom.com, May 2,

  2005, *available at*

  http://www.3gnewsroom.com/3g_news/may_05/news_5817.shtml

- Brett Simpson & Richard Kramer, *3G IPR: A Great Mobile Mystery*,

  Arete, Jan. 25, 2005, *available at*

  https://www.arete.net/REPORTS/3GIPR250105.pdf

- Kim Tae-gyu, *Cell Phone Makers Face Higher Royalties*, Korea Times, Oct.

  17, 2005, *available at*

  http://times.hankooki.com/lpage/tech/200510/kt2005101718201511800.htm

- Rudi Bekker's & Joel West, *The Effect of Strategic Patenting on*

  *Cumulative Innovation in UMTS Standardization*, March 2006, *available*

  *at* http://www.dime-eu.org/files/active/1/IPR-WORKING-PAPER-

  9_BekkersWest.pdf

## INTERROGATORY NO. 10:

Identify each Nokia customer you claim was "deterred from purchasing Nokia's standard compliant products" as a result of InterDigital's alleged false and misleading statements, including, without limitation, the contact person at such customer(s) and all facts, documents, materials, and the person(s) with knowledge that support or refute that such customers have been so deterred.

### ANSWER:

In addition to the foregoing Reservations of Rights and General Objections, all of

which are incorporated herein by reference, Nokia specifically objects to Interrogatory

No. 10 to the extent that it misrepresents Nokia's statements. Nokia also objects to this

interrogatory to the extent that it seeks the production of information or documents

protected by the Attorney/Client privilege or Work Product immunity. Nokia further

objects to this interrogatory because it is overly broad and unduly burdensome: publicly

available information – including InterDigital's own SEC filings – demonstrates the harm

to the wireless industry caused by false essentiality declarations. Nokia also objects to

this interrogatory because it seeks confidential and proprietary information of Nokia.

Nokia also objects to this interrogatory to the extent it seeks information that is in the

possession, custody, or control of InterDigital. For example, in the Form 10-K that

InterDigital filed with the SEC on March 14, 2006, InterDigital stated on page 12 that:

> [N]umerous companies . . . claim that they hold essential . . . 3G patents.
> To the extent that multiple parties all seek royalties on the same product,
> the manufacturers may have difficulty in meeting the financial
> requirements of each patent holder.

Nokia further objects to this interrogatory because it is premature as, among other

things, InterDigital has neither identified each of the patents it has in the past declared to

be essential, nor identified all of the statements it has made regarding the essentiality of

its patents. Nokia has endeavored to answer the aspects of this interrogatory involving

opinions or contentions as completely as reasonably possible at this time. However,

because discovery has only recently begun and much of the information Nokia needs to

respond to this interrogatory is in InterDigital's possession, custody, or control, Nokia's

response is unavoidably incomplete. Nokia will supplement this response insofar as

further discovery supports a more complete response.

To the extent that Interrogatory No. 10 seeks information regarding a narrative

description of the harm to Nokia stemming from InterDigital's false statements, Nokia

objects to Interrogatory No. 10 as duplicative of Interrogatory No. 8.

Subject to and without waiving the General Objections and the specific objections and pursuant to Federal Rule of Procedure 33(d), Nokia will produce documents from which information targeted by Interrogatory 10 may be derived or ascertained. The following publicly available documents also relate to Nokia's contention that Nokia customers have been deterred from purchasing Nokia's 3G products.

- Drew Cullen, *Gang of Four set W-CDMA royalty cap*, The Register, Nov. 6, 2002, *available at*

  http://www.theregister.co.uk/2002/11/06/gang_of_four_set_wcdma/.

- *InterDigital will not limit standard royalty*, 3GNewsroom.com, Nov. 21, 2002, *available at*

  http://www.3gnewsroom.com/3g_news/nov_02/news_2761.shtml.

- Vodafone, *Examining the IPR Regime*, Aug. 29, 2005, *available at*

  http://portal.etsi.org/docbox/workshop/gsc/gsc10archive/gsc10_ipr/gsc10_ipr_15a1%20Evaluation%20of%20IPR%20challenges%20in%20Standards%20making.ppt

- Vodafone Group plc, *Evaluation of IPR Challenges in Standards Making*, Aug. 24, 2005, *available at*

  http://portal.etsi.org/docbox/workshop/gsc/gsc10archive/gsc10_ipr/gsc10_ipr_15%20Evaluation%20of%20IPR%20challenges%20in%20Standards%20making.doc

- *Vodafone evaluation of IPR challenges in ETSI*, *available at* http://sos-interop.org//files/vodafone_evaluation_of_ipr_challenges_in_etsi_555.doc

36

- Ericsson, Motorola, Nokia, *Proposal for IPR Policy Reform*, Feb. 20, 2006, available from http://portal.etsi.org/Portal_Common/home.asp

- IPR Working Group, GSM Association, *IPR Problem Statement*, July 20, 2005, *available at* http://sos-interop.org//files/ipr_working_group_problem_statement_ver_2_246.doc

- Tobias Buck, *Groups push for action on intellectual property*, FT.com, Nov. 21, 2005, *available at* http://www.ft.com/cms/s/9609cb48-5ab1-11da-8628-0000779e2340,dwp_uuid=d4f2ab60-c98e-11d7-81c6-0820abe49a01.html.

- John Oates, *Telcos united on anti-patent laws*, The Register, available at http://www.theregister.co.uk/2005/11/22/telcos_unite_on_ip/

- ComputerWire, *Patent fees weigh down 3G uptake*, The Register, Sept. 13, 2002, *available at* http://www.theregister.co.uk/2002/09/13/patent_fees_weigh_down_3g/

- *3G market could be stifled by high IPR costs*, 3Gnewsroom.com, May 2, 2005, *available at* http://www.3gnewsroom.com/3g_news/may_05/news_5817.shtml

- Brett Simpson & Richard Kramer, *3G IPR: A Great Mobile Mystery*, Arete, Jan. 25, 2005, *available at* https://www.arete.net/REPORTS/3GIPR250105.pdf

- Kim Tae-gyu, *Cell Phone Makers Face Higher Royalties*, Korea Times, Oct. 17, 2005, *available at*

http://times.hankooki.com/lpage/tech/200510/kt2005101718201511800.ht

m

- Rudi Bekker's & Joel West, *The Effect of Strategic Patenting on*

  *Cumulative Innovation in UMTS Standardization,* March 2006, *available*

  *at* http://www.dime-eu.org/files/active/1/IPR-WORKING-PAPER-

  9_BekkersWest.pdf

**INTERROGATORY NO. 11:**

For any 3G patent or technology license Nokia has negotiated, entered or
attempted to enter with a third party in which InterDigital's Patents Portfolio or 3G
technology was discussed, identify the license agreement, licensee or potential licensee,
licensor or potential licensor, date of license and the patents or technology licensed.

**ANSWER:**

In addition to the foregoing Reservations of Rights and General Objections, all of

which are incorporated herein by reference, Nokia specifically objects to Interrogatory

No. 11 to the extent it is overly broad, unduly burdensome, and not reasonably calculated

to lead to the discovery of admissible evidence. For example, the interrogatory seeks

detailed information regarding Nokia's licensing efforts even if InterDigital's patents

were only mentioned in passing during such negotiations. Nokia also objects to this

interrogatory to the extent that it seeks the production of information or documents

protected by the Attorney/Client privilege or Work Product immunity.

To the extent that Interrogatory No. 11 seeks information regarding a narrative

description of the harm to Nokia stemming from InterDigital's false statements, Nokia

objects to Interrogatory No. 11 as duplicative of Interrogatory No. 8.

38

Subject to and without waiving the General Objections and the specific objections and pursuant to Federal Rule of Procedure 33(d), Nokia will produce documents from which the information targeted by Interrogatory 11 may be derived or ascertained.

In addition, the following companies also are likely to possess information relating to Nokia's contention that InterDigital's false essentiality statements have stifled Nokia's efforts to license its essential 3G patents:

- BenQ Corp., Taiwan
- Compal Electronics, Taiwan
- Compal Communications, Inc., Taiwan
- Curitel Communications, Inc., Korea
- DBTel, Taiwan
- Haier, China
- LiteOn, Taiwan
- Option NV, Netherlands
- Palm, Inc., United States
- Pantech, Korea
- Sierra Wireless, United States
- TCL, China

**INTERROGATORY NO. 12:**

State whether, how and when Nokia determines to declare a patent to be essential to a 3G Standard, including the identity of all facts, documents (by production numbers), materials, and the person(s) with knowledge that relate to Nokia's constructions) of "essential" for such 3G Standard(s).

**ANSWER:**

In addition to the foregoing Reservations of Rights and General Objections, all of which are incorporated herein by reference, Nokia specifically objects to Interrogatory No. 12 to the extent that it seeks the production of information or documents protected by the Attorney/Client privilege or Work Product immunity. Nokia further objects to this interrogatory to the extent it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence: Nokia's Lanham Act claim involves the falsity of InterDigital's essentiality declarations, not Nokia's.

Subject to and without waiving the General Objections and the specific objections and pursuant to Federal Rule of Procedure 33(d), Nokia will produce unobjectionable documents – if any are within Nokia's possession custody, or control – from which the information targeted by Interrogatory 12 may be derived or ascertained.

**INTERROGATORY NO. 13:**

Identify all facts, documents, materials and the person(s) with knowledge related to, that support and/or that refute your contention that "the goods that InterDigital has disparaged have indisputably traveled in interstate commerce." *See* Nokia's Answering Brief at p 31. Your answer should include, but not be limited to, the goods claimed to be disparaged, when the goods were shipped, where the goods were shipped from and to and to whom the goods were shipped.

**ANSWER:**

In addition to the foregoing Reservations of Rights and General Objections, all of which are incorporated herein by reference, Nokia specifically objects to Interrogatory No. 13 to the extent it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. For example, given the broad definition of "relate" incorporated into the interrogatory, any "fact, documents, materials, [or] person with knowledge related to" Nokia's interstate or international sale of 3G products

40

would be responsive to this interrogatory. Nokia further objects to this interrogatory to the extent that it seeks the production of information or documents protected by the Attorney/Client privilege or Work Product immunity.

Nokia has endeavored to answer the aspects of this interrogatory involving opinions or contentions as completely as reasonably possible at this time. However, because discovery has only recently begun and much of the information Nokia needs to respond to this interrogatory is in InterDigital's possession, custody, or control, Nokia's response is unavoidably incomplete. Nokia will supplement this response insofar as further discovery supports a more complete response.

Subject to and without waiving the General Objections and the specific objections and pursuant to Federal Rule of Procedure 33(d), Nokia will produce documents from which the information targeted by Interrogatory 13 may be derived or ascertained.

**INTERROGATORY NO. 14:**

Identify the name, address, phone number and principal contact person for all customers or prospective customers to whom Nokia has presented, demonstrated, offered to sell, sold, offered to license or licensed any Nokia 3G Products, including the Nokia employee(s) with the most knowledge of the foregoing.

**ANSWER:**

In addition to the foregoing Reservations of Rights and General Objections, all of which are incorporated herein by reference, Nokia specifically objects to Interrogatory No. 14 to the extent it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. For example, the interrogatory seeks information regarding Nokia sales personnel who may be unaware of InterDigital's deleterious impact on the industry. Nokia further objects to this interrogatory because it seeks confidential and proprietary information of Nokia. Subject to and without waiving

41

the General Objections and the specific objections and pursuant to Federal Rule of

Procedure 33(d), Nokia will produce documents from which the information targeted by

Interrogatory 14 may be derived or ascertained.

### INTERROGATORY NO. 15:

Identify by production number one complete, non-duplicative set of Nokia's business plans, from January 1, 1990, to the present, that are related to InterDigital, patents essential to 3G Standards, 3G Products sold or offered for sale by Nokia, 3G Standards, or any other Nokia product or service that was the subject of InterDigital's purported false or misleading statements.

#### ANSWER:

In addition to the foregoing Reservations of Rights and General Objections, all of

which are incorporated herein by reference, Nokia specifically objects to Interrogatory

No. 15 to the extent that it seeks the production of information or documents protected by

the Attorney/Client privilege or Work Product immunity. Nokia further objects to this

interrogatory to the extent it is overly broad, unduly burdensome, and not reasonably

calculated to lead to the discovery of admissible evidence: this interrogatory seeks

information regarding Nokia's business plans completely unrelated to Nokia's Lanham

Act Claim. Nokia further objects to this interrogatory to the extent that it seeks

information outside the relevant time period for the claims asserted.

Nokia also objects to this interrogatory because it is vague and ambiguous. For

example, use of the term "business plan" is vague and ambiguous. Read literally, this

interrogatory would address any information related to forward-looking statements made

by *any* Nokia employee regarding "InterDigital," and "patents essential to 3G Standards,

3G Products sold or offered for sale by Nokia, [or] 3G Standards." Because the market

for 3G products is expected eventually to replace the market for 2G products, a

*substantial* portion of Nokia's entire wireless business involves such "business plans."

42

Even if this interrogatory were limited to "business plans . . . related to InterDigital," it would include every forward-looking statement – including memoranda, letters, and emails – made by any Nokia employee regarding the relations between Nokia and InterDigital. While InterDigital would no doubt be interested in such information, the benefit to InterDigital is unwarranted by the burden on Nokia and the issues involved in Nokia's Lanham Act claim.

Subject to and without waiving the General Objections and the specific objections and pursuant to Federal Rule of Procedure 33(d), Nokia will produce unobjectionable documents – if any are within Nokia's possession custody, or control – from which the information targeted by Interrogatory 15 may be derived or ascertained.

**INTERROGATORY NO. 16:**

Please identify by patent number, the date declared, and the applicable 3G Standard, the patents Nokia has within its patent portfolio that Nokia has declared or contends to be essential to 3G Standards.

**ANSWER:**

In addition to the foregoing Reservations of Rights and General Objections, all of which are incorporated herein by reference, Nokia specifically objects to this interrogatory to the extent that it seeks the production of information or documents protected by the Attorney/Client privilege or Work Product immunity. Nokia further objects to this interrogatory to the extent that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Which patents Nokia has declared to be or contends to be essential is irrelevant to the claims currently in dispute and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the General Objections and the specific objections and pursuant to Federal Rule of Procedure 33(d), Nokia will produce unobjectionable

43

documents – if any are within Nokia's possession custody, or control – from which the information targeted by Interrogatory 16 may be derived or ascertained.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200
*Attorneys for NOKIA CORPORATION and NOKIA INC.*

OF COUNSEL:

ALSTON & BIRD LLP
Peter Kontio
Randall L. Allen
Lance A. Lawson
William R. Hubbard
1201 West Peachtree Street
Atlanta, GA 30309
(404) 881-7000

August 15, 2006

44

## VERIFICATION .

I, Henry Muir, state as follows:

I am a Director of IPR Licensing for Nokia Corporation. I have reviewed Plaintiffs' First Supplemental Objections and Responses to Defendants' First Set of Interrogatories to Plaintiff, and I know the contents thereof. I verify under penalty of perjury under the laws of the United States of America that the facts listed therein are true and correct to the best of my knowledge.

Executed this 15th day of August, 2006.

Henry Muir
Director of IPR, Licensing
Nokia Corporation
Nokia House
Summit Avenue
Farnborough, Hampshire GU14 0NG
United Kingdom

LEGAL02/30055505v1

## CERTIFICATE OF SERVICE

I, Julia Heaney, hereby certify that on copies of the foregoing were caused

to be served this 15th day of August, 2006 upon the following in the manner indicated:

**BY HAND**

Richard L. Horwitz
Potter Anderson & Corroon LLP
1313 N. Market Street
Wilmington, DE  19801

**BY FEDERAL EXPRESS**

Dan D. Davison
Fulbright & Jaworski LLP
2200 Ross Avenue
Suite 2800
Dallas, TX 75201-2784

Julia Heaney (#3052)

# EXHIBIT E

# SEC Statements[1]

## InterDigital Communications Corp. Form 10-K, March 31, 2005:

"Based on our history of invention and our extensive participation in the standards bodies, together with the extensive use of our technology innovations across different standards, we believe that our patent portfolio, including patents applied for, is applicable to all of the air interface protocols described in the IMT-2000 standard. We also believe that we will have patents essential to new IEEE 802.11 standards currently under development. We have indicated to the appropriate SDOs that we hold patents and patent applications that are essential for implementation of the present 3G standards in products, and have, in conjunction with such indication, declared that our patented inventions will be available for license under the general principles of fairness, reasonableness and/or non-discrimination."

"As a result of our participation in the Standards, we have filed declarations that make our essential inventions available for use and we will license on fair, reasonable and non-discriminatory or similar terms consistent with the requirements of the individual Standards organizations."

## InterDigital Communications Corp. Form 10-K, March 15, 2004:

"Based on our history of invention and our extensive participation in the standards bodies, together with the extensive use of our technology innovations across different standards, we believe that our patent portfolio, including patents applied for, is applicable to all of the air interface protocols described in the IMT-2000 standard. We have indicated to the appropriate standards bodies that we hold patents and patent applications that are essential for implementation of the present 3G standards specifications in products, and have, in conjunction with such indication, declared that our patented inventions will be available for license under the general principles of fairness, reasonableness and/or non-discrimination for each standards body."

## InterDigital Communications Corp. Form 10-K, March 31, 2003:

"Based on our history of invention and our extensive participation in the standards bodies, together with the extensive use of our technology innovations across different standards, we believe that our patent portfolio, including patents applied for, is applicable to all of the air interface protocols described in the IMT-2000 standard. We have indicated to the appropriate standards bodies that we hold patents and patent applications that are essential for implementation of the present 3G standards specifications in products, and have, in conjunction with such indication, declared that our patented inventions will be available for license under the general principles for each standards body."

---

[1] *See* Plaintiffs' Statement Pursuant to First Discovery Order at 1-2. The SEC Statements are attached to this exhibit as Exhibit F2.

**InterDigital Communications Corp. Form 10-K405, March 29, 2002:**

"Based on our history of invention and our extensive participation in the standards bodies, together with extensive cross use of technology innovation across different standards, we believe we [sic] that our patent portfolio (including patents applied for) is applicable to all of the air interface protocols described in the IMT-2000 standard. We have indicated to the appropriate standards setting bodies that we hold patents and patent applications that are either essential or commercially important for implementation of the present 3G standards specifications in products, and have, in conjunction with such indication, declared that our patented inventions will be available for license under the general principles for each standards body."

**InterDigital Communications Corp. Form 10-K405, April 2, 2001:**

"We believe that our patent portfolio is, or when applications result in granted patents, will be applicable to all of the air interface protocols described in the IMT-2000 standard. We have indicated to the appropriate standards setting bodies that we hold patents and patent applications that are either essential or commercially important for implementation of the present 3G standards specifications into products."

**InterDigital Communications Corp. Form 10-K, March 29, 2000:**

"We believe that our patent portfolio is applicable to all of the air interface protocols described in the standard, and we have indicated to the standard setting bodies that we hold patents and patent applications that are either essential or commercially important for 3G products built to present standards specifications."

## Press Statements[2]

"InterDigital believes that, in many instances, licenses for certain of our patents are required for third parties to manufacture and sell digital cellular products in compliance with TDMA and CDMA-based standards currently in use worldwide." www.InterDigital.com/tech_products_licensing.shtml.

"Today, [InterDigital's] inventions and technology are embedded in every 2G, 2.5G and 3G device." www.InterDigital.com/tech_products_introduction.shtml.

"InterDigital has a strong portfolio of patented technologies covering 2G, 2.5G and 3G standards, which it licenses worldwide." http://www.interdigital.com/press_room_news_archive_detail.jsp?releaseId=547434&cb=11515 94870650.

"InterDigital supports the evolution of 3G technology through active participation in the standards bodies, invention of essential patented technologies, and development of advanced 3G

---

[2] *See* Plaintiffs' Statement Pursuant to First Discovery Order at 2-4. The Press Statements are attached as Exhibit F3 to this exhibit.

product solutions." http://phx.corporate-ir.net/phoenix.zhtml?c=116582&p=irol-newsArticle&ID=813104.

"InterDigital's 3G license with High Tech Computer 'affirms InterDigital's position as a recognized developer and contributor of essential wireless technologies.'" http://phx.corporate-ir.net/phoenixzhtm l?c=116582&p=irol-newsArticle&ID=547419.

"[W]e have essential patents . . . and anybody that produces a 3G terminal U.S. device, needs to be licensed under all these essential patents. So from our perspective, every manufacturer who produced devices to that standards [sic] needs to license with us." William Merritt, Speech at Bear Stearns Annual Technology Conference (June 12, 2006).

"Panasonic's acknowledgement that they used our technology was tantamount to a ... statement that our patents are essential. So it's not that they were making some - doing some particular implementation that lead them into our patents. It was an acknowledgement by them that, yes InterDigital does hold essential patents." *Id.*

"InterDigital holds essential [intellectual property rights] in variations of 3G, including FDD, TDD, and CDMA." www.tdscdma-forum.org/EN/zf/yjx.asp (attributing quote to Donald Boles, Senior Vice President and Chief Patent Strategist of InterDigital from Interview; dated July 25, 2005).

"[InterDigital's] broad portfolio of essential patents, along with InterDigital's 3G products and technology, will serve to fuel [InterDigital's] revenue growth as the 3G market emerges." www.3Gnewsroom.com/3g_news/jan_02/news_1743.shtml (attributing quote to Howard E. Goldberg, President and Chief Executive Officer of InterDigital; dated Jan 16, 2002).

"InterDigital's *3G licenses* with Matsushita, Sharp and Japan Radio Company 'reflect the industry's recognition of the importance of [InterDigital's] 3G essential patent portfolio.'" www.3Gnewsroom. com/3g_news/jan02/news_1732.shtml (attributing quote to Howard E. Goldberg, President and Chief Executive Officer of InterDigital; dated Jan. 15, 2002).

"IngterDigital is 'a recognized developer and contributor of essential technology' for 3G." www.3Gnewsroom.com/3g_news/dec_02/news_2867.shtml (attributing quote to William Merritt, President of InterDigital Technology Corp.; dated Dec. 18, 2002).

"We have said in a prior press release that we believe that our patents are essential to each of the five specifications under the third generation technology. Therefore anyone practicing that technology is going to have to deal with us." Video Interview by Bill Griffeth with Howard Goldberg, President, InterDigital Communications Corp. (Jan. 10, 2000), 2000 WLNR 2850752 (statement by Goldberg).

"'InterDigital began saying on Nov. 17 [, 1999] that it holds "patents that are essential to the new IMT-2000 standard," executive vice president Rip Tilden said yesterday.'" Henry J. Holcomb, *InterDigital Soars After U.N. Report a New Wireless-Technology Standard Was Adopted,* Philadelphia Inquirer (Dec. 31, 1999).

# ETSI Statements[3]

### IPR Information and Declaration Statement, April 10, 2001:

IPR Information Statement:  "In accordance with the ETSI IPR Policy, Article 4.1, I hereby inform ETSI that....with reference to ETSI Standard No. UMTS it is my belief that the IPRs listed in Annex 2 are, or are likely to become, Essential IPRs in relation to that Standard."

IPR Declaration Statement:  "The SIGNATORY has notified ETSI that it is the proprietor of IPRs listed in Annex 2 and has informed ETSI that it believes that the IPRs may be considered ESSENTIAL to the Standards listed above."

### IPR Information Statement and Licensing Declaration, April 8, 2004:

IPR Information Statement:  "In accordance with the ETSI IPR Policy, Article 4.1, I hereby inform ETSI that....with reference to ETSI Standard No. UMTS...it is my belief that the IPRs listed in Annex 2 are, or are likely to become, Essential IPRs in relation to that Standard."

IPR Declaration Statement:  "The SIGNATORY has notified ETSI that it is the proprietor of IPRs listed in Annex 2 and has informed ETSI that it believes that the IPRs may be considered ESSENTIAL to the Standards listed above."

---

[3] *See* Plaintiffs' Statement Pursuant to First Discovery Order at 4.  Attached as Exhibit F1 to this exhibit are copies of the declarations filed by InterDigital with ETSI.

**EXHIBIT F1**

ANNEX 1

IPR INFORMATION AND DECLARATION STATEMENT

**IPR Holder/Organisation**

Legal Name: InterDigital Technology Corporation

**Signatory**

Name: Howard E. Goldberg

Position: President

Department:

Address: 300 Delaware Avenue Suite 527

Wilmington DE 19801

Tel: (610) 878-5677

Fax: (610) 878-7843

E-mail: howard.goldberg@interdigital.com

**IPR Information statement**

In accordance with the ETSI IPR Policy, Article 4.1, I hereby inform ETSI that:

With reference to the technical proposal identified as:
tabled
in relation to Work Item No.
and/or
with reference to ETSI Standard No.    UMTS

it is my belief that the IPRs listed in Annex 2 are, or are likely to become, Essential IPRs in relation to that Standard.

**IPR declaration statement**

The SIGNATORY has notified ETSI that it is the proprietor of the IPRs listed in Annex 2 and has informed ETSI that it believes that the IPRs may be considered ESSENTIAL to the Standards listed above.

The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licences under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

The construction, validity and performance of this DECLARATION shall be governed by the laws of France.

Place, Date:    Signature:

King PA USA  10/4/01

(Signed for and on behalf of the SIGNATORY)

Please return this Annex duly completed with Annex 1 duly signed to.
DIRECTOR GENERAL – Karl Heinz Rosenbrock

ETSI - 650, route des Lucioles - F - 06921 Sophia Antipolis Cedex - FRANCE

**EXHIBIT F2**



# FORM 10-K

## INTERDIGITAL COMMUNICATIONS CORP – IDCC

**Filed: March 31, 2005 (period: December 31, 2004)**

Annual report which provides a comprehensive overview of the company for the past year

Table of Contents
In this document, the words "we," "our," "ours," "us," "the Company," and "InterDigital" refer only to InterDigital Communications Corporation collectively with its subsidiaries.

PART I

Item 1. BUSINESS

*General*

We design and develop advanced wireless technology solutions, which we make available for license or sale to semiconductor companies and equipment producers. Our advanced technology solutions are comprised of inventions, know–how and other technical data (e.g., software, designs and specifications) related to the design and operation of digital wireless products and systems. We patent many of our inventions and license those inventions to wireless communications equipment producers and/or related suppliers. In addition, we offer for sale or license, on a non–exclusive basis, various portions of our technology (e.g., reference designs, algorithms, know–how and software) to producers of wireless equipment products and components. Our advanced technology solutions have been developed independently, in conjunction with equipment manufacturers and through strategic acquisitions. We also actively participate in the standard setting process for wireless technologies, contributing solutions that are incorporated from time–to–time into the standards.

We currently generate revenues and cash flow primarily through royalties from the licensing of our patent portfolio. We also expect to generate revenues and cash flow from licensing of other technology product solutions (e.g., FDD terminal unit protocol stack software, smart antenna solutions, physical layer chipset designs, etc.) and the provision of specialized engineering services.

As an early participant in the digital wireless market, we developed pioneering solutions for both of the main air interface technologies in use in today's cellular systems, namely: TDMA and CDMA technologies. Our significant worldwide portfolio of patents and patent applications in wireless communications has been driven by our high level of early and fundamental invention in digital wireless technologies. A number of our patented inventions are essential to the implementation of 2G, 2.5G and 3G wireless products, and we have been licensing those and other inventions to numerous wireless communications manufacturers in conjunction with their manufacture, and sale of 2G, 2.5G or 3G products. As a result of our participation in the Standards, we have filed declarations that make our essential inventions available for use and we will license on fair, reasonable and non–discriminatory or similar terms consistent with the requirements of the individual Standards organizations. In addition, we have been developing various technology solutions for use in wireless LAN/MAN standards being developed by the IEEE (Institute of Electrical and Electric Engineering) 802 LAN/MAN standards committee. The products incorporating our inventions include but are not limited to:

- Mobile phones and personal digital assistants

- Other wireless devices (e.g., laptops, PC cards, USB sticks)

- Base stations and other infrastructure equipment

- Modules and components for wireless devices

We also incorporate our inventions into our own product solutions. We develop advanced technology platforms (including reference designs, know–how and software) that provide highly efficient solutions for the wireless market. We offer technology and product solutions for mainstream wireless applications that deliver time–to–market, performance and cost advantages, as well as product differentiation advantages to our customers. Most of our principal solutions are implemented in a proprietary manner to conform to applicable standards, although there are currently no standards requiring conformance by or use of our Adaptive Interference Management solutions.

We invest heavily in the development of advanced wireless technology and related products by building and sustaining a highly specialized engineering team. Over each of the last three years, our cost of development has represented approximately one–half of our total operating expenses. The largest portion of our cost of development has been personnel costs. As of December 31, 2004, we employed 209 engineers, of whom 58% hold masters degrees and an additional 17% hold PhDs. Our technology development programs broaden and deepen our extensive patent portfolio through inventing activities necessary to create new, higher performance, leading–edge technologies, and expand our body of technical know–how related to standards–based wireless technologies and systems, and have enabled us to bring product to market. We are developing technologies that may be utilized to extend the life of the current generation of products, and that may be applicable to multiple generational standards such as 2G, 2.5G and 3G as well as IEEE 802 wireless standards, and that may have applicability across multiple air interfaces.

We incorporated in 1972 under the laws of the Commonwealth of Pennsylvania. We conducted our initial public offering in November 1981. Our corporate headquarters and administrative offices are located in King of Prussia, Pennsylvania, USA. Our research and technology and product development teams are located in the following locations: King of Prussia, Pennsylvania, USA; Melville, New York, USA; Melbourne, Florida, USA; and Montreal, Quebec, Canada.

1

Table of Contents

(TDD)(R5) and past Editor and Rapporteur, 3GPP RAN WG4, TDD Base Station Classification. In addition to our participation in a number of standards bodies, we also are active in several technology forums that foster our business interests.

Based on our history of invention and our extensive participation in the standards bodies, together with the extensive use of our technology innovations across different standards, we believe that our patent portfolio, including patents applied for, is applicable to all of the air interface protocols described in the IMT-2000 standard. We also believe that we will have patents essential to new IEEE 802.11 standards currently under development. We have indicated to the appropriate SDOs that we hold patents and patent applications that are essential for implementation of the present 3G standards in products, and have, in conjunction with such indication, declared that our patented inventions will be available for license under the general principles of fairness, reasonableness and/or non-discrimination. (See, "—*Business Activities, Patent and Technology Licensing*").

*Business Activities*

Technology and Product Development

Over the course of our history, we have designed, developed and placed into operation a variety of advanced wireless technologies, systems and products. In addition, through our involvement in the standards bodies and incubation efforts, we monitor emerging technologies and identify needs created by the development of advanced wireless systems. The Company began developing CDMA solutions in early 1999. Since 1999, we have focused the vast majority of our technology and product development on the air interface technology referred to as WCDMA. More recently, we have devoted resources to initial product implementations of our Adaptive Interference Management technologies and we continue to expand our technology and product development business, targeting new customers for our existing technologies and products as well as targeting new markets and investing in new technologies, such as wireless IEEE 802 wireless standard compliant solutions.

We recorded expenses of $51.2 million, $45.9 million, and $46.1 million during 2004, 2003 and 2002, respectively, related to our research, technology and product development efforts. Research and development efforts enable us to patent many of our inventions. As a result of such patents, we have generated substantial royalty revenues. In addition, in 2004, 2003, and 2002, we recognized revenues associated with technology development projects totaling $0.1 million, $1.1 million, and $4.5 million, respectively. Revenue amounts in 2003 and 2002 were primarily associated with a TDD development project for Finland-based Nokia Corporation (Nokia).

3G Air Transport Solutions

The WCDMA technology suite is comprised of two duplexing methods, FDD and TDD. With FDD transmission, communications signals are transmitted in full duplex mode via two separate radio bands of equal size. With TDD transmission, communications signals are sent in half duplex mode using a single radio channel. While global market demand for FDD products is growing in tandem with the emerging market demand for 3G generally, we expect that any deployment of TDD products will trail the emergence of FDD products.

FDD Technology Products

Infineon Technologies AG

We developed and continue to support an FDD protocol stack for use in terminal units under our cooperative development and sales agreement with Infineon Technologies AG (Infineon). This FDD protocol stack interfaces with existing GSM/GPRS hardware and software, supports Infineon's 3G baseband processor, and is portable to other baseband processors. The Company and Infineon completed the full multi-mode FDD protocol stack in 2003 and, in first quarter 2004, conducted a successful public demonstration of the protocol stack operating in a fully functional 3G handset. The FDD protocol stack solution is being offered to 3G mobile phone and semiconductor producers. We have supported Infineon in its early product launch with interoperability testing and continue to support product certification and launch with field support, lab testing and software support.

Under the March 2001 agreement with Infineon, which has a duration of twelve years from the first sale of the joint 3G protocol stack, the parties each own the technology they develop. In addition, the parties have cross-licensed to each other a limited set of patents for specified purposes. In our case, the cross-licensed patents are those generally applicable to the jointly developed software and related products for specified purposes. We have also agreed to a framework for determining royalties in other 2G and 3G products. No revenues have been generated under this agreement to date. (See, "—*Risk Factors, We Rely and Intend to Rely on Relationships with Third Parties to Develop and Deploy Products*").

As a result of the relationship established under the March 2001 agreement, Infineon additionally requested that we provide Outer Loop Power Control software for Infineon's UMTS platform. In addition, due to the technology portfolio we developed, we were positioned to license a commercial FDD protocol stack to General Dynamics Decision Systems, Inc. (General Dynamics) as described below.

8

Table of Contents

*Risk Factors*

This Annual Report, including "Item 1. Business" and "Item 7. Management's Discussion and Analysis", contains forward-looking statements reflecting, among other things, the Company's beliefs and expectations as to: (i) the deployment, migration to and growth of the 3G market and the wireless data services market; analysts and industry expert forecasts as to the market for wireless products and services and growth of certain technologies; our belief as to the inability of existing system solutions to meet anticipated demands of wireless data users; (ii) our ability to influence the wireless technology standards development process; the timing of new standards being adopted; (iii) our strategy including: (a) the development and delivery of advanced wireless technologies to address the constantly evolving demands of the wireless market while securing and protecting the underlying intellectual property; (b) a program of licensing our patented technology to wireless equipment producers worldwide; (c) the implementation of our technologies into a diversified portfolio of products to serve a broad range of customers in the global cellular, IEEE 802 wireless and U.S. government markets; (d) maximizing the value proposition for our customers and partners by combining our intellectual property rights and technology products into a coordinated offering; (e) substantial involvement in key worldwide standards bodies to contribute to the ongoing definition of wireless standards and to incorporate our inventions into those standards; (f) acquisition of valuable intellectual property, technologies and products that will enhance the value of our portfolio of solutions for our customers; (g) creatively structured relationships with leading technology developers and equipment producers; (iv) our belief that a number of our inventions are essential to the 2G, 2.5 G and 3G standards, and many will be commercially important in 2G, 2.5G and 3G product offerings and have application and will be essential in IEEE 802 and interference management technologies and our belief that our patent portfolio is applicable to all air interface protocols described in the IMT—2000 standard; (v) our plans to: (a) continue testing and implementation of the Company's and Infineon's FDD protocol stack, (b) offer our HSDPA solution to semiconductor and handset manufacturers; (c) monitor market interest in TDD technology and defer allocating further resources on TDD development; (d) market our AIM Antenna technology in the IEEE 802 wireless market, pursue relationships with top antenna manufacturers, ODMs and OEMs and our beliefs as to the applications and capabilities of our AIM Antenna and AIM Performance solutions; (e) enhance internal development efforts by partnering with leading universities and researchers and acquisitions and leveraging such relationships and acquisitions through licensing of associated patents and technology; (vi) the timing of deliverables and associated payments under our General Dynamics contract; (vii) our future revenues, cash flow, short-term investment position, operating expenses, and capital expenditures, and the sources and timing thereof, and our near term operating requirements and lack of need to seek additional financing; (viii) our ability to monetize our investment in technology development primarily through patent licensing or sale of all or a portion of our technologies; (ix) our ability to enter into new customer, partner and licensing relationships, secure patent protection for our inventions, and develop, introduce and sell new products, technology and enhancements on a timely and consistent basis; (x) the royalty obligations of Nokia and Samsung under their respective patent license agreements with us and the timing of the respective arbitration proceedings; (xi) our ability to collect royalties under existing license agreements and settlement agreements and derive future revenues from our patents, including: (a) the impact of a successful action against some of our patents based on validity or infringement or the impact of a design around some of our commercially important patents on ongoing and new royalty revenue streams and; (b) the impact on our cash flow, results of operations and level of profitability due to loss of revenues under the NEC 3G License, Sony Ericsson Agreement, or Sharp PDC/PHS Agreement and our expectation as to the structure of new patent license agreements. Words such as "expect," "will," "believe," "could," "would," "may," "anticipate," "our strategy," "future," "target," "trend," "seek to," "will continue," "outcome," "predict," "due to receive," "likely," "in the event" or similar expressions contained herein are intended to identify such forward-looking statements.

Although forward-looking statements in this Annual Report on Form 10-K reflect the good faith judgment of our management, such statements can only be based on facts and factors currently known by the Company. Consequently, forward-looking statements are inherently subject to risks and uncertainties. We caution readers that actual results and outcomes could differ materially from those expressed in or anticipated by such forward-looking statements. You should not place undue reliance on these forward-looking statements, which are only as of the date of this Annual Report. In addition to the associated risks and uncertainties identified in this Annual Report as well as other information contained herein, each of the following risk factors should be considered in evaluating our business and prospects. The following risk factors are not listed in any order of importance or priority:

<u>Our Technologies May Not Be Adopted By the Market or Widely Deployed.</u>

We invest significant engineering resources in the development of advanced wireless technology and related products. These investments may not be recoverable or not result in meaningful revenue if products based on the technologies in which we invest are not widely deployed. Competing digital wireless technologies could reduce the opportunities for deployment of technologies we develop. If the technologies in which we invest are not adopted in the mainstream markets or in time periods we expect or we are unable to secure partner support for our technologies, our business, financial condition and operating results could be adversely affected. For example, our ability to capitalize on our investments in WCDMA and smart antenna solutions depends upon market interest in such technologies. There are emerging wireless technologies, such as WiMAX, that may compete with WCDMA. If deployments of such other technologies obtained significant market share, the market size for WCDMA products could be reduced. All of these competing technologies also could impair multi—vendor and operator support for WCDMA, key factors in defining opportunities in the wireless market. Similarly, changes or delays in the implementation of new wireless standards could limit our opportunities in the wireless market.

18


10kWIZARD
SEC POWER SEARCH

# FORM 10-K

## INTERDIGITAL COMMUNICATIONS CORP - IDCC

**Filed: March 15, 2004 (period: December 31, 2003)**

Annual report which provides a comprehensive overview of the company for the past year

Table of Contents

- Global pilot: The use of a common pilot channel to synchronize sub-channels in a multiple access environment

- Bandwidth allocation: Techniques including multi-channel and multi-code mechanisms

- Power control: Highly efficient schemes for controlling transmission power output of terminal and base station devices vital in a CDMA system

- Overlay techniques for communications systems, which allow new wireless systems to be deployed with existing wireless technologies without frequency allocation

- Joint detection and interference cancellation for reducing multiple access interference in a physical receiver

- Soft handover enhancement techniques between designated cells

- Various sub-channel access and coding techniques

- Packet data

- Fast handoff

- Geo-location for calculating the position of terminal users

- Multi-user detection (MUD)

Our reputation as an inventor and innovator positions us to influence the content and direction of wireless technology standards. Our competitive advantage is derived from the fact that we have intimate knowledge of the innovation together with intellectual property rights that may attach to such innovations. Our ability to influence the standards development process also helps to create a climate for the growth of business opportunities both by enhancing our image as a key innovator, and providing early intelligence on technologies.

To facilitate our position as a contributor to emerging wireless technologies, we are active in the Third Generation Partnership Project (3GPP), through our membership in the European Telecommunications Standards Institute (ETSI), and are also an active member of several SDOs and standards associations that influence and sponsor standards development including the ITU-R, the Telecommunications Industry Association (TIA), the Alliance for Telecommunications Industry Solutions (ATIS) Committee T1P1, the Institute of Electrical and Electronic Engineers (IEEE) Standards Association and the American National Standards Institute (ANSI). For 3G standards, we have submitted over 1,000 contributions to standards bodies worldwide and over 60% of those contributions have been adopted. We have made technical contributions into the IEEE 802 standards bodies and expect that effort to expand. We have also taken leadership positions in a number of these standards bodies. Company management and engineers either have served or are currently serving in a number of leadership positions in key industry standards bodies including past Chair of the IEEE 802.16a Task Group (Broadband Wireless Access, 2–11 GHz); current Chair of the IEEE 802.16e Task Group (Mobile Broadband Wireless Access, based on the 2–11 GHz IEEE 802.16a air interface); current Vice-Chair of the 3GPP RAN Working Group 3 (WG3); Acting Chair of T1P1.4 Wireless Wideband Internet Access; past North American Rapporteur for ITU–R IMT–2000 Deployment Handbook; past Editor, 3GPP RAN WG1 Physical Layer Procedures (TDD)(R5) and past Editor and Rapporteur, 3GPP RAN WG4, TDD Base Station Classification. In addition to our participation in a number of standards bodies, we are also active in several technology forums that foster our business interests. For example, our Chief Technology Officer (CTO) chairs the Universal Mobile Telecommunications System (UMTS) Forum Task Force on TDD and Wireless LANs, and is the Chair, as well as a member of the Associate Member Interest Group (AMIG) of the GSM Association. Our Chief Operating Officer is the Vice–Chair of the Manufacturing Task Force for the UMTS Forum. A member of our CTO Office is the Co–chair of the GSM Association's Wireless LANs Task Force. Further, we are a Council Member (a senior level position held by a limited number of the world's leading wireless companies) of the TD–SCDMA Forum, and our Chief Strategic Standards Officer is an officer in the TDD Coalition, an industry consortium which promotes TDD airlink technology.

Based on our history of invention and our extensive participation in the standards bodies, together with extensive use of technology innovation across different standards, we believe that our patent portfolio, including patents applied for, is applicable to all of the air interface protocols described in the IMT–2000 standard. We have indicated to the appropriate standards bodies that we hold patents and patent applications that are essential for implementation of the present 3G standards specifications on products, and have, in conjunction with such indication, declared that our patented inventions will be available for license under the general principles of fairness, reasonableness and/or non–discrimination for each standards body. (See, "–Business Activities, Patent and Technology Licensing".)

Table of Contents

within one year following a change of control, which is defined as the acquisition (including by mergers or consolidations, or by the issuance by InterDigital of its securities) by one or more persons in one transaction or a series of related transactions, of more than fifty percent (50%) of the voting power represented by the outstanding stock of InterDigital, the executive would generally receive two years of salary and the immediate vesting of all restricted stock and stock options.

*Risk Factors*

This Annual Report, including "Item 1. Business" and "Item 7. Management's Discussion and Analysis", contains forward-looking statements reflecting, among other things, the Company's beliefs and expectations as to:

(i) the deployment, pace, and growth of the 3G market and the wireless data services market, and analyst and industry expert forecasts as to the market for wireless products and services and growth of certain technologies; (ii) the ability of operators to deliver 3G services in volume, the success of underlying 3G technology functionality and affordability being offered by manufacturers, and the successful introduction and reception of new services designed to use enhanced data capabilities; (iii) our current strategic objectives to (a) develop and deliver advanced wireless technologies and deepen and broaden our portfolio of intellectual property to address the evolving demands of the wireless market, (b) implement our technologies into a diversified portfolio of products to serve a broad range of customers in the global cellular and WLAN markets, (c) continue to expand our patent licensing program to wireless equipment producers worldwide, (d) maximize customer and partner value by combining our intellectual property rights and technology products into coordinated offerings, (e) continue to have substantial involvement and make substantial contributions to worldwide standards bodies, (f) acquire intellectual property, technologies and products to enhance the value of our current intellectual property portfolio, and (g) create relationships with leading technology developers and equipment producers to accelerate our time to market and extend our reach into new markets; (iv) our belief that a number of our inventions are essential to the 2G, 2.5G and 3G standards, and many will be commercially important in actual 2G, 2.5G, 3G, WLAN and smart antenna product offerings; (v) our plans to (a) continue field trials, testing and implementation support of the Company's and Infineon's FDD protocol stack product offering to Huawei, (b) expand our HSDPA solution into a product offering to semiconductor manufacturers and equipment producers, (c) devote modest Company resources to the stabilization of our TDD technology developed for Nokia, (d) establish cooperative field trials of our cellular smart antenna solution with mobile device manufacturers, (e) seek potential customers for our WLAN smart antenna technology among semiconductor manufacturers and equipment producers, (f) potentially extend the application of our SmartRRM[SM] solution into WLAN and cellular systems technologies, and (g) partner with leading universities and research centers to leverage new architectures and technologies for wireless systems into advancements in material sciences and advanced software applications; (vi) our future revenues, cash flow, short-term investment position, operating expenses, and capital expenditures, and the sources and timing thereof, and our near term operating requirements and lack of need to seek additional financing; (vii) our ability to monetize our investment in technology development primarily through patent licensing or sale of all or a portion of our technologies; (viii) our ability to enter into new customer, partner and licensing relationships, secure patent protection for our inventions, and develop, introduce and sell new products, technology and enhancements on a timely and consistent basis; (ix) our beliefs as to the royalty obligations of Nokia and Samsung under their respective patent license agreements with us and the timing of the respective arbitration proceedings; and (x) our ability to collect royalties under existing license agreements and settlement agreements and derive revenues from our patents. Words such as "expect", "will", "believe", "could", "would", "may", "anticipate", "our strategy", "future", "target", "trend", "seek to", "will continue", "outcome", "predict", "due to receive", "likely", "in the event" or similar expressions contained herein are intended to identify such forward-looking statements.

Although forward-looking statements in this Annual Report on Form 10-K reflect the good faith judgment of our management, such statements can only be based on facts and factors currently known by the Company. Consequently, forward-looking statements are inherently subject to risks and uncertainties. We caution readers that actual results and outcomes could differ materially from those expressed in or anticipated by such forward-looking statements. You should not place undue reliance on these forward-looking statements, which are only as of the date of this Annual Report. In addition to the associated risks and uncertainties identified in this Annual Report as well as other information contained herein, each of the following risk factors should be considered in evaluating our business and prospects. The following risk factors are not listed in any order of importance or priority:

Our Technologies May Not Be Adopted By the Market or Widely Deployed.

We invest significant engineering resources in the development of advanced wireless technology and related products. These investments may not be recoverable or not result in meaningful revenue. To increase future revenues and our share of the 3G market, we are dependent upon the wide deployment of products based on the technologies in which we invest. Competing digital wireless technologies could reduce the opportunities for deployment of these technologies. For example, if the technologies in which we invest are not adopted in the mainstream markets or in time periods we expect or we are unable to secure partner support for our technologies, our business, financial condition and operating results could be adversely affected. Our ability to capitalize on our investments in TDD and smart antenna solutions, for example, depends upon market interest in such technologies. WLAN, which enables users to connect laptops and personal digital assistants to the Internet, is already being marketed worldwide and is competitive with TDD in a non-mobile, data-only environment. In addition, if the initial deployment of FDD for data applications obtains significant market share, or if FDD HSDPA gains market acceptance, the niche targeted for TDD could be reduced or eliminated. All of these competing technologies also could impair multi-vendor and operator support for TDD, key factors in defining opportunities in the wireless market.

Our Technology and Product Development Activities May Experience Delays.

We may experience technical, financial or other difficulties or delays related to the further development of our technologies and products. Delays may have adverse financial effects and may allow competitors with comparable technology and/or product offerings to gain a competitive advantage over us. There can be no assurance that our development efforts will ultimately be successful. Further, if such development efforts are not successful or delays are serious, strategic relationships could suffer and strategic partners could be hampered in their marketing efforts of products containing our technologies. As a result we could experience reduced revenues or we could miss critical market windows. Moreover, our technologies have not been fully tested in commercial use. It is possible that they may not perform as expected. In each case, our business, financial condition and operating results could be adversely affected and our ability to secure new customers and other business opportunities could be diminished.

The Markets for Our Technologies and Our Products May Fail to Materialize in the Manner We Expect.

We are positioning our current development projects for the evolving advanced wireless markets. Certain of these markets, in particular the 3G market and the market for smart antenna solutions, may continue to develop at a slower rate or pace than we expect and may be of a smaller size than we expect. Additionally, the development projects that target only the emerging 3G market do not have direct bearing on the 2.5G or any other market which has developed or might develop after the 2G market but prior to the development of the 3G market. For example, the potential exists for 3G market preemption or reduction in scope by the success of current or future 2.5G solutions and of WLAN. In addition, there could be fewer applications for our technology and products than

20



# FORM 10–K

## INTERDIGITAL COMMUNICATIONS CORP – IDCC

**Filed: March 31, 2003 (period: December 31, 2002)**

Annual report which provides a comprehensive overview of the company for the past year

Table of Contents

companies) of the TD-SCDMA Forum, and a member in the TDD Coalition, an industry consortium which promotes TDD airlink technology.

Based on our history of invention and our extensive participation in the standards bodies, together with extensive use of technology innovation across different standards, we believe that our patent portfolio, including patents applied for, is applicable to all of the air interface protocols described in the IMT–2000 standard. We have indicated to the appropriate standards bodies that we hold patents and patent applications that are essential for implementation of the present 3G standards specifications in products, and have, in conjunction with such indication, declared that our patented inventions will be available for license under the general principles for each standards body. (See, "–Business Activities, Patent and Technology Licensing".)

## Business Activities

### Technology and Product Development

Given the dominant global market position today of the GSM service providers, analysts expect that they will maintain a similarly strong market position in the next generation wireless environment. The GSM service providers in Europe that have selected a 3G air interface have selected WCDMA because its adoption offers them backward compatibility with existing infrastructure, thus allowing network phase–in, as well as the most sensible route to 3G services worldwide as a result of lower expected costs and faster time to market. We expect that WCDMA technology (as opposed to the other 3G specifications) will be the dominant technology in the 3G marketplace, once that marketplace is fully developed later this decade. We believe that our heritage of know–how and patented wireless inventions based upon both TDMA and CDMA differentiates us among current enabling 3G technology providers.

We are making significant investments in WCDMA technology development and expect to generate revenues through a combination of intellectual property licensing and product sales. Our current development programs focus on creating enabling inventions as well as hardware and software products for the WCDMA specifications of the 3G standard.

The principal current focus of our technology and product development activity involves the development of technology Platforms for the two modes of WCDMA: FDD and TDD. Our development activity for TDD–based products includes both the wideband form of TDD (WTDD) and the narrowband form of TDD (TD–SCDMA). Our focus on both specifications of WCDMA allows us to offer a complete WCDMA solution to manufacturers of wireless infrastructure and terminal equipment.

With respect to our FDD focus, for the past several years we have been engaged in the implementation of 3G FDD Protocol stacks for WCDMA products. Under our cooperative development and sales agreement with Infineon Technologies AG (Infineon) we have been jointly developing 3G Protocol stacks incorporating FDD technology for terminal unit applications. The 3G Protocol stack interfaces with existing GSM/GPRS hardware and software, and supports Infineon's 3G baseband processor, and is portable to other baseband processors. In the first quarter of 2003, we successfully publicly demonstrated the 3G Protocol stack's performance characteristics with critical features, including 384 kbps voice and video transmission capability, on a variety of different hardware Platforms. The Company is now offering its FDD Protocol stack solution for evaluation and sale to 3G terminal unit producers and semiconductor producers. InterDigital and Infineon expect to complete the full multi–mode 3G Protocol stack no later than the first quarter of 2004. Under the agreement, executed in March of 2001 with a duration of nine years from the first sale, if any, of the joint 3G Protocol stack, the parties each own the technology they develop and the parties have cross–

9

Table of Contents

William C. Miller joined InterDigital as Senior Vice President, Programs and Engineering in July 2000. Before joining InterDigital, Mr. Miller served as Vice President, Programs with Telephonics Corporation, an aircraft and mass transit communications systems corporation located in Farmingdale, New York, since 1993.

Lawrence F. Shay joined InterDigital as Vice President, General Counsel and Corporate Secretary in November 2001. Before joining InterDigital, Mr. Shay served as General Counsel and Corporate Secretary with U.S. Interactive, Inc., a multi-national publicly-held Internet professional services corporation, from June 1999 to June 2001, Executive Vice President from September 2000 until June 2001, and Senior Vice President from June 1999 until September 2000. US Interactive, Inc. filed a Chapter 11 bankruptcy petition in January 2001 and a reorganization plan was confirmed in September 2001. Prior to June 1999, Mr. Shay was a partner in the corporate group of Dilworth Paxson LLP, a major Philadelphia law firm, where he practiced law from 1985 until 1999.

Guy M. Hicks joined InterDigital as Vice President, Corporate Communications and Investor Relations in December 2001. Before joining InterDigital, Mr. Hicks served as Vice President, Corporate Communications with Structural Dynamics Research Corporation, Cincinnati, Ohio, an international enterprise development software corporation, from August 1999 until December 2001. Mr. Hicks previously served as Vice President, Corporate Communications with Epicor Software Corporation, an enterprise resource planning software company located in Irvine, California from April 1998 until August 1999. Mr. Hicks also served as Corporate Director, Executive Communications with Northrop Grumman Corporation, an aerospace company located in Los Angeles, California, from January 1996 until April 1998.

InterDigital's executive officers are elected to the offices set forth above to hold office until their successors are duly elected and have qualified. All of such persons are parties to agreements which provides for severance pay and continuation of designated benefits. Mr. Goldberg's agreement generally provides for the payment of severance of up to a maximum of eighteen months salary and up to a maximum of eighteen months continuation of medical and dental benefits. The other executives' agreements generally provide for the payment of severance up to a maximum of one year's salary and up to a maximum of one year's continuation of medical and dental benefits. In addition, with respect to all of these agreements, in the event of a termination or resignation within one year following a change of control, which is defined as the acquisition (including by mergers or consolidations, or by the issuance by InterDigital of its securities) by one or more persons in one transaction or a series of related transactions, of more than fifty percent (50%) of the voting power represented by the outstanding stock of InterDigital, the executive would generally receive two years of salary and the immediate vesting of all restricted stock and stock options.

*Risk Factors*

This Annual Report, including Item 1, "Business" and Item 7, "Management's Discussion and Analysis", contains forward-looking statements reflecting, among other things: (i) our current strategic objectives to (a) position the Company in the marketplace as a preferred provider of wireless communications technology and products, and to deliver advanced wireless technologies and products with superior performance capabilities and features to equipment and component manufacturers, (b) continue to invest in and develop wireless technologies and develop products for 2G, 2.5G, and 3G standards, (c) focus on continued development of standardized technologies and products while placing our technology and intellectual property rights into standards and a diverse array of advanced wireless products in the wireless markets, (d) capitalize on the value of our intellectual property through patent licensing, technology transfers, product sales, and by combining our licensing initiatives with product or service offerings (or a combination thereof) on a worldwide basis, to bring to market, with strategic partners or on our own, wireless solutions and products; (ii) our belief as to the impact of the Ericsson and Sony Ericsson license agreements on the royalty obligations of Nokia and Samsung; (iii) our beliefs and expectations as to future revenue, cash flow, and operating expenses, trends in the wireless industry, and performance of our licensees; (iv) our belief that 3G WCDMA technologies will be the dominant 3G technologies in the wireless market over the next decade; (v) analysts' and industry experts' beliefs and forecasts as to the market position of WCDMA technology in the next generation of wireless services, the market for wireless products and services, 2G, 2.5G and 3G market growth, and the nature and performance of wireless products and services; (vi) our beliefs and expectations as to 2G, 2.5G and 3G product and technological capability, the successful development and the applications for our technology and products, growth of the wireless market, product sales generally and of our licensees, demand for wireless products, timing of 2.5G and 3G market development, our competitors and competing technologies, the impact of our standards activities on revenues, and the applicability of our patents and patent applications to technologies in industry standards and to other technologies; (vii) manufacturers' intentions to bring 2.5G and 3G products and technologies to the market during 2003 and thereafter; and (viii) our ability to enter into new customer, partner, and licensing relationships, bring 2.5G and 3G products to market on a timely basis or at all, secure patent protection for our inventions, reuse WTDD in other technologies, create a return on our investment in the various technologies, collect royalties under existing license agreements and settlement agreements, and derive revenues from our patents. Words such as "expect", "anticipate", "attempt", "speculate", "believe", "should", "likely", "predict", "strategy", "objective", "pursuing", "goal", "intend", "could", "plan", "may", and "trends", and similar expressions and variations of such words, are intended to identify such forward-looking statements.

Although forward-looking statements in this Annual Report reflect the good faith judgment of our management, such statements can only be based on facts and factors currently known by the Company. Consequently, forward-looking statements are inherently subject to risks and uncertainties. We caution readers that actual results and outcomes could differ materially from those expressed in or anticipated by such forward-looking statements. You should not place undue reliance on these forward-looking statements, which are only as of the date of this Annual Report. Each of the following factors as well as other information in this Annual Report should be considered in evaluating our business and prospects.

22


10kWIZARD
SEC POWER SEARCH

# FORM 10–K405

## INTERDIGITAL COMMUNICATIONS CORP – IDCC

**Filed: March 29, 2002 (period: December 31, 2001)**

Annual report. The Regulation S–K Item 405 box on the cover page is checked

Based on our history of invention and our extensive participation in the standards bodies, together with extensive cross use of technology innovation across different standards, we believe we that our patent portfolio (including patents applied for) is applicable to all of the air interface protocols described in the IMT-2000 standard. We have indicated to the appropriate standards setting bodies that we hold patents and patent applications that are either essential or commercially important for implementation of the present 3G standards specifications in products, and have, in conjunction with such indication, declared that our patented inventions will be available for license under the general principles for each standards body. (See, "-Business Activities, Patent and Technology Licensing".)

Business Activities

Core Technology and Product Development

Our current technology development program are focused on creating intellectual property and hardware and software products for the WCDMA specifications of the 3G standard. We have focused on this market segment because we expect that WCDMA technology (as opposed to the other 3G specifications) will be the dominant technology in the 3G marketplace. Of the GSM service providers in Europe that have selected a 3G air interface, all have selected WCDMA because its adoption offers them the most sensible route to 3G services worldwide as a result of lower expected costs and faster time to market. Given the dominant global market position today of the GSM service providers, analysts expect that they will maintain a similarly strong market position in the next generation wireless environment. We believe technology providers or enablers such as InterDigital which are serving this market by transferring or licensing their technology to companies producing silicon, software or products, will benefit from a leading market position for WCDMA. We believe that our heritage of know-how and patented wireless inventions based upon both TDMA and CDMA differentiates us among current enabling 3G technology providers.

The principal focus of our business activity involves the development of technology platforms for the two modes of WCDMA: FDD and TDD. We are making significant investments in both technologies and expect to monetize our investment through a combination of intellectual property licensing and product sales. While global market demand for FDD-related licensing and products is growing in tandem with the emerging market demand for 3G generally, market demand for TDD-related licensing and products is trailing FDD emergence in accordance with our initial expectations.

With respect to our FDD focus, for the past several years we have been engaged in a research and development effort to develop FDD protocol stacks for WCDMA products. FDD technology supports two-way radio communication using paired radio frequencies. In the FDD format, one frequency supports transmission from a base station to a mobile terminal (downlink) while the other frequency supports transmission in the reverse (uplink) direction. Because of the paired frequencies, simultaneous communication in both directions is possible. Both frequencies typically have the same capacity. This technique is useful for high volume mobile voice traffic and is the traditional public mobile radio spectrum allocation. FDD technology provides high-quality voice transmission and can support high-speed wireless Internet access and multimedia imaging, but it is inefficient in these unbalanced traffic applications.

In March 2001, we entered into a broad, long-term cooperative relationship with Infineon Technologies AG (Infineon) involving the development of FDD (Layer 2/3) software (Joint 3G Protocol Stack) for use with Infineon's terminal unit 3G system-on-a-chip integrated circuits (ICs). Each party will own the technology it develops under the co-development agreement. The agreement provides for us to be compensated on a per unit royalty basis on sales of Infineon standard ICs containing the Joint 3G Protocol Stack. The agreement also provides that we will serve as Infineon's sole source of certain portions of the FDD Access Stratum in its 3G terminal unit ICs except where Infineon customers require use of their own or a third party's protocol stack. If we commence a FDD Access Stratum development effort with another semiconductor company for terminal unit applications, Infineon may engage a third party for the development or modification of a new FDD Access Stratum. The agreement provides for joint marketing of the Joint 3G Protocol Stack in terminal unit applications, as mutually agreed, subject to certain time-to-market restrictions as regards each new software version. Each party is permitted to independently market and use their own respective portions of the Joint 3G Protocol Stack without restriction. Infineon has committed to cooperate in enabling us to design custom 3G ASICs based on an Infineon platform for both infrastructure and selected terminal unit applications where Infineon would serve as the foundry. Infineon is permitted to sell our custom ASICs within its portfolio of products and to re-use our reference designs in non-competitive products. We are permitted to market Infineon's custom ICs which are not a part of the co-development agreement and would receive a commission fixed at then current standard rates. Under the agreement, the parties have cross-licensed to each other a limited set of patents, in our case, generally applicable to the jointly developed software and related products for specified purposes. The parties have also agreed to a framework for determining royalties in other 2G and 3G products.

6

Risk Factors

Item 1, "Business" and Item 7, "Management's Discussion and Analysis" contained within this Annual Report on Form 10-K contain forward-looking statements reflecting, among other things, (i) our current strategic objectives to (a) position ourself in the marketplace as a preferred provider of wireless communications products, (b) invest in and develop our wireless technologies and develop 3G products, (c) focus on standardized technologies and products while placing our technology and intellectual property rights into 3G standards and products, (d) capitalize on the value of our intellectual property through patent licensing, product sales and a combination thereof, (e) bring to market, with strategic partners or on our own, 3G solutions and products; (ii) analysts' and experts' beliefs and forecasts as to the market for wireless products and services, 3G market growth, the nature and performance of 3G products and services, (iii) our current beliefs and expectations as to 3G product and technological capability, the successful development and the applications for our technology and potential products, growth in the 3G market growth, product sales, demand for 3G products, timing of 3G market development, our competition, the impact of our standards activities on revenues, the applicability of our patents to various standards, and expected levels of revenues, cash flow and operating expenses; (iv) manufacturers intentions to bring 3G products to the market during 2002; and (v) our ability to enter into new customer and partner relationships, enter into new licenses, bring 3G products to market on a timely basis or at all, secure patent protection for our inventions, reuse WTDD in other technologies, create a return on our investment in 3G technologies, collect royalties under existing license agreements, and derive revenues from our patents. Words such as "expect", "anticipate", "speculate", "believe", "should", "likely", "predict", "strategy", "objective", "pursuing", "goal", "intend", "could", "plan", "may", and "trends", variations of such words, and words with similar meaning or connotations are intended to identify such forward-looking statements.

Such statements are subject to risks and uncertainties. We caution readers that important factors in some cases have affected and, in the future could materially affect, actual results and cause actual results to differ materially from the results expressed in any such forward-looking statements. You should not place undue reliance on these forward-looking statements which apply on or as of the date of this report. Certain of these risks and uncertainties are described in greater detail below. It should be noted that risks described as affecting one forward-looking statement may affect other forward-looking statements. In addition, other factors may exist that are not detailed below or that are not fully known to us at this time. We undertake no obligation to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise.

Our Technologies May Not Be Widely Deployed.

Our activities are focused on next-generation technologies and products and therefore begin as research and development work. Accordingly, we are subject to the risks typically associated with such activities. New technological innovations generally require a substantial investment before they are commercially viable, and we may make substantial, non-recoverable investments in new technologies that may not result in meaningful revenues. For example, in order to generate revenues and profits from sales of 3G products, we must continue to make substantial investments and technological innovations. A significant assumption in our strategic plan is that WCDMA will be widely deployed in the 3G market. WCDMA may not be deployed as widely as we expect which could reduce revenue opportunities. A second significant assumption in our strategic plan is that FDD will be adopted and widely used in the 3G market. While our inventions and know-how can apply across a broad range of technologies, our detailed technology and development efforts are primarily focused on WTDD and FDD. Other digital wireless technologies, particularly CDMA2000, Wireless LAN (W-LAN), FDD used in data applications, FDD high speed downlink, and WTDD are expected to be competitive with WTDD. CDMA2000 has been deployed in parts of Asia and the United States, and such deployment could cause CDMA2000 to gain significant market share and reduce the opportunities for WCDMA. W-LAN, which enables users to connect laptops and PDAs to the Internet, is already being marketed worldwide and is competitive with TDD. If the initial deployment of FDD for data applications obtains significant market share, or if FDD high speed downlink gains market acceptance, the niche targeted for WTDD could be reduced or eliminated. All of these competing technologies also could impair multi-vendor and operator support for WTDD, key factors in defining opportunities in the wireless market. There can be no assurance that our technology will ultimately have market relevance or be selected by wireless service providers for their networks or equipment manufacturers. If we determine that WTDD will not be adopted at all or in a time period we expect, or adopted in a manner which justifies our continuing investment in the technology, we may change our strategic plan to reduce or eliminate such continuing investment and/or to capture more lucrative market opportunities. Additionally, if WTDD is not adopted and widely used, our strategic plan will require a significant shift and a portion of our anticipated revenue may be impaired.

14



10kWIZARD
SEC POWER SEARCH

# FORM 10-K405

## INTERDIGITAL COMMUNICATIONS CORP – IDCC

**Filed: April 02, 2001 (period: December 31, 2000)**

Annual report. The Regulation S-K Item 405 box on the cover page is checked

As with our TDMA inventions, we have patented our CDMA inventions and today hold a significant worldwide portfolio of patents and patent applications for CDMA technology. Our key CDMA inventions, many of which are applicable to multiple implementations of CDMA including TDD, FDD and Multi-carrier CDMA (CDMA 2000), include among others or relate to:

- Global Pilot: The use of a common pilot channel to synchronize sub-channels in a multiple access environment.
- Bandwidth Allocation: Techniques including multi-channel and multi-code mechanisms.
- Power Control: Highly efficient schemes for controlling transmission power output of terminal and base station devices vital in a CDMA system.
- Overlay techniques for communication systems, which allow new wireless systems to be deployed with existing wireless technologies without frequency reallocation.
- Joint detection and interference cancellation for reducing multiple access interference in a physical receiver.
- Soft Handover enhancement techniques between designated cells.
- Various sub-channel access and coding techniques.
- Packet Data.
- Fast handoff.
- Geo-location for calculating the position of terminal users.

We believe that certain of our inventions are essential to the implementation of the 3G IS-95 systems. (See, "-Business Activities. Patent and Technology Licensing".) We also believe that a number of our inventions are essential to the implementation of the 3G standard, referred to as IMT-2000, approved by the International Telecommunications Union Radio Sector (ITU-R). The ITU-R approved the new standard for IMT-2000 (3G) wireless networks to enable global roaming for mobile users and compatibility with the dominant existing wireless standards. IMT-2000 defines five sets of alternative specifications for the digital mobile radios which can be selected or aggregated by equipment manufacturers to produce standards-compliant third generation wireless products for their customers. The five specifications under the standard include three forms of CDMA technology: Time Division Duplex (TDD) and Frequency Division Duplex (FDD), forms of wideband CDMA, and CDMA 2000. The standard also includes two forms of TDMA technology: Digital Enhanced Cordless Telephone (DECT) and UWC-136, an evolved form of the U.S. TIA/EIA-136 digital cellular TDMA standard. Products built to one or more of these specifications are being designed to deliver a varying range of high bandwidth wireless services, including high speed Internet access, multimedia communications, video conferencing, and other forms of data transmission. InterDigital has made more than 300 contributions to the various 3G standards bodies as the standard has been formulated and expects to continue to do so as the standard is refined.

We believe that our patent portfolio is, or when applications result in granted patents, will be applicable to all of the air interface protocols described in the IMT-2000 standard. We have indicated to the appropriate standards setting bodies that we hold patents and patent applications that are either essential or commercially important for implementation of the present 3G standards specifications into products.

Our current technology development programs are focused on creating hardware and software products for the wideband CDMA protocols of the 3G standard. We have focused on this market segment because we expect that wideband CDMA technology (as opposed to the other 3G protocols) will be the dominant technology in the 3G marketplace. The large majority of GSM service providers, along with TDMA and some IS-95 service providers, have selected wideband CDMA as their 3G air interface protocol because its adoption offers them the most attractive route to 3G services worldwide. Given the dominant global market position today of the GSM service providers, analysts expect that they will maintain a dominant market position in the next generation market. Technology providers or enablers such as InterDigital serving this market by transferring their technology to companies producing silicon, software or final products could benefit from a leading market position for wideband CDMA. We believe that our heritage of know-how and patented wireless inventions based upon both TDMA and CDMA air interface protocols differentiates us among enabling 3G technology providers.

5

Risk Factors

Item 1, "Business" and Item 7, "Management's Discussion and Analysis" contained within this Annual Report on Form 10-K contain forward-looking statements reflecting, among other things, (i) our current intentions and plans (a) to position ourself in the marketplace as an end-to-end "technology enabler" offering a broad portfolio of products, (b) to capitalize on the value of our intellectual property through patent licensing, technology and know-how transfer and specialized engineering services, (c) to bring to market, with strategic partners or on our own, 3G products to enable the delivery of high quality voice and high data rate services in mobile terminals and base stations, and (d) to dedicate a portion of our engineering resources to incubate extensions of our current technology, derivative products and new technologies; (ii) analysts', industry observers' and experts' beliefs and forecasts as to the market for wireless products and services, 3G market growth, and the timing of market development; (iii) our current beliefs and expectations as to 3G product and technological capability, the successful development and the applications for our technology and potential products, 3G markets, demand for 3G products, timing of 3G market development, applicability of standards, preferences of service providers, our competition and competitive advantages, and growth in revenues and operating expenses; and (iv) our ability to enter into new business relationships, enter into new licenses, bring 3G products to market on a timely basis or at all, deliver engineering services, hire additional personnel, and derive revenues from our patents. Words such as "should", "likely to", "expect", "forecast", "believe", "strategy", "intend", "plan", "targeting", "anticipate", "project", and "may seek", variations of such words, and words with similar meaning or connotations are intended to identify such forward-looking statements.

Such statements are subject to risks and uncertainties. We caution readers that important factors in some cases have affected and, in the future, could materially affect actual results and cause actual results to differ materially from the results expressed in any such forward looking statement. You should not place undue reliance on these forward-looking statements, which apply on or as of the date of this report. Certain of these risks and uncertainties are described in greater detail below. It should be noted that risks described as affecting one forward looking statement may affect other forward looking statements. In addition, other factors may exist that are not detailed below or that are not fully known to us at this time. We undertake no obligation to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise.

Our Strategy as it Relates to our Position in 3G is in the Early Stages of Implementation and, as such, is Based on Numerous Assumptions

17



# FORM 10-K

## INTERDIGITAL COMMUNICATIONS CORP – IDCC

**Filed: March 29, 2000 (period: December 31, 1999)**

Annual report which provides a comprehensive overview of the company for the past year

deliver a varying range of high bandwidth wireless services, including high speed Internet access, multimedia communications, video conferencing, and other forms of data transmission. We made numerous contributions to the 3G standards bodies as the standard was being formulated and expect to continue to do so as the standard is refined. Many of our contributions are included as part of the standard adopted by the ITU study group.

We believe that our patent portfolio is applicable to all of the air interface protocols described in the standard, and we have indicated to the standard setting bodies that we hold patents and patent applications that are either essential or commercially important for 3G products built to present standards specifications.

Our current technology development programs are focused on creating solutions (including ASICs) for the wideband CDMA protocols of the 3G standard. We have focused on this market segment, in part, based on industry analysts' expectations that wideband CDMA technology (as opposed to the other 3G protocols) will serve the largest number of wireless subscribers as the 3G market grows. For many GSM service providers, wideband CDMA is likely to be the preferred 3G air interface protocol because its adoption offers them the least expensive and fastest route to 3G services. Given the dominant global market position today of the GSM service providers, analysts expect that they will maintain a dominant market position in the next generation market. Technology providers serving this market could benefit from a leading market position for wideband CDMA. We believe that our heritage of know-how and patented wireless inventions based upon both TDMA and CDMA air interface protocols presents us with attractive opportunities to provide technology in the 3G market.

Strategy

Our strategic objective is to create long-term growth as one of the leading developers of advanced air interface and full system-on-a-chip technology for the wireless communications industry. To achieve this objective, we are actively participating in worldwide 3G markets, with the following focus:

-       Emphasizing Core Technology Development and System Design Capability. We possess longstanding core competencies in digital air interface design and the development of full system solutions for wireless products. By building on these strengths, we can give our customers the full advantage of the depth of our engineering know-how and long heritage of wireless inventions that enhance the effectiveness of end products.

-       Building a Base of Strategic Relationships. To secure our position in the 3G market and define our growth opportunities, we intend to establish a network of customer/partner relationships to complement our strengths and enhance our ability to create value in a broader market. We seek partners that bring complementary technologies, production capability and market access. A key ingredient in the strategic plan is to work in partnership with a semiconductor producer to bring a number of standards-compliant 3G ASICs to market.

-       Leveraging Technology and Intellectual Property Rights into 3G Standards and Products. We have been a leader in developing and promoting key industry standards starting with 2G in the 1980s as well as the recently proposed 3G standard. We believe this strategy enables us to promote the adoption of our technology into new standards-based products, providing our customers time to market and other advantages.

-       Licensing Intellectual Property Worldwide. Our substantial portfolio of patented TDMA and CDMA inventions is a unique asset. Access to these inventions, and the technological know-how they represent, through licensing agreements has proven valuable to producers of wireless devices who provide advanced services around the world. By continuing to build our licensing program, we believe that we can capture substantial value in the future.

-       Providing Specialized Engineering Services. We intend to selectively enter into agreements to develop technology for leading companies and offer integration technology and implementation assistance. Our goals

5

Risk Factors

Item 1, "Business" and Item 7, "Management's Discussion and Analysis" contained within this Annual Report on Form 10-K contain forward-looking statements reflecting, among other things, (i) our strategic objectives; (ii) analysts', industry observers' and experts' beliefs and forecasts as to the market for wireless products and services, 3G market growth, and the timing of market development; and (iii) our current beliefs and expectations as to 3G product and technological capability, the successful development and the applications for our technology and potential products, 3G markets, demand for 3G products, timing of 3G market development, applicability of standards, preferences of service providers, our ability to enter into new business relationships, enter into new licenses, bring 3G products to market, and deliver engineering services, our ability to derive revenues from our patents, our competition and competitive advantages, and the effectiveness of our Year 2000 compliance. Words such as "should", "likely to", "expect", "forecast", "believe", "strategy", "intend", "plan", "targeting", "anticipate", "project", and "may seek", variations of such words, and words with similar meaning or connotations are intended to identify such forward-looking statements.

Such statements are subject to risks and uncertainties. We caution readers that important factors in some cases have affected and, in the future, could materially affect actual results and cause actual results to differ materially from the results expressed in any such forward looking statement. You should not place undue reliance on these forward-looking statements, which apply on or as of the date of this report. Certain of these risks and uncertainties are described in greater detail below. It should be noted that risks described as affecting one forward looking statement may affect other forward looking statements. In addition, other factors may exist that are not detailed below or that are not fully known to us at this time. We undertake no obligation to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise.

Our Strategy Is Forward-Looking in Nature

Our strategy is forward-looking in nature and, as such, is inherently subject to risks and uncertainties. Many factors, including the other Risk Factors detailed below, could affect our potential revenues and profitability and our ability to achieve our objective to become a premier provider of innovative technology for advanced wireless communications products. For example, our plans to place our strategic emphasis on 3G technology and products, to devote substantial resources to the development of TDD and FDD technology, to market our FDD and TDD components (including system-on-a-chip), our capabilities and technology content, and generate sufficient revenues from associated engineering services could be affected by shifts in our strategy, the ability to generate sufficient revenues to support our development activities (which could itself be affected by numerous factors including, without limitation, the ability to secure new and enforce existing license agreements and the ability to enter into new strategic relationships), unanticipated development costs, difficulties or delays in engineering projects, failure to successfully enter into additional strategic relationships, our ability to successfully and timely complete engineering projects, our ability and the ability of our partners to successfully market and sell 3G products, our ability to hire or retain adequate personnel, Nokia's exercise of its rights to terminate the development project for convenience, and the failure of the 3G market to materialize in the manner or time frame anticipated.

Analyst and Market Predictions are Forward-Looking in Nature

Our market predictions, as well as, analyst, industry observer and expert predictions described in "—Wireless Telecommunications Industry Overview" above, are forward looking in nature and, as such, are inherently subject to risks and uncertainties. Many factors could affect these predictions including, but not limited to, the validity of their and our assumptions, economic conditions, customer buying patterns, timeliness of equipment development, pricing of 3G products, continued growth in telecommunications services that would be delivered on 3G devices, and availability of capital for infrastructure improvements. Also, the 3G market may not develop at the rate or the pace that we or they predict.

13

**EXHIBIT F3**

Interdigital - Technologies/Products

**InterDigital**

Profile | Press Room | Technologies & Products | Investing | Careers | Contact

Home | Gl

Introduction | Complete 3G Modems | Licensing | Contributing to Industry Standards |
Technology Patents | Contact Us



Since our inception, InterDigital has employed an aggressive program of developing and protecting
our intellectual property, with the ultimate objective of realizing licensing revenues from use by third
parties of inventions covered by our patent portfolio. Since 1992, we have generated over $500
million in patent royalty and technology licensing payments.

InterDigital believes that, in many instances, licenses for certain of our patents are required for third
parties to manufacture and sell digital cellular products in compliance with TDMA and CDMA-based
standards currently in use worldwide. Accordingly, we offer non-exclusive, royalty bearing patent
licenses to telecommunications manufacturers worldwide that manufacture, use or sell, equipment
utilizing our extensive portfolio of essential or commercially important intellectual property, including
patents relating specifically to digital wireless radiotelephony technology, Time Division Multiple
Access (TDMA) and Code Division Multiple Access (CDMA).

Copyright © 2006 InterDigital Communications Corporation
781 Third Avenue, King of Prussia, PA 19406 USA
InterDigital is an equal opportunity employer supporting diversity in the workplace.
For more information contact InterDigital.
All Rights Reserved, see important legal notices.
Contact the webmaster with all comments and questions about the website.

# InterDigital®

Profile | Press Room | Technologies & Products | Investing | Careers | Contact

Home | Glo

Introduction | Complete 3G Modems | Licensing | Contributing to Industry Standards | Technology Patents | Contact Us

InterDigital has been a leading developer of wireless technology and product platforms for more than 30 years- partnering with the largest companies in the world.

Recognized as a pioneer of advanced wireless modem solutions, many of our inventions have helped shape today's booming wireless industry.

Today, our inventions and technology are embedded in every 2G, 2.5G and 3G device. An active contributor to standard bodies, we participate with other industry leaders in defining the evolution of 3G.

InterDigital's comprehensive 3G solutions include advanced WCDMA, HSDPA, and HSUPA modems, protocol software and baseband products for 3G semiconductor and mobile device manufacturers.

Many of our patented inventions are licensed by the manufacturers of the leading brands of mobile devices around the world.

Our financial strength, growing revenue base, and strong balance sheet support continued investment in research and development- shaping, and "future-proofing" the next generation of wireless technology and products.

Copyright © 2006 InterDigital Communications Corporation
781 Third Avenue, King of Prussia, PA 19406 USA
InterDigital is an equal opportunity employer supporting diversity in the workplace.
For more information contact InterDigital.
All Rights Reserved, see important legal notices.
Contact the webmaster with all comments and questions about the website.

**InterDigital**

Profile | Press Room | Technologies & Products | Investing | Careers | Contact

Home | Gl

Press Releases | Events | News Archive

< Back



**7/31/2003 - InterDigital Acquires Assets of Tantivy Communications, Inc.; Company Strengthens Existing Market Position in CDMA2000, Smart Antenna and Wireless LAN Technologies**

KING OF PRUSSIA, Pa.--(BUSINESS WIRE)--July 31, 2003--InterDigital Communications Corporation (Nasdaq:IDCC), a leading architect, designer and provider of wireless technology and product platforms, today announced that a wholly-owned subsidiary has acquired substantially all the assets of Tantivy Communications, Inc. (Tantivy), a developer of wireless data communications technology. Included in the acquisition are patents, patent applications, know-how, state-of-the art laboratory facilities, and other technologies related to CDMA2000, smart antenna, wireless LAN and other wireless communications technologies. Also included were the rights created under a November 2002 transaction whereby another InterDigital wholly-owned subsidiary acquired exclusive licensing rights to certain CDMA2000 patents and patent applications held by Tantivy.

Under the terms of the agreement, Tantivy was paid a total of $11.5 million, consisting of approximately $10 million in cash and cancellation of approximately $1.5 million in outstanding principal and interest from a loan previously provided to Tantivy. In addition, Tantivy will receive a minimal percentage of the compensation received by InterDigital on the licensing or sale of Tantivy smart antenna and 802.11 intellectual property.

"Acquiring the assets of Tantivy Communications further strengthens our existing CDMA2000 patent portfolio and competitive position in that marketplace, while broadening our offering to potential licensees and technology partners," said Howard Goldberg, President and CEO of InterDigital. "It also effectively eliminates the earn-out obligation we had to Tantivy in connection with the exclusive license we entered into with them in 2002 regarding the CDMA2000-related patents With this transaction we are continuing the evolution of our patent licensing business and creating the opportunity for additional revenues. We also have added several key technologies that reach across multiple product platforms and wireless generations, thereby expanding our technology portfolio consistent with our strategic objectives.

"We welcome the talented people of Tantivy to InterDigital. They bring strong, complementary skills and expertise to our engineering teams. At the same, we are establishing a new development center in Melbourne, Florida, a very attractive and growing area for telecommunications technologies. We look forward to working with our new colleagues in extending the global reach and impact of their activities, and expanded access to their inventions, in CDMA2000, smart antenna and wireless LAN technologies," concluded Mr. Goldberg.

About InterDigital

InterDigital architects, designs and provides advanced wireless technologies and products that drive voice and data communications. The Company offers technology and product solutions for mainstream wireless applications that deliver cost and time-to-market advantages for its customers. InterDigital has a strong portfolio of patented technologies covering 2G, 2.5G and 3G standards, which it licenses worldwide. For more information, please visit InterDigital's web site: www.interdigital.com.

This press release contains forward-looking statements regarding our ability to create additional licensing revenues from and the key nature of the Tantivy patents and technologies acquired. Forward-looking statements are subject to risks and uncertainties and actual outcomes could differ materially from those expressed in such forward-looking statements due to a variety of factors including, but not limited to, (i) the market relevance of such acquired technologies, changes in technology preferences of strategic partners, and the availability or development of substitute technologies or competition from competitive technologies; (ii) the

implementation of design-arounds to the acquired Tantivy patents; (iii) differing interpretations
of and changes to standards; (iv) our ability to successfully market and license the
CDMA2000, smart antenna, and wireless LAN patents and technology acquired; (v) the
performance of our licensees in selling their products; (vi) our ability to adequately enforce and
protect our patents and intellectual property rights as well as developments in current patent
litigation matters; and (vii) other factors listed in our most recently filed Forms 10-K and 10-Q,
respectively. We undertake no duty to publicly update any forward-looking statements,
whether as a result of new information, future events or otherwise.

InterDigital is a registered trademark of InterDigital Communications Corporation. All other
trademarks are the property of their respective owners.

```
    CONTACT: InterDigital Communications Corporation
             Media Contact:
             Guy Hicks, 610-878-7800
             email:  guy.hicks@interdigital.com
                or
             Investor Contact:
             Janet Point, 610-878-7800
             email:  janet.point@interdigital.com

    SOURCE: InterDigital Communications Corporation
```

< Back

Copyright © 2006 InterDigital Communications Corporation
781 Third Avenue, King of Prussia, PA 19406 USA
InterDigital is an equal opportunity employer supporting diversity in the workplace.
For more information contact InterDigital.
All Rights Reserved, see important legal notices.
Contact the webmaster with all comments and questions about the website.

**InterDigital**

Profile | Press Room | Technologies & Products | Investing | Careers | Contact

Home | Gl

## Press Releases

Press Releases | Events | News Archive

View printer-friendly version

<< Back

### InterDigital Shows Path to the Future of Wireless at 3GSM World Congress 2006; Fast Forward from GSM to HSUPA With Faster Data and Faster Time-to-Market

KING OF PRUSSIA, Pa.--(BUSINESS WIRE)--Feb. 6, 2006--InterDigital Communications Corporation (Nasdaq:IDCC) will demonstrate its leading edge portfolio of 2G and 3G protocol stack software, ASIC, and complete wireless modem products at the 3GSM World Congress 2006 in Barcelona, Spain, February 13-16 (Hall 1, Stand D122).

InterDigital supports the evolution of 3G technology through active participation in the standards bodies, invention of essential patented technologies, and development of advanced 3G product solutions. The company will demonstrate the following items:



-- Complete WCDMA/HSDPA Modem: simultaneous high speed operation of voice, MMS, video streaming, file downloads, and Internet browsing using both packet and circuit switched modes.

-- HSDPA ASIC: data speeds over 10Mbps delivering simultaneous video streams while dynamically adapting to changing channel conditions.

-- HSUPA Baseband and Protocol Stack Software: improved latency and higher capacity in the uplink data channel showing the adaptive parameters of HSUPA.

-- Dual-mode Protocol Stack Software: seamless handover between GSM/GPRS/EDGE and UMTS modes.

In addition, InterDigital's President and Chief Executive Officer, William J. Merritt, will participate in a panel discussion titled "How Do We Successfully Manage the Evolution of 3GPP Based Technologies?" The panel discussion at the 3GSM Conference is scheduled for Tuesday, February 14, 2006 from 17:40 to 18:15 CET.

To Schedule Meetings in Advance:

-- Media / Industry Analysts / Product Inquiries: Jack Indekeu +1. 610.878.7800 or jack.indekeu@interdigital.com

-- Investors / Equity Analysts: Janet Point +1.610.878.7800 or janet.point@interdigital.com

About InterDigital

InterDigital Communications Corporation designs, develops and provides advanced wireless technologies and products that drive voice and data communications. InterDigital is a leading contributor to the wireless standards and holds a strong portfolio of patented technologies which it licenses to manufacturers of 2G, 2.5G, 3G and 802 products worldwide. Additionally, the company offers baseband product solutions and protocol software for 3G multimode terminals and converged devices, delivering time-to-market, performance and cost benefits. The company's financial strength and solid revenue base contribute to the continued investment in innovation and development that will shape the next generation of wireless technology. For more information,

please visit InterDigital's web site: www.interdigital.com. InterDigital is a registered trademark of InterDigital.

CONTACT: InterDigital Communications Corporation
Media Contact:
Jack Indekeu, 610-878-7800
jack.indekeu@interdigital.com
or
Investor Contact:
Janet Point, 610-878-7800
janet.point@interdigital.com

SOURCE: InterDigital Communications Corporation

Copyright © 2005 InterDigital Communications Corporation
781 Third Avenue, King of Prussia, PA 19406 USA
InterDigital is an equal opportunity employer supporting diversity in the workplace.
For more information contact InterDigital.
All Rights Reserved, see important legal notices.
Contact the webmaster with all comments and questions about the website.

**InterDigital**

Home | Glo

Profile | Press Room | Technologies & Products | Investor | Careers | Contact

## Press Releases

Press Releases | Events | News Archive

🖶 View printer-friendly version

<< Back

**InterDigital Signs High Tech Computer to Worldwide 2G And 3G Patent License Agreement**



KING OF PRUSSIA, Pa., Dec 17, 2003 (BUSINESS WIRE) — InterDigital Communications Corporation (Nasdaq:IDCC), a leading architect, designer and provider of wireless technology and product platforms, today announced that its subsidiary, InterDigital Technology Corporation (ITC), has signed a non-exclusive, worldwide, royalty-bearing patent license agreement with High Tech Computer Corp. (HTC) covering the sale of wireless terminal units and infrastructure built to Second Generation (2G and 2.5G) IS-136/GSM/GPRS/EDGE and Third Generation (3G) WCDMA/CDMA2000/TD-SCDMA standards. HTC is one of the world's largest original design manufacturers of Windows Mobile-based Pocket PC, Wireless Pocket PC, and Smartphone products.

"The signing of this agreement with HTC reflects the continuing, growing momentum of our global patent licensing program and strengthens our existing recurring royalty revenue base," said William Merritt, President of ITC. "This agreement expands our 3G licensee base, marks our progress in entering new geographical markets, and confirms our ability to license our patented inventions across multiple standards and a broad range of mobile wireless devices and manufacturers. It also affirms InterDigital's position as a recognized developer and contributor of essential wireless technologies."

About InterDigital

InterDigital architects, designs and provides advanced wireless technologies and products that drive voice and data communications. The Company offers technology and product solutions for mainstream wireless applications that deliver cost and time-to-market advantages for its customers. InterDigital has a strong portfolio of patented technologies covering 2G, 2.5G and 3G standards, which it licenses worldwide. For more information, please visit InterDigital's web site: www.interdigital.com. InterDigital is a registered trademark of InterDigital Communications Corporation. All other trademarks are the property of their respective owners.

This press release contains forward-looking statements regarding our current beliefs, plans and expectations as to the importance of our wireless technologies for the wireless market, our progress in entering new geographic markets, our momentum and ability to do global patent licensing, and our recurring royalties. Forward-looking statements are subject to risks and uncertainties and actual outcomes could differ materially from those expressed in any such forward-looking statement due to a variety of factors including, but not limited to, (i) our ability to enter into additional license agreements and our licensees' performance under licensee agreements; (ii) our ability to adequately prosecute, enforce and protect our patents and other intellectual property rights; and (iii) as well as other factors listed in the Company's most recently filed Form 10-K and Form 10-Q. We undertake no duty to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise.

SOURCE: InterDigital Communications Corporation

CONTACT:          InterDigital Communications Corporation
                  Media Contact:
                  Dawn Goldstein, 610-878-7800
                  e-mail: dawn.goldstein@interdigital.com
                  Investor Contact:
                  Janet Point, 610-878-7800

Interdigital - Press Releases

e-mail: janet.point@interdigital.com

Customize your Business Wire news & multimedia to match your needs.
Get breaking news from companies and organizations worldwide.
Logon for FREE today at www.BusinessWire.com.

Copyright (C) 2003 Business Wire.  All rights reserved.

SOURCE: InterDigital Communications Corporation

Copyright © 2006 InterDigital Communications Corporation
781 Third Avenue, King of Prussia, PA 19406 USA
InterDigital is an equal opportunity employer supporting diversity in the workplace.
For more information contact InterDigital.
All Rights Reserved, see important legal notices.
Contact the webmaster with all comments and questions about the website.

Subject: FW: Transcript of InterDigital Communications Corporation at Bear, Stearns & Co. Annual Technology Conference

AVIE SAUFER, TELECOM EQUIPMENT TEAM, BEAR STEARNS: Good afternoon everyone. My name is [Avie Saufer]. I work on the telecom equipment team at Bear Stearns. With us today we have senior management. We have Chief Executive Officer, Bill Merritt of InterDigital as well as Janet Point of Investor Relations. As you probably know, InterDigital is one of the leading developers of cellular standards both in 2G and 3G and a very strong IP holder and patent holder in this area.

With that, I'll turn it over to Bill for his [brief] presentation and then some Q&A.

BILL MERRITT, CHIEF EXECUTIVE OFFICER, INTERDIGITAL COMMUNICATIONS CORP.: Thank you Avie, and good afternoon everyone. It's a pleasure to be here at the conference today. One quick message from our lawyers. Obviously, we're going to be talking about things that are forward-looking in nature and they're obviously subject to some risks, and we refer you to the appropriate SEC filings for a discussion of those risks.

Let me talk to you a little bit about who InterDigital is. Where we're going, and what we think its worth to everyone. InterDigital in a nutshell, what we do is we design 3G modems. The modem technology is basically a technology that moves the information over the air. That's basically the [ACIX] [and] the software. That's what we design.

We've been in it longer than anybody else. We got into a wideband CDMA back in 1993 and have been in that market ever since. We actually were a pioneer in that industry as well as being a pioneer within the TDMA and GSM technologies. So I'm going to talk to you a little bit about how we move from developing technology in the lab, and how we actually move that eventually onto our income statement.

Again, we are a 30 year veteran of wireless technologies. As a result of being a 30 year veteran of wireless technologies we have very, very deep patent portfolios covering all aspects of wireless technologies. Our inventions are actually used in every mobile phone used in the world today. The other thing that's unique about InterDigital is that, because we're in the market so early, we actually have developed a complete solution.

We couldn't just develop it internally. We actually had to develop base stations and everything else and deploy systems in the field. The result of that is we have a very strong systems base which gives us a very, very strong ability to develop excellent technology to [inaudible] we're focus today.

So we do a lot of work with technology development. What's the next step in the process for us? Well over the years, we've been very, very involved in standards development. We're involved in the development of the 2G standards in the United States, and we're involved in the development of the 3G standards worldwide. We actually consider this one of the more important parts in our process, because this is actually where we make the sale of technology to third parties. In the standard setting that we convince other players like Ericsson, Nokia, and other folks that our technology or our solutions should be used in favor of others.

We've been very successful therefore getting our solutions into the 3G standards, as well as getting our technology into 802 standards. As you all know, 802 now is developing from what was once sort of private island deployment, into more system-wide network deployment and the future 802 technologies

contain a very significant amount of InterDigital technology. And we continue to participate not only in 2G and 3G and 802 standards, but also with respect to 4G standards. These standards continue to evolve.

Participating in standards gives us two things. It gives us an IPR position within the standards, but equally important, gives us a perception in the market that we actually contributed to the success of the standard. And that perception is very, very important as we move into the next part of our process, which is to license our technologies to third parties. We license our patents on a worldwide basis. Been very successful with the patent licenses [coming] -- nearly 40 companies now manufacturers licensed under our patents. We've generated actually up to this point, almost 1.5 billion in cash off of our licensing programs. We've licensed most of the leading brands under our [patents].

The other part of our process in addition to licensing our patents is we sell technology. We provide complete 3G technology solutions. We have a number of customers today that take our ACIX solutions and/or our software solutions. We also find that the licensing technology is very synergistic with our patent licensing program, in the sense that we can put both together and create a very high value offering for our customers. So that's our process for moving from essentially the laboratory to monetizing [our] development expense to licensing and sale of 3G solutions.

So how's it done for us over the years? It's actually worked very well. Since 2003, we've maintained over $100 million in the bank, at the same time that we've been investing a substantial amount of money in technology development and repurchasing our own stock. By the end of 2005, we had repurchased approximately 100 million shares of stock at about -- $100 million of stock about 6.7 million shares.

We've announced a $200 million repurchase recently. It brings us to pull back in more shares. So we've maintained a very, very healthy cash balance. At the same time, we've made very, very substantial investments, both in our technologies and in our company. If you look at the right side, you see the revenue over that period of time for Q1 of 2005 to now steadily increasing. In Q1 of '05, we had about 35 or so million dollars in revenue. Q1 of '06, $52 million in revenue.

So the company's revenue base -- also in 2006 we saw our contributors of revenue grow from approximately four or five companies that contributed about $1 million a quarter in revenue to over 10 companies that contributed $1 million a quarter. So the base began to grow [significantly]. So a very strong cash balance and very strong revenue stream.

Where does it come from? [So] all names you should know. Folks like Sharp, NET, Nokia, Sanyo. All are licensees under our patents and/or technologies. All provide us with revenue. So it's a very strong licensing pace. At this point, we have approximately 65% of the 2G markets under license, and about 35 to 40% of all terminal units or so for 3G, are licensed under our patent. So that's generally how we license and who we license to.

How we doing today? Well we recently resolved a dispute with Nokia $253 million, that was paid in April. Earlier this year, we signed LG Electronics $285 million contract for a five year license. We signed Panasonic a number of years ago. But recently we resolved with them one of the issues under that contract was, [the] conditions for payment under that contract was an acceptance by Panasonic that they did in fact use our patents. And this year they agreed that they are using our patents, and they now are sending us royalties on a regular basis.

First quarter this year as I mentioned before, strongest quarter in the company's history. Revenue up 45% from the prior quarter. EPS up very significantly from the comparable quarter in Q1 up from a $0.23 loss to $12.9 million gain. And as I said before, we also now authorized repurchase of 200 million shares -$200 million worth of shares.

What's driving our success today? That licensing program $600 million in deals in the last nine months. Again, we've resolved Nokia. We resolved LG - licensed LG. We resolved our issues with Panasonic, and we also signed Nokia there and a number of other companies under our patents. We have 35 to 40% of that market covered today by licensed patents. In the past year, we signed five new 3G patent license [program]. And as I said, the program to date has now generated a $1.5 billion. So it's a very, very strong well known patent licensing program.

What's the other side of the story for InterDigital? It's the products progress. Those are now being brought up to complement the patent licensing program. And today we have in place license agreements or IP license agreements with a number of key players. [Inaudible] Semiconductor license our HSDPA ACIX design. A little bit on that design. It is actually the highest speed design operating in the market today 14.4 megabits per second, versus the comparable design from other folks at about 3.6 megabits per second.

General Dynamics licensed a complete terminal unit technology package from us both the software and hardware. And Infineon has licensed both our WCDMA protocol stacks and our HADPA protocol [stacks]. Where the company is going with respect to this product programs, is to bring to the market by the end of the year, a substantially complete dual mode 2G/3G ACIX for [licensing]. That means both the GSM component, the WCDMA component, as well as with respect to 3G, HSUPA capability.

Back at the Barcelona Trade Show this year in February, we were one of the very few companies demonstrating high speed uplink capabilities, consistent with what InterDigital has done over its life with respect to technology development. Because we have been in this market longer than anybody else, we tend to be ahead of everybody else on our technology development. And we're one of the few people in Barcelona actually demonstrating HSUPA capability. So we have very strong patent licensing program and growing strength with respect to our product programs.

So where do we take it? Well our target is to have 100% coverage with respect to licensing on 3G mobile turnover devices. As I said we have 35 to 40% to date. If you look at what that means. There are going to be one billion phones shipped in 2008, and by 2010, 60% of those phones or a very large portion or more than 50%, will be 3G. Our goal is to secure revenue on every device sold.

So what does that mean? Today, we receive somewhere north of $2 per unit on an average, with respect to WCDMA terminal use. And [as] I said, we have 35 to 40% of the market [covered]. So we will do two things. We'll use our patent position to drive our coverage in the market. Patent position gives us entitlement to cover 100% of the market. We will then use the patents as well - our product position to drive the amount of money which we receive on each unit.

So if we use 2010 as an example, if we can get an average of $1.50 per unit which is lower than where we are today, and we can get that on 75% of the market that means our annual revenue will be about $800 million a year. Several things about that. One, we can generate that revenue without any significant growth in the company. Today we have a very strong patent licensing program and products programs, and those programs will largely be the same as we go after this revenue. Certainly there will be some growth, but we don't need to grow the company substantially to get there.

And second with respect to the market coverage a 75% number as an example is actually consistent with where we ended up on 2G, and not that far stretched from where we are today with respect to licensing. And again, we have 35 to 40% of the market covered today. So we think that there's a tremendous opportunity for the company. We think we're positioned very well in what is the largest consumer market in the world [inaudible] And we're positioned with two very important components; patents and

technology, and I think together, those things can help drive a very significant amount of revenue for the company.

So with that, I can open up for questions.

UNIDENTIFIED AUDIENCE MEMBER: [inaudible question-microphone inaccessible]

BILL MERRITT: Sure. The question is. Where we expect to be with respect to Nokia, Sony, Ericsson and Samsung on 3G license. One, we don't talk generally about the time tables of anyone, because obviously we can't predict when deals will get done. But a couple of factors. One, we are as you would expect to be, us to be very focused on licensing the top end of the business. The top six manufacturers is where a substantial amount of the value is.

With respect to Nokia, we have some litigation ongoing with Nokia which obviously establishes at least a timeframe in which things could get [tougher] as you would expect. Litigation tends to provide opportunities where people can sit down and talk and work things out. And whether that is how it goes with Nokia or not, there is certainly that other dynamic in place.

With respect to Samsung, Samsung is in the same position as Nokia in that they [had] a similar contract to Nokia. We are awaiting an arbitration decision with respect to the 2G royalties that are owed by Samsung. And then following up on that or in conjunction with that, there could also be 3G discussions with Samsung. So, we were very focused on that top end of the market is a high priority for the company.

UNIDENTIFIED AUDIENCE MEMBER: [inaudible question-microphone inaccessible]

BILL MERRITT: Infineon has design wins with Panasonic, and they also have a design win with LG, but it's on 2G. But it certainly positions them for a upgrading that position to 3G. And I know they're in discussions with another focus with respect to a solution. And Infineon recently announced it will be coming up in the market this year when HSDPA solutions. So we would expect that would create some traction for Infineon in the market. [Phillips] is not - as we know had a current design win, but they also are just getting their 3G device into the market. Our design for them is an HSDPA design. They've had very good success in the past with folks like Samsung, so we would hope that that success will continue.

UNIDENTIFIED AUDIENCE MEMBER: [inaudible question-microphone inaccessible]

BILL MERRITT: With respect to Motorola certainly on 3G products they need to take a license under our patents, so they're one of those top six companies that we've been very focused on. The options for Motorola are like the options we have with other folks. It can be through straight up negotiations on the patents. It can be through a combination of patents and products or it could down another path. But certainly they are the company we need to deal with, with respect to licensing and we intend to [do it]. Any other questions?

UNIDENTIFIED AUDIENCE MEMBER: [inaudible question-microphone inaccessible]

BILL MERRITT: Sure. I think that the current environment where you do have a fair amount of litigations going on with respect to 3G patents. It's an environment that can have an affect on us. It can have an affect both in the positive and negative [direction]. Certainly from a positive perspective, as people get involved in litigations they tend not to want to get involved in lots of litigations. So if someone is very tied up with a number of other litigations they may be more likely or could be more likely to settle with another party.

So if we're one of the parties they want to deal with then that could be a positive thing for us. I think in a litigation environment, if that's where the world goes on 3G, which is a little bit different than where it was on 2G, there was not as much litigation on patent. InterDigital, while we use litigation very rarely, actually to get licensing [done], we've actually used it very effectively.

So I think in that type of environment, we've done equally well as we did in the prior environment where it was more of a negotiation phase. So I think it's certainly putting a focus on IPR. I think a focus on IPR is not a bad thing for us, but certainly it's also an environment where we can use that environment - use it appropriately so we can get things to work better for us.

UNIDENTIFIED AUDIENCE MEMBER: [inaudible question-microphone inaccessible]

BILL MERRITT: In China we actually have involvement in a couple of ways. Correct, Infineon is actually one of the companies that would be involved in China, because they are seeking customers in China as you would expect that they would. We also were very involved in China with respect to the TDS-CDMA standards, which is the 3G that's being developed into voice in China. We have very close connections with the Chinese government with respect to that.

So you would expect - we would expect over time, as that standard gets deployed - or products get deployed to that standard in China, that we would then go back into China and begin the licensing program. It was a little premature to do it up until now, because it was not clear when that standard would get rolled out and what volumes there would be and things like that. But I think that there's becoming a little bit greater clarity with respect to that market, so we would expect to be back in there.

UNIDENTIFIED AUDIENCE MEMBER: [inaudible question-microphone inaccessible]

BILL MERRITT: Sure. Cingular has deployed UMTS and actually HSDPA capability in the U.S. and they do sell a number of dual mode devices. There suppliers are folks like [Options], [Zero Wireless], [Novitell] and LG. And what Cingular is doing is obviously leveraging off a very, very high data rate capability within HSDPA. From our perspective, that's actually a very good alignment with where InterDigital has always been. We're always on the leading edge.

So leading edge companies like Cingular who like that leading edge technology and their vendors who supply to them become very good folks that we can talk to, with respect to supplying our solution to them. So, I think it's a good movement in the United States to have those systems being deployed and I think it's essentially an opportunity for us.

UNIDENTIFIED AUDIENCE MEMBER: [inaudible question-microphone inaccessible]

BILL MERRITT: Good question. It actually does not come at the expense of anybody. As the nature of essential patent - we have essential patents [other] companies [may] -- and anybody that produces a 3G terminal U.S. device, needs to be licensed under all these essential patents. So from our perspective, every manufacturer who produces devices to that standards needs to license with us. They may also have a license with other people, but they have to license with us. And so today we have 35% of those devices that go out or sold, and they're licensed [to] us. And again, are targeted to get to [inaudible].

UNIDENTIFIED AUDIENCE MEMBER: [inaudible question-microphone inaccessible]

BILL MERRITT: The 55% would come from signing up new folks. So signing someone like a Samsung or Nokia would begin to increase our share. It does not take away share from other people. It's not like

product sales, where only one person supplies the products. Here the patents are actually supplied by a number of different companies.

UNIDENTIFIED AUDIENCE MEMBER: [inaudible question-microphone inaccessible]

BILL MERRITT: Off the top of my head I don't know. But I know for 2000 — and we have put out revenue guidance for the second quarter of 2006. That includes 230 some odd million dollars from Nokia, $12 million in patent [infringement] from Panasonic, as well as 50 some odd million dollars in revenue. So the second quarter has some very high revenue numbers for us, but full year estimates, I don't know off the top of my head.

UNIDENTIFIED AUDIENCE MEMBER: [inaudible question-microphone inaccessible]

BILL MERRITT: Panasonic's acknowledgement that they used our technology was tantamount to a [inaudible] statement that our patents are essential. So it's not that they were making some - doing some particular implementation that lead them into our patents. It was an acknowledgement by them that, yes InterDigital does hold essential patents [inaudible].

UNIDENTIFIED AUDIENCE MEMBER: [inaudible question-microphone inaccessible]

BILL MERRITT: Actually we were one of the first companies back in the mid '80s to file [inaudible]. We have some of the very early patent numbers that are [in China]. We did a lot of filing in China with respect to not only the WCDMA technology, but also TDS-CDMA technology. So we have very good patent position there in China.

UNIDENTIFIED AUDIENCE MEMBER: [inaudible question-microphone inaccessible]

BILL MERRITT: Well, you don't always have to look at enforceability in China as a sort of - or look at that issue in a vacuum. As an example, manufacturers in China may export to other jurisdictions. So to the extent you don't feel as strong with respect to the enforceability patent in China, you have other places to go. When in fact, the Chinese patent systems - patent office does a very good job with respect to the patents. The patent system itself on paper is very good, and over time we hope that it will improve. As far as enforceability, there certainly have been some issues in the past, but certainly it's moving in the right direction.

A third thing and it goes back to one of the points that I made at the beginning. Patent licensing - there's two components to patent licensing. One is, having patents. The second is, having the right perception in the market. We work very, very hard with respect to development of TDD technology of which TDS-CDMA is [invariant]. Worked very hard with the Chinese government, with respect to [positioning] technology. So it's that perception at the end of the day that becomes very important as well.

UNIDENTIFIED AUDIENCE MEMBER: [inaudible question-microphone inaccessible]

BILL MERRITT: Well actually [with] the standard bodies develop our technology for which they know - what they assure themselves is not that the patents will be - that they'll be free to use the patents. What they assure themselves is that the patent holders will offer a fair, reasonable and non-discriminatory terms. So in fact, if your patent is resident in a standard, that does not mean you won't get paid, it just means you have to offer - that you have to offer those patents for licensing. You can't hold it back as a proprietary [inaudible].

So I think from our standpoint, getting the technology into the standards, as I said is a very, very

important part of the sales process. We've been very effective at negotiating license agreements with a large number of folks, as I've said 40 some odd companies now have license under our patents. So, we don't have to really work that balance too much. I think with the patents and the standards we do just fine.

UNIDENTIFIED AUDIENCE MEMBER: [inaudible question-microphone inaccessible]

BILL MERRITT: We have license agreements with folks in Taiwan. So, we make a fair amount of money out of Taiwan. With respect to China, we have some products that are manufactured in China and then resold on [inaudible] royalties. But no domestic Chinese company in the People's Republic of China do we have as a current licensee of ours. Again, I think the focus there will be TDS-CDMA, where we've gotten a very good position, again both with respect to technology, but also the leg work we've done with the people on the ground in China.

UNIDENTIFIED AUDIENCE MEMBER: [inaudible question-microphone inaccessible]

BILL MERRITT: Absolutely. Part of the - it's the goal of the company and it is, is to get coverage on 100% of the terminals sold. China becomes an important market in doing that.

UNIDENTIFIED AUDIENCE MEMBER: [inaudible question-microphone inaccessible]

BILL MERRITT: That's a good question. And you're right, on an average basis Qualcomm gets a royalty that is higher than ours. The question for us has been, what's the right royalty for us to get to - one, build the business, grow the business and deal with it as a return business? Our view is, these patent license agreements are not a one time agreement that you go back to parties and renegotiate.

Our business model is one you have to go back again, and again, and again, as new technologies become [resonant] on those phones. So over the years and I ran the patent licensing program for a number of years, we sort of found that spot in the market that we thought made sense for us in the context of that type of program. And we've been very successful of being able to re-up the licenses. And in fact, many of the licenses we have today are the second or third generation of licenses. So whether we have the right rate or the wrong rate or too high a rate or too low a rate, I think - my experience has been [resurrect] the spot in the market for what we want [it in].

UNIDENTIFIED AUDIENCE MEMBER: [inaudible question-microphone inaccessible]

BILL MERRITT: There's no sort of theoretical limit. I think that again, it depends upon where you're taking the business over time. And we again, think that where we are and where our licensing today makes a lot of sense. We've been able to do a lot of deals; 90 plus percent of our deals without any litigation. Certainly if you have litigation, it's a plus or minus game. If you take the patents into litigation, and you don't do well that can have a negative effect on the portfolio. Not to say that we're afraid of litigation. We're not at all.

So again, I think we've [inaudible] the right place in the markets, but if you go back to the slide before, certainly we do want to move it up the scale there over time. Whether we do that by just increasing the amount we charge for the patent or, whether we do it by adding product or technology or products or other things to improve the amount [inaudible] we'll see it over time. But certainly we do want to move it up. And I think we're pretty good at finding a place in the market, or at least a [price point] in the market that makes sense.

UNIDENTIFIED AUDIENCE MEMBER: [inaudible question-microphone inaccessible]

BILL MERRITT: We've had - the portfolio is very large, and you're always going to have patents in the portfolio that will get challenged and you're going to win some and you're going to lose some. And this part of the licensing and patents [inaudible] for us. So we don't put a lot of value on anyone patent at anyone time. It's an entire portfolio of patents that has held up very well over time. But we've had some wins and losses and draws over time.

UNIDENTIFIED AUDIENCE MEMBER: [inaudible question-microphone inaccessible]

BILL MERRITT: Well Lucent took our license for CDMA 2000 for [it's] U.S. sales and paid $14 million on that. Infrastructure is interesting, because -- while the infrastructure itself is a much larger device than the handset, there's actually a lot of other things in infrastructure this is not the link to the patent. So at the end of the day the royalty base is pretty small.

Lucent is also involved in WCDMA, as well as shipments of CDMA 2000 outside the United States. So certainly they're another company we would want to license with. The focus though for the company is primarily terminal use, and it's where they value it. It's not to say that the infrastructure part of the equation is one we're going to ignore, but if we're looking at where do we spend our energy, it's more on the terminal use side.

AVIE SAUFER: [Inaudible] and the breakout session is right down the hall. [Inaudible]

## InterDigital, a significant power in TD-SCDMA industry
VIP Interview with InterDigital



InterDigital Communications Corporation (NASDAQ:IDCC) is a recognized pioneer in the design, development and delivery of advanced wireless communication platforms. InterDigital began developing its standards compliant TDD technology in late 1990s, and is now one of the board members of TD-SCDMA Forum. On July 25, 2005, Journalist (J) from TD-SCDMA Forum interviewed Mr. Donald M. Boles (B), Senior Vice President and Chief Patent Strategist of InterDigital.

J : What is the contribution of InterDigital to TD-SCDMA and 3G?

B: InterDigital has a rich heritage in developing advanced wireless technology solutions for 2G, 2.5G, 3G and 802 standards. With respect to InterDigital's innovation for 3G, we have a robust suite of air transport technologies including WCDMA FDD (Release 99/Release 4) TDD and HSDPA, the next generation of FDD. We believe a substantial amount of our TDD technology applies to other TDD technologies, such as TD-SCDMA. It's important to note that the company is an active participant in the worldwide standards bodies and has made many contributions to the 3G standards.

J: What are InterDigital's products and solutions?

B: InterDigital has an extensive portfolio of 2G, 2.5G, 3G and 802 technology solutions and intellectual property. Our technology solutions are comprised of patented inventions, software, reference designs, and know-how. InterDigital offers a complete WCDMA solution, offering FDD and TDD, HSDPA, and WLAN. The company provides baseband designs, protocol software, Adaptive Interference Management? Solutions, and engineering services.

J: Do you have any plan in LCR development?

B: We believe that much of our TDD technology development work applies to other TDD technologies, such as TD-SCDMA. The development of the LCR version of TDD will depend largely on the market potential for deployment.

J: What's your main IPR on TDD and 3G?
B: As a pioneer in 3G technologies, InterDigital has made a large number of inventions in both FDD and TDD. Furthermore, we continue to drive the evolution of 3G with innovations in HSDPA and HSUPA. As one would expect, InterDigital holds essential IPR in variations of 3G, including FDD, TDD and CDMA.

J: What is the proportion of your IPR in all the 3G IPR?
B: As a developer of CDMA technology since 1992, InterDigital has a robust portfolio of 3G IPR. Through our active participation in the worldwide 3G standard bodies and our innovative technology development efforts we have become a recognized provider of 3G technologies.

J: Besides air interface, what IPR in other area do you have?
B: It's important to note that with respect to IPR for air transport technologies, InterDigital has IPR throughout the various layers of the air transport – Layers 1 through 3. In addition to air transport technology IPR, InterDigital also has IPR for smart antenna and RF management technologies.

J: Do you have any partners in TD-SCDMA area?
B: At present, we do not have any partners in the TD-SCDMA area. As we continue to monitor the evolution of TD-SCDMA, we also continue to evaluate potential partnership opportunities.

J: What about InterDigital's IPR in other countries?
B: As the mobile industry has become global, InterDigital has been filing its patents in most major markets – in more than 50 countries -- around the world. In the 2G field, we have licensed about 70-75% of the market. In 3G, our list of licensees and customers continues to grow.

J: What is your future plan for TD-SCDMA development?
B: InterDigital continues to monitor the favorable developments of TD-SCDMA. Our further commitment depends largely on China's commitment in this field, and the potential migration of TD-SCDMA outside of China.

J: Where do you think TD-SCDMA will prosper outside China?
B: No one knows. If I have to guess, I think the potential for TD-SCDMA deployment outside of China is in developing markets, such as India, Pakistan, countries of the former Soviet Union, etc.

J: Do you have any traditional sense products? Where does your revenue come from? How much revenue does InterDigital get from its IPR?
B: InterDigital's products are in the form of technology solutions such as software, reference designs, specifications, algorithms and know-how. Our asset is our people and our product is our technology. InterDigital's annual revenue is more than 100 million US dollars. The majority of the company's revenues are currently generated through patent licensing. InterDigital also generates revenue from technology transfers and IP product sales.

J: What are your comments and suggestions on the TD-SCDMA Forum?
B: We believe the Forum has been active and professional. The Forum has done an excellent job in bringing together the regulators, the network operators, and the equipment vendors. We hope that we can continue to rely on the TD-SCDMA Forum as our main information source and contact for the Chinese market. We also believe that the Forum can play a key role in positioning Chinese manufacturers in the global market.

# News Release

# InterDigital®

*Wireless technologies to move your ideas™*

Media Contact:
Susan Sutton
e-mail: susan.sutton@interdigital.com
Investor Contact:
Janet Point
e-mail: janet.point@interdigital.com
(610) 878-7800

InterDigital Communications Corporation
781 Third Avenue
King of Prussia, PA 19406-1409

FOR IMMEDIATE RELEASE
January 16, 2002

### INTERDIGITAL AND NEC SIGN GLOBAL 3G PATENT LICENSE AGREEMENT AND SETTLE OUTSTANDING 2G PATENT LICENSING DISPUTE

King of Prussia, PA, January 16, 2002 . . . InterDigital Communications Corporation (NASDAQ: IDCC), a leading developer and enabler of advanced wireless technologies and product platforms, today announced that its subsidiary, InterDigital Technology Corporation (ITC), has entered into a royalty-bearing license agreement with NEC Corporation of Japan for sales of wireless products compliant with all Third Generation (3G) and narrowband CDMA standards. The Company concurrently reached an amicable settlement of its Second Generation (2G) patent licensing dispute with NEC in connection with a 1995 license agreement.

Under the 3G agreement, ITC will receive a royalty on each licensed product sold by NEC. The licensed products include infrastructure, terminal units, communication cards and other mobile devices compliant with Third Generation and narrowband CDMA standards. NEC will pay ITC an advance royalty of $19.5 million. Once that advance is exhausted, NEC will be obligated to pay additional recurring royalties to ITC as it sells licensed products. In addition, NEC and ITC agreed to settle the outstanding 1995 2G TDMA license agreement dispute for the payment by NEC of $53 million to ITC. The $53 million is in addition to the royalty advance previously paid by NEC under the 1995 agreement. In exchange for those payments, NEC's royalty obligations for PHS and PDC products under the 1995 agreement will be considered paid up. Otherwise, the 1995 agreement will remain materially unaltered by the settlement. Currently, NEC has no further royalty payment obligations under that agreement based on existing pre-paid units and certain other unique provisions included in the 1995 agreement.

"We are very pleased to welcome NEC as an ITC 3G patent licensee, while also reaching an amicable resolution of the outstanding patent dispute between us," said Howard Goldberg, President and Chief Executive Officer of InterDigital. "NEC is a key global supplier of telecommunications equipment worldwide, and the number one supplier of 3G telecommunications products in Japan, the country which is leading the world in 3G rollout. This licensing agreement with NEC, combined with our previous 3G agreements with Sharp, Matsushita, and Japan Radio Company demonstrates the strength of ITC's expanding 3G patent portfolio. Our broad portfolio of essential patents, along with InterDigital's 3G products and technology, will serve to fuel the Company's revenue growth as the 3G market emerges."

"The 3G patent licensing program at ITC continues to gain momentum," added William J. Merritt, President of ITC. "We have executed four 3G license agreements in the last ten months, including agreements with the top two manufacturers in Japan. We anticipate continued success in 2002, as additional companies come to recognize the breadth and scope of ITC's 3G related inventions realized over 15 years of research and development. We are well positioned to leverage these key 3G license agreements as other global markets emerge."

-more-

Given the complexity of accounting for revenue associated with multi-faceted agreements, the Company and its auditors have not finalized the manner in which revenue will be recognized for payments to be received under these agreements.

**About NEC Corporation**

NEC Corporation (NASDAQ: NIPNY) (FTSE: 6701q.l) is a leading provider of Internet solutions, dedicated to meeting the specialized needs of its customers in the key computer, network and electron device fields through its three market-focused in-house companies: NEC Solutions, NEC Networks and NEC Electron Devices. NEC Corporation, with its in-house companies, employs more than 150,000 people worldwide and saw net sales of 5,409 billion Yen (approx. US$43 billion) in fiscal year 2000-2001. For further information, please visit the NEC home page at: http://www.nec.com.

NEC is a trademark of NEC Corporation.

**About InterDigital Communications Corporation**

InterDigital develops advanced wireless technologies and products that drive voice and data communications. The Company offers technology and product solutions for mainstream wireless applications that deliver cost and time-to-market advantages for its customers. InterDigital has a strong portfolio of patented TDMA, GSM/GPRS and CDMA inventions, which it licenses worldwide. For more information, please visit InterDigital's web site: www.interdigital.com.

InterDigital is a trademark of InterDigital Communications Corporation.

###

This press release contains forward-looking statements regarding, among other things, the continued success in our patent licensing program, our ability to leverage existing agreements, and the growth in ITC's 3G related patent license revenue. Such statements are subject to risks and uncertainties. Actual outcomes could materially differ from those expressed in any such forward-looking statements due to a variety of factors. These factors include, but are not limited to ITC's ability to obtain and maintain key patents worldwide, inability to conclude licensing agreements upon mutually acceptable terms, failure of licensees to meet sales expectations, and the failure of the 3G market to materialize at all or at the rate or pace that we expect, as well as other factors listed in the Company's most recently filed 10-K Annual Report. InterDigital undertakes no duty to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise.

# News Release

# InterDigital®

*Wireless technologies to move your ideas™*

InterDigital Communications Corporation
781 Third Avenue
King of Prussia, PA 19406-1409

Media Contact:
Susan Sutton
e-mail: susan.sutton@interdigital.com
Investor Contact:
Janet Point
e-mail: janet.point@interdigital.com
(610) 878-7800

FOR IMMEDIATE RELEASE
January 15, 2002

### INTERDIGITAL EXPANDS WORLDWIDE PATENT LICENSE WITH JAPAN RADIO COMPANY

#### Agreement Covers FDD and TDD for All Modes of 3G Products

King of Prussia, PA, January 15, 2002 . . . InterDigital Communications Corporation (Nasdaq: IDCC) today announced that its subsidiary, InterDigital Technology Corporation (ITC), has expanded its worldwide royalty-bearing patent license with Japan Radio Co., Ltd. (JRC) to include Narrowband CDMA and 3G products. The new agreement expands license coverage to include wireless devices, whether fixed or mobile, and infrastructure equipment, built to GSM, Narrowband CDMA (including the IS-95 and CDMAOne technology specifications) and all 3G standards, including both FDD and TDD for W-CDMA, as well as TDMA based specifications.

"Over the last twelve months, we executed three new 3G patent licenses with Matsushita, Sharp and now JRC," said Howard E. Goldberg, President and Chief Executive Officer of InterDigital. "These three agreements are strong evidence of InterDigital's growing momentum in the 3G market and reflect the industry's recognition of the importance of ITC's 3G essential patent portfolio. These agreements are designed to deliver growing revenue as licensed products are sold. We expect to continue these successes in 2002."

William J. Merritt, President and Director of ITC, stated, "This agreement with JRC is further proof of the major contributions to 2G and 3G technologies made by InterDigital. Our patent portfolio now stands at over 3,600 patents and patent applications worldwide, covering TDMA and CDMA inventions conceived over a 15-year period. In 2001 alone, we secured 42 additional patents worldwide and filed for an additional 249 patents worldwide. InterDigital's inventors are contributing to the advancement of wireless technologies, and their patents are providing a growing revenue source for the Company."

In accordance with SAB 101, InterDigital will recognize royalty revenue as JRC reports sales of products licensed under the agreement. JRC signed a worldwide royalty-bearing TDMA patent license with ITC in 1999 and is now licensed under both ITC's TDMA and CDMA patents around the world.

For more information on Japan Radio Co., Ltd., please visit: http://www.jrc.co.jp/index-e.html.

-more-

InterDigital develops advanced wireless technologies and products that drive voice and data communications, offering solutions for mainstream wireless applications that deliver cost and time-to-market advantages for its customers. By leveraging its technology and intellectual property into third generation standards and products, the Company is maximizing its long-term revenue and earnings opportunities. InterDigital has a strong portfolio of patented TDMA, GSM/GPRS and CDMA inventions, which it licenses worldwide. For more information, please visit InterDigital's web site: www.interdigital.com.

InterDigital is a trademark of InterDigital Communications Corporation.

CDMAOne is a trademark of Qualcomm Incorporated.

### 

This press release contains forward looking statements regarding, among other things, the continued success in our patent licensing program and the growth in ITC's patent license revenue. Such statements are subject to risks and uncertainties. Actual outcomes could materially differ from those expressed in any such forward-looking statements due to a variety of factors. These factors include, but are not limited to ITC's ability to obtain and maintain key patents worldwide, changes to the 3G standard in a manner that adversely affects the applicability of our patents to the standards, inability to conclude licensing agreements upon mutually acceptable terms, failure of licensees to meet sales expectations, and the failure of the 3G market to materialize at all or at the rate or pace that we expect, as well as other factors listed in the Company's most recent filed 10-k Annual Report. InterDigital undertakes no duty to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise.

Hop-On enters royalty agreement with InterDigital        Page 1 of 2

 

you are here: Home >> 3G News

**Recent News**

Sony Ericsson introduces 3G Z610, August 22, 2006

ATI drives multimedia in 2G and 3G mobile phones, August 22, 2006

CDMA2000 coverage on major Caribbean Islands, August 22, 2006

Indonesia emerges as a hotbed for CDMA2000, August 22, 2006

Vivo selects HUAWEI to build the 3G-oriented GSM network, August 22, 2006

Mitsubishi Electric and Toshiba gains ground among GaAs device manufacturers, August 22, 2006

MiTV goes 3G with Ericsson, August 21, 2006

NTT DoCoMo to implement new congestion control system for 3G FOMA network, August 21, 2006

Bouygues Telecom moves to 3G with Nortel, August 21, 2006

EDGE handset shipments to reach 148 million in 2006, August 21, 2006

previous news

Search

# Hop-On enters royalty agreement with InterDigital

December 18, 2002

Hop-On, a developer of disposable and fully recyclable cell phones, announced that its subsidiary, Hop-On Wireless, and InterDigital Technology Corporation (ITC), a subsidiary of InterDigital Communications Corporation, have entered into a royalty-bearing license agreement covering Hop-On's manufacture and sale of wireless communications products compliant with TDMA 2G and multiple 3G standards.

Under the agreement, ITC has granted Hop-On a worldwide, non-exclusive license under InterDigital's patents to develop, manufacture and sell wireless devices built to Second Generation TDMA standards, including IS-54/136, GSM, GPRS, EDGE and others; and all 3G standards, including FDD and TDD for WCDMA, TD-SCDMA, and CDMA2000. Under the terms of the agreement, ITC will receive a royalty on each licensed product sold by Hop-On.

"This agreement reflects our ongoing success in licensing manufacturers worldwide that are producing to the primary 2G and 3G wireless standards," stated William J. Merritt, President of ITC. "It further validates InterDigital's position as a recognized developer and contributor of essential technology while also demonstrating the positive impact of our recent acquisition of exclusive patent licensing rights from Tantivy Communications, particularly as it relates to CDMA2000."

Peter Michaels, Chairman and CEO of Hop-On, commented, "This agreement significantly expands our access to critical intellectual property and will enable us to move forward in our production of additional low-priced handset models. Our first priority will be to address the needs of the international markets where GSM is the dominant protocol."

| Top Sellers at our online store |
| --- |
| 1.  NEC e606 on 3 |
| 2.  Orange Nokia 7250i |
| 3.  O2 Samsung A800 |
| 4.  NEC e808 on 3 |
| 5.  Motorola A920 on 3 |
| last updated: January 12, 2004 |
| Visit our online store, click here |

| 3 phones |
| --- |
|  3G Motorola A920 Available Now! Superb full colour touch- sensitive screen with a built-in digital camera for Video Calling. Buy now from Free |

**M-Profits: Making Money from 3G Services**
*ISBN: 0470847751*

 This book discusses 3G services from the view of what is needed for the service to provide value to the user, what is the value proposition for the user, how will money be made out of delivering the service, and discussions on how revenue sharing propositions might work to benefit content providers and network operators. 3G operators should take note of this highly recommended book.

# EXHIBIT  F

March 27, 2007

THE
HARTFORD

<u>**Via Certified Mail, Return Receipt Requested**</u>
Mr. Stephen J. Mathes
Hoyle, Fickler, Herschel & Mathes LLP
Suite 1500
One South Broad Street
Philadelphia, PA 19107-3418

RE: *Nokia Corp. and Nokia, Inc. v. InterDigital
   Communications Corp.   and InterDigital
   Technology Corp.*
   **Hartford Claim File No.: YCH LP 44967**
   **Our File No.: 1565301 - 25**

Dear Mr. Mathes:

  I am writing in response to your firm's tender of the Amended Complaint filed in the above-referenced *Nokia v. InterDigital* action (hereinafter the "*Nokia* action"). We have now completed our review of the allegations of Nokia's Amended Complaint, which we understand the *Nokia* court has since accepted for filing, and the potential coverage, if any, available for those claims. We regret to inform you that the Hartford Fire Insurance Company ("Hartford Fire") and Hartford Casualty Insurance Company ("Hartford Casualty") (referred to herein collectively as "Hartford") continue to deny coverage for the *Nokia* action -- under both the Hartford Fire and the Hartford Casualty policies issued to InterDigital Communications Corporation ("ICC") and/or InterDigital Technology Corporation ("ITC") (collectively referred to herein as "InterDigital").

  As discussed further below, the *Nokia* action, including the allegations in the Amended Complaint, does not allege "bodily injury", "property damage" or "personal and advertising injury" covered by the Hartford policies. As such, Hartford has neither a duty to defend nor a duty to indemnify InterDigital in connection with the *Nokia* action.

## I. FACTUAL BACKGROUND

  Please refer to the January 12, 2006 letter of Gale White, Esquire of White and Williams to yourself which contains a discussion of the background of this matter. Since then, we understand that Nokia has filed an Amended Complaint and we have reviewed additional materials from the *Nokia* action which further detail Nokia's claims.

### A. <u>Nokia's Amended Complaint</u>

  Nokia's Amended Complaint sets forth fourteen (14) cause of actions against InterDigital. Nokia's Amended Complaint differs from Nokia's initial complaint in that

Hartford Plaza RT18-2
Hartford, CT 06115
Mailing Address: 690 Asylum Avenue
Hartford, CT 06115
Telephone 860 547 5000
Facsimile 860 547 8782

least three respects: (1) Nokia does not repeat the numerous patent invalidity/non-infringement counts raised in the initial complaint (which counts we understand have since been dismissed), (2) Nokia alleges two separate Lanham Act claims, and (3) Nokia adds a number of state law claims. *See* Nokia's Amended Complaint.

Like the initial complaint, however, Nokia alleges throughout the Amended Complaint that InterDigital's actions were "willful and in bad faith", and that InterDigital made false and misleading statements "in bad faith and with knowledge of their falsity." *See, e.g., id.* at ¶¶ 57, 65.

**B.     Statements Identified by Nokia as Supporting its Claims Against InterDigital**

We understand that in the course of discovery in the *Nokia* action, Nokia has identified numerous statements allegedly supportive of its claims against InterDigital. Certain of the statements identified by Nokia appear to have been made outside of Hartford's coverage territory and others have been made outside the Hartford policy periods.

For example, we understand that on June 30, 2006, Nokia's filed its Statement Pursuant to First Discovery Order. In that initial Statement, Nokia identified twenty-one (21) statements in support of its allegations that "InterDigital has repeatedly made public statements that its patent portfolio covers the practice of 3G wireless phone systems and the sale of 3G complaint products." Those 21 statement were organized into four general categories:

> (1) statements made in InterDigital's filings with the United States Securities and Exchange Commission (seven statements);
>
> (2) statements on the InterDigital website (five statements);
>
> (3) statements made through various news outlets (seven statements); and
>
> (4) declarations to the European Telecommunications Standards Institute ("ETSI") (two statements).

We further understand that on August 15, 2006, Nokia served its First Supplemental Objections and Responses to InterDigital's Interrogatories. Therein, Nokia identified four categories of statements at issue, including:

> (1) InterDigital's essentiality declarations to the European Telecommunications Standards Institute ("ETSI"). The first of these declarations was made on April 10, 2001.
>
> (2) InterDigital's 3G licensing presentations to Nokia in January 2002 and June 2003, wherein InterDigital allegedly contended that certain patents were essential to certain 3G standards. The

presentations reportedly were memorialized in two PowerPoint presentations. **(Should InterDigital continue to believe that these claims are covered, please provide copies of these PowerPoints and any other statements made at these presentations.)**

(3) InterDigital's public statements, to the media and other persons or entities, regarding the essentiality of its patents, including but not limited to statements dating back to at least 1999; and

(4) Statements in InterDigital's SEC filings, including those dating back to at least 2000.

We also have reviewed some of the (redacted) exhibits to InterDigital's proposed December 2006 Summary Judgment brief, wherein InterDigital summarizes the statements it believes are at issue in Nokia's initial complaint. **(Should InterDigital continue to believe that this matter implicates coverage, please provide us with an unredacted.)** InterDigital attached copies of many of those statements to its summary judgment papers. InterDigital's summary similarly identifies statements made outside of Hartford's coverage territory and/or made prior to the Hartford policy periods.

In all, Nokia and InterDigital appear to have identified twenty-four (24) alleged statements of InterDigital. Exhibit A hereto attaches a chart we have prepared identifying those statements. **If you are aware of any other statements at issue in the _Nokia_ action, please let us know and provide us with copies of any pleadings or discovery concerning any such statements.**

## II.    HARTFORD POLICIES

Hartford Fire issued the following two commercial general liability policies to ICC as the named insured: (a) Policy No. 39 UUN TS 0845 DB for the December 22, 2003 to December 22, 2004 policy period; and (b) Policy No. 39 UUN TS 0845 K1 for the December 22, 2004 to December 22, 2005 policy period. The Hartford Fire general liability policies provide coverage subject to, among other things, a $1 million per occurrence limit, a $1 million personal and advertising injury limit, and a $2 million general aggregate limit.

Hartford Casualty issued the following two umbrella policies to ICC as the named insured: (a) Policy No. 39 RHU TS 0953 for the December 22, 2003 to December 22, 2004 policy period; and (b) Policy No. 39 RHU TS 0953 for the December 22, 2004 to December 22, 2005 policy period. The Hartford Casualty umbrella policies each provide coverage subject to a $10,000 self-insured retention, a $15 million per occurrence limit, and a $15 million general aggregate limit.

In addition to the above four policies Hartford also continued to provide coverage to InterDigital after December 2005. This letter focuses primarily on the four above Hartford policies; however, please note that Hartford denies coverage under any and all policies issued by Hartford including but not limited to any policies providing coverage to

InterDigital after December 2005. <u>To the extent that InterDigital claims that it is entitled to coverage under any other Hartford policies, other than the four specifically mentioned above, please let us know and identify such policies so that we can further detail why coverage does not exist under those policies.</u> For now, Hartford denies coverage under all of its policies for all of the reasons set forth herein and in Hartford's prior correspondence, including but not limited to Hartford's January 12, 2006 letter and Hartford's earlier declination of coverage.

**III.    HARTFORD CONTINUES TO DENY COVERAGE FOR THE *NOKIA* ACTION**

### A.    Who Is an Insured

InterDigital Communications Corp. is the Named Insured to each of the Hartford policies. InterDigital Technology Corp. is not expressly listed as a Named Insured or an additional insured to the Hartford policies.

You have advised that ITC is "(i) a direct, wholly-owned, subsidiary of InterDigital Communications Corporation and (ii) not an insured under another policy." Assuming those statements are true, ITC appears to qualify as an insured; however, Hartford continues to reserve all rights to deny coverage to ITC to the extent that it is not in fact an insured to any of the Hartford policies. Should ITC continue to seek coverage for the *Nokia* action, Hartford reserves the right to demand proof that ITC is in fact an insured and that it is not an insured under any other policy.

### B.    Hartford Has No Duty to Defend

Pursuant to the InterDigital CGL policies, Hartford Fire has "the right and duty to defend" the insured against any suit seeking covered damages. Hartford Fire is not obligated, however, to defend or indemnify a "suit" that does not seek covered damages.

The Hartford Casualty umbrella policies provide a duty to defend "bodily injury", "property damage" and/or "personal and advertising injury" to which the insurance applies and for which either there is no "underlying insurance" or the "underlying insurance" has been exhausted by payments of "damages" for "occurrences" within the "policy period." Hartford Casualty has no duty to defend a suit which does not seek damages covered by the umbrella policies.

For the reasons set forth below, Hartford denies any duty to defend because the *Nokia* action, including the Amended Complaint, does not seek covered damages.

Should it later be determined that Hartford is or was obligated to provide a defense to the *Nokia* action, Hartford reserves the right to deny coverage for, including any duty to defend or to pay/reimburse defense costs related to, uncovered claims and/or InterDigital's prosecution of its own claims against Nokia. Hartford similarly reserves the right to seek allocation and/or reimbursement (to the extent that Hartford later makes any payment) of any fees or costs not reasonably related to the defense of a covered

claim.

### C.    "Bodily Injury" and "Property Damage" Coverage

Hartford Fire's general liability policies provide that Hartford Fire will pay certain sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which the insurance applies.

As to coverage for "bodily injury" or "property damage", any such injury or damage must be caused by an "occurrence" that takes place in the "coverage territory" during the policy period. The term "occurrence" is defined in the Hartford Fire policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The Hartford Fire policies define "bodily injury" as "bodily injury, sickness or disease sustained by a person, including mental anguish or death resulting from any of these at any time." "Property damage" is defined in the Hartford Fire policies as "physical injury to tangible property, including all resulting loss of use of that property . . . ." and as "[l]oss of use of tangible property that is not physically injured. . . ."

The *Nokia* Amended Complaint does not allege "bodily injury" or "property damage" caused by an "occurrence" as those terms are defined in the Hartford policies.

It is our understanding based upon InterDigital's replies to Hartford's prior denial letters that InterDigital does <u>not</u> dispute the denial of "bodily injury" and "property damage" coverage. Accordingly, we do not address in this letter the various exclusions to "bodily injury" and/or "property damage" coverage which may further preclude coverage for the *Nokia* action. However, <u>**if InterDigital does contend that covered "bodily injury" and/or "property damage" are alleged in the *Nokia* Amended Complaint, please let us know as soon as possible.**</u> Hartford will, at that time, cite the other policy provisions and exclusions which further preclude "bodily injury" and/or "property damage" coverage for the *Nokia* action.

### D.    "Personal and Advertising Injury" Coverage

The Hartford Fire policies provide certain coverage for sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which the insurance applies. The policies state that such coverage applies to "personal and advertising injury" caused by an offense arising out of the named insured's business but only if the offense was committed in the "coverage territory" during the policy period.

The Hartford Fire general liability policies define "personal and advertising injury" as:

> injury, including consequential "bodily injury," arising out of one or more of the following offenses:

a.   False arrest, detention or imprisonment;

b.   Malicious prosecution;

c.   The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d.   Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e.   Oral, written or electronic publication of material that violates a person's right of privacy;

f.   Copying, in your "advertisement" or on "your web site", a person's or organization's "advertising idea" or style of "advertisement";

g.   Infringement of copyright, slogan, or title of any literary or artistic work, in your "advertisement" or on "your web site"; or

h.   Discrimination or humiliation that results in injury to the feelings or reputation of a natural person.

We understand that InterDigital contends that the *Nokia* Amended Complaint is covered under only subparagraph d. above and agrees that the *Nokia* action does not allege any claim that falls with parts a, b, c, e, f, g, and/or h of the "personal and advertising injury" definition.

To the extent that Nokia's claims are based upon InterDigital's statements about its own products/patents, such claims do not constitute libel, slander or disparagement of Nokia or its goods, products or services. To the extent that the Nokia claims are based upon InterDigital's alleged statements about Nokia or Nokia's products, coverage still does not exist for several reasons.

1.   <u>Nokia complains about alleged statements made outside Hartford's "coverage territory"</u>

The Hartford CGL policies define "coverage territory" as:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in a. above; or

c. All other parts of the world if the injury or damage arises out of:

> (1) Goods or products made or sold by you in the territory descried in a. above;

> (2) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; or

> (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic communication

provided the insured's responsibility to pay damages is determined in the United States of America (including its territories and possessions), Puerto Rico and Canada, in a "suit" on the merits according to the substantive law in such territory or in a settlement we agree to. (emphasis added).

A number of the statements upon which Nokia's claims are based appear to have been made outside of the Hartford policies' coverage territory -- such as the statements to the ETSI. Also, depending upon where InterDigital's licensing statements/presentations were made, those statements also may fall outside Hartford's "coverage territory."

Hartford denies all coverage for any claims based upon statements made outside the Hartford coverage territory. There is no coverage to the extent that any offense was committed outside the "coverage territory."

**Should InterDigital continue to believe that the *Nokia* action implicates coverage, please identify each and every offense (and all related statements) at issue which you contend was committed in the Hartford coverage territory and provide us with copies of all such statements and information as to where such statement was made.**

2.      <u>Coverage does not exist to the extent that any alleged offense was not committed during the Hartford policy periods</u>

To the extent that the statements at issue were made outside Hartford's policy periods coverage does not exist under the Hartford policies. As such, Hartford denies coverage for any alleged offense committed outside the Hartford policy periods.

Certain of the statements allegedly made by InterDigital have been identified in

the *Nokia* action as taking place outside the Hartford policy period. For example, Nokia contends that beginning in the early 1990s, InterDigital began falsely stating that it had "numerous patent essential to 2G mobile phone standards." *See* Amended Complaint at ¶ 22. Nokia also avers that "[m]ore recently, InterDigital has alleged that its patents are essential to 3G mobile telephone standards, including UMTS, CDMA 2000, and a standard called TD-SCDMA." *See id.* at ¶ 27.

Additionally, as noted on Exhibit A hereto, of the twenty-four (24) statements identified by Nokia as supportive of its *claims*, most have been identified by Nokia as occurring outside the Hartford policy periods.

Hartford denies coverage for any offense based upon a statement made outside the Hartford policy periods.

We also understand that InterDigital has averred in the *Nokia* action that Nokia's claims are time-barred based on the applicable statute of limitations. **Should InterDigital continue to believe that these claims are covered under the Hartford policies, please identify any claims (and related statements) which InterDigital contends are time-barred and the date of each such offense (and related statement).**

### 3.    Coverage is precluded by one or more of the exclusions to "personal and advertising injury" coverage

The Hartford Fire policies bar coverage for "personal and advertising injury" to the extent precluded by the various policy exclusions, including but not limited to those set forth below:

a.    Knowing Violation of Rights of Another

"Personal and advertising injury" caused by an offense committed by, at the direction or with the consent or acquiescence of the insured with the expectation of inflicting "personal and advertising injury."

b.    Material Published with Knowledge of Falsity

"Personal and advertising injury" arising out of oral, written or electronic publication of material, if done by or at the direction of the insured with knowledge of its falsity.

c.    Material Published Prior to Policy Period

"Personal and advertising injury" arising out of oral, written or electronic publication of material whose first publication took place before the beginning of the policy period.

* * *

g.    Quality or Performance of Goods - - Failure to
Conform to Statements

"Personal and advertising injury" arising out of the failure
of goods, products, or services to conform with any
statement of quality or performance made in your
"advertisement" or on "your web site";

\* \* \*

i.    Infringement of Intellectual Property Rights

"Personal and advertising injury" arising out [of] any
violation of any intellectual property rights such as
copyright, patent, trademark, trade name, trade secret,
service mark or other designation of origin or authenticity.

\* \* \*

Hartford denies coverage for the *Nokia* action, including the claims in the
Amended Complaint, based upon Exclusion a. (Knowing Violation of Rights of Another)
and Exclusion b. (Material Published with Knowledge of Falsity).

Among other things, both the *Nokia* complaint and the *Nokia* Amended
Complaint allege both (a) that InterDigital has used false or misleading descriptions and
has made false public statements regarding the scope of its patent portfolio and the
applicability of its patents, and (b) that these statements were made in "bad faith" and
with "knowledge of their falsity." *See, e.g., Nokia* complaint, ¶¶ 142-143, 146; Amended
Complaint, ¶¶ 40, 57, 65. These allegations are incorporated into and made a part of each
of Nokia's claims in the Amended Complaint.

Further, we understand that the Court in the *Nokia* action will require proof of
"bad faith" in order for Nokia to prevail on its Lanham Act claim. *See Nokia Corp. v.
InterDigital Communications*, 2005 WL 3525696, \*5 (D. Del. Dec. 21, 2005). Thus,
Nokia cannot prevail on its claim without proving facts implicating one or both of these
exclusions. Hartford reserves the right to further deny coverage to the extent public
policy precludes coverage for such bad faith misconduct.

Hartford also denies coverage to the extent precluded by the remaining policy
exclusions. for instance, Exclusion c. (Material Published Prior to Policy Period) bars
coverage for the *Nokia* action to the extent that Nokia's claims are based upon material
first published prior to December 22, 2003 – the inception of the Hartford policies. Here,
Nokia's Amended Complaint and its discovery responses reference InterDigital's
statements dating back to years before the Hartford policies incepted. Additionally,
statements allegedly made during the Hartford policy periods appear to be publications of
material first whose first publication took place before the beginning of the policy period.

Exclusion g. (Quality or Performance of Goods - - Failure to Conform to

Statements) bars coverage for the *Nokia* action to the extent that Nokia alleges that InterDigital made false claims that InterDigital's patent portfolio covers 3G wireless phone systems.

Exclusion i. (Infringement of Intellectual Property Rights) bars coverage for the *Nokia* action because, *inter alia*, the claims in the *Nokia* complaint arise out of a dispute concerning intellectual property rights. Nokia's claims arise out of statements allegedly made by InterDigital regarding the scope of its patent portfolio and Nokia's possible violation of such patents.

### E.    Hartford Casualty Umbrella Policies Also Do Not Provide Coverage

The Hartford Casualty umbrella policies provide that Hartford Casualty "will pay those sums that the 'insured' becomes legally obligated to pay as 'damages' in excess of the 'underlying insurance,' . . . because of 'bodily injury,' 'property damage,' or 'personal and advertising injury' to which this insurance applies because of an 'occurrence.'"

The Hartford Casualty policies define "occurrence" as:

> 1.    With respect to any "bodily injury" or "property damage":    an accident, including continuous or repeated exposure to   substantially the same general harmful conditions, and

> 2.    With respect to "personal and advertising injury":    an    offense described in one of the numbered subdivisions of        that definition in the "underlying insurance".

The terms "bodily injury," "property damage" and "personal and advertising injury" are not otherwise defined within the Hartford Casualty umbrella policies and thus, according to the umbrella policies, "shall follow the definitions of the applicable 'underlying insurance' policy" – that is, the Hartford Fire policy definitions set forth above.

For all of the reasons set forth above in discussing the Hartford Fire policies' coverage, Hartford Casualty denies any duty to defend or indemnify InterDigital in connection with the *Nokia* action, including the claims asserted in the Amended Complaint. The claims in the *Nokia* action do not seek recovery of damages because of "bodily injury," "property damage" or "personal and advertising injury" to which the Hartford Casualty policies apply.

The Hartford Casualty policies also contain a Personal and Advertising Injury exclusion which provides:

> 4.    Personal and Advertising Injury

> This policy does not apply to "personal and

advertising injury."

### EXCEPTION

This exclusion does not apply if "underlying insurance" is applicable to "personal and advertising injury" and to "personal and claims arising out of that advertising injury."

Additionally, the Hartford Casualty umbrella policies contain an endorsement entitled Amendment of Insuring Agreement -- Known Injury or Damage, which provides *inter alia*:

(2) This insurance applies to "bodily injury", "property damage" or "personal and advertising injury" only if:

(a) The "bodily injury", "property damage" or "personal and advertising injury" occurs during the "policy period"; ...

Hartford reserves the right to further deny coverage under the umbrella policies to the extent precluded by the Personal and Advertising Injury exclusion and/or falling outside the insuring agreement, as amended by the Known Injury or Damage endorsement.

F.      **"Damages"**

Under the Hartford policies, Hartford is only obligated to pay sums that the insured is legally obligated to pay as "damages." The Hartford Casualty umbrella policies define the term "damages" as used in those policies so as <u>not</u> to include "1. Fines; 2. Penalties; or 3. Damages for which insurance is prohibited by the law applicable to the construction of this policy."

Should it later be determined that Hartford has a duty to defend and/or indemnify the *Nokia* action (which Hartford denies), Hartford reserves the right to deny coverage for any relief awarded against InterDigital, including but not limited to any injunctive or equitable relief or punitive or enhanced damages that may be awarded, which do not involve the payment of "damages" as such term is used in the policies. Hartford further reserves the right to deny coverage for any relief, such as any punitive or enhanced damages which may later be awarded, to the extent coverage is precluded by applicable law (in addition to being expressly excluded by the policies).

G.      **Other Insurance**

As noted above, Hartford denies coverage to the extent that Nokia's claims are based upon, *inter alia*, offenses committed outside the Hartford coverage territory (*e.g.*, the ETSI related claims) and/or are based upon statements either (a) made prior to the

Hartford policy periods, or (b) which are based upon publication of material whose first publication took place before the beginning of the policy period (*e.g.*, the License Presentations and SEC statements).

**To the extent that InterDigital continues to believe that it is entitled to coverage from Hartford, Hartford requests that InterDigital immediately place all other insurers of notice of this claim – including any insurers who provided coverage prior to the inception of the Hartford policies and any insurers providing coverage for international offenses – due to the fact that certain of the statements at issue are alleged to have been made outside the Hartford coverage territory and/or Hartford policy periods.**

The Hartford policies contain other insurance provisions which provide that Hartford's obligations under the policies may be affected by the presence of other insurance.

The Hartford CGL policies contain other insurance provisions which provide that Hartford will share with other insurance when both apply on a primary basis.

The Hartford umbrella policies contain an excess other insurance provision which provides:

> this policy shall apply in excess of all "underlying insurance" whether or not valid and collectible. It shall also apply in excess of other valid and collectible insurance (except other insurance purchased specifically to apply in excess of this insurance) which also applies to any loss for which insurance is provided by this policy.

\* \* \*

To the extent that other insurance exists for the *Nokia* action, Hartford's obligations may be altered pursuant to the other insurance provisions.

Hartford reserves the right to further deny coverage to the extent limited by the other insurance provisions and to hold any insured, or any other person or entity, responsible for any increased cost or liability to Hartford arising out of the failure to or delay in tendering this claim to all other insurers.

## IV.    CONCLUSION

For the reasons set forth above, Hartford denies any duty to defend or indemnify InterDigital in connection with the *Nokia* action, including the allegations in the Amended Complaint.

We look forward to InterDigital's response in agreement with Hartford's position. Alternatively, if InterDigital does not agree with Hartford's position, we would appreciate your advise as to the basis of InterDigital's disagreement. We will consider any

additional information or documentation which InterDigital believes support its position on coverage.

Should InterDigital agree that it is not entitled to coverage for the *Nokia* action, please let us know so that we can take steps to have the coverage action dismissed. Alternatively, should InterDigital continue to believe that either ICC and/or ITC are entitled to coverage under any Hartford policy, Hartford will continue to investigate this claim and consider any additional information or materials you wish to provide in support of your claim for coverage. Should InterDigital continue to believe that this claim is covered, please provide us with the following information to the extent not previously provided to Hartford:

1.  Copies of any and all documents reflecting communications between InterDigital and Nokia concerning any of the claims at issue in the *Nokia* action;

2.  Copies of any and all documents evidencing or discussing any allegedly false communication made by InterDigital which is at issue in the *Nokia* action (to the extent that Nokia has identified such communications to InterDigital) and information concerning the dates on which any such communication was made;

3.  Copies of any other insurance policies issued to ICC or ITC, and/or providing coverage to ICC and/or ITC, for any of the time periods at issue in the *Nokia* action, including by not limited to 1990 to the present; and

4.  The identity of all other insurance carriers to which this claim has been tendered (if any), and copies of your tender letters and any response thereto.

Hartford does not waive, and shall not be estopped from asserting, any rights or defenses available under the policies or the law. If Hartford later learns that additional issues bar coverage covered for the above-referenced matter, Hartford reserves the right to assert such issues at such time.

Sincerely,

Michael V. Hebert
The Hartford

cc:     Gale White, Esquire

**InterDigital's Statements Allegedly Forming The Basis Of Nokia's Claims**

| Date of Statement | Source of Statement | Document Identifying Statement At Issue |
|---|---|---|
| 12/31/1999 | Henry J. Holcomb, InterDigital Soars After U.N. Report a New Wireless-Technology Standard Was Adopted, Philadelphia Inquirer | Nokia's Statement at pg. 4; InterDigital's Summary, pg. 3 |
| 1/10/2000 | Video Interview by Bill Griffeth with Howard Goldberg, President, Interdigital Communications Corp. (2000 WLNR 2850752) | Nokia's Statement at pg. 4; InterDigital's Summary, pg. 3 |
| 3/29/2000 | InterDigital Communications Corp. Form 10-K | Nokia's Statement at pg. 2; InterDigital's Summary, pg. 2 |
| 4/2/2001 | InterDigital Communications Corp. Form 10-K | Nokia's Statement at pg. 2; InterDigital's Summary, pg. 2 |
| 4/10/2001 | Declarations submitted by Howard Goldberg, InterDigital's CEO, available at http://webapp.etsi.org/IPR/home.asp | Nokia's Statement at pg. 4; InterDigital's Summary, pg. 4 |
| 1/1/2002 | InterDigital's 3G Licensing Presentation | Nokia's Supplemental Responses at pg. 6 |
| 1/15/2002 | http://www.3Gnewsroom.com/3g_news/jan_02/news_1733.shtml (attributing quote to Howard E. Goldberg, President and CEO of InterDigital) | Nokia's Statement at pg. 3-4; InterDigital's Summary, pg. 3 |
| 1/16/2002 | http://www.3Gnewsroom.com/3g_news/jan_02/news_1743.shtml (attributing quote to Howard E. Goldberg, President and CEO of InterDigital) | Nokia's Statement at pg. 3; InterDigital's Summary, pg. 3 |
| 3/29/2002 | InterDigital Communications Corp. Form 10-K | Nokia's Statement at pg. 2; InterDigital's Summary, pg. 2 |
| 12/18/2002 | http://www.3Gnewsroom.com/3g_news/jan_02/news_2867.shtml (attributing quote to William Merritt, President of InterDigital Technology Corp.) | Nokia's Statement at pg. 4; InterDigital's Summary, pg. 3 |
| 3/31/2003 | InterDigital Communications Corp. Form 10-K | Nokia's Statement at pg. 2; InterDigital's Summary, pg. 1 |
| 6/1/2003 | InterDigital's 3G Licensing Presentation | Nokia's Supplemental Responses at pg. 6 |
| 7/31/2003 | http://www.interdigital.com/press_room_news_archive_detail.jsp?releaseId=547434&cb=1151594870650 | Nokia's Statement at pg. 3; InterDigital's Summary, pg. 2 |
| 12/17/2003 | http://phx.corporate-ir.net/phoenix.zhtml?c=116582&p=irol-newsArticle&ID=547419 | Nokia's Statement at pg. 3; InterDigital's Summary, pg. 3 |
| 12/22/2003 | Elizabeth MacDonald, Pay Up or Else, FORBES | Nokia's Supplemental Responses at pg. 6 |
| 3/15/2004 | InterDigital Communications Corp. Form 10-K | Nokia's Statement at pg. 2; InterDigital's Summary, pg. 1 |

3092005_1.XLS

**InterDigital's Statements Allegedly Forming The Basis Of Nokia's Claims**

| Date of Statement | Source of Statement | Document Identifying Statement At Issue |
|---|---|---|
| 4/8/2004 | Declarations submitted by Donald Boles, InterDigital's Chief Patent Officer, available at http://webapp.etsi.org/IPR/home.asp | Nokia's Statement at pg. 4; InterDigital's Summary, pg. 4 |
|  |  |  |
| 3/31/2005 | InterDigital Communications Corp. Form 10-K | Nokia's Statement at pg. 1-2; InterDigital's Summary, pg. 1 |
| 3/31/2005 | InterDigital Communications Corp. Form 10-K | Nokia's Statement at pg. 1-2; InterDigital's Summary, pg. 1 |
| 7/25/2005 | http://www.tdscdma-forum.org/EN/zl/yjx.asp (attributing quote to Donald Boles, Senior Vice President and Chief Patent Strategist of InterDigital from Interview) | Nokia's Statement at pg. 3; InterDigital's Summary, pg. 3 |
|  |  |  |
| 2/6/2006 | http://phx.corporate-ir.net/phoenix.zhtml?c=116582&p=irol-newsArticle&ID=813104 | Nokia's Statement at pg. 3; InterDigital's Summary, pg. 2-3 |
| 6/12/2006 | William Merritt, Speech at Bear Stearns Annual Technology Conference | Nokia's Statement at pg. 3; InterDigital's Summary, pg. 3 |
| 6/12/2006 | William Merritt, Speech at Bear Stearns Annual Technology Conference | Nokia's Statement at pg. 3; InterDigital's Summary, pg. 3 |
| not provided | www.InterDigital.com/tech_products_licensing.shtml | Nokia's Statement at pg. 2; InterDigital's Summary, pg. 2 |
| not provided | http://www.InterDigital.com/tech_products_introduction.shtml | Nokia's Statement at pg. 3; InterDigital's Summary, pg. 2 |

3092005_1.XLS