## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| **HARTFORD FIRE INSURANCE COMPANY** and **HARTFORD CASUALTY INSURANCE COMPANY** | : | |
| Plaintiffs, | : | CIVIL ACTION NO. 06-cv-422-UNA |
| | : | JURY TRIAL DEMANDED |
| v. | : | |
| **INTERDIGITAL COMMUNICATIONS CORPORATION** and **INTERDIGITAL TECHNOLOGY CORPORATION** | : | **PUBLIC VERSION** |
| Defendants. | : | |

---

### APPENDIX OF EXHIBITS FOR
### BRIEF OF HARTFORD FIRE INSURANCE COMPANY AND
### HARTFORD CASUALTY INSURANCE COMPANY IN SUPPORT OF HARTFORD'S
### CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
### INTERDIGITAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**WHITE AND WILLIAMS**

Attorneys for Plaintiffs, Hartford Fire
Insurance Company and Hartford Casualty
Insurance Company

James S. Yoder, Esquire
Delaware I.D. No.: 2643
White and Williams LLP
824 N. Market Street - Suite 902
Wilmington, DE  19899-0709
(302) 654-0424

and

Gale White, Esquire
Anthony L. Miscioscia, Esquire
White and Williams LLP
1800 One Liberty Place
Philadelphia, PA  19103-7395
(215) 864-6234/6356

Sealed Version
Dated: January 8, 2008

Public Version
Dated: January 11, 2008

PHLDMS1 3845549v.2

## TABLE OF CONTENTS

| **Exhibit** | **Tab** |
|---|:---:|
| Civil Docket for *Nokia* Action | A |
| InterDigital's Original Answer to Nokia's First Amended Complaint and Original Counterclaims | B |
| Plaintiffs' Opening Brief in Support of Motion for Mandatory Stay Pursuant to 28 U.S.C. §1659(a) | C |
| InterDigital's Opposition to Nokia's Motion for Mandatory Stay Pursuant to 28 U.S.C. §1659(a) | D |
| Plaintiffs' Statement Pursuant to First Discovery Order | E |
| Plaintiffs' First Supplemental Objections and Responses to Defendants' First Set of Interrogatories to Plaintiffs | F |
| Defendants' Statement Pursuant to Special Master's First Discovery Order | G |
| Exhibit B to Nokia's First Amended Complaint -- ETSI Guide on Intellectual Property Rights | H |
| ██████████████████████████ | I |
| 2004 – 2005 American International Specialty Lines Insurance Co. policy for InterDigital Communications Corp. | J |
| 2004 – 2005 The Insurance Company of The State of Pennsylvania policy for InterDigital Communications Corp. | K |
| January 4, 2008 Letter from Arleigh Helfer to Anthony Miscioscia | L |

# EXHIBIT  A

MEDIATION, PATENT, PaperDocuments, SPECIALMASTER, STAYED

## U.S. District Court
### District of Delaware (Wilmington)
### CIVIL DOCKET FOR CASE #: 1:05-cv-00016-JJF

Nokia Corporation, et al v. Interdigital Comm., et al
Assigned to: Honorable Joseph J. Farnan, Jr.
Demand: $0
Related Case: 1:06-cv-00422-JJF
Cause: 28:2201 Declaratory Judgment

Date Filed: 01/12/2005
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Special Master**

**Collins J. Seitz, Jr.**

**Plaintiff**

**Nokia Corporation**                    represented by  **Jack B. Blumenfeld**
                                                          Morris, Nichols, Arsht & Tunnell LLP
                                                          1201 North Market Street
                                                          P.O. Box 1347
                                                          Wilmington, DE 19899
                                                          (302) 658-9200
                                                          Email: jbbefiling@mnat.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Julia Heaney**
                                                          Morris, Nichols, Arsht & Tunnell
                                                          1201 North Market Street
                                                          P.O. Box 1347
                                                          Wilmington, DE 19899
                                                          (302) 658-9200
                                                          Email: jhefiling@mnat.com
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Lance A. Lawson**
                                                          Pro Hac Vice
                                                          Email: llawson@alston.com
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Patrick J. Flinn**
                                                          Pro Hac Vice
                                                          Email: pflinn@alston.com
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Nokia Inc.**                           represented by  **Jack B. Blumenfeld**
                                                          (See above for address)

App. 1

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julia Heaney**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lance A. Lawson**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Interdigital Communications**          represented by   **Richard L. Horwitz**
**Corporation**                                           Potter Anderson & Corroon, LLP
                                                          1313 N. Market St., Hercules Plaza, 6th
                                                          Flr.
                                                          P.O. Box 951
                                                          Wilmington, DE 19899-0951
                                                          (302) 984-6000
                                                          Email: rhorwitz@potteranderson.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Dan D. Davison**
                                                          Pro Hac Vice
                                                          Email: ddavison@fulbright.com
                                                          *TERMINATED: 04/13/2007*

                                                          **Darius Dudley Oldham**
                                                          Pro Hac Vice
                                                          Email: doldham@fulbright.com
                                                          *TERMINATED: 04/13/2007*

                                                          **David Ellis Moore**
                                                          Potter Anderson & Corroon, LLP
                                                          1313 N. Market St., Hercules Plaza, 6th
                                                          Flr.
                                                          P.O. Box 951
                                                          Wilmington, DE 19899-0951
                                                          (302) 984-6000
                                                          Email: dmoore@potteranderson.com
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Elizabeth A. Niemeyer**
                                                          Pro Hac Vice
                                                          Email:
                                                          elizabeth.niemeyer@finnegan.com
                                                          *ATTORNEY TO BE NOTICED*

**Elizabeth I. Rogers**
Pro Hac Vice
Email:
elizabeth.rogers@wilmerhale.com
*ATTORNEY TO BE NOTICED*

**Gregory J. Wallace**
Pro Hac Vice
Email: gwallace@wsgr.com
*ATTORNEY TO BE NOTICED*

**Houtan K. Esfahani**
Pro Hac Vice
Email: houtan.esfahani@finnegan.com
*ATTORNEY TO BE NOTICED*

**Jack B. Blumenfeld**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Linda L. Addison**
Pro Hac Vice
Email: laddison@fulbright.com
*TERMINATED: 04/13/2007*

**Lionel M. Lavenue**
Pro Hac Vice
Email: Lionel.lavenue@finnegan.com
*ATTORNEY TO BE NOTICED*

**Mark D. Flanagan**
Pro Hac Vice
Email: mark.flanagan@wilmerhale.com

*ATTORNEY TO BE NOTICED*

**Michael B. Levin**
Pro Hac Vice
Email: mlevin@wsgr.com
*ATTORNEY TO BE NOTICED*

**Nathan L. Walker**
Pro Hac Vice
Email: nathan.walker@wilmerhale.com

*ATTORNEY TO BE NOTICED*

**Patrick J. Coyne**
Pro Hac Vice

Email: patrick.coyne@finnegan.com
*ATTORNEY TO BE NOTICED*

**Qingyu Yin**
Pro Hac Vice
Email: Qingyu.yin@finnegan.com
*ATTORNEY TO BE NOTICED*

**R. Bruce Bower**
Pro Hac Vice
Email: bruce.bower@finnegan.com
*ATTORNEY TO BE NOTICED*

**Richard S. Zembek**
Pro Hac Vice
Email: rzembek@fulbright.com
*TERMINATED: 04/13/2007*

**Ron E. Shulman**
Pro Hac Vice
Email: rshulman@wsgr.com
*ATTORNEY TO BE NOTICED*

**Steven L. Park**
Pro Hac Vice
Email: steven.park@finnegan.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Interdigital Technology Corporation**          represented by   **Richard L. Horwitz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dan D. Davison**
(See above for address)
*TERMINATED: 04/13/2007*

**Darius Dudley Oldham**
(See above for address)
*TERMINATED: 04/13/2007*

**David Ellis Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jack B. Blumenfeld**
(See above for address)
*ATTORNEY TO BE NOTICED*

Linda L. Addison
(See above for address)
*TERMINATED: 04/13/2007*

Richard S. Zembek
(See above for address)
*TERMINATED: 04/13/2007*

**Counter Claimant**

**Interdigital Communications**         represented by   **Richard L. Horwitz**
**Corporation**                                         (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Dan D. Davison**
                                                        (See above for address)
                                                        *TERMINATED: 04/13/2007*

                                                        **Darius Dudley Oldham**
                                                        (See above for address)
                                                        *TERMINATED: 04/13/2007*

                                                        **David Ellis Moore**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Jack B. Blumenfeld**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Linda L. Addison**
                                                        (See above for address)
                                                        *TERMINATED: 04/13/2007*

                                                        **Richard S. Zembek**
                                                        (See above for address)
                                                        *TERMINATED: 04/13/2007*

**Counter Claimant**

**Interdigital Technology Corporation**   represented by   **Richard L. Horwitz**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Dan D. Davison**
                                                        (See above for address)
                                                        *TERMINATED: 04/13/2007*

                                                        **Darius Dudley Oldham**
                                                        (See above for address)

*TERMINATED: 04/13/2007*

**David Ellis Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jack B. Blumenfeld**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Linda L. Addison**
(See above for address)
*TERMINATED: 04/13/2007*

**Richard S. Zembek**
(See above for address)
*TERMINATED: 04/13/2007*

V.

**Counter Defendant**

**Nokia Corporation**               represented by   **Jack B. Blumenfeld**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julia Heaney**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lance A. Lawson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Patrick J. Flinn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Nokia Inc.**                      represented by   **Jack B. Blumenfeld**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julia Heaney**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lance A. Lawson**
(See above for address)

*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/12/2005 | 1 | COMPLAINT filed. Magistrate Consent Notice to Pltf. FILING FEE $ 150.00 RECEIPT # 137606 (mwm) (Entered: 01/13/2005) |
| 01/12/2005 | | DEMAND for jury trial by Nokia Corporation, Nokia Inc. (mwm) (Entered: 01/13/2005) |
| 01/12/2005 | 2 | Disclosure Statement pursuant to Rule 7.1 by Nokia Corporation, Nokia Inc. (mwm) (Entered: 01/13/2005) |
| 01/12/2005 | | SUMMONS(ES) issued for Interdigital Comm., Interdigital Tech. (mwm) (Entered: 01/13/2005) |
| 01/18/2005 | 3 | RETURN OF SERVICE executed as to Interdigital Tech. 1/13/05 Answer due on 2/2/05 for Interdigital Tech. (dab) (Entered: 01/19/2005) |
| 01/19/2005 | 4 | CASE assigned to Judge Joseph J. Farnan Jr. . Notice to all parties. (rjb) (Entered: 01/19/2005) |
| 01/19/2005 | 5 | RETURN OF SERVICE executed as to Interdigital Comm. 1/12/05 Answer due on 2/1/05 for Interdigital Comm. (dab) (Entered: 01/20/2005) |
| 01/28/2005 | 6 | Declaration of Jack B. Blumenfeld, Esq. on behalf of pltf. (afb) (Entered: 01/31/2005) |
| 02/04/2005 | 7 | STIPULATION with proposed order to extend the date by which Interdigital must file and serve an Answer or respond to Nokia's Complaint by 03/15/05. (afb) (Entered: 02/07/2005) |
| 02/10/2005 | | So Ordered granting [7-1] stipulation reset Answer deadline to 3/15/05 for Interdigital Tech., for Interdigital Comm. ( signed by Judge Joseph J. Farnan Jr. ) Notice to all parties. (rbe) (Entered: 02/11/2005) |
| 02/25/2005 | 8 | MOTION and Order for Pro Hac Vice Appearance of Attorneys D. Dudley Oldham, Robert S. Harrell and Richard S. Zembek - filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (mwm, ) (Entered: 02/28/2005) |
| 03/02/2005 | 9 | SO ORDERED, re [8] MOTION for Pro Hac Vice Appearance of Attorney D. Dudley Oldham, Robert S. Harrell and Richard S. Zembek filed by Interdigital Technology Corporation,, Interdigital Communications Corporation . Signed by Judge Joseph J. Farnan, Jr. on 03/01/05. (afb, ) (Entered: 03/02/2005) |
| 03/15/2005 | 10 | MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter *Pursuant to Federal Rules of Civil Procedure 12(B)(1), 12(B)(6), and 12 (H)(3)* - filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Attachments: # 1 Order Granting Defendants' Motion to Dismiss)(Moore, David) (Entered: 03/15/2005) |

CM/ECF LIVE - U.S. District Court:ded - Docket Report                    Page 8 of 36

| 03/15/2005 | 11 | OPENING BRIEF in Support re 10 MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter *Pursuant to Federal Rules of Civil Procedure 12(B)(1), 12(B)(6), and 12(H)(3)* filed by Interdigital Communications Corporation, Interdigital Technology Corporation.Answering Brief/Response due date per Local Rules is 3/29/2005. (Attachments: # 1 Exhibit Nos. 1-3# 2 Exhibit Nos. 4-6) (Moore, David) (Entered: 03/15/2005) |
|---|---|---|
| 03/23/2005 | 12 | STIPULATION set forth briefing scheduling re 10 MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter *Pursuant to Federal Rules of Civil Procedure 12(B)(1), 12(B)(6), and 12(H)(3)* by Nokia Corporation, Nokia Inc., Interdigital Communications Corporation, Interdigital Technology Corporation. (Blumenfeld, Jack) (Entered: 03/23/2005) |
| 03/23/2005 | | SO ORDERED, re 12 Stipulation filed by Interdigital Technology Corporation, Nokia Corporation, Nokia Inc., Interdigital Communications Corporation, Set Briefing Schedule: Answering Brief due 4/28/2005. Reply Brief due 5/12/2005. Signed by Judge Joseph J. Farnan, Jr. on 03/23/05. (afb, ) (Entered: 03/24/2005) |
| 04/15/2005 | 13 | Letter to Judge Farnan from Richard L. Horwitz regarding recent decision by United States Court of Appeals for the Federal Circuit which vacates a district court decision cited by InterDigital re 11 Opening Brief in Support,. (Horwitz, Richard) (Entered: 04/15/2005) |
| 04/28/2005 | 14 | ANSWERING BRIEF in Opposition to Defendants' Motion to Dismiss (D.I. 10) Pursuant to Federal Rules of Civil Procedure 12(B)(1), 12(B)(6) and 12(H)(3) filed by Nokia Corporation, Nokia Inc. Reply Brief due date per Local Rules is 5/5/2005. (Blumenfeld, Jack) Modified on 11/15/2005 (afb, ). (Entered: 04/28/2005) |
| 04/28/2005 | 15 | APPENDIX re 14 Answering Brief in Opposition, To Defendants' Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(B) (1), 12(B)(6), and 12(H)(3) by Nokia Corporation, Nokia Inc.. (Attachments: # 1 Exhibit Exhibit C Part 1# 2 Exhibit Exhibit C Part 2# 3 Exhibit Exhibit C Part 3# 4 Exhibit Exhibit C Part 4# 5 Exhibit Exhibit C Part 5# 6 Exhibit Exhibits D-F# 7 Exhibit Exhibit G Part 1# 8 Exhibit Exhibit G Part 2# 9 Exhibit Exhibit G Part 3# 10 Exhibit Exhibits H-L# 11 Exhibit Exhibits M-O# 12 Exhibit Exhibits P-S# 13 Certificate of Service)(Blumenfeld, Jack) Modified on 11/15/2005 (afb, ). (Entered: 04/28/2005) |
| 04/28/2005 | 16 | DECLARATION re 14 Answering Brief in Opposition, of Ilkka Rahnasto by Nokia Corporation, Nokia Inc.. (Blumenfeld, Jack) Modified on 11/15/2005 (afb, ). (Entered: 04/28/2005) |
| 04/28/2005 | 17 | DECLARATION re 14 Answering Brief in Opposition, Declaration of Ilkka Niva in Support of Nokia's Opposition to Interdigital's Motion to Dismiss by Nokia Corporation, Nokia Inc.(Blumenfeld, Jack) Modified on 11/15/2005 (afb, ). (Entered: 04/28/2005) |
| 04/28/2005 | 18 | DECLARATION re 14 Answering Brief in Opposition, Declaration of |

| | | |
|---|---|---|
| | | Jussi Numminen in Support of Nokia's Opposition to Interdigital's Motion to Dismiss by Nokia Corporation, Nokia Inc. (Attachments: # 1 Exhibit)(Blumenfeld, Jack) Modified on 11/15/2005 (afb, ). (Entered: 04/28/2005) |
| 04/28/2005 | 19 | DECLARATION re 14 Answering Brief in Opposition, Declaration of Vipul Mehrotra in Support of Nokia's Opposition to Interdigital's Motion to Dismiss by Nokia Corporation, Nokia Inc.. (Attachments: # 1 Exhibit Exhibit A# 2 Exhibit Exhibit B# 3 Exhibit Exhibit C-E# 4 Exhibit Exhibit F# 5 Exhibit Exhibits G-H# 6 Exhibit Exhibit I-J# 7 Exhibit Exhibits K-M)(Blumenfeld, Jack) Modified on 11/15/2005 (afb, ). (Entered: 04/28/2005) |
| 05/12/2005 | 20 | REPLY BRIEF in Support of Defendants' Motion to Dismiss (D.I. 10) Pursuant to Federal Rules of Civil Procedure 12(B)(1), 12(B)(6) and 12(H)(3) [filed 5/12/05 by Stipulation and Order, D.I. #12] filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Attachments: # 1)(Moore, David) Modified on 11/15/2005 (afb, ). (Entered: 05/12/2005) |
| 05/16/2005 | 21 | Letter to The Honorable Joseph J. Farnan, Jr. from Jack B. Blumenfeld regarding Requesting oral argument on defendants' motion to dismiss. (Blumenfeld, Jack) (Entered: 05/16/2005) |
| 06/03/2005 | 22 | Letter to The Honorable Joseph J. Farnan, Jr. from Richard L. Horwitz regarding notice of recent Federal Circuit decision re 10 MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter *Pursuant to Federal Rules of Civil Procedure 12(B)(1), 12(B)(6), and 12(H)(3)*. (Attachments: # 1 Exhibit A)(Horwitz, Richard) (Entered: 06/03/2005) |
| 06/08/2005 | 23 | Letter to The Honorable Joseph J. Farnan, Jr. from Jack B. Blumenfeld regarding response to InterDigital's 6/3/05 letter and to submit additional evidence re 22 Letter,. (Blumenfeld, Jack) (Entered: 06/08/2005) |
| 06/13/2005 | 24 | Letter to Judge Farnan from Richard L. Horwitz regarding reply to Nokia's June 8, 2005 letter re 23 Letter. (Horwitz, Richard) (Entered: 06/13/2005) |
| 12/21/2005 | 25 | MEMORANDUM OPINION re: D.I. 26. Signed by Judge Joseph J. Farnan, Jr. on 12/21/05. (afb, ) (Entered: 12/22/2005) |
| 12/21/2005 | 26 | ORDER that Defts.' 10 Motion to Dismiss for Lack of Subject Jurisdiction Over The Subject Matter Pursuant to Federal Rules Of Civil Procedure 12(b)(1), 12(b)(6), and 12(h)(3) is GRANTED IN PART AND DENIED IN PART. (SEE ORDER FOR DETAILS). Signed by Judge Joseph J. Farnan, Jr. on 12/21/05. (afb, ) (Entered: 12/22/2005) |
| 01/06/2006 | 27 | ORDER that parties shall confer and submit, by 1/20/06, a Proposed R16 Scheduling Order. Signed by Judge Joseph J. Farnan, Jr. on 01/05/2006. (Attachments: # 1 Form of proposed scheduling order)(dlk ) (Entered: 01/06/2006) |
| 01/06/2006 | 28 | STIPULATION TO EXTEND TIME for InterDigital to Answer Nokia's |

| | | |
|---|---|---|
| | | Complaint to January 20, 2006 - filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Horwitz, Richard) (Entered: 01/06/2006) |
| 01/09/2006 | 29 | MOTION for Pro Hac Vice Appearance of Attorney Linda L. Addison of Fulbright & Jaworski L.L.P. - filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 01/09/2006) |
| 01/09/2006 | | SO ORDERED, re 28 STIPULATION TO EXTEND TIME for InterDigital to Answer Nokia's Complaint to January 20, 2006 filed by Interdigital Technology Corporation, Interdigital Communications Corporation . Signed by Judge Joseph J. Farnan, Jr. on 01/09/06. (afb, ) (Entered: 01/10/2006) |
| 01/09/2006 | | Set/Reset Answer Deadlines: Interdigital Communications Corporation answer due 1/20/2006; Interdigital Technology Corporation answer due 1/20/2006 per D.I. 28. (afb, ) (Entered: 01/10/2006) |
| 01/10/2006 | | SO ORDERED, re 29 MOTION for Pro Hac Vice Appearance of Attorney Linda L. Addison of Fulbright & Jaworski L.L.P. filed by Interdigital Technology Corporation, Interdigital Communications Corporation . Signed by Judge Joseph J. Farnan, Jr. on 01/10/06. (afb, ) (Entered: 01/10/2006) |
| 01/20/2006 | 30 | Second STIPULATION TO EXTEND TIME to Answer the Complaint and submit a Proposed Rule 16 Scheduling Order to January 27, 2006 and February 3, 2006 - filed by Nokia Corporation, Nokia Inc., Interdigital Communications Corporation, Interdigital Technology Corporation. (Horwitz, Richard) (Entered: 01/20/2006) |
| 01/23/2006 | | SO ORDERED, re 30 Second STIPULATION TO EXTEND TIME to Answer the Complaint and submit a Proposed Rule 16 Scheduling Order to January 27, 2006 and February 3, 2006 filed by Interdigital Technology Corporation, Nokia Corporation, Nokia Inc., Interdigital Communications Corporation . Signed by Judge Joseph J. Farnan, Jr. on 01/23/06. (afb, ) (Entered: 01/24/2006) |
| 01/23/2006 | | Set/Reset Answer Deadlines: Interdigital Communications Corporation answer due 1/27/2006; Interdigital Technology Corporation answer due 1/27/2006 per D.I. 30.(afb, ) (Entered: 01/25/2006) |
| 01/26/2006 | 31 | ANSWER to Complaint with Jury Demand by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 01/26/2006) |
| 02/01/2006 | 32 | MOTION for Pro Hac Vice Appearance of Attorney Patrick J. Flinn, Keith E. Broyles, Randall L. Allen, Mark A. McCarty and Lance A. Lawson - filed by Nokia Corporation, Nokia Inc.. (Blumenfeld, Jack) (Entered: 02/01/2006) |
| 02/03/2006 | 33 | STIPULATION TO EXTEND TIME to submit a Proposed Rule 16 Scheduling Order to February 10, 2006 - filed by Nokia Corporation, |

| | | |
|---|---|---|
| | | Nokia Inc., Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 02/03/2006) |
| 02/06/2006 | | SO ORDERED, re 32 MOTION for Pro Hac Vice Appearance of Attorney Patrick J. Flinn, Keith E. Broyles, Randall L. Allen, Mark A. McCarty and Lance A. Lawson filed by Nokia Corporation, Nokia Inc. ;Signed by Judge Joseph J. Farnan, Jr. on 02/03/06. (afb, ) (Entered: 02/06/2006) |
| 02/06/2006 | | SO ORDERED, re 33 STIPULATION TO EXTEND TIME to submit a Proposed Rule 16 Scheduling Order to February 10, 2006 filed by Interdigital Technology Corporation, Nokia Corporation, Nokia Inc., Interdigital Communications Corporation . Signed by Judge Joseph J. Farnan, Jr. on 02/06/06. (afb, ) (Entered: 02/06/2006) |
| 02/06/2006 | | Set/Reset Deadlines: Notice of Compliance deadline to file a Proposed Rule 16 Scheduling Order is set for 2/10/2006 per D.I. 33. (afb, ) (Entered: 02/06/2006) |
| 02/10/2006 | 34 | STIPULATION TO EXTEND TIME to submit a Proposed Rule 16 Scheduling Order to February 15, 2006 - filed by Nokia Corporation, Nokia Inc., Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) Modified on 2/10/2006 (afb, ). (Entered: 02/10/2006) |
| 02/10/2006 | | CORRECTING ENTRY: Clerk updated the docket text to D.I 34 to reflect a Stipulation of Time was filed. (afb, ) (Entered: 02/10/2006) |
| 02/13/2006 | 35 | STATEMENT PLAINTIFFS' RESPONSE TO DEFENDANTS' NOTICE OF INTENT REGARDING "COMPLEX" DESIGNATION D.I. 31 by Nokia Corporation, Nokia Inc.; (Blumenfeld, Jack) Modified on 2/14/2006 (afb, ). (Entered: 02/13/2006) |
| 02/13/2006 | | CORRECTING ENTRY: Clerk linked D.I. 35 to D.I. 31. (afb, ) (Entered: 02/14/2006) |
| 02/14/2006 | | SO ORDERED, re 34 First STIPULATION TO EXTEND TIME to submit a Proposed Rule 16 Scheduling Order to February 15, 2006 filed by Interdigital Technology Corporation, Nokia Corporation, Nokia Inc., Interdigital Communications Corporation . Signed by Judge Joseph J. Farnan, Jr. on 02/14/06. (afb, ) (Entered: 02/14/2006) |
| 02/15/2006 | 36 | Letter to The Honorable Joseph J. Farnan, Jr. from Jack B. Blumenfeld regarding proposed Rule 16 Scheduling Order. (Attachments: # 1 Text of Proposed Order)(Blumenfeld, Jack) (Entered: 02/15/2006) |
| 02/17/2006 | 37 | Letter to The Honorable Joseph J. Farnan, Jr. from David E. Moore regarding case schedule. (Moore, David) (Entered: 02/17/2006) |
| 02/23/2006 | 38 | ORDER that a Scheduling Conference is set for 3/1/2006 at 04:30 PM in Courtroom 4B before Honorable Joseph J. Farnan, Jr.; Signed by Judge Joseph J. Farnan, Jr. on 02/23/06. (afb, ) (Entered: 02/23/2006) |
| 03/01/2006 | | Minute Entry for proceedings held before Judge Joseph J. Farnan, Jr. : |

| | | |
|---|---|---|
| | | Scheduling Conference held on 3/1/2006. DECISION: Parties are to submit a new Proposed Scheduling Order with a Markman Hearing for 07/15/07 (which the Court may move by 60-90 days to allow for additional discovery, if necessary). Parties are to suggest possible trial dates and the Court will pick a date to insert. The Court also wants to appoint Collins Seitz, Jr., Esq. as a Special Master. The parties are to file objections to Mr. Seitz's appointment within a week. (Court Reporter Heather from Hawkins ct. rptr.) (afb, ) (Entered: 03/02/2006) |
| 03/03/2006 | 39 | TRANSCRIPT of Scheduling Conference held on 03/01/06 before Judge Farnan, Jr.; Court Reporter: Heather Triozzi from Hawkins ct. rptr.; (Transcript on file in Clerk's Office) (afb, ) (Entered: 03/03/2006) |
| 03/22/2006 | 40 | ORDER REFERRING CASE to Special Master. Collins J. Seitz, Jr. appointed. Signed by Judge Joseph J. Farnan, Jr. on 03/22/06. (afb, ) (Entered: 03/22/2006) |
| 03/27/2006 | 41 | Letter to The Honorable Joseph J. Farnan, Jr. from Richard L. Horwitz regarding submission of a proposed Scheduling Order. (Attachments: # 1 Text of Proposed Order)(Horwitz, Richard) (Entered: 03/27/2006) |
| 03/29/2006 | 42 | RULE 16 SCHEDULING ORDER: Case referred to the Magistrate Judge for the purpose of exploring ADR. Pre-Discovery Disclosures ddl. 03/31/06. Joinder of Parties due by 6/15/2006. Amended Pleadings due by 1/15/2007. Discovery due by 7/15/2007. Status Conference set for 10/5/2006 at 12:30 PM in Courtroom 4B before Honorable Joseph J. Farnan, Jr.; Dispositive Motions due by 8/15/2007. Pretrial Conference set for 11/15/2007 at 11:00 AM in Courtroom 4B before Honorable Joseph J. Farnan, Jr.; If necessary, Markman Hearing will be held on 08/02/07. Signed by Judge Joseph J. Farnan, Jr. on 03/29/06. (afb, ) (Entered: 03/30/2006) |
| 03/30/2006 | | CASE REFERRED to Mediation. (cab, ) (Entered: 03/30/2006) |
| 03/30/2006 | 43 | Order Setting Teleconference: Telephone Conference set for 5/23/2006 09:00 AM before Honorable Mary Pat Thynge to discuss ADR. Signed by Judge Mary Pat Thynge on 3/30/2006. (cab, ) (Entered: 03/30/2006) |
| 03/30/2006 | 44 | NOTICE OF SERVICE of Defendants' First Set of Interrogatories to Plaintiffs; Defendants' First Set of Requests for Production to Plaintiffs; and Defendants Interdigital Communications Corporation and Interdigital Technology Corporation's Initial Disclosures by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 03/30/2006) |
| 03/30/2006 | | Set Deadlines/Hearings: Markman Hearing set for 8/2/2007 at 11:00 AM in Courtroom 4B before Honorable Joseph J. Farnan, Jr.; Pretrial Conference set for 11/15/2007 at 11:00 AM in Courtroom 4B before Honorable Joseph J. Farnan, Jr.; Discovery Status Conference set for 10/5/2006 at 12:30 PM in Courtroom 4B before Honorable Joseph J. Farnan, Jr. per calendar ntc. (afb, ) (Entered: 03/31/2006) |
| 03/31/2006 | 45 | NOTICE OF SERVICE of Initial Disclosures by Nokia Corporation, |

| | | |
|---|---|---|
| | | Nokia Inc..(Blumenfeld, Jack) (Entered: 03/31/2006) |
| 04/06/2006 | 46 | Letter to The Honorable Joseph J. Farnan, Jr. from Julia Heaney regarding Proposed Agreed Protective Order. (Attachments: # 1 Text of Proposed Order)(Heaney, Julia) (Entered: 04/06/2006) |
| 04/10/2006 | 47 | Letter to Dr. Peter T. Dalleo from Julia Heaney regarding filing a corrected version of the Agreed Protective Order that was filed on April 6 on behalf of both parties - re 46 Letter. (Attachments: # 1)(Heaney, Julia) (Entered: 04/10/2006) |
| 04/13/2006 | 48 | NOTICE OF SERVICE of First Set of Interrogatories and First Set of Requests for Production by Nokia Corporation, Nokia Inc..(Heaney, Julia) (Entered: 04/13/2006) |
| 04/21/2006 | 49 | NOTICE OF SERVICE of Plaintiffs' Revised Initial Disclosures by Nokia Corporation, Nokia Inc..(Blumenfeld, Jack) (Entered: 04/21/2006) |
| 04/24/2006 | 50 | Letter to The Honorable Joseph J. Farnan, Jr. from Jack B. Blumenfeld regarding attached proposed revised Scheduling Order. (Attachments: # 1 Text of Proposed Order Revised Rule 16 Scheduling Order)(Blumenfeld, Jack) (Entered: 04/24/2006) |
| 04/26/2006 | 51 | REVISED RULE 16 SCHEDULING ORDER: Case referred to the Magistrate Judge for the purpose of exploring ADR. Pre-Discovery Disclosures ddl. 03/31/06. Joinder of Parties due by 6/15/2006. Amended Pleadings due by 1/15/2007. Fact Discovery due by 2/15/2007. Interim Status Report due by 9/25/2006. Dispositive Motions due by 8/15/2007. If necessary, a Markman Hearing will be held on 08/02/07. (SEE ORDER FOR DETAILS). Signed by Judge Joseph J. Farnan, Jr. on 04/26/06. (afb, ) (Entered: 04/27/2006) |
| 04/26/2006 | | Set Hearings: Markman Hearing set for 8/2/2007 at 11:00 AM in Courtroom 4B before Honorable Joseph J. Farnan, Jr. per D.I. 51. (afb, ) (Entered: 05/01/2006) |
| 04/28/2006 | | CASE REFERRED to Mediation. (cab, ) (Entered: 04/28/2006) |
| 05/01/2006 | 52 | NOTICE OF SERVICE of (1) Plaintiffs' Objections and Responses to Defendants' First Set of Interrogatories to Plaintiffs and (2) Plaintiffs' Objections and Responses to Defendants' First Set of Requests for Production to Plaintiffs by Nokia Corporation, Nokia Inc..(Heaney, Julia) (Entered: 05/01/2006) |
| 05/24/2006 | 53 | Order Setting Teleconference: Telephone Conference set for 11/7/2006 09:00 AM before Honorable Mary Pat Thynge to discuss status of negotiations and whether a spring mediation would be desired by the parties. Signed by Judge Mary Pat Thynge on 5/24/2006. (cab, ) (Entered: 05/24/2006) |
| 05/30/2006 | 54 | NOTICE OF SERVICE of InterDigital's Answers and Objections to Plaintiffs' First Set of Interrogatories; and InterDigital's Answers and Objections to Plaintiffs' First Set of Requests for Production by Interdigital Communications Corporation, Interdigital Technology |

| | | Corporation.(Moore, David) (Entered: 05/30/2006) |
|---|---|---|
| 06/12/2006 | 55 | FIRST DISCOVERY ORDER . Signed by Special Master Collins J. Seitz, Jr. on 06/12/06. (afb, ) (Entered: 06/12/2006) |
| 06/14/2006 | 56 | NOTICE to Take Deposition of InterDigital Communications Corporation & InterDigital Technology Corporation on 06/28/06 at 9:30am & 06/29/06 at 9:30am, respectively by Nokia Corporation, Nokia Inc.. (Attachments: # 1 Attachments A-C)(Blumenfeld, Jack) (Entered: 06/14/2006) |
| 07/05/2006 | 57 | NOTICE OF SERVICE of Plaintiffs' Statement Pursuant to First Discovery Order by Nokia Corporation, Nokia Inc..(Heaney, Julia) (Entered: 07/05/2006) |
| 07/12/2006 | 58 | Joint PROPOSED ORDER Agreed Protective Order by Nokia Corporation. (Heaney, Julia) (Entered: 07/12/2006) |
| 07/13/2006 | 59 | AGREED PROTECTIVE ORDER. Signed by Judge Joseph J. Farnan, Jr. on 7/13/06. (maw, ) (Entered: 07/14/2006) |
| 08/14/2006 | 60 | NOTICE to Take Deposition of /Re-Notice of Depositions of InterDigital Communications Corporation and InterDigital Technology Corporation on August 24, 2006 and August 25, 2006, respectively by Nokia Corporation, Nokia Inc.. (Attachments: # 1 Attachments A-C)(Heaney, Julia) (Entered: 08/14/2006) |
| 08/15/2006 | 61 | NOTICE OF SERVICE of Plaintiffs' First Supplemental Objections and Responses to Defendants' First Set of Interrogatories to Plaintiffs by Nokia Corporation, Nokia Inc..(Heaney, Julia) (Entered: 08/15/2006) |
| 08/21/2006 | 62 | NOTICE OF SERVICE of InterDigital's Objections to Nokia's 30(b)(6) Notice of Deposition by Interdigital Communications Corporation, Interdigital Technology Corporation. Related document: 60 Notice to Take Deposition, filed by Nokia Corporation,, Nokia Inc.,.(Moore, David) Modified on 8/21/2006 (dab, ). Modified on 8/22/2006 (dab, ). (Entered: 08/21/2006) |
| 08/22/2006 | | CORRECTING ENTRY: Clerk clarified docket text DI #62 (dab, ) (Entered: 08/22/2006) |
| 08/24/2006 | 63 | NOTICE OF SERVICE of InterDigital's First Amended Answers and Objections to Plaintiffs' First Set of Interrogatories by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 08/24/2006) |
| 08/31/2006 | 64 | NOTICE to Take Deposition of corporate representatives of plaintiffs on September 22, 2006 by Interdigital Communications Corporation, Interdigital Technology Corporation.(Moore, David) (Entered: 08/31/2006) |
| 09/14/2006 | 65 | NOTICE OF SERVICE of Objections to Interdigital's 30(b)(6) Notice of Deposition by Nokia Corporation, Nokia Inc..(Heaney, Julia) (Entered: 09/14/2006) |

| | | |
|---|---|---|
| 09/25/2006 | 66 | Letter to the Honorable Joseph J. Farnan, Jr. from Jack B. Blumenfeld regarding Interim Status Report. (Blumenfeld, Jack) (Entered: 09/25/2006) |
| 10/23/2006 | 67 | NOTICE to Take Deposition of InterDigital Communications Corporation and InterDigital Technology Corporation on November 3, 2006 and November 4, 2006, respectively by Nokia Corporation, Nokia Inc.. (Attachments: # 1 Attachment A)(Heaney, Julia) (Entered: 10/23/2006) |
| 11/03/2006 | 68 | NOTICE OF SERVICE of Defendants' Second Set of Interrogatories to Plaintiffs and Defendants' Second Set of Requests For Production to Plaintiffs by Interdigital Communications Corporation, Interdigital Technology Corporation.(Moore, David) (Entered: 11/03/2006) |
| 11/07/2006 | 69 | Order Setting Teleconference: Telephone Conference set for 1/11/2007 09:00 AM before Honorable Mary Pat Thynge to discuss status of negotiations and whether a spring mediation would be desired by the parties. Signed by Judge Mary Pat Thynge on 11/7/2006. (cak) (Entered: 11/07/2006) |
| 11/07/2006 | 70 | NOTICE of of Issuance of Subpoena Ad Testificandum and Duces Tecum by Interdigital Communications Corporation, Interdigital Technology Corporation (Moore, David) (Entered: 11/07/2006) |
| 11/14/2006 | 71 | SECOND DISCOVERY ORDER: within 30 days, Nokia shall identify on a patent by patent basis why InterDigital's declarations are false. Within 30 days of service of Nokia's statement, InterDigital shall respond in kind. InterDigital need not respond to certain discovery requests (See Order for Details). Signed by Collins J. Seitz, Jr., Special Master. (maw) (Entered: 11/15/2006) |
| 11/17/2006 | 72 | NOTICE to Take Deposition of Tim Frain on December 7, 2006 by Interdigital Communications Corporation, Interdigital Technology Corporation.(Moore, David) (Entered: 11/17/2006) |
| 11/17/2006 | 73 | NOTICE to Take Deposition of Harri Honkasalo on December 6, 2006 by Interdigital Communications Corporation, Interdigital Technology Corporation.(Moore, David) (Entered: 11/17/2006) |
| 11/17/2006 | 74 | NOTICE to Take Deposition of Henry Muir on December 8, 2006 by Interdigital Communications Corporation, Interdigital Technology Corporation.(Moore, David) (Entered: 11/17/2006) |
| 11/17/2006 | 75 | MOTION to Compel *[Defendants' Motion to Compel Arbitration and Stay Litigation Pending Completion of Arbitration]* - filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 11/17/2006) |
| 11/17/2006 | 76 | SEALED OPENING BRIEF in Support re 75 MOTION to Compel *[Defendants' Motion to Compel Arbitration and Stay Litigation Pending Completion of Arbitration]* filed by Interdigital Communications Corporation, Interdigital Technology Corporation.Answering |

| | | |
|---|---|---|
| | | Brief/Response due date per Local Rules is 12/7/2006. (Moore, David) (Entered: 11/17/2006) |
| 11/17/2006 | 77 | SEALED APPENDIX re 76 Opening Brief in Support, *of Its Motion to Compel Arbitration and Stay Litigation Pending Completion of Arbitration [APPENDIX I]* by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 11/17/2006) |
| 11/17/2006 | 78 | SEALED APPENDIX re 76 Opening Brief in Support, *of Its Motion to Compel Arbitration and Stay Litigation Pending Completion of Arbitration [APPENDIX II]* by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 11/17/2006) |
| 11/27/2006 | 79 | REDACTED VERSION of 76 Opening Brief in Support, *[Defendants' Motion to Compel Arbitration and Stay Litigation Pending Completion of Arbitration]* by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 11/27/2006) |
| 11/27/2006 | 80 | REDACTED VERSION of 77 Appendix, *in Support of Its Motion to Compel Arbitration and Stay Litigation Pending Completion of Arbitration [APPENDIX I]* by Interdigital Communications Corporation, Interdigital Technology Corporation. (Attachments: # 1 Exhibit A Part 1# 2 Exhibit A part 2 - D)(Moore, David) (Entered: 11/27/2006) |
| 11/27/2006 | 81 | REDACTED VERSION of 78 Appendix, *in Support of Its Motion to Compel Arbitration and Stay Litigation Pending Completion of Arbitration [APPENDIX II]* by Interdigital Communications Corporation, Interdigital Technology Corporation. (Attachments: # 1 Exhibit E-L# 2 Exhibit M-T)(Moore, David) (Entered: 11/27/2006) |
| 11/30/2006 | 82 | OBJECTIONS by Nokia Corporation, Nokia Inc. to 74 Notice to Take Deposition *of Henry Muir and Subpoena Duces Tecum.* (Heaney, Julia) (Entered: 11/30/2006) |
| 11/30/2006 | 83 | OBJECTIONS by Nokia Corporation, Nokia Inc. to 72 Notice to Take Deposition *of Tim Frain and Subpoena Duces Tecum.* (Heaney, Julia) (Entered: 11/30/2006) |
| 11/30/2006 | 84 | OBJECTIONS by Nokia Corporation, Nokia Inc. to 73 Notice to Take Deposition *of Harri Honkasalo and Subpoena Duces Tecum.* (Heaney, Julia) (Entered: 11/30/2006) |
| 12/01/2006 | 85 | STIPULATION TO EXTEND TIME to serve and file Plaintiffs' Answering Brief in Opposition to Defendants' Motion to Compel Arbitration and Stay Litigation Pending Completion of Arbitration to December 12, 2006 - filed by Nokia Corporation, Nokia Inc., Interdigital Communications Corporation, Interdigital Technology Corporation. (Blumenfeld, Jack) (Entered: 12/01/2006) |
| 12/01/2006 | 86 | SEALED MOTION for Leave to File *Motion For Summary Judgment* - filed by Interdigital Communications Corporation, Interdigital |

| | | |
|---|---|---|
| | | Technology Corporation. (Moore, David) (Entered: 12/01/2006) |
| 12/01/2006 | 87 | Decision on Pltfs' Motion for Declaration that documents are discoverable and Dfts' Cross Motion to Stay Discovery pending resolution of arbitration proceedings. InterDigital's Motion to Stay is GRANTED and Nokia's Motion for Declaration is DENIED. Signed by Collins J. Seitz, Jr., Special Master on 12/1/06. (dab) (Entered: 12/04/2006) |
| 12/04/2006 | 88 | MOTION for Pro Hac Vice Appearance of Attorney A. William Urquhart and Marshall M. Searcy - filed by Nokia Corporation, Nokia Inc.. (Heaney, Julia) (Entered: 12/04/2006) |
| 12/04/2006 | 89 | NOTICE OF SERVICE of (1) Plaintiffs' Objections and Responses to Defendants' Second Set of Interrogatories to Plaintiffs, and (2) Plaintiffs' Objections and Responses to Defendants' Second Set of Requests for Production to Plaintiffs by Nokia Corporation, Nokia Inc..(Heaney, Julia) (Entered: 12/04/2006) |
| 12/06/2006 | 90 | REDACTED VERSION of 86 SEALED MOTION for Leave to File *Motion For Summary Judgment* by Interdigital Communications Corporation, Interdigital Technology Corporation. (Attachments: # 1 Text of Proposed Order # 2 Exhibit 1# 3 Exhibit 2# (4) Exhibit A-E# 5 Exhibit F# 6 Exhibit G-H# 7 Exhibit I-J)(Moore, David) Additional attachment(s) added on 12/7/2006 (dab, ). (Entered: 12/06/2006) |
| 12/07/2006 | 91 | Letter to Dr. Peter T. Dalleo, Clerk of the Court from David E. Moore, Esquire regarding corrected exhibit - re 90 Redacted Document,. (Moore, David) (Entered: 12/07/2006) |
| 12/07/2006 | | CORRECTING ENTRY: Clerk replaced Exhibit A - E to Exhibit 2 per request of counsel re 91 (dab) (Entered: 12/07/2006) |
| 12/08/2006 | | SO ORDERED, re 88 MOTION for Pro Hac Vice Appearance of Attorney A. William Urquhart and Marshall M. Searcy filed by Nokia Inc., Nokia Corporation. Signed by Judge Joseph J. Farnan, Jr. on 12/8/2006. (maw) (Entered: 12/08/2006) |
| 12/08/2006 | | SO ORDERED, re 85 STIPULATION TO EXTEND TIME to serve and file Plaintiffs' Answering Brief in Opposition to Defendants' Motion to Compel Arbitration and Stay Litigation Pending Completion of Arbitration to December 12, 2006 filed by Nokia Inc., Nokia Corporation, Interdigital Technology Corporation, Interdigital Communications Corporation. Answering Brief due 12/12/2006. Signed by Judge Joseph J. Farnan, Jr. on 12/8/2008. (maw) (Entered: 12/08/2006) |
| 12/12/2006 | 92 | SEALED ANSWERING BRIEF in Opposition re 75 MOTION to Compel *[Defendants' Motion to Compel Arbitration and Stay Litigation Pending Completion of Arbitration]* filed by Nokia Corporation, Nokia Inc..Reply Brief due date per Local Rules is 12/22/2006. (Attachments: # 1 Exhibits A-E)(Heaney, Julia) (Entered: 12/12/2006) |
| | | |

| | | |
|---|---|---|
| 12/15/2006 | | Remark: Please note a change of the procedure for filing non-case dispositive motions in patent cases. This procedure is effective immediately and shall be used in lieu of the discovery dispute procedure in all existing Scheduling Orders. Please see Standing Order for details at: http://www.ded.uscourts.gov/JJF/CaseMgmt/ordrenondispmotions.pdf (dlk) (Entered: 12/15/2006) |
| 12/15/2006 | 93 | STIPULATION TO EXTEND TIME to Reply on Motion to Compel Arbitration and Stay Litigation Pending Completion of Arbitration [DI 75] to December 21, 2006 - filed by Nokia Corporation, Nokia Inc., Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 12/15/2006) |
| 12/15/2006 | 94 | ANSWERING BRIEF in Opposition re 86 SEALED MOTION for Leave to File *Motion For Summary Judgment* filed by Nokia Corporation, Nokia Inc..Reply Brief due date per Local Rules is 12/27/2006. (Attachments: # 1 Exhibits A-C)(Heaney, Julia) (Entered: 12/15/2006) |
| 12/15/2006 | 95 | SEALED EXHIBIT re 94 Answering Brief in Opposition *Exhibit B to Plaintiffs' Answering Brief in Opposition to Defendants' Motion for Leave to File Motion for Summary Judgment* by Nokia Corporation, Nokia Inc.. (Heaney, Julia) (Entered: 12/15/2006) |
| 12/19/2006 | | SO ORDERED, re 93 STIPULATION TO EXTEND TIME to Reply on Motion to Compel Arbitration and Stay Litigation Pending Completion of Arbitration [DI 75] to December 21, 2006 filed by Nokia Inc., Nokia Corporation, Interdigital Technology Corporation, Interdigital Communications Corporation, Set Briefing Schedule: Reply Brief due 12/21/2006. Signed by Judge Joseph J. Farnan, Jr. on 12/19/06. (dab) (Entered: 12/19/2006) |
| 12/20/2006 | 96 | SEALED REPLY BRIEF re 75 MOTION to Compel *[Defendants' Motion to Compel Arbitration and Stay Litigation Pending Completion of Arbitration]* filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 12/20/2006) |
| 12/21/2006 | 97 | SEALED REPLY BRIEF re 86 SEALED MOTION for Leave to File *Motion For Summary Judgment* filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 12/21/2006) |
| 12/21/2006 | 98 | OBJECTIONS by Nokia Corporation, Nokia Inc. to 87 Order, *(December 1, 2006 Decision of the Special Master)*. (Heaney, Julia) (Entered: 12/21/2006) |
| 12/21/2006 | 99 | SEALED OPENING BRIEF in Support *of Objections to Special Master's December 1, 2006 Decision* filed by Nokia Corporation, Nokia Inc..Answering Brief/Response due date per Local Rules is 1/12/2007. (Attachments: # 1 Exhibit A)(Heaney, Julia) (Entered: 12/21/2006) |
| 12/22/2006 | 100 | REDACTED VERSION of 92 Answering Brief in Opposition, *to Defendants' Motion to Compel Arbitration and Stay Litigation Pending* |

| | | |
|---|---|---|
| | | *Completion of Arbitration* by Nokia Corporation, Nokia Inc.. (Attachments: # 1 Exhibit A-E)(Heaney, Julia) (Entered: 12/22/2006) |
| 12/26/2006 | 101 | REQUEST for Oral Argument by Nokia Corporation, Nokia Inc. re 75 MOTION to Compel *[Defendants' Motion to Compel Arbitration and Stay Litigation Pending Completion of Arbitration].* (Blumenfeld, Jack) (Entered: 12/26/2006) |
| 12/28/2006 | 102 | REDACTED VERSION of 96 Reply Brief, *to Plaintiffs' Answering Brief in Opposition to Defendants' Motion to Compel Arbitration and Stay Litigation Pending Completion of Arbitration* by Interdigital Communications Corporation, Interdigital Technology Corporation. (Attachments: # 1 Exhibit 1-3)(Moore, David) (Entered: 12/28/2006) |
| 12/28/2006 | 103 | MOTION for Extension of Time to Complete Discovery - filed by Nokia Corporation, Nokia Inc.. (Attachments: # 1 Notice of Motion)(Heaney, Julia) (Entered: 12/28/2006) |
| 12/28/2006 | 104 | OPENING BRIEF in Support re 103 MOTION for Extension of Time to Complete Discovery filed by Nokia Corporation, Nokia Inc..Answering Brief/Response due date per Local Rules is 1/16/2007. (Attachments: # 1 Exhibit A-C# (2) Exhibit D-H (E & F Under Seal)(Heaney, Julia) Modified on 1/8/2007 (lec ). (Entered: 12/28/2006) |
| 12/28/2006 | 105 | SEALED EXHIBIT re 104 Opening Brief in Support, *Exhibit F to Plaintiffs' Opening Brief in Support of Their Motion for Extension of Discovery Deadline* by Nokia Corporation, Nokia Inc.. (Heaney, Julia) (Entered: 12/28/2006) |
| 12/29/2006 | 106 | NOTICE OF SERVICE of Defendants InterDigital Communications Corporation and InterDigital Technology Corporation's First Amended Initial Disclosures by Interdigital Communications Corporation, Interdigital Technology Corporation.(Moore, David) (Entered: 12/29/2006) |
| 12/29/2006 | 107 | REDACTED VERSION of 99 Opening Brief in Support, *of Objections to Special Master's December 1, 2006 Decision* by Nokia Corporation, Nokia Inc.. (Heaney, Julia) (Entered: 12/29/2006) |
| 12/30/2006 | 108 | MOTION for Leave to File *Amended Complaint* - filed by Nokia Corporation, Nokia Inc.. (Attachments: # 1 Exhibit Sealed# 2 Notice of Motion # 3 Text of Proposed Order)(Blumenfeld, Jack) (Entered: 12/30/2006) |
| 12/30/2006 | 109 | SEALED EXHIBIT re 108 MOTION for Leave to File *Amended Complaint* by Nokia Corporation, Nokia Inc.. (Blumenfeld, Jack) (Entered: 12/30/2006) |
| 12/30/2006 | 110 | SEALED OPENING BRIEF in Support re 108 MOTION for Leave to File *Amended Complaint* filed by Nokia Corporation, Nokia Inc..Answering Brief/Response due date per Local Rules is 1/19/2007. (Blumenfeld, Jack) (Entered: 12/30/2006) |
| 01/02/2007 | 111 | REDACTED VERSION of 97 Reply Brief *to Plaintiffs' Answering Brief* |

| | | |
|---|---|---|
| | | *in Opposition to Defendants' Motion for Leave to File Motion For Summary Judgment* by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 01/02/2007) |
| 01/03/2007 | 112 | STIPULATION TO EXTEND TIME to respond to the Motion for Extension of Time to Complete Discovery (D.I. 103) to January 16, 2007 - filed by Nokia Corporation, Nokia Inc., Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 01/03/2007) |
| 01/03/2007 | 115 | Decision of Defendants' Motion to Compel Compliance with Discovery Obligations regarding electronic information and Plaintiffs' Cross-Motion to Compel Electronic Discovery. Motion to Compel Compliance is GRANTED in part and DENIED in part. With respect to Nokia's Cross Motion to Compel, motion is DENIED. (See order for details) Signed by Special Master Collins J. Seitz, Jr. on 1/3/2007. (dab) (Entered: 01/05/2007) |
| 01/03/2007 | 116 | Decision on Pltfs' Motion for Reconsideration and Clarification of Second Discovery Order. (See order for details) Signed by Special Master Collins J. Seitz, Jr. on 1/3/2007. (dab) (Entered: 01/05/2007) |
| 01/04/2007 | 113 | DEFICIENCY NOTICE by the Court issued to Nokia Corporation re 95 Exhibit to a Document. (dab) (Entered: 01/04/2007) |
| 01/04/2007 | 114 | REDACTED VERSION of 95 Exhibit to a Document *Exhibit B to Plaintiffs' Answering Brief in Opposition to Defendants' Motion for Leave to File Motion for Summary Judgment* by Nokia Corporation, Nokia Inc.. (Heaney, Julia) (Entered: 01/04/2007) |
| 01/08/2007 | | CORRECTING ENTRY: Removed Exh. E from docket/PDF. Exhibit E to D.I. 104 is UNDER SEAL. (dlk) (Entered: 01/08/2007) |
| 01/09/2007 | 117 | SEALED EXHIBIT re 104 Opening Brief in Support, *Exhibit E to Plaintiffs' Opening Brief in Support of Their Motion for Extension of Discovery Deadline* by Nokia Corporation, Nokia Inc.. (Heaney, Julia) (Entered: 01/09/2007) |
| 01/09/2007 | 118 | REDACTED VERSION of 117 Exhibit to a Document *Exhibit E to Plaintiffs' Opening Brief in Support of Their Motion for Extension of Discovery Deadline* by Nokia Corporation, Nokia Inc.. (Heaney, Julia) (Entered: 01/09/2007) |
| 01/09/2007 | 119 | REDACTED VERSION of 105 Exhibit to a Document *Exhibit F to Plaintiffs' Opening Brief in Support of Their Motion for Extension of Discovery Deadline* by Nokia Corporation, Nokia Inc.. (Heaney, Julia) (Entered: 01/09/2007) |
| 01/09/2007 | | Remark: Pltfs' Motion for Extension of Time to Complete Discovery (D.I. 103) and Motion for Leave to File Amended Complaint (D.I. 108) are STRICKEN. Motions were filed outside of thirty days (See Court's Order dated December 15, 2006). (dlk) (Entered: 01/09/2007) |

| 01/09/2007 | | CORRECTING ENTRY: DI #120 docketed in error. Removed from docket and DI #120 will be reused. (dab) (Entered: 01/09/2007) |
| 01/09/2007 | | SO ORDERED, re 112 STIPULATION TO EXTEND TIME to respond to the Motion for Extension of Time to Complete Discovery (D.I. 103) to January 16, 2007 filed by Nokia Inc., Nokia Corporation, Interdigital Technology Corporation, Interdigital Communications Corporation, Set Briefing Schedule: Answering Brief due 1/16/2007. Signed by Judge Joseph J. Farnan, Jr. on 1/9/2007. (dab) (Entered: 01/09/2007) |
| 01/09/2007 | 120 | NOTICE of Motion for Leave to Amend Their Complaint by Nokia Corporation, Nokia Inc. (Heaney, Julia) (Entered: 01/09/2007) |
| 01/09/2007 | 121 | MOTION for Leave to File *an Amended Complaint* - filed by Nokia Corporation, Nokia Inc.. (Attachments: # 1 Exhibits 1-2)(Heaney, Julia) (Entered: 01/09/2007) |
| 01/09/2007 | 122 | SEALED EXHIBIT re 121 MOTION for Leave to File *an Amended Complaint (Exhibits 1-2)* by Nokia Corporation, Nokia Inc.. (Heaney, Julia) (Entered: 01/09/2007) |
| 01/09/2007 | 123 | SEALED OPENING BRIEF in Support re 121 MOTION for Leave to File *an Amended Complaint* filed by Nokia Corporation, Nokia Inc..Answering Brief/Response due date per Local Rules is 1/29/2007. (Attachments: # 1 Exhibit A)(Heaney, Julia) (Entered: 01/09/2007) |
| 01/09/2007 | 124 | NOTICE of Motion for Extension of Discovery Deadline by Nokia Corporation, Nokia Inc. (Heaney, Julia) (Entered: 01/09/2007) |
| 01/09/2007 | 125 | MOTION for Extension of Time to Complete Discovery - filed by Nokia Corporation, Nokia Inc.. (Heaney, Julia) (Entered: 01/09/2007) |
| 01/09/2007 | 126 | OPENING BRIEF in Support re 125 MOTION for Extension of Time to Complete Discovery filed by Nokia Corporation, Nokia Inc..Answering Brief/Response due date per Local Rules is 1/29/2007. (Attachments: # 1 Exhibits A-C# 2 Exhibits D-H)(Heaney, Julia) (Entered: 01/09/2007) |
| 01/09/2007 | 127 | SEALED EXHIBIT re 126 Opening Brief in Support, *of Their Motion for Extension of Discovery Deadline (Exhibits E and F)* by Nokia Corporation, Nokia Inc.. (Heaney, Julia) (Entered: 01/09/2007) |
| 01/10/2007 | 128 | Letter to The Honorable Joseph J. Farnan, Jr. from Richard L. Horwitz regarding conflict between Scheduling Order and newly adopted non-dispositive motion procedures. (Horwitz, Richard) (Entered: 01/10/2007) |
| 01/11/2007 | 129 | Order Setting Teleconference: Telephone Conference set for 2/15/2007 at 9:00 AM before Honorable Mary Pat Thynge. Signed by Judge Mary Pat Thynge on 1/11/2007. (cak) (Entered: 01/11/2007) |
| 01/11/2007 | 130 | NOTICE of Issuance of Subpoena Ad Testificandum and Duces Tecum to Dr. David J. Goodman by Interdigital Communications Corporation, Interdigital Technology Corporation (Moore, David) (Entered: 01/11/2007) |
| | | |

| 01/12/2007 | 131 | ANSWERING BRIEF in Opposition *[DEFENDANTS' ANSWERING BRIEF IN RESPONSE TO PLAINTIFFS' OBJECTIONS TO SPECIAL MASTER'S DECEMBER 1, 2006 DECISION] REGARDING D.I. NOS. 98 and 99* filed by Interdigital Communications Corporation, Interdigital Technology Corporation.Reply Brief due date per Local Rules is 1/25/2007. (Attachments: # 1 Exhibit A-B)(Moore, David) (Entered: 01/12/2007) |
|---|---|---|
| 01/12/2007 |  | Remark: Regarding letter dated 1/10/07 from Mr. Horwitz (D.I. 128), The Court will grant an extension of the Scheduling Order deadline on the Motion to Amend to allow compliance with the Court's December 15, 2006 procedure Order for filing of non-dispositive motions. (dlk) (Entered: 01/12/2007) |
| 01/16/2007 | 132 | ORDER regarding 75 Motion to Compel (see Order for details). Signed by Special Master Collins J. Seitz, Jr. on 1/15/2007. (lec) (Entered: 01/16/2007) |
| 01/16/2007 | 133 | Letter to The Honorable Joseph J. Farnan, Jr. from Richard L. Horwitz, Esquire regarding pending motions - re 75 MOTION to Compel *[Defendants' Motion to Compel Arbitration and Stay Litigation Pending Completion of Arbitration]*, 86 SEALED MOTION for Leave to File *Motion For Summary Judgment*. (Horwitz, Richard) (Entered: 01/16/2007) |
| 01/22/2007 | 134 | REPLY BRIEF *Plaintiffs' Reply Brief In Support Of Objections To The December 1, 2006 Decision Of The Special Master* filed by Nokia Corporation, Nokia Inc.. (Heaney, Julia) Additional attachment(s) added on 1/23/2007 (lec, ). (Entered: 01/22/2007) |
| 01/23/2007 | . | CORRECTING ENTRY: Replaced D.I. 134 Plaintiff's Reply Brief In Support of Objections (filed on 1/22/07) with CORRECTED VERSION (per email request). (lec) (Entered: 01/23/2007) |
| 01/24/2007 | 135 | SEALED ANSWERING BRIEF in Opposition re 125 MOTION for Extension of Time to Complete Discovery *(Defendants' Memorandum in Response to Plaintiffs' Brief in Support of Their Motion For Extension of Discovery Deadline)* filed by Interdigital Communications Corporation, Interdigital Technology Corporation.Reply Brief due date per Local Rules is 2/5/2007. (Moore, David) (Entered: 01/24/2007) |
| 01/24/2007 | 136 | ANSWERING BRIEF in Opposition re 121 MOTION for Leave to File an Amended Complaint *(Defendants' Memorandum in Response to Plaintiff's Opening Brief in Support of Motion For Leave to Amend Their Complaint)* filed by Interdigital Communications Corporation, Interdigital Technology Corporation.Reply Brief due date per Local Rules is 2/5/2007. (Moore, David) (Entered: 01/24/2007) |
| 01/24/2007 | 138 | REDACTED VERSION of 122 Exhibit to a Document *Plaintiffs' Motion for Leave to Amend Their Complaint* by Nokia Corporation, Nokia Inc.. (Heaney, Julia) (Entered: 01/24/2007) |
| 01/25/2007 | 139 | REDACTED VERSION of 135 Answering Brief in Opposition, *to* |

| | | |
|---|---|---|
| | | *Plaintiff's Brief in Support of Their Motion for Extension of Discovery Deadline* by Interdigital Communications Corporation, Interdigital Technology Corporation. (Attachments: # 1 Exhibit Exhibit A)(Moore, David) (Entered: 01/25/2007) |
| 01/25/2007 | | CORRECTING ENTRY: DELETED D.I. # 137 per attorney email request. (lec) (Entered: 01/25/2007) |
| 01/26/2007 | 140 | REDACTED VERSION of 123 Opening Brief in Support *of Motion for Leave to Amend Complaint* by Nokia Corporation, Nokia Inc.. (Attachments: # 1 Exhibit A)(Heaney, Julia) (Entered: 01/26/2007) |
| 01/26/2007 | 141 | REPLY BRIEF re 121 MOTION for Leave to File *an Amended Complaint,* 125 MOTION for Extension of Time to Complete Discovery filed by Nokia Corporation, Nokia Inc.. (Heaney, Julia) (Entered: 01/26/2007) |
| 01/26/2007 | 142 | NOTICE OF SERVICE of InterDigital's Second Amended Answers and Objections to Plaintiffs' First Set of Interrogatories by Interdigital Communications Corporation, Interdigital Technology Corporation. (Horwitz, Richard) (Entered: 01/26/2007) |
| 02/01/2007 | 143 | NOTICE of Motion for Sanctions by Interdigital Communications Corporation, Interdigital Technology Corporation (Moore, David) (Entered: 02/01/2007) |
| 02/01/2007 | | ORAL ORDER: Nokia's Motion to Amend Complaint and Motion for Extension of Time to Complete Discovery are unopposed (D.I. 141, para 1) and are therefore GRANTED. Orders will be issued. Notices for Feb. 2 Motion Day are cancelled. Ordered by Judge Joseph J. Farnan, Jr. on 02/01/2007. (dlk) (Entered: 02/01/2007) |
| 02/01/2007 | 144 | MOTION for Sanctions *Based on Nokia's Spoliation of Evidence* - filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Attachments: # 1 Exhibit A (Text of Proposed Order)# 2 Exhibit B (Rule 7.1.1 Certification))(Moore, David) (Entered: 02/01/2007) |
| 02/01/2007 | 145 | SEALED OPENING BRIEF in Support re 144 MOTION for Sanctions *Based on Nokia's Spoliation of Evidence* filed by Interdigital Communications Corporation, Interdigital Technology Corporation.Answering Brief/Response due date per Local Rules is 2/20/2007. (Moore, David) (Entered: 02/01/2007) |
| 02/01/2007 | 146 | NOTICE of Motion for Leave to Amend by Interdigital Communications Corporation, Interdigital Technology Corporation (Moore, David) (Entered: 02/01/2007) |
| 02/01/2007 | 147 | SEALED MOTION for Leave to File *an Amended Answer and Original Counterclaim* - filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 02/01/2007) |
| 02/01/2007 | 148 | SEALED OPENING BRIEF in Support re 147 SEALED MOTION for |

| | | |
|---|---|---|
| | | Leave to File *an Amended Answer and Original Counterclaim* filed by Interdigital Communications Corporation, Interdigital Technology Corporation.Answering Brief/Response due date per Local Rules is 2/20/2007. (Moore, David) (Entered: 02/01/2007) |
| 02/02/2007 | 149 | Order Setting Teleconference: Telephone Conference scheduled for 2/16/2007 at 9:00 a.m. has been rescheduled to 2/21/2007 at 10:00 AM before Honorable Mary Pat Thynge. Signed by Judge Mary Pat Thynge on 2/2/2007. Modified on 2/2/2007 (cak). (Entered: 02/02/2007) |
| 02/02/2007 | | CORRECTING ENTRY: Corrected pdf for D.I. 149 (cak) (Entered: 02/02/2007) |
| 02/02/2007 | 150 | REDACTED VERSION of 145 Opening Brief in Support, *of its Motion for Sanctions* by Interdigital Communications Corporation, Interdigital Technology Corporation. (Attachments: # 1 Exhibit 1-7)(Moore, David) (Entered: 02/02/2007) |
| 02/06/2007 | 151 | ORDER GRANTING D.I. # 121 Motion for Leave to Amend Complaint. Plaintiff's First Amended Complaint deemed filed as of date of this Order. Def't's Answer due by 2/21/2007. Signed by Judge Joseph J. Farnan, Jr. on 2/6/2007. (lec) (Entered: 02/06/2007) |
| 02/06/2007 | | Set/Reset Answer Deadlines: Interdigital Communications Corporation Answer to Amended Complaint due 2/21/2007; Interdigital Technology Corporation Answer to Amended Complaint due 2/21/2007. (lec) (Entered: 02/06/2007) |
| 02/07/2007 | 152 | REDACTED VERSION of 147 SEALED MOTION for Leave to File *an Amended Answer and Original Counterclaim* by Interdigital Communications Corporation, Interdigital Technology Corporation. (Attachments: # 1 Exhibit A-C# 2 Text of Proposed Order Ex. D# 3 Exhibit E)(Moore, David) (Entered: 02/07/2007) |
| 02/07/2007 | 153 | REDACTED VERSION of 148 Opening Brief in Support, *Motion for Leave to Amend* by Interdigital Communications Corporation, Interdigital Technology Corporation. (Attachments: # 1 Exhibit 1-2)(Moore, David) (Entered: 02/07/2007) |
| 02/09/2007 | 154 | REDACTED VERSION of First AMENDED COMPLAINT, D.I. 122 *(Final Public Version) of D.I. 138* against Interdigital Communications Corporation, Interdigital Technology Corporation- filed by Nokia Corporation, Nokia Inc., as granted by So Ordered, D.I. 151. (Attachments: # 1 Exhibit A and B)(Heaney, Julia) Modified on 2/12/2007 (rbe, (Entered: 02/09/2007) |
| 02/12/2007 | | CORRECTING ENTRY: Docket text modified for D.I. 154 to reflect that filing is a redacted document. (rbe) (Entered: 02/12/2007) |
| 02/15/2007 | 155 | ORDER GRANTING D.I. # 125 Motion for Extension of Time to Complete Discoveryby 4/29/2007. Parties to submmit a Joint Proposed Amended Rule 16 Scheduling Order by 2/20/2007. Signed by Judge Joseph J. Farnan, Jr. on 2/15/2007. (lec) (Entered: 02/15/2007) |

| 02/15/2007 | 156 | MOTION to Withdraw 147 SEALED MOTION for Leave to File *an Amended Answer and Original Counterclaim* - filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 02/15/2007) |
| --- | --- | --- |
| 02/15/2007 | 157 | SEALED ANSWERING BRIEF in Opposition re 144 MOTION for Sanctions *Based on Nokia's Spoliation of Evidence* filed by Nokia Corporation, Nokia Inc..Reply Brief due date per Local Rules is 2/26/2007. (Attachments: # 1 Exhibits A-D)(Heaney, Julia) (Entered: 02/15/2007) |
| 02/16/2007 | 164 | THIRD DISCOVERY ORDER regarding Defendants' Motions to Compel and Plaintiffs' Cross-Motion for Protective Order. Parties shall submit a joint letter to the Special Master setting forth the disputes that remain to be resolved related to the pending motions by 3/2/2007 (See Order for Details).Notice of Compliance deadline set for 3/2/2007. Signed by Special Master Collins J. Seitz, Jr. on 2/16/2007. (lec) (Entered: 02/22/2007) |
| 02/20/2007 | 158 | Letter to The Honorable Joseph J. Farnan, Jr. from Jack B. Blumenfeld regarding proposed Amended Rule 16 Scheduling Order. (Attachments: # 1 Text of Proposed Order)(Blumenfeld, Jack) (Entered: 02/20/2007) |
| 02/21/2007 | 159 | Order Setting Teleconference: Telephone Conference set for 4/18/2007 10:30 AM before Honorable Mary Pat Thynge. Signed by Judge Mary Pat Thynge on 2/21/2007. (cak) (Entered: 02/21/2007) |
| 02/21/2007 | 160 | ANSWER to Amended Complaint with JURY DEMAND *(SEALED)*, COUNTERCLAIM against Nokia Corporation, Nokia Inc. by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 02/21/2007) |
| 02/21/2007 | 161 | MOTION to Dismiss Based upon Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 12(h)(3) - filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Attachments: # 1 Text of Proposed Order)(Moore, David) (Entered: 02/21/2007) |
| 02/21/2007 | 162 | SEALED OPENING BRIEF in Support re 161 MOTION to Dismiss Based upon Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 12 (h)(3) filed by Interdigital Communications Corporation, Interdigital Technology Corporation.Answering Brief/Response due date per Local Rules is 3/12/2007. (Moore, David) (Entered: 02/21/2007) |
| 02/21/2007 | 163 | SEALED DECLARATION re 162 Opening Brief in Support, *of Defendants' Motion to Dismiss First Amended Complaint (Declaration of Richard S. Zembek)* by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 02/21/2007) |
| 02/22/2007 | 165 | SEALED REPLY BRIEF re 144 MOTION for Sanctions *Based on Nokia's Spoliation of Evidence* filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 02/22/2007) |

| 02/27/2007 | 166 | REDACTED VERSION of 165 Reply Brief *to Plaintiffs' Answering Brief in Response to Defendants' Motion for Sanctions* by Interdigital Communications Corporation, Interdigital Technology Corporation. (Attachments: # 1 Exhibit A-E)(Moore, David) (Entered: 02/27/2007) |
| --- | --- | --- |
| 02/28/2007 | 167 | STIPULATION TO EXTEND TIME time for plaintiffs' response to defendants' motion to dismiss (D.I. 161) and time for plaintiffs to respond to defendants' counterclaims (D.I. 160) to March 21, 2007 and March 27, 2007 respectively - filed by Nokia Corporation, Nokia Inc., Interdigital Communications Corporation, Interdigital Technology Corporation. (Blumenfeld, Jack) (Entered: 02/28/2007) |
| 03/01/2007 | 168 | REDACTED VERSION of 160 Answer to Amended Complaint, Counterclaim *[InterDigital's Original Answer to Nokia's First Amended Complaint and Original Counterclaims]* by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 03/01/2007) |
| 03/01/2007 | 169 | REDACTED VERSION of 162 Opening Brief in Support, *of Defendants' Motion to Dismiss First Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(B)(1), 12 (B)(6), and 12(H)(3)* by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 03/01/2007) |
| 03/01/2007 | 170 | REDACTED VERSION of 163 Declaration, *(Declaration of Richard S. Zembek)* by Interdigital Communications Corporation, Interdigital Technology Corporation. (Attachments: # 1 Exhibit A-C# 2 Exhibit D part 1# 3 Exhibit D part 2# 4 Exhibit E-L# 5 Exhibit M# 6 Exhibit N part 1# 7 Exhibit N part 2# 8 Exhibit O-P# 9 Exhibit Q part 1# 10 Exhibit Q part 2# 11 Exhibit R-T)(Moore, David) (Entered: 03/01/2007) |
| 03/01/2007 | 171 | AMENDED RULE 16 SCHEDULING ORDER: Interim Status Report due by 8/15/2007., Fact Discovery due by 12/14/2007.,Expert Discovery closed on 6/27/2008., If necessary, a Markman Hearing will be scheduled., Disputed Claim Terms agreed to by 2/15/2008., Joint Claim Construction Statement due by 2/2/2008.,Markman opening Briefs by 5/16/2008., Markman Answer Briefs by 7/1/2008., Pretrial Conference set for 10/16/2008 at 11:00 AM in Courtroom 4B before Honorable Joseph J. Farnan, Jr. Trial to be scheduled (SEE ORDER FOR FURTHER DETAILS). Signed by Judge Joseph J. Farnan, Jr. on 3/1/2007. (lec) (Entered: 03/01/2007) |
| 03/01/2007 | 172 | NOTICE OF SERVICE of Addendum to Plaintiffs' Statement Pursuant to Second Discovery Order by Nokia Corporation, Nokia Inc..(Blumenfeld, Jack) (Entered: 03/01/2007) |
| 03/01/2007 | | SO ORDERED D.I.167 STIPULATION TO EXTEND TIME time for plaintiffs' response to defendants' motion to dismiss D.I. 161 to 3/21/2007 AND TIME for plaintiffs to respond to defendants' counterclaims D.I. 160 to 3/27/2007. Set Briefing Schedule: Answering Brief due 3/21/2007 re 161., Set/Reset Answer Deadlines: Nokia Corporation answer due 3/27/2007 re 160. Signed by Judge Joseph J. |

| | | |
|---|---|---|
| | | Farnan, Jr. on 3/1/2007. (lec) (Entered: 03/02/2007) |
| 03/02/2007 | | ORAL ORDER: For the reasons stated on the record during the 3/2/07 Motion Day Hearing, D.I. 144 MOTION for Sanctions *Based on Nokia's Spoliation of Evidence* filed by Interdigital Technology Corporation, Interdigital Communications Corporation is DENIED.. Ordered by Judge Joseph J. Farnan, Jr. on 03/02/2007. (Entered: 03/02/2007) |
| 03/02/2007 | | Minute Entry for proceedings held before Judge Joseph J. Farnan, Jr. : Motion Day Hearing held on 3/2/2007 re D.I. 144. Oral Order issued. (Court Reporter Heather M. Triozzi.) (lec) (Entered: 03/06/2007) |
| 03/05/2007 | 173 | NOTICE OF SERVICE of InterDigital's First Amended Responses and Objections to Plaintiffs' First Set of Requests for Production by Interdigital Communications Corporation, Interdigital Technology Corporation.(Moore, David) (Entered: 03/05/2007) |
| 03/06/2007 | 174 | SEALED TRANSCRIPT of Motion Hearing held on 3/2/2007 before Judge Joseph J. Farnan, Jr. Court Reporter: Heather M. Triozzi. (Transcript on file in Clerk's Office) (lec) (Entered: 03/07/2007) |
| 03/09/2007 | 175 | Letter to The Honorable Joseph J. Farnan, Jr. from David E. Moore, Esquire regarding March 2, 2007 transcript - re [174] Transcript. (Moore, David) (Entered: 03/09/2007) |
| 03/14/2007 | 176 | Letter to Dr. Peter T. Dalleo from Julia Heaney regarding redacted version of March 2, 2007 hearing transcript for filing - re 175 Letter. (Attachments: # 1 Attachment)(Heaney, Julia) (Entered: 03/14/2007) |
| 03/21/2007 | 177 | SEALED ANSWERING BRIEF in Opposition re 161 MOTION to Dismiss Based upon Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 12(h)(3) filed by Nokia Corporation, Nokia Inc..Reply Brief due date per Local Rules is 4/2/2007. (Heaney, Julia) (Entered: 03/21/2007) |
| 03/22/2007 | 178 | ORDER DENYING D.I. 86 Motion for Leave to File Motion For Summary Judgment. Signed by Judge Joseph J. Farnan, Jr. on 3/22/2007. (lec) (Entered: 03/22/2007) |
| 03/23/2007 | 179 | NOTICE OF SERVICE of Plaintiffs' Second Set of Interrogatories and Plaintiffs' Second Set of Requests for Production by Nokia Corporation, Nokia Inc..(Heaney, Julia) (Entered: 03/23/2007) |
| 03/27/2007 | 180 | ANSWER to Counterclaim *Reply to InterDigital's Original Counterclaims* by Nokia Corporation, Nokia Inc..(Heaney, Julia) (Entered: 03/27/2007) |
| 03/28/2007 | 181 | REDACTED VERSION of 177 Answering Brief in Opposition *to Defendants' Motion to Dismiss First Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(B)(1), 12(B)(6), and 12(H)(3)* by Nokia Corporation, Nokia Inc.. (Attachments: # 1 Exhibit A-E)(Heaney, Julia) (Entered: 03/28/2007) |
| 03/28/2007 | 182 | STIPULATION TO EXTEND TIME to file a Reply Brief on InterDigital's Motion to Dismiss the Amended Complaint to April 11, |

| | | |
|---|---|---|
| | | 2007 - filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 03/28/2007) |
| 03/29/2007 | | SO ORDERED D.I. 182 STIPULATION TO EXTEND TIME to file a Reply Brief on InterDigital's Motion to Dismiss the Amended Complaint D.I. 161 to April 11, 2007 filed by Interdigital Technology Corporation, Interdigital Communications Corporation, Set Briefing Schedule: Reply Brief due 4/11/2007. Signed by Judge Joseph J. Farnan, Jr. on 3/29/2007. (lec) (Entered: 03/30/2007) |
| 04/02/2007 | 183 | Letter to The Honorable Joseph J. Farnan, Jr. from Julia Heaney regarding proposed Second Amended Scheduling Order - re 171 Scheduling Order,.. (Attachments: # 1 Text of Proposed Order)(Heaney, Julia) (Entered: 04/02/2007) |
| 04/05/2007 | 184 | NOTICE of Entry of Appearance of the law firms Wilson Sonsini Goodrich & Rosati, and Wilmer Cutler Pickering Hale and Dorr LLP by Interdigital Communications Corporation, Interdigital Technology Corporation (Moore, David) (Entered: 04/05/2007) |
| 04/06/2007 | 185 | MOTION for Pro Hac Vice Appearance of Attorney Ron E. Shulman, Michael B. Levin and Gregory J. Wallace of WIlson Sonsini Goodrich & Rosati - filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 04/06/2007) |
| 04/06/2007 | 186 | MOTION for Pro Hac Vice Appearance of Attorney Mark D. Flanagan and Nathan L. Walker of Wilmer Cutler Pickering Hale and Dorr LLP - filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 04/06/2007) |
| 04/06/2007 | 187 | STIPULATION TO EXTEND TIME for InterDigital to file and serve a Reply Brief on Its Motion to Dismiss the Amended Complaint to May 9, 2007 - filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Horwitz, Richard) (Entered: 04/06/2007) |
| 04/10/2007 | | SO ORDERED D.I. 186 MOTION for Pro Hac Vice Appearance of Attorney Mark D. Flanagan and Nathan L. Walker of Wilmer Cutler Pickering Hale and Dorr LLP filed by Interdigital Technology Corporation, Interdigital Communications Corporation. Signed by Judge Joseph J. Farnan, Jr. on 4/10/2007. (lec) (Entered: 04/11/2007) |
| 04/10/2007 | | SO ORDERED D.I. 185 MOTION for Pro Hac Vice Appearance of Attorney Ron E. Shulman, Michael B. Levin and Gregory J. Wallace of WIlson Sonsini Goodrich & Rosati filed by Interdigital Technology Corporation, Interdigital Communications Corporation. Signed by Judge Joseph J. Farnan, Jr. on 4/10/2007. (lec) (Entered: 04/11/2007) |
| 04/10/2007 | | SO ORDERED D.I. 187 STIPULATION TO EXTEND TIME for InterDigital to file and serve a Reply Brief on Its Motion to Dismiss the Amended Complaint D.I. 161 to May 9, 2007 filed by Interdigital Technology Corporation. Reply Brief due 5/9/2007. Signed by Judge Joseph J. Farnan, Jr. on 4/10/2007. (lec) (Entered: 04/11/2007) |
| | | |

| 04/12/2007 | 188 | MOTION for Pro Hac Vice Appearance of Attorney Christopher P. Isaac, R. Bruce Bower, Roger D. Taylor, Houtan K. Esfahani, Rajev Gupta and Patrick J. Coyne - filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 04/12/2007) |
|---|---|---|
| 04/13/2007 | 189 | NOTICE *of Withdrawal of Counsel for Interdigital Communications Corporation and InterDigital Technology Corporation]* - filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Attachments: # 1 Text of Proposed Order)(Moore, David) Modified on 5/29/2007 (lec, ). (Entered: 04/13/2007) |
| 04/18/2007 | 190 | Order Setting Teleconference: Telephone Conference set for 5/14/2007 at 3:00 PM before Honorable Mary Pat Thynge. Signed by Judge Mary Pat Thynge on 4/18/2007. (cak) (Entered: 04/18/2007) |
| 04/18/2007 | | SO ORDERED D.I.188 MOTION for Pro Hac Vice Appearance of Attorney Christopher P. Isaac, R. Bruce Bower, Roger D. Taylor, Houtan K. Esfahani, Rajev Gupta and Patrick J. Coyne filed by Interdigital Technology Corporation, Interdigital Communications Corporation. Signed by Judge Joseph J. Farnan, Jr. on 4/18/2007. (lec) (Entered: 04/18/2007) |
| 04/18/2007 | 191 | NOTICE OF SERVICE of Plaintiffs' Third Set of Interrogatories and Plaintiffs' Third Set of Requests for Production by Nokia Corporation, Nokia Inc..(Heaney, Julia) (Entered: 04/18/2007) |
| 05/07/2007 | 192 | NOTICE OF SERVICE of InterDigital's Responses and Objections to Plaintiffs' Second Set of Requests for Production; and InterDigital's Responses and Objections to Plaintiffs' Second Set of Interrogatories by Interdigital Communications Corporation, Interdigital Technology Corporation.(Moore, David) (Entered: 05/07/2007) |
| 05/09/2007 | 193 | REPLY BRIEF re 161 MOTION to Dismiss Based upon Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 12(h)(3) *[Reply Brief in Support of Defendants' Motion to Dismiss First Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 12 (h)(3)]* filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Attachments: # 1 Exhibit A)(Horwitz, Richard) (Entered: 05/09/2007) |
| 05/11/2007 | 194 | MOTION for Pro Hac Vice Appearance of Attorney Elizabeth I. Rogers of WilmerHale - filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 05/11/2007) |
| 05/14/2007 | 195 | NOTICE OF SERVICE of (1) Plaintiffs' Fourth Set of Interrogatories and (2) Plaintiffs' Fourth Set of Requests for Production by Nokia Corporation, Nokia Inc..(Heaney, Julia) (Entered: 05/14/2007) |
| 05/14/2007 | 196 | MOTION for Pro Hac Vice Appearance of Attorney Jeffrey J. Swart - filed by Nokia Corporation, Nokia Inc.. (Blumenfeld, Jack) (Entered: 05/14/2007) |

| | | |
|---|---|---|
| 05/15/2007 | 197 | Order Setting Teleconference: Telephone Conference set for 8/2/2007 at 11:00 AM Eastern Time before Honorable Mary Pat Thynge. Signed by Judge Mary Pat Thynge on 5/15/2007. (cak) (Entered: 05/15/2007) |
| 05/18/2007 | 198 | NOTICE OF SERVICE of INTERDIGITAL'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' THIRD SET OF REQUESTS FOR PRODUCTION; INTERDIGITAL'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' THIRD SET OF INTERROGATORIES re 191 Notice of Service by Interdigital Communications Corporation, Interdigital Technology Corporation. Related document: 191 Notice of Service filed by Nokia Inc., Nokia Corporation.(Moore, David) (Entered: 05/18/2007) |
| 05/22/2007 | | SO ORDERED D.I. 196 MOTION for Pro Hac Vice Appearance of Attorney Jeffrey J. Swart filed by Nokia Inc., Nokia Corporation and D.I. 194 MOTION for Pro Hac Vice Appearance of Attorney Elizabeth I. Rogers of WilmerHale filed by Interdigital Technology Corporation, Interdigital Communications Corporation. Signed by Judge Joseph J. Farnan, Jr. on 5/22/2007. (lec) (Entered: 05/23/2007) |
| 05/23/2007 | 199 | NOTICE OF SERVICE of Defendants' Third Set of Interrogatories to Plaintiff (Nos. 22-30); and Defendants' Third Set of Requests for Production to Plaintiffs (Nos. 57-73) by Interdigital Communications Corporation, Interdigital Technology Corporation.(Moore, David) (Entered: 05/23/2007) |
| 06/04/2007 | | CORRECTING ENTRY: Deleted D.I. 200 Ltr (per atty request). Docket No. 200 is available for re-use.(lec) (Entered: 06/04/2007) |
| 06/08/2007 | 200 | MOTION for Pro Hac Vice Appearance of Attorney Lionel M. Lavenue, Steven L. Park, Elizabeth A. Niemeyer and Qingyu Yin of Finnegan Henderson Farabow Garrett & Dunner LLP - filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) Additional attachment(s) added on 6/12/2007 (lec, ). (Entered: 06/08/2007) |
| 06/12/2007 | | CORRECTING ENTRY: Deleted D.I. 201 which was the corrected version of D.I. 200 Motion for Pro Hac Vice. Replaced D.I. 200 with the Corrected Version. Docket No. 201 is available for re-use. (lec) (Entered: 06/12/2007) |
| 06/14/2007 | 201 | NOTICE OF SERVICE of Interdigital's Responses and Objections to Plaintiffs' Fourth Set of Interrogatories and Interdigital's Responses and Objections to Plaintiffs' Fourth Set of Requests For Production by Interdigital Communications Corporation, Interdigital Technology Corporation.(Moore, David) (Entered: 06/14/2007) |
| 06/14/2007 | | SO ORDERED D.I. 200 MOTION (corrected version) for Pro Hac Vice Appearance of Attorney Lionel M. Lavenue, Steven L. Park, Elizabeth A. Niemeyer and Qingyu Yin of Finnegan Henderson Farabow Garrett & Dunner LLP filed by Interdigital Technology Corporation, Interdigital Communications Corporation. Signed by Judge Joseph J. Farnan, Jr. on 6/14/2007. (lec) (Entered: 06/14/2007) |
| | | |

| | | |
|---|---|---|
| 06/29/2007 | 202 | NOTICE OF SERVICE of (i) Plaintiffs' Objections and Responses to Defendants' Third Set of Interrogatories to Plaintiff and (ii) Plaintiffs' Objections and Responses to Defendants' Third Set of Requests for Production to Plaintiffs by Nokia Corporation, Nokia Inc..(Blumenfeld, Jack) (Entered: 06/29/2007) |
| 06/29/2007 | 203 | CASE MANAGEMENT ORDER (See Order for Details). Signed by Special Master Collins J. Seitz, Jr., on 6/29/2007. (lec) (Entered: 07/02/2007) |
| 07/09/2007 | 204 | PROPOSED FIRST AMENDED CASE MANAGEMENT ORDER (See Order For Details) . Signed by Special Master Collins J. Seitz, Jr. on 7/9/2007. (lec) (Entered: 07/09/2007) |
| 07/13/2007 | 205 | STATEMENT re 204 Order *Plaintiffs' Reservation of Rights Regarding Amended Case Management Order* by Nokia Corporation, Nokia Inc.. (Heaney, Julia) (Entered: 07/13/2007) |
| 07/31/2007 | 206 | NOTICE OF SERVICE of Plaintiffs' Response To InterDigital's Statement Pursuant To Second Discovery Order Regarding Nokia's Patents by Nokia Corporation, Nokia Inc..(Heaney, Julia) (Entered: 07/31/2007) |
| 08/06/2007 | 207 | ORDER Setting Mediation Conferences:Mediation Conference set for 8/30/2007 at 10:00 AM in Courtroom 6C before Honorable Mary Pat Thynge. Dress for the mediation is casual. Statements due 8/20/2007. Signed by Judge Mary Pat Thynge on 8/6/2007. (cak) (Entered: 08/06/2007) |
| 08/13/2007 | 208 | NOTICE OF SERVICE of Supplement to Plaintiffs' Statement Pursuant to Second Discovery Order by Nokia Corporation, Nokia Inc.. (Blumenfeld, Jack) (Entered: 08/13/2007) |
| 08/14/2007 | 209 | NOTICE OF SERVICE of Plaintiffs' Supplemental and Amended Response to InterDigital's Statement Pursuant to Second Discovery Order Regarding Nokia's Patents by Nokia Corporation, Nokia Inc.. (Blumenfeld, Jack) (Entered: 08/14/2007) |
| 08/15/2007 | 210 | Letter to The Honorable Joseph J. Farnan, Jr. from Jack B. Blumenfeld regarding Joint Interim Status Report. (Blumenfeld, Jack) (Entered: 08/15/2007) |
| 08/24/2007 | 211 | ORDER Cancelling mediation scheduled for 8/30/07 at 10:00. Signed by Judge Mary Pat Thynge on 8/24/07. (ntl) (Entered: 08/24/2007) |
| 08/24/2007 | 212 | OBJECTIONS by Nokia Corporation, Nokia Inc. *Objections to the August 20, 2007 Decision of the Special Master*. (Heaney, Julia) (Entered: 08/24/2007) |
| 08/24/2007 | 213 | SEALED OPENING BRIEF in Support *of Objections to Special Master's August 20, 2007 Decision (D.I. 212)* filed by Nokia Corporation, Nokia Inc..Answering Brief/Response due date per Local Rules is 9/13/2007. (Attachments: # 1 Attachments A-L)(Heaney, Julia) (Entered: 08/24/2007) |

| 08/29/2007 | 214 | ORDER ADOPTING D.I. 204 Proposed First Amended Case Management Order. Signed by Judge Joseph J. Farnan, Jr. on 8/29/2007. (lec) (Entered: 08/30/2007) |
|---|---|---|
| 08/29/2007 | 215 | AMENDED CASE MANAGEMENT ORDER re D.I. 214 and D.I. 204 Proposed Case Management Order. Signed by Judge Joseph J. Farnan, Jr. on 8/29/2007. (lec) (Entered: 08/30/2007) |
| 09/05/2007 | 216 | SEALED ANSWERING BRIEF in Opposition *[INTERDIGITAL'S OPPOSITION TO NOKIA'S OBJECTIONS TO SPECIAL MASTER'S AUGUST 20, 2007 DECISION (D.I. 212)]* filed by Interdigital Communications Corporation, Interdigital Technology Corporation.Reply Brief due date per Local Rules is 9/17/2007. (Moore, David) (Entered: 09/05/2007) |
| 09/06/2007 | 217 | Letter to The Honorable Joseph J. Farnan, Jr. from Richard L. Horwitz regarding status of briefing and resolution of Nokia's objections to Special Master's Order. (Horwitz, Richard) (Entered: 09/06/2007) |
| 09/12/2007 | 218 | REDACTED VERSION of 216 Answering Brief in Opposition, *[INTERDIGITAL'S OPPOSITION TO NOKIA'S OBJECTIONS TO SPECIAL MASTER'S AUGUST 20, 2007 DECISION (D.I. 212)]* by Interdigital Communications Corporation, Interdigital Technology Corporation. (Attachments: # 1 Exhibit 1# 2 Exhibit 2 part 1# 3 Exhibit 2 part 2# 4 Exhibit 3-12)(Moore, David) (Entered: 09/12/2007) |
| 09/17/2007 | 219 | SEALED REPLY BRIEF *in Support of Its Objections to Special Master's August 20, 2007 Decision* filed by Nokia Corporation, Nokia Inc.. (Attachments: # 1 Exhibit A)(Blumenfeld, Jack) (Entered: 09/17/2007) |
| 09/26/2007 | 220 | ORDER that Plaintiffs Nokia Corporation and Nokia Inc.'s Objections To Special Master's August 20, 2007 Decision 212are OVERRULED.. Signed by Judge Joseph J. Farnan, Jr. on 9/26/2007. (lec) (Entered: 09/27/2007) |
| 09/28/2007 | 221 | NOTICE OF SERVICE of InterDigital's First Supplemental Responses and Objections to Plaintiffs' Third Set of Interrogatories by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 09/28/2007) |
| 10/01/2007 | 222 | NOTICE OF SERVICE of Amendment to Plaintiffs' Statement Pursuant to Second Discovery Order by Nokia Corporation, Nokia Inc..(Heaney, Julia) (Entered: 10/01/2007) |
| 10/04/2007 | 223 | NOTICE OF SERVICE of Defendants' Fourth Set of Requests For Production to Plaintiffs (Nos. 74-121) by Interdigital Communications Corporation, Interdigital Technology Corporation.(Moore, David) (Entered: 10/04/2007) |
| 10/04/2007 | 224 | NOTICE OF SERVICE of Notice of Deposition of Faith M. Ozluturk and Notice of Deposition of Gary R. Lomp by Nokia Corporation, Nokia Inc..(Heaney, Julia) (Entered: 10/04/2007) |
| 10/05/2007 | 225 | MOTION for Protective Order *(AGREED AMENDED PROTECTIVE* |

| | | |
|---|---|---|
| | | *ORDER]* - filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 10/05/2007) |
| 10/05/2007 | 226 | MOTION to Stay *Pursuant to 28 U.S.C. § 1659(a)* - filed by Nokia Corporation, Nokia Inc.. (Blumenfeld, Jack) (Entered: 10/05/2007) |
| 10/05/2007 | 227 | NOTICE of Plaintiffs' Motion for Mandatory Stay Pursuant to 28 U.S.C. § 1659(a) by Nokia Corporation, Nokia Inc. re 226 MOTION to Stay *Pursuant to 28 U.S.C. § 1659(a)* (Blumenfeld, Jack) (Entered: 10/05/2007) |
| 10/05/2007 | 228 | SEALED OPENING BRIEF in Support re 226 MOTION to Stay *Pursuant to 28 U.S.C. § 1659(a)* filed by Nokia Corporation, Nokia Inc..Answering Brief/Response due date per Local Rules is 10/25/2007. (Attachments: # 1 Exhibits A through M)(Blumenfeld, Jack) (Entered: 10/05/2007) |
| 10/10/2007 | 229 | SO ORDERED - Amended Protective Order. Signed by Judge Joseph J. Farnan, Jr. on 10/10/07. (rwc) (Entered: 10/10/2007) |
| 10/10/2007 | 230 | ORDER, GRANTING AGREED AMENDED PROTECTIVE ORDER 225. Signed by Judge Joseph J. Farnan, Jr. on 10/10/07. (bkb) (Entered: 10/10/2007) |
| 10/11/2007 | 231 | REDACTED VERSION of 228 Opening Brief in Support, *of Motion for Mandatory Stay Pursuant to 28 U.S.C. § 1659(a)* by Nokia Corporation, Nokia Inc.. (Attachments: # 1 Exhibits A-F# 2 Exhibit G (Part 1)# 3 Exhibit G (Part 2)# 4 Exhibits H-M)(Heaney, Julia) (Entered: 10/11/2007) |
| 10/12/2007 | 232 | NOTICE OF SERVICE of (1) Second Notice of Deposition for Gary R. Lomp and (2) Second Notice of Deposition for Fatih M. Ozluturk by Nokia Corporation, Nokia Inc..(Heaney, Julia) (Entered: 10/12/2007) |
| 10/12/2007 | 233 | NOTICE of Subpoena for Gary R. Lomp by Nokia Corporation, Nokia Inc. (Attachments: # 1 Exhibit A)(Heaney, Julia) (Entered: 10/12/2007) |
| 10/19/2007 | 234 | STIPULATION TO EXTEND TIME to respond to plaintiffs' Motion to Stay (D.I. 226) to October 29, 2007 - filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 10/19/2007) |
| 10/29/2007 | 235 | STIPULATION TO EXTEND TIME to respond to plaintiffs' Motion to Stay to October 30, 2007 - filed by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 10/29/2007) |
| 10/29/2007 | | SO ORDERED, re 235 STIPULATION TO EXTEND TIME to respond to plaintiffs' Motion to Stay to October 30, 2007 filed by Interdigital Technology Corporation, Interdigital Communications Corporation, Set Briefing Schedule: Answering Brief due 10/30/2007.. Signed by Judge Joseph J. Farnan, Jr. on 10/29/07. (bkb) (Entered: 10/30/2007) |
| 10/30/2007 | | SO ORDERED, re 234 STIPULATION TO EXTEND TIME to respond |

| | | |
|---|---|---|
| | | to plaintiffs' Motion to Stay (D.I. 226) to October 29, 2007 filed by Interdigital Technology Corporation, Interdigital Communications Corporation, Set Briefing Schedule: re226 MOTION to Stay *Pursuant to 28 U.S.C. § 1659(a)*. Answering Brief due 10/29/2007. Signed by Judge Joseph J. Farnan, Jr. on 10/30/07. (dab) (Entered: 10/30/2007) |
| 10/30/2007 | 236 | SEALED ANSWERING BRIEF in Opposition re 226 MOTION to Stay *Pursuant to 28 U.S.C. § 1659(a) (INTERDIGITAL'S OPPOSITION TO NOKIA'S MOTION FOR MANDATORY STAY PURSUANT TO 28 U.S.C. § 1659(a))* filed by Interdigital Communications Corporation, Interdigital Technology Corporation.Reply Brief due date per Local Rules is 11/9/2007. (Moore, David) (Entered: 10/30/2007) |
| 10/30/2007 | 237 | PROPOSED ORDER Denying Nokia's Motion For Mandatory Stay and Granting Conditional Discretionary Stay re 226 MOTION to Stay *Pursuant to 28 U.S.C. § 1659(a)*, 236 Answering Brief in Opposition, by Interdigital Communications Corporation, Interdigital Technology Corporation. (Moore, David) (Entered: 10/30/2007) |
| 11/02/2007 | 238 | MOTION for Pro Hac Vice Appearance of Attorney John D. Haynes - filed by Nokia Corporation, Nokia Inc.. (Heaney, Julia) (Entered: 11/02/2007) |
| 11/05/2007 | 239 | NOTICE OF SERVICE of Plaintiffs' Responses and Objections to Defendants' Fourth Set of Requests for Production of Plaintiffs (Nos. 74-121) by Nokia Corporation, Nokia Inc..(Heaney, Julia) (Entered: 11/05/2007) |
| 11/05/2007 | 240 | SEALED REPLY BRIEF re 226 MOTION to Stay *Pursuant to 28 U.S.C. § 1659(a)* filed by Nokia Corporation, Nokia Inc.. (Attachments: # 1 Text of Proposed Order # 2 Exhibits A through C)(Heaney, Julia) (Entered: 11/05/2007) |
| 11/07/2007 | | SO ORDERED, re 238 MOTION for Pro Hac Vice Appearance of Attorney John D. Haynes filed by Nokia Inc., Nokia Corporation. Signed by Judge Joseph J. Farnan, Jr. on 11/7/07. (dab) (Entered: 11/07/2007) |
| 11/07/2007 | | ORAL ORDER that the November 9, 2007 Motion Day Hearing regarding D.I. 226 MOTION to Stay *Pursuant to 28 U.S.C. § 1659(a)* filed by Nokia Inc., Nokia Corporation is CANCELLED. The motion will be decided on the papers submitted. Ordered by Judge Joseph J. Farnan, Jr. on 11/07/2007. (dlk) (Entered: 11/07/2007) |
| 11/07/2007 | 241 | STIPULATION (ADDENDUM TO AGREED AMENDED PROTECTIVE ORDER) by Nokia Corporation, Nokia Inc., Interdigital Technology Corporation. (Moore, David) (Entered: 11/07/2007) |
| 11/08/2007 | 242 | REDACTED VERSION of 236 Answering Brief in Opposition, *[INTERDIGITAL'S OPPOSITION TO NOKIA'S MOTION FOR MANDATORY STAY PURSUANT TO 28 U.S.C. § 1659(a)]* by Interdigital Communications Corporation, Interdigital Technology Corporation. (Attachments: # 1 Exhibit 1-7)(Moore, David) (Entered: 11/08/2007) |

App. 34

| 11/08/2007 | | ORDER GRANTING ADDENDUM TO AGREED AMENDED PROTECTIVE ORDER re 241 Stipulation filed by Nokia Inc., Nokia Corporation, Interdigital Technology Corporation that patent prosecutions limitation of Paragraph 11 of the Order shall not apply to lawyers of Fulbright & Jaworski LLP. Signed by Judge Joseph J. Farnan, Jr. on 11/8/07. (dab) (Entered: 11/08/2007) |
| --- | --- | --- |
| 11/12/2007 | 243 | MOTION for Pro Hac Vice Appearance of Attorney Ross R. Barton - filed by Nokia Corporation, Nokia Inc.. (Heaney, Julia) (Entered: 11/12/2007) |
| 11/13/2007 | 244 | REDACTED VERSION of 240 Reply Brief *in Support of Plaintiffs' Motion for Mandatory Stay Pursuant to 28 U.S.C. Section 1659(a)* by Nokia Corporation, Nokia Inc.. (Attachments: # 1 Exhibit A-C)(Heaney, Julia) (Entered: 11/13/2007) |
| 11/14/2007 | | SO ORDERED, re 243 MOTION for Pro Hac Vice Appearance of Attorney Ross R. Barton filed by Nokia Inc., Nokia Corporation. Signed by Judge Joseph J. Farnan, Jr. on 11/14/07. (bkb) (Entered: 11/14/2007) |
| 12/04/2007 | 245 | Letter to The Honorable Joseph J. Farnan, Jr. from Richard L. Horwitz, Esquire regarding enclosing Joint Proposed Order regarding Nokia's Motion for Mandatory Stay (D.I. 226) [LETTER AND PROPOSED ORDER FILED UNDER SEAL] - re 228 Opening Brief in Support, 226 MOTION to Stay *Pursuant to 28 U.S.C. § 1659(a)*, 236 Answering Brief in Opposition, 240 Reply Brief. (Horwitz, Richard) (Entered: 12/04/2007) |
| 12/05/2007 | 246 | ORDER - granting 226 Motion to Stay. Signed by Judge Joseph J. Farnan, Jr. on 12/5/07. (rwc) (UNSEALED PER DI# 247 ON 12/13/07). Modified on 12/13/2007 (rwc, ). (Entered: 12/10/2007) |
| 12/11/2007 | 247 | STIPULATION [Stipulated Motion to Unseal Order Granting Motion to Stay] re 246 Order on Motion to Stay by Interdigital Communications Corporation, Interdigital Technology Corporation. (Horwitz, Richard) (Entered: 12/11/2007) |
| 12/13/2007 | 248 | SO ORDERED - granting 247 Stipulation to Unseal Order 246. Signed by Judge Joseph J. Farnan, Jr. on 12/13/07. (rwc) (Entered: 12/13/2007) |
| 12/13/2007 | | CORRECTING ENTRY: DI# 246 ORDER WAS UNSEALED PER DI# 247 ON 12/13/07. (rwc) (Entered: 12/13/2007) |

| **PACER Service Center** | | | |
| --- | --- | --- | --- |
| **Transaction Receipt** | | | |
| 01/07/2008 11:04:51 | | | |
| **PACER Login:** | ww0039 | **Client Code:** | adm-1565301-00025/galewhite |
| **Description:** | Docket | **Search** | 1:05-cv-00016-JJF Start date: |

| | Report | Criteria: | 1/1/1970 End date: 1/7/2008 |
|---|---|---|---|
| Billable Pages: | 22 | Cost: | 1.76 |

App. 36

# EXHIBIT  B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NOKIA CORPORATION and          )
NOKIA, INC.,                   )
                               )    C. A. No. 05-16-JJF
            Plaintiffs,        )
                               )
        v.                     )    **JURY TRIAL DEMANDED**
                               )
INTERDIGITAL COMMUNICATIONS    )    **PUBLIC VERSION**
CORPORATION and INTERDIGITAL   )
TECHNOLOGY CORPORATION,        )
                               )
            Defendants.        )

**INTERDIGITAL'S ORIGINAL ANSWER TO
NOKIA'S FIRST AMENDED COMPLAINT
AND ORIGINAL COUNTERCLAIMS**

POTTER ANDERSON & CORROON LLP
Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19801
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

OF COUNSEL:

D. Dudley Oldham
Linda L. Addison
Richard S. Zembek
Fulbright & Jaworski L.L.P.
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Tel: (713) 651-5151

*Attorneys for Defendants,*
*InterDigital Communications Corporation and*
*InterDigital Technology Corporation*

Dan D. Davison
Fulbright & Jaworski L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-2784
Tel: (214) 855-8000

Dated: February 21, 2007
Public Version Dated: March 1, 2007
780493 / 28840

App. 37

Subject to and without waiving their Motion to Dismiss Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6) and 12(h)(3), InterDigital Communications Corporation ("IDCC") and InterDigital Technology Corporation ("ITC") (collectively, "InterDigital") file this Original Answer to Plaintiffs' First Amended Complaint and Original Counterclaim, and for same would respectfully show the Court as follows.

### NATURE AND BASIS OF ACTION

1.      InterDigital admits that this is purportedly an action for violations of the Lanham Act (15 U.S.C. § 1501 *et seq.*), common law unfair competition, intentional interference with business relationships or opportunities, injurious falsehood, and commercial or business disparagement, and for violations of the laws of the states of Delaware, Pennsylvania, and Texas. InterDigital admits that Nokia purports to seek damages, declaratory and injunctive relief, and disgorgement of unjust enrichment. Otherwise, deny.

### THE PARTIES

2.      InterDigital is without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 2.

3.      InterDigital is without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 3.

4.      Admit.

5.      Admit.

6.      Admit.

7.      Admit.

8.      Admit that ITC is a wholly-owned subsidiary of IDCC.

App. 38

### JURISDICTION AND VENUE

9.     InterDigital admits that this Court has jurisdiction over Nokia's Lanham Act claim pursuant to 28 U.S.C. §§ 1331 and 1338 and has supplemental jurisdiction over Nokia's claims of common law unfair competition, intentional interference with business relationships or opportunities, injurious falsehood, and commercial or business disparagement, and violations of the laws of the States of Delaware, Pennsylvania, and Texas.

10.     Admit.

11.     Admit.

### FACTS PURPORTEDLY GIVING RISE TO THIS ACTION

12.     InterDigital is without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 12.

13.     Admit that a second generation ("2G") of mobile telephone technology was developed to address capacity, one 2G technology used time division (called "Time Division Multiple Access" or "TDMA"), the 2G standard developed in Europe is called GSM, and one 2G technology uses Code Division Multiple Access (CDMA), and was specified in the United States by a standard called IS-95.  InterDigital is otherwise without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 13.

14.     Admit that GSM and IS-95 remain the two principal competing 2G standards implemented worldwide.  InterDigital is otherwise without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 14.

15.     InterDigital is without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 15.

2

16.     Admit that cdma2000 also uses code division, and will be backward compatible with IS-95.  InterDigital is otherwise without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 16.

17.     InterDigital is without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 17.

18.     Admit that in the process of specifying standards, the participants may have intellectual property rights ("IPRs") – including patents and published patent applications – where as a technical matter the standard cannot be implemented without infringing the patent (or the patent that would issue if an application were granted).  Otherwise, InterDigital is without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 18.

19.     InterDigital is without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 19.

20.     Admit that InterDigital has become a member of wireless telephony standards organizations.  Otherwise, deny.

21.     Deny.

22.     Admit that ITC has in the past asserted certain of its 2G patents in court against OKI America, Inc., Qualcomm, Inc., Motorola, Inc., and Ericsson, Inc.  Otherwise, deny.

23.     Deny.

24.     Admit that in none of these disputes did a court rule that any of ITC's patents were valid and infringed.  Otherwise, deny.

25.     Deny.

3

26. Deny.

## INTERDIGITAL'S PURPORTED FALSE STATEMENTS REGARDING THIRD GENERATION TECHNOLOGY

27. Admit that InterDigital has alleged that its patents are essential to 3G mobile telephone standards, including UMTS, CDMA 2000, and TD-SCDMA.

28. Admit that ITC has filed an IPR Information Statement and Licensing Declaration ("ETSI IPR Statement") that identifies at least 195 patents with the European Telecommunications Standards Institute ("ETSI"). Admit that ITC filed an ETSI IPR Statement in April 2001 and April 2004. Otherwise, deny.

29. Admit that ETSI is one of the Standards Setting Organizations ("SSOs"). Admit that ETSI requires its members to disclose IPRs that are believed in their opinion to be, are likely to become, or might be Essential, as that term is defined in the ETSI IPR Policy. Admit that ETSI makes the disclosed IPRs publicly available through a searchable database on its website. Otherwise, deny

30. Admit that at the time ITC made the 2001 and 2004 disclosures to ETSI (and currently), the term "ESSENTIAL" with respect to IPRs was a defined term defined in part as follows:

> "ESSENTIAL" as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

Otherwise, deny.

31. Deny.

4

App. 41

32.    Admit that section 5 of ETSI TS 121.101 lists separately numbered technical specifications and technical reports. Otherwise, deny.

33.    Admit that the patents ITC disclosed in ITC's ETSI IPR Statements are publicly available through a searchable database on ETSI's website. Otherwise, deny.

34.    Admit that in a press release issued on November 10, 2006, by IDCC states that it "has built an intellectual property portfolio of more than 7,500 issued patents and patents pending around the world," "active participation in global standards bodies that shape the evolution of the technology and the future of the industry," and "a strong portfolio of patented technologies which it licenses to manufacturers of 2G, 2.5G, 3G and 802 products worldwide." Otherwise, deny.

35.    Deny.

36.    Deny.

     a.    InterDigital is without knowledge or information sufficient to form a belief as to the truth of the averments regarding "Participants in the industry, including manufacturers and users of 3G compliant equipment." Otherwise, deny.

     b.    Deny. In addition, InterDigital incorporates by reference InterDigital's Statement Pursuant to Second Discovery Order.

     c.    Deny.

     d.    InterDigital is without knowledge or information sufficient to form a belief as to the truth of the averments regarding "members of the industry." Otherwise, deny.

5

     e.     Admit that Nokia has an agreed-upon, fully-paid, irrevocable license as to certain of InterDigital Patents for certain applications. Otherwise, deny.

     f.     Deny.

37.     InterDigital is without knowledge or information sufficient to form a belief as to the truth of the averments regarding "industry as a general matter." Otherwise, deny.

### INTERDIGITAL'S PURPORTED ABUSE OF THE STANDARDS PROCESS

38.     Deny.

39.     Admit that InterDigital is an associate member of ETSI. Admit that ETSI has promulgated an IPR Policy. Otherwise, deny.

40.     Deny.

     a.     Deny.

     b.     Deny.

     c.     Deny.

     d.     Deny.

     e.     Deny.

41.     Deny.

42.     Deny.

43.     Deny.

44.     Deny.

45.     Because of the incomprehensible nature of the averments of Paragraph 45, InterDigital is without knowledge or information sufficient to form a belief as to the truth of the averments of Paragraph 45.

6

App. 43

46.     Deny.

## COUNT I.

### VIOLATION OF § 43(A) OF THE LANHAM ACT
### (ESSENTIALITY CLAIMS)

47.     InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 46, as if set forth in full.

48.     Deny.

49.     Deny.

50.     Deny.

51.     Deny.

52.     Deny.

53.     Deny.

54.     Deny.

55.     Deny.

56.     Deny.

57.     Deny.

58.     Deny.

## COUNT II.

### VIOLATION OF § 43(A) OF THE LANHAM ACT
### (ETSI DECLARATIONS)

59.     InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 58, as if set forth in full.

60.     Deny.

61.     Deny.

62.     Deny.

63.     Deny.

7

App. 44

64. Deny.

65. Deny.

66. Deny.

## COUNT III.

### VIOLATION OF DELAWARE DECEPTIVE TRADE PRACTICES ACT
### (6 DEL. CODE § 2532)

67. InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 66, as if set forth in full.

68. Deny.

69. Deny.

70. Deny.

71. Deny.

72. Deny.

73. Deny.

74. Deny.

75. Deny.

76. Deny.

## COUNT IV.

### COMMON LAW UNFAIR COMPETITION
### (DELAWARE)

77. InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 76, as if set forth in full.

78. Deny.

79. Deny.

80. Deny.

81. Deny.

8

App. 45

## COUNT V.

### COMMON LAW UNFAIR COMPETITION
### (PENNSYLVANIA)

82.    InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 81, as if set forth in full.

83.    Deny.

84.    Deny.

85.    Deny.

86.    Deny.

## COUNT VI.

### INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS OPPORTUNITIES
### (DELAWARE)

87.    InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 86, as if set forth in full.

88.    Deny.

89.    Deny.

90.    Deny.

91.    Deny.

92.    Deny.

93.    Deny.

## COUNT VII.

### INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS
### (PENNSYLVANIA)

94.    InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 93, as if set forth in full.

95.    Deny.

96.    Deny.

9

App. 46

97.    Deny.

98.    Deny.

99.    Deny.

100.    Deny.

101.    Deny.

102.    Deny.

### COUNT VIII.

**INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS (TEXAS)**

103.    InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 102, as if set forth in full.

104.    Deny.

105.    Deny.

106.    Deny.

107.    Deny.

108.    Deny.

109.    Deny.

110.    Deny.

111.    Deny.

### COUNT IX.

**INJURIOUS FALSEHOOD (DELAWARE)**

112.    InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 111, as if set forth in full.

113.    Deny.

114.    Deny.

App. 47

115.  Deny.

116.  Deny.

117.  Deny.

118.  Deny.

119.  Deny.

## COUNT X.

### COMMERCIAL DISPARAGEMENT
### (PENNSYLVANIA)

120.  InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 119, as if set forth in full.

121.  Deny.

122.  Deny.

123.  Deny.

124.  Deny.

125.  Deny.

126.  Deny.

127.  Deny.

## COUNT XI.

### BUSINESS DISPARAGEMENT
### (TEXAS)

128.  InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 127, as if set forth in full.

129.  Deny.

130.  Deny.

131.  Deny.

132.  Deny.

11

133.  Deny.

134.  Deny.

135.  Deny.

136.  Deny.

## COUNT XII.

### UNJUST ENRICHMENT
### (DELAWARE)

137.  InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 136, as if set forth in full.

138.  Deny.

139.  Deny.

140.  Deny.

141.  Deny.

142.  Deny.

143.  Deny.

144.  Deny.

## COUNT XIII.

### UNJUST ENRICHMENT
### (PENNSYLVANIA)

145.  InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 144, as if set forth in full.

146.  Deny.

147.  Deny.

148.  Deny.

149.  Deny.

150.  Deny.

12

App. 49

151.    Deny.

152.    Deny.

## COUNT XIV.

### UNJUST ENRICHMENT
### (TEXAS)

153.    InterDigital incorporates by reference its answers to the averments contained in Paragraphs 1 through 152, as if set forth in full.

154.    Deny.

155.    Deny.

156.    Deny.

157.    Deny.

158.    Deny.

159.    Deny.

160.    Deny.

## JURY DEMAND

InterDigital demands a trial by jury.

## PRAYER FOR RELIEF

InterDigital denies that Nokia is entitled to the requested relief. Defendants incorporate the Court's Memorandum and Order Granting Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction Over the Subject Matter Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(h)(3) as to the Declaratory Judgment Claims (Docket Entries Nos. 25 and 26) (the "Court's Order") and Defendants' Motion to Dismiss Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(h)(3).

13

App. 50

To the extent not expressly admitted above, the factual allegations contained in the Complaint are denied.

## INTERDIGITAL'S DEFENSES
### BACKGROUND

161.    This is a dispute between Plaintiffs Nokia Corporation and Nokia, Inc. (collectively "Nokia"), global leaders in the design, manufacture, and supply of mobile handset and infrastructure products, and Defendants InterDigital Communications Corporation and InterDigital Technology Corporation (collectively "InterDigital"), leading innovators and developers of wireless technology and product platforms for more than 30 years. In 1999, Nokia entered into a Patent License Agreement with InterDigital concerning 2G and 3G digital wireless technologies and a development agreement concerning certain 3G digital wireless technologies.

162.    On January 12, 2005, Nokia filed a Complaint for Declaratory Judgments of Patent Invalidity and Noninfringement and Violations of the Lanham Act Relating to 3G Mobile Phone Technology (hereafter "Complaint"). At the time Nokia filed this lawsuit, Nokia was a licensee of InterDigital's 2G and 3G patented technology. However, InterDigital and Nokia were involved in a pending I.C.C. arbitration initiated by Nokia involving past and future royalty payments due under their Patent License Agreement.

163.    In its Complaint filed in this Court, Nokia originally sought a declaratory judgment that certain claims of InterDigital's patents are invalid and that Nokia does not infringe certain claims of those patents. Nokia also alleged that InterDigital violated Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)). *Id.* at 34-35. On December 21, 2005, the Court dismissed all of Nokia's claims except its Lanham Act claim.

14

App. 51

164.    By Order dated March 22, 2006, the Court referred discovery disputes to a Special Master, the Honorable Collins J. Seitz, Jr. Following certain discovery disputes between the parties, on June 12, 2006, the Special Master issued his First Discovery Order requiring Nokia to provide a verified response regarding Paragraph 143 of its Complaint, which alleges that "InterDigital has repeatedly made public statements that its patent portfolio covers the practice of 3G wireless phone systems and the sale of 3G compliant products." Specifically, the Special Master ordered that Nokia:

> [I]dentify separately (a) each public statement that it relies upon for this allegation, (b) the date of the public statement, and (c) the identity of anyone who made the statement. For each public statement, Nokia shall also provide a detailed response why each statement is false.

165.    On June 30, 2006, Nokia served the required verified response, identifying statements that fall into the following four categories:

a.    statements made in filings with the Securities and Exchange Commission;

b.    statements on InterDigital's website and through various news outlets;

c.    statements made to the European Telecommunications Standardization Institute ("ETSI"); and

d.    statements made to Nokia during confidential licensing discussions.

**THE STANDARD SETTING PROCESS AND IPR STATEMENTS**

166.    Because (a) Nokia's claims principally concern ETSI and associated intellectual property rights ("IPR") rules and (b) Nokia has fundamentally

15

App. 52

mischaracterized these rules, it is necessary to discuss and review the actual wording of same.

167.   3GPP promulgates the UMTS Standard.   3GPP is an association of standard setting organizations.   3GPP includes ETSI as an organizational partner.   *See* www.3gpp.org/About/about.htm.   ETSI is the standard setting organizational partner through which both Nokia and InterDigital, among others, participate in 3GPP.

168.   Participants in the 3GPP standard setting process "should declare, to their organizational Partners, any IPRs which they believe to be essential, or potentially essential, to any work ongoing within 3GPP."   *See* www.3GPP.org/legal/legal.htm. 3GPP does not, however, define "essential" or "potentially essential."   Both Nokia and InterDigital declare to their organizational Partner IPRs that they believe to be essential, or potentially essential, to any work ongoing within 3GPP by submitting to ETSI Information Statements and Licensing Declarations ("ETSI IPR Statement").

169.   In addition to the requirements of 3GPP, ETSI has adopted an Intellectual Property Rights Policy ("ETSI IPR Policy") and a Guide on Intellectual Property Rights ("ETSI IPR Guide").   The ETSI IPR Policy requires ETSI Members to disclose IPRs that they believe are or might be Essential.   Specifically, the ETSI IPR Guide provides that ETSI IPR Statements are merely statements of opinion:

> Members are obliged to disclose IPRs, *which might be essential* and ETSI is obliged to make these disclosures available to Members.   *This disclosure reflects, of course, only an opinion of the Member* and some facts on the IPRs, but the Member is responsible for the content.   *Any further opinion* should be added only with the agreement of the Member or to implement a General Assembly decision.

ETSI IPR Guide at 3.3.3 (emphasis added).

16

170.    The purpose of the ETSI IPR Policy and Guide is to encourage disclosure of Essential IPRs. As the European Competition Commission explained following closure of investigation of ETSI's IPR Policy: ETSI's recent change to its standard-setting rules "strengthens the requirement for early disclosure of those intellectual property rights (IPRs) which are essential for the implementation of a standard in order to minimise the risk of so-called 'patent ambush' (where a company hides the fact that it owns        IPRs        essential        for        a        standard)." http://europa.eu/rapid/pressReleasesAction.do?reference=IP/05/1565. Concerns that ETSI's IPR rules did not sufficiently protect against the risk of "patent ambush" during ETSI standard-setting procedures prompted the Commission's investigation of ETSI's IPR rules. That is, it is under-disclosure – not over-disclosure – that is the concern that the ETSI IPR Policy and Guide seek to address.

171.    Contrary to Nokia's argument ████████████████████ ███████████ under the ETSI IPR Policy and ETSI IPR Guide, there is no requirement that an ETSI Member demonstrate any proof of Essentiality. Therefore, a belief that an IPR is or might be Essential is the threshold for the triggering of a disclosure requirement by an ETSI Member. Only the ETSI Member making a disclosure of an IPR can speak to what it believes.

172.    The current version of the ETSI IPR Policy defines IPR as follows:

> **"IPR"** shall mean any intellectual property right conferred by statute law including applications therefore other than trademarks. For the avoidance of doubt rights relating to get-up, confidential information, trade secrets or the like are excluded from the definition of IPR.

173.    The current version of the ETSI IPR Policy defines Essential with two separate limbs as follows:

17

App. 54

"ESSENTIAL" [1] as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair use or operate EQUIPMENT of METHODS which comply with a STANDARD without infringing that IPR. [2] For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

174.    Thus, the ETSI definition of Essential includes two limbs. Under the first limb of the ETSI definition of Essential, Essential IPRs include patents that are necessarily infringed by equipment or methods that comply with a Standard when taking into account normal technical practice and the state of the art generally available at the time of standardization. Under the second limb of the ETSI definition of Essential, Essential IPRs also include patents that cover technical solutions for implementing a particular Standard, where all alternative technical solutions of such Standard are also patented.

175.    The definition of Essential is not, however, limited to the current "version" of an ETSI standard or the express requirements of such a standard. The current version of the ETSI definition of Essential is further defined by reference to the defined term STANDARD:

"STANDARD" shall mean any standard adopted by ETSI including options therein or amended versions and shall include European Standards (ENs) (telecommunications series). ETSI Standards (ESs), Common Technical Regulations (CTRs) which are taken from ENs (telecommunications series) and including drafts of any of the foregoing and documents made under the previous nomenclature, including ETSs, I-ETSs, parts of NETs and TBRs, the technical specifications of which are available to all members, but not including any standards, or parts thereof, not made by ETSI.

176.    Thus, under the ETSI definition, Essential IPRs include patents that satisfy either limb of the definition of the defined term Essential for (a) any adopted standard, (b)

18

options in such standards, (c) amendments to such standards, and (d) drafts of any of the foregoing.

177.    Despite its publication of the ETSI IPR Policy and Guide, ETSI does not establish an internal process that a company should follow in making a determination as to whether it holds Essential IPRs. There are no books that define what internal process a company is to follow in making a determination as to whether it holds Essential IPRs. Nor are there professional or trade organizations that establish a process a company is to follow in making a determination as to whether it holds Essential IPRs.

178.    Prior to 2005, as admitted by Nokia's authorized representative, there was no ETSI prescribed way, nor were there any concrete guidelines, on what information an IPR owner must provide on an ETSI IPR Statement. The lack of such requirements and guidelines resulted in different IPR owners making ETSI IPR Statements in different ways.

179.    Similarly, ████████████████████████ prior to 2005, there was no ETSI requirement that an ETSI IPR Statement identify to which Standard an Essential IPR relates. Although the ETSI IPR Statement form had a place for stating the Standard number, some IPR owners disclosed this information, while most did not.

180.    Numerous examples of different approaches to providing ETSI IPR Statements may be found in the ETSI IPR Database. By way of examples, Nokia's disclosures have varied over times – sometimes providing and sometimes not providing reference to technical specifications. And, Lucent has not disclosed a single patent in an ETSI IPR Statement. Instead, Lucent has merely informed ETSI that it is likely to have IPRs Essential to UMTS and that it is prepared to license same.

### NOKIA'S IPR STATEMENTS

181.    While complaining about InterDigital's ETSI IPR Statements, Nokia has alleged that it holds hundreds of patents that are Essential to 3G standards, including the UMTS Standard and the cdma2000 Standard (collectively, the "Nokia Declared Essential IPRs").    On the Nokia website, in public presentations to investors, ████████ ████████████████████ and in ETSI IPR Statements, Nokia has represented and continues to represent that it holds in excess of 300 Essential IPRs for the UMTS Standard (the "Nokia Declared UMTS Essential IPRs") and in excess of 100 Essential IPRs for the cdma2000 Standard ("Nokia's Declared cdma2000 Essential IPRs").

182.    To bolster its claim that it holds more Essential IPR for the UMTS Standard than any other company and to support its royalty demands, Nokia secretly funded an article authored by Drs. David J. Goodman and Robert A. Myers that Nokia promotes as an independent scholarly article (the "Nokia Goodman & Myers Study"). *See* David J. Goodman & Robert A. Myers, *3G Cellular Standards and Patents*, IEEE WirelessCom    (June    13,    2005)    available    at http://europe.nokia.com/link?cid=EDITORIAL_6212    (the "Nokia Goodman & Myers Article").    Ironically, even with Nokia's funding and controlling the Nokia Goodman & Myers Study, the Nokia Goodman & Myers Article judged certain patents identified in InterDigital's ETSI IPR Statements to be Essential IPRs.    Moreover, the Nokia Goodman & Myers Article demonstrates that InterDigital has one of the highest ratios of patents judged to be essential to disclosed patents among companies that submitted ETSI IPR Statements examined in the Nokia Goodman & Myers Study.

183.    Even with Nokia's funding and controlling the Nokia Goodman & Myers Study, the Nokia Goodman & Myers Article judged over fifty five percent (55%) of the

20

App. 57

Nokia Declared UMTS Essential IPRs and over fifty five percent (55%) of the Nokia

Declared cdma2000 Essential IPRs to be Non-Essential IPRs (the "Nokia Judged Non-

Essential IPRs"). ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

184.    Nokia intentionally has concealed from standard setting organizations, its

investors, the public, ████████████████████ the identity of the Nokia Judged Non-

Essential IPRs. ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

185.    In addition to the Nokia funded and controlled Goodman & Myers Study,

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

186.    Indeed, Nokia has never requested that ETSI remove a single patent from

the ETSI IPR Database – let alone the removal of the Nokia Judged Non-Essential IPRs.

### INTERDIGITAL'S FIRST DEFENSE

187.    InterDigital incorporates by reference Paragraphs 161 through 186.

188.    Nokia has failed to state a claim on which relief may be granted.

21

### INTERDIGITAL'S SECOND DEFENSE

189.    InterDigital incorporates by reference Paragraphs 161 through 188.

190.    Nokia has waived any claim it may have had.

### INTERDIGITAL'S THIRD DEFENSE

191.    InterDigital incorporates by reference Paragraphs 161 through 190.

192.    Nokia's claims are barred by the equitable doctrine of laches.

### INTERDIGITAL'S FOURTH DEFENSE

193.    InterDigital incorporates by reference Paragraphs 161 through 192.

194.    Nokia's claims are barred by equitable estoppel.

### INTERDIGITAL'S FIFTH DEFENSE

195.    InterDigital incorporates by reference Paragraphs 161 through 194.

196.    Nokia's claims are barred by acquiescence.

### INTERDIGITAL'S SIXTH DEFENSE

197.    InterDigital incorporates by reference Paragraphs 161 through 196.

198.    Nokia's claims are barred in whole and/or in part by the applicable statute
of limitations.

### INTERDIGITAL'S SEVENTH DEFENSE

199.    InterDigital incorporates by reference Paragraphs 161 through 198.

200.    Nokia's claims are barred by the doctrine of unclean hands.

### INTERDIGITAL'S EIGHTH DEFENSE

201.    InterDigital incorporates by reference Paragraphs 161 through 200.

202.    Nokia's claims are barred by the First Amendment.

App. 59

# I.
## INTERDIGITAL'S ORIGINAL COUNTERCLAIMS

203.    Defendants/Counterplaintiffs InterDigital Communications Corporation ("IDCC") and InterDigital Technology Corporation ("ITC") (collectively "InterDigital") file this Original Counterclaim against Nokia Corporation and Nokia, Inc. (collectively, "Nokia") for violations of Sections 43(a)(1)(A) and 43(a)(1)(B) of the Lanham Act, the laws of the states of Delaware and Pennsylvania, and common law unfair competition, intentional interference with prospective business opportunities, intentional interference with prospective business relations, injurious falsehoods, commercial disparagement, and unjust enrichment.

204.    This counterclaim is filed subject to, and without waiver of the requests for relief set forth in InterDigital's (1) Motion to Compel Arbitration and Stay Litigation Pending Completion of Arbitration, (2) Motion for Leave to File Motion for Summary Judgment, and (3) Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(h)(3). Specifically, submitting an ETSI Information Statement and Licensing Declaration ("ETSI IPR Statement") is a non-actionable statement of opinion. In the unlikely event that the Court concludes otherwise, to comply with the Court's Scheduling Order, InterDigital pleads below, in the alternative, a counterclaim under the Lanham Act based in part on Nokia's ETSI IPR Statements and reserves the right to plead additional counterclaims and request additional relief.

### THE PARTIES

205.    InterDigital Communications Corporation is incorporated under the laws of the State of Pennsylvania and has its principal place of business at 781 Third Avenue, King of Prussia, Pennsylvania.

23

App. 60

206.    InterDigital Technology Corporation is incorporated under the laws of the State of Delaware and has its principal place of business at 300 Delaware Avenue, Suite 527, Wilmington, Delaware.

207.    Nokia Corporation is incorporated under the laws of Finland and has a principal place of business at Keilalahdentie 4 Espoo, Finland.  Nokia Corporation has previously appeared before the Court for all purposes.

208.    Nokia, Inc. is incorporated under the laws of the State of Delaware and has a principal place of business at 6000 Connection Drive, Irving, Texas.  Nokia, Inc. has previously appeared before the Court for all purposes.

### JURISDICTION AND VENUE

209.    This Court has jurisdiction over InterDigital's counterclaim pursuant to 28 U.S.C. §§ 1331, 1338, 1367; and 28 U.S.C. § 2201 et seq.

210.    Venue is proper under 28 U.S.C. § 1391(b) and (c).

211.    All parties have previously appeared in this lawsuit, are represented by counsel, and have submitted to the jurisdiction of this Court.

### INTERDIGITAL

212.    InterDigital was formed in 1992 by the merger of two companies that, throughout the 1980's, developed, improved, and patented digital wireless systems that provided for the efficient use of the radio spectrum.   One predecessor company developed and patented a digital wireless system that utilized Frequency Division Multiple Access, Time Division Multiplexing, and Time Division Multiple Access (an "FD/TDMA System").  The other predecessor company developed and patented a digital wireless system that utilized spread spectrum Code Division Multiple Access ("CDMA").

24

App. 61

213.    In the late 1980's and early 1990's, the cellular industry (manufacturers and cellular service providers) cooperated in the development of second generation ("2G") digital wireless system standards – the GSM and US-TDMA FD/TDMA systems and the IS-95 CDMA system – which are widely used today in mobile telephones. Recognizing the unique knowledge and experience of InterDigital's predecessors, the United States standards-setting bodies invited their participation in the development of the US-TDMA and IS-95 2G standards, and adopted in these 2G standards many of their contributions and much of their patented intellectual property.    Similarly, European standards-setting bodies incorporated in the GSM standard much of InterDigital's patented intellectual property.  Because of the pioneering work of its predecessors and the inclusion of InterDigital's patented intellectual property in the 2G standards, InterDigital has, to date, entered into over thirty-five patent license agreements with companies within the cellular industry.

214.    InterDigital's proven ability to conceive of new digital wireless access schemes and to transform these concepts into products has enabled it to become a technology innovator that designs and delivers advanced digital wireless solutions. InterDigital has used this ability successfully under long-term agreements to develop third generation ("3G") digital wireless technology, which includes Universal Mobile Telecommunication Systems ("UMTS") and cdma2000 technology.   Under these 3G agreements, InterDigital develops technology for third parties, owns intellectual property related to that technology, licenses that technology to the third parties, and promotes the use of that technology in 3G applications.

215.   In December 1998, the Third Generation Partnership Project ("3GPP") was formed by various regional standard setting organizations for the purpose of creating a uniform standard for UMTS. The UMTS Standard includes two modes of operation – Frequency Division Duplex ("FDD") for paired frequency band operation and Time Division Duplex ("TDD") for unpaired frequency band operation.

216.   InterDigital has made numerous contributions to 3GPP, and many of InterDigital's contributions were ultimately adopted as part of the FDD and/or TDD mode UMTS Standard. In addition, InterDigital has entered numerous development agreements that relate to the FDD and/or TDD mode UMTS Standard.

217.   One such agreement was for the development of a complete TDD technology platform for Nokia – a world leader in wireless infrastructure and terminals and the plaintiff in this lawsuit – for use in Nokia's UMTS equipment. The agreement involved a multi-year development project of technology components for use in UMTS equipment. InterDigital successfully designed, developed, and delivered a complete TDD technology platform. As part of the TDD development project, Nokia audited InterDigital's technology development process and certified InterDigital as one of a handful of technology suppliers to Nokia.

218.   In 2001, InterDigital entered a development agreement with Infineon Technologies, AG, one of the leading semiconductor manufacturers. Under that agreement, InterDigital developed and provided to Infineon a highly complex software solution referred to in the cellular industry as 3G "access stratum." Specifically, InterDigital developed layer 2/3 software for use with Infineon's baseband integrated circuits, which power UMTS FDD terminal devices.

26

App. 63

219.   In 2004, InterDigital entered into a development agreement with General Dynamics to deliver standards-compliant UMTS modem technology to General Dynamics for incorporation into handheld terminals. The development agreement related to the U.S. military's Mobile User Objective System ("MUOS") program, which is an advanced tactical terrestrial and satellite communications system utilizing 3G commercial cellular technology to provide significantly improved high data rate and assured communications for U.S. warfighters. InterDigital successfully developed a complete terminal unit solution, and InterDigital successfully conducted interoperability testing with Ericsson, which supplied base stations to General Dynamics as part of the MUOS Program.

220.   In 2005, InterDigital entered into a development agreement with Philips Semiconductor, which supplies full semiconductor system solutions for 3G terminal devices. The development agreement relates to the development of a high speed data 3G terminal unit design, which is referred to in the industry as High Speed Packet Data Access ("HSDPA"). The UMTS standard defines HSDPA as a 3G FDD solution, and InterDigital is currently in the process of delivering that solution to Philips.

221.   In 2006, InterDigital entered into a development agreement with SK Telecom, which is the largest mobile phone operator in Korea. SK Telecom currently operates a nationwide UMTS Network. After SK Telecom announced its plans to expand its advanced mobile network across Korea, including building facilities for a broadband wireless Internet technology known as WiBro, SK Telecom approached InterDigital to develop a solution that addresses the need for network interoperability. Specifically, under this agreement InterDigital is in the process of developing a software solution that

27

App. 64

will permit SK Telecom's customers to roam seamlessly from SK's UMTS network to SK's recently deployed WiBro wireless network.

222.    InterDigital has created a substantial patent portfolio in connection with its performance of the development agreements described above, other development agreements, and through its own investment in the development of wireless technologies. As of December 2005, InterDigital's patent portfolio consisted of 524 United States patents (134 of which issued in 2005), and 1,148 non-United States patents (468 of which issued in 2005). Many of these patents relate to the UMTS Standard and products that comply with this standard.

223.    PA Consulting Group ███████████████████████ ▌evaluated many patents disclosed to ETSI. PA Consulting published an extensive report entitled Essential Intellectual Property in 3GPP-FDD (the "3GPP Report"), which is                               available                               at http://www.paconsulting.com/services/tech_innovation/wireless/_entry_3gIPR.htm. ███

██████████████████████████████████████████████████████

███████████

███████████████████████████████████

████████████████████████████████████████

██████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████

28

App. 65

224.    While InterDigital (a) did not fund or otherwise control the preparation of the PA 3GPP Report and (b) InterDigital disagrees with certain conclusions therein, ■

225.    ■

## NOKIA'S WORLDWIDE CAMPAIGN OF ATTACK ON INTERDIGITAL

226.    Nokia's Delaware lawsuit in which this Counterclaim is filed is merely the latest step in Nokia's aggressive, worldwide campaign of attack against InterDigital and its intellectual property rights – a campaign that has dragged InterDigital into courts, arbitrations, and patent proceedings across the United States and abroad.   Nokia originally initiated this campaign because what it once thought to be unthinkable occurred – the triggering of its obligation to pay InterDigital significant royalties on 2G

29

App. 66

products under the patent license agreement it voluntarily executed in January 1999 ("PLA").

227.    Under the PLA between InterDigital and Nokia, InterDigital granted to Nokia a worldwide non-exclusive license under defined patents. Those patents included InterDigital's TDMA and CDMA patents, which apply to 2G products such as GSM and US-TDMA-compliant products as well as 3G products such as UMTS and cdma2000-compliant products.

228.    The amount of consideration paid and to be paid by Nokia for this license was divided into two different periods. Period 1 ran through December 2001 and required Nokia to make an irrevocable and non-refundable payment of $31.5 million, which Nokia paid. Period 2 ran from January 2002 to December 2006, and required Nokia to pay royalties at market-defined rates upon the occurrence of InterDigital licensing a contractually-defined "Major Competitor" at royalties paid by this competitor, retroactive to the beginning of Period 2. Under this process, Nokia was treated as a most favored licensee of InterDigital, and, as such, its royalty obligations during Period 2 were to be determined by reference to InterDigital's PLA's patent license agreements with defined Major Competitors, their successors and assigns, and purchasers of the assets that are the subject of the PLA.

229.    One of the defined Major Competitors was Ericsson, Inc. At the time InterDigital and Nokia entered into the PLA in January 1999, InterDigital was engaged in patent litigation with Ericsson. In March 2003, to Nokia's apparent surprise, InterDigital and Ericsson and Sony Ericsson (the successor, assign, and purchaser of Ericsson's handset business) entered into patent license agreements for 2G products at market-based

30

App. 67

running royalty rates. Those licenses triggered Nokia's Period 2 royalty obligations on Nokia's 2G products, which – given Nokia's market share – were very substantial.

230.    The triggering of Nokia's contractual royalty obligations did not result in Nokia's payment of royalties as the parties had agreed and as the PLA required. Instead, it triggered Nokia's onslaught of legal proceedings against InterDigital. Nokia's campaign against InterDigital consists of the following adversarial proceedings, all of which Nokia initiated after it refused to pay the Period 2 royalties owed under the PLA:

    a.    An I.C.C. arbitration to vitiate any Period 2 royalty obligations on Nokia's 2G products (the "Arbitration Proceeding");

    b.    A revocation proceeding in the United Kingdom seeking to revoke certain of InterDigital's U.K. patents as invalid as well as a declaration that these patents are not Essential to the GSM standard (the "UK1 Action");

    c.    A post-judgment, post-settlement intervention in the prior litigation between InterDigital and Ericsson to reinstate certain orders vacated by the district court (resulting in an appeal to the Federal Circuit) (the "Ericsson Action");

    d.    Two actions to obtain discovery pursuant to 28 U.S.C. § 1782 (filed against Ericsson and Sony-Ericsson but requiring responses by InterDigital due to indications Nokia intended to use such discovery not just in the U.K. proceeding, as it claimed, but in the arbitration as well);

    e.    This lawsuit; and

31

App. 68

      f.    A second proceeding in the United Kingdom seeking a declaration that certain of InterDigital's U.K. patents are not Essential to the UMTS standard (the "UK2 Action").

Despite Nokia's dominant market position and extensive cash reserves, InterDigital has successfully defended itself against Nokia's meritless campaign.

231.    In June 2005, the Arbitral Tribunal delivered its Final Award in the Arbitration Proceeding. The Tribunal determined that Nokia's Period 2 obligations had been triggered and established royalty rates that were applicable to Nokia's sales of covered products for the period beginning January 1, 2002, through December 31, 2006.

232.    In August 2005, the Federal Circuit determined that the district court erred as a matter of law and abused its discretion in granting Nokia's motion to intervene in the Ericsson Action for the purpose of seeking reinstatement of the orders previously vacated pursuant to the Ericsson-InterDigital settlement.

233.    In December 2005, a Federal District Court Judge presiding over the enforcement proceeding between InterDigital and Nokia Corporation in the United States District Court for the Southern District of New York confirmed in its entirety the Final Award rendered by the Arbitral Tribunal. Nokia appealed the December 2005 decision to the Federal Court of Appeals for the Second Circuit.

234.    In April 2006, InterDigital entered into two agreements with Nokia that resolved certain legal proceedings between them. Specifically, in an Arbitration Settlement Agreement (the "Arbitration Settlement Agreement"), the parties resolved disputes arising out of the June 2005 Arbitration Tribunal Award, including the appeal to the Second Circuit. Pursuant to a second agreement, Nokia dismissed its claims under

32

the UK1 Action. Pursuant to the Arbitration Settlement Agreement, Nokia paid InterDigital $253 million. Under the Arbitration Settlement Agreement, the Nokia License Agreement was terminated.

235.    Because of Nokia's campaign of attack against InterDigital, InterDigital has been forced to file the following against Nokia:

a.    An action in the United States District Court for the Southern District of New York seeking a temporary restraining order and preliminary injunction to prevent Nokia's continued and further violation of contractual restrictions on Nokia's use and disclosure of InterDigital confidential information;

b.    An I.C.C. arbitration to enforce contractual restrictions on Nokia's use and disclosure of InterDigital confidential information;

c.    A proceeding filed in December 2006 in the United Kingdom seeking a declaration that thirty-five of Nokia's European patents registered in the United Kingdom are not Essential to the UMTS standard; and

d.    These counterclaims.

THE STANDARD SETTING PROCESS AND IPR STATEMENTS

236.    This Court dismissed all of Nokia's original claims except its Lanham Act claim. Nokia's Lanham Act claim is defective as a matter of law. *See* InterDigital's Motion for Leave to File Motion for Summary Judgment; InterDigital's Motion to Dismiss Amended Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(h)(3). Nevertheless, Nokia continues to pursue this claim. Because (a) Nokia's Lanham Act claim principally concerns ETSI and associated intellectual property

33

App. 70

rights ("IPR") rules, (b) Nokia has fundamentally mischaracterized these rules, and (c) Nokia's statements related to Essential IPRs is at issue in this case, it is necessary to discuss and review the actual wording of same. (Indeed, as noted above, ETSI IPR Statements are non-actionable statements of opinion.)

237.    ETSI has adopted an Intellectual Property Rights Policy ("ETSI IPR Policy") and a Guide on Intellectual Property Rights ("ETSI IPR Guide"). The ETSI IPR Policy requires ETSI Members to disclose IPRs that they believe are or might be Essential. Specifically, the ETSI IPR Guide provides that ETSI IPR Statements are merely statements of opinion:

> Members are obliged to disclose IPRs, *which might be essential* and ETSI is obliged to make these disclosures available to Members. *This disclosure reflects, of course, only an opinion of the Member* and some facts on the IPRs, but the Member is responsible for the content. *Any further opinion* should be added only with the agreement of the Member or to implement a General Assembly decision.

ETSI IPR Guide at 3.3.3 (emphasis added).

238.    The current version of the ETSI IPR Policy principally defines Essential in the following language:

> "ESSENTIAL" [1] as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair use or operate EQUIPMENT of METHODS which comply with a STANDARD without infringing that IPR. [2] For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.
>
> "IPR" shall mean any intellectual property right conferred by statute law including applications therefore other than trademarks. For the avoidance of doubt rights relating to get-up, confidential information, trade secrets or the like are excluded from the definition of IPR.

34

"**STANDARD**" shall mean any standard adopted by ETSI including options therein or amended versions and shall include European Standards (ENs) (telecommunications series). ETSI Standards (ESs), Common Technical Regulations (CTRs) which are taken from ENs (telecommunications series) and including drafts of any of the foregoing and documents made under the previous nomenclature, including ETSs, I-ETSs, parts of NETs and TBRs, the technical specifications of which are available to all members, but not including any standards , or parts thereof, not made by ETSI.

## NOKIA'S DISINGENUOUS ATTACKS AGAINST INTERDIGITAL'S ETSI IPR STATEMENTS AND NOKIA'S INTENTIONAL OVER-DECLARATION OF ESSENTIAL IPRS

239. Nokia has alleged that it holds hundreds of patents that are Essential to 3G standards, including the UMTS Standard and the cdma2000 Standard (collectively, the "Nokia Declared Essential IPRs"). On the Nokia website, in public presentations to investors, ████████████████████████, and in ETSI IPR Statements, Nokia has represented and continues to represent that it holds in excess of 300 Essential IPRs for the UMTS Standard (the "Nokia Declared UMTS Essential IPRs") and in excess of 100 Essential IPRs for the cdma2000 Standard ("Nokia's Declared cdma2000 Essential IPRs").

240. To bolster its claim that it holds more Essential IPR for the UMTS Standard than any other company and to support its royalty demands, Nokia secretly funded an article authored by Drs. David J. Goodman and Robert A. Myers that Nokia promotes as an independent scholarly article (the "Nokia Goodman & Myers Study"). *See* David J. Goodman & Robert A. Myers, 3G Cellular Standards and Patents, IEEE WirelessCom       (June       13,       2005)       available       at http://europe.nokia.com/link?cid=EDITORIAL_6212 (the "Nokia Goodman & Myers Article"). The Nokia Goodman & Myers Article fails to disclose the materially relevant fact that the paper was requested, funded, and directed by Nokia, and Nokia fails to

App. 72

publicly disclose ███████████████████ that the Nokia Goodman &

Myers Article was requested, funded, and directed by Nokia. By failing to disclose that

the paper was requested, funded, and directed by Nokia, the Nokia Goodman & Myers

Article ignored a basic tenet of scientific publishing and the paper's purported

independent academic analysis is in doubt. *See* Martin, Donald L. and De Meyer, Carl,

"Patent Counting, a Misleading Index of Patent Value: A Critique of Goodman & Myers

and      its      Uses"    (December     4,      2006)      available      at

http://papers.ssrn.com/sol3/papers.cfm?abstract_id=949439.

241.    Even with Nokia's funding and controlling the Nokia Goodman & Myers

Study, the Nokia Goodman & Myers Article judged over fifty five percent (55%) of the

Nokia Declared UMTS Essential IPRs and over fifty five percent (55%) of the Nokia

Declared cdma2000 Essential IPRs to be Non-Essential IPRs (the "Nokia Judged Non-

Essential IPRs"). ██████████████████████████████████████

██████████████████████████████████████████████

█████████████████████

242.    Nokia intentionally has concealed from standard setting organizations, its

investors, the public, ████████████████████████████████

█████████████████ that it funded the Nokia Goodman & Myers Study. *See, e.g.,* Ulla

James, Nokia IPR Landscape, Nokia Technology Media Briefing (October 3-4, 2006)

(relying on Nokia Goodman & Myers Article and failing to disclose Nokia's sponsorship

of              same)              available              at

http://www.nokia.com/NOKIA_COM_1/Press/Press_Events/Nokia_Technology_Media_

Briefing/Ulla_James_03-10-2006.pdf; Tero Ojanperä, Nokia Technology Strategy

36

App. 73

(relying on Nokia Goodman & Myers Article and failing to disclose Nokia's sponsorship of                     same)                     available                     at http://www.nokia.com/NOKIA_COM_1/Press/Press_Events/Nokia_Technology_Media_ Briefing/Tero_Ojanpera_04-10-2006.pdf. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████

243.    In addition to the Nokia Goodman & Myers Study, ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████

244.    Nokia has engaged in a publicity campaign regarding its claim of Essentiality. This publicity has appeared in the press and is intended to be disseminated in the communications industry. Nokia continues falsely to claim in public statements that it has over 300 Essential IPRs that must be licensed to practice the UMTS Standard and over 100 Essential IPRs that must be licensed to practice the cdma2000 Standard. *See, e.g.,* Ulla James, Nokia IPR Landscape, Nokia Technology Media Briefing (October 3-4, 2006).

37

App. 74

245.    Nokia makes such false claims and statements in bad faith for the purposes of securing substantial license revenue for its Declared Essential IPRs, including furthering Nokia's demands for royalties 

246.    Nokia also makes such false claims and statements in bad faith for the purposes of:

    a.    reducing royalties that it otherwise would be required to pay to third parties that hold Essential IPRs, including furthering Nokia's ability to leverage IPRs 

    b.    influencing the business environment, including leveraging IPRs ████████; and

    c.    dominating the standard setting environment, ████████

38

App. 75

██████████████████████████████████

███████████████████████████████

### NOKIA'S MISUSE OF THE NOKIA GOODMAN & MYERS ARTICLE

247.    Nokia has not merely over-declared Essential IPRs.  In addition, and as discussed above, Nokia routinely holds out the Nokia funded and controlled Nokia Goodman & Myers Article as a reliable and independent academic analysis.  Nokia uses the article on its website, in its public presentations to investors, in its commercial advertising, ██████████████████████████ Indeed, Nokia routinely holds out the Nokia Goodman & Myers Article as a reliable and "independent" confirmation of its Essential IPR position.  Furthermore, in public presentations to its investors, in its commercial advertising, ███████████████████████ Nokia asserts that:

      a.    a maximum cumulative royalty cap is applicable to Essential IPR for the UMTS Standard;

      b.    royalties for Essential IPRs should be distributed based upon the total number of Essential IPRs a company owns; and

      c.    the Nokia Goodman & Myers Article is an independent study that

██████████████████████████████

██████████████████████████████

███████

248.    Nokia's statements regarding and use of the Nokia Goodman & Myers Article are intentional and in bad faith:

      a.    false and misleading descriptions that are likely to cause confusion, cause mistake, and deceive as to the affiliation, connection, or

39

association of Nokia with such report, including, without limitation, the false impression that such report is in fact a reliable independent report that is in no way affiliated, connected, or associated with Nokia; and

b. false and misleading descriptions that misrepresent the nature, characteristics, and qualities of Nokia Declared Essential IPRs.

249. Furthermore, as discussed above, PA Consulting has prepared reports that evaluate Essential IPRs from ETSI IPR Statements. ███████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████

## COUNT I

### VIOLATION OF SECTION 43(A)(1)(A) OF THE LANHAM ACT

250. To the extent not inconsistent, InterDigital realleges each allegation set forth in Paragraphs 203 through 249 of this counterclaim.

251. In connection with efforts to license Essential IPRs, Nokia has used and continues to use false and misleading descriptions of the Nokia Goodman & Myers Article.

252. Nokia's false and misleading descriptions have and are likely to cause confusion, cause mistake, and deceive as to the affiliation, connection, or association of Nokia with such report, including, without limitation, the false impression that such report is in fact a reliable independent report that is in no way affiliated, connected, or associated with Nokia.

40

App. 77

253. Nokia has used and continues to use the Nokia Goodman & Myers Article in interstate commerce, including in the State of Delaware and has substantially affected interstate commerce.

254. Nokia's conduct has damaged InterDigital, including actual damages to InterDigital's business and good will.

255. Nokia's conduct has caused InterDigital to suffer actual damages. Further, Nokia's conduct was in bad faith and willful, knowing, and intentional such that the imposition of punitive damages in an amount to be determined by the trier of fact is authorized.

## COUNT II

### VIOLATION OF SECTION 43(A)(1)(B) OF THE LANHAM ACT

256. To the extent not inconsistent, InterDigital realleges each allegation set forth in Paragraphs 203 through 249 of this counterclaim.

257. In connection with efforts to license Essential IPRs, Nokia has used and continues to use false and misleading descriptions of the Nokia Goodman & Myers Article.

258. Nokia's false and misleading descriptions misrepresent the nature, characteristics, and qualities of Nokia and InterDigital's Essential IPRs.

259. Nokia's false and misleading descriptions have been made in bad faith.

260. Nokia has used and continues to use the Nokia Goodman & Myers Article in interstate commerce, including in the State of Delaware, and has substantially affected interstate commerce.

261. Nokia's conduct has damaged InterDigital, including actual damages to InterDigital's business and good will.

## COUNT III

### VIOLATION OF SECTION 43(A)(1)(A) OF THE LANHAM ACT

262.    To the extent not inconsistent, InterDigital realleges each allegation set forth in Paragraphs 203 through 249 of this counterclaim.

263.    In connection with efforts to license and leverage Essential IPRs, Nokia has used and continues to use false and misleading descriptions of the Nokia Declared UMTS Essential IPRs.

264.    Nokia's false and misleading descriptions misrepresent the nature, characteristics, and qualities of Nokia Declared UMTS Essential IPRs.

265.    Nokia's false and misleading descriptions have been made in bad faith and with knowledge of their falsity.

266.    Nokia has used and continues to make such false and misleading statements in interstate commerce, including in the State of Delaware, and has substantially affected interstate commerce.

267.    Nokia's conduct has damaged InterDigital, including actual damages to InterDigital's business and good will.

## COUNT IV

### VIOLATION OF DELAWARE DECEPTIVE TRADE PRACTICES ACT
### (DELAWARE)

268.    To the extent not inconsistent, InterDigital realleges each allegation set forth in Paragraphs 201 through 249 of this counterclaim.

269.    In connection with efforts to license Essential IPRs, Nokia has used and continues to use false and misleading descriptions of the Nokia Goodman & Myers Article and Nokia Declared UMTS Essential IPRs.

42

App. 79

270.    Nokia's false and misleading descriptions have and are likely to cause confusion or misunderstanding as to the source, affiliation, sponsorship of the Nokia Goodman & Myers Article and quality of Nokia Declared UMTS Essential IPRs.  In connection with efforts to license the Essential IPRs, Nokia has used and continues to use the Nokia Goodman & Myers Article to disparage others and falsely describe its Essential IPRs.

271.    Nokia's actions were willful and in bad faith.

272.    Nokia's above-described unfair competition has caused and continues to cause actual injuries to InterDigital.

273.    InterDigital is entitled to the relief requested herein.

## COUNT V

### COMMON LAW UNFAIR COMPETITION
### (DELAWARE)

274.    To the extent not inconsistent, InterDigital realleges each allegation set forth in Paragraphs 201 through 249 of this counterclaim.

275.    InterDigital possessed a reasonable probability of contractual relations with third parties with respect to 3G technology with which Nokia interfered.

276.    Nokia's interference was purposeful and intended to harm such relations or prevent such relations from occurring.

277.    Nokia had no privilege or justification for its conduct.

278.    Nokia's interference has caused and threatens to continue to cause actual injuries to InterDigital.

279.    Nokia's interference was knowing and willful and in bad faith as discussed above.  InterDigital is therefore entitled to punitive damages from Nokia.

280.    InterDigital is further entitled to the relief requested herein.

43

## COUNT VI

### INTENTIONAL INTERFERENCE WITH PROSPECTIVE
### BUSINESS OPPORTUNITIES
### (DELAWARE)

281.    To the extent not inconsistent, InterDigital realleges each allegation set forth in Paragraphs 201 through 249 of this counterclaim.

282.    InterDigital possessed a reasonable probability of contractual relations with third parties with respect to 3G technology with which Nokia interfered.

283.    Nokia's interference was purposeful and in bad faith and intended to harm such relations or prevent such relations from occurring.

284.    Nokia had no privilege or justification for its conduct.

285.    Nokia's interference has caused and threatens to continue to cause actual injuries to InterDigital.

286.    Nokia's interference was knowing and willful as discussed above. InterDigital is therefore entitled to punitive damages from Nokia.

287.    InterDigital is further entitled to the relief requested herein.


## COUNT VII

### INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS
### (PENNSYLVANIA)

288.    To the extent not inconsistent, InterDigital realleges each allegation set forth in Paragraphs 201 through 249 of this counterclaim.

289.    InterDigital possessed a reasonable probability of contractual relations with third parties with respect to 3G technology with which Nokia interfered.

290.    Nokia's interference was purposeful and in bad faith and intended to harm such relations or prevent such relations from occurring.

44

App. 81

291. Nokia had no privilege or justification for its conduct.

292. Nokia's interference has caused and threatens to continue to cause actual injuries to InterDigital.

293. Nokia's interference was knowing and willful as discussed above. InterDigital is therefore entitled to punitive damages from Nokia.

294. InterDigital is further entitled to the relief requested herein.

## COUNT VIII
### Injurious Falsehood
### (Delaware)

295. To the extent not inconsistent, InterDigital realleges each allegation set forth in Paragraphs 201 through 249 of this counterclaim.

296. Nokia published false statements as discussed above.

297. Nokia knew that such statements were not true, or acted in reckless disregard of the statements' truth or falsity.

298. Nokia's statements were willful and in bad faith.

299. Nokia intended its statements to result in pecuniary harm to InterDigital, or recognized or should have recognized harm would result.

300. Nokia's interference has caused and threatens to continue to cause actual injuries to Nokia.

301. InterDigital is further entitled to the relief requested herein.

## COUNT IX
### Commercial Disparagement
### (Pennsylvania)

302. To the extent not inconsistent, InterDigital realleges each allegation set forth in Paragraphs 201 through 249 of this counterclaim.

45

303.    Nokia published false statements as discussed above.

304.    Nokia's false statements were willful and in bad faith.

305.    Nokia intended its statements to result in pecuniary harm to InterDigital, or recognized or should have recognized harm would result, as Nokia knew its statements would negatively impact marketability of InterDigital's technology.

306.    Nokia's interference has caused and threatens to continue to cause actual injuries to InterDigital.

## COUNT X
### UNJUST ENRICHMENT
### (DELAWARE)

307.    To the extent not inconsistent, InterDigital realleges each allegation set forth in Paragraphs 201 through 249 of this counterclaim.

308.    Nokia received an unjust enrichment of licensing revenues as a result of its false and misleading statements and other conduct described herein.

309.    InterDigital has lost money due to Nokia's wrongful conduct.

310.    Nokia's false and misleading statements and other conduct described herein were purposeful and in bad faith and caused both Nokia's unjust enrichment and InterDigital's loss.

311.    There was no privilege or justification for the false and misleading statements and other conduct described herein as Nokia used an unfair method of competition.

312.    InterDigital suffers the absence of an adequate remedy at law as Nokia has improperly obtained licensing revenue and the adequate remedy is restitution of this improperly obtained revenue.

46

313.   Nokia's statements and conduct have caused and threaten to continue to cause actual injuries to InterDigital.

314.   InterDigital is further entitled to the relief requested herein.

## COUNT XI

### UNJUST ENRICHMENT
### (PENNSYLVANIA)

315.   To the extent not inconsistent, InterDigital realleges each allegation set forth in Paragraphs 201 through 249 of this counterclaim.

316.   Nokia received an unjust enrichment of licensing revenues as a result of its false and misleading statements and other conduct described herein.

317.   Nokia appreciated its unjust benefit as the false and misleading statements and other conduct described herein were purposeful and in bad faith.

318.   Nokia accepted and retained its unjust benefit at the expense of InterDigital and others and therefore it would be inequitable not to return its benefit.

319.   There was no privilege or justification for the false and misleading statements and other conduct described herein as Nokia used an unfair method of competition.

320.   InterDigital suffers the absence of an adequate remedy at law as Nokia improperly obtained licensing revenue and the adequate remedy is restitution of this improperly obtained revenue.

321.   Nokia's statements have caused and threaten to continue to cause actual injuries to InterDigital.

47

App. 84

## JURY DEMAND

InterDigital hereby demands a jury on all issues raised in both the Complaint and the Counterclaim in accordance with the Federal Rules of Civil Procedure and the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, InterDigital Communications Corporation and InterDigital Technology Corporation respectfully request that upon final trial a judgment be entered and that the following relief be granted:

1. Plaintiffs' Complaint be dismissed with prejudice;

2. Defendants be awarded their reasonable attorneys' fees and costs;

3. A permanent injunction prohibiting Nokia from continued use of false and misleading statements;

4. InterDigital be awarded treble damages;

5. InterDigital be awarded punitive damages;

6. Nokia be required to disgorge its unjust enrichment; and

7. InterDigital be granted such other and further relief, general and special, at law or in equity, to which they may be justly entitled.

48

App. 85

Respectfully submitted,

OF COUNSEL:

POTTER ANDERSON & CORROON LLP

D. Dudley Oldham
Linda L. Addison
Richard S. Zembek
Fulbright & Jaworski L.L.P.
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Tel: (713) 651-5151

By:  /s/ David E. Moore
      Richard L. Horwitz (#2246)
      David E. Moore (#3983)
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, Delaware 19801
      Tel: (302) 984-6000
      rhorwitz@potteranderson.com
      dmoore@potteranderson.com

Dan D. Davison
Fulbright & Jaworski L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-2784
Tel: (214) 855-8000

*Attorneys for Defendants,*
*InterDigital Communications Corporation and*
*InterDigital Technology Corporation*

Dated: February 21, 2007
Public Version Dated: March 1, 2007
780493 / 28840

49

App. 86

# EXHIBIT  C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NOKIA CORPORATION and NOKIA INC.,

Plaintiffs,

v.

INTERDIGITAL COMMUNICATIONS
CORPORATION and INTERDIGITAL
TECHNOLOGY CORPORATION,

Defendants.

C.A. No. 05-16 (JJF)

**PUBLIC VERSION**

---

**PLAINTIFFS' OPENING BRIEF IN SUPPORT OF MOTION FOR
MANDATORY STAY PURSUANT TO 28 U.S.C. § 1659(a)**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200
jblumenfeld@mnat.com
jheaney@mnat.com

*Attorneys for Plaintiffs*

*Of Counsel:*

Patrick Flinn
Randall Allen
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309
(404) 881-7000

Original Filing Date: October 5, 2007

Redacted Filing Date: October 11, 2007

App. 88

i

## TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF THE PROCEEDINGS ...................................................................1

SUMMARY OF THE ARGUMENT ..........................................................................................3

STATEMENT OF FACTS ..........................................................................................................4

ARGUMENT ...............................................................................................................................11

    I.     THE STATUTE MANDATES A STAY OF CLAIMS THAT HAVE ANY
          ISSUES IN COMMON WITH AN ITC PROCEEDING.............................................11

    II.    THERE ARE OVERLAPPING ISSUES IN THIS CASE. .........................................14

        A.  The "Essentiality" Issue Is Common to Both Cases and Requires a Stay of
            all Claims in this Case.........................................................................................14

        B.  The Other Common Issues With the Three Patents Also Mandate a Stay. ...........15

        C.  This Court Should Use Its Discretion to Stay Any Portions of the Case Not
            Otherwise Subject to the Mandatory Stay. .........................................................17

CONCLUSION..........................................................................................................................19

## TABLE OF AUTHORITIES

CASES

*Amkor Tech. , Inc. v. Carsem (M) SDN BHD*,
    No. 03-5116 MMC, 2004 WL 3237542 ...................................................... 12-13

*Broadcom Corp. v. Qualcomm Inc.*,
    No. 06-4292, 2007 WL 2475874 (3d Cir. Sept. 4, 2007) ................................... 14

*Cellco P'ship v. Broadcom Corp.*,
    227 F. App'x. 889 (Fed. Cir. 2007) ................................................................... 12

*Cost Bros., Inc. v. Travelers Indemnity Co.*,
    760 F.2d 58 (3d Cir. 1985) ................................................................................ 17

*Flexsys Americas, LP v. Kumho Tire, U.S.A., Inc.*,
    No. 5:05CV156, 2005 WL 1126750 (N.D. Ohio Apr. 29, 2005) ................... 13, 19

*In re Princo Corp.*,
    478 F.3d 1345 (Fed. Cir. 2007) ......................................................................... 12

*InterDigital Communications, LLC, et al v. Nokia Corp., et al.*,
    No. 1:07-cv-00489-SLR ...................................................................................... 2

*Landis v. N. Am. Co.*,
    299 U.S. 248 (1936) ........................................................................................... 17

*Micron Tech., Inc. v. Mosel Vitelic Corp., Inc.*,
    No. CIV 98-0293-S-LMB, 1999 WL 458168 (D. Idaho Mar. 31, 1999) ............ 13

*Pegasus Dev. Corp. v. DirecTV, Inc.*,
    C.A. No. 00-1020-GMS, 2003 WL 21105073 (D. Del. May 14, 2003) .............. 17

*Thomson Licensing S.A. v. Benq Corp.*,
    No. 3:05-CV-01005-JSW, 2005 WL 1039030 (E.D. Cal. May 4, 2005) ............ 12

*Verve, LLC v. Verifone, Inc.*,
    No. C04-03659JF, 2004 WL 2600452 (N.D. Cal. Nov. 15, 2004) ................ 12, 19

*Xerox Corp. v. 3Com Corp.*,
    69 F. Supp. 2d 404 (W.D.N.Y.1999) ................................................................. 17

iii

## TABLE OF AUTHORITIES, cont'd

STATUTES

19 U.S.C. § 1337.............................................................................................9

19 U.S.C. § 1337(a)(1)(A)(i) ...........................................................................9

28 U.S.C. § 1659(a) ..................................................................................*Passim*


OTHER AUTHORITIES

H.R. Rep. 103-826(I), (1994), *as reprinted in* 1994 U.S.C.C.A.N. 3773 .....................................12

1.

## NATURE AND STAGE OF THE PROCEEDINGS

In this case, each side accuses the other of engaging in acts of unfair competition arising from declarations of essentiality of patents to the European Telecommunications Standards Institute ("ETSI"). Plaintiffs Nokia Corp. and Nokia Inc. (collectively, "Nokia") have further alleged that defendants InterDigital Communications Corp. and InterDigital Technology Corp. (collectively, "InterDigital") have made false statements about the validity and scope of certain of InterDigital's patents.

In an amended complaint filed in January, 2007, Nokia sought broad equitable and declaratory relief with respect to the InterDigital patent portfolio, and challenged InterDigital's public statements that manufacturers of phones compliant with ETSI's Universal Mobile Telecommunications System ("UMTS") standard[1] were required to pay InterDigital substantial sums of money due to the alleged essentiality of several hundred patents. Nokia's Amended Complaint alleges that the industry does not owe InterDigital any money for these patents because they are alternatively (a) not essential, (b) invalid, (c) already licensed to the industry, or (d) applicable to a portion of the UMTS standard not implemented by commercial carriers. In response to the Amended Complaint, InterDigital filed what it claimed was a "mirror image" of the Nokia complaint.

In March, 2007, InterDigital replaced the counsel that had been representing it since 2005 in the case. New counsel, after requesting a delay of nearly two months to learn about the case, asked the Special Master to enter an order managing discovery. A Case Management Order ("CMO") prepared by the Special Master was entered by the Court on August 29, 2007 (D.I. 214). No depositions or new, non-trivial document discovery took place

---

[1]    UMTS is a Third Generation (or "3G") standard, following the first analog-based cell phone standard ("1G") and the first digital standards ("2G").

App. 92

2.

between the time InterDigital replaced its counsel and the entry of this Order. InterDigital refused to produce patent-related documents during this period or to make any inventors available for deposition and, to date, still has not provided any such discovery.

As part of the CMO, Nokia was required, over its objections, to state contentions regarding 24 InterDigital patents that had not been declared to ETSI when Nokia's Amended Complaint was filed. On August 7, 2007, just prior to the date Nokia was required to submit these contentions, InterDigital filed a complaint with the International Trade Commission ("ITC"), asserting that Nokia infringed two of those 24 new patents. On September 5, 2007, the ITC agreed to conduct an investigation based on InterDigital's complaint. For reasons explained in more detail below, InterDigital felt it necessary to specifically allege that these two patents were essential to the practice of the UMTS standard.[2]

InterDigital also filed a complaint against Nokia for infringement of those two patents in this Court, but failed to mark it as a related case to this one, as required by D. Del. LR 3.1(b).[3]

Because InterDigital had insisted on litigating the same two patents in three different cases, Nokia asked the Special Master to delay requiring Nokia to provide contentions regarding these two patents until the correct forum was resolved. During an August 20, 2007 teleconference, the Special Master refused, but stayed that order pending Nokia's appeal of that decision. ████████████████████████████████████

---

[2]    As shown below, to sue in the ITC, a patent owner must plead and prove more than infringement of a valid patent. A patent owner must prove the existence of a domestic industry that practices the accused invention. InterDigital makes no products and principally seeks patent license fees. Accordingly, it appears as if InterDigital is counting on proving essentiality as the basis for its domestic industry case.

[3]    That case, *InterDigital Communications, LLC, et al v. Nokia Corp., et al.*, C.A. No. 07-489-SLR, is currently assigned to Judge Robinson.

App. 93

3.

On September 27, 2007, this Court affirmed the Special Master's decision to require Nokia to submit contentions regarding the scope of the two ITC patents in this proceeding (D.I. 220). The next day, September 28, 2007, InterDigital sought leave in the ITC to add a third patent to the case, and filed an amended complaint in its infringement case in this Court. This new patent, U.S. Patent Number 6,973,579 (the "'579 patent"), was identified by Nokia in 2006 in this case as one of specific the patents whose scope was contested. The issues of enforceability and validity of that patent were joined in this case with the January 2007 Amended Complaint.

Today, October 5, 2007, Nokia answered InterDigital's complaint in the ITC. Among other affirmative defenses, Nokia alleges that InterDigital is not entitled to an exclusion order by virtue of its declarations of essentiality to ETSI and promise to license those patents on terms that are fair, reasonable, and non-discriminatory.

Nokia now moves, pursuant to 28 U.S.C. § 1659(a), for a mandatory stay of this entire action as a result of InterDigital's ITC filing. A companion motion seeking to stay the infringement action filed before Judge Robinson has also been filed.

### SUMMARY OF THE ARGUMENT

A stay of "any claim" in a district court is *mandatory* when any "issue" is presented to the ITC proceeding and a district court at the same time. 28 U.S.C. § 1659(a). In this case, the unfair competition claims will necessarily address the definition of "essential," and will do so specifically in the context of the ETSI IPR policy which defines that term. In the ITC case, InterDigital elected to prove that its patents are not just infringed, but essential to the

App. 94

4.

practice of the UMTS standard and Nokia's affirmative defenses also involve the issue of essentiality.

In addition, the common issues of scope, validity and enforceability of the three InterDigital patents at issue in the ITC require that this Court stay the proceedings with respect to those three patents. Moreover, because InterDigital has consistently maintained that its counterclaims are merely contingent on Nokia's claims (and in fact InterDigital believes that its claims are not even actionable, but has filed them only in the alternative that Nokia prevails), there is no reason for InterDigital's counterclaims -- or any claims -- to proceed once Nokia's claims are stayed.

## STATEMENT OF FACTS

**Issues in Nokia's Claims in this Case.** InterDigital's violations of the Lanham Act and various state unfair competition laws arise from its false and misleading statements regarding the scope and validity of its patent portfolio and InterDigital's related claims that the mobile phone industry must pay substantial royalties for the use of InterDigital's technology purportedly covered by that portfolio.

More specifically, InterDigital claims that it owns a substantial number of valid patents that are "essential" to interoperability standards necessary for the success of the mobile telephone industries. This suit focuses on interoperability standards for mobile telephones known as UMTS, which is the predominant third and most recent generation of wireless interoperability standards.[4]

---

[4]    WCDMA (Wideband Code Division Multiple Access) is the name of the technique that allows multiple users to share the same radio frequency in UMTS, and, therefore, the terms WCDMA and UMTS are, for purposes of this Motion, used interchangeably.

App. 95

5.

When a valid patent claim covers a portion of an interoperability standard, it is typically described as "essential" to the standard. The owner of such a patent can demand compensation from the entire mobile telephone industry implementing that aspect of the standard based on its asserted use. After manufacturers have expended substantial capital implementing a portion of a standard, the owner of a valid essential patent could, absent proper controls, attempt to "hold up" the industry and extort unreasonable patent royalties.

Standards-setting organizations employ a variety of strategies to prevent such "hold-ups." For example, ETSI, the world leader in promulgating UMTS, requires that its members disclose essential intellectual property rights, including patents, to the industry by making a formal declaration of essentiality to ETSI.[5] ETSI further requests that its members agree to grant irrevocable licenses for their declared patents on terms that are "fair, reasonable and non-discriminatory" or "FRAND."[6] Nokia and InterDigital are both ETSI members.

Nokia has alleged in this case InterDigital's abuse of the ETSI declaration policy. InterDigital abused the standards process by, among other things, declaring to ETSI that patents were essential when they were clearly not. InterDigital touts a portfolio of more than 200 allegedly essential patents, but that claim is a gross exaggeration. In many instances, InterDigital attempts to inflate the volume of purportedly essential patents by filing a single application that sprouts dozens of continuation applications, producing many patents with claims all arising from the same specification. Two of the patents at issue in this case and asserted by InterDigital at the ITC, U.S. Patent Numbers 7,117,004 (the "'004 patent") and 7,190,966 (the "'966 patent"), are excellent examples of this abuse. Both claim priority to an application filed in 1996. Prior to the

---

[5]    *See* ETSI Guide on Intellectual Property Rights (Exhibit A), § 2.

[6]    *See* ETSI IPR Policy (Exhibit B), ¶ 6.1.

App. 96

6.

issuance of these two patents (in late 2006 and early 2007), InterDigital had declared as "essential" at least 15 other patents springing from the same application. The first such "essential" patent issued in 1998,[7] and InterDigital's first set of declarations of "essential" patents were filed in 2001.

Although it had more than a decade to write claims to read on the emerging standard, and although it had declared at least 15 patents from a single family as essential by 2006, it is telling that InterDigital did not feel comfortable enough to charge anyone with infringing any of these 15 patents. InterDigital has abandoned all 15 of the "essential" patents from this specification and relies only on patents issued in October, 2006 and March 2007 in its ITC case against Nokia.

This abuse places the definition of "essential" at the very center of the parties' Lanham Act and related state law claims. Indeed, the parties have repeatedly disputed the definition of essential and the Special Master ordered the parties to provide their definitions of essential in a contention interrogatory response.[8] The parties' responses, not surprisingly, differed widely. Nokia's proposed definition tracks language in the ETSI IPR policy and Nokia maintains that such language excludes patents that are considered to be commercially essential, but not technically essential.[9] Nokia further recognizes that an exception is available only in

---

[7]    U.S. Patent No. 5,841,768 (filed in 1996).

[8]    *See* First Amended Case Management Order (D.I. 204) at ¶ 2.

[9]    The definition of "essential" in the ETSI IPR Policy states:

   ESSENTIAL as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by

7.

"exceptional cases" where patents may be essential if there are a number of ways of implementing a standard, but all of them are patented.[10]  InterDigital, on the other hand, claims that nearly 50% of its patents for which essentiality remains an issue fall within the "exceptional case" provision of the definition.[11]  The parties' dispute regarding the definition of essentiality is of paramount importance to Nokia's claims and InterDigital's mirror-image counterclaims.

When Nokia filed its Amended Complaint in this case, InterDigital had only submitted its patents to ETSI as essential to UMTS on two occasions: once in 2001, and once in 2004.  The 2004 declaration included the '579 patent and Nokia's Amended Complaint unquestionably put the scope, validity and enforceability of the '579 patent at issue.  Then, on March 21, 2007, InterDigital submitted its third set of declarations to ETSI regarding 26 additional patents, which included the '004 patent and the '966 patent.  ETSI, however, did not publish, and still has not published, the March, 2007 submission in its online database of ETSI declarations. ███████████████████████████████████

███████████████████████████████████████████████████████████████

---

technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

(Exhibit B).

[10]  *See* Nokia's September 18, 2007 Interrogatory Response Pursuant to Paragraph Two of the Amended Case Management Order (Exhibit C) at 1-2.

[11]  *See* First Amended Case Management Order (D.I. 204) at Exhibits A and B.  In Exhibit A, InterDigital identifies 239 patents it has declared to ETSI, although the essentiality of roughly 70 of these patents is not at issue because they are either associated with a portion of the UMTS standard not used by the industry or are already licensed to the industry.  In Exhibit B, InterDigital identifies 77 patents (or roughly half of the patents still at issue) which it claims are essential only under the exceptional case provision.

8.

████████████████████████████████████████████  The Special

Master agreed that these new patents were part of this action and ordered Nokia to provide

essentiality contentions regarding the 26 newly declared InterDigital patents (D.I. 204).  The

Court then adopted the Special Master's Order (D.I. 214).  As explained below, the '579, '004

and '966 patents are each also at issue in InterDigital's ITC action against Nokia.

    **Issues in InterDigital's Counterclaims in this Action.**  On February 21, 2007,

InterDigital filed retaliatory counterclaims against Nokia that attempt to mirror Nokia's claims

against InterDigital, ostensibly attacking the essentiality of 195 patents that Nokia has declared

to ETSI as essential to UMTS.

    InterDigital made clear that its counterclaims were filed in the "alternative," and

on the condition that the Court concluded that the submission of an ETSI information statement

was actionable under the Lanham Act.[13]  InterDigital has confirmed this aspect of its

counterclaims on numerous, recent occasions.  First, in a June 4, 2007 letter from InterDigital's

counsel to the Special Master, InterDigital explained under its heading "Description of the

Case," that it "filed a conditional counterclaim, essentially mirroring Nokia's claims against it,"

and that the claims were "contingent," and filed only to ensure that Nokia's own statements

would be "assessed under the same standards it invokes to challenge InterDigital's statements."[14]

More recently, InterDigital again confirmed that "InterDigital's counterclaims concerning

---

[12]  ████████████████████████████████████████████████████████████

[13]  InterDigital's Original Answer to Nokia's First Amended Complaint and Original
       Counterclaims (D.I. 160) at ¶ 204.

[14]  June 4, 2007 Letter from Richard Horwitz to Special Master (Exhibit F) at 3-4.

9.

Nokia's statements to ETSI are expressly conditioned on the unlikely event that the Court finds InterDigital's corresponding statements to be actionable."[15]

**InterDigital's ITC Case.** On August 7, 2007, InterDigital filed an investigation request with the ITC alleging infringement by Nokia of two patents (the '004 patent and the '966 patent, both among InterDigital's March, 2007 filing with ETSI and, as described above, both part of the pending action) and requesting, among other relief, an order barring Nokia from importing infringing UMTS handsets into the United States.[16] On September 5, 2007, the ITC agreed to conduct an investigation based on the Original ITC Complaint and the ITC named Nokia as a respondent.[17] Then, on September 28, 2007, InterDigital filed a Motion to Amend its Original ITC Complaint which adds an infringement claim for the '579 patent.[18]

The purported essentiality of these three patents to UMTS is central to InterDigital's ITC action. InterDigital appears to believe that proving essentiality is necessary for it to obtain any relief from the ITC. This is because the remedy provided by the ITC under 19 U.S.C. § 1337 does *not* give the ITC jurisdiction over patent infringement claims asserted against *all* imported products. Rather, a complainant in the ITC must plead and prove the existence of "an industry in the United States" that would be "destroy[ed] or substantially injure[d]" by the importation of an infringing product. 19 U.S.C. § 1337(a)(1)(A)(i). This

---

[15]   InterDigital's September 5, 2007 Opposition to Nokia's Objections to Special Master's August 20, 2007 Decision (D.I. 216) at n. 6.

[16]   *See* ITC Complaint (Exhibit G), ¶ 65(c).

[17]   *See* Notice of Investigation (Exhibit H).

[18]   *See* InterDigital's proposed Amended Complaint ("Amended ITC Complaint") (Exhibit I), ¶ 39.

10.

requires the complainant to prove that some domestic industry practices the technology claimed in the patents at issue.

This "domestic industry" requirement is particularly difficult for InterDigital to prove because InterDigital does not make any products that practice the patents. Rather, InterDigital claims the benefit of a domestic industry based on its activities in standard setting and the alleged practice of its inventions by its *licensees*.[19] It is unlikely that any licensee has ever specifically licensed only the three ITC patents to the exclusion of the other patents in the InterDigital portfolio given what appears to be InterDigital's typical practice of licensing only on a portfolio basis. Thus, the two ways InterDigital could try to meet its burden of proving that a domestic industry practices these inventions are: to prove (a) specific practice of the patents through technical information provided by a licensee somehow willing to help InterDigital; or (b) that the patents are essential to UMTS. InterDigital will likely seize on the second method given the obvious problems in proving the first.

For this reason, essentiality permeates the ITC proceedings. InterDigital's Amended ITC Complaint states that "any of [Nokia's] handsets capable of operating in a 3G WCDMA [i.e., UMTS] system are accused of infringing [the '004 and the '966 patents]," (Exhibit I, ¶ 51) and that Nokia's handsets capable of operating with a specific portion of the UMTS standard called HSDPA are accused of infringing the '579 patent (*see id.* at ¶ 52). Further, InterDigital explains that Nokia's products are specifically designed to be used in a 3G UMTS system, are advertised as working with a 3G UMTS system, and that there is no substantial non-infringing use of the products when used in a 3G UMTS system. *See id.* at ¶¶ 62-63.

---

[19]  *See* InterDigital's Original ITC Complaint (Exhibit G), ¶ 64.

App. 101

11.

InterDigital's Amended ITC Complaint sets forth InterDigital's purported work in developing the 3G standard and the fact that InterDigital's licensees make 3G-compliant products. *See id.* at ¶¶ 75, 80-81. In addition to the statements in the Amended ITC Complaint, InterDigital also provided with its filing lengthy portions of the UMTS standard and claims charts comparing the '579, '004 and '966 patents to the UMTS standard.[20]

InterDigital served discovery requests in the ITC requesting that Nokia admit or deny that the '004 patent and '966 patent are essential to UMTS and that practice of UMTS infringes the '004 and '966 patents.[21] InterDigital has made it quite clear that it plans to address directly the issue of whether these patents are "essential" to the UMTS standard promulgated by ETSI.

## ARGUMENT

**I.    THE STATUTE MANDATES A STAY OF CLAIMS THAT HAVE ANY ISSUES IN COMMON WITH AN ITC PROCEEDING.**

Congress has provided that when an *issue* exists in common between an ITC case and a district court case, the *claims* where those issues are present *must be stayed.* 28 U.S.C. § 1659(a) provides:

> In a civil action involving parties that are also parties to a proceeding before the United States International Trade Commission under section 337 of the Tariff Act of 1930, at the request of a party to the civil action that is also a respondent in the proceeding before the Commission, *the district court shall stay,* until the determination of the Commission becomes final, *proceedings in the civil action with respect to any claim that involves the same issues involved in the proceeding before the Commission,* but only if such request is made within-- (1) 30 days after the party is named as a respondent in the proceeding before

---

[20]    *See* Exhibits 18 and 19 to Exhibit I; Exhibits 6, 7, 10, 11, and 12 to Exhibit G.

[21]    *See* InterDigital's September 11, 2007 First Set of Requests for Admission to Respondents (Exhibit J), Request Nos. 32-39.

App. 102

12.

the Commission, or (2) 30 days after the district court action is
filed, whichever is later.

(Emphasis added.)  This statute implements Congress' decision to allow an ITC Respondent to

avoid fighting the same issues on multiple legal fronts and instead, to "address the possibility

that infringement proceedings may be brought against imported goods in two forums at the same

time." H.R. Rep. 103-826(I), at 141 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 3773; *see also In

re Princo Corp.*, 478 F.3d 1345, 1355 (Fed. Cir. 2007) (Congress enacted this provision "to

prevent separate proceedings on the same issues occurring at the same time").

The key to § 1659(a) is not that Congress opted to stay only identical disputes or

identical claims, but all claims in civil courts where the claims involve the same issues as those

in a claim between the same parties pending before the ITC.  Specifically, stays are not limited to

infringement actions or issues only, but are instead appropriate "with respect to any claim

that involves the same issues as those pending before the Commission."  H.R. Rep. 103-826(I),

at 141; *see also Princo Corp.*, 478 F.3d at 1356 ("[t]he statute is *not limited to a stay of any

district court determination of issues pending before the Commission; it extends to any district

court 'proceedings' on a 'claim' involving issues pending before the Commission*") (emphasis

added).

Consistent with the above discussion of the purposes of § 1659(a), the statute has

generally been applied by district courts (or discussed by other courts) to stay matters with little

comment or discussion regarding what constitutes the same issues.  *See Verve, LLC v. Verifone,

Inc.*, No. C04-03659JF, 2004 WL 2600452, at *1 (N.D. Cal. Nov. 15, 2004); *Cellco P'ship v.

Broadcom Corp.*, 227 F. App'x. 889 (Fed. Cir. 2007); *Thomson Licensing S.A. v. Benq Corp.*,

No. 3:05-CV-01005-JSW, 2005 WL 1039030, at *1 (E.D. Cal. May 4, 2005); *Amkor Tech. , Inc.*

App. 103

13.

*v. Carsem (M) SDN BHD*, No. 03-5116 MMC, 2004 WL 3237542, at * 1 (N.D. Cal. Feb. 9, 2004).

There are some limited circumstances, however, where district courts have addressed in more detail § 1659(a)'s requirement that the same issues be before the court and the ITC. These circumstances arise when courts consider whether to stay claims in a district court involving patents that are similar, but legally separate, from patents involved in ITC actions. Notably, that is not the circumstance in the present case given that each of Nokia's claims includes InterDigital's patent portfolio and thus the patents at issue in the ITC action.

In the limited situations described above, some courts have determined that where the ITC will construe similar claims to those at issue before the court or consider other issues which will make resolution of claims easier for the court, even claims solely regarding patents not before the ITC should be stayed. *See Flexsys Americas, LP v. Kumho Tire, U.S.A., Inc.*, No. 5:05CV156, 2005 WL 1126750, at *4 (N.D. Ohio Apr. 29, 2005). Other courts have determined that § 1659(a) only applies to the claims involving precisely the same patents at issue in the ITC action, and not the other patent infringement claims, and therefore have refused their discretion to stay claims solely related to other patents not present at the ITC. *See Micron Tech., Inc. v. Mosel Vitelic Corp., Inc.*, No. CIV 98-0293-S-LMB, 1999 WL 458168, at *3 (D. Idaho Mar. 31, 1999). Regardless of the fact that courts have differed on how to treat claims expressly about patents not before the ITC, the fact remains that here, all of Nokia's claims, at InterDigital's insistence, include the three patents which InterDigital seeks to litigate in the ITC, and, as demonstrated below, because the same issues are at present in both actions, all claims in this case should be stayed.

14.

## II.    **THERE ARE OVERLAPPING ISSUES IN THIS CASE.**

### A.    The "Essentiality" Issue Is Common to Both Cases and Requires a Stay of all Claims in this Case.

The issue of what is an "essential" patent, and how that definition is applied to patents declared to ETSI, is a central issue in both this case and in the ITC case.  It is central here because InterDigital claims that its statements of "essentiality" are true because of the nature of the definition of "essential" under the ETSI policy.  It is central in the ITC case because if the patents are not "essential," then there is no domestic industry to protect and the ITC has no jurisdiction.

Moreover, as noted above, the ETSI definition of "essential" is also central in the ITC case because the declaration to ETSI of "essential" patents gives rise to various defenses, including patent misuse of those patents.  Indeed, the Third Circuit has recently ruled in a case involving the ETSI IPR policy that a "patent holder's intentionally false promise to license essential proprietary technology on FRAND terms," coupled with the "patent holder's subsequent breach of that promise" gives rise to antitrust liability.  *See Broadcom Corp. v. Qualcomm Inc.*, No. 06-4292, 2007 WL 2475874, at *11 (3d Cir. Sept. 4, 2007).  Thus, the presence of the essentiality issues in all claims requires all claims to be stayed.

Indeed, when addressing the narrow issue of whether to require discovery on the ITC patents in this case, the Special Master in this case recognized the presence of overlapping *issues* between the actions.[22]  Similarly, this Court noted that "determining essentiality of the patents may implicate issues synonymous to issues raised in the infringement actions [before the

---

[22]    *See* Transcript of Aug. 20, 2007 Teleconference (Exhibit K) at 22:6-7.

App. 105

15.

ITC and before this Court]."[23]  This Court cannot continue with the prosecution of the claims or counterclaims in light of the presence of the essentiality issues in the two parallel proceedings.

   B.  The Other Common Issues With the Three Patents
      Also Mandate a Stay.

    With regard to the three patents (the '579, '004 and '966 patents) InterDigital has injected into this case and the ITC, there are unquestionably issues in common.  The scope of the patents – what they cover and what they do not – will be decided in both cases.  InterDigital will seek to prove in both cases that the patents are essential.  Both this Court and the ITC will be required to construe the claims of these patents.

    The validity of these patents is likewise at issue in both cases.  Nokia's Amended Complaint puts directly at issue the validity of the patents Nokia specifically challenged, including the '579 patent.  For example, Nokia's Amended Complaint alleges that, even if some of InterDigital's patents were to "meet the definition of 'essential,' members of the industry do not need to pay InterDigital any money for them . . . [in part because] the patents cannot be valid and cover the standard at the same time."[24]  Indeed, Nokia's requested relief includes judgment:

> (c) Declaring the extent to which any of the patents [challenged by Nokia] have valid, enforceable claims which necessarily read on any product compliant with . . . any 3G Standard . . . ; [and]
>
> . . .
>
> (e) That InterDigital's statements concerning the scope and validity of its 3G patents are false and misleading[.][25]

    Moreover, because ███████████ the '004 and '966 patents be included in this case ████████████████████████████ the

---

[23]  September 27, 2007 Memorandum Opinion (D.I. 220) at 4.

[24]  Nokia Amended Complaint (D.I. 122) at ¶ 36(d); *see also id.* at ¶¶ 50-51.

[25]  *Id.* at p. 26.

App. 106

16.

validity of those patents is in common in both cases. The same is true for the enforceability of these patents.

Because these *issues* with respect to the three patents are found in *all* of Nokia's unfair competition *claims*, there is no separate claim that can be litigated in this Court free from the requirements of § 1659(a).



---

26  InterDigital's September 5, 2007 Opposition to Nokia's Objections to Special Master's August 20, 2007 Decision (D.I. 216) at 3, 4, 11 and 14.

27  *See* September 11, 2007 Letter from Special Master (Exhibit L) at 1.

17.

C.    This Court Should Use Its Discretion to Stay Any Portions
      of the Case Not Otherwise Subject to the Mandatory Stay.

The essentiality issues discussed above permeate both the claims and the counterclaims in this case, and the claims and defenses in the ITC. Likewise, the patent specific issues in this case cannot be separated from InterDigital's claims or the defenses Nokia today asserts in that action. To the extent there is anything left, however, this Court should exercise its discretion and stay anything remaining.

District courts have the inherent power to stay a particular case pending the conclusion of some other event. *See, e.g., Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936). The Third Circuit has held that a court has the "inherent power to conserve judicial resources by controlling its own docket." *Cost Bros., Inc. v. Travelers Indemnity Co.*, 760 F.2d 58, 60 (3d Cir. 1985). Such stays are discretionary. *See Pegasus Dev. Corp. v. DirecTV, Inc.*, C.A. No. 00-1020-GMS, 2003 WL 21105073, at *1 (D. Del. May 14, 2003). In ruling on a motion to stay, courts are guided by three factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Id.* at *1 (quoting *Xerox Corp. v. 3Com Corp.*, 69 F. Supp. 2d 404, 406 (W.D.N.Y.1999)).

Here, Nokia's and InterDigital's claims are so entwined, that if any claims are stayed, all should be stayed. Specifically, InterDigital has made numerous and express statements that its counterclaims are filed in the "alternative," and are brought only on the condition that the Court concludes that the submission of ETSI information statements is

App. 108

18.

actionable under the Lanham Act.[28]   InterDigital maintains that its counterclaims are
"contingent" claims, filed only to ensure that Nokia's own statements would be "assessed under
the same standards it invokes to challenge InterDigital's statements."[29]



        The other two prongs cited above (whether a stay will simplify the issues in
question and the trial of the case and whether discovery is complete and a trial date has been set)
also weigh in favor of staying any claims remaining after application of the mandatory stay.  The
benefit of the ITC's adjudication of issues, whether or not issue preclusive, will certainly be of
benefit to this Court.  As for the final prong, discovery in this case has been at a virtual standstill
since March and does not close until December of this year (D.I. 171).  As the Court recognized,

---

[28]  InterDigital's Original Answer to Nokia's First Amended Complaint and Original
       Counterclaims (D.I. 160) at ¶ 204.

[29]  Exhibit F at 3-4; *see also* InterDigital's September 5, 2007 Opposition to Nokia's
       Objections to Special Master's August 20, 2007 Decision (D.I. 216) at n. 6
       ("InterDigital's counterclaims concerning Nokia's statements to ETSI are expressly
       conditioned on the unlikely event that the Court finds InterDigital's corresponding
       statements to be actionable").

[30]

19.

staying only a portion of the case "could result in bifurcated proceedings," which would not conserve judicial resources.[31]

Finally, a stay of remaining claims after § 1659(a) is applied is consistent with other courts' actions. *See Flexsys*, 2005 WL 1126750, at *4 (staying claims on patents that were not before the ITC given the court had already stayed other claims pursuant to § 1659(a)); *Verve, LLC*, 2004 WL 2600452, at *1 (staying claims involving non-moving defendants who were not parties to the related ITC action given the same claims against moving defendants, who were parties to the ITC, had been stayed). Accordingly, to the extent the Court finds any claims are not subject to § 1659(a)'s mandatory stay, the Court should nonetheless stay the entire action, in its discretion, pending resolution of InterDigital's ITC action.[32]

## CONCLUSION

Because a stay of claims is mandatory when they share issues in common with an ITC proceeding, this Court should stay this case in its entirety pending the resolution of the ITC case. Any claims found not to have issues in common should be stayed under the Court's discretionary power.

---

[31]    September 27, 2007 Memorandum Order (D.I. 220) at 5.

[32]    In the unlikely event that the Court finds a stay of Nokia's claims is warranted but a stay of InterDigital's contingent counterclaims is not, Nokia would respectfully request that Nokia's claims go forward on all patents at issue except for the three ITC patents (the '579, '004 and '966 patents) in order to avoid piecemeal, inefficient, and asymmetrical litigation of the Lanham Act issues.

App. 110

20.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld (#1014)*
Jack B. Blumenfeld (#1014)
Julia Heaney (#3052)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200
jblumenfeld@mnat.com
jheaney@mnat.com

*Attorneys for Plaintiffs*

*Of Counsel:*

Patrick Flinn
Randall Allen
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309
(404) 881-7000

October 5, 2007

App. 111

**CERTIFICATE OF SERVICE**

I, Jack B. Blumenfeld, hereby certify that on October 11, 2007, I electronically

filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of

such filing(s) to the following:

> Richard L. Horwitz
> POTTER ANDERSON & CORROON LLP

I also certify that copies were caused to be served on October 11, 2007 upon the

following in the manner indicated:

> **BY ELECTRONIC MAIL**
> **and HAND DELIVERY**
>
> Richard L. Horwitz
> POTTER ANDERSON & CORROON LLP
> 1313 N. Market Street
> Wilmington, DE 19801
>
> **BY ELECTRONIC MAIL**
>
> Ron E. Shulman
> WILSON SONSINI GOODRICH & ROSATI
> 650 Page Mill Road
> Palo Alto, CA 94304-1050
>
> Mark D. Flanagan
> WILMER CUTLER PICKERING HALE
>   AND DORR LLP
> 1117 California Avenue
> Palo Alto, CA 94304
>
> Patrick J. Coyne
> FINNEGAN, HENDERSON, FARABOW,
>   GARRETT & DUNNER, LLP
> 901 New York Avenue, NW
> Washington, DC 20001

> /s/ Julia Heaney
> Julia Heaney (#3052)
> jheaney@mnat.com

App. 112

# EXHIBIT  D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NOKIA CORPORATION and NOKIA, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. No. 05-16-JJF |
| INTERDIGITAL COMMUNICATIONS CORPORATION and INTERDIGITAL TECHNOLOGY CORPORATION, | ) ) ) ) | **PUBLIC VERSION** |
| Defendants. | ). ) | |

**INTERDIGITAL'S OPPOSITION TO NOKIA'S MOTION FOR
MANDATORY STAY PURSUANT TO 28 U.S.C. § 1659(a)**

OF COUNSEL:

Mark D. Flanagan
Nathan L. Walker
WILMER CUTLER PICKERING
  HALE & DORR, LLP
Palo Alto, California 94304

Ron E. Shulman
Michael B. Levin
WILSON SONSINI GOODRICH & ROSATI
Palo Alto, CA 94304-1050

Patrick J. Coyne
Houtan K. Esfahani
Rajeev Gupta
FINNEGAN HENDERSON FARABOW
  GARRETT & DUNNER LLP
Washington, DC 20001-4413

Christopher D. Isaac
FINNEGAN HENDERSON FARABOW
  GARRETT & DUNNER LLP
Reston, Virginia 20190

Dated: October 30, 2007
Public Version Dated: November 8, 2007
830748/28840

Richard L. Horwitz  (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19801
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

OF COUNSEL:

Roger D. Taylor
R. Bruce Bower
FINNEGAN HENDERSON FARABOW
  GARRETT & DUNNER LLP
Atlanta, GA 30308-3263

*Attorneys for Defendants Interdigital
Communications Corporation and Interdigital
Technology Corporation*

# TABLE OF CONTENTS

Page

I.    NATURE AND STAGE OF THE PROCEEDINGS ..................................................... 1

II.   SUMMARY OF ARGUMENT ................................................................................... 2

III.  FACTUAL BACKGROUND ..................................................................................... 4

IV.   ARGUMENT ............................................................................................................. 7

    A.    Nokia Is Not Entitled to a Mandatory Stay Under 28 U.S.C. § 1659(a) ................ 7

        1.    Nokia's Request for a Mandatory Stay Is Precluded by the Law of the Case Doctrine ..........................................................................................7

        2.    Nokia's Lanham Act Claims Are Distinct from the Infringement Claims Asserted in the ITC Action ............................................................8

    B.    Nokia Is Not Entitled to a Discretionary Stay Because Nokia Relies on a Feigned Claim of Prejudice ........................................................................ 14

        1.    If Harm Is a Possibility, a Discretionary Stay May only Be Granted When the Moving Party Establishes a Case of Hardship and Inequity .....14

        2.    Nokia's Request for a Discretionary Stay Appears to Based upon a Disingenuous Claim of Hardship and Inequity...................................15

    C.    Should the Court Grant a Discretionary Stay, It Should Be Granted with Conditions to Ensure that the Purpose of the Discretionary Stay Is Met.............. 16

V.    CONCLUSION.......................................................................................................... 18

i

App. 114

## TABLE OF AUTHORITIES

Page(s)

*Baisden v. Bourne*, Slip Copy,
No. 8:06-cv-517, 2006 WL 3497854 (D. Neb. 2006).........................................................14

*Cheng v. Sighting System Instruments, LLC*,
No. 1:06-cv-2326-WSD, 2007 WL 1341119 (N.D. Georgia May 3, 2007).......................15

*Dohse v. Potter*,
No. 8:04-cv-355, 2006 WL 1314327 (D. Neb. 2006).......................................................14

*In re Princo Corp.*,
478 F.3d 1344 (Fed. Cir. 2007)............................................................................................10

*Jersey Dental Labs. v. Dentsply Int'l, Inc.*,
C. A. No. 01-267-SLR, 2002 WL 2007916 (D. Del. Aug. 27, 2002)..................................8

*Micron Technology, Inc. v. Mosel Vitelic et al.*,
No. CIV 98-0293-S-LMB, 1999 WL 458168 (D. Idaho Mar. 31, 1999)..............7, 8, 9, 13

*Landis v. North American Co.*,
299 U.S. 248 (1936)...............................................................................................14, 15, 17

*Lockyer v. Mirant Corp.*,
398 F.3d 1098 (9th Cir. 2005)..............................................................................................14

*Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.*,
123 F.3d 111 (3d Cir. 1997).................................................................................................8

### STATUTES

19 U.S.C. § 1337.............................................................................................................*passim*

28 U.S.C. § 1659(a).........................................................................................................*passim*

App. 115

## I.  NATURE AND STAGE OF THE PROCEEDINGS

In January 2005, Plaintiffs Nokia Corporation and Nokia Inc. (collectively "Nokia") initiated this action, alleging that InterDigital Communications, LLC[1] and InterDigital Technology Corp. (collectively, "InterDigital") violated the Lanham Act by making declarations to the European Telecommunications Standards Institute ("ETSI"), a third generation ("3G") wireless standards body, and other public statements, that InterDigital owned patents that may be essential to the UMTS 3G standard.  InterDigital subsequently filed counterclaims, including mirror-image claims asserting that Nokia made public statements falsely asserting that it owned essential 3G patents.  Because the parties' allegations involved the potential for litigation concerning more than 300 patents, InterDigital moved for a modified case management order to manage the proceedings.  After weeks of hearings and negotiations, the Special Master issued the First Amended Case Management Order ("CMO") on July 9, 2007.[2]

On August 10, 2007, the Special Master ordered Nokia to submit its contentions on certain InterDigital patents declared to ETSI in March 2007, including U.S. Patent Nos. 7,117,004 ("the '004 patent") and 7,190,966 ("the '966 patent") (collectively the "Crossover Patents").  Instead of submitting its contentions on the Crossover Patents, Nokia requested a stay of its obligation to provide contentions with respect to these patents under its Lanham Act claim theory.  As it is arguing here, Nokia then argued that a discovery stay for those patents was warranted under 28 U.S.C. § 1659(a) because InterDigital had initiated a patent infringement action before the International Trade Commission on those patents (the "ITC Action") on August 7, 2007.  Finding Nokia's Lanham Act claims to be distinct from the infringement claims in the ITC Action even as to the two Crossover Patents, both the Special Master and this Court properly denied Nokia's requested stay.

---

[1] InterDigital Communications, LLC is the successor to InterDigital Communications Corporation, the originally named co-defendant.

[2] This Court entered the CMO on August 30, 2007.

Despite being denied even a far more limited stay of discovery pursuant to 28 U.S.C. § 1659(a) on the two Crossover Patents, Nokia now has moved to stay this *entire* action on precisely the same grounds.

While InterDigital disagrees that Nokia is entitled to a mandatory stay of this action, InterDigital nonetheless proposed that the parties stipulate to stay not only this action but any future actions involving similar claims, as doing so would conserve resources given that the parties may be in a better position to resolve their disputes following the resolution of the ITC Action. Nokia rejected this proposal. Contradicting its present request for a broad stay of the issues that are allegedly "common" to both this action and the ITC Action, Nokia insisted on limiting any stay to "identical" claims at issue here, while retaining the right to assert in other jurisdictions claims similar to those at issue here. As a result, the parties have been unable to reach an agreement on the stay issue.

InterDigital respectfully submits that this Court should grant a discretionary stay of this action—but conditioned on the parties not initiating any new actions with similar claims for the duration of the stay. If the Court decides not to enter such a conditional stay, InterDigital requests that the Court deny Nokia's request for a stay of the present action where such a stay would allow Nokia to bring the same or similar actions in other jurisdictions. Nokia's requested stay would not accomplish Nokia's purported goal of avoiding litigation of similar issues in multiple forums, but would rather permit Nokia to pursue Lanham Act or similar claims against InterDigital in other forums—but without the benefit of the discovery and case management procedures the parties, the Court and the Special Master have worked so hard to develop over the course of this litigation.

## II.    SUMMARY OF ARGUMENT

Nokia's request for a stay is yet another attempt by Nokia to delay litigating in this forum the case that it instituted. Indeed, Nokia's motion represents the *second* time Nokia has sought a

2

App. 117

stay of the proceedings under the mandatory stay provision set forth in 28 U.S.C. § 1659(a).
During its first unsuccessful attempt at obtaining a stay, Nokia made the identical argument that
it makes here: that this Lanham Act action involves the same issues as the ITC Action. The
Court properly denied Nokia's previous request for a stay, holding that "Nokia's Lanham Act
claims are distinct from the claims in the infringement actions, and therefore any potential
overlap does not warrant the requested stay." *See* Exh. 1 (D.I. 220) (Memorandum Order, Sept.
26, 2007) at 4.

Nokia, however, has refused to take "no" for an answer. Making the same argument that
this Court previously rejected—that there are overlapping issues between this action and the ITC
Action—Nokia has again sought a stay. Specifically, this Court found that although
"determining essentiality of the patents may implicate issues synonymous to issues raised [in the
ITC Action]," a mere overlap or even substantial similarity in issues is not enough to warrant a
stay under § 1659(a). *See id.* The issues must be the same. As this Court previously recognized,
the Lanham Act claims are distinct from the infringement claims alleged in the ITC Action, and
thus a mandatory stay under § 1659(a) is not warranted. *See id.*

Nokia also has requested a discretionary stay of this action under what appears to be an
argument of alleged hardship resulting from litigating similar claims in separate forums. Nokia's
request for a discretionary stay should similarly be denied, as Nokia's actions call into doubt
Nokia's alleged hardship stemming from multiple litigations involving similar claims.



3

███████████████████████████████████████ Nokia's request for a discretionary stay, therefore, should be denied on the terms it has requested.

Nonetheless, InterDigital proposes that the Court use its discretion to enter a *conditional* stay of this action and actions with similar claims, which stay would dissolve if either party institutes a new action involving similar claims in this or another forum. Doing so will ensure that the purpose behind any discretionary stay be respected by avoiding litigation of "common" issues in separate forums. It will also prevent Nokia from misusing the stay to re-start this litigation in another forum, where Nokia could potentially avoid any of the orders of this Court that it may now view as unfavorable.

## III.    FACTUAL BACKGROUND

On November 14, 2006, the Special Master issued the Second Discovery Order requiring Nokia to "identify on a patent-by-patent basis why InterDigital's ETSI declarations are false and made in bad faith." *See* D.I. 71 (Second Discovery Order) at 4-5. On December 14, 2006, Nokia submitted its contentions pursuant to the Second Discovery Order for 195 of InterDigital's declared patents. In February 2007, InterDigital asserted counterclaims against Nokia, including ones that are mirror images of Nokia's claims against InterDigital.[3] *See* D.I. 160. InterDigital thereafter submitted its contentions pursuant to the Second Discovery Order for 188 of Nokia's declared patents.

In March 2007, InterDigital declared to ETSI an additional group of twenty-six patents (the "March 2007 Declared Patents"). The Special Master ordered Nokia to provide its

---

[3] InterDigital submits that statements of belief made to a standards body such as ETSI cannot be actionable, as a matter of law. (InterDigital filed a motion to dismiss Nokia's Amended Complaint on the grounds that the alleged false statements are not actionable. *See* D.I. 161.) Accordingly, InterDigital's counterclaims concerning Nokia's statements to ETSI are expressly conditioned on the unlikely event that the Court finds InterDigital's corresponding statements to be actionable. *See* D.I. 160, ¶ 204.

App. 119

contentions concerning these patents so that InterDigital could prepare its defenses. *See* D.I. 203.

On August 7, 2007, InterDigital filed two patent infringement actions against Nokia: (i) a complaint with the International Trade Commission under 19 U.S.C. § 1337, *In re Certain 3G Mobile Handsets and Components Thereof* (the "ITC Action"); and (ii) a parallel district court action, *InterDigital Communications, LLC v. Nokia Corp.*, C. A. 07-489 (D. Del.). These patent infringement actions involve the two Crossover Patents, InterDigital's U.S. Patents Nos. 7,117,004 ("the '004 patent") and 7,190,966 ("the '966 patent"), which are among the twenty-six patents InterDigital declared to ETSI in March 2007. InterDigital has since amended its complaint in both the district court action and the ITC Action to include U.S. Patent No. 6,973,579 ("the '579 patent"). *See* Exhs. 2, 3. Thus, Nokia is accused of infringing three patents in the ITC Action: the '004, '966, and '579 patents (collectively "the ITC Patents").

On August 10, 2007, Nokia submitted its contentions pursuant to the Second Discovery Order for all but the '004 and '966 patents.[4] *See* Exh. 4 (Nokia's Aug. 10 Submission). Nokia requested a stay of discovery as to the '004 and '966 patents arguing—just as it does here—that a stay was mandatory under 28 U.S.C. § 1659(a) because these patents were at issue in the ITC Action.

On August 20, 2007, the Special Master held a hearing on Nokia's stay request. *See* Exh. 5 (Aug. 20, 2007 Hearing Transcript). After hearing from both sides, the Special Master denied Nokia's request. *See id.* at 21:21-23:23. The Special Master recognized that, although the issues in this Lanham Act action may overlap to some degree with the issues in the patent infringement actions, the claims are different and any potential overlap did not warrant a stay. *See id.* at

---

[4] Nokia submitted its contentions with respect to the '579 patent pursuant to the Second Discovery Order on December 14, 2006.

5

21:23-22:14. Nokia, however, insisted on pressing the stay issue and, on August 24, 2007, filed objections to the Special Master's decision with this Court.

The Court affirmed the Special Master's decision, finding that "Nokia's Lanham Act claims are distinct from the claims in the infringement actions, and therefore any potential overlap does not warrant the requested stay." Exh. 1 (D.I. 220) (Memorandum Order, Sept. 26, 2007) at 4. Nokia did not seek reconsideration of this order, or otherwise attempt to appeal it. Nonetheless, undeterred by two rulings finding that it was not entitled to a far narrower stay, Nokia has once again sought a stay pursuant to 28 U.S.C. § 1659(a).[5] The two earlier decisions, in fact, appear to have emboldened Nokia.  Recycling many of its losing arguments, Nokia now seeks not only a stay of *discovery* with respect to the Crossover Patents, but a stay of this *entire action*, including InterDigital's counterclaims relating to *Nokia's* patents.

While InterDigital recognizes that Nokia is not entitled to a mandatory stay, to conserve resources, InterDigital proposed that Nokia agree to a stipulation to stay this action on reasonable terms.



---

[5] On the same day, October 5, 2007, Nokia also filed a motion pursuant to 28 U.S.C. § 1659(a) to stay the district court action alleging infringement of the same patents that are at issue in the ITC Action, *InterDigital Communications, LLC v. Nokia Corp.*, C. A. No. 07-489-SLR (D. Del.).

6

## IV.    ARGUMENT

### A.    Nokia Is Not Entitled to a Mandatory Stay Under 28 U.S.C. § 1659(a)

Nokia is not entitled to a mandatory stay because the present action, in which the parties have made allegations of false or misleading statements under the Lanham Act, does not "involve[] the same issues involved in the proceedings before the [International Trade] Commission." *See* 28 U.S.C. § 1659(a).  A mere overlap or even *substantial similarity* in issues is *not* enough to warrant a stay under 28 U.S.C. § 1659(a); rather, the issues must be the same. *See Micron Technology, Inc. v. Mosel Vitelic et al.*, No. CIV 98-0293-S-LMB, 1999 WL 458168 at *3 (D. Idaho Mar. 31, 1999) (finding that while the patent infringement claims of the seven related patents filed before the district court "raise issues that are substantially similar to the issues that will be raised in the patent infringement claims before the ITC, those issues are not the same issues as required by the statute and a mandatory stay cannot be granted"). Furthermore, because this Court has already recognized that the Lanham Act and state law claims asserted in this action are distinct from the claims in the ITC Action, Nokia's renewed request for a stay is precluded under the law of the case doctrine.

### 1.    Nokia's Request for a Mandatory Stay Is Precluded by the Law of the Case Doctrine

This Court has already decided the issue presented by Nokia's motion—whether Nokia is entitled to a mandatory stay of this action under 28 U.S.C. § 1659(a).  In August 2007, Nokia argued in its Objections to the Special Master's August 20, 2007 Decision ("Nokia's Objections") that it was entitled to a stay of discovery pursuant to § 1659(a) because of common issues of essentiality, validity and claim construction in both this action and in the ITC action. *See* D.I. 212 (Nokia's Objections) at 11-12.  The Court rejected Nokia's argument and "agree[d] with the Special Master that Nokia's Lanham Act claims are distinct from the claims in the infringement actions [in the ITC], and therefore any potential overlap does not warrant the requested stay." *See* Exh. 1 (D.I. 220) (Memorandum Order, Sept. 26, 2007) at 4 (recognizing

7

App. 122

that even patent infringement actions raising "'issues that are substantially similar'" to patent infringement claims before the ITC "'are not the same issues as required by 28 U.S.C. § 1659(a).'") (quoting *Micron Tech., Inc. v. Mosel Vitelic*, No. Civ. 98-0293-S-LMB, 1999 WL 458168, at *5 (D. Idaho Mar. 31, 1999)).  Nokia did not move for reconsideration, seek an interlocutory appeal, or otherwise attempt to set aside this binding opinion of the Court.

Because the stay issue was previously briefed by the parties and decided by this Court, the law of the case doctrine precludes Nokia from raising it a second time. *See, e.g., Jersey Dental Labs. v. Dentsply Int'l, Inc.*, C. A. No. 01-267-SLR, 2002 WL 2007916, at *1 (D. Del. Aug. 27, 2002) (applying the law of the case doctrine to issues the court "'resolved earlier in the . . . litigation'") (quoting *Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997)).  Nokia has failed to provide any basis for this Court to re-decide this settled issue, and there is none.

### 2. Nokia's Lanham Act Claims Are Distinct from the Infringement Claims Asserted in the ITC Action

Even if this Court were to revisit its prior decision denying a much *narrower* stay on discovery with respect to the two Crossover Patents, Nokia's argument for *broadly* staying both sides' Lanham Act claims relating to hundreds of InterDigital and Nokia patents should fail for the same reasons.

Nokia argues that this action—involving allegations of false or misleading statements under the Lanham Act and a number of state law claims—should be stayed because it shares a few "common" issues with the ITC patent infringement action.  Nokia's argument fails because (i) this case does not involve the same issues as the ITC Action; and (ii) even if this Lanham Act case involved *some* of the same issues as the ITC patent infringement action, that still would not warrant a stay.

InterDigital is aware of no cases staying a Lanham Act claim under 28 U.S.C. § 1659(a), and Nokia has cited none. *See* Exh. 5 (Aug. 20, 2007 Hearing Transcript) at 6:22-7:11.  But

8

even if § 1659(a) were applicable to Lanham Act claims, there is not a sufficient overlap to warrant a stay, as a mere overlap—or even a *substantial similarity*—in issues is *not* enough to warrant a stay under § 1659(a); rather, the issues must be *the same*. *See Micron Technology, Inc.*, 1999 WL 458168 at *3 (D. Idaho Mar. 31, 1999). The present action involves *Lanham Act* claims concerning the parties' alleged false or misleading public statements and submissions to ETSI. These claims relate in part to the "essentiality" of hundreds of InterDigital's (and Nokia's) patents, at most three of which are also involved in the ITC Action. It does not involve any of the *same* legal issues as the ITC patent infringement action.

One of the issues Nokia has raised in this case is whether the parties' declared patents read on any of the 3G wireless standards and whether such patents are "essential," as that term is defined by ETSI. However, Nokia's claims do not turn on whether or not particular patents are valid or enforceable, or whether or not any particular products infringe any particular patents. In this case, one of the issues is whether particular *patents* may or might be essential to the 3G standards. In the ITC Action, while InterDigital will likely rely to some extent on standards in showing how Nokia's products operate, its infringement analysis is based primarily on comparing Nokia's products to the claims of the ITC Patents. Unlike the ITC Action, no *products* are at issue in this suit. Thus, the question of whether particular Nokia products infringe those patents—which is a central issue in the infringement actions—will not be resolved in this case. For that reason, the CMO expressly denied discovery on the issues of validity, enforceability and infringement of products.[6] *See* D.I. 204, ¶ 9. Thus, even in the absence of any stay, there will not be *any* discovery regarding the validity, enforceability, or infringement of the ITC Patents in the present action.[7]

---

[6] The CMO permits either party to apply for relief from this limitation following claim construction. *See* D.I. 204, ¶ 9.

[7] In fact, there may never be *any* discovery permitted in this action regarding two of the three ITC Patents, the '004 or '966 patents. For such discovery to be permitted, two things must first

(continued...)

9

App. 124

Moreover, contrary to Nokia's suggestion, there is no law or authority holding that stays under section 1659(a) can extend beyond infringement claims to Lanham Act claims. Nokia relies on *In re Princo Corp.*, 478 F.3d 1344 (Fed. Cir. 2007) in support of its argument that stays under § 1659(a) are "not limited to infringement actions or issues only" (*see* D.I. 228 at 12), despite the fact that *Princo Corp.* actually involved two actions with claims of patent *infringement* of the same patents. *See In re Princo Corp.*, 478 F.3d at 1348. While the district court in *Princo Corp.* only had the issue of patent infringement damages left to adjudicate, those damages were based on the alleged infringement of the same patent being asserted in the concurrent ITC action. Thus, both actions in the *Princo Corp.* decision necessarily involved the same issue of infringement of the same patents. Indeed, Nokia does not cite to any cases that demonstrate a court using § 1659(a) to stay an action not involving issues of patent infringement. InterDigital need not address the cases cited by Nokia or its position that such instances trigger a mandatory stay, as there are no infringement claims at issue here, and Nokia has failed to present any authority that § 1659(a) extends to either Lanham Act claims or similar state law claims.

      a.    **Nokia Incorrectly Argues that InterDigital Necessarily Must Prove Essentiality of its Patents in Order to Establish Domestic Industry in the ITC Action**

To further its position that InterDigital must litigate identical issues in both this action and the ITC Action, Nokia creates a straw-man argument by claiming that InterDigital must necessarily prove essentiality of its patents in the ITC Action in order to satisfy the domestic industry requirement under 19 U.S.C. § 1337(a)(3). Nokia is wrong.

At the outset, Nokia's motion makes a number of fundamentally flawed statements about ITC law in general and, more specifically, InterDigital's allegations in the ITC. For example:

---

occur: (a) the Special Master must determine that the parties should select additional Representative Patents from among InterDigital's March 2007 Declared Patents pursuant to the CMO, and (b) one of the parties must select these patents as Representative Patents. *See* D.I. 204, ¶ 5.

App. 125

- Nokia states that "a complainant in the ITC must plead and prove the existence of 'an industry in the United States' that would be 'destroy[ed] or substantially injure[d]' by the importation of an infringing product," citing 19 U.S.C. § 1337(a)(1)(A)(i). D.I. 228 at 9. That is incorrect. The section Nokia cites does not apply to unfair import claims based on patent infringement, which is the basis for InterDigital's ITC complaint. Patent infringement claims in the ITC are covered by a different section of the statute—19 U.S.C. § 1337(a)(1)(B)(i)—and for such claims a complainant need not demonstrate injury to the domestic industry. Because Nokia is wrong about the requirement of showing injury to the domestic industry, most of its subsequent comments about what InterDigital must show in order to satisfy the domestic industry requirement are also wrong, particularly its comments about the need to show that some products practice a claim of the asserted patents.

- Nokia states that "InterDigital claims the benefit of a domestic industry based on its activities in standard setting and the alleged practice of its inventions by its *licensees*." D.I. 228 at 10 (emphasis in original). Again, Nokia is wrong, because it apparently does not understand the difference between a domestic industry based on activities of the complainants' licensees and a domestic industry based on the complainants' own activities in seeking and obtaining licenses under its patents. InterDigital is not basing its domestic industry case on production related activities of its many licensees, which would presumably require InterDigital to prove that the licensees' products were covered by the patents at issue. Instead, InterDigital is relying on its own activities in obtaining licenses under the patents at issue.

11

App. 126

- Nokia states that "the two ways InterDigital could try to meet its burden of proving that a domestic industry practices these inventions are: to prove (a) specific practice of the patents through technical information provided by a licensee somehow willing to help InterDigital; or (b) that the patents are essential to UMTS." D.I. 228 at 10. Again, Nokia is wrong. InterDigital need not show that its licensees are practicing the technology in the patents at issue. Rather, to show that it has a licensing industry, InterDigital need only focus on its efforts to license its patent portfolio, which includes the patents at issue in the ITC Action.

Those incorrect statements form the basis of Nokia's argument that the issues in the ITC Action and this action are similar, and once they are corrected it becomes clear that there is little substantive overlap between InterDigital's ITC allegations and the issues in this case.

In its Amended ITC complaint, InterDigital states that a domestic industry exists under 19 U.S.C. § 1337(a)(3)(C). *See* Exh. 3 (Amended ITC Complaint) at 18-19. Under § 1337(a)(3)(C), domestic industry of a patent is established when a party shows that there is substantial investment in the patented technology's exploitation, including engineering, research and development *or* licensing of the technology. *See* 19 U.S.C. § 1337(a)(3). As to investments in research and development and engineering, InterDigital explains that it has made substantial investments in personnel, facilities, and equipment in the United States used for the research and development and engineering of technology covered by InterDigital's asserted patents. *See* Exh. 3 at 18-19 (Amended ITC Complaint). As for investments in licensing, InterDigital explains that it has made substantial investment in personnel and resources associated with licensing the asserted patents. *See id.* at 19-20. There is no mention of establishing domestic industry by proving that the asserted patents are "essential" to the UMTS standard, and proving that InterDigital has a licensing industry does not require proof that the asserted patents are practiced

12

App. 127

by any and all of InterDigital's licensees because the patents are "essential," which appears to be what Nokia incorrectly assumes InterDigital is arguing.

The absence of a single reference to essentiality in the domestic industry section is not surprising, since InterDigital can establish domestic industry under § 1337(a)(3)(C) without having to prove that its patents are essential to a particular standard. Bold (and baseless) predictions as to the future strategies to be employed by InterDigital cannot serve as evidence worthy of granting a mandatory stay under 28 U.S.C. § 1659(a).

### b.    No Other Common Issues Exist

Nokia also attempts to justify its request for a stay by further arguing that the same issues of claim construction and validity are supposedly present both in this action as well as in the patent infringement actions. *See* D.I. 228 at 15. Again, Nokia is wrong.

On the issue of validity, Nokia's Amended Complaint does not even fairly raise that issue—as witnessed by the fact that Nokia has been unable to point to any actionable statement by InterDigital regarding the validity of the patents it disclosed to ETSI. But even if validity were at issue, under the Case Management Order discovery relating to the validity of all the patents—including the ITC Patents—is currently prohibited.

With regard to claim construction, there is no guarantee that the claims of the '004 and '966 patents will be construed in this action ██████████████████████████████ ████ *See* discussion *supra* note 7. However, even if a similar issue of claim construction might exist in the ITC patent infringement action and this Lanham Act action, these similarities do not involve the "same" issues, as per the *Micron Tech* decision, and therefore cannot justify a mandatory stay. Indeed, InterDigital is aware of no cases where a Court has stayed an action pursuant to § 1659(a) solely due to overlapping issues of claim construction, absent overlapping claims of patent infringement. Furthermore, any overlap with respect to claim construction

---

████████████████████████████████████████████

13

would, at most, involve only three of the dozens of patents selected as representative patents from among the hundreds of patents at issue in this action. Thus, a mandatory stay should be denied.[9]

**B.    Nokia Is Not Entitled to a Discretionary Stay Because Nokia Relies on a Feigned Claim of Prejudice**

**1.    If Harm Is a Possibility, a Discretionary Stay May only Be Granted When the Moving Party Establishes a Case of Hardship and Inequity**

District courts have the power to stay proceedings pending the resolution of other suits. *See, e.g., Landis v. North American Co.,* 299 U.S. 248, 254-255 (1936). Before exercising that power the court should require that the moving party "make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else." *Id.* at 255; *accord Lockyer v. Mirant Corp.,* 398 F.3d 1098, 1109 (9th Cir. 2005); *Dohse v. Potter,* No. 8:04-cv-355, 2006 WL 1314327 (D. Neb. 2006); *Baisden v. Bourne,* Slip Copy, No. 8:06-cv-517, 2006 WL 3497854, at *2 (D. Neb. 2006).

**a.    InterDigital Will Suffer Harm from the Stay on the Terms Proposed by Nokia**

A stay on the terms requested by Nokia pending resolution of the ITC Action would harm InterDigital in various ways. Federal Courts have found a plaintiff's request for a discretionary stay to be harmful for defendants where they would suffer from the uncertainty caused by a stay of an indeterminate length of time. *See Baisden v. Bourne,* No. 8:06CV517, 2006 WL 3497854, at *3 (D. Neb. Dec. 5, 2006) (denying plaintiff's request for a stay because of the fair possibility of harm to the defendants existed if the stay were to be granted, as the Defendants would not be able to have the serious claims heard against them for an unknown period of time). Here, a stay pending resolution of the ITC Action could similarly harm InterDigital by allowing Nokia's

---

[9] If claim construction on the ITC Patents were to become an issue, a far more limited stay— as originally requested by Nokia (and properly rejected by the Court)—would be the broadest relief that would be appropriate under the circumstances, not a stay of the *entire* action (including InterDigital's counterclaims relating to Nokia's patents).

baseless claims to indefinitely hang over InterDigital and its patents, potentially harming InterDigital's licensing business. Such potential harm to InterDigital's business is sufficient grounds to deny a request for a discretionary stay. *See Cheng v. Sighting System Instruments, LLC*, No. 1:06-cv-2326-WSD, 2007 WL 1341119, at *2 (N.D. Georgia May 3, 2007) (denying plaintiff's request for a stay because the undue prejudice the defendant faced from the uncertainty of the stay could impose harm to defendants' ability to price and sell his goods that were the subject of the litigation).

InterDigital could also be harmed by a stay on the terms Nokia proposes because InterDigital's counterclaims would be stayed for an extended period of time, and InterDigital would be unable to obtain any injunctive relief against Nokia's false and misleading statements. For example, Nokia continues to make false and misleading statements regarding the Goodman & Myers study and article, as alleged in InterDigital's counterclaims. *See* D.I. 160, ¶¶ 251, 263 (InterDigital's Original Answer to Nokia's First Amended Complaint and Original Counterclaims). These statements have damaged and will continue to damage InterDigital, *see id.*, ¶¶ 254, 267, and a stay of these proceedings could lead to further harm. While Nokia has attempted to justify its proposed stay of InterDigital's counterclaims on the ground that they are conditioned on the Court accepting some of Nokia's theories, it has not even attempted to justify staying those InterDigital counterclaims that are not mirror images of Nokia's claims. A stay on such claims would similarly harm InterDigital.

### 2. Nokia's Request for a Discretionary Stay Appears to Based upon a Disingenuous Claim of Hardship and Inequity

Nokia's request for a discretionary stay hinges upon the fact that the Court should protect Nokia from the hardship and inequity of having to litigate similar issues in multiple forums. *See Landis v. North American, Co.*, at 255.



15



**C.** **Should the Court Grant a Discretionary Stay, It Should Be Granted with Conditions to Ensure that the Purpose of the Discretionary Stay Is Met**

Should this Court grant a discretionary stay of this action, such a stay should include conditions that will give effect to the purposes behind discretionary stays—to avoid the undue burden of multiple litigations of similar issues. Nokia's proposal for a narrow stay covering only *identical claims* is both inefficient and unfair. For instance, under Nokia's proposal, nothing would prevent Nokia from instituting a new action with *identical allegations* (*e.g.* that InterDigital made false or misleading statements regarding the essentiality of its patents to 3G standards bodies), but based on similar (but not precisely identical) claims for relief. Indeed, Nokia might have this exact scenario in mind. Nokia may hope to stay this action so that it can then reassert its allegations against InterDigital in a new forum, free of any adverse decisions, the

16

App. 131

limitations imposed by the CMO, or the binding nature of its selections made pursuant to the CMO. Nokia should not be given the opportunity to play such games.

The discretionary stay, therefore, would need to protect against both Nokia's alleged undue hardship and inequity of having to litigate similar claims in multiple forums, and the unfairness that would result if Nokia were allowed to effectively restart this litigation in another forum. *See Landis*, 299 U.S. at 255. To accomplish this, InterDigital respectfully submits that any stay should apply both to the present Lanham Act action[10] as well as to any future actions involving the same or similar claims. Consistent with the purposes of a discretionary stay, the stay should further provide that, in the event either party institutes in any forum a new action involving similar claims, the other party should have the option to (a) seek to stay the new action pursuant to this Court's Order, and/or (b) seek the automatic dissolution of the stay in this action.[11]

---

[10] Nokia seeks to stay InterDigital's counterclaims, contending that they are all conditioned on Nokia prevailing on some aspect of its claims. *See* D.I. 228 at 4. Not so. Portions of InterDigital's counterclaims are not conditioned on any theory of Nokia being accepted (*see, e.g.*, D.I. 160, ¶¶ 247-249 ). Nonetheless, in the interests of judicial economy, InterDigital will agree to stay all of its counterclaims in the event a stay of Nokia's claims is granted with the conditions discussed above.

[11] InterDigital respectfully submits that the stay should also be conditioned on staying the related arbitration in the International Chamber of Commerce, International Court of Arbitration (Arbitration No.: 14 685/EBS) regarding Nokia's attempted use of two alleged confidential licensing presentations (the "ICC Arbitration"). Nokia previously agreed to such a condition during the parties' negotiations, and presumably agrees that it is inefficient to proceed with the arbitration in the event that the Delaware proceeding is stayed.

17

## V.    CONCLUSION

For the foregoing reasons, Nokia's motion for a mandatory stay pursuant to 28 U.S.C. § 1659(a) should be denied.  Nokia's request for a discretionary stay on the terms proposed by Nokia also should be denied.  However, should the Court find a discretionary stay to be appropriate, InterDigital respectfully requests that the stay provide the following:

- The stay of this action would last for the entire duration of the ITC Action, including any appeals;

- The stay would apply both to the claims brought in this action as well as to the same claims or "Similar Claims" brought in any forum;

  - For purposes of the requested stay order, "Similar Claims" would include:

    - Claims involving the same causes of action (e.g., Lanham Act claims) based on similar factual allegations (e.g., alleged false statements of the same nature as those currently at issue in this action); and

    - Claims based on the same factual allegations, but brought under different legal theories (e.g., state unfair competition laws other than those included in the parties' claims and counterclaims).

- In the event that a party brings a new claim in violation of the stay order, the other party would be permitted to (a) move to stay the new action on the grounds that it is barred by this Order, and/or (b) seek the automatic dissolution of the stay; and

- The stay would also apply to the pending related ICC arbitration between the parties.

App. 133

A form of InterDigital's proposed stay order is submitted herewith.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Mark D. Flanagan
Nathan L. Walker
WILMER CUTLER PICKERING
  HALE & DORR, LLP
1117 California Avenue
Palo Alto, California 94304
Tel:  (650) 858-6000

Ron E. Shulman
Michael B. Levin
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Tel:  (650) 493-9300

Patrick J. Coyne
Houtan K. Esfahani
Rajeev Gupta
FINNEGAN HENDERSON FARABOW
  GARRETT & DUNNER LLP
901 New York Avenue, NW
Washington, DC 20001-4413
Tel:  (202) 408-4000

Dated:  October 30, 2007
Public Version Dated:  November 8, 2007
830748/28840

By:  /s/ David E. Moore
      Richard L. Horwitz  (#2246)
      David E. Moore (#3983)
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, Delaware 19801
      Tel:  (302) 984-6000
      rhorwitz@potteranderson.com
      dmoore@potteranderson.com

OF COUNSEL:

Christopher D. Isaac
FINNEGAN HENDERSON FARABOW
  GARRETT & DUNNER LLP
Two Freedom Square
11955 Freedom Drieb
Reston, Virginia 20190
Tel:  (571) 203-2700

Roger D. Taylor
R. Bruce Bower
FINNEGAN HENDERSON FARABOW
  GARRETT & DUNNER LLP
3500 SunTrust Plaza
303 Peachtree Street, NE
Atlanta, GA 30308-3263
Tel:  (404) 653-6400

*Attorneys for Defendants Interdigital
Communications Corporation and Interdigital
Technology Corporation*

19

App. 134

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on November 8, 2007, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on November 8, 2007, I have Electronically Mailed the document to the following person(s):

Jack B. Blumenfeld
Julia Heaney
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19899-1347
jblumenfeld@mnat.com
jheaney@mnat.com


A. William Urquhart
Marshall M. Searcy
Quinn Emanuel Urquhart
   Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
billurquhart@quinnemanuel.com
marshallsearcy@quinnemanuel.com

Peter Kontio
Patrick J. Flinn
Gardner S. Culpepper
Keith E. Broyles
Randall L. Allen
Lance Lawson
Alston & Bird LLP
1201 West Peachtree Street
Atlanta, GA 30309-3424
pkontio@alston.com
pflinn@alston.com
gculpepper@alston.com
keith.broyles@alston.com
rallen@alston.com
llawson@alston.com


By:  /s/ David E. Moore
      Richard L. Horwitz
      David E. Moore
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, Delaware 19899-0951
      (302) 984-6000
      rhorwitz@potteranderson.com
      dmoore@potteranderson.com

713935 / 28840

App. 135

# EXHIBIT  E

# FILED UNDER SEAL

# SUBJECT TO PROTECTIVE ORDER

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT  F

FILED UNDER SEAL

SUBJECT TO PROTECTIVE ORDER

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY

# EXHIBIT  G

# FILED UNDER SEAL

# SUBJECT TO PROTECTIVE ORDER

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT  H

# EXHIBIT B

# ETSI Guide on Intellectual Property Rights (IPRs)

**(As endorsed by the ETSI GA#46 on 23 November 2005)**

© European Telecommunications Standards Institute 2005. All rights reserved.

# Contents

Background ..................................................................................................................4

Foreword ...................................................................................................................4

1    The ETSI IPR Policy................................................................................................4
    1.1    What is the Purpose of the IPR Policy?..........................................................4
    1.2    Where can I find the ETSI IPR Policy?............................................................5
    1.3    Terminology ..................................................................................................5
    1.4    Rights and obligations deriving from the IPR Policy.......................................5
    1.5    "Essential" IPRs ............................................................................................7

2    Importance of timely disclosure of Essential IPRs.....................................................7
    2.1    Members Duties..............................................................................................8
        2.1.1    Responding to Calls for IPRs performed in Technical Body meetings ........8
        2.1.2    Use the ETSI IPR Information Statement and Licensing Declaration
                 forms ....................................................................................................8
        2.1.3    Update and complete the ETSI IPR Information Statement form ............8
        2.1.4    Copyrights in ETSI Deliverables .............................................................8
    2.2    Members do NOT have a duty to: ..................................................................8
    2.3    Technical Body Chairmen's duties ..................................................................9
        2.3.1    Define scope statements for work items .................................................9
        2.3.2    Make call for IPRs in Technical Bodies meetings. ....................................9
        2.3.3    When and How?.....................................................................................9
        2.3.4    Record and report information on IPRs ..................................................10
        2.3.5    Copyrights in ETSI Deliverables .............................................................11
        2.3.6    Confidential information .......................................................................11
    2.4    ETSI Secretariat Duties .................................................................................11
        2.4.1    Information on Essential IPRs in ETSI Deliverables..................................11
        2.4.2    Initiate a procedure of clause 8 when no licensing declaration can be
                 obtained...............................................................................................11
        2.4.3    Non response by an IPR owner ............................................................11
        2.4.4    Redrafting of ETSI Deliverables .............................................................12
        2.4.5    Disclose copyright identified in ETSI documentation...............................12
        2.4.6    Acknowledgement of third parties copyright............................................12
        2.4.7    Reporting of a substantial IPR problem...................................................12
        2.4.8    Maintenance of information on Essential IPRs ........................................13

3    Information on Essential IPRs by ETSI ...................................................................13
    3.1    Where to find information on essential IPRs ...................................................13
        3.1.1    ETSI Special Report 000 314...................................................................13
        3.1.2    The ETSI IPR Online Database ................................................................13
        3.1.3    Requests to the ETSI Secretariat.............................................................13
    3.2    What type of information and procedures for updates .....................................14
        3.2.1    Assessment of IPR rights........................................................................14
        3.2.2    Update procedure for the ETSI IPR Online database.................................14

4    Other ETSI IPR Policy matters................................................................................14
    4.1    Responsibility for specific licensing terms ......................................................14
    4.2    Dispute Resolution.........................................................................................14
    4.3    Notice on the use of NDAs in IPR negotiations ..............................................15
    4.4    Financial contingency......................................................................................15
    4.5    Rationale and clarifying texts for the changes in Article 4.1 of the ETSI IPR Policy ........15
        4.5.1    History of changes .................................................................................15
        4.5.2    EC DG COMPETITION's position regarding the rationale and scope
                 for the changes of Article 4.1 of the ETSI IPR Policy.................................15
            4.5.2.1    Addition of the sentence "Subject to Article 4.2
                       below..." and Deletion of the phrase "... it is aware of
                       or becomes aware of."...............................................................15

ETSI Guide on Intellectual Property Rights (IPRs)
page 3 of 27

|  | 4.5.2.2 | Addition of the phrase "... where it participates ..." | 16 |
|  | 4.5.2.3 | Re the expression "in particular" | 16 |
| 4.5.3 |  | ETSI's position regarding the rationale and scope for the changes of Article 4.1 of the ETSI IPR Policy | 17 |
|  | 4.5.3.1 | Re the addition of the sentence "Subject to Article 4.2 below..." | 17 |
|  | 4.5.3.2 | Re the deletion of the phrase "... it is aware of or becomes aware of." | 17 |
|  | 4.5.3.3 | Addition of the phrase "... where it participates ..." | 18 |
|  | 4.5.3.4 | Re the expression "in particular" | 18 |
|  | 4.5.3.5 | Re the expression "Reasonable Endeavours" | 18 |

Annex A       ETSI Intellectual Property Rights Policy ......................................................... 20

Annex B       ETSI IPR Information Statement and Licensing Declaration Forms ........................ 25

Annex C       Check list of the Chairmen's obligations in respect of the notification and disclosure
of IPRs       27

## Background

The ETSI IPR Policy was adopted by the 21st General Assembly on 23 November 1994 and incorporated in the ETSI Directives as Annex 6 to the ETSI Rules of Procedure.

At a later stage a Technical Body Chairman's Guide on IPRs had been written to help Chairmen and others involved in ETSI's standardization activities to understand and implement the Institute's IPR Policy. That Chairman's Guide on IPR had not been endorsed by the General Assembly or the Board and therefore did not have the same official status as the ETSI Statutes, the Rules of Procedure or the Technical Working procedures. The Technical Body Chairman's Guide on IPRs is now replaced by the present ETSI Guide on IPRs.

In 2002 the ETSI General Assembly #40 identified the need to review the ETSI IPR Policy with a view to addressing and rectifying any uncertainties on the operation of this Policy and on any legal rules and obligations on the membership in order to avoid an incorrect implementation of the ETSI IPR Policy and in order to avoid anti-competitive actions. An ad-hoc IPR group, with a clear mandate to review the implementation of the IPR Policy but not to change the Policy itself, was consequently created and 30 recommendations on the operation of the ETSI IPR Policy where approved by the ETSI General Assembly #42. The present ETSI Guide on IPRs embodies most of these recommendations.

A revised version of the Article 4.1 of the ETSI IPR Policy was adopted by the 46th General Assembly in November 2005. This revision was induced by the EC DG COMPETITION in its concern to generate a general awareness of the risk of "patent ambush" situation in the standard making process. The EC DG COMPETITION rationale behind the changes is given in section 4.5 of the present Guide.

## Foreword

Intellectual property plays an important role in standardization, especially in the telecommunications and electronic communications sector. In that context, the likelihood of having Intellectual Property Rights (IPRs) incorporated into ETSI Deliverables became critical after a few years of existence of ETSI. This tension (proprietary nature of IPRs versus wide dissemination of standards) was minimized with the adoption by the ETSI Membership of the ETSI IPR Policy as found in Annex 6 to the ETSI Rules of Procedure.

In the preparation of standards, IPR issues may arise. It is important for all parties involved in the ETSI standards-making process to be aware of their responsibilities and that there is good co-operation between all parties.

This guide is intended to help ETSI Members and any other party involved in ETSI's standardization activities (e.g. Members, Technical Body Chairmen, Secretariat, etc.) to understand and implement the Institute's IPR Policy.

This guide provides explanatory information on how to handle IPR matters in ETSI and does not replace the ETSI IPR Policy which takes precedence in all cases.

This guide has been endorsed by the Board but does not have the same official status as the Statutes, the Rules of Procedure or the Technical Working Procedures.

Should you (the reader) have any difficulty with provisions of this guide or with any practical aspects of the Policy which are not answered by this guide, please do not hesitate to contact the ETSI Secretariat (hereafter called simply "Secretariat").

## 1    The ETSI IPR Policy

### 1.1    What is the Purpose of the IPR Policy?

The purpose of the ETSI IPR Policy is to facilitate the standards making process within ETSI. In complying with the Policy the Technical Bodies should not become involved in legal discussion on IPR matters. The main characteristics of the Policy can be simplified as follows:

App. 350

- Members are fully entitled to hold and benefit from any IPRs which they may own, including the right to refuse the granting of licenses.

- Standards and Technical Specifications shall be based on solutions which best meet the technical objectives of ETSI.

- In achieving this objective, the ETSI IPR Policy seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs.

- The IPR Policy seeks to reduce the risk that investment in the preparation, adoption and application of standards could be wasted as a result of an Essential IPR for a standard or technical specification being unavailable.

- Therefore, the knowledge of the existence of Essential IPRs is required as early as possible within the standards making process, especially in the case where licenses are not available under fair, reasonable and non-discriminatory (FRAND) terms and conditions.

The ETSI IPR Policy defines the rights and obligations for ETSI as an Institute, for its Members and for the Secretariat.

The Policy is intended to ensure that IPRs are identified in sufficient time to avoid wasting effort on the elaboration of a Deliverable which could subsequently be blocked by an Essential IPR.

## 1.2    Where can I find the ETSI IPR Policy?

The ETSI IPR Policy is part of the ETSI Directives and can be found in Annex 6 of the ETSI Rules of Procedures (http://www.etsi.org/legal/home.htm). This means that the rights and obligations specified by the IPR Policy are an integral part of the ETSI Rules of Procedure and are binding on all ETSI Members.

You can also find a copy of the Policy at Annex A.

## 1.3    Terminology

The ETSI IPR Policy defines a number of terms; those used in this guide correspond to those used in the Policy.

In the ETSI IPR Policy:

   **an IPR includes:**

- COPYRIGHT
- PATENT
- UTILITY MODEL
- REGISTERED DESIGN
- … and applications thereof.

   **an IPR does not include:**

- TRADEMARKS
- TRADE SECRETS
- CONFIDENTIAL INFORMATION
- RIGHTS RELATING TO GET-UP (packaging)

## 1.4    Rights and obligations deriving from the IPR Policy

The ETSI IPR POLICY defines rights and obligations for ETSI as an Institute, for its Members and for the Secretariat. Non-Members of ETSI also have certain rights under the Policy but do not have legal obligations.

The following table intends to give a clear overview of the most important rights and obligations of the Institute, the Members, the Secretariat and the rights of third parties as specified under the ETSI IPR Policy. All references below which are in italics relate to the ETSI IPR Policy.

| | Obligations | Rights |
|---|---|---|
| Institute | • to inform users of standards about Essential IPRs declared and ensure that this information is publicly available (*clause 7*).<br>• to perform IPR searches if the EC and/or EFTA so require and reasonable expenses are met (*clause 6.2*).<br>• to grant licenses on ETSI-owned IPRs (other than copyright) on fair, reasonable and non-discriminatory terms and conditions to third parties, free of charge to ETSI Members (*clause 9.3*).<br>• to respect confidential information within a Technical Body until publication of the relevant Deliverable.<br>• to include the information in a standard (*clause 10*). | |
| Members | • to inform ETSI about their own, and other people's Essential IPRs (*clause 4.1*).<br>• owners of Essential IPRs are requested to undertake to grant licenses on fair, reasonable and non-discriminatory terms and conditions (*clause 6.1*).<br>• owners of Essential IPRs who refuse to grant license when no alternative is available, are requested to reconsider their position and provide the Director-General with a justification (*clause 8.1*).<br>• to abstain from claiming copyright on standards documentation (text, graphics etc., of the standard itself) on behalf of the member itself and its employees (*clause 9.1*). | • no obligation to conduct IPR searches (*clause 4.2*).<br>• to refuse the inclusion of own IPRs in standards (*clauses 8.1 and 8.2*).<br>• to be granted licenses on fair, reasonable and non-discriminatory terms and conditions in respect of a standard (*clause 6.1*).<br>• to make copies of standards documentation (clause 11) free of charge.<br>• to use IPRs owned by ETSI free of charge (*clause 9.3*).<br>• to have confidential information within a Technical Body respected until publication of the relevant Deliverable (*clause 10*). |
| Secretariat | • the Director-General to contact owners of Essential IPRs having refused to grant licenses on behalf of ETSI (*clauses 8.1 and 8.2*).<br>• the Director-General to request the owner of an Essential IPR to give within three months an undertaking in writing that it is prepared to grant licenses (*clause 6.1*). | |
| Third Parties | • the ETSI IPR Policy is only binding on ETSI Members. Third parties do not have any legal OBLIGATIONS under the Policy.<br>• when ETSI is informed that an IPR | • Third parties have certain RIGHTS under the ETSI IPR Policy either as owners of Essential IPRs or as users of ETSI standards or documentation:<br>  o to refuse the inclusion of their own Essential IPRs in ETSI |

App. 352

| | | |
|---|---|---|
| | belonging to a non-Member could be essential for a standard, the non-Member owner is also requested to undertake to grant licenses on fair, reasonable and non-discriminatory terms and conditions (*clause 6.1*). | Deliverables (*clause 8.1 and 8.2*).<br>○ To be granted licenses on fair, reasonable and non-discriminatory terms and conditions in respect of a standard at least to manufacture, sell, lease, repair, use and operate. (*clause 6.1*)<br>○ to be granted licenses for ETSI owned IPRs (other than copyright in the standard documentation) (*clause 9.3*) on fair, reasonable and non-discriminatory terms and conditions.<br>○ to have confidential information within a Technical Body respected until publication of the relevant Deliverable (*clause 10*). |

## 1.5    "Essential" IPRs

Clause 15.6 of the ETSI IPR Policy gives the following definition of essentiality:

"*15.6    ESSENTIAL as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL".*

In simpler terms, an "essential IPR" is an IPR which has been included within a standard and where it would be impossible to implement the standard without making use of this IPR. The only way to avoid the violation of this IPR in respect of the implementation of the standard is therefore to request a license from the owner.

## 2    Importance of timely disclosure of Essential IPRs

The main problems for ETSI as a standards body which may arise from "late disclosures" include:

* Licenses for Patents which have been disclosed late and are not available at all, or.

* Licenses for Patents which have been disclosed late and which are available, but not on Fair, Reasonable and Non-Discriminatory (FRAND) terms, i.e. the company is unwilling to make a 'FRAND' undertaking/licensing declaration.

If the above problems cannot be satisfactorily resolved, then ETSI has to change the standard, which in some extreme cases could even include the need to start again with the development of that standard.

NOTE 1:    Definitions for "Timeliness" or "Timely" cannot be agreed because such definitions would constitute a "change to the Policy".

NOTE 2:    The following description of Intentional Delay has been noted:

*"Intentional Delay" has arisen when it can be demonstrated that an ETSI Member has deliberately withheld IPR disclosures significantly beyond what would be expected from normal considerations of "Timeliness".*

This description of 'Intentional Delay' should be interpreted in a way that is consistent with the current ETSI IPR Policy. In complying with the requirements of timeliness under section 4.1 of the IPR Policy, Members are recommended to make IPR disclosures at the earliest possible time following their becoming aware of IPRs which may be Essential.

NOTE 3:    "Intentional Delay", where proven, should be treated as a breach of the IPR Policy (clause 14 of the ETSI IPR Policy) and can be sanctioned by the General Assembly.

## 2.1    Members Duties

### 2.1.1    Responding to Calls for IPRs performed in Technical Body meetings

Members participating in Technical Bodies should respond at the earliest possible time to the Call for IPRs performed by Technical Body Chairmen at the beginning of each meeting, based on the working knowledge of their participants.

Furthermore, the call for IPRs acts as a reminder of the Member's obligations under the IPR Policy and is performed to foster the disclosure of Essential IPRs in a timely fashion.

Members having IPR portfolios should improve their internal IPR co-ordination processes to ensure, as far as possible, that their participants in Technical Bodies are aware of any alleged-essential IPR the company may have (related to the on-going work on a particular ETSI Standard or Technical Specification), that they understand their obligations, and that they know how to discharge them.

Members are encouraged to make general IPR undertakings/licensing declarations that they will make licenses available for all their IPRs under FRAND terms and conditions related to a specific standardization area and then, as soon as feasible, provide (or refine) detailed disclosures. This process reduces the risk of the standards making process being blocked due to IPR constraints.

### 2.1.2    Use the ETSI IPR Information Statement and Licensing Declaration forms

The ETSI IPR Information Statement and Licensing Declaration forms should be used by any IPR holders wishing to make their disclosures and undertaking to ETSI.

A copy of the ETSI IPR Information Statement and Licensing Declaration Forms can be found at Annex B and online at: http://www.etsi.org/legal/IPR_database/IPRforms-V4.doc

These forms, once completed and duly signed should be returned to the ETSI Director-General.

Any questions related to the completion of the forms should be addressed to the ETSI Legal Advisor.

### 2.1.3    Update and complete the ETSI IPR Information Statement form

Members are not obliged to inform ETSI of any updates to their essential IPRs. Nevertheless, Members are encouraged to update and complete their information statements in line with the forms (see Annex B). A minimum of information should be provided, which allows verifying the essentiality or the potential essentiality of an IPR.

### 2.1.4    Copyrights in ETSI Deliverables

Members should be aware that once a technical proposal has been included into ETSI documentation the copyright is owned by ETSI, for the purpose of the publication of ETSI documentation.

## 2.2    Members do NOT have a duty to:

- conduct IPR searches (see clause 4.2 of the IPR Policy).

- disclose within the Technical Body the commercial terms for licenses for which they have undertaken to grant licenses under FRAND terms and conditions. Any such commercial

terms are a matter for discussion between the IPR holder and the potential licensee, outside of ETSI (see section 4.1 of this Guide).

## 2.3    Technical Body Chairmen's duties

Chairmen represent the membership while having the authority to represent the Institute in their Technical Body. Chairmen have an important role in respect of both, the identification and disclosure of essential IPRs. They have a duty to remind the Members of their statutory obligations to submit IPR disclosures.

In addition to the actions aiming at the identification of IPRs, the Chairmen also need to take the following actions, which ensure that the disclosure of essential IPRs is properly carried out:

- to record in the report of the meeting that an IPR call has been made and to record any responses;

- to inform the Secretariat of the existence of any essential IPRs identified.

Throughout the standardization process the Chairmen must take the following actions which facilitate the identification of Essential IPRs.

### 2.3.1    Define scope statements for work items

It is vital that Chairmen ensure that the scope statements for all work items in the ETSI work programme are properly defined. This will ensure that if a search for patents is required (under clause 6.2 of the Policy) or chosen to be performed by a Member, the task can be carried out in the most effective manner.
In order that the scope statement of an ETSI work item can be used for IPR purposes, it should contain the following:

- a broad statement concerning the technical field of this work;
- a description of broad system concepts;
- identification of any standard on which the work item is likely to be based;
- a list of features which the standard will define, or on which the standard will place limitations;
- a technical description of each feature listed, in broad terms; and,
- a list of any criteria which the standard must satisfy.

### 2.3.2    Make call for IPRs in Technical Bodies meetings

Every Technical Body and working group meeting shall start with a "Call for IPRs" (either in a written form – as part of the meeting's agenda - or in oral form) performed by the Chairman. This Call for IPRs acts as a reminder of the Member's obligations under the ETSI IPR Policy and is performed to foster the disclosure of Essential IPRs in a timely fashion.

An example of this "Call for IPRs" may be found below in clause 2.3.3. Please note that during the Operational Co-ordination Group meetings (OCG) Chairmen will be reminded to perform that call for IPRs.

Technical Body Chairmen are also invited to encourage Members to make general IPR undertakings/licensing declarations that they will make licenses available for all their IPRs under FRAND terms and conditions related to a specific standardization area and then, as soon as feasible, provide (or refine) detailed disclosures.

### 2.3.3    When and How?

A formal call for IPR disclosures shall be made by the Chairman at the beginning of each meeting.

The formal call for IPR disclosures needs to be made by the Chairman orally or in writing according to the example given below. Members need to be reminded that the recommended form for the notification of essential IPRs and licensing declaration are available on-line and attached in Annex B.

**Example of a formal call for IPRs**

> The attention of the members of this Technical Body is drawn to the fact that ETSI Members shall use reasonable endeavours under clause 4.1 of the ETSI IPR Policy, Annex 6 of the Rules of Procedure, to inform ETSI of Essential IPRs in a timely fashion. This section covers the obligation to notify its own IPRs but also other companies' IPRs.
>
> The members take note that they are hereby invited:
>
> - to investigate in their company whether their company does own IPRs which are, or are likely to become Essential in respect of the work of the Technical Body,
>
> - to notify to the Chairman or to the ETSI Director-General all potential IPRs that their company may own, by means of the IPR Information Statement and the Licensing Declaration forms that they can obtain from the ETSI Technical Officer or http://www.etsi.org/legal/IPR_database/IPRforms-V4.doc."
>
> Members are encouraged to make general IPR undertakings/declarations that they will make licenses available for all their IPRs under FRAND terms and conditions related to a specific standardization area and then, as soon as feasible, provide (or refine) detailed disclosures.

During the meeting a short reminder call for IPR disclosures should be made:

- on formal submission of a technical solution;
- on completion of the first stable draft of the standard;
- on working group approval of a draft standard;
- on TB approval of a draft standard.

E.g., this may consist of the following sentence *"May I remind Members of their obligations to use reasonable endeavours to disclose any Essential IPR [related to this issue] in a timely fashion"*.

The Technical Body Chairmen should note and should make their attendees aware that disclosure of Essential or potentially Essential IPRs should be made at the earliest possible stage within the above list.

Knowing who has contributed to the development of a standard may help identify IPRs Essential to that standard.

If it becomes apparent that an IPR declaration/licensing undertaking is unlikely to be provided, the Technical Body Chairman should inform the Legal Advisor in the Secretariat, who will take the necessary action.

Ultimately, it may be necessary for the Secretariat to invoke clause 8.1 of the Policy, which could require all work on the standard to stop. In any case, the party owning the IPR is allowed three months consideration time after the Technical Body has examined the matter and the Director-General has invited the IPR owner to reconsider its refusal to grant a license. Chairmen should use their judgment (in consultation with the Secretariat) as to whether or not the Technical Body should suspend work on the standard until the matter has been resolved.

### 2.3.4    Record and report information on IPRs

Technical Body Chairmen must be particularly careful to record in the report of each meeting that a reminder was issued and include details of any responses that were made. If there were no responses, then this fact should also be recorded.

Whenever a Chairman becomes aware of the existence of an Essential or potentially Essential IPR he must immediately inform the Legal Advisor of the ETSI Secretariat.

**2.3.5        Copyrights in ETSI Deliverables**

Chairmen shall ensure that all technical proposals adopted by their Technical Body are recorded in the minutes of the meeting, together with any restrictions on their use, and shall report them to the Secretariat. The Secretariat will inform Chairmen if copyright licenses/assignments are required. If so, then they must be obtained before publication of the document. The Secretariat will determine, with the assistance of the Chairman, which third party copyrights, if any, have to be acknowledged.

**2.3.6        Confidential information**

It may happen that Chairmen or Technical Bodies are offered confidential information. There are certain precautions which must be observed and Chairmen are strongly urged to contact the Secretariat before proceeding.

Clause 10 of the Policy states that information disclosed to ETSI's Technical Bodies is to be regarded as non-confidential, unless all of the following criteria are satisfied:

- the information is in written or other tangible form; and
- the information is identified in writing as confidential at the time it is submitted; and
- the information is first submitted to the Technical Body Chairman and accepted by him as confidential.

Where a Chairman becomes aware that confidential information has been disclosed in breach of a confidential disclosure agreement to which ETSI is a party, he must immediately inform the Secretariat.

**2.4        ETSI Secretariat Duties**

The Secretariat, and especially the Legal Advisor, have a general duty to assist the Chairmen in IPR matters. In addition to this, the Secretariat is responsible for the actions below:

**2.4.1        Information on Essential IPRs in ETSI Deliverables**

The ETSI Secretariat will ensure that an appropriate reminder of the duty to disclose the identity of Essential IPRs is included in all published ETSI Deliverables in the form of a standard text.

Specifically, the Secretariat shall ensure that the following marking appears in ETSI Deliverables prior to Publication, Member vote, Public Enquiry or National Vote:

> **Intellectual Property Rights**
> IPRs essential or potentially essential to the present document may have been declared to ETSI. The information pertaining to these essential IPRs, if any, is publicly available for **ETSI members and non-members**, and can be found in SR 000 314: "*Intellectual Property Rights (IPRs); Essential, or potentially Essential, IPRs notified to ETSI in respect of ETSI standards*", which is available from the ETSI Secretariat. Latest updates are available on the ETSI Web server (http://www.etsi.org/ipr).
>
> Pursuant to the ETSI IPR Policy, no investigation, including IPR searches, has been carried out by ETSI. No guarantee can be given as to the existence of other IPRs not referenced in SR 000 314 (or the updates on the ETSI Web server) which are, or may be, or may become, essential to the present document.

**2.4.2        Initiate a procedure of clause 8 when no licensing declaration can be obtained**

Where an IPR licensing declaration cannot be obtained because of the refusal by the essential IPR owner, the ETSI Secretariat is obliged to initiate the procedure set out in clause 8 of the ETSI IPR Policy.

**2.4.3        Non response by an IPR owner**

In situation where there has been no response from an IPR owner to a request for undertaking/licensing declaration within the three months specified in clause 6.1 of the IPR Policy:

- where a standard has not yet been published and an undertaking/licensing declaration has not been received or is not sufficiently defined, the steps listed in clause 8.1 of the IPR Policy should be applied, e.g. the TB should not pursue development of the standard based on the non-available technology and should look for alternative solutions.

- where a standard has already been published and an undertaking/licensing declaration has not been received or is not sufficiently defined, the steps listed in clause 8.2 of the IPR Policy should be applied, e.g. contact the IPR owner concerned, bring to the attention of the GA, etc. If these steps do not solve the issue of non-availability of licenses, the process of withdrawal of the standard should be initiated.

### 2.4.4    Redrafting of ETSI Deliverables

Published Standards or Technical Specifications should not be redrafted because a change on the essentiality of an IPR arises unless the required undertaking/licensing declaration has not been provided within the three month period foreseen under clause 6.1 of the IPR Policy, or has been refused. Any IPR changes should be entered into the ETSI IPR Database by the Secretariat, showing the date of the entry.

### 2.4.5    Disclose copyright identified in ETSI documentation

The copyright of ETSI documentation, including that produced in its Technical Bodies, is owned by ETSI. The Secretariat shall ensure that the following marking appears in ETSI Deliverables prior to Publication, Member vote, Public Enquiry or National Vote:

> Reproduction is only permitted for the purpose of standardization work undertaken within ETSI.
>
> The copyright and the foregoing restrictions extend to reproduction in all media.
>
> © European Telecommunications Standards Institute yyyy.
> All rights reserved.

This marking shall also appear in document templates provided to the Technical Organization by the Secretariat.

### 2.4.6    Acknowledgement of third parties copyright

Due acknowledgement of copyrights owned by third parties, which are identifiable in ETSI documentation, must be made in the following form:

> Some material contained herein is the copyright of, or has been supplied by...(insert name of party in question).

This legend should appear on the ETSI documents and/or media concerned and should immediately follow the copyright legend(s) referred to above.

In response to the obligation on Chairmen to report to the Secretariat any copyright restrictions in technical proposals adopted by their Technical Body, the Secretariat will inform Chairmen if copyright licenses/assignments are required. If so, then they must be obtained before publication of the document. The Secretariat will determine, with the assistance of the Chairman, which third party copyrights, if any, have to be acknowledged.

### 2.4.7    Reporting of a substantial IPR problem

The ETSI Director-General should bring any [substantial] IPR problem to the ETSI Board and/or General Assembly for further discussion.

**2.4.8        Maintenance of information on Essential IPRs**

The Secretariat is responsible for the maintenance of the ETSI IPR online database and the ETSI Special Report 000 314 (see sections 3.1 and 3.2 of this guide).

# 3        Information on Essential IPRs by ETSI

All information statements and licensing declarations of IPRs received by ETSI are publicly available to ETSI Members and standards' implementers via two means: The ETSI Special Report (SR) 000 314 and the ETSI IPR Online Database.

## 3.1        Where to find information on essential IPRs

### 3.1.1        ETSI Special Report 000 314

The ETSI Special report SR 000 314 is an ETSI Deliverable entirely dedicated to information on IPRs which have been notified to ETSI as being Essential, or potentially Essential, to ETSI standards. This SR is generated twice a year and offers a summary of the information contained in the ETSI IPR Online database as of the time it is generated.

In case of any conflict between the information contained in SR 000 314 and the information contained in the ETSI IPR Online Database, the contents of the database takes precedence.

ETSI SR 000 314 can be found at: http://webapp.etsi.org/ipr.

### 3.1.2        The ETSI IPR Online Database

The ETSI IPR Online Database is an application that has been developed by the ETSI Secretariat to allow electronic online access to Information Statements and Licensing Declarations received by ETSI.

Like the SR 000 314, the ETSI IPR Online Database contains IPRs, particularly patents and patent applications, which have been notified to ETSI as being essential, or potentially essential, to ETSI standards.

Unless otherwise specified, all IPRs contained herein have been notified to ETSI, with an undertaking from the owner to grant licenses according to the terms and conditions of Clause 6.1 of Annex 6 of the ETSI Rules of Procedure (the ETSI IPR Policy).

It is important to note that the ETSI IPR online database provides data that is based on the information received, i.e.:

- ETSI has not checked the validity of the information, nor the relevance of the identified patents/patent applications to the ETSI standards and cannot confirm, or deny, that the patents/patent applications are, in fact, essential, or potentially essential,
- No investigation or IPR searches have been carried out by ETSI and therefore, no guarantee can be given concerning the existence of other IPRs which are, or may become, essential;
- Potential licensees should use the information in this database at their discretion and should contact the patent holder, for example to establish the status of a disclosed patent family, prior to making a patent licensing decision.

The ETSI IPR Online Database can be found at: http://webapp.etsi.org/ipr.

### 3.1.3        Requests to the ETSI Secretariat

Whenever requested, the ETSI Secretariat shall provide any details on information statements and licensing undertakings/licensing declarations that it has received. The main contact point is the ETSI Legal Advisor.

## 3.2 What type of information and procedures for updates

IPR information reflected by ETSI is based on the information received. ETSI has not checked the validity of the information, nor the relevance of the identified patents/patent applications to the ETSI standards and cannot confirm, or deny, that the patents/patent applications are, in fact, essential, or potentially essential. No investigation or IPR searches have been carried out by ETSI and therefore, no guarantee can be given concerning the existence of other IPRs which are, or may become, essential.

### 3.2.1 Assessment of IPR rights

As a general principle, ETSI does not perform any check on the status and validity of any Essential IPRs notified to ETSI.

In addition, ETSI does not perform any search for Essential IPRs which may exist and have not been notified.

### 3.2.2 Update procedure for the ETSI IPR Online database

In addition to the entry of new disclosures and undertakings/licensing declarations, existing data in the ETSI IPR Database should only be updated based on information received from IPR holders or as the result of a General Assembly decision, in particular with respect to the following cases:

- **Completion of an existing data entry**, e.g. the publication number, identification of standard.

- **Updating of legal information**, such as change of legal status of an IPR (e.g. grant, dropped, revoked or expired), change of ownership of the IPR.

- **Addition of information concerning studies performed on the essentiality of an IPR**: Members are obliged to disclose IPRs, which might be essential and ETSI is obliged to make these disclosures available to Members. This disclosure reflects, of course, only an opinion of the Member and some facts on the IPRs, but the Member is responsible for the content. Any further opinion should be added only with the agreement of the Member or to implement a General Assembly decision.

- **Removal of IPR disclosures at the request of the IPR holder**: Members are obliged to declare IPRs which they believe to be essential.  A license undertaking/licensing declaration for these IPRs is also published.  ETSI is obliged to publish this undertaking/licensing declaration.  Any such removal shall be tracked in the IPR on-line database.

- **Removal of IPR disclosures in exceptional circumstances**: Removals not requested by the IPR holder shall only be performed following a decision taken by the General Assembly. Any such removal shall be tracked in the IPR on-line database.

## 4 Other ETSI IPR Policy matters

### 4.1 Responsibility for specific licensing terms

Specific licensing terms and negotiations are commercial issues between the companies and shall not be addressed within ETSI. Technical Bodies are not the appropriate place to discuss IPR issues. Technical Bodies do not have the competence to deal with commercial issues. Members attending ETSI Technical Bodies are often technical experts who do not have legal or business responsibilities with regard to licensing issues. Discussion on licensing issues among competitors in a standards making process can significantly complicate, delay or derail this process.

### 4.2 Dispute Resolution

ETSI Members should attempt to resolve any dispute related to the application of the IPR Policy bilaterally in a friendly manner.

Should this fail, the Members concerned are invited to inform the ETSI GA in case a friendly mediation can be offered by other ETSI Members and/or the ETSI Secretariat.

However, it should be noted that once an IPR (patent) has been granted, in the absence of an agreement between the parties involved, the national courts of law have the sole authority to resolve IPR disputes.

### 4.3    Notice on the use of NDAs in IPR negotiations

It is recognized that Non Disclosure Agreements (NDAs) may be used to protect the commercial interests of both potential licensor and potential licensee during an Essential IPR licensing negotiation, and this general practice is not challenged. Nevertheless, ETSI expects its Members (as well as non-ETSI Members) to engage in an impartial and honest Essential IPR licensing negotiation process for FRAND terms and conditions.

### 4.4    Financial contingency

Members developing products based on standards where there may be Essential IPRs, but there is uncertainty, have mechanisms available which they can use to minimize their risk. As a non-exclusive example, a Member might wish to put in place financial contingency, based on their assessment of "reasonable", against the possibility that further/additional license fees might become payable.

### 4.5    Rationale and clarifying texts for the changes in Article 4.1 of the ETSI IPR Policy

A revised version of the Article 4.1 of the ETSI IPR Policy was adopted by the 46th General Assembly on November 2005. This revision was induced by the EC DG COMPETITION in its concern to generate a general awareness of the risk of "patent ambush" situation in the standard making process.

#### 4.5.1    History of changes

Prior to the 46th ETSI General Assembly, Article 4.1 of the ETSI IPR Policy read:

> 4.1    *Each MEMBER shall use its reasonable endeavours to timely inform ETSI of ESSENTIAL IPRs it becomes aware of. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.*

During the 46th ETSI General Assembly the modifications below to Article 4.1 of the ETSI IPR Policy were adopted.

> 4.1    *Subject to Article 4.2 below, Eeach MEMBER shall use its reasonable endeavours, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates, in particular to timely inform ETSI of ESSENTIAL IPRs in a timely fashionit becomes aware of. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.*

#### 4.5.2    EC DG COMPETITION's position regarding the rationale and scope for the changes of Article 4.1 of the ETSI IPR Policy

The extracts below are taken from various correspondences between ETSI and the EC DG COMPETITION services.

##### 4.5.2.1    Addition of the sentence "Subject to Article 4.2 below..." and Deletion of the phrase "... it is aware of or becomes aware of."

#### RATIONALE from DG COMPETITION

" .... the deletion of the phrase "*becomes aware of*" is important from the Commission's "patent ambush" perspective...."

App. 361

Source:    DG COMPETITION letter dated 26 April 2005 reproduced in B#52(05)17, Annex, Footnote 2.

**CLARIFYING LANGUAGE from DG COMPETITION"**

" .... the deletion of the phrase *becomes aware of* is important from the Commission's "patent ambush" perspective. [but] does not imply an extra burden on ETSI Members - by definition, a company can only inform about essential IPRs if it has knowledge of such IPRs."

Source:    DG COMPETITION letter dated 26 April 2005 reproduced in B#52(05)17, Annex, Footnote 2.

"... the deletion of the words *becomes aware of* "*arguably imposes a higher burden of disclosure for the ETSI Members*". More specifically, you raise the concern that this might oblige Members to conduct IPR searches. We do not believe that this concern is warranted. As Mr. Mensching noted in his letter of 28 January 2005, the rationale behind the proposed deletion of "*becomes aware of*" is that we would expect a Member in a standard-setting process to have a general awareness of the scope of its IPR rights in that area, and therefore where necessary, "*use its reasonable endeavours*" to identify these IPR.[1] However, as has been explicitly confirmed to you in writing on numerous occasions, this does not mean that we would expect Members[2] to conduct patent/IPR searches. As such, our proposed change does not create a heightened expectation for Members to identify essential IPRs. Nor does it create any contradiction with Article 4.2 of ETSI's IPR policy. Nevertheless, in order to explicitly convey this message in ETSI's IPR policy itself, we would be willing to incorporate, at the beginning of Article 4.1, the phrase "*Subject to Clause/Article 4.2 below*". "

Source:    DG COMPETITION LETTER dated 29 March 2005 reproduced in GA#45(05)22, Annex I, paragraph 4

**4.5.2.2    Addition of the phrase "... where it participates ..."**

**RATIONALE from DG COMPETITION**

"The addition of the phrase "*in which it participates*" therefore addresses the concern expressed by some ETSI members, and also means that to the extent that a member is not participating in an ETSI standards development committee/working group but becomes aware of certain essential IPRs,[3] a general obligation to inform ETSI of the essential IPRs remains".

Source:    DG COMPETETITION LETTER dated 26 April 2005 reproduced in B#52(05)17r1, Annex III (paragraph 4 of Annex to the EC letter of 26.04.05).

**4.5.2.3    Re the expression "in particular"**

**CLARIFYING LANGUAGE from DG COMPETITION**

"Firstly, I note your concern that DG Competition's proposed wording might be interpreted as narrowing the obligation to disclose essential IPR to a very specific phase of the standardisation process. As you stress, we have already confirmed that our proposed changes do not mean that the window of opportunity to declare essential IPR is closed when a standard is adopted. However, to more explicitly address your concern in Article 4.1 of the IPR rules, we are happy to accept your proposed addition of the words "*in particular*".

Source:    DG COMPETITION LETTER dated 29 March 2005 reproduced in GA#45(05)22, Annex I, paragraph 2

---

[1]   Once again, this is consistent with the notion of members being invited by the meeting Chairman to identify essential IPR at the beginning of each relevant meeting

[2]   whether or not they are participating in the development of a standard

[3]   In this regard, as you correctly noted at the General Assembly, the deletion of the phrase "becomes aware of" is important from the Commission's "patent ambush" perspective, but does not imply an extra burden on ETSI members - by definition, a company can only inform about essential IPRs if it has knowledge of such IPRs.

**4.5.3      ETSI's position regarding the rationale and scope for the changes of Article 4.1 of the ETSI IPR Policy**

The extracts below has been developed, with the support of EC DG COMPETITION, by the ETSI membership and endorsed by the 46th ETSI General Assembly.

**4.5.3.1      Re the addition of the sentence "Subject to Article 4.2 below…"**

The insertion of the phrase "Subject to Article 4.2 below" at the beginning of the first sentence of the new text of Article 4.1 is intended to reflect the general framework under which the requirement of disclosure of Article 4.1 operates. This insertion explicitly conveys the notion that the requirement of disclosure contained in Article 4.1 is not to be interpreted as an obligation on ETSI Members to conduct IPR searches.

As DG COMPETITION explicitly confirmed to ETSI in writing on numerous occasions;

-      the new text of Article 4.1 "does not mean that we would expect Members4 to conduct patent/IPR searches. As such, our proposed change does not create a heightened expectation for Members to identify essential IPRs. Nor does it create any contradiction with Article 4.2 of ETSI's IPR policy. Nevertheless, in order to explicitly convey this message in ETSI's IPR policy itself, we would be willing to incorporate, at the beginning of Article 4.1, the phrase "Subject to Clause/Article 4.2 below".

      Source:      Letter from Angel Trabacete, DG COMPETITION, to Karl Heinz Rosenbrock, ETSI Director-General, 29 March 2005 reproduced in GA#45(05)22, Annex I, paragraph 4.

-      "it is clear that it should not be reasonably expected that an ETSI Member should have a duty to take steps to find out about potential IPR it might have relating to ETSI standards development work in areas/committees where that Member is not participating in that work (no more than it should be expected, as we have previously confirmed, that a Member carry out patent/IPR searches)."

      Source:      Letter from Angel Tradacete, DG COMPETITION, to Karl Heinz Rosenbrock, ETSI Director-General, 26 April 2005, reproduced in B#52(05)17r1, Annex III (paragraph 2 of Annex to the EC letter of 26.04.05).

**4.5.3.2      Re the deletion of the phrase "… it is aware of or becomes aware of."**

DG COMPETITION's intention in pursuing deletion of the phrase "*it becomes aware of*" is viewed as important from the patent ambush perspective.[5]   The idea is to prevent an ETSI Member from intentionally not disclosing Essential Intellectual Property Rights (EIPR) during the standardization process, and after the standard has issued, then disclosing such EIPR with the intention to not license on fair, reasonable, and non-discriminatory (FRAND) terms as expected by ETSI Policy for EIPR.[6] Intentional non-disclosure of EIPR generally occurs in two instances:

1)      when a representative participating in a Technical Body on behalf of a Member has actual knowledge of EIPR, and yet the Member holds back notification; or,

2)      when a member fosters an atmosphere of ignorance amongst its employees participating at ETSI with the intent to avoid its EIPR disclosure and FRAND licensing obligations.

DG COMPETITION has made it clear that the removal of the "*it becomes aware of*" wording is not intended to place a higher burden of disclosure upon a Member, nor is it intended to create a heightened expectation for Members to identify EIPR.[7]   This position is consistent with the ETSI IPR

---

4      Whether or not they are participating in the development of a standard.
5      DG COMPETITION letter dated 26 April 2005
6      ETSI Guide on Intellectual Property Rights, Section 6 1.
7      DG COMPETITION letter dated 26 April 2005.

Policy and ETSI practice to requiring Members participating in Technical Bodies to respond at the earliest possible time to the Call for IPRs performed by Technical Body Chairmen at the beginning of each meeting, based on the working knowledge of their participants.[8]

Further, it has been explicitly confirmed by DG COMPETITION on numerous occasions that the removal of the words does not mean a Member would be required to conduct patent/EIPR searches.[9]

Concern has been raised that removal of the "it becomes aware of" wording places an untenably broad burden of disclosure on ETSI Members. Based on the above, it appears the intent is for the burden to remain the same while identifying conduct whereby "patent ambush" in violation of the ETSI IPR Policy may be assumed.

**4.5.3.3    Addition of the phrase "... where it participates ..."**

The term "where it participates" as employed in Article 4.1 seeks to clarify that a Member's obligation to use such reasonable endeavours under this Article should be adhered to in those Technical Bodies or its Working Groups in which an employee (or otherwise authorised representative) of such Member (as defined within the ETSI IPR Policy) performs at least one of the following:

i)      attends a meeting of;
ii)     participates in or contributes, directly or indirectly, to the work of;
iii)    votes on any matter raised within;

such Technical Body or Working Group where such Technical Body or Working Group is responsible for the ETSI Work Item from which such STANDARD or TECHNICAL SPECIFICATION, [as an ETSI Deliverable], has or will result.

**4.5.3.4    Re the expression "in particular"**

The insertion of the phrase "*in particular*" in the first sentence of the new text of Section 4.1 is intended to reflect the importance placed by DG COMPETITION on a member's informing ETSI of Essential IPRs during the period when that information might be most relevant to the development of a Standard of Technical Specification. DG COMPETITION has made clear (see DG Competition Letter dated 29 March 2005 reproduced in GA#45(05)22, Annex 1, paragraph 2) that the inclusion of this phrase does not mean either that the window of opportunity for a member to declare its Essential IPRs is closed once a standard is adopted or that the member's duty to use its "*reasonable endeavours*" post-adoption is waived or altered.

**4.5.3.5    Re the expression "Reasonable Endeavours"**

The new text of Article 4.1 of the ETSI IPR Policy provides, in part, that each ETSI Member "*shall use its reasonable endeavours, in particular during the development of a Standard or Technical Specification where it participates, to inform ETSI of Essential IPRs in a timely fashion.*" Section 4.2 of the ETSI IPR Policy provides that these disclosure obligations "do however not imply any obligation on Members to conduct IPR searches."

As DG COMPETITION has pointed out, the concept of "*reasonable endeavours*" qualifies the obligation to disclose essential patents. As it has noted, "*it is clear that it should not be reasonably expected that an ETSI Member should have a duty to take steps to find out about potential IPR it might have relating to ETSI standards development work in areas/committees where that Member is not participating in that work (no more than it should be expected, as we have previously confirmed, that a member carry out patent/IPR searches).*"

> Source:    Letter from Angel Tradacete, DG COMPETITION, to Karl Heinz Rosenbrock, ETSI Director General, 26 April 2005, at Annex.

This interpretation by DG COMPETITION is supported by the longstanding interpretation of "*reasonable endeavours*" in the ETSI Guide on Intellectual Property Rights. The steps that must be

---

[8]    ETSI Guide on Intellectual Property Rights, Section 2.3.1.
[9]    DG COMPETITION letter dated 29 March 2005.

ETSI Guide on Intellectual Property Rights (IPRs)
page 19 of 27

taken to identify essential patents focus on the activities and knowledge of the ETSI Member's representatives who are active in a particular ETSI matter. Each Technical Body and working group meeting, for example, must begin with a call for IPRs. *See* ETSI Guide on Intellectual Property Rights, Section 2.3.2. *"Members participating in Technical Bodies should respond at the earliest possible time to the Call for IPRs performed by Technical Body Chairmen at the beginning of each meeting, based on the working knowledge of their participants." Id.*, Section 2.1.1.

Accordingly, it seems that the *"reasonable endeavours"* that are to be taken to disclose patents that are essential to a particular ETSI deliverable should be measured in terms of the knowledge of representatives of an ETSI Member who are actively involved in the work of the body developing that ETSI deliverable. This interpretation acknowledges, as DG COMPETITION has noted, that *"reasonable endeavours'* has the benefit of being able to cover different scenarios on their merits on a logical, case-by-case basis."

      Source:    Letter from Angel Tradacete at Annex, note 1.

**Annex A    ETSI Intellectual Property Rights Policy**

**[ETSI Rules of Procedure, Annex 6]**

**1    Introduction**

The General Assembly of ETSI has established the following Intellectual Property Rights POLICY

**2    Definitions**

Terms in the POLICY which are written in capital letters shall have the meaning set forth in Clause 15 entitled DEFINITIONS.

**3    Policy Objectives**

3.1    STANDARDS and TECHNICAL SPECIFICATIONS shall be based on solutions which best meet the technical objectives of the European telecommunications sector, as defined by the General Assembly. In order to further this objective the ETSI IPR POLICY seeks to reduce the risk to ETSI, MEMBERS, and others applying ETSI STANDARDS and TECHNICAL SPECIFICATIONS, that investment in the preparation, adoption and application of STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD or TECHNICAL SPECIFICATION being unavailable. In achieving this objective, the ETSI IPR POLICY seeks a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs.

3.2    IPR holders whether members of ETSI and their AFFILIATES or third parties, should be adequately and fairly rewarded for the use of their IPRs in the implementation of STANDARDS and TECHNICAL SPECIFICATIONS.

3.3    ETSI shall take reasonable measures to ensure, as far as possible, that its activities which relate to the preparation, adoption and application of STANDARDS and TECHNICAL SPECIFICATIONS, enable STANDARDS and TECHNICAL SPECIFICATIONS to be available to potential users in accordance with the general principles of standardization.

**4    Disclosure of IPRs**

4.1    *Subject to Article 4.2 below, each MEMBER shall use its reasonable endeavours, in particular during the development of a STANDARD or TECHNICAL SPECIFICATION where it participates to inform ETSI of ESSENTIAL IPRs in a timely fashion. In particular, a MEMBER submitting a technical proposal for a STANDARD or TECHNICAL SPECIFICATION shall, on a bona fide basis, draw the attention of ETSI to any of that MEMBER's IPR which might be ESSENTIAL if that proposal is adopted.*

4.2    The obligations pursuant to clause 4.1 above do however not imply any obligation on MEMBERS to conduct IPR searches.

**5    Procedures for Committees**

ETSI shall establish guidelines for the chairmen of COMMITTEES with respect to ESSENTIAL IPRs.

**6    Availability of Licences**

6.1    When an ESSENTIAL IPR relating to a particular STANDARD or TECHNICAL SPECIFICATION is brought to the attention of ETSI, the Director-General of ETSI shall immediately request the owner to give within three months an undertaking in writing that it is prepared to grant irrevocable licences on fair, reasonable and non-discriminatory terms and conditions under such IPR to at least the following extent:

- MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;

- sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;

- repair, use, or operate EQUIPMENT; and

- use METHODS.

The above undertaking may be made subject to the condition that those who seek licences agree to reciprocate.

6.2     At the request of the European Commission and/or EFTA, initially for a specific STANDARD or TECHNICAL SPECIFICATION or a class of STANDARDS/TECHNICAL SPECIFICATIONS, ETSI shall arrange to have carried out in a competent and timely manner an investigation including an IPR search, with the objective of ascertaining whether IPRs exist or are likely to exist which may be or may become ESSENTIAL to a proposed STANDARD or TECHNICAL SPECIFICATIONS and the possible terms and conditions of licences for such IPRs  This shall be subject to the European Commission and/or EFTA meeting all reasonable expenses of such an investigation, in accordance with detailed arrangements to be worked out with the European Commission and/or EFTA prior to the investigation being undertaken.

## 7     Information on IPR by ETSI

7.1     Any published STANDARD or TECHNICAL SPECIFICATION shall include information pertaining to ESSENTIAL IPRs which are brought to the attention of ETSI prior to such publication.

7.2     ETSI shall establish appropriate procedures to allow access to information at any time with respect to ESSENTIAL IPRs which have been brought to the attention of ETSI.

## 8     Non-availability of Licences

8.1     MEMBERS' refusal to license

8.1.1   Where a MEMBER notifies ETSI that it is not prepared to license an IPR in respect of a STANDARD or TECHNICAL SPECIFICATION, the General Assembly shall review the requirement for that STANDARD or TECHNICAL SPECIFICATION and satisfy itself that a viable alternative technology is available for the STANDARD or TECHNICAL SPECIFICATION which:

- is not blocked by that IPR; and

- satisfies ETSI's requirements.

8.1.2   Where, in the opinion of the General Assembly, no such viable alternative technology exists, work on the STANDARD or TECHNICAL SPECIFICATION shall cease, and the Director-General of ETSI shall request that MEMBER to reconsider its position. If the MEMBER decides not to withdraw its refusal to license the IPR, it shall inform the Director-General of ETSI of its decision and provide a written explanation of its reasons for refusing to license that IPR, within three months of its receipt of the Director-General's request.

The Director-General shall then send the MEMBER's explanation together with relevant extracts from the minutes of the General Assembly to the ETSI Counsellors for their consideration.

8.2     Non-availability of licences from third parties

Where, in respect of a STANDARD or TECHNICAL SPECIFICATION, ETSI becomes aware that licences are not available from a third party in accordance with clause 6.1 above, that STANDARD or TECHNICAL SPECIFICATION shall be referred to the Director-General of ETSI for further consideration in accordance with the following procedure:

i)      The Director-General shall request full supporting details from any MEMBER who has complained that licences are not available in accordance with clause 6.1 above.

ii)    The Director-General shall write to the IPR owner concerned for an explanation and request that licences be granted according to clause 6.1 above.

iii)    Where the IPR owner refuses the Director-General's request or does not answer the letter within three months, the Director-General shall inform the General Assembly. A vote shall be taken in the General Assembly on an individual weighted basis to immediately refer the STANDARD or TECHNICAL SPECIFICATION to the relevant COMMITTEE to modify it so that the IPR is no longer ESSENTIAL.

iv)    Where the vote in the General Assembly does not succeed, then the General Assembly shall, where appropriate, consult the ETSI Counsellors with a view to finding a solution to the problem. In parallel, the General Assembly may request appropriate MEMBERS to use their good offices to find a solution to the problem.

v)    Where (iv) does not lead to a solution, then the General Assembly shall request the European Commission to see what further action may be appropriate, including non-recognition of the STANDARD or TECHNICAL SPECIFICATION in question.

In carrying out the foregoing procedure due account shall be taken of the interest of the enterprises that have invested in the implementation of the STANDARD or TECHNICAL SPECIFICATION in question.

## 9        ETSI ownership of IPRs

9.1    The ownership of the copyright in STANDARDS and TECHNICAL SPECIFICATIONS documentation and reports created by ETSI or any of its COMMITTEES shall vest in ETSI but due acknowledgement shall be given to copyrights owned by third parties that are identifiable in ETSI copyrighted works.

9.2    In respect of IPRs other than copyright in STANDARDS and TECHNICAL SPECIFICATIONS documentation and reports, ETSI shall only seek ownership of IPRs generated either by its employees or by secondees to ETSI from organizations who are not MEMBERS.

9.3    ETSI shall, on request by a non-member, grant licences to that non-member on fair and reasonable terms and conditions in respect of any IPRs, other than those referred to in clause 9.1 above, owned by ETSI. MEMBERS shall be allowed to use IPRs owned by ETSI free of charge.

## 10        Confidentiality

The proceedings of a COMMITTEE shall be regarded as non-confidential except as expressly provided below and all information submitted to a COMMITTEE shall be treated as if non-confidential and shall be available for public inspection unless:

- the information is in written or other tangible form; and
- the information is identified in writing, when submitted, as confidential; and
- the information is first submitted to, and accepted by, the chairman of the COMMITTEE as confidential.

CONFIDENTIAL INFORMATION incorporated in a STANDARD or TECHNICAL SPECIFICATION shall be regarded as non-confidential by ETSI and its MEMBERS, from the date on which the STANDARD or TECHNICAL SPECIFICATION is published.

## 11        Reproduction of Standards Documentation

MEMBERS may make copies of STANDARDS and TECHNICAL SPECIFICATIONS documentation produced by ETSI for their own use free of charge but may not distribute such copies to others.

## 12        Law and Regulation

The POLICY shall be governed by the laws of France. However, no MEMBER shall be obliged by the POLICY to commit a breach of the laws or regulations of its country or to act against supranational laws or regulations applicable to its country insofar as derogation by agreement between parties is not permitted by such laws.

Any right granted to, and any obligation imposed on, a MEMBER which derives from French law and which are not already contained in the national or supranational law applicable to that MEMBER is to be understood as being of solely a contractual nature.

## 13        Policy Decisions

Without prejudice to ETSI's Statutes and Rules of Procedure, no decisions shall be taken by ETSI in relation to implementation of the POLICY unless supported by a 71 % majority of the weighted individual votes cast by MEMBERS.

## 14        Violation of Policy

Any violation of the POLICY by a MEMBER shall be deemed to be a breach, by that MEMBER, of its obligations to ETSI. The ETSI General Assembly shall have the authority to decide the action to be taken, if any, against the MEMBER in breach, in accordance with the ETSI Statutes.

## 15        Definitions

1    **"AFFILIATE"** of a first legal entity means any other legal entity:

- directly or indirectly owning or controlling the first legal entity, or

- under the same direct or indirect ownership or control as the first legal entity, or

- directly or indirectly owned or controlled by the first legal entity,

for so long as such ownership or control lasts.

Ownership or control shall exist through the direct or indirect:

- ownership of more than 50 % of the nominal value of the issued equity share capital or of more than 50 % of the shares entitling the holders to vote for the election of directors or persons performing similar functions, or

- right by any other means to elect or appoint directors, or persons who collectively can exercise such control. A state, a division of a state or other public entity operating under public law, or any legal entity, linked to the first legal entity solely through a state or any division of a state or other public entity operating under public law, shall be deemed to fall outside the definition of an AFFILIATE.

2    **"COMMITTEE"** shall mean any Technical Body of ETSI and shall include ETSI Projects, Technical Committees, ETSI Partnership Projects, and their Working Groups.

3    **"CONFIDENTIAL INFORMATION"** shall mean all information deemed to be confidential pursuant to Clause 10 of the POLICY disclosed directly or indirectly to the MEMBER.

4    **"EQUIPMENT"** shall mean any system, or device fully conforming to a STANDARD.

5    **"METHODS"** shall mean any method or operation fully conforming to a STANDARD.

6    **"ESSENTIAL"** as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardization, to make, sell, lease, otherwise dispose of, repair, use or operate EQUIPMENT or METHODS which comply with a STANDARD without infringing that IPR. For the avoidance of doubt in exceptional cases where a STANDARD can only be implemented by technical solutions, all of which are infringements of IPRs, all such IPRs shall be considered ESSENTIAL.

7   **"IPR"** shall mean any intellectual property right conferred by statute law including applications thereof other than trademarks. For the avoidance of doubt rights relating to get-up, confidential information, trade secrets or the like are excluded from the definition of IPR.

8   **"MANUFACTURE"** shall mean production of EQUIPMENT.

9   **"MEMBER"** shall mean a member or associate member of ETSI. References to a MEMBER shall wherever the context permits be interpreted as references to that MEMBER and its AFFILIATES.

10  **"POLICY"** shall mean ETSI's Intellectual Property Rights Policy

11  **"STANDARD"** shall mean any standard adopted by ETSI including options therein or amended versions and shall include European Standards (ENs) (telecommunications series), ETSI Standards (ESs), Common Technical Regulations (CTRs) which are taken from ENs (telecommunications series) and including drafts of any of the foregoing, and documents made under the previous nomenclature, including ETSs, I-ETSs, parts of NETs and TBRs, the technical specifications of which are available to all MEMBERS, but not including any standards, or parts thereof, not made by ETSI.

The date on which a STANDARD is considered to be adopted by ETSI for the purposes of this POLICY shall be the date on which the technical content of that STANDARD was available to all MEMBERS.

12  **"TECHNICAL SPECIFICATION"** shall mean any Technical Specification (TS) adopted by ETSI including options therein or amended version including drafts, the Technical Specifications of which are available to all MEMBERS, but not including any technical specifications, or parts thereof, not made by ETSI.

The date on which a TECHNICAL SPECIFICATION is considered to be adopted by ETSI for the purposes of this POLICY shall be the date on which the technical content of that TECHNICAL SPECIFICATION was available to all MEMBERS.

App. 370

ETSI Guide on Intellectual Property Rights (IPRs)
page 25 of 27

**Annex B    ETSI IPR Information Statement and Licensing Declaration Forms**

**ANNEX 1**

---

**IPR Holder/Organisation**

Legal Name: _____

**Signatory**

Name: _____

Position: _____

Department: _____

Address: _____

_____

_____

Tel.: _____

Fax: _____

E-mail: _____

**IPR information statement**

In accordance with the ETSI IPR Policy, Article 4.1, I hereby inform ETSI that,

with reference to the technical proposal identified as _____

and/or

in relation to Work Item No. _____

and/or

with reference to ETSI Standard No. _____

it is my belief that the IPRs listed in Annex 2 are, or are likely to become, Essential IPRs in relation to that Standard.

**IPR licensing declaration**

The SIGNATORY has notified ETSI that it is the proprietor of the IPRs listed in Annex 2 and has informed ETSI that it believes that the IPRs may be considered ESSENTIAL to the Standards listed above.

The SIGNATORY and/or its AFFILIATES hereby declare that they are prepared to grant irrevocable licenses under the IPRs on terms and conditions which are in accordance with Clause 6.1 of the ETSI IPR Policy, in respect of the STANDARD, to the extent that the IPRs remain ESSENTIAL.

The construction, validity and performance of this DECLARATION shall be governed by the laws of France.

**Place, Date:**                               **Signature:**


_____              _____

                                     (Signed for and on behalf of the SIGNATORY)

---

Please return this form duly signed to:
ETSI Director General - Karl Heinz Rosenbrock

ETSI - 650, route des Lucioles - F-06921 Sophia Antipolis Cedex - FRANCE
Fax. +33 (0) 4 93 65 47 16

App. 371

ANNEX 2

| ETSI Standard, Technical Specification or Work Item | | | | Patent Proprietor | Patent/ Application No. | Patent Subject/ Title | Country | OPTIONAL INFORMATION: Other patents/applications in same family*: | |
|---|---|---|---|---|---|---|---|---|---|
| Project or Standard name | Work Item OR Standard No. | Section | Version | | | | | Patent/application No. | Country |
| Example UMTS | TS 125 215 | 6.1.1.2 | V3.5.0 | Nokia | 1131972 | Scheduling of slotted-mode related measurements | EPO | 1274900 | Australia |
| | | | | | | | | 99813100.8 | China P.R. |
| | | | | | | | | 108270 | Finland |
| | | | | | | | | 11-318161 | Japan |
| | | | | | | | | 6532236 | USA |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

*Patent family information is provided voluntarily. The completeness and accuracy of any patent family information that is provided cannot be guaranteed.

App. 372

**Annex C      Check list of the Chairmen's obligations in respect of the notification and disclosure of IPRs**

- Check that the scope statements for work items are sufficiently defined

- Perform "call for IPRs" in Technical Bodies meetings:

  - at the beginning of meetings using the text supplied in clause 2.3.3 of the IPR Guide.

  - during meetings: (reminder of the formal call of IPRs) as in clause 2.3.3 of the IPR Guide:

    - on formal submission of a technical solution;
    - on completion of a first stable draft;
    - on working group approval of a draft standard;
    - on TB approval of a draft standard.

- Record that the "call" has been performed.

- Record any responses received (or the absence thereof) and inform the Secretariat.

- Record any copyright identified (or absence thereof) and inform the Secretariat.

App. 373

# EXHIBIT  I

FILED UNDER SEAL

SUBJECT TO PROTECTIVE ORDER

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY

# EXHIBIT  J



# AMERICAN INTERNATIONAL
## SPECIALTY LINES INSURANCE COMPANY
### A Member Company of American International Group, Inc.

A Capital Stock Insurance Company
175 Water Street
New York, NY 10038

**NOTICE: THIS INSURER IS NOT LICENSED IN THE STATE OF NEW YORK
AND IS NOT SUBJECT TO ITS SUPERVISION.**

# AIG ProTech®
## Modular Edition ℠

NOTICE: THIS POLICY CONTAINS ONE OR MORE COVERAGE MODULES. CERTAIN LIABILITY COVERAGE PARTS OF THIS POLICY ARE LIMITED TO LIABILITY FOR CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER AS REQUIRED. CLAIM EXPENSES SHALL REDUCE THE APPLICABLE LIMITS OF LIABILITY AND ARE SUBJECT TO APPLICABLE RETENTIONS.

PLEASE READ THIS POLICY CAREFULLY AND REVIEW IT WITH YOUR INSURANCE AGENT OR BROKER.

Terms appearing in **bold** type have special meanings. See the Definitions for more information.

REPLACEMENT OF POLICY #: *640-79-93*          POLICY NUMBER: *884-65-15*

## DECLARATIONS

| | | |
|---|---|---|
| **ITEMS** | | |
| 1 | NAMED INSURED: | *INTERDIGITAL COMMUNICATIONS CORPORATION* |
| 1(a) | MAILING ADDRESS: | *781 3RD AVENUE* *KING OF PRUSSIA, PA 19406-6140* |
| 1(b) | STATE OF INCORPORATION/FORMATION: | *Pennsylvania* |
| 1(c) | **Subsidiary Coverage:** ☒ none, ☐ only those listed by endorsement, or ☐ blanket | |
| 2 | POLICY PERIOD: From: *December 22, 2004*   To: *December 22, 2005* 12:01 A.M. at the address stated in Item 1(a) | |
| 3 | LIMITS OF LIABILITY | |
| 3(a) | **POLICY AGGREGATE:** Aggregate for all coverages combined (including **claim expenses**): *$5,000,000* | |
| 3(b) | **EACH WRONGFUL ACT** or series of continuous, repeated or related **wrongful acts**: *$5,000,000* | |

*7135709*

IDH000448

© 2002 American International Group, Inc.
All rights reserved.

79454 (4/02)                    1

App. 380

ITEMS (continued)

| 4 | COVERAGE MODULE | SUBLIMIT OF LIABILITY | RETENTION | CO-INSURANCE | | RETROACTIVE DATE | FIRST INCEPTION DATE |
|---|---|---|---|---|---|---|---|
| | TECH | $5,000,000 | $500,000 | 0 | % | December 22, 2000 | December 22, 2000 |
| | TELECOM | Nil | | | % | Not Applicable | Not Applicable |
| | MPL | Nil | | | % | Not Applicable | Not Applicable |
| | MEDIA | Nil | | | % | Not Applicable | Not Applicable |
| | AI/PI–(Supp) | Nil | | | % | Not Applicable | Not Applicable |
| | NAP | $5,000,000 | $500,000 | 0 | % | December 22, 2000 | December 22, 2000 |
| | [Reserved] | Nil | | | % | Not Applicable | Not Applicable |

Sublimit of Liability of "Nil" for any Coverage Module reflects that such module was not purchased.

5    PREMIUM: $62,854

   Premium for Certified Acts of Terrorism Coverage under Terrorism Risk Insurance Act 2002: $622 included in policy premium.
Any coverage provided for losses caused by an act of terrorism as defined by TRIA (TRIA Losses) may be partially reimbursed by the United States under a formula established by TRIA as follows:  90% of TRIA Losses in excess of the insurer deductible mandated by TRIA, the deductible to be based on a percentage of the insurer's direct earned premiums for the year preceding the act of terrorism.
   A copy of the TRIA disclosure sent with the original quote is attached hereto.

6    NAME AND ADDRESS OF INSURER

AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY
175 WATER STREET
NEW YORK, NEW YORK 10038

This policy is issued only by the insurance company indicated in this Item 6.

PRODUCER: THE ADDIS GROUP

PRODUCER LICENSE NO.: On File with Carrier

ADDRESS:    2300 RENAISSANCE BOULEVARD
            KING OF PRUSSIA, PA 19406

7135709                                                    IDH000449

© 2002 American International Group, Inc.
All rights reserved.

App. 381

**IN WITNESS WHEREOF**, the insurer has caused this policy to be signed on the Declarations by its President, a Secretary and its duly authorized representative or countersigned in states where applicable.

_Elizabeth M. Tuck_

—————————————
SECRETARY

_[signature]_

—————————————
PRESIDENT

_[signature]_

—————————————
AUTHORIZED REPRESENTATIVE
Or Countersignature (In states where applicable)


—————————————     ——————     —————————————
COUNTERSIGNATURE         DATE          COUNTERSIGNED AT

_7135709_

IDH000450

© 2002 American International Group, Inc.
All rights reserved.

79454 (4/02)                           3

App. 382

POLICYHOLDER DISCLOSURE STATEMENT
UNDER
TERRORISM RISK INSURANCE ACT OF 2002

You are hereby notified that under the federal Terrorism Risk Insurance Act of 2002 (the "Act") effective November 26, 2002, you now have a right to purchase insurance coverage for losses arising out of an Act of Terrorism, which is defined in the Act as an act certified by the Secretary of the Treasury (i) to be an act of terrorism, (ii) to be a violent act or an act that is dangerous to (A) human life; (B) property or (C) infrastructure, (iii) to have resulted in damage within the United States, or outside of the United States in case of an air carrier or vessel or the premises of a U.S. mission and (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. You should read the Act for a complete description of its coverage. The Secretary's decision to certify or not to certify an event as an Act of Terrorism and thus covered by this law is final and not subject to review. There is a $100 billion dollar annual cap on all losses resulting from Acts of Terrorism above which no coverage will be provided under this policy and under the Act unless Congress makes some other determination.

For your information, coverage provided by this policy for losses caused by an Act of Terrorism may be partially reimbursed by the United States under a formula established by the Act. Under this formula the United States pays 90% of terrorism losses covered by this law exceeding a statutorily established deductible that must be met by the insurer, and which deductible is based on a percentage of the insurer's direct earned premiums for the year preceding the Act of Terrorism.

COPY OF DISCLOSURE SENT WITH ORIGINAL QUOTE

Insured Name: *INTERDIGITAL COMMUNICATIONS CORPORATION*

Policy Number: *884-65-15*
Policy Period Effective Date From: *December 22, 2004*    To: *December 22, 2005*

81285 (1/03)

IDH000451

App. 383



**AMERICAN INTERNATIONAL SPECIALTY
LINES INSURANCE COMPANY**

# AIG ProTech®
*Modular Edition*®

## BASE
### COMMON TERMS, CONDITIONS AND LIMITATIONS

n consideration of the payment of the premium, and in reliance upon the **application** and the statements therein, which form a part of this policy, we agree as follows:

1. **MODULAR FORMAT**

   This policy shall be comprised of the following components: (i) the Declarations, (ii) this BASE Section, and (iii) one or more optional Coverage Modules.

   This BASE Section shall be applicable to all Coverage Modules. The terms, conditions, exclusions and other limitations of each Coverage Module shall control solely with respect to coverage afforded by that Coverage Module.

2. **INSURING AGREEMENTS**

   For Coverages A and B, and all other claims made and reported coverage in this policy, solely with respect to **claims** first made against an **insured** and reported to **us** during the **policy period** or any applicable **extended reporting period**, and subject to the other terms, conditions, exclusions and other limitations of this policy, this policy affords the following coverage:

   **COVERAGE A: LIABILITY FOR DAMAGES**

   **We** shall pay amounts, in excess of the applicable Retention and Coinsurance, **you** or any **additional insureds** are legally obligated to pay as **damages** arising from a **claim**

       (i)    made against **you** or such **additional insured**; or
       (ii)   for **liability from others**,

   for **wrongful acts**.

   **COVERAGE B: DEFENSE OF INSUREDS**

   (1) *Our Duty To Defend Insureds:* **We** have the right and duty to defend a **suit** brought against any **insured** for covered **wrongful acts**, even if the **suit** is groundless or fraudulent.

   (2) *Claim Expenses:* **We** shall pay for **claim expenses** any **insured** incurs with **our** prior written consent in the defense of a **suit** for covered **wrongful acts**.

   (3) *Our Right To Investigate and Settle Claims:* **We** have the right, but not the duty, to investigate any **claim** against any **insured**, and settle any **claim**, with **your** written consent, against an **additional insured** or leased worker or against **you**.

   (4) *Your Right To Settle:* **You** may settle any **claim** or **suit** to which this insurance applies provided that **you** do so (i) on behalf of all **insureds**, and (ii) without incurring **loss** in excess of all applicable Retentions.

   (5) *When Our Duty To Defend Ends:* **Our** duty to defend ends upon the exhaustion of the **policy limit of liability**, the applicable **sublimit of liability** or the **wrongful act limit of liability**, by payment of **loss**, including **claim expenses**. **Our** duty to defend also ends if **you** fail or refuse to consent to a settlement **we** recommend and the claimant will accept. **You** must then defend the **claim** at **your** own expense. As a consequence of such failure or refusal, **our** liability for **loss** shall not exceed the amount for which **we** could have settled such **claim** had **you** consented, plus **claim expenses** incurred prior to the date of such failure or refusal.

IDH000452

© 2003 American Interna................ ........ .......
All rights reserved.

App. 384

3.  **DEFINITIONS**

(a)  **"Additional insured"** means (i) any natural person or entity listed as such in an endorsement to this BASE Section (ii) any other natural person or entity described or listed as such in a Coverage Module of this policy, and (iii) any employee of any such described or listed entity.

(b)  **"Advertising"** means the material in any publicity or promotion including branding, co-branding, sponsorships and/or endorsements on your own behalf or for others.

(c)  **"Application"** means each and every signed application, any attachments to such applications, other materials submitted therewith or incorporated therein and any other documents submitted or representations made by you, or your broker, agent or attorney in connection with the underwriting of this policy or the underwriting of any other errors and omissions or media liability policy issued by the insurer, or any of its affiliates, of which this policy is a renewal, replacement or which it succeeds in time.

(d)  **"Bodily injury"** means physical injury, sickness, disease, pain or death, and, if arising out of the foregoing, mental anguish, mental injury, shock, humiliation or emotional distress at any time.

(e)  **"Claim"** means:

(1)  a written or oral demand for money, services, non-monetary relief or injunctive relief; or
(2)  a **suit**.

(f)  **"Claim expenses"** means the reasonable and necessary (i) fees and disbursements charged by an attorney appointed by us, and (ii) other fees, costs and expenses incurred in the defense or investigation of a claim against an insured, either incurred by us or by an insured with our prior written consent; provided, however, this Definition is subject to the limitations set forth in Definition 3(s). **"Claim expenses"** shall also include premiums for appeal bonds for covered judgments or bonds to release property used to secure a legal obligation, if required in any claim against an insured for your wrongful acts; however, we have no obligation to appeal or to obtain bonds.

(g)  **"Computer attack"** means **unauthorized access, unauthorized use,** transmission of a **malicious code** or **denial of service attack** which:

(1)  alters, copies, misappropriates, corrupts, destroys, disrupts, deletes, damages or prevents, restricts or hinders access to, a **computer system**; or
(2)  results in the disclosure of confidential information stored on **your computer system**;

whether any of the foregoing is intentional or unintentional, malicious or accidental, fraudulent or innocent, specifically targeted at **you** or generally distributed, and regardless of whether the perpetrator is motivated for profit.

(h)  **"Computer system"** means computer hardware, software, firmware, and components thereof, including electronic data stored thereon, which are linked together through a network of two or more computers, including such networks accessible through the **Internet**, intranets, extranets or virtual private networks.

(i)  **"Damages"** means any amount that any **insured** shall be legally required to pay because of judgments, arbitration awards or the like rendered against an **insured**, or for settlements negotiated by us or by you in accordance with Coverage B, including, but not limited to:

(1)  pre-judgment interest;
(2)  post-judgment interest that accrues after entry of judgment and before we have paid, offered to pay or deposited in court that part of the judgment within the applicable Limit of Liability; and
(3)  subject to this policy's other terms, conditions, exclusions and other limitations, including but not limited to exclusions relating to profit or advantage, deliberate fraud or deliberate criminal acts: (i) punitive, (ii) exemplary and (iii) multiple damages; provided, however, the enforceability of this Subparagraph 3(i)(3) shall be governed by such applicable law that most favors coverage for such punitive, exemplary and multiple damages.

This Definition is subject to the limitations set forth in Paragraph 3(s).

© 2003 American International Group, Inc.
All rights reserved.

79453 (5/03)                                    2                                    IDH000453

App. 385

This Definition is subject to the limitations set forth in Paragraph 3(s).

(j)  "**Denial of service attack**" means an attack launched by a person(s) that sends an excessive volume of electronic data to a computer system in order to deplete such computer system's capacity, and prevents those who are authorized to do so from gaining access to such **computer system** in a manner in which they are legally entitled.

(k)  "**Employee**" means any past, present or future employee, including any part-time, seasonal and temporary employee.

(l)  "**Extended reporting period**" means whichever extended reporting period described in Paragraphs 9(a) through 9(c), if any, is applicable.

(m) "**First inception date**" means, for each Coverage Module, the date set forth in Item 4 of the Declarations as the inception date of the first errors and omissions, professional, media or other liability policy that (i) provides or provided the same or essentially the same coverage as such Coverage Module and (ii) was issued by **us** or any other member company of American International Group, Inc. ("AIG") to the **named insured** and continually renewed by **us** or any other AIG member company through the inception date of this policy; or such other date specified in Item 4 of the Declarations as such.

(n)  "**Insured**" means each (1) of **you**; (2) **leased worker**; and (3) **additional insured**.

(o)  "**Internet**" means the worldwide public network of computers commonly known as the **Internet**, as it currently exists or may be manifested in the future.

(p)  "**Internet professional services**" means any of the following services:

(1)  "**Application service provider (ASP services),**" which means providing access to computer applications controlled by **you** for use by others through the **Internet**;

(2)  "**Domain name registration services,**" which means the following services provided in order to facilitate navigation of the **Internet**: collecting, processing or maintaining information provided to **you** which is necessary for registering a domain name; registering a domain name; or accepting or maintaining a record of domain names in a database;

(3)  "**e-Commerce transaction services,**" which means the following services provided on behalf of others through the **Internet**: processing electronic transactions; registering **Internet** users; or collecting or organizing information provided by **Internet** users, including demographic and transactional data;

(4)  "**Electronic exchange and auction services,**" which means: the electronic matching of third-party buyers and third-party sellers of goods or services through the **Internet**; and providing e-commerce transactions services with respect to such buyers and sellers;

(5)  "**Internet hosting services,**" which means: housing or maintaining physical control over others' computer file servers connected to the **Internet**; or providing storage of others' electronic data on **your computer systems** connected to the **Internet**, for the purpose of transmitting electronic data through the **Internet**;

(6)  "**Internet media services,**" which means: the electronic publishing or display of material (including **advertising**) on an **Internet** site; or providing or maintaining of: instant messaging, web-conferencing, webcasting, **Internet**-based electronic mail, online forums, bulletin boards, list-serves or chat rooms;

(7)  "**Internet service provider (ISP services),**" which means providing direct access to the **Internet**;

(8)  "**Managed and network security services,**" which means: reviewing, analyzing, or consulting with respect to written security policies intended to prevent a **computer attack**; analyzing, testing, or monitoring the **security** infrastructure or vulnerabilities of **computer systems**; implementing, managing or maintaining **security**; providing content

© 2003 American Inter
All rights reserved.

IDH000454

App. 386

filtering security; providing security patch administration; providing security audits; or preparing security assessment reports;

(9) **"Public Key Infrastructure Services,"** which means: developing, implementing, or managing public key infrastructure; registering, authenticating or validating the identities of users of public key infrastructure; issuing or managing electronic security credentials or digital certificates for message encryption; monitoring or maintaining the integrity or security of electronic information transmitted using public key infrastructure;

(10) **"Search engine services,"** which means providing search or navigational computer applications to allow others to locate electronic data through the Internet; or

(11) **"Web portal services,"** which means organizing, aggregating, or providing access to electronic data, material or any service described above in this definition, through an Internet site commonly known as a "web portal."

(q) **"Leased worker"** means any person provided by an employment contractor or agency under an agreement between an organization and the employment contractor or agency to perform duties related to the conduct of an organization's professional services.

(r) **"Liability from others"** means vicarious liability of any insured for damages from wrongful acts.

(s) **"Loss"** means the total sum of damages and claim expenses. "Claim expenses," "damages" and "loss" shall not mean and this policy shall not cover: (1) compensation, benefits, overhead, charges or expenses of any insured or such insured's employees; (2) production costs or the cost of recall, reproduction, reprinting or correction of material by any person or entity; (3) any costs or expenses incurred by any person or entity to withdraw or recall material, media, medium (including CD's, DVD's, cassettes and LP's), products (including products of others which incorporate your products) or professional services from the marketplace, or from loss of use arising out of such withdrawal or recall; (4) civil or criminal fines or penalties; (5) taxes; (6) any amounts for which an insured is not financially liable or which are without legal recourse to an insured; (7) the costs and expenses of complying with any injunctive or other form of equitable relief; (8) the monetary value of any electronic fund transfer or transaction by an insured or on your behalf, which is lost or diminished during transfer into, out of or between an insured's accounts; and (9) matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

(t) **"Malicious code"** means an unauthorized corrupting or harmful piece of code. Malicious code includes, but is not limited to, computer viruses, "Trojan horses," "worms," and "time or logic bombs."

(u) **"Management control"** means: (1) owning interests representing more than 50% of the voting, appointment or designation power for the selection of a majority of: the Board of Directors of a corporation, the management committee members of a joint venture or partnership, or the members of the management board of a limited liability company; or (2) having the right, pursuant to written contract or the by-laws, charter, operating agreement or similar documents of an organization, to elect, appoint or designate a majority of: the Board of Directors of a corporation, the management committee of a joint venture or partnership or the management board of a limited liability company.

(v) **"Named insured"** means the entity listed as such in Item 1 of the Declarations.

(w) **"Organization"** means (1) the named insured; and (2) each subsidiary.

(x) **"Policy limit of liability"** means the aggregate limit of liability set forth as such in Item 3(a) of the Declarations.

(y) **"Policy period"** means the period set forth as such in Item 2 of the Declarations.

(z) **"Pollutants"** means, but is not limited to, any solid, liquid, gaseous, biological, radiological or

4

© 2003 American Int'l
All rights reserved.

IDH000455

App. 387

thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, acids, alkalis, chemicals and waste. "Waste" includes, but is not limited to, materials to be recycled, reconditioned or reclaimed and nuclear materials.

(aa)    **"Privacy policy"** means statements in written or electronic form regarding the collection, dissemination or treatment of information regarding customers, visitors to an **Internet** site, or other persons.

(bb)    **"Professional services"** means the services described as such in the Coverage Modules of this policy.

(cc)    **"Property damage"** means (1) physical injury to or loss or destruction of tangible property including the resulting loss of use thereof, and/or (2) loss of use of tangible property which has not been physically injured or destroyed.

(dd)    **"Retroactive date"** means the respective dates set forth in the Declarations as such for each Coverage Module.

(ee)    **"Sublimit of liability"** means each of the respective sublimits of liability set forth in Item 4 of the Declarations as applicable to all **loss** covered under a specific Coverage Module purchased.

(ff)    **"Subsidiary"** means:

(1) if "Blanket" has been checked in Item 1(c) of the Declarations, (a) any for-profit entity of which the **named insured** has **management control ("controlled entity")** on or before the inception of the **policy period** either directly or indirectly through one or more other **controlled entities;** and (b) any not-for-profit entity under section 501(c)(3) of the Internal Revenue Code of 1986 (as amended) sponsored exclusively by an **organization;** or

(2) otherwise, the entities listed as such on an endorsement to this policy.

(gg)    **"Suit"** means a civil proceeding for monetary, non-monetary or injunctive relief which is commenced by service of a complaint or similar pleading. "**Suit**" shall also include a binding arbitration proceeding in which **damages** are alleged and to which an **insured** must submit or does submit with **our** prior written consent.

(hh)    **"Trade secret"** means information (including any idea) that has been reduced to a written or electronic form, including a formula, compilation, pattern, program, device, method, process, or technique which: (1) derives independent economic value, actual or potential, from not being generally known and not being readily ascertainable through proper means by other persons who can obtain economic advantage from its disclosure or use; (2) is the subject of reasonable efforts to maintain its secrecy; and (3) is used, capable of being used, or intended to be used in commerce.

(ii)    **"Transaction"** means a transaction defined as such in Paragraph 10(a) of this BASE Section.

(jj)    **"Unauthorized access"** means the gaining of access to a **computer system** by an unauthorized person or persons.

(kk)    **"Unauthorized use"** means the use of a **computer system** by an unauthorized person or persons or an authorized person or persons in an unauthorized manner.

(ll)    **"We," "us," "insurer"** and **"our"** mean the insurer named in Item 6 of the Declarations.

(mm)    **"Wrongful act"** means the acts, errors or omissions defined as such in the Coverage Modules of this policy.

(nn)    **"Wrongful act limit of liability"** means the limit of liability applicable to each **wrongful act** set forth in Item 3(b) of the Declarations.

(oo)    **"You"** or **"your"** mean each and every (1) **organization** and (2) **employee** of an **organization.**

© 2003 American In
All rights reserved.

IDH000456

App. 388

4.    **EXCLUSIONS**

This policy does not cover any **claim**:

(a)    arising out of or resulting, directly or indirectly, from any dishonest, fraudulent, criminal or malicious act, error or omission, or any intentional or knowing violation of the law, or gaining of any profit or advantage to which an **insured** is not legally entitled; however, we will defend **suits** alleging any of the foregoing conduct until there is a judgment against, final adjudication against, adverse finding of fact against, adverse admission, at which time you shall reimburse us for **claim expenses**; provided, however, we will not defend such **suits** if they allege any of the foregoing conduct which has been the subject of a criminal proceeding in which an **insured** has been found guilty, or pleaded *nolo contendere* or no contest;

(b)    alleging, arising out of or resulting, directly or indirectly, from any:

    (1)    purchase, sale, offer of or solicitation of an offer to purchase or sell securities, or violation of any securities law, including provisions of the Securities Act of 1933, or the Securities Exchange Act of 1934, as amended;

    (2)    violation of the Organized Crime Control Act of 1970 (commonly known as "Racketeer Influenced And Corrupt Organizations Act" or "RICO"), as amended;

    (3)    breach of fiduciary duty, responsibility, or obligation in connection with any employee benefit or pension plan, including violation of the responsibilities, obligations or duties imposed upon fiduciaries by the Employee Retirement Income Security Act of 1974 as amended;

    (4)    antitrust violations, restraint of trade, misappropriation of **trade secrets** or unfair competition, or violations of the Sherman Act, the Clayton Act or the Robinson-Patman Act, as amended; or

    (5)    regulation promulgated under the foregoing laws, or any federal, state, local or foreign laws (a) similar to the foregoing laws (including "Blue Sky" laws) or (b) regulating the same or similar conduct or services, whether such law is statutory, regulatory or common law;

(c)    alleging, arising out of or resulting, directly or indirectly, from any employment practices or any discrimination against any person or entity on any basis, including but not limited to: race, creed, color, religion, ethnic background, national origin, age, handicap, disability, sex, sexual orientation or pregnancy;

(d)    alleging, arising out of or resulting, directly or indirectly, from any (1) presence of **pollutants**, (2) the actual or threatened discharge, dispersal, release or escape of **pollutants**, or (3) direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **pollutants**, or in any way respond to or assess the effects of **pollutants**;

(e)    alleging, arising out of or resulting, directly or indirectly, from any infringement of any patent, copyright, trademark, trade dress, trade name, service mark or other intellectual property;

(f)    arising out of or resulting, directly or indirectly, from **Internet professional services**;

(g)    alleging, arising out of or resulting, directly or indirectly, from an actual or threatened **computer attack** through or otherwise involving the **Internet**;

(h)    alleging, arising out of or resulting, directly or indirectly, from any:

    (1)    false arrest, detention or imprisonment;
    (2)    libel, slander or defamation of character;
    (3)    wrongful entry or eviction, or invasion of any right of privacy; or
    (4)    malicious prosecution;

(i)    alleging, arising out of or resulting, directly or indirectly, from any intentional, knowing or reckless (1) false or deceptive **advertising** or misrepresentation in **advertising** of **your** products or services, or (2) unfair competition based on such **advertising**, including, but not

© 2003 American I/
All rights reserved.

iDH000457

App. 389

limited to, **advertising** related violations of any local, state or federal consumer protection or privacy laws;

(j) alleging, arising out of or resulting, directly or indirectly, from any **bodily injury or property damage;**

(k) alleging, arising out of or resulting, directly or indirectly, from any **insured** (1) advising, requiring, obtaining, or (2) failing to advise, require, obtain, effect or maintain any bond, suretyship or other insurance;

(l) alleging, arising out of or resulting, directly or indirectly, from facts alleged, or to the same **wrongful acts**, or series of continuous, repeated or related **wrongful acts** alleged or contained in any **claim** which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

(m) alleging, arising out of or resulting, directly or indirectly, from any **wrongful act**, circumstance or event committed or occurring prior to the **first inception date** if on or before the **first inception date, you** knew or could have reasonably foreseen that such **wrongful act**, circumstance or event could give rise to a **claim** against an **insured** or **loss;**

(n) alleging, arising out of or resulting, directly or indirectly, from, as of the **first inception date,** any pending or prior: (1) **claim**, demand, **suit**, arbitration, mediation or litigation, or (2) administrative, bankruptcy or regulatory proceeding or investigation, of which **you** had notice, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior **claim**, demand, **suit**, arbitration, mediation or litigation or administrative, bankruptcy or regulatory proceeding or investigation;

(o) made against an **insured** alleging, arising out of or resulting, directly or indirectly, from (1) any **wrongful act** or (2) **liability from others** based upon, relating to or in connection with any act, error or omission, occurring, committed or omitted prior to the applicable **retroactive date;**

(p) alleging, arising out of or resulting, directly or indirectly, from any liability or obligation under any contract or agreement or out of any breach of contract; however, this exclusion does not apply to any:

   (1) liability or obligation an **insured** would have in the absence of such contract or agreement; or

   (2) liability or obligation under a contract for **professional services from a wrongful act;**

(q) alleging, arising out of or resulting, directly or indirectly, from any warranty, representation or guarantee; inaccurate, inadequate, or incomplete description of the price of goods, products or services; or any failure of goods, products or services to conform with an advertised quality or performance; or liquidated damages; or any failure to provide goods or products, or perform services within a specified time period, by a deadline or according to specified milestones; or the collection of or seeking the return of fees or royalties or other compensation paid to an **insured;** or **your** cost of providing, correcting or re–performing or completing any **professional services;** or any violation of any **insured's privacy policy;** or any **insured's** fees, cost or profit guarantees, cost representations, contract price, or estimates of probable costs or cost estimates being exceeded;

(r) against an **insured** that is brought, directly or indirectly, by or on behalf of:

   (1) any of **you;**

   (2) any business entity that is controlled, managed or operated, directly or indirectly, in whole or in part, by **you;**

   (3) any parent company, subsidiary, director, officer, partner, trustee, successor or assignee of **yours**, or any person or entity affiliated with **you** or such business entity through common majority ownership or control; or

© 2003 American Inter
All rights reserved.

IDH000458

App. 390

(4) any independent contractor of an insured or any leased worker; however, this exclusion shall not apply to claims arising out of your professional services provided to such independent contractor; or

(s) alleging, arising out of or resulting, directly or indirectly, from:

(1) fire, smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, act of God or any other physical event, however caused;

(2) strikes or similar labor action, war, invasion, act of foreign enemy, hostilities or warlike operations (whether declared or not), civil war, mutiny, civil commotion assuming the proportions of or amounting to a popular rising, military rising, insurrection, rebellion, revolution, military or usurped power, or any action taken to hinder or defend against these actions; or

(3) electrical or mechanical failures, including any electrical power interruption, surge, brownout or blackout.

5.    **LIMIT OF LIABILITY (FOR ALL LOSS–INCLUDING CLAIM EXPENSES)**

(a) **General**

(1) The aggregate **policy limit of liability** set forth in the Declarations is the most we will pay as loss under this policy, in the aggregate, for all coverages combined, regardless of the number of persons, occurrences, **claims** or entities covered by this policy, or claimants or **claims** brought against any **insured**.

(2) Each **sublimit of liability** set forth in the Declarations as applicable to a specific Coverage Module is the most we shall pay under this policy as loss in respect of such Coverage Module regardless of the number of persons, occurrences, **claims** or entities covered by this policy, or claimants or **claims** brought against any **insured**. If two or more Coverage Modules apply to loss and the amount of the **sublimits of liability** differ, the most we will pay for loss covered by any single Coverage Module is the **sublimit of liability** applicable to that Coverage Module. In any event the highest applicable **sublimit of liability** shall be **our** maximum limit of liability for all loss from such claim. **Our** total liability for all loss arising from any and all claims made against an **insured** and reported to **us** during the **policy period** or any applicable **extended reporting period**, alleging any **wrongful act** or series of continuous, repeated or related **wrongful acts** shall not exceed the respective **wrongful act limit of liability** set forth in the Declarations.

(3) Loss arising out of the same **wrongful acts**, or a series of continuous, repeated or related **wrongful acts** shall be deemed to arise from the first such **wrongful act.**

(4) The **policy limit of liability** and **sublimits of liability** for any **extended reporting period** shall be part of and not in addition to the **policy limit of liability** and respective **sublimits of liability** for the **policy period.**

(5) Further, each and every **claim** made subsequent to the **policy period** or an applicable **extended reporting period**, that pursuant to Paragraph 7(b) is considered made during the **policy period** or an **extended reporting period**, shall also be subject to the same **policy limit of liability** and respective **sublimits of liability** afforded to claims made and reported during the **policy period.**

(6) The **wrongful act limit of liability** and the **sublimits of liability** are all part of and subject to the **policy limit of liability.**

(7) **Damages, claim expenses** and loss are all part of and subject to the **policy limit of liability, wrongful act limit of liability** and the **sublimits of liability.**

(b) **Multiple Policies**

Two or more policies may be issued by **us** and/or any other AIG member companies to **you.** These policies may provide coverage for:

(1) **claims** arising from the same **wrongful acts**, events or circumstances, or series of continuous, repeated or related **wrongful acts**, events or circumstances; or

© 2003 American I
All rights reserved.

IDH000459

79453 (5/03)

App. 391

(2) **claims** for which persons or organizations covered under those policies are jointly and severally liable.

In such case, **we** will not be liable under this policy for an amount greater than the proportion of the loss that this policy's applicable limit(s) of coverage bears to the total applicable limits of liability under all such policies. In addition, the total amount payable under all such policies combined shall not be greater than the highest applicable limit of liability among all such policies.

6.   **RETENTION AND COINSURANCE**

(a)   *Retention:* For each **claim**, the **insurer** shall only be liable for the amount of loss arising from such **claim** that exceeds the Retention amount applicable to any Coverage Module affording coverage to such **claim**. Such Retention amounts must be borne by the **insureds** and remain uninsured with regard to all loss. In the event a **claim** triggers more than one Retention amount, then, as to that **claim**, the highest of such Retention amounts shall be deemed the Retention amount applicable to loss arising from such **claim**. A single Retention amount shall apply to loss arising from all **claims** alleging the same **wrongful acts**, or series of continuous, repeated or related **wrongful acts**. In our sole and absolute discretion, **we** may advance all or part of the applicable Retention amount in which case **you** agree to repay **us** immediately after **we** notify **you** of that payment.

(b)   *Coinsurance:* For each **claim** against an **organization** or additional **insured**, such **insured** shall, excess of the applicable Retention amount, bear uninsured at such their own risk and pay the Coinsurance percentage proportion of such loss. The Coinsurance percentage to be applied shall be the percentage set forth as such in Item 4 of the Declarations for any Coverage Module affording coverage for such **claim**. In the event a **claim** triggers more than one Coinsurance percentage, then, as to that **claim**, the highest such Coinsurance percentage shall be deemed the Coinsurance percentage applicable to loss arising from such **claim**. Our liability hereunder with respect to loss of an **organization** or an additional **insured** shall apply only to the remaining percentage of such loss. **We** shall have no obligation to pay to the extent that an **organization** or additional **insured** does not pay the applicable Coinsurance percentage. In our sole and absolute discretion, **we** may advance all or part of the applicable Coinsurance, in which case **you** agree to repay **us** immediately after **we** notify **you** of that payment. Payments of Coinsurance shall not be subject to and do not reduce any limits of liability under this policy.

7.   **NOTICE AND AUTHORITY**

(a)   *Generally:* Notice in connection with this policy shall be given in writing to **us** (i) in the case of **claims**, as provided in Paragraph 7(b) and (ii) in all other cases, at **our** address indicated in the Declarations c/o the Professional Liability Division. The **named insured** shall act on behalf of each and every **insured** with respect to the giving and receiving of any notice under this policy, including, but not limited to, notice of a **claim** and notice of cancellation. If mailed, the date of mailing shall constitute the date that such notice or information was given and proof of mailing shall be sufficient proof of notice.

(b)   *Claims:*

(1)   With respect to **claims** or circumstances, notice and all other information and documentation required to be provided under this policy should be directed to **us** c/o AIG Technical Services, Inc., Professional Liability Division, at **our** address indicated in the Declarations. To be effective, such notice must reference this policy.

(2)   For any and all coverage under this policy afforded on a claims made and reported basis:

(a)   before coverage will apply, an **insured** must notify **us** in writing of a **claim** made against an **insured** as soon as practicable;

(b)   if an **insured** has notified **us** in writing of a **claim** pursuant to Subparagraph 7(b)(2)(a) above, then any **claim** which is subsequently made against an **insured** and reported

© 2003 American Inter
All rights reserved.

IDH000460

79453 (5/03)                                  9

App. 392

to the **insurer** alleging, arising out of, based upon or attributable to the facts alleged in the **claim** for which such notice has been given, or alleging any **wrongful act** which is the same as or related to any **wrongful act** alleged in the **claim** of which such notice has been given, shall be considered related to the first **claim** and made at the time such notice was given; and

(c) if during the **policy period** or during an applicable **extended reporting period** an **insured** shall become aware of any circumstances which may reasonably be expected to give rise to a **claim** being made against an **insured** for a **wrongful act** that occurs prior to the end of the **policy period**, and, during the **policy period** or any applicable **extended reporting period**, an **insured** gives written notice to **us** of (i) such circumstances, (ii) the **wrongful acts** allegations anticipated and (iii) the reasons for anticipating such a **claim**, with full particulars as to dates, persons and entities involved, then any **claim** that is subsequently made against an **insured** arising out of such **wrongful act** or the same **wrongful act** or series of continuous, repeated or related **wrongful acts**, shall be treated as a **claim** made against such **insured** and reported to **us** at the time such notice of such circumstances was given.

(3) For any and all coverage under this policy afforded on an occurrence basis, **you** must notify **us** in writing of any **claim** against **you** as soon as practicable.

8. **WHAT YOU MUST DO IN THE EVENT OF A CLAIM**

(a) In addition to providing notice as required in this policy, with respect to all coverages under this policy, each and every **insured** must also:

(1) send **us** copies of all demands, suit papers, other legal documents and invoices for **claim expenses** received by such **insured**, as soon as practicable;

(2) immediately record the specifics of any **claim** and the date such **insured** first received such **claim**;

(3) take prompt and reasonable steps to minimize the **loss** and take reasonable steps to prevent further **loss**;

(4) at **our** request, report such **loss** to the FBI, a computer emergency response team (CERT), information sharing and analysis center (ISAC) or any other central reporting or investigative organization which **we** may designate;

(5) upon **our** request, furnish to **us** any and all documentation within such **insured's** possession; and

(6) give **us** and any counsel **we** select to represent an **insured** in connection with a **suit** or to investigate any **claim**, full cooperation and such information as **we** or such counsel may reasonably require, including, but not limited to, assisting **us** or such counsel in:

(a) any investigation of a **claim**, **loss**, or other matter relating to the coverage afforded under this policy (including submission to an examination by **us** or **our** designee, under oath if required by **us**);

(b) making settlements;

(c) enforcing any legal rights **you** or **we** may have against any person or entity who may be liable to **you**;

(d) attending depositions, hearings and trials;

(e) securing and giving evidence, and obtaining the attendance of witnesses; and

(f) any inspection or survey conducted by **us**.

(b) No **insured** shall admit any liability, assume any financial obligation or pay any money in connection with any **claim** without **our** prior consent. If any **insured** does, it will be at such **insured's** own expense. The foregoing sentences of this Paragraph 8(b) shall not apply to a settlement pursuant to Coverage B(4) of this policy so long as such **insured** provides **us** written notice of such settlement as soon as practicable, but in no case later than thirty (30) days after such settlement is reached in principle.

© 2003 American Ir
All rights reserved.

IDH000461

App. 393

(c)  In all events, no **insured** shall take any action, or fail to take any required action, without **our** written consent, which prejudices **our** rights under this policy.

**EXTENDED REPORTING PERIOD**

The following provisions are applicable solely to claims made and reported coverages of this policy:

(a)  *Automatic Extended Reporting Period:* If the **named insured** or the **insurer** shall refuse to renew this policy, the **named insured** shall have the right following the effective date of such nonrenewal to a period of sixty (60) days (the "**automatic extended reporting period**") in which to give written notice to **us** of claims first made against an **insured** during the **automatic extended reporting period** for any **wrongful act** committed prior to the end of the **policy period** and otherwise covered by this policy. The **automatic extended reporting period** shall not apply where an **extended reporting period** has been purchased or to **claims** that are covered under any subsequent insurance **you** purchase or that is purchased for **your** benefit, or that would be covered, but for the exhaustion of the amount of insurance applicable to such **claims** or that is within any applicable Retention amount.

(b)  *Optional Extended Reporting Period:* Except as indicated below, if the **named insured** shall cancel or **we** or the **named insured** refuse to renew this policy, the **named insured** shall have the right to a period of up to three years following the effective date of such cancellation or nonrenewal (an "**extended reporting period**"), upon payment of an additional premium amount as shall be determined by **us**, in which to give to **us** written notice pursuant to Subparagraph 7(b)(2)(a) of the policy of **claims** (1) first made against an **insured** during said **extended reporting period** and (2) solely with respect to a **wrongful act** committed prior to the end of the **policy period** and otherwise covered by this policy. If the **named insured** exercises its right to purchase an **extended reporting period**, that period incepts at the end of the **policy period** and there shall be no **automatic extended reporting period**.

(c)  *Transaction Triggered Extended Reporting Period:* In the event of a **transaction** (see Paragraph 10(a)), the **named insured** shall have the right to request an offer from **us** of an **extended reporting period** (solely with respect to pre-**transaction wrongful acts**). Upon **our** receipt of such a request, **we** shall offer such **extended reporting period** pursuant to such terms, conditions, exclusions and additional premium as **we** may decide. In the event of a **transaction**, the right to an **extended reporting period** shall not otherwise exist except as provided in this paragraph.

(d)  *Common Extended Reporting Period Terms:* An **extended reporting period** is not cancelable and the additional premium charged shall be fully earned at inception. This Clause 9 shall not apply to any cancellation resulting from non-payment of premium. The rights contained in this Clause 9 shall terminate unless written notice of election of an **extended reporting period** together with any additional premium due is received by **us** no later than thirty (30) days subsequent to the effective date of the cancellation, nonrenewal or **transaction**.

10.  **ORGANIZATIONAL CHANGES**

(a)  *Transactions:* If during the **policy period**:

(1)  the **named insured** shall consolidate with, merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or.

(2)  any person or entity or group of persons or entities acting in concert shall acquire **management control** of the **named insured**;

(any of such events being a "**transaction**"), then this policy shall continue in full force and effect as to **wrongful acts** occurring prior to the effective time of the **transaction**, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **wrongful act** after the effective time of the **transaction**, unless (i) within thirty (30) days of such **transaction** we have been provided with full particulars of the **transaction**, the related entities and any other information requested by **us**, and (ii) the **named insured** or its

© 2003 American
All rights reserved

IDH000462

App. 394

successor, has agreed to any additional premium and amendments to this policy required by **us.**

Coverage for post-transaction wrongful acts is conditioned upon the **named insured** or its successor paying when due any additional premium required by **us.** This policy may not be canceled after the effective time of a **transaction** and the entire premium for this policy shall be deemed earned as of such time.

(b) *Subsidiary Additions:* If "Blanket" has been checked in Item 1(c) of the Declarations, **subsidiary** also includes any for-profit entity of which the **named insured** first had **management control** during the **policy period,** whether directly or indirectly through one or more other **subsidiaries,** and:

    (1) whose revenues from services, that, if provided by **you,** would have fallen within the meaning of **"professional services"** as such term is used in this policy (the **"similar services"**), do not exceed five percent (5%) of the aggregate revenues of the **organization** (as of the inception date of this policy) from such services; or

    (2) whose revenues from **similar services** exceed five percent (5%) or more of the aggregate revenues of the **organization** (as of the inception date of this policy) from the same services, but such entity shall be a **"subsidiary"** only once the **named insured** shall have provided **us** with full particulars of the new **subsidiary** and agreed to any additional premium and amendments to this policy required by **us** relating to such **subsidiary.** Further, coverage as shall be afforded to any **subsidiary** and any **employee** thereof is conditioned upon the **named insured** paying when due any additional premium required by **us** relating to such **subsidiary.**

(c) *Other Organizational Changes:* In all events, coverage as is afforded under this policy with respect to a **claim** made against any **subsidiary** and/or any **employee** of an **organization** shall only apply for **wrongful acts** committed or allegedly committed (1) in the case of a **subsidiary,** (i) after the effective time the **named insured** obtained **management control** of such **subsidiary,** and (ii) prior to the effective time that the **named insured** no longer has **management control** over such **subsidiary,** (2) in the case of an **employee** of an **organization,** solely while such **employee** is employed by the **named insured** or a **subsidiary** over which the **named insured** has **management control,** or (3) in the case of an **employee** of an **additional insured,** solely while employed by such **additional insured.**

11.  **WHERE COVERAGE APPLIES**

We cover **wrongful acts** that occur, **claims** that are brought and **losses** suffered anywhere in the world, except we shall not cover such **wrongful acts, claims** or **losses** in countries against which the Office of Foreign Assets Control of the United States Department of the Treasury administers or enforces economic or trade sanctions, or if otherwise prohibited by law.

12.  **ACTIONS AGAINST US**

(a) No one can sue **us,** or commence alternative dispute resolution as provided by Clause 17 of this policy, to recover under this policy unless there has been full compliance with all the terms of this policy.

(b) A person or organization may sue **us** to recover up to the **policy limits of liability,** the **wrongful act limit of liability** or any applicable **sublimit of liability** under this policy, whichever would be exhausted first, only after liability of all **insureds** has been decided by:

    (1) an arbitration award as a result of arbitration commenced in accordance with Clause 17 of this policy;

    (2) a trial or appeal, after which a final judgment has been entered; or

    (3) a written agreement signed by **you, us** and the party making the **claim.**

(c) Any person, organization or legal representative thereof who has secured such award, judgment or written agreement shall thereafter be entitled to recover under this policy to the

© 2003 American †
All rights reserved

IDH000463

79453 (5/03)

App. 395

extent of the insurance afforded by this policy. We may not be impleaded by any natural person **insured**, his or her spouse, any other **insured** or any legal representative of the foregoing.

13. **SUBROGATION**

**You** may be able to recover all or part of a **claim** or a **loss** from someone other than **us**. **You** therefore must do all that is possible after a **claim** or **loss** to preserve any such right of recovery. If we make a payment under this policy, that right of recovery will belong to **us**. **You** will do whatever is necessary, including signing documents, to help **us** obtain that recovery.

14. **OTHER INSURANCE**

Except as otherwise stated to the contrary elsewhere in the policy, such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance available to any **insured** unless such other insurance is written only as specific excess insurance over the **policy limit of liability** provided by this policy.

15. **CANCELLATION**

(a) *By Named Insured*: This policy may be canceled by the **named insured** at any time only by mailing written prior notice to **us** or by surrender of this policy to **our** authorized agent or **us**.

(b) *By Us*: This policy may be canceled by **our** delivering to the **named insured** by registered, certified, other first class mail or other reasonable delivery method, at the address of the **named insured** set forth in the Declarations, written notice stating when, not less than sixty (60) days thereafter (ten (10) days in the event of cancellation for non-payment of premium), the cancellation shall be effective. Proof of mailing or delivery of such notice as aforesaid shall be sufficient proof of notice and this policy shall be deemed canceled as to all **insureds** at the date and hour specified in such notice.

(c) *Return of Premium*: We shall have the right to the premium amount for the portion of the **policy period** during which the policy was in effect. If this policy shall be canceled by the **named insured**, we shall retain the customary short rate proportion of the premium herein.

16. **ASSIGNMENT**

This policy and any and all rights hereunder are not assignable without **our** prior written consent.

17. **ALTERNATIVE DISPUTE RESOLUTION PROCESS**

It is hereby understood and agreed that all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of **loss**, shall be submitted to the alternative dispute resolution ("ADR") process set forth in this clause.

Either **you** or **we** may elect the type of ADR process discussed below; provided, however, that you shall have the right to reject **our** choice of the type of ADR process at any time prior to its commencement, in which case **your** choice of ADR process shall control.

There shall be two choices of ADR process: (1) non-binding mediation administered by any mediation facility to which **we** and **you** mutually agree, in which all implicated **insureds** and **we** shall try in good faith to settle the dispute by mediation under or in accordance with the then-prevailing commercial mediation rules; or (2) arbitration submitted to an arbitration panel of three (3) arbitrators. The **insureds** shall select one (1) arbitrator, **we** shall select one (1) arbitrator and said arbitrators shall mutually agree upon the selection of the third arbitrator. In either mediation or arbitration, the mediator or arbitrators shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute.

The dispute or differences considered by the mediator or arbitrators shall be governed by the internal laws of the State of New York; provided, however, that New York law shall not apply to:

© 2003 American In' All rights reserved.

IDH000464

79453 (5/03)                    13

App. 396

(a) procurement, issuance or delivery of this policy, including cancellation or nonrenewal provisions of this policy (if any) or any other New York State regulations or requirements regarding policies issued pursuant to New York State Insurance Law; or

(b) to the determination of the availability of punitive damages, unless New York law otherwise applies.

In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the arbitrators' award shall not include attorneys fees or other costs. In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until at least 120 days after the date the mediation shall be deemed concluded or terminated. In all events, each party shall share equally the expenses of the ADR process.

Either choice of ADR process may be commenced in New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; or in the state indicated in Item 1(a) of the Declarations as the mailing address for the named insured. The named insured shall act on behalf of each and every insured in connection with any ADR process under this clause.

18.  **BANKRUPTCY**

Bankruptcy or insolvency of any insured shall not relieve the insurer of any of its obligations hereunder.

19.  **SPOUSAL AND LEGAL REPRESENTATIVE EXTENSION**

If a claim against a natural person insured includes a claim against: (a) the lawful spouse of such insured; or (b) a property interest of such spouse, and such claim arises from any actual or alleged wrongful act of such insured; this policy shall cover loss arising from the claim made against that spouse or the property of that spouse to the extent that such loss does not arise from a claim for any actual or alleged act, error or omission of such spouse. This policy shall cover loss arising from a claim made against the estates, heirs, or legal representatives of any deceased natural person insured, and the legal representatives of any natural person insured, in the event of incompetency, insolvency or bankruptcy, who was an insured at the time the wrongful acts upon which such claim is based were committed.

20.  **APPLICATION**

All the statements and representations in the application are deemed to be material to the risk assumed by the insurer, form the basis of this policy and are incorporated into and have become a part of this policy.

21.  **POLICY CHANGES**

This policy contains all the agreements between you and us concerning this insurance. This policy can only be changed by a written endorsement we issue and make a part of this policy.

22.  **SPECIAL RIGHTS AND DUTIES OF NAMED INSURED**

You agree that when there is more than one natural person or entity covered under this policy, the named insured first listed in Item 1 of the Declarations shall act on behalf of all insureds as to:

(a) giving and receiving notice, including, but not limited to, notice of claims and cancellation;

(b) the exercising or declining of any right to an extended reporting period;

(c) the resolution of any dispute in connection with coverage afforded or purportedly afforded by this policy;

(d) payment of premiums and receipt of return premiums, if any; and

(e) acceptance of any endorsements or other changes to this policy.

© 2003 American
All rights reserved.

IDH000465

App. 397

23. **HEADINGS**

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

24. **SERVICE OF SUIT**

Subject to Clause 17, it is agreed that in the event of **our** failure to pay any amount claimed to be due under this policy, **we**, at the request of any **insured**, will submit to the jurisdiction of a court of competent jurisdiction within the United States of America. Nothing in this Clause constitutes, or should be understood to constitute, a waiver of **our** rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States of America or of any state in the United States of America. It is further agreed that service of process may be made upon General Counsel, Legal Department, American International Specialty Lines Insurance Company, 70 Pine Street New York, NY 10270, or his or her representative, and that in any **suit** instituted against us upon this contract, **we** will abide by the final decision of such court or of any appellate court in the event of any appeal.

Further, pursuant to any statute of any state, territory, or district of the United States of America which makes provision therefore, **we** hereby designate the Superintendent, Commissioner, or Director of Insurance, or other officer specified for that purpose in the statute, or his or her successor or successors in office as **our** true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of any **insured** or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the above-named General Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

IDH000466

© 2003 American International Group, Inc.
All rights reserved.

79453 (5/03)                    15

App. 398

# AIG ProTech©
## Modular Edition℠

## TECH MODULE
### TECHNOLOGY ERRORS & OMISSIONS
### HARDWARE, SOFTWARE & RELATED SERVICES

**1.   MODULAR FORMAT**

This TECH Module is a part of an AIG ProTech modular policy comprised of the following components; (i) the Declarations, (ii) a BASE Section, (iii) this Coverage Module, and (iv) if purchased, other optional Coverage modules. This Coverage Module affords no coverage except as part of a policy comprised of the components set forth above. The terms, conditions, exclusions and other limitations set forth in this Coverage Module are solely applicable to coverage afforded by this Coverage Module. THIS COVERAGE MODULE IS WRITTEN ON A CLAIMS–MADE AND REPORTED BASIS.

**2.   DEFINITIONS**

TECH (a)   **"Professional services"** means the:

(1)  performance of **your technology services**; or

(2)  creation, manufacture, development, distribution, license, lease or sale of **your technology products**.

TECH (b)   **"Technology product"** means any computer hardware, firmware, software, or any related electronic product, equipment or device, that is created, manufactured, developed, distributed, licensed, leased or sold (i) by **you**, or (ii) for **you** by others acting under **your** trade name to others for compensation which are specifically designed or intended for use in connection with any **technology service**.

TECH (c)   **"Technology service"** means any computer or electronic information technology service performed (i) by **you**, or (ii) for **you** by others acting under **your** trade name, for others for compensation; including, but not limited to:

(1)  systems analysis,

(2)  systems programming,

(3)  data processing,

(4)  system integration,

(5)  outsourcing development and design,

(6)  management, repair and maintenance of computer products, networks and systems,

(7)  training in the use of any **technology products**, and

(8)  technology consulting services.

TECH (d)   **"Wrongful act"** means any actual or alleged negligent act, error, omission, breach of duty, misstatement or misleading statement committed or omitted on or after the **retroactive date** in the performance of **your professional services**.

**3.   BASE EXCLUSIONS**

The exclusion in Subparagraph 4(s)(3) (electrical or mechanical failures exclusion) of the BASE Section does not apply to coverage afforded under this Coverage Module.

**4.   MODULE EXCLUSIONS**

This Coverage Module shall not cover any claim:

TECH (a)   alleging, arising out of or resulting, directly or indirectly, from the transfer of funds, monies or securities to or from any natural person or entity; or

TECH (b)   arising out of electrical or mechanical failures, including those arising from any electrical power interruption, surge, brownout or blackout; provided, however, this exclusion shall not apply to electrical or mechanical failures, other than satellite failures, where such failure was the result of **your wrongful act**.

<End of Module>

© 2002 American
All rights reserved

IDH000467

79439 (4/02)

1

App. 399

**AIG**

# AIG ProTech
## *Modular Edition* ®

## AIG netAdvantage Professional®
## NAP MODULE
### INTERNET PROFESSIONAL INSURANCE

NOTICE: COVERAGE NAP A OF THIS COVERAGE MODULE IS WRITTEN ON AN OCCURRENCE BASIS. COVERAGE NAP B OF THIS COVERAGE MODULE IS WRITTEN ON A CLAIMS–MADE AND REPORTED BASIS.

1.    **MODULAR FORMAT**

This NAP Module is a part of an AIG ProTech modular policy comprised of the following components: (i) the Declarations, (ii) a BASE Section, (iii) this Coverage Module, and (iv) if purchased, other optional Coverage Modules. This Coverage Module affords no coverage except as part of a policy comprised of the components set forth above. The terms, conditions, exclusions and other limitations set forth in this Coverage Module are solely applicable to coverage afforded by this Coverage Module.

2.    **BASE INSURING CLAUSES**

Clause 2. Insuring Agreements, (i) the paragraph preceding Coverage A, (ii) Coverage A and (iii) Coverage B, of the BASE Section do <u>not</u> apply to and do <u>not</u> grant coverage under this Coverage Module.

3.    **NAP MODULE INSURING CLAUSES**

**COVERAGE––NAP A: INTERNET MEDIA CONTENT LIABILITY (Occurrence Based)**

We shall pay on **your** behalf those amounts, in excess of the applicable Retention and Coinsurance, **you** or any **additional insureds** are legally obligated to pay, including liability assumed under **contract**, as **damages**, resulting from any **claim** made against **you** or such **additional insured** for **wrongful acts** in the display of **Internet media**. Such **wrongful act** must occur during the **policy period** regardless of when such **claim** is made or a **suit** is filed.

**COVERAGE––NAP B: INTERNET PROFESSIONAL SERVICES LIABILITY (Claims Made and Reported Based)**

We shall pay on **your** behalf those amounts, in excess of the applicable Retention and Coinsurance, **you** or any **additional insureds** are legally obligated to pay as **damages** resulting from any **claim** first made against **you** or such **additional insured**, and reported to **us** in writing during the **policy period** or any applicable **extended reporting period**, for **your wrongful acts**. Such **wrongful act** must occur on or after the **retroactive date** and be in **your** performance of **Internet professional services**.

**COVERAGE––NAP C: DEFENSE COSTS, CHARGES AND EXPENSES**

(1)   *Our Duty To Defend Insureds*: We have the right and duty to defend a **suit** brought against any **insured** for covered **wrongful acts**, even if such **suit** is groundless or fraudulent. We have the right, with **your** written consent, to settle any **suit** (i) against an **additional insured** or a **leased worker**, or (ii) against **you**, if we believe that it is proper.

(2)   *Claim Expenses*: We shall pay for **claim expenses** any **insured** incurs with **our** prior written consent in the defense of a **suit** for covered **wrongful acts**.

(3)   *Our Rights To Investigate and Settle Claims*: We have the right, but not the duty, to investigate any **claim** against any **insured**. We have the right but not the duty, to settle any **claim** with **your** written consent (i) against an **additional insured** or a **leased worker**, or (ii) against **you**, if we believe that it is proper.

© 2003 American International Group, Inc.
All rights reserved.

IDH000468

79446 (5/03)                                    1

App. 400

(4) *Your Right To Settle:* **You** may settle any **claim** or **suit** to which this policy applies provided that **you** do so (i) on behalf of all **insureds**, and (ii) without incurring **loss** in excess of all applicable Retentions.

(5) *When Our Duty To Defend Ends:* **Our** duty to defend ends upon the exhaustion of the **policy limit of liability**, the applicable **sublimit of liability** or the **wrongful act limit of liability** by payment of **loss**, including **claim** expenses. **Our** duty to defend also ends if **you** fail or refuse to consent to a settlement **we** recommend and the claimant will accept, or if **you** violate any of the conditions set forth in the BASE Section, Subparagraph 8(a)(6) and Paragraphs 8(b) and 8(c). **You** must then defend the **claim** at **your** own expense. As a consequence of such failure or refusal, **our** liability for **loss** shall not exceed the amount for which **we** could have settled such **claim** had **you** consented, plus **claim** expenses incurred prior to the date of such failure or refusal.

4.    **BASE DEFINITIONS**

With respect to the coverage afforded under this Coverage Module, the definitions of the BASE Section are hereby amended as follows:

**"Advertising"** means material on the **Internet** in any publicity or promotion including branding, co-branding, sponsorships and/or endorsements on **your** own behalf or for others.

**"Additional insured"** shall mean the following, but only in the event and while **you** are also claimed against and such **claim** is pending against **you**:

(1)    any third-party distributors, licensees and sub-licensees in their provision of material for **Internet media**, but solely where an **organization** has, prior to the commission of a **wrongful act**, expressly agreed in writing to indemnify and defend such third party of and from liability arising out of such **wrongful act**; and

(2)    any other persons or entities who perform, disseminate or distribute **Internet media** and who are listed as an **"additional insured"** by endorsement to this Coverage Module or to the BASE Section.

**"Application,"** in addition to the definition in the BASE section, also includes all statements, information, representations and attachments made, prepared or provided by **you** with respect to any security assessment, whether on-line or off-line, conducted in connection with or involving a request for insurance under this policy.

**"Claim expenses," "damages"** and **"loss,"** shall also not mean, and this Coverage Module shall not cover any costs or expenses incurred by **you** or others to withdraw or recall **your Internet media** from the marketplace, or from loss of use arising out of such withdrawal or recall.

**"Computer attack"** means unauthorized access, unauthorized use, transmission of a **malicious code** or a denial of service attack that:

(1)    alters, copies, misappropriates, corrupts, destroys, disrupts, deletes, damages, or prevents, restricts, or hinders access to, a **computer system**;

(2)    results in the disclosure of private or confidential information stored on **your computer system**; or

(3)    results in **identity theft;**

whether any of the foregoing is intentional or unintentional, malicious or accidental, fraudulent or innocent, specifically targeted at you or generally distributed, and regardless of whether the perpetrator is motivated for profit.

**"Internet professional services"** means any of the following services selected and checked in an endorsement attached hereto and defined below, which **you** provide to others:

© 2003 American I
All rights reserved.

IDH000469

79446 (5/03)                    2

App. 401

(1)    "**Application service provider (ASP services)**," which means providing access to computer applications controlled by **you** for use by others through the **Internet**;

(2)    "**Domain name registration services**," which means the following services provided in order to facilitate navigation of the **Internet**: collecting, processing or maintaining information provided to **you** which is necessary for registering a domain name; registering a domain name; or accepting or maintaining a record of domain names in a database;

(3)    "**e-Commerce transaction services**," which means the following services provided on behalf of others through the **Internet**: processing electronic transactions; registering **Internet** users; or collecting or organizing information provided by **Internet** users, including demographic and transactional data;

(4)    "**Electronic exchange and auction services**," which means: the electronic matching of third-party buyers and third-party sellers of goods or services through the **Internet**; and providing **e-commerce transactions services** with respect to such buyers and sellers;

(5)    "**Internet hosting services**," which means: housing or maintaining physical control over others' computer file servers connected to the **Internet**; or providing storage of others' electronic data on **your computer systems** connected to the **Internet**, for the purpose of transmitting electronic data through the **Internet**;

(6)    "**Internet media services**," which means: the electronic publishing or display of material (including **advertising**) on an **Internet** site; or providing or maintaining of: instant messaging, web-conferencing, webcasting, **Internet**-based electronic mail, online forums, bulletin boards, list-serves or chat rooms;

(7)    "**Internet service provider (ISP services)**," which means providing direct access to the **Internet**;

(8)    "**Managed and network security services**," which means: reviewing, analyzing, or consulting with respect to written security policies intended to prevent a **computer attack**; analyzing, testing, or monitoring the **security** infrastructure or vulnerabilities of **computer systems**; implementing, managing or maintaining **security**; providing content filtering **security**; providing **security** patch administration; providing security audits; or preparing security assessment reports;

(9)    "**Public Key Infrastructure Services**," which means: developing, implementing, or managing public key infrastructure; registering, authenticating or validating the identities of users of public key infrastructure; issuing or managing electronic security credentials or digital certificates for message encryption; monitoring or maintaining the integrity or security of electronic information transmitted using public key infrastructure;

(10)   "**Search engine services**," which means providing search or navigational computer applications to allow others to locate electronic data through the **Internet**; or

(11)   "**Web portal services**," which means organizing, aggregating, or providing access to electronic data, material or any service described above (that has been selected and checked in an endorsement attached hereto) in this definition, through an **Internet** site commonly known as a "web portal."

"**Leased worker**" means a person provided by an employment contractor or agency under an agreement between the **named insured** and the employment contractor or agency to perform duties related to the conduct of the **named insured's Internet**-related business.

**MODULE DEFINITIONS**

NAP (a)    "**Assumed under contract**" means liability assumed by **you** in the form of hold

© 2003 American
All rights reserve

IDH000470

App. 402

harmless or indemnity agreements executed with any party, but only for **Internet media** displayed on **your Internet** site or material published or displayed by **you** in the rendering of **Internet media** services under NAP B.

NAP (b)     **"Covered peril"** means any:

(1)     form of defamation or other tort related to disparagement or harm to character, including, but not limited to, libel, slander, product disparagement or trade libel; or infliction of emotional distress, outrage or outrageous conduct directly resulting from the foregoing;

(2)     infringement of copyright, domain name, title, slogan, trademark, trade name, trade dress, mark, service mark or service name, or any form of improper deep-linking or framing; plagiarism or misappropriation of ideas under implied contract or other misappropriation of property rights, ideas or information; or

(3)     form of invasion, infringement or interference with rights of privacy or publicity, including, but not limited to, false light, public disclosure of private facts, intrusion and commercial appropriation of name, persona or likeness.

NAP (c)     **"Failure(s) of security"** means:

(1)     the actual failure and inability of the **security** of **your computer system** to mitigate loss from or prevent a **computer attack**; or

(2)     physical theft of hardware or firmware controlled by **you** (or components thereof) on which electronic data is stored, by a person other than an **insured**, from a premises occupied and controlled by **you**.

**"Failure(s) of security"** shall also include such actual failure and inability above, resulting from the theft of a password or access code by non-electronic means in direct violation of **your** specific written **security** policies or procedures.

NAP (d)     **"Identity theft"** means the misappropriation of personal identity information of **your** customers, members or employees that is stored on **your computer system**, including without limitation, social security numbers, account numbers, passwords, credit card numbers, addresses or phone numbers, and that has resulted in, or could reasonably result in the wrongful or fraudulent use of such information.

NAP (e)     **"Internet media"** means any material, including **advertising**, on **your Internet** site.

NAP (f)     **"Last termination date"** means the effective date of cancellation or expiration of the last professional or media liability policy that (1) provided the same or essentially the same coverage as such Coverage Module and (2) was issued by **us** or any other AIG member company to the **named insured** in a continuously renewed succession by **us** or any other AIG member company since the **first inception date**.

NAP (g)     **"Over-redemption"** means coupons, price discounts, prizes, awards or any other valuable consideration given in excess of the total contracted or expected amount.

NAP (h)     **"Professional services"** means **Internet professional services**.

NAP (i)     **"Security"** means hardware, software or firmware whose function or purpose is to mitigate loss from or prevent a **computer attack. Security** includes, without limitation, firewalls, filters, DMZ's, computer virus protection software, intrusion detection, the electronic use of passwords or similar identification of authorized users. **Security** also includes **your** specific written policies or procedures intended to directly prevent the theft of a password or access code by non-electronic means.

NAP (j)     **"Wrongful act"** means:

With respect to Coverage NAP A, and with respect to Coverage NAP B when rendering or failing to render **Internet media** services, any actual or alleged breach of duty,

© 2003 American
All rights reserv
IDH000471

App. 403

neglect, act, error, omission, misstatement or misleading statement that results in any **covered peril**.

With respect to Coverage NAP B, any actual or alleged breach of duty, neglect, act, error, misstatement, misleading statement, or omission in the rendering of or failure to render **Internet professional services** to others, including any of the foregoing that results in a **computer attack** to others.

NAP (k)     "**Your computer system**" means a **computer system** under the ownership, operation or control of the **organization**.

## 6.   BASE EXCLUSIONS

Exclusions in Subparagraph 4(b)(4) (antitrust and unfair competition) and Paragraphs 4(e) (intellectual property), 4(f) (**Internet professional services**), 4(g) (**computer attacks**), 4(h) (personal injury), 4(i) (false advertising), 4(l) (previously reported claims), 4(m) (known wrongful acts), 4(o) (retroactive date), 4(p) (contract liability) and 4(q) (contractual obligations) of the BASE Section are not applicable to this Coverage Module.

## 7.   MODULE EXCLUSIONS

This Coverage Module shall not cover any **claim**:

NAP (a)     alleging, arising out of or resulting, directly or indirectly, from any patent infringement;

NAP (b)     alleging, arising out of or resulting, directly or indirectly, from any misappropriation, theft, copying, display or publication of any **trade secret** by, or with active cooperation, participation, or assistance of, any **insured**, any of your former employees, subsidiaries, directors, officers, partners, trustees, or any of **your** successors or assignees;

NAP (c)     by any independent contractor, joint venturer, venture partner, any **employee** of the foregoing or any **employee** of an **insured** alleging, arising out of or resulting, directly or indirectly, from disputes over the (1) ownership or exercise of rights in material or (2) services supplied by such independent contractor, joint venturer, venture partner or **employee**;

NAP (d)     alleging, arising out of or resulting, directly or indirectly, from any liability or obligation under any contract or agreement including, without limitation, any contract price, cost guarantee or cost estimate being exceeded; provided, however, this exclusion does not apply to:

  (1)     liability an **insured** would have in the absence of such contract or agreement; or

  (2)     with respect to Coverage NAP A and NAP B for **Internet media services** only, liability **assumed under contract**;

NAP (e)     alleging, arising out of or resulting, directly or indirectly, from **over-redemption**;

NAP (f)     alleging, arising out of or resulting, directly or indirectly, from any of the following:

  (1)     any warranty, representation or guarantee; inaccurate, inadequate, or incomplete description of the price of goods, products or services; or any failure of goods, products or services to conform with an advertised quality or performance; or liquidated damages; or any failure to provide goods or products; or perform services within a specified time period, by a deadline or according to specified milestones; or the collection of or seeking the return of fees or royalties or other compensation paid to **you**; or the cost of providing, correcting, re-performing, or completing any services, including without limitation, **Internet professional services**; or the cost of providing, repairing, or replacing any product; or **your** fees, cost or profit guarantees, cost representations, contract price, or estimates of probable costs or cost estimates being exceeded;

© 2003 American I[          ]
All rights reserved.

IDH000472

App. 404

(2)    any intentional violation of **your privacy policy**; or

(3)    intentional, knowing or reckless misrepresentation in **advertising**, false **advertising**, or unfair or deceptive business practices, including, without limitation, violations of any local, state or federal consumer protection or privacy laws; however, with respect to Coverage NAP A only, we will defend **suits** alleging any of the foregoing conduct until there is a judgment, final adjudication, adverse admission or finding of fact against **you** as to such conduct, at which time **you** shall reimburse **us** for **claim expenses**; provided, however, **we** will not defend such **suits** if they allege any of the foregoing conduct that has been the subject of a criminal proceeding in which **you** have been found guilty, or pleaded *nolo contendere* or no contest;

**NAP (g)**    against **you** that is brought by or on behalf of:

(1)    the Federal Trade Commission ("FTC"), the Department of Health and Human Services ("HHS"), the Office of Civil Rights, ("OCR") the Federal Communications Commission ("FCC") or any other federal, state or local government agency; or

(2)    the American Society of Composers, Authors and Publishers, the Society of European Stage Authors and Composers, Broadcast Music, Inc., or any other licensing or rights organizations in such entity's regulatory, quasi–regulatory or official capacity, functions or duties;

**NAP (h)**    alleging or arising out of any circumstance or occurrence which have been reported to an insurer on, or is covered under, any other policy of insurance effective prior to the inception date of this policy; or alleging or arising out of the same **wrongful act** or series of continuous, repeated or related **wrongful acts** or alleging the same or similar facts, alleged or contained in any claim that has been reported, or any **wrongful act(s)** of which notice has been given, under any policy of which this policy is a replacement or succeeds in time;

**NAP (i)**    arising out of resulting, directly or indirectly, from any of the following a failure of telephone lines, data transmission lines, satellites or other infrastructure comprising or supporting the **Internet**, unless such lines or infrastructure were under **your** operational control;

**NAP (j)**    any **wrongful act**, circumstance or event committed or occurring prior to the **first inception date** if on or before the **first inception date**, **you** knew or could have reasonably foreseen that such **wrongful act**, circumstance or event could give rise to a **claim** against **you** or **loss**; provided, with respect to Coverages NAP A and NAP B for **Internet media** services only, if the **wrongful act** arises out of material which was initially disseminated or broadcast prior to the **first inception date**, and is disseminated or broadcast again after the **first inception date** and prior to the **last termination date**, then in such event, **our** maximum liability shall be limited to that portion of the total **loss** which the number of disseminations or broadcasts during the period of time on or after the **first inception date** and prior to the **last termination date** bears to the total number of disseminations or broadcasts upon which the **claim** is made;

**NAP (k)**    alleging, arising out of or resulting, directly or indirectly, from any antitrust violations, restraint of trade or unfair competition, including, without limitation, violations of the Sherman Act, the Clayton Act or the Robinson–Patman Act, or any other federal, state, local or foreign laws regulating the same or similar conduct;

**NAP (l)**    solely with respect to Coverage NAP B, made against an **insured** alleging, arising out of or resulting, directly or indirectly, from any **wrongful act** based upon, relating to or in connection with any act, error or omission occurring, committed or omitted prior to the applicable **retroactive date**; or

© 2003 American I(
All rights reserved.

IDH000473

79446 (5/03)                                    6

App. 405

NAP (m)    alleging, arising out of or resulting, directly or indirectly, from any **failure of security of your computer system.**

**LIMIT OF LIABILITY (FOR ALL LOSS – INCLUDING CLAIMS EXPENSES),** sub-paragraph 5(a) of the BASE Section, is hereby amended by appending the following to the end of that paragraph:

(9)    With respect to a claim covered under Coverage NAP A, the **policy limit of liability** and applicable **sublimits of liability** and AIG policy providing the same or essentially the same coverage as this Coverage NAP A, issued by **us** (or any other AIG member company) to the named **insured,** and in effect when the first such **wrongful act** took place after the **first inception date,** shall be the only **policy limit of liability,** applicable **sublimits of liability** and policy that shall apply.

## 9.    INSPECTION RIGHTS

**We** may make audits, inspections or surveys at any time, and we may give **you** reports on the conditions **we** find, and recommend changes. Any inspections, surveys, reports or recommendations relate only to insurability, terms, conditions and the premiums to be charged; such inspections, surveys, reports or recommendations will be treated as confidential by **you. We** do not make safety inspections or undertake to perform the duty of any person or organization to provide for the safety of workers or the public. **We** do not warrant conditions or warrant that conditions comply with laws, regulations, codes or standards. This paragraph applies not only to **us,** but also to any outside consultant who makes inspections, surveys, reports or recommendations for the purpose of underwriting and offering insurance.

## 10.    BASE CONDITION

Solely with respect to this Coverage Module, Paragraph 8(b) of the BASE Section is amended to read as follows:

(b)    No **insured** shall admit any liability, assume any financial obligation or pay any money in connection with any **claim** without **our** prior consent. If any **insured** does, it will be at such **insured's** own expense. The foregoing sentences of this Paragraph 8(b) shall not apply to a settlement pursuant to Coverage C(4) of the NAP Module so long as such **insured** provides **us** written notice of such settlement as soon as practicable, but in no case later than thirty (30) days after such settlement is reached in principle.

## 11.    ASSISTANCE AND COOPERATION

In addition to the requirements of Paragraph 8(a) of the BASE Section, **WHAT YOU MUST DO IN THE EVENT OF A CLAIM,** each insured shall take such actions that, in such **insured's** reasonable judgment, are deemed necessary and practicable to prevent, discontinue or limit the utterance or dissemination of material that is erroneous, false or untrue.

<End of Module>

© 2003 American
All rights reserved

IDH000474

App. 406

**ENDORSEMENT# 1**

This endorsement, effective ~~12:01 am~~ ~~December 22, 2004~~ forms a part of policy number *884-65-15*.
issued to *INTERDIGITAL COMMUNICATIONS CORPORATION*

by    *American International Specialty Lines Insurance Company*

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

TERRORISM EXCLUSION

(WITH AN EXCEPTION FOR CERTIFIED ACTS OF TERRORISM

UNDER THE TERRORISM RISK INSURANCE ACT OF 2002)

This insurance does not apply to loss, injury, damage, claim or suit, arising directly or indirectly as a result of or in connection with "terrorism" including but not limited to, any contemporaneous or ensuing loss caused by fire, looting or theft.

DEFINITION – The following definition of terrorism shall apply:

"Terrorism" means the use or threatened use of force or violence against person or property, or commission of an act dangerous to human life or property, or commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in any connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm:

(1) A government;
(2) The civilian population of a country, state or community; or
(3) To disrupt the economy of a country, state or community.

This exclusion does not apply to a certified "act of terrorism" defined by Section 102. Definitions, of the Terrorism Risk Insurance Act of 2002 and any revisions or amendments. For purposes of this endorsement and in compliance with the Terrorism Risk Insurance Act of 2002, an "act of terrorism shall mean:

(1)    Act of Terrorism –

(A)    Certification. – The term "act of terrorism" means any act that is certified by the Secretary of the Treasury of the United States, in concurrence with the Secretary of State, and the Attorney General of the United States --

(i)    to be an act of terrorism;
(ii)    to be a violent act or an act that is dangerous to --
(I)    human life;
(II)    property; or
(III)    infrastructure;
(iii)    to have resulted in damage within the United States, or outside of the United States in the case of --
(I)    an air carrier or vessel described in paragraph (5)(B); [for the convenience of this endorsement, paragraph (5)(B) reads: occurs to an air carrier (as defined in Section 40102 of title 49, United States Code) to a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid

*END 001*

IDH000475

App. 407

<u>ENDORSEMENT# 1</u>     (continued)

and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs, or at the premises of any United States mission );

(II)     the premises of a United States mission; and

(iv)     to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

(B)     Limitation. — No act shall be certified by the Secretary as an act of terrorism if —

(i)     the act is committed as part of the course of a war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or

(ii)     property and casualty insurance losses resulting from the act, in the aggregate, do not exceed $5,000,000.

(C)     Determinations Final. — Any certification of, or determination not to certify, an act as an act of terrorism under this paragraph shall be final, and shall not be subject to judicial review.

(D)     Nondelegation. — The Secretary may not delegate or designate to any other officer, employee, or person, any determination under this paragraph of whether, during the effective period of the Program, an act of terrorism has occurred.

All other terms and conditions of the policy are the same.

_____

AUTHORIZED REPRESENTATIVE

Or Countersignature (In states where applicable)

***END 001***

81288 (12/02)     Page 2 of 2     IDH000476

App. 408

DEC 20 04   12:38pm   From-AIG SERVICE CENTER          215-255-6541       T-860   P.001   F-155

 AMERICAN INTERNATIONAL COMPANIES®    88 4-65-15

Name of insurance company to which Application is made (the "Insurer")

## AIG ProTech® Renewal Application

NOTICE: THE POLICY PROVIDES THAT THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGEMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR LEGAL DEFENSE. FURTHER NOTE THAT AMOUNTS INCURRED FOR LEGAL DEFENSE SHALL BE APPLIED AGAINST THE RETENTION AMOUNT.

NOTICE: IF A POLICY IS ISSUED, IT WILL BE ON A CLAIMS-MADE BASIS.

Named Applicant: InterDigital Communications Corporation Telephone: 610-878-7800

Address:          781 Third Avenue                        Facsimile: 610-878-7842

                  King of Prussia, PA 19406

Primary Web Page: www.interdigital.com

Contact Person: Richard J. Fagan                Title: Chief Financial Officer

e-mail:         richard.fagan @ interdigital.com

If applying for coverage for multiple entities, please attach a list of all such entities, describe their relationships to each other and indicate their places of formation. Where not apparent from entity name, please indicate entity type. ☐ List Attached ☐ Not Applicable

Please select the coverages desired and complete the corresponding application section:

| | | | |
|---|---|---|---|
| GENERAL INFORMATION | Section GI | ☑ | (Required) |
| TECHNOLOGY ERRORS AND OMISSIONS | Section TECH | ☒ | (Optional) |
| TELECOMMUNICATIONS LIABILITY | Section TEL | ☐ | (Optional) |
| MEDIA LIABILITY | Section MEDIA | ☐ | (Optional) |
| MISCELLANEOUS PROFESSIONAL LIABILITY | Section MPL | ☐ | (Optional) |
| AIG netADVANTAGE® | Section NA | | |
|   AIG netADVANTAGE, or | | ☑ | (Optional) |
|   AIG netADVANTAGE PROFESSIONAL | | ☐ | (Optional) |
| ADDITIONAL SECTIONS: 1. | | ☑ | (Optional) |
|                      2. | | ☑ | (Optional) |
| QUESTIONS APPLICABLE TO ALL SECTIONS | Section CLS | ☑ | (Required) |

INSTRUCTIONS: This application is divided into sections so you can apply for the coverage desired without having to answer questions that do not apply. In the box above, please indicate the coverages for which you are applying. At a minimum, Sections GI, CLS and at least one of the optional sections must be fully (all required attachments provided) completed. Such Sections, their respective attachments and any other related information or documentation you provide will constitute a single "Application."

The words "you," "your" and "Applicant(s)" refer to the Named Applicant and all the other entities applying for coverage. If your answer to any question in this Application requires additional space, please complete your answer on an attachment.

- Cover -

81367 (11/03)

IDH000477

App. 409

FROM-ATC SERVICE CENTER                    215-255-6541          T-860   P.002   F-155

Named Applicant _____          Date _____

**RENEWAL APPLICATION**
**Section GI**
**GENERAL INFORMATION**

(To be completed by all Applicants)

GI-1.  Describe any changes to your business activities over the past year and any anticipated changes to same, and list all applicable SIC Codes:

6794, 7373

InterDigital architects, designs and provides advanced wireless technologies and products that drive voice and data communications. The Company offers technology and product solutions for mainstream wireless applications that deliver time-to-market advantages for its customers. InterDigital has a strong portfolio of patented technologies covering 2G, 2.5G, 3G and 802 standards, which it licenses worldwide. In addition, InterDigital is developing proprietary technology and product solutions to enhance the performance of wireless products. In 2003, $113.6 million of InterDigital's $114.6 million in total revenue related to royalties paid under patent license agreements.

GI-2.  Aggregate revenues most recent fiscal year $ 1 million _____ and projections for the following fiscal year $ 0 _____ (Use actual where available, expected otherwise).
(See note below)

GI-3.  Percent of such revenues from foreign sales: last year ____% next year ____%.

GI-4.  Have you entered into any new contracts over the course of the last year?
☑ Yes (Contract(s) Attached) ☐ No.

If "Yes," please indicate with respect to each contract (Attach a separate sheet if necessary):

• Duration: 3 years

• Size of Contract: Approximately six million

• Outside Consultants/Contractors: We have entered into a tentative agreement to provide a reference design, software and software maintenance. We expect to finalize the agreement in Dec. 04

GI-5.  Attach a list of all contracts that are more than 30 days past customer acceptance. As to each, please indicate: (i) contract size; (ii) length of original contract; and (iii) remediation steps taken. ☐ Attached ☐ Not Applicable

None.

*NOTE: The amounts listed above reflect the Company's technology product and service revenues. The Company also reported $113.6 million of revenue related to patent license royalties in 2003, as well as nearly all of its $70 million in revenue for the first nine months of 2004.

GI-1

8I-368 (4/03)

IDH000478

App. 410

Named Applicant _____    Date _____

**RENEWAL APPLICATION**
**Section CLS**
**QUESTIONS APPLICABLE TO ALL SECTIONS**
(To be completed by all Applicants)

CLS-1.    Please indicate desired policy limit and retention.

| | | | Policy Limit of Liability | |
| Alternative | Retention | Co-Insurance | Per Wrongful Act | Aggregate |
|---|---|---|---|---|
| 1 | 500,000 | – | 5,000,000 | 5,000,000 |
| 2 | 750,000 | – | 5,000,000 | 5,000,000 |
| 3 | 1,000,000 | – | 5,000,000 | 5,000,000 |

| | | | ATTACHMENTS CHECKLIST | |
| Applicable | Not Applicable | Question No. | Attachment | |
|---|---|---|---|---|
| ☐ | ☐ | Cover | List of all entities proposed for coverage, describe their relationships to each other, and indicate their places of formation. | |
| ☐ | ☐ | GI-4 | Any new contracts entered into over the course of the last year. | |
| ☐ | ☐ | GI-5 | List of all contracts that are more than 30 days past customer acceptance. As to each, please indicate: (i) contract size; (ii) length of original contract; and (iii) remediation steps taken. | |
| ☐ | ☐ | GI-7 | List of Applicants' five largest projects during the last three years. As to each, please indicate: (i) contract size; (ii) length of project; and (iii) services/products provided. | |
| ☐ | ☐ | TECH-4 | Applicant's policies and procedures for ensuring that it owns or has licensed any new software code it began to produce, manufacture or market during the last year, and that such code does not infringe any intellectual property rights of others. | |
| ☐ | ☐ | TEL-4 | Description of your tariff filing policies and procedures as amended during the last year. | |
| ☐ | ☐ | TEL-5 | Details of any tariff filings or protections that have been disallowed, rejected or waived. | |

Continued on Next Page

NOTE: The contract referred to in GI-4 has not yet been issued.
NOTE: See 2001 10Q (Pages 6,7,8,11,12) and 10Q for the nine months ended September 30, 2002.

CLS-1

A1378 (1/03)

IDH000479

App. 411

Dec-28-04    12:38pm    From-AIG SERVICE CENTER    215-255-6541    T-580    P.004/014    F-155

Named Applicant _____    Date _____

## ATTACHMENTS CHECKLIST (CONTINUED)

| Attached | Not Applicable | Question No. | |
|---|---|---|---|
| ☐ | ☒ | MEDIA-3 | Describe the changes during the last year to the Applicant's methods for avoiding (vetting) for potential infringement of copyrights, trademarks, service marks and other intellectual property. |
| ☐ | ☒ | MEDIA-4 | Any qualified opinions that an intellectual property infringement may exist and description of remedial efforts. |
| ☐ | ☒ | MEDIA-5 | Describe the changes during the last year to the Applicants' procedures for handling controversial, potentially offensive or infringing material and any related agreements with third parties. |
| ☐ | ☒ | NA-4 | Applicant's methods for avoiding (vetting) potential infringement of copyrights, trademarks, service marks and other intellectual property. As to each such IP type, please indicate: (i) who provides the review, (ii) what employee related policies are in place, and (iii) if outside counsel is involved, the name(s) of such counsel. |
| ☐ | ☒ | NA-5 | Any qualified opinions that an intellectual property infringement may exist and description of remedial efforts. |
| ☐ | ☒ | NA-6 | Applicants' procedures for handling controversial, potentially offensive or infringing material on your web site or web sites you manage and any related agreements with third parties. |
| ☐ | ☒ | NA-8 | Standard contracts with customers and other content providers and any agreements with third parties that contribute to 5% or more of your Internet related revenues. |
| ☐ | ☒ | NA-20 | List of software and service providers used and copies of your contracts with the vendors who provide designated services to you. |
| ☐ | ☒ | NA-22 | Contracts with outsourced Internet, network or computers service providers as indicated. |
| ☐ | ☒ | NA-24 | Your written warranties or indemnities regarding your Internet services, network or computer operations. |
| ☐ | ☒ | NA-25 | Written warranties or indemnities you receive regarding Internet services provided to you, your network or your computer operations. |
| ☒ See 2003 10K | ☐ | NONE | Most recent audited financial statements (i.e. annual report, 10k, pro-forma). If none are audited, then most recent statements. |
| ☒ | ☐ | NONE | Descriptive promotional materials (advertising brochures) that have been produced or amended in the past twelve months. |

CLS-2

83373 (6/03)

IDH000480

App. 412

Dec-28-04   12:38pm   From-AIG SERVICE CENTER          215-255-6541          T-860   P.005/014   F-155

Named Applicant _____          Date _____

ALL WRITTEN STATEMENTS, SUPPLEMENTAL APPLICATIONS AND MATERIALS FURNISHED TO THE INSURER IN CONJUNCTION WITH THIS APPLICATION ARE HEREBY INCORPORATED BY REFERENCE INTO THIS APPLICATION AND MADE A PART HEREOF.

THE UNDERSIGNED AUTHORIZED OFFICER OF THE APPLICANT DECLARES THAT THE STATEMENTS SET FORTH HEREIN AND THE INFORMATION PROVIDED BY ATTACHMENT HERETO ARE TRUE. THE UNDERSIGNED AUTHORIZED OFFICER AGREES THAT IF THE INFORMATION SUPPLIED ON THIS APPLICATION (INCLUDING INFORMATION PROVIDED BY ATTACHMENT HERETO) CHANGES BETWEEN THE DATE OF THIS APPLICATION AND THE EFFECTIVE DATE OF THE INSURANCE, HE/SHE (UNDERSIGNED) WILL, IN ORDER FOR THE INFORMATION TO BE ACCURATE ON THE EFFECTIVE DATE OF THE INSURANCE, IMMEDIATELY NOTIFY THE INSURER OF SUCH CHANGES, AND THE INSURER MAY WITHDRAW OR MODIFY ANY OUTSTANDING INDICATIONS, QUOTATIONS AND/OR AUTHORIZATIONS OR AGREEMENTS TO BIND THE INSURANCE.

THE SIGNING OF THIS APPLICATION DOES NOT BIND THE APPLICANT OR THE INSURER TO COMPLETE THE INSURANCE, BUT IT IS AGREED THAT THIS APPLICATION SHALL BE THE BASIS OF THE CONTRACT SHOULD A POLICY BE ISSUED, AND IT WILL BE ATTACHED TO AND BECOME PART OF THE POLICY.

NOTICE TO ARKANSAS APPLICANTS: "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

NOTICE TO COLORADO APPLICANTS: "IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICYHOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICYHOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AUTHORITIES."

NOTICE TO DISTRICT OF COLUMBIA APPLICANTS: "WARNING: IT IS A CRIME TO PROVIDE FALSE OR MISLEADING INFORMATION TO AN INSURER FOR THE PURPOSE OF DEFRAUDING THE INSURER OR ANY OTHER PERSON. PENALTIES INCLUDE IMPRISONMENT AND/OR FINES. IN ADDITION, AN INSURER MAY DENY INSURANCE BENEFITS IF FALSE INFORMATION MATERIALLY RELATED TO A CLAIM WAS PROVIDED BY THE APPLICANT."

NOTICE TO FLORIDA APPLICANTS: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY IN THE THIRD DEGREE."

NOTICE TO KENTUCKY APPLICANTS: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME."

NOTICE TO LOUISIANA APPLICANTS: "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE

CLS 3

81373 (6/03)

IDH000481

App. 413

From AIG SERVICE CENTER                215-255-6541          T-860   P.006/014   F-155

Named Applicant _____     Date _____

INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

NOTICE TO MAINE APPLICANTS: "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS."

NOTICE TO NEW JERSEY APPLICANTS: "ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES."

NOTICE TO NEW MEXICO APPLICANTS: "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES."

NOTICE TO NEW YORK APPLICANTS: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION."

NOTICE TO OHIO APPLICANTS: "ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD."

NOTICE TO OKLAHOMA APPLICANTS: "WARNING: ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY (365 O.S. 1981 1613.1)."

NOTICE TO PENNSYLVANIA APPLICANTS: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES."

NOTICE TO TENNESSEE APPLICANTS: "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS."

NOTICE TO VIRGINIA APPLICANTS: "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS."

Signed on behalf of the Named Insured and all other Applicants

By _____     Date _____

Title _____

Organization _____     (Organization's Seal)

| MUST BE SIGNED BY THE CHAIRMAN OF THE BOARD OR |
| PRESIDENT OF THE NAMED APPLICANT |

IDH000482

App. 414

215-255-6541    T-860   P.007/014   F-155

Named Applicant _____    Date _____

Attest _____    (Broker)

Brokerage _____    License Number _____

Address _____

Please read the following statement carefully and sign where indicated. If a policy is issued, this signed statement will be attached to the policy.

The undersigned authorized officer of the Named Applicant hereby acknowledges that he/she is aware that the Limit of Liability contained in this policy shall be reduced, and may be completely exhausted by the costs of legal defense and in such event, the Insurer shall not be liable for the costs of legal defense or for the amount of any judgment or settlement to the extent that such exceeds the Limit of Liability of this policy.

The undersigned authorized officer of the Named Applicant hereby further acknowledges that he/she is aware that legal defense costs that are incurred shall be applied against applicable retention amount.

By _____    Date _____

Title _____

Organization _____    (Organization's Seal)

> MUST BE SIGNED BY THE CHAIRMAN OF THE BOARD OR
> PRESIDENT OF THE NAMED APPLICANT

© 2003 American International Group, Inc. All rights reserved. This form may be copied solely in connection with the placement of insurance with an AIG member company.

CLS 5

87373 (1/03)

IDH000483

App. 415

Named Applicant _____    Date _____

**RENEWAL APPLICATION**
**Section TECH**
**TECHNOLOGY ERRORS & OMISSIONS**
**HARDWARE, SOFTWARE & RELATED SERVICES**

*(Optional Coverage)*

TECH-1.  Describe any changes to your technology services over the last year and any anticipated changes to same.

See attached press release from October 7, 2004 announcing our unveiling of adaptive interference management products.



Technology errors & omissions coverage will not be provided for business activities not specifically disclosed in response to this question and that are not listed on any application for any previous AIG financial policy issued by the Insurer of which this proposed insurance is a renewal.

TECH-2.  Indicate the amount of the revenues reported in Question GI-2 of this Application which are derived from technology products and services.
Most recent fiscal year $ 1 million   next fiscal year $ 0

TECH-3.  Has the percentage of such recent fiscal year's revenues derived from technology products and services changed from last year? ☐ Yes   ☒ No
If "Yes," explain below.

_____
_____
_____

TECH-4.  Has the Applicant obtained any new software code? ☐ Yes ☒ No
If "Yes," attach a copy of the Applicant's policies and procedures for ensuring that it owns, or has licensed any and all of the software code you produce, manufacture or market, and that such code does not infringe any intellectual property rights of others.

TECH 1

83369 (1/03)

IDH000484

App. 416

Named Applicant _____                    Date _____

TECH-5.   Have the Applicant's policies and procedures for product quality control and recall changed from last year? ☐ Yes ☐ No. If "Yes," describe the changes below.

_____

_____

_____

_____

TECH-6.   Identify your mission critical suppliers, but only if such suppliers have changed during the policy period of the insurance policy of which this proposed insurance would be a renewal.

_____

TECH 2

84369 (1/03)

IDH000485

App. 417

Named Applicant _____    Date _____

**Section NA
AIG netADVANTAGE℠
AIG netADVANTAGE PRO℠
INTERNET ERRORS & OMISSIONS**

*(Optional Coverage)*

NA-1.   Indicate the amount of revenues reported in Question GI-2 of this Application derived from Internet professional services:
Most recent fiscal year $ _____   next fiscal year $ _____

NA-2.   What percent of your GI-2 revenues are derived from e-commerce sales of goods?
Most recent fiscal year $ _____   next fiscal year $ _____

NA-3.   Please provide the average number of unique visitors to your site per day. _____

*MEDIA*

NA-4.   With respect to web site content, for each Applicant, please describe Applicant's methods for avoiding (vetting for) potential infringement of copyrights, trademarks, service marks and other intellectual property. As to each such IP type, please indicate; (i) who provides the review, (ii) what employee related policies are in place, and (iii) if outside counsel is involved, the name(s) of such counsel.
☐ Attached

NA-5.   In the event any of Applicants' products or material have been the subject of a qualified opinion that an intellectual property infringement may exist, please (i) attach such opinion(s) and (ii) describe remedial efforts.
☐ Attached ☐ Not Applicable

NA-6.   Please attach a description of Applicants' procedures for handling controversial, potentially offensive or infringing material on your web site or web sites you manage and any agreements with third parties for handling same.
☐ Attached ☐ Not Applicable

NA-7.   Do your agreements with the developer(s) of your web site and any consultants providing material for your web site provide that you own the intellectual property rights to the content and business methods incorporated into the web site?
☐ Yes ☐ No?

NA-8.   Please attach copies of your standard contracts with customers and other content providers (i.e. authors, advertisers, advertising agencies, independent producers and sponsors) and any agreements with third parties that contribute to 5% or more of your Internet related revenues. ☐ Attached

- NA-1 -

78738 (8/01)

IDH000486

App. 418

Dec 20-04   12:40pm   From-AIG SERVICE CENTER        215-255-6541      T-860  P.011/014  F-195

Name of Applicant _____    Date _____
Professional Services

NA-9.   Please provide the percentage of Question NA-1 recent fiscal year's revenues
        derived from the following services:

| Activity | Of NA-1 Revenue | U.S./ Can. | U.K. | Non- U.K. Europe | All Others |
|---|---|---|---|---|---|
| Web site | | | | | |
|   Design | % | % | % | % | % |
|   Management | % | % | % | % | % |
|   Hosting | % | % | % | % | % |
| Web directories | % | % | % | % | % |
| Search engines | % | % | % | % | % |
| Internet access provider | | | | | |
|   No content | % | % | % | % | % |
|   Content, no other services | % | % | % | % | % |
|   Content, e-mail, BBS &: chat | % | % | % | % | % |
| Security | | | | | |
|   Software – firewall, intrusion detection, anti-virus or other network security | % | % | % | % | % |
|   Consultants | % | % | % | % | % |
|   Digital certificates, PKI or encryption software or services | % | % | % | % | % |
| Internet related software - other | | | | | |
|   Pre-packaged | % | % | % | % | % |
|   Custom solutions | % | % | % | % | % |
| Internet related consulting-other | % | % | % | % | % |
| Other Internet services (attach description) | % | % | % | % | % |

NA-10.   Please provide the percentage of Question NA-1 revenues derived from the following
         market segments:

| | Gov't | Financial Institutions | Health Care /Medical | Other Commercial | All Others |
|---|---|---|---|---|---|
| Most recent fiscal year | % | % | % | % | % |
| Next fiscal year | % | % | % | % | % |

NA-2

78738 [8/01]

IDH000487

App. 419

Dec-28-04   12:41pm   From-AIG SERVICE CENTER            215-255-6541         T-860   P.012/014   F-155

Named Applicant _____          Date _____

NA-11.   Do you provide original content? ☐ Yes ☐ No

NA-12.   Please provide the information indicated.

| No. of Your Web site Subscribers | | Capacity for Subscribers | |
|---|---|---|---|
| Last FY | Next FY | Last FY | Next FY |
| | | | |

NA-13.   Check all that apply.

| Internet Service/Activity | Managed By | | Frequency | | | | |
|---|---|---|---|---|---|---|---|
| | You | Others | No/ None/ Never | Daily | Weekly | Monthly | Other (Attach details.) |
| Bulletin board/chat room services at your website | ☐ | ☐ | ☐ | | | | |
| Remove any posting at your sole discretion and Internet Service Provider agreement allows you to do so | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | |
| Edit the content of your bulletin board/chat room | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Edit or censor the material contained on your web site or Internet service in any way | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Scan websites for viruses | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | |
| Update the content of your web site or Internet service | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

NA-14.   Do you make representations that you review, edit or censor the material contained on your web site or Internet service in any way? ☐ Yes ☐ No.

NA-15.   Do you provide content for a web site on the behalf of a client? ☐ Yes ☐ No.

NA-16.   Do clients approve material you provide before it is published on the Internet? ☐ Always ☐ Mostly ☐ Sometimes ☐ Rarely ☐ No

NA-17.   Are credit card transactions conducted on your web site or Internet service? ☐ Yes ☐ No

NA-18.   Does your web site contain materials designed to be downloaded? ☐ Yes ☐ No

NA-19.   Would you like professional liability coverage to include claims arising out of failures to a network or your web site? ☐ Yes ☐ No

*If you answered "No" to Question NA-19, you have completed this Section. Otherwise, please continue on the next page.*

- NA 3 -

78738 (8/01)

IDH000488

App. 420

Named Applicant                                              Date

**Network Security**

NA-20.      Check all that apply:

| Security Feature/Procedure | Implemented | | | Frequency of Updates/Backups | | | |
|---|---|---|---|---|---|---|---|
| | Not | Partially | Fully | Daily | Weekly | Monthly | Other (Attach details.) |
| Firewalls used to prevent unauthorized access connections from external networks and computer systems to internal networks | ☐ | ☐ | ☐ | | | | |
| Remote users authenticated before being allowed to connect to internal network and computer systems | ☐ | ☐ | ☐ | | | | |
| Anti-virus procedures and protections used on desktops and mission critical servers | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Backup and recovery procedures documented and implemented for: | | | | | | | |
|    All mission critical systems | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
|    Your web site | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
|    Data and information assets | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Special privileges restricted to primary and backup system administration personnel | ☐ | ☐ | ☐ | | | | |
| Continuity plans in place for mission critical business processes | ☐ | ☐ | ☐ | | | | |
| Network and computer systems monitored | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Internal security and privacy policy | | | | | | | |

NA-21.      For each of the Security Features/Procedures above that you have implemented either "partially" or "fully," attach a list of the software and, where applicable, the service provider used and copies of your contracts with the vendors who provide such services to you. ☐ Attached ☐ Not applicable

NA-22.      Describe the user authentication process or applications you utilize in connection with your e-business.

NA-4

78298(10/01)

IDH000489

App. 421

Name of Applicant _____                                          Date

NA-23    For critical Internet, network or computers services that you outsource, please
provide the information indicated.

| Outsource Service | Service Provider(s) | Contract/Service Level Agreement | |
|---|---|---|---|
| | | Attached | N/A |
| Hosting Facility | | ☐ | ☐ |
| Firewall Maintenance | | ☐ | ☐ |
| Server Maintenance | | ☐ | ☐ |
| Intrusion Detection | | ☐ | ☐ |
| Managed Security Type: Scope: | | ☐ | ☐ |
| Application/Software | | ☐ | ☐ |
| Data Storage | | ☐ | ☐ |
| Other (attach description) | | ☐ | ☐ |

NA-24    Name any organizations providing you with CERT or SAIC Advisories, or similar
notification:

NA-25    Attach copies of your written warranties or indemnities regarding your Internet
services, network or computer operations. ☐ Attached ☐ Not applicable

NA-26    Attach copies of written warranties or indemnities you receive regarding Internet
services provided to you, your network or your computer operations.
☐ Attached ☐ Not applicable

NA-27    Has there been any change in ownership or senior management (including Chief
Information Officer) in the past year? ☐ Yes ☐ No

NA-28    Do you have a full time, dedicated Director of Information Security or equivalent? ☐
Yes ☐ No

NA-5

78735 (8/01)

IDH000490

App. 422

# EXHIBIT  K



RENEWAL
SCHEDULE OF FORMS / ENDORSEMENTS

| Policy No.: | Policy Term: | Date of Issue: |
|---|---|---|
| EX55100533 | From: December 22, 2004   To: December 22, 2005 | 01/04/05 |
| | 12:01 A.M. STANDARD TIME AT THE INSURED'S ADDRESS AS SHOWN ON THIS DOCUMENT | |

Insured:

Interdigital Communications Corporation, Inc.

781 3rd Avenue
King of Prussia, PA 19406-1409

| Number/Name | Title |
|---|---|
| RENDEC | Renewal Declarations Page |
| NOTICE | What To Do For Claims |
| BNI | Broad Named Insured |
| MEP | Minimum Earned Premium |
| TERRITOR | Amended Coverage Territory |
| SOL77882 | 77882 Schedule of Limits |
| 77882 | Foreign Comm General Liability |
| 80986WR | EX-Nuclear Energy Liability |
| 80979 | Foreign Comm Liab Recognition |
| 78990 | Emp Benefits Liab Claims Made |
| PORTCOMM | EX-Portable Comm Devices |
| 64003WS | EX-Silicosis |
| 79034 | EX-Telecommunication Equip/Serv |
| SOL48007 | 48007 Schedule of Limits |
| 48007 | Foreign Comm Auto Liability |
| ALPHYDMG | Auto Physical Damage Dec |
| ALPHYDMGFORM | Auto Physical Damage Form |
| EDIC | Excess/Difference Conditions |
| ME | Mobile Equipment |
| 83808 | EX - Airside Liability Premises |
| SOL48011 | 48011 Schedule of Limits |
| 48011 | Foreign Voluntary WC and EL |
| AMEND 6 | Amend Exclusion 6 |
| NAD01WR | Emp Classification Definitions |
| WCED | Endemic Disease |
| NAD19WR | Excluded Jurisdictions |
| EFLY | Flight Limitation |
| WCWAR | War and Terrorism |
| SOL48013 | 48013 Schedule of Limits |
| FCPSCH | 48013 Schedule of Locations |
| 48013 | Foreign Comm Property Insurance |
| TERRPROP | Commercial Property Territory |
| EBI | Business Interruption |
| CYBER | Data Recognition (Property) |
| 48015 | Extra Expense Insurance |
| PROPEX 11-02 | EX - Commercial Property |
| 82858 | EX - Fungus, Mold(s), Mildew |
| 82859 | EX - Venezuelan Civil Commotion |
| NMA2918 | EX - War And Terrorism |
| FL 06-02 | Flood Endorsement |
| PROPY2K | Property Millennium Endorsement |
| SOL48003 | 48003 Schedule of Limits |

Page 1 of 2

IDH000410

App. 423



**RENEWAL**
**SCHEDULE OF FORMS / ENDORSEMENTS**
**(CONTINUED)**

| Policy No.: | Policy Term: | | Date of Issue: |
|---|---|---|---|
| EX55100533 | From:    December 22, 2004        To:    December 22, 2005 | | 01/04/05 |
| | 12:01 A.M. STANDARD TIME AT THE INSURED'S ADDRESS AS SHOWN ON THIS DOCUMENT | | |

Insured:

Interdigital Communications Corporation, Inc.

781 3rd Avenue
King of Prussia, PA  19406-1409

| Number/Name | Title |
|---|---|
| 48003 | Travel Accident & Sickness |
| 48004 | Assist Services |
| SOL48017 | 48017 Schedule of Limits |
| 48017 | Dishonesty, Disappearance & Dest |

Page 2 of 2

IDH000411

App. 424



THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA
A CAPITAL STOCK COMPANY (HEREIN CALLED THE COMPANY)
AS THEIR RESPECTIVE COVERAGES MAY APPEAR
MEMBERS OF THE AMERICAN INTERNATIONAL GROUP, INC,
EXECUTIVE OFFICES: 70 PINE STREET, NEW YORK  NY  10270

# RENEWAL DECLARATIONS

| Expired Policy No.: | Renewal Policy No.: | Policy Term: |
|---|---|---|
| EX55100345 | EX55100533 | From:  December 22, 2004    To:  December 22, 2005 |
| | | 12:01 A.M. STANDARD TIME AT THE INSURED'S ADDRESS AS SHOWN ON THIS DOCUMENT |

**Named Insured:**

Interdigital Communications Corporation, Inc.

781 3rd Avenue
King of Prussia, PA  19406-1409

| SIC Code & Description: | Client Number: | Form of Business: |
|---|---|---|
| 7373  Computer Systems Design Service | 000000057207953 | Organization |

The Renewal Declarations renews the policy or renewal declarations number shown above ("Expired Policy No.") for the renewal Policy Period shown above.  Except as may be indicated otherwise, it provides a new  Limit of Liability.  This Renewal Declarations shall replace the Declarations Page of the Expiring Policy for the renewal Policy Period.  The terms, conditions, and exclusions of the Expiring Policy and any additional endorsements attached hereto shall apply to the renewal Policy Period.

For the purposes of coverage afforded during the renewal Policy Period, the term "policy" shall mean the Expired Policy (including any endorsements attached thereto) as amended by this Renewal Declarations together with any  endorsements attached to this Renewal Declarations.

For the purposes of coverage afforded during this renewal Policy Period, the term "Declarations" or "Declarations Page" as used in the policy shall mean the "Renewal Declarations" or "Renewal Declarations Page."

For the purposes of coverage afforded during this renewal Policy Period, the term "Renewal Policy No." as used in the policy shall mean the "Policy No."

## ATTACH THIS DECLARATIONS TO YOUR EXPIRING POLICY

Policy Currency  X  US$     Cdn$; all premiums and all amounts indicated on all schedules, policies, forms, and endorsements shall be deemed to be in the currency indicated by the checked box unless another currency is expressly indicated.

**Coverages:**                                                                    **Premium:**

Foreign Commercial General Liability                                              $3,060.00
Foreign Commercial Automobile Liability                                          $450.00
Foreign Voluntary Workers' Compensation/Employer's Liability                    $10,453.00
Foreign Commercial Property Liability                                            $2,975.00
Travel Accident and Sickness                                                     $1,573.00
Comprehensive Dishonesty, Disappearance and Destruction                          $250.00
                                              Total (US):                        $18,761.00
                                              Minimum Earned Premium:            $8,000.00
                                              Deposit:                           $18,761.00

RENDEC                                                                            Page 1 of 2

IDH000412

App. 425



THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA
A CAPITAL STOCK COMPANY (HEREIN CALLED THE COMPANY)
AS THEIR RESPECTIVE COVERAGES MAY APPEAR
MEMBERS OF THE AMERICAN INTERNATIONAL GROUP, INC,
EXECUTIVE OFFICES: 70 PINE STREET, NEW YORK, NY 10270

# RENEWAL DECLARATIONS
## (CONTINUED)

| Expired Policy No.: | Renewal Policy No.: | Policy Term: |
|---|---|---|
| EX55100345 | EX55100533 | From:  December 22, 2004    To:  December 22, 2005 |
| | | 12:01 A.M. STANDARD TIME AT THE INSURED'S ADDRESS AS SHOWN ON THIS DOCUMENT |

**Named Insured:**

Interdigital Communications Corporation, Inc.

781 3rd Avenue
King of Prussia, PA  19406-1409

**Producer:**

The Addis Group
2500 Renaissance Blvd, Suite 100
King of Prussia, PA  19406-2772

**Producer Number:**

0551052449

IN WITNESS WHEREOF, we have caused this Renewal Declarations to be executed and attested.  However, this Renewal Declarations shall not be valid unless countersigned by our authorized representative.

*Elizabeth M. Tuck*

**President
& Authorized Representative**

**Secretary**

Berkeley Heights, NJ
**Countersigned At**

January 4, 2005
**Countersigned Date**

RENDEC

Page 2 of 2

IDH000413

App. 426

ENDORSEMENT No. 3

This endorsement, effective 12:01 AM: December 22, 2004

Forms a part of policy no.: EX55100533

Issued to: Interdigital Communications Corporation, Inc.

By: The Insurance Company of the State of Pennsylvania and/or
National Union Fire Insurance Company of Pittsburgh, PA

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

<u>AMENDED COVERAGE TERRITORY</u>

This endorsement modifies insurance provided under the following:

**FOREIGN COMMERCIAL AUTOMOBILE LIABILITY COVERAGE PART**
**FOREIGN VOLUNTARY WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY COVERAGE PART**
**TRAVEL ACCIDENT AND SICKNESS COVERAGE PART**
**FOREIGN COMMERCIAL PROPERTY INSURANCE COVERAGE PART**

The definitions of "Coverage Territory" in forms 48007, 48011, "Policy Territory" in form AH 48003 and "Territorial Limitation" in forms 48013 are hereby deleted and replaced by the following:

"Coverage Territory", "Policy Territory", and or "Territorial Limitation" means anywhere in the world, including international waters or airspace, but excluding:

The United States of America, (including its territories or possessions), Puerto Rico and Canada; and those countries against which the Office of Foreign Assets Control of the U.S. Department of the Treasury administers and enforces economic and trade sanctions

All other terms, conditions, and exclusions shall remain the same.

_____
AUTHORIZED REPRESENTATIVE

TERRITOR                                                    Page 1 of 1

IDH000417

App. 427



# FOREIGN COMMERCIAL GENERAL LIABILITY
## SCHEDULE OF LIMITS

| Policy No.: | Policy Term: | Date of Issue: |
|---|---|---|
| EX55100533 | From:   December 22, 2004        To:   December 22, 2005<br>12:01 A.M. STANDARD TIME AT THE INSURED'S ADDRESS AS SHOWN ON THIS DOCUMENT | 01/04/05 |

**Named Insured:**

Interdigital Communications Corporation, Inc.

781 3rd Avenue
King of Prussia, PA  19406-1409

### FOREIGN COMMERCIAL GENERAL LIABILITY

Limits of Insurance:

| | |
|---|---|
| $2,000,000 | Master Control Program Aggregate Limit |
| $1,000,000 | General Aggregate Limit |
| $1,000,000 | Products Completed Operations Aggregate Limit |
| $1,000,000 | Personal & Advertising Injury Limit |
| $1,000,000 | Each Occurrence Limit |
| $50,000 | Damages to Premises Rented To You Limit |
| $10,000 | Medical Expense Limit |

SOL77882

Page 1 of 1

IDH000418

App. 428



# THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA

### A CAPITAL STOCK COMPANY INCORPORATED 1794



## FOREIGN COMMERCIAL GENERAL LIABILITY COVERAGE PART

### OCCURRENCE FORM

### PLEASE READ THE ENTIRE FORM CAREFULLY

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words you and your refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words we, us and our refer to the Company providing this insurance.

The word insured means any person or organization qualifying as such under Section II - Who Is an Insured.

Other words and phrases that appear in bold type have special meaning. Refer to Section V - Definitions.

## SECTION I - COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1.  Insuring Agreement

    a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies. We will have the right and duty to defend the insured against any suit seeking those damages. However, we will have no duty to defend the insured against any suit seeking damages for bodily injury or property damage to which this insurance does not apply. We may, at our discretion, investigate any occurrence and settle any claim or suit that may result. But:

    (1) The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and

    (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

    (3) Our duty to defend applies only in those countries in the coverage territory where legal circumstances permit us to defend. In those countries in the coverage territory where legal circumstances do not permit us to defend, we will reimburse you for your defense costs, subject to our prior authorization.

    No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

    This insurance applies to bodily injury and property damage only if:

    b.  (1) The bodily injury or property damage is caused by an occurrence that takes place in the coverage territory;

    (2) The bodily injury or property damage occurs during the policy period; and

77882  (6/01)

1 of 17

IDH000419

App. 429

(3) Prior to the policy period, no insured listed under Paragraph I. of Section II - Who Is An Insured and no employee authorized by you to give or receive notice of an occurrence or claim, knew that the bodily injury or property damage had occurred, in whole or in part. If such a listed insured or authorized employee: knew, prior to the policy period, that the bodily injury or property damage occurred, then any continuation, change or resumption of such bodily injury or property damage during or after the policy period will be deemed to have been known prior to the policy period.

(4) Any claim or suit is made or brought in the coverage territory or the United States of America, its territories and possessions, Puerto Rico or Canada.

c. Bodily injury or property damage which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph I. of Section II - Who Is An Insured or any employee authorized by you to give or receive notice of an "occurence" or claim, includes any continuation, change or resumption of that bodily injury or property damage after the end of the policy period.

d. Bodily injury or property damage will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph I. of Section II - Who Is An Insured or any employee authorized by you to give or receive notice of an occurrence or claim:

(1) Reports all, or any part, of the bodily injury or property damage to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the bodily injury or property damage; or

(3) Becomes aware by any other means that bodily injury or property damage has occurred or has begun to occur.

e. Damages because of bodily injury include damages claimed by any person or organization for care, loss of services or death resulting at any time from the bodily injury.

2. Exclusions

------- This insurance does not apply to:

a. Expected or Intended Injury

Bodily injury or property damage expected or intended from the standpoint of the insured. This exclusion does not apply to bodily injury resulting from the use of reasonable force to protect persons or property.

b. Contractual Liability

Bodily injury or property damage for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an insured contract, provided the bodily injury or property damage occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an insured contract, reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of bodily injury or property damage, provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same insured contract; and

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

c. Liquor Liability

Bodily injury or property damage for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

77882 (6/01)

2 of 17

IDH000420

App. 430

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

d.  Workers' Compensation and Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

e.  Employer's Liability

Bodily injury to:

(1) An employee of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that employee as a consequence of Paragraph (1) above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an insured contract.

f.  Pollution

(1) Bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) Bodily injury if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building;

(ii) Bodily injury or property damage for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not or never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) Bodily injury or property damage arising out of heat, smoke or fumes from a hostile fire;

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) Bodily injury or property damage arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of mobile equipment or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part

IDH000421

designed to hold, store or receive them. This exception does not apply if the bodily injury or property damage arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) Bodily injury or property damage sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) Bodily injury or property damage arising out of heat, smoke or fumes from a hostile fire.

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants.

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, pollutants.

However, this paragraph does not apply to liability for damages because of property damage that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or suit by or on behalf of a governmental authority;

77882 (6/01)

g. Aircraft, Auto or Watercraft

Bodily injury or property damage arising out of the ownership, maintenance, use or entrustment to others of any aircraft, auto or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and loading or unloading.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the occurrence which caused the bodily injury or property damage involved the ownership, maintenance, use or entrustment to others of any aircraft, auto or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 50 feet long; and
(b) Not being used to carry persons or property for a charge;

(3) Parking an auto on, or on the ways next to, premises you own or rent, provided the auto is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any insured contract for the ownership, maintenance or use of aircraft or watercraft; or

(5) Bodily injury or property damage arising out of the operation of any of the equipment listed in Paragraph f.(2) or f.(3) of the definition of mobile equipment.

h. Mobile Equipment

Bodily injury or property damage arising out of:

(1) The transportation of mobile equipment by an auto owned or operated by or rented or loaned to any insured; or

(2) The use of mobile equipment in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

i. War

Bodily injury or property damage due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, invasion, act of foreign enemy, civil commotion, factional civil commotion, terrorism, military or usurped power, rebellion or revolution.

4 of 17

IDH000422

App. 432

j.   Damage To Property

Property damage to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the property damage arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the property damage arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because your work was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to property damage (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage to Premises Rented to You as described in Section III - Limits of Insurance.

Paragraph (2) of this exclusion does not apply if the premises are your work and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to property damage included in the products-completed operations hazard.

k.   Damage To Your Product

Property damage to your product arising out of it or any part of it.

l.   Damage To Your Work

Property damage to your work arising out of it or any part of it and included in the products-completed operations hazard.

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

77882  (6/01)

m.   Damage to Impaired Property Or Property Not Physically Injured

Property damage to impaired property or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in your product or your work; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to your product or your work after it has been put to its intended use.

n.   Recall Of Products, Work Or Impaired Property

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) Your product;

(2) Your work; or

(3) Impaired property;

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

o.   Employment-Related Practices

Bodily injury to:

(1) A person arising out of any:

(a) Refusal to employ that person;

(b) Termination of that person's employment; or

(c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of bodily injury to that person at whom any of the employment related practices describe in paragraphs (a), (b) or (c) above is directed.

This exclusion applies:

(i) Whether the insured may be liable as an employer or in any other capacity; and

5 of 17

IDH000423

App. 433

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

p. **Personal and Advertising Injury**

Bodily injury arising out of personal and advertising injury.

q. **Asbestos**

Property damage or bodily injury, arising out of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of, or exposure to asbestos products, asbestos fibers or asbestos dust, or to any obligation to indemnify any party because of damages arising out of such property damage or bodily injury as a result of manufacture of, mining of, use of, sale of, installation of, removal of, distribution of, or exposure to asbestos products, asbestos fibers or asbestos dust.

Exclusions c. through n., with the exception of exclusion i., War., do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III - Limits Of Insurance.

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of personal and advertising injury to which this insurance applies. We will have the right and duty to defend the insured against any suit seeking those damages. However, we will have no duty to defend the insured against any suit seeking damages for personal and advertising injury to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or suit that may result. But:

(1) The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

(3) Our duty to defend applies only in those countries in the coverage territory where legal circumstances permit us to defend. In those countries in the coverage territory where legal circumstances do not permit us to defend, we will reimburse you for your defense costs, subject to our prior authorization.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

b. This insurance applies to personal and advertising injury caused by an offense arising out of your business, but only if the offense was committed in the coverage territory during the policy period. Any claim or "suit" must be made or brought in the coverage territory or the United States of America, its territories and possessions, Puerto Rico or Canada.

2. **Exclusions**

This insurance does not apply to:

a. Knowing Violation Of Rights Of Another

Personal and advertising injury caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict personal and advertising injury.

b. Material Published With Knowledge Of Falsity

Personal and advertising injury arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

c. Material Published Prior To Policy Period

Personal and advertising injury arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

d. Criminal Acts

Personal and advertising injury arising out of a criminal act committed by or at the direction of the insured.

e. Contractual Liability

Personal and advertising injury for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

f. Breach Of Contract

Personal and advertising injury arising out of a breach of contract, except an implied contract to use another's advertising idea in your advertisement.

g. Quality Or Performance Of Goods - Failure To Conform To Statements

Personal and advertising injury arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your advertisement.

IDH000424

App. 434

h.  **Wrong Description Of Prices**

Personal and advertising injury arising out of the wrong description of the price of goods, products or services stated in your advertisement.

i.  **Infringement Of Copyright, Patent, Trademark or Trade Secret**

Personal and advertising injury arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in your advertisement, of copyright, trade dress or slogan.

j.  **Insureds In Media And Internet Type Businesses**

Personal and advertising injury committed by an insured whose business is:

(1)  Advertising, broadcasting, publishing or telecasting;

(2)  Designing or determining content of websites for others; or

(3)  An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs 15.a., b. and c. of personal and advertising injury under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

k.  **Electronic Chatrooms Or Bulletin Boards**

Personal and advertising injury arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

l.  **Unauthorized Use Of Another's Name Or Product**

Arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

m.  **Pollution**

Personal and advertising injury arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

n.  **Pollution-Related**

Any loss, cost or expense arising out of any:

(1)  Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants; or

(2)  Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, pollutants.

o.  **Asbestos**

Arising out of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of, or exposure to asbestos products, asbestos fibers or asbestos dust, or to any obligation of the insured to indemnify any party because of damages arising out of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of, or exposure to asbestos products, asbestos fibers or asbestos dust; or

p.  **War**

Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, invasion, act of foreign enemy, civil commotion, factional civil commotion, terrorism, military or usurped power, rebellion or revolution.

q.  **Employment-Related Practices**

Personal and advertising injury to:

(1)  A person arising out of any:

(a)  Refusal to employ that person;

(b)  Termination of that person's employment; or

(c)  Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2)  The spouse, child, parent, brother or sister of that person as a consequence of personal and advertising injury to that person at whom any of the employment related practices describe in paragraphs (a), (b) or (c) above is directed.

This exclusion applies:

(1)  Whether the insured may be liable as an employer or in any other capacity; and

77882  (6/01)

IDH000425

App. 435

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

COVERAGE C MEDICAL PAYMENTS

1. Insuring Agreement

a. We will pay medical expenses as described below for bodily injury caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(1) The accident takes place in the coverage territory and during the policy period;

(2) The expenses are incurred and reported to us within one year of the date of the accident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

2. Exclusions

We will not pay expenses for bodily injury:

a. Any Insured

To any insured, except volunteer workers.

b. Hired Person

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. Injury On Normally Occupied Premises

To a person injured on that part of premises you own or rent that the person normally occupies.

d. Workers Compensation And Similar Laws

To a person, whether or not an employee of any insured, if benefits for the bodily injury are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

77882 (6/01)

e. Athletics Activities

To a person injured while taking part in athletics.

f. Products-Completed Operations Hazard

Included within the products-completed operations hazard.

g. Coverage A Exclusions

Excluded under Coverage A.

h. War

Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, invasion, act of foreign enemy, civil commotion, factional civil commotion, terrorism, military or usurped power, rebellion or revolution.

SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

1. We will pay, with respect to any claim we investigate or settle or any suit against an insured we defend:

a. All expenses we incur.

b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or suit, including actual loss of earnings up to $250 a day because of time off from work.

e. All costs taxed against the insured in the suit.

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

8 of 17

IDH000426

App. 436

2. If we defend an insured against a suit and an indemnitee of the insured is also named as a party to the suit, we will defend that indemnitee if all of the following conditions are met:

   a. The suit against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an insured contract;

   b. This insurance applies to such liability assumed by the insured;

   c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same insured contract;

   d. The allegations in the suit and the information we know about the occurrence are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

   e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such suit and agree that we can assign the same counsel to defend the insured and the indemnitee; and

   f. The indemnitee:

     (1) Agrees in writing to:

       (a) Cooperate with us in the investigation, settlement or defense of the suit;

       (b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the suit;

       (c) Notify any other insurer whose coverage is available to the indemnitee; and

       (d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

     (2) Provides us with written authorization to:

       (a) Obtain records and other information related to the suit; and

       (b) Conduct and control the defense of the indemnitee in such suit.

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b. (2) of Section I - Coverage A - **Bodily Injury and Property Damage** Liability, such payments will not be deemed to be damages for **bodily injury** and **property damage** and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

   a. We have used up the applicable limit of insurance in the payment of judgments or settlements; or

   b. The conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

**SECTION II- WHO IS AN INSURED**

1. If you are designated in the Declarations as:

   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your executive officers and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

   e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

   a. Your volunteer workers only while performing duties related to the conduct of your business, or your employees, other than either your executive officers (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these employees or volunteer workers are insured for:

     (1) **Bodily injury** or **personal and advertising injury:**

       (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-employee

IDH000427

while in the course of his or her employment or performing duties related to the conduct of your business, or to your other volunteer workers while performing duties related to the conduct of your business;

    (b) To the spouse, child, parent, brother or sister of that co-employee as a consequence of Paragraph (1)(a) above;

    (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (1)(a) or (b) above; or

    (d) Arising out of his or her providing or failing to provide professional health care services.

  (2) **Property damage** to property:

    (a) Owned, occupied or used by,

    (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your **employees**, volunteer workers, any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

b.  Any person (other than your **employee**, volunteer worker), or any organization while acting as your real estate manager.

c.  Any person or organization having proper temporary custody of your property if you die, but only:

    (1) With respect to liability arising out of the maintenance or use of that property; and

    (2) Until your legal representative has been appointed.

d.  Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. With respect to **mobile equipment** registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

a.  **Bodily injury** to a co-employee of the person driving the equipment; or

b.  **Property damage** to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

4. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a.  Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b.  **Coverage A** does not apply to **bodily injury** or **property damage** that occurred before you acquired or formed the organization; and

c.  **Coverage B** does not apply to **personal and advertising injury** arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III - LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a.  Insureds;

b.  Claims made or suits brought; or

c.  Persons or organizations making claims or bringing suits.

2. The Master Control Program Aggregate is the most we will pay for the sum of damages paid under this policy and any local **underlying policy**. You will reimburse us within thirty (30) days of our request for any payment we make under this policy or any local **underlying policy** for damages or expenses after the Master Control Program Aggregate is exhausted.

3. Subject to 2. above, the General Aggregate Limit is the most we will pay for the sum of:

a.  Medical expenses under **Coverage C**;

b.  Damages under **Coverage A**, except damages because of **bodily injury** or **property damage** included in the **products-completed operations hazard**; and

c.  Damages under **Coverage B**.

77882 (6/01)

10 of 17

IDH000428

App. 438

4. Subject to 2. above, the Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of **bodily injury** and **property damage** included in the **products-completed operations hazard.**

5. Subject to 3. above, the **Personal and Advertising Injury Limit** is the most we will pay under Coverage B for the sum of all damages because of all **personal and advertising injury** sustained by any one person or organization.

6. Subject to 3. or 4. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

    a. Damages under Coverage A; and

    b. Medical expenses under Coverage C because of all **bodily injury** and **property damage** arising out of any one **occurrence.**

7. Subject to 6. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of **property damage** to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

8. Subject to 6. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of **bodily injury** sustained by any one person.

9. All payments made under any local policy issued to you by us or any other insurance company will reduce the Limits of Insurance of this policy.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS**

1. Bankruptcy

    Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. Duties In The Event Of Occurrence, Offense, Claim Or Suit

    a. You must see to it that we are notified as soon as practicable of an **occurrence** or offense which may result in a claim. To the extent possible, notice should include:

        (1) How, when and where the **occurrence** or offense took place;

        (2) The names and addresses of any injured persons and witnesses; and

        (3) The nature and location of any injury or damage arising out of the **occurrence** or offense.

    Notice of an **occurrence** or offense is not notice of a claim.

    b. If a claim is made or suit is brought against any insured, you must:

        (1) Immediately record the specifics of the claim or suit and the date received; and

        (2) Notify us as soon as practicable.

    You must see to it that we receive written notice of the claim or suit as soon as practicable.

    c. You and any other involved insured must:

        (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or suit;

        (2) Authorize us to obtain records and other information;

        (3) Cooperate with us in the investigation or settlement of the claim or defense against the suit; and

        (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

    d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. Legal Action Against Us

    No person or organization has a right under this Coverage Part:

    a. To join us as a party or otherwise bring us into a suit asking for damages from an insured; or

    b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

    A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

IDH000429

App. 439

4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

a. Primary Insurance

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

b. Excess Insurance

This insurance is excess over:

(1) Any of the other insurance, whether primary, excess, contingent or on any other basis:

(a) That is Fire, Extended Coverage, Builders' Risk, Installation Risk or similar coverage for your work;

(b) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(c) That is insurance purchased by you to cover your liability as a tenant for property damage to premises rented to you or temporarily occupied by you with permission of the owner; or

(d) If the loss arises out of the maintenance or use of aircraft, autos or watercraft to the extent not subject to Exclusion g. of Section I - Coverage A - Bodily Injury And Property Damage Liability.

(2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement; or

(3) Any of the other insurance or your self-insurance plan that that covers a loss on the same basis.

When this insurance is excess, we will have no duty under Coverages A or B to defend, the insured against any suit if any other insurer has a duty to defend the insured against that suit. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

c. Method of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

d. Difference in Conditions

When the insurance provided by this policy has broader coverage than any other policy available to you covering the same loss, the insurance afforded by this policy will apply to the extent that any coverage or condition herein is less restrictive to you than are the terms and conditions afforded under that other policy.

5. Maintenance of Underlying Insurance

For as long as this policy is in effect all local underlying policies must:

a. Continuously provide no less coverage than in effect at inception of this policy; and

b. Afford no lower Limits of Insurance than in effect at inception of this policy, except for reduction or exhaustion of primary limits solely due to payment of losses.

This policy shall apply as though such policies had been maintained in force at the terms and conditions at inception of this policy.

6. Premium Audit

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that

77882 (6/01)

12 of 17

IDH000430

App. 440

period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

7. Representations

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

8. Separation Of Insureds

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or suit is brought.

9. Transfer Of Rights Of Recovery Against Others To Us

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring suit or transfer those rights to us and help us enforce them.

10. When We Do Not Renew

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

11. Cancellation

a. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

b. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

(1) 10 days before the effective date of cancellation if we cancel for non-payment of premium; or

(2) 60 days before the effective date of cancellation if we cancel for any other reason.

c. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

d. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

e. If this policy is canceled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. If the first Named Insured cancels and the Total Advance Program Premium is indicated as a minimum premium, no refund will be made. The cancellation will be effective even if we have not made or offered a refund.

f. If notice is mailed, proof of mailing will be sufficient proof of notice.

12. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

13. Examination of Your Books and Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

14. Inspections and Surveys

a. We have the right to:

(1) make inspections and surveys at any time;

(2) give you reports on the conditions we find; and

(3) recommend changes.

b. We are not obligated to make any inspections, surveys, reports or recommendations, and such actions we do make relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And, we do not warrant that conditions:

77882 (6/01)

13 of 17

IDH000431

App. 441

(1) are safe or healthful; or

(2) comply with laws, regulations, codes or standards.

c. Paragraphs a. and b. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

f. Paragraph b. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

15. Premiums

The first Named Insured shown in the Declarations:

a. is responsible for the payment of all premiums; and

b. will be the payee for any return premiums we pay.

16. Transfer of Your Rights and Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative, but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your right and duties, but only with respect to that property.

**SECTION V - DEFINITIONS**

1. Advertisement means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web-sites, only that part of a website that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. Auto means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But auto does not include mobile equipment.

3. Bodily injury means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. Coverage territory means anywhere in the world, including international waters or airspace, but excluding:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada; and

b. Those countries against which the Office of Foreign Assets Control of the U.S. Department of the Treasury administers and enforces economic and trade sanctions.

5. Employee includes a leased worker. Employee does not include a temporary worker.

6. Executive officer means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. Hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

8. Impaired property means tangible property, other than your product or your work, that cannot be used or is less useful because:

a. It incorporates your product or your work that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a. The repair, replacement, adjustment or removal of your product or your work; or

b. Your fulfilling the terms of the contract or agreement.

9. Insured contract means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an insured contract;

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business

77882 (6/01)

14 of 17

IDH000432

App. 442

(including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for **bodily injury or property damage** to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

(1) That indemnifies a railroad for bodily injury or property damage arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

10. **Leased worker** means a person leased to you by a labor-leasing firm under an agreement between you and the labor-leasing firm, to perform duties related to the conduct of your business. Leased worker does not include a **temporary worker**.

11. **Loading or unloading** means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or auto;

b. While it is in or on an aircraft, watercraft or **auto**; or

c. While it is being moved from an aircraft, watercraft or auto to the place where it is finally delivered;

but **loading or unloading** does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or auto.

12. **Local underlying policy** means a primary policy effective on or after the inception of this policy which has been issued at our direction or coordinated by us specifically for this insurance program.

13. **Mobile equipment** means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in a, b, c, or d, above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in a, b, c, or d, above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not mobile equipment but will be considered autos:

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

IDH000433

App. 443

14. **Occurrence** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

15. **Personal and advertising injury** means injury, including consequential bodily injury, arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;

   b. Malicious prosecution;

   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

   f. The use of another's advertising idea in your advertisement; or

   g. Infringing upon another's copyright, trade dress or slogan in your advertisement.

16. **Pollutants** mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

17. **Products-completed operations hazard:**

   a. Includes all bodily injury and property damage occurring away from premises you own or rent and arising out of your product or your work except:

      (1) Products that are still in your physical possession; or

      (2) Work that has not yet been completed or abandoned. However, your work will be deemed completed at the earliest of the following times:

         (a) When all of the work called for in your contract has been completed.

         (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

         (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

      Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

   b. Does not include bodily injury or property damage arising out of:

      (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the loading or unloading of that vehicle by any insured;

      (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

      (3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

18. **Property damage means:**

   a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

   b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the occurrence that caused it.

   For the purposes of this insurance, electronic data is not tangible property.

   As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

19. **Suit** means a civil proceeding in which damages because of bodily injury, property damage or personal and advertising injury to which this insurance applies are alleged. Suit includes:

   a. An arbitration proceeding in which such damages claimed and to which the insured must submit or does submit with our consent; or

   b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

20. **Temporary worker** means a person who is furnished to you to substitute for a permanent employee on leave or to meet seasonal or short-term workload conditions.

21. **Terrorism** means the unlawful use of violence against persons or property to further political objectives, and which is intended to intimidate or coerce a government, individuals or persons to modify their behavior or policies, or an act

77882 (6/01)

- 16 of 17

IDH000434

App. 444

which is verified by the United States Department of State as an act of terrorism. Terrorism does not include:

a. Any act of violence directed at a specific individual or individuals which is motivated by personal reasons specific to the parties, i. e., robbery, crime of passion, murder; or

b. Any act of war or civil war.

22. Volunteer worker means a person who is not your employee, and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

23. Your product:

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of your product, and

(2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

24. Your work.

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

(2) The providing of or failure to provide warnings or instructions.

77882 (6/01)

In witness, the Company has caused this Policy to be executed by its President and Secretary but this Policy shall not be valid unless countersigned on the Declarations Page by a duly authorized represen-tative of the Company.

*Elizabeth M. Tuck*

Secretary

President

17 of 17

IDH000435

App. 445

ENDORSEMENT No. 5

**This endorsement, effective 12:01 AM:** December 22, 2004

**Forms a part of Policy No.:** EX55100533

**Issued to:** Interdigital Communications Corporation, Inc.

By: The Insurance Company of the State of Pennsylvania

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

FOREIGN COMMERCIAL LIABILITY COVERAGE RECOGNITION

This endorsement modifies insurance provided under the following:

FOREIGN COMMERCIAL GENERAL LIABILITY COVERAGE PART
GLOBAL COMMERCIAL GENERAL LIABILITY COVERAGE PART

Wherever the phrase, "Commercial General Liability Coverage Form", appears in this policy, it shall be read as, "Foreign Commercial General Liability Coverage Form".

All other terms, conditions, and exclusions shall remain the same.

_____

AUTHORIZED REPRESENTATIVE

80979 (10/02)                                                                                          Page 1 of 1

IDH000438

App. 446



THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA
A CAPITAL STOCK COMPANY (HEREIN CALLED THE COMPANY)
AS THEIR RESPECTIVE COVERAGES MAY APPEAR
MEMBERS OF THE AMERICAN INTERNATIONAL GROUP, INC.
EXECUTIVE OFFICES: 70 PINE STREET, NEW YORK  NY  10270

# DECLARATIONS

**Policy No.:**

EX55100345

**Policy Term:**

From:    December 22, 2003        To:    December 22, 2004
12:01 A.M. STANDARD TIME AT THE INSURED'S ADDRESS AS SHOWN ON THIS DOCUMENT

**Named Insured:**

Interdigital Communications Corporation, Inc.

781 3rd Avenue
King of Prussia, PA  19406-1409

**SIC Code & Description:**

7373  Computer Systems Design Service

**Client Number:**

000000057207953

**Form of Business:**

Organization

Detailed descriptions and any limitations to the specific coverages will be found in the specific policy coverage parts.  Schedule of Form(s) and Endorsement(s) made a part of these coverages at time of issue.

Policy Currency X US$   Cdn$; all premiums and all amounts indicated on all schedules, policies, forms, and endorsements shall be deemed to be in the currency indicated by the checked box unless another currency is expressly indicated.

| Coverages: | Premium: |
|---|---|
| Foreign Commercial General Liability | $2,250.00 |
| Foreign Commercial Automobile Liability | $300.00 |
| Foreign Voluntary Workers' Compensation/Employer's Liability | $7,250.00 |
| Foreign Commercial Property Liability | $2,987.00 |
| Travel Accident and Sickness | $1,250.00 |

| | |
|---|---|
| Total (US): | $14,037.00 |
| Minimum Earned Premium: | $5,614.80 |
| Deposit: | $14,037.00 |

**Producer:**

The Addis Group
2500 Renaissance Blvd, Suite 100
King of Prussia, PA  19406-2772

**Producer Number:**

0551052449

IN WITNESS WHEREOF, the Company has caused this policy to be signed by its President and Secretary and signed on the Declarations Page by a duly authorized representative of the Company, where required by law.

**President**                    **Secretary**

Berkeley Heights, NJ
**Countersigned At**

January 9, 2004
**Countersigned Date**

DECPAGE                                                     Page 1 of 1

App. 447

ENDORSEMENT No. 3

**This endorsement, effective 12:01 AM:** December 22, 2003

**Forms a part of policy no.:** EX55100345

**Issued to:** Interdigital Communications Corporation, Inc.

**By:** The Insurance Company of the State of Pennsylvania and/or
National Union Fire Insurance Company of Pittsburgh, PA

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**AMENDED COVERAGE TERRITORY**

This endorsement modifies insurance provided under the following:

**FOREIGN COMMERCIAL AUTOMOBILE LIABILITY COVERAGE PART**
**FOREIGN VOLUNTARY WORKERS' COMPENSATION AND EMPLOYER'S LIABILITY COVERAGE PART**
**TRAVEL ACCIDENT AND SICKNESS COVERAGE PART**
**FOREIGN COMMERCIAL PROPERTY INSURANCE COVERAGE PART**

The definitions of "Coverage Territory" in forms 48007, 48011, "Policy Territory" in form AH 48003 and "Territorial Limitation" in forms 48013) are hereby deleted and replaced by the following:

"Coverage Territory", "Policy Territory", and or "Territorial Limitation" means anywhere in the world, including international waters or airspace, but excluding:

The United States of America, (including its territories or possessions), Puerto Rico and Canada; and those countries against which the Office of Foreign Assets Control of the U.S. Department of the Treasury administers and enforces economic and trade sanctions

All other terms, conditions, and exclusions shall remain the same.

_____
**AUTHORIZED REPRESENTATIVE**

TERRITOR                                                    Page 1 of 1

App. 448



**FOREIGN COMMERCIAL GENERAL LIABILITY
SCHEDULE OF LIMITS**

| Policy No.: | Policy Term: | | Date of Issue: |
|---|---|---|---|
| EX55100345 | From:   December 22, 2003      To:   December 22, 2004 | | 01/09/04 |
| | 12:01 A.M. STANDARD TIME AT THE INSURED'S ADDRESS AS SHOWN ON THIS DOCUMENT | | |

**Named Insured:**

Interdigital Communications Corporation, Inc.

781 3rd Avenue
King of Prussia, PA  19406-1409

### FOREIGN COMMERCIAL GENERAL LIABILITY

Limits of Insurance:

| | |
|---|---|
| $2,000,000 | Master Control Program Aggregate Limit |
| $1,000,000 | General Aggregate Limit |
| $1,000,000 | Products Completed Operations Aggregate Limit |
| $1,000,000 | Personal & Advertising Injury Limit |
| $1,000,000 | Each Occurrence Limit |
| $50,000 | Damages to Premises Rented To You Limit |
| $10,000 | Medical Expense Limit |

SOL77882

Page 1 of 1

App. 449



# THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA

### A CAPITAL STOCK COMPANY INCORPORATED 1794



## FOREIGN COMMERCIAL GENERAL LIABILITY COVERAGE PART

### OCCURRENCE FORM

### PLEASE READ THE ENTIRE FORM CAREFULLY

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words **you** and **your** refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words **we**, **us** and **our** refer to the **Company** providing this insurance.

The word **insured** means any person or organization qualifying as such under Section II - Who Is an Insured.

Other words and phrases that appear in bold type have special meaning. Refer to Section V - Definitions.

## SECTION I - COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement

    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of **bodily injury** or **property damage** to which this insurance applies. We will have the right and duty to defend the insured against any **suit** seeking those damages. However, **we** will have no duty to defend the insured against any **suit** seeking damages for **bodily injury** or **property damage** to which this insurance does not apply. **We** may, at **our** discretion, investigate any **occurrence** and settle any claim or **suit** that may result. But:

(1) The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and

(2) **Our** right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

(3) **Our** duty to defend applies only in those countries in the **coverage territory** where legal circumstances permit **us** to defend. In those countries in the **coverage territory** where legal circumstances do not permit **us** to defend, **we** will reimburse **you** for your defense costs, subject to **our** prior authorization.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

This insurance applies to **bodily injury** and **property damage** only if:

b. (1) The **bodily injury** or **property damage** is caused by an **occurrence** that takes place in the **coverage territory**;

(2) The **bodily injury** or **property damage** occurs during the policy period; and

77882 (6/01)

1 of 17

App. 450

(3) Prior to the policy period, no insured listed under Paragraph I . of Section II - Who Is An Insured and no employee authorized by you to give or receive notice of an occurrence or claim, knew that the bodily injury or property damage had occurred, in whole or in part. If such a listed insured or authorized employee: knew, prior to the policy period, that the bodily injury or property damage occurred, then any continuation, change or resumption of such bodily injury or property damage during or after the policy period will be deemed to have been known prior to the policy period.

(4) Any claim or suit is made or brought in the coverage territory or the United States of America, its territories and possessions, Puerto Rico or Canada. .

c. Bodily Injury or property damage which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph I. of Section II - Who Is An Insured or any employee authorized by you to give or receive notice of an "occurence" or claim, includes any continuation, change or resumption of that bodily injury or property damage after the end of the policy period.

d. Bodily Injury or property damage will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph I. of Section II - Who Is An Insured or any employee authorized by you to give or receive notice of an occurrence or claim:

(1) Reports all, or any part, of the bodily injury or property damage to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the bodily injury or property damage; or

(3) Becomes aware by any other means that bodily injury or property damage has occurred or has begun to occur.

e.

Damages because of bodily injury include damages claimed by any person or organization for care, loss of services or death resulting at any time from the bodily injury.

2. Exclusions

This insurance does not apply to:

a. Expected or Intended Injury

Bodily injury or property damage expected or intended from the standpoint of the insured. This exclusion does not apply to bodily injury resulting from the use of reasonable force to protect persons or property.

b. Contractual Liability

Bodily injury or property damage for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an insured contract, provided the bodily injury or property damage occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an insured contract, reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of bodily injury or property damage, provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same insured contract; and

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

c. Liquor Liability

Bodily injury or property damage for which any insured may be held liable by reason of: .

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

App. 451

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

d. Workers' Compensation and Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

e. Employer's Liability

**Bodily injury** to:

(1) An **employee** of the insured arising out of and in the course of:

   (a) Employment by the insured; or

   (b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that **employee** as a consequence of Paragraph (1) above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an **Insured contract**.

f. Pollution

(1) **Bodily injury or property damage** arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **pollutants**:

   (a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

      (i) **Bodily injury** if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building;

      (ii) **Bodily injury or property damage** for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not or never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

      (iii) **Bodily injury or property damage** arising out of heat, smoke or fumes from a **hostile fire;**

   (b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

   (c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

      (i) Any insured; or

      (ii) Any person or organization for whom you may be legally responsible; or

   (d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the **pollutants** are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

      (i) **Bodily injury or property damage** arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of **mobile equipment** or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part

App. 452

designed to store or receive them. This exception does not apply if the **bodily injury** or **property damage** arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) **Bodily injury** or **property damage** sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by **you** or on **your** behalf by a contractor or subcontractor; or

(iii) **Bodily injury** or **property damage** arising out of heat, smoke or fumes from a **hostile fire**.

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any **insured's** behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, **pollutants**.

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, **pollutants**; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, **pollutants**.

However, this paragraph does not apply to liability for damages because of **property damage** that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or **suit** by or on behalf of a governmental authority.

g. **Aircraft, Auto or Watercraft**

**Bodily injury** or **property damage** arising out of the ownership, maintenance, use or entrustment to others of any aircraft, **auto** or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and **loading** or **unloading**.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the **occurrence** which caused the **bodily injury** or **property damage** involved the ownership, maintenance, use or entrustment to others of any aircraft, **auto** or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises **you** own or rent;

(2) A watercraft **you** do not own that is:

(a) Less than 50 feet long; and
(b) Not being used to carry persons or property for a charge;

(3) Parking an **auto** on, or on the ways next to, premises **you** own or rent, provided the **auto** is not owned by or rented or loaned to **you** or the insured;

(4) Liability assumed under any **insured contract** for the ownership, maintenance or use of aircraft or watercraft; or

(5) **Bodily injury** or **property damage** arising out of the operation of any of the equipment listed in Paragraph f.(2) or f.(3) of the definition of **mobile equipment**.

h. **Mobile Equipment**

**Bodily injury** or **property damage** arising out of:

(1) The transportation of **mobile equipment** by an **auto** owned or operated by or rented or loaned to any insured; or

(2) The use of **mobile equipment** in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

i. War

**Bodily injury** or **property damage** due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, invasion, act of foreign enemy, civil commotion, factional civil commotion, **terrorism**, military or usurped power, rebellion or revolution.

77882  (6/01)

4 of 17

j. Damage To Property

**Property damage to:**

(1) Property **you** own, rent, or occupy, including any costs or expenses incurred by **you**, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises **you** sell, give away or abandon, if the **property damage** arises out of any part of those premises;

(3) Property loaned to **you**;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which **you** or any contractors or subcontractors working directly or indirectly on **your** behalf are performing operations, if the **property damage** arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because **your work** was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to **property damage** (other than damage by fire) to premises, including the contents of such premises, rented to **you** for a period of seven or fewer consecutive days. A separate limit of insurance applies to Damage to Premises Rented to You as described in Section III - Limits of Insurance.

Paragraph (2) of this exclusion does not apply if the premises are **your work** and were never occupied, rented or held for rental by **you**.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to **property damage** included in the **products-completed operations hazard.**

k. Damage To Your Product

**Property damage** to **your product** arising out of it or any part of it.

l. Damage To Your Work

**Property damage** to **your work** arising out of it or any part of it and included in the **products-completed operations hazard.**

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on **your** behalf by a subcontractor.

77882 (6/01)

m. l to Impaired Property Or Property Not Physically Injured

**Property damage** to impaired property or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in **your product** or **your work**; or

(2) A delay or failure by **you** or anyone acting on **your** behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to **your product** or **your work** after it has been put to its intended use.

n. Recall Of Products, Work Or Impaired Property

Damages claimed for any loss, cost or expense incurred by **you** or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) **Your product**;

(2) **Your work**; or

(3) **impaired property**;

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

o. Employment-Related Practices

**Bodily injury** to:

(1) A person arising out of any:

(a) Refusal to employ that person;

(b) Termination of that person's employment; or

(c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of **bodily injury** to that person at whom any of the employment related practices describe in paragraphs (a), (b) or (c) above is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

5 of 17

(2) To any obliga' : are damages with or repay .omeone else who must pay damages because of the injury.

p.  Personal and Advertising Injury

Bodily injury arising out of personal and advertising injury.

q.  Asbestos

Property damage or bodily injury, arising out of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of, or exposure to asbestos products, asbestos fibers or asbestos dust, or to any obligation of the insured to indemnify any party because of damages arising out of such property damage or bodily injury as a result of manufacture of, mining of, use of, sale of, installation of, removal of, distribution of, or exposure to asbestos products, asbestos fibers or asbestos dust.

Exclusions c. through n., with the exception of exclusion i., War., do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III - Limits Of Insurance.

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

1. Insuring Agreement

a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of personal and advertising injury to which this insurance applies. We will have the right and duty to defend the insured against any suit seeking those damages. However, we will have no duty to defend the insured against any suit seeking damages for personal and advertising injury to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or suit that may result. But:

(1) The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

(3) Our duty to defend applies only in those countries in the coverage territory where legal circumstances permit us to defend. In those countries in the coverage territory where legal circumstances do not permit us to defend, we will reimburse you for your defense costs, subject to our prior authorization.

' :  obligation or liability to pay sums c . peri.irm acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

b.  This insurance applies to personal and advertising injury caused by an offense arising out of your business, but only if the offense was committed in the coverage territory during the policy period. Any claim or "suit" must be made or brought in the coverage territory or the United States of America, its territories and possessions, Puerto Rico or Canada.

2. Exclusions

This insurance does not apply to:

a.  Knowing Violation Of Rights Of Another

Personal and advertising injury caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict personal and advertising injury.

b.  Material Published With Knowledge Of Falsity

Personal and advertising injury arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

c.  Material Published Prior To Policy Period

Personal and advertising injury arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

d.  Criminal Acts

Personal and advertising injury arising out of a criminal act committed by or at the direction of the insured.

e.  Contractual Liability

Personal and advertising injury for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

f.  Breach Of Contract

Personal and advertising injury arising out of a breach of contract, except an implied contract to use another's advertising idea in your advertisement.

g.  Quality Or Performance Of Goods - Failure To Conform To Statements

Personal and advertising injury arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your advertisement.

77882 (6/01)

6 of 17

App. 455

h. **Wrong Description   Pr ；**

Personal and advertising injury arising out of the wrong description of the price of goods, products or services stated in your advertisement.

i. **Infringement Of Copyright, Patent, Trademark or Trade Secret**

Personal and advertising injury arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in your advertisement, of copyright, trade dress or slogan.

j. **Insureds In Media And Internet Type Businesses**

Personal and advertising injury committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of websites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs 15.a., b. and c. of personal and advertising injury under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

k. **Electronic Chatrooms Or Bulletin Boards**

Personal and advertising injury arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

l. **Unauthorized Use Of Another's Name Or Product**

Arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

m. **Pollution**

Personal and advertising injury arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

n. **Pollution-Related**

Any loss, cost or expense arising out of any:

( e t, demand or order that any insured or others test for, monitor, clean up,' remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, pollutants.

o. **Asbestos**

Arising out of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of, or exposure to asbestos products, asbestos fibers or asbestos dust, or to any obligation of the insured to indemnify any party because of damages arising out of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of, or exposure to asbestos products, asbestos fibers or asbestos dust; or

p. **War**

Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, invasion, act of foreign enemy, civil commotion, factional civil commotion, terrorism, military or usurped power, rebellion or revolution.

q. **Employment-Related Practices**

Personal and advertising injury to:

(1) A person arising out of any:

(a) Refusal to employ that person;

(b) Termination of that person's employment; or

(c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of personal and advertising injury to that person at whom any of the employment related practices describe in paragraphs (a), (b) or (c) above is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligatio. si .J damages with or repay someone else who must pay damages because of the injury.

## COVERAGE C MEDICAL PAYMENTS

1. Insuring Agreement

a. **We** will pay medical expenses as described below for **bodily injury** caused by an accident:

   (1) On premises **you** own or rent;

   (2) On ways next to premises **you** own or rent; or

   (3) Because of **your** operations;

provided that:

   (1) The accident takes place in the **coverage territory** and during the policy period;

   (2) The expenses are incurred and reported to us within one year of the date of the accident; and

   (3) The injured person submits to examination, at **our** expense, by physicians of **our** choice as often as **we** reasonably require.

b. **We** will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. **We** will pay reasonable expenses for:

   (1) First aid administered at the time of an accident;

   (2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

   (3) Necessary ambulance, hospital, professional nursing and funeral services.

2. Exclusions

**We** will not pay expenses for **bodily injury**:

a. **Any Insured**

To any insured, except **volunteer workers.**

b. **Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. **Injury On Normally Occupied Premises**

To a person injured on that part of premises **you** own or rent that the person normally occupies.

d. **Workers Compensation And Similar Laws**

To a person, whether or not an **employee** of any insured, if benefits for the **bodily injury** are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

77882 (6/01)

e. **A t Activities**

To a person injured while taking part in athletics.

f. **Products-Completed Operations Hazard**

Included within the **products-completed operations** hazard.

g. **Coverage A Exclusions**

Excluded under Coverage A.

h. **War**

Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, invasion, act of foreign enemy, civil commotion, factional civil commotion, **terrorism**, military or usurped power, rebellion or revolution.

## SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

1. **We** will pay, with respect to any claim **we** investigate or settle or any **suit** against an insured **we** defend:

a. All expenses **we** incur.

b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the **Bodily Injury** Liability Coverage applies. **We** do not have to furnish these bonds.

c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. **We** do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at **our** request to assist **us** in the investigation or defense of the claim or **suit**, including actual loss of earnings up to $250 a day because of time off from work.

e. All costs taxed against the insured in the **suit.**

f. Prejudgment interest awarded against the insured on that part of the judgment **we** pay. If **we** make an offer to pay the applicable limit of insurance, **we** will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before **we** have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

8 of 17

App. 457

2. If we defend an insu  g  t a suit and an indemnitee of the insured is also named as a party to the suit, we will defend that indemnitee if all of the following conditions are met:

a. The suit against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an insured contract;

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same insured contract;

d. The allegations in the suit and the information we know about the occurrence are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such suit and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the suit;

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the suit;

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the suit; and

(b) Conduct and control the defense of the indemnitee in such suit.

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b. (2) of Section I - Coverage A - Bodily Injury and Property Damage Liability, such payments will not be deemed to be damages for bodily injury and property damage and will not reduce the limits of insurance.

Our obliga   t   efend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

a. We have used up the applicable limit of insurance in the payment of judgments or settlements; or

b. The conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

SECTION II- WHO IS AN INSURED

1. If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your executive officers and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

a. Your volunteer workers only while performing duties related to the conduct of your business, or your employees, other than either your executive officers (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these employees or volunteer workers are insured for:

(1) Bodily injury or personal and advertising injury:

(a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-employee

App. 458

while in the of his or her employment or performing duties related to the conduct of your business, or to your other **volunteer workers** while performing duties related to the conduct of **your business**;

(b) To the spouse, child, parent, brother or sister of that co-employee as a consequence of Paragraph (1)(a) above;

(c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (1)(a) or (b) above; or

(d) Arising out of his or her providing or failing to provide professional health care services.

(2) **Property damage** to property:

(a) Owned, occupied or used by,

(b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of **your employees, volunteer workers,** any partner or member (if **you** are a partnership or joint venture), or any member (if **you** are a limited liability company).

b. Any person (other than **your employee, volunteer worker**), or any organization while acting as **your** real estate manager.

c. Any person or organization having proper temporary custody of **your** property if **you** die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until **your** legal representative has been appointed.

d. **Your** legal representative if **you** die, but only with respect to duties as such. That representative will have all **your** rights and duties under this Coverage Part.

3. With respect to **mobile equipment** registered in **your** name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with **your** permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

a. Bodily injury to a co-employee of the person driving the equipment; or

b. **Property damage** to property owned by, rented to, in the charge of or occupied by **you** or the employer of any person who is an insured under this provision.

4. Any organization **you** newly acquire or form, other than a partnership, joint venture or limited liability company, and over which **you** maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a. Coverage under this provision is afforded only until the 90th day after **you** acquire or form the organization or the end of the policy period, whichever is earlier;

b. Coverage A does not apply to **bodily injury** or property damage that occurred before **you** acquired or formed the organization; and

c. Coverage B does not apply to **personal and advertising injury** arising out of an offense committed before **you** acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III - LIMITS OF INSURANCE**

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or **suits** brought; or

c. Persons or organizations making claims or bringing suits.

2. The Master Control Program Aggregate is the most we will pay for the sum of damages paid under this policy and any **local underlying policy. You** will reimburse us within thirty (30) days of **our** request for any payment **we** make under this policy or any **local underlying policy** for damages or expenses after the Master Control Program Aggregate is exhausted.

3. Subject to 2. above, the General Aggregate Limit is the most we will pay for the sum of:

a. Medical expenses under Coverage C;

b. Damages under Coverage A, except damages because of **bodily injury** or **property damage** included in the **products-completed operations hazard;** and

c. Damages under Coverage B.

77882 (6/01)                                              10 of 17

4. Subject to 2. above, the Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of **bodily injury and property damage** included in the **products-completed operations hazard**.

5. Subject to 3. above, the **Personal and Advertising Injury** Limit is the most we will pay under Coverage B for the sum of all damages because of all **personal and advertising injury** sustained by any one person or organization.

6. Subject to 3. or 4. above, whichever applies, the **Each Occurrence** Limit is the most we will pay for the sum of:

   a. Damages under Coverage A; and

   b. Medical expenses under Coverage C because of all **bodily injury** and **property damage** arising out of any one **occurrence**.

7. Subject to 6. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of **property damage** to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by **you** with permission of the owner.

8. Subject to 6. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of **bodily injury** sustained by any one person.

9. All payments made under any local policy issued to **you** by us or any other insurance company will reduce the Limits of Insurance of this policy.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS**

1. Bankruptcy

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. Duties In The Event Of **Occurrence**, Offense, Claim Or **Suit**

   a. **You** must see to it that we are notified as soon as practicable of an **occurrence** or offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the **occurrence** or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the **occurrence** or offense.

   Notice of an **occurrence** or offense is not notice of a claim.

   b. If a claim is made or **suit** is brought against any insured, you must:

      (1) Immediately record the specifics of the claim or **suit** and the date received; and

      (2) Notify **us** as soon as practicable.

   **You** must see to it that we receive written notice of the claim or **suit** as soon as practicable.

   c. **You** and any other involved insured must:

      (1) Immediately send **us** copies of any demands, notices, summonses or legal papers received in connection with the claim or **suit**;

      (2) Authorize **us** to obtain records and other information;

      (3) Cooperate with **us** in the investigation or settlement of the claim or defense against the **suit**; and

      (4) Assist **us**, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. Legal Action Against Us

   No person or organization has a right under this Coverage Part:

   a. To join **us** as a party or otherwise bring **us** into a **suit** asking for damages from an insured; or

   b. To sue **us** on this Coverage Part unless all of its terms have been fully complied with.

   A person or organization may sue **us** to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by **us**, the insured and the claimant or the claimant's legal representative.

77882 (6/01)

App. 460

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

**b. Excess Insurance**

This insurance is excess over:

(1) Any of the other insurance, whether primary, excess, contingent or on any other basis:

   (a) That is Fire, Extended Coverage, Builders' Risk, Installation Risk or similar coverage for your work;

   (b) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

   (c) That is insurance purchased by you to cover your liability as a tenant for property damage to premises rented to you or temporarily occupied by you with permission of the owner; or

   (d) If the loss arises out of the maintenance or use of aircraft, autos or watercraft to the extent not subject to Exclusion g. of Section I - Coverage A Bodily Injury And Property Damage Liability.

(2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement; or

(3) Any of the other insurance or your self-insurance plan that that covers a loss on the same basis.

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any suit if any other insurer has a duty to defend the insured against that suit. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**d. Difference in Conditions**

When the insurance provided by this policy has broader coverage than any other policy available to you covering the same loss, the insurance afforded by this policy will apply to the extent that any coverage or condition herein is less restrictive to you than are the terms and conditions afforded under that other policy.

**5. Maintenance of Underlying Insurance**

For as long as this policy is in effect all local underlying policies must:

a. Continuously provide no less coverage than in effect at inception of this policy; and

b. Afford no lower Limits of Insurance than in effect at inception of this policy, except for reduction or exhaustion of primary limits solely due to payment of losses.

This policy shall apply as though such policies had been maintained in force at the terms and conditions at inception of this policy.

**6. Premium Audit**

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that

period. Audit n ß are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c.  The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

7.  Representations

By accepting this policy, you agree:

a.  The statements in the Declarations are accurate and complete;

b.  Those statements are based upon representations you made to us; and

c.  We have issued this policy in reliance upon your representations.

8.  Separation Of Insureds

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a.  As if each Named Insured were the only Named Insured; and

b.  Separately to each insured against whom claim is made or suit is brought.

9.  Transfer Of Rights Of Recovery Against Others To Us

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring suit or transfer those rights to us and help us enforce them.

10. When We Do Not Renew

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

11. Cancellation

a.  The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

b.  We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

(1)   c  . before the effective date of cancellation if we cancel for non-payment of premium; or

(2)  60 days before the effective date of cancellation if we cancel for any other reason.

c.  We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

d.  Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

e.  If this policy is canceled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. If the first Named Insured cancels and the Total Advance Program Premium is indicated as a minimum premium, no refund will be made. The cancellation will be effective even if we have not made or offered a refund.

f.  If notice is mailed, proof of mailing will be sufficient proof of notice.

12. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

13. Examination of Your Books and Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

14. Inspections and Surveys

a.  We have the right to:

(1)  make inspections and surveys at any time;

(2)  give you reports on the conditions we find; and

(3)  recommend changes.

b.  We are not obligated to make any inspections, surveys, reports or recommendations, and such actions we do make relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And, we do not warrant that conditions:

(1) are safe or healthful; or

(2) comply with laws, regulations, codes or standards.

c. Paragraphs a. and b. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

f. Paragraph b. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

15. Premiums

The first Named Insured shown in the Declarations:

a. is responsible for the payment of all premiums; and

b. will be the payee for any return premiums we pay.

16. Transfer of Your Rights and Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative, but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your right and duties, but only with respect to that property.

**SECTION V - DEFINITIONS**

1. **Advertisement** means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web-sites, only that part of a website that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. **Auto** means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But **auto** does not include **mobile equipment**.

3. **Bodily injury** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. **Coverage territory** means anywhere in the world, including international waters or airspace, but excluding:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada; and

b. Those countries against which the Office of Foreign Assets Control of the U.S. Department of the Treasury administers and enforces economic and trade sanctions.

5. **Employee** includes a **leased worker**. **Employee** does not include a **temporary worker**.

6. **Executive officer** means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. **Hostile fire** means one which becomes uncontrollable or breaks out from where it was intended to be.

8. **Impaired property** means tangible property, other than your product or your work, that cannot be used or is less useful because:

a. It incorporates your product or your work that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a. The repair, replacement, adjustment or removal of your product or your work; or

b. Your fulfilling the terms of the contract or agreement.

9. **Insured contract** means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an **insured contract**;

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business

77882 (6/01)

14 of 17

App. 463

(including an application of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for **bodily injury** or **property damage** to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

    (1) That indemnifies a railroad for **bodily injury** or **property damage** arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

    (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

        (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

        (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

    (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

10. **Leased worker** means a person leased to you by a labor-leasing firm under an agreement between **you** and the labor-leasing firm, to perform duties related to the conduct of **your** business. Leased worker does not include a **temporary worker**.

11. **Loading or unloading** means the handling of property:

    a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or **auto**;

    b. While it is in or on an aircraft, watercraft or **auto**; or

    c. While it is being moved from an aircraft, watercraft or **auto** to the place where it is finally delivered;

but **loading or unloading** does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or **auto**.

12. **Local c ing policy** means a primary policy effective on or after the inception of this policy which has been issued at our direction or coordinated by us specifically for this insurance program.

13. **Mobile equipment** means any of the following types of land vehicles, including any attached machinery or equipment:

    a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    b. Vehicles maintained for use solely on or next to premises you own or rent;

    c. Vehicles that travel on crawler treads;

    d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

        (1) Power cranes, shovels, loaders, diggers or drills; or

        (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

    e. Vehicles not described in a, b, c, or d, above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

        (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

        (2) Cherry pickers and similar devices used to raise or lower workers;

    f. Vehicles not described in a, b, c, or d, above maintained primarily for purposes other than the transportation of persons or cargo.

    However, self-propelled vehicles with the following types of permanently attached equipment are not **mobile equipment** but will be considered autos:

        (1) Equipment designed primarily for:

            (a) Snow removal;

            (b) Road maintenance, but not construction or resurfacing; or

            (c) Street cleaning;

        (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

        (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

14. **Occurrence** means  :ident, including continuous or repeated exposure to substantially the same general harmful conditions.

15. **Personal and advertising injury** means injury, including consequential **bodily injury**, arising out of one or more of the following offenses:

   a.  False arrest, detention or imprisonment;

   b.  Malicious prosecution;

   c.  The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   d.  Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   e.  Oral or written publication, in any manner, of material that violates a person's right of privacy;

   f.  The use of another's advertising idea in **your advertisement**; or

   g.  Infringing upon another's copyright, trade dress or slogan in **your advertisement**.

16. **Pollutants** mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

17. **Products-completed operations hazard:**

   a.  Includes all **bodily injury** and **property damage** occurring away from premises you own or rent and arising out of **your product** or **your work** except:

      (1)  Products that are still in your physical possession; or

      (2)  Work that has not yet been completed or abandoned. However, your work will be deemed completed at the earliest of the following times:

         (a)  When all of the work called for in your contract has been completed.

         (b)  When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

         (c)  When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

      Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

   b.  Do   )   :lude **bodily injury** or **property damage** arising out of:

      (1)  The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by **you**, and that condition was created by the **loading** or **unloading** of that vehicle by any insured;

      (2)  The existence of tools, uninstalled equipment or abandoned or unused materials; or

      (3)  Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

18. **Property damage** means:

   a.  Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

   b.  Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the **occurrence** that caused it.

   For the purposes of this insurance, electronic data is not tangible property.

   As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

19. **Suit** means a civil proceeding in which damages because of **bodily injury**, **property damage** or **personal and advertising injury** to which this insurance applies are alleged. **Suit** includes:

   a.  An arbitration proceeding in which such damages claimed and to which the insured must submit or does submit with **our** consent; or

   b.  Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with **our** consent.

20. **Temporary worker** means a person who is furnished to **you** to substitute for a permanent **employee** on leave or to meet seasonal or short-term workload conditions.

21. **Terrorism** means the unlawful use of violence against persons or property to further political objectives, and which is intended to intimidate or coerce a government, individuals or persons to modify their behavior or policies, or an act

App. 465

which is verified by the United States Department of State as an act of **terrorism**. Terrorism does not include:

   a.   Any act of violence directed at a specific individual or individuals which is motivated by personal reasons specific to the parties, i. e., robbery, crime of passion, murder; or

   b.   Any act of war or civil war.

22.  **Volunteer worker** means a person who is not your **employee**, and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

23.  **Your product:**

   a.  Means:

      (1)  Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

         (a)  You;

         (b)  Others trading under **your** name; or

         (c)  A person or organization whose business or assets **you** have acquired; and

      (2)  Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

   b.  Includes:

      (1)  Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **your product**, and

      (2)  The providing of or failure to provide warnings or instructions.

   c.  Does not include vending machines or other property rented to or located for the use of others but not sold.

24.  **Your work.**

   a.  Means:

      (1)  Work or operations performed by **you** or on **your** behalf; and

      (2)  Materials, parts or equipment furnished in connection with such work or operations.

   b.  Includes:

      (1)  Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

      (2)  The providing of or failure to provide warnings or instructions.

In witness, the Company has caused this Policy to be executed by its President and Secretary but this Policy shall not be valid unless countersigned on the Declarations Page by a duly authorized represen-tative of the Company.

*Elizabeth M. Tuck*

**Secretary**

**President**

ENDORSEMENT No. 5

**This endorsement, effective 12:01 AM:**   December 22, 2003

**Forms a part of Policy No.:** EX55100345

**Issued to:**   Interdigital Communications Corporation, Inc.

**By:**   The Insurance Company of the State of Pennsylvania

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### FOREIGN COMMERCIAL LIABILITY COVERAGE RECOGNITION

This endorsement modifies insurance provided under the following:

**FOREIGN COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**GLOBAL COMMERCIAL GENERAL LIABILITY COVERAGE PART**

Wherever the phrase, "Commercial General Liability Coverage Form", appears in this policy, it shall be read as, "Foreign Commercial General Liability Coverage Form".

All other terms, conditions, and exclusions shall remain the same.

_____
AUTHORIZED REPRESENTATIVE

80979 (10/02)

Page 1 of 1

App. 467

# EXHIBIT  L

# The Hoyle Law Firm

### HOYLE, FICKLER, HERSCHEL & MATHES LLP

One South Broad Street, Suite 1500
Philadelphia, PA 19107-3418

215-981-5700 Fax 215-981-5959
www.hoylelawfirm.com

**Arleigh P. Helfer III**
Direct Dial: (215) 981-5830
E-Mail: ahelfer@hoylelawfirm.com

January 4, 2008

**VIA HAND DELIVERY**

Anthony Miscioscia, Esquire
White and Williams
1800 One Liberty Place
Philadelphia, PA 19103-7395

> Re:   Hartford Fire Insurance Co., et al. v. InterDigital Communications
>        Corporation, et al., D. Del. Civil Action No. 06-422

Dear Tony:

    With reference to your belated request of December 26, 2007, for unredacted copies of InterDigital's Statement Pursuant to First Discovery Order, Nokia's Statement Pursuant to First Discovery Order, and Nokia's First Supplemental Objections and Responses to Interrogatories, we have been able to obtain copies of those documents from our client now that the holidays are over. Please find copies of the requested documents enclosed.

    I note that we have not produced Attachments C & D to Nokia's Statement. This is because Nokia designated those materials as confidential in the underlying litigation pursuant to a protective order in that case. InterDigital is bound by that protective order. As you know, Nokia is a party opponent in the underlying litigation, and we cannot waive Nokia's confidentiality designations. I am enclosing a copy of that protective order for your review.

Sincerely yours,

Arleigh P. Helfer III

Enclosures

received
1/4/08

App. 468